1  KARL J. KRAMER (CA SBN 136433)
   ROBERT L. McKAGUE (CA SBN 187461)
2  ERIKA L. LABIT (CA SBN 234919)
   MORRISON & FOERSTER LLP
3  755 Page Mill Road
   Palo Alto, California  94304-1018
4  Telephone: (650) 813-5600
   Facsimile: (650) 494-0792
5  kkramer@mofo.com

6  Attorneys for Defendant
   SYNAPTICS, INC.

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11

12
    ELANTECH DEVICES CORPORATION., a          Case No.    3:06-CV-01839 CRB
13  corporation existing under the laws of Taiwan,
    R.O.C.,                                    **APPENDIX OF AUTHORITIES
14                                             NOT CONTAINED IN WEST
                    Plaintiff,                 REPORTERS AND CITED IN
15                                             DEFENDANT SYNAPTICS'
          v.                                   MOTION TO DISMISS
16                                             COUNTERCLAIMS OF
    SYNAPTICS, INC., a Delaware corporation,   PLAINTIFF ELANTECH
17                                             DEVICES CORP.**
                    Defendant.
18                                             Date:  July 7, 2006
                                               Time:  10:00 a.m.
19                                             Courtroom 8, 19th Floor
                                               Hon. Charles R. Breyer
20

21

22

23

24

25

26

27

28

1   For the Court's convenience, attached to this Appendix are complete and accurate copies

2   of the following authorities cited in Defendant Synaptics, Inc.'s Motion to Dismiss Counterclaims

3   of Plaintiff Elantech Devices Corp. that are reported exclusively on computerized databases.

4

5   **AUTHORITIES**

6   <u>Tab</u>

7
8   *Big Bear Fireworks, Inc. v. Anco Mgmt. Servs.*,
        No. C-92-2336 SBA ENE, 1992 U.S. Dist. LEXIS 21918
9       (N.D. Cal. Oct. 23, 1992) ................................................................................................ 1

10  *Faruqui v. State of Cal.*,
        No. C 93-20297 RMW (EAI), 1994 U.S. Dist. LEXIS 8676
11      (N.D. Cal. May 24, 1994) ............................................................................................... 2

12  *Formula One Licensing v. Purple Interactive Ltd,*
        No. C 00-2222 MMC, 2001 U.S. Dist. LEXIS 2968
13      (N.D. Cal. Feb. 6, 2001) ................................................................................................. 3

14  *Google v. American Blind & Wallpaper Factory, Inc.,*
        Case No. C 03-05340 JF, 2005 U.S. Dist. LEXIS 6228
15      (N.D. Cal. Mar. 30, 2005) .............................................................................................. 4

16  *McGehee v. Coe Newnes/McGehee ULC*,
        No. C 03-5145 MJJ, 2004 U.S. Dist. LEXIS 22931
17      (N.D. Cal. Nov. 4, 2004) ................................................................................................ 5

18  *Polyclad Laminates, Inc. v. MacDermid, Inc.,*
        Civil No. 99-162-M, 1999 U.S. Dist. LEXIS 22563
19      (N.H. July 22, 1999) ....................................................................................................... 6

20
21  *Robinson v. State of California,*
        No. Civ. S-04-1888 GEB DAD PS, 2005 U.S. Dist. LEXIS 24692
22      (E.D. Cal. Oct. 21, 2005) ................................................................................................ 7

23  *Ross v. Slabach,*
        No. C 02-1349 SI, 2002 U.S. Dist. LEXIS 22908
24      (N.D. Cal. Nov. 26, 2002) .............................................................................................. 8

25
26  *Sharper Image Corp. v. Target Corp.,*
        No. C 04-0824 CW, 2006 U.S. Dist. LEXIS 24851
27      (N.D. Cal. Mar. 29, 2006) .............................................................................................. 9

28

App. of Auth. Not Contained in West Rep. and Cited in Synaptics' Mot. to Dismiss
Case No. 3:06-CV-01839 CRB

2

pa-1067421

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Smith & Hawken, Ltd. v. Gardendance, Inc.*
No. C 04-1664 SBA, 2004 U.S. Dist. LEXIS 22934
(N.D. Cal. Nov. 5, 2004) ........................................................................................................ 10

# EXHIBIT 1

1 of 1 DOCUMENT

**BIG BEAR FIREWORKS, INC., et al., Plaintiffs, v. ANCO MANAGEMENT SERVICES INC., et al., Defendants.**

No. C-92-2336 SBA ENE

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

*1992 U.S. Dist. LEXIS 21918*

October 22, 1992, Decided
October 23, 1992, Filed

LexisNexis(R) Headnotes

*Civil Procedure > Justiciability > Standing > General Overview*
[HN1] The Constitution prevents a federal court from considering a case where the plaintiff lacks standing. The complaint must establish the three elements of standing. First, the complaint must allege injury. Second, the injury must result from the defendant's misconduct. Third, a decision in the plaintiff's favor must redress the injury. A plaintiff must allege injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.

*Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > Coverage*
*Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > Sham Exception*
*Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > Sherman Act*
[HN2] The Noerr-Pennington doctrine recognizes that the antitrust laws cannot be applied to activities protected by the First Amendment. Petitioning a government agent, such as a Fire Marshal, is protected by the doctrine. The First Amendment does not, however, shield activities that fall within the sham exception to the Noerr-Pennington doctrine. The sham exception is derived from the language in Noerr where the Supreme Court acknowledged that the Sherman Act could apply to activities ostensibly directed toward influencing governmental action, which were really a mere sham to cover an attempt to interfere directly with the business relationships of a competitor. The sham exception has been narrowed, and cannot be applied where the party petitioning the government had a genuine interest in achieving the gov-

ernment action requested. The sham exception applies only if the sole purpose of the petitioning is to use government process to delay the competitor's entry into the market.

*Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > General Overview*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
[HN3] A motion for a more definite statement should not be granted unless a pleading is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading. Fed. R. Civ. P. 12(e). Rule 12(e) is consistent with Fed. R. Civ. P. 8(a)(2), which allows pleadings that contain merely a short and plain statement of the claim. The rules thus anticipate that the parties will familiarize themselves with the claims and ultimate facts through the discovery process. The rules do not, however, sanction pleadings that are simply legal conclusions cast in the form of factual allegations. For instance, a mere assertion that defendants have eliminated competition is insufficient without "some factual basis for such a charge." In addition, heightened specificity is required when the complaint alleges fraud, Fed. R. Civ. P. 9(b), or implicates the Noerr-Pennington doctrine.

*Antitrust & Trade Law > Private Actions > Standing > General Overview*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
[HN4] In an antitrust action, courts tend to be less rigorous in requiring specificity. The antitrust plaintiff is usually a bystander without access to evidence of the anti-

Case 5:06-cv-01839-PVT    Document 13-2    Filed 05/19/2006    Page 3 of 6

1992 U.S. Dist. LEXIS 21918, *                                    Page 2

competitive actions. Often only anticompetitive consequences, such as high market share, are observable without discovery. The courts follow a policy disfavoring the pre-trial dismissal of antitrust actions because the proof lies largely in the hands of the defendants. This admonition is most compelling when dismissal is sought prior to discovery. The admonition carries no weight, however, where specific allegations are within the plaintiff's knowledge.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > General Overview*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
[HN5] Under Fed. Rule Civ. P. 9(b), an allegation of fraud requires pleading with particularity.

*Antitrust & Trade Law > Monopolization > Attempts to Monopolize > Claims*
*Antitrust & Trade Law > Monopolization > Attempts to Monopolize > Sherman Act*
[HN6] A plaintiff must prove three elements in order to establish attempted monopolization. The elements are a specific intent to monopolize, an overt act and a dangerous probability of success.

**JUDGES:** [*1] ARMSTRONG

**OPINIONBY:** SAUNDRA BROWN ARMSTRONG

**OPINION:**

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY FOR MORE DEFINITE STATEMENT

This is an action brought by plaintiffs Big Bear Fireworks, Inc. ("Big Bear"), a California wholesaler of fireworks, and Diamond Sparkler Manufacturing, Inc. ("Diamond"), an Ohio manufacturer and wholesaler of fireworks. The action alleges that the defendants' activities in the California fireworks market violate provisions of both Federal and California antitrust laws.

The case is presently before the Court on the defendants' motion to dismiss for failure to state a claim or alternatively to provide a more definite statement pursuant to Federal Rules 12(b)(6) and 12(e) respectively. After having read the papers submitted and considered the arguments of the parties, and being fully informed, the Court finds that Diamond's suit should be dismissed for lack of standing, and that Big Bear's suit should be dismissed in part for failing to plead factual allegations of anticompetitive conduct.

### I. BACKGROUND

This action arises from the alleged anticompetitive conduct of the defendants in the California fireworks market. The plaintiffs [*2] assert that the defendants control 98 percent of the fireworks market in California. (Complaint P 33) They further assert that the defendants current and continuing market power is a direct result of anticompetitive acts which violate federal and state antitrust laws including the Sherman Act, *15 U.S.C. § § 1* and 2, the Clayton Act, *15 U.S.C. § § 14* and 18, and the Cartwright Act, *Cal. Bus. and Prof. Code § § 16700-16760, 17000-17010, 17200-17208.* The anticompetitive acts alleged are horizontal and vertical price fixing; group boycotts; tying arrangements; monopolization; attempted monopolization; product and customer territory fixing; and conspiracy.

### II. DISCUSSION

#### A. Standing

[HN1] The Constitution prevents a federal court from considering a case where the plaintiff lacks standing. The complaint must establish the three elements of standing. First, the complaint must allege injury. Second, the injury must result from the defendant's misconduct. Third, a decision in the plaintiff's favor must redress the injury. See *Allen v. Wright, 468 U.S. 737, 751, 82 L. Ed. 2d 556, 104 S. Ct. 3315 (1984)* (Plaintiff must [*3] allege injury "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.")

Defendants argue that all the claims should be dismissed because the plaintiffs pleadings prove that their injury was not caused by the defendants. The complaint states that fireworks may not be sold in California without the approval of the State Fire Marshal's Office ("Fire Marshal"). (Complaint P 19) The complaint also suggests that the plaintiffs' fireworks have not been approved by the Fire Marshal (Complaint P 37(i), 111(a)) If the Court accepts these two contentions then plaintiffs do not have standing. If plaintiffs were barred by the State from selling fireworks in California then defendants' conduct had no impact on plaintiffs' ability to sell fireworks.

With respect to plaintiff Big Bear, the argument is not persuasive. Big Bear states in the complaint that it "is in direct competition with Defendants . . . in the sale of Class C fireworks in the state of California to non-profit organization retailers for Fourth of July Celebrations and in the sale of additional goods and services necessary to sell said fireworks at retail." (Complaint P 8) [*4] Thus, the complaint does not support the view that the Fire Marshal barred Big Bear from the California market.

Case 5:06-cv-01839-PVT    Document 13-2    Filed 05/19/2006    Page 4 of 6

1992 U.S. Dist. LEXIS 21918, *                                    Page 3

Plaintiff Diamond, however, does not allege in either the Complaint or the Opposition to this motion that it competes with Defendants in California. Instead, Diamond's sole argument is that the prohibition by the Fire Marshal is the result of defendants' anticompetitive activities. Diamond alleges that defendants made "false and misleading statements to and used undue influence on the State of California Fire Marshal." Complaint P 111(a). Diamond further alleges that defendants influence on the Fire Marshal was "fraudulent" and "illegal." (Complaint P 37(i))

Defendants respond that petitioning the Fire Marshal cannot be considered an anticompetitive activity under the Noerr-Pennington doctrine. See *United Mine Workers v. Pennington, 381 U.S. 657, 14 L. Ed. 2d 626, 85 S. Ct. 1585 (1965); Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 5 L. Ed. 2d 464, 81 S. Ct. 523 (1961).* [HN2] This doctrine recognizes that the antitrust laws cannot be applied to activities protected by the First Amendment. Petitioning a government agent, such as the Fire Marshal, **[*5]** is protected by the doctrine. *California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 30 L. Ed. 2d 642, 92 S. Ct. 609 (1972)* (extending the doctrine to administrative agencies).

The First Amendment does not, however, shield activities that fall within the sham exception to the Noerr-Pennington doctrine. The sham exception is derived from the language in Noerr where the Supreme Court acknowledged that the Sherman Act could apply to activities "ostensibly directed toward influencing governmental action," which were really "a mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor." Noerr at 144.

In *City of Columbia v. Omni Outdoor Advertising, 499 U.S. 365, 111 S. Ct. 1344, 1354, 113 L. Ed. 2d 382 (1991)*, the Supreme Court narrowed the sham exception. As a result of that case, the sham exception cannot be applied where the party petitioning the government had a genuine interest in achieving the government action requested. Id. The sham exception applies only if the sole purpose of the petitioning is to use government process to delay the competitor's entry into the market. Id.

Here, the **[*6]** Court does not reach the question of whether the sham exception applies. The burden is on the plaintiff, to include in the complaint "specific allegations" demonstrating the inapplicability of the Noerr-Pennington protections. *Boone v. Redevelopment Agency of City of San Jose, 841 F.2d 886, 894 (9th Cir. 1988),* cert. denied, *488 U.S. 965, 102 L. Ed. 2d 526, 109 S. Ct. 489 (1988)*. This heightened pleading standard is necessary to avoid chilling legitimate lobbying activities. Id. The Ninth Circuit concluded in Boone that "although

we may be more generous in reviewing complaints in other contexts, our responsibilities under the first amendment . . . require us to demand that a plaintiff's allegations be made with specificity." Id.

The allegations rejected in Boone were considerably more specific then those at issue here. The plaintiff in Boone alleged secret meetings and agreements with city officials. The complaint also alleged payoffs, false reports and misrepresentations. Id. Diamond's allegations contain almost no specificity. The only detail is that the complaint identifies the office petitioned. Diamond's conclusory allegations **[*7]** are not sufficient to establish the sham exception.

Diamond attempts to avoid its burden by arguing that the Noerr-Pennington protections do not apply in the first instance when the petitioning is part of an "overall scheme" of anticompetitive acts. Diamond relies on *Clipper Exxpress v. Rocky Mountain Motor Tariff, 690 F.2d 1240 (1982)*. The Clipper case, however, only holds that the other anticompetitive acts alleged need not be dismissed merely because one element of the scheme is protected by Noerr-Pennington. Diamond should not ignore the Supreme Court's admonition that petitioning ". . . is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." *Pennington, 381 U.S. at 670.*

Diamond's failure to plead the sham exception with specificity leaves this Court no choice but to conclude that any representations the defendants' made to the Fire Marshal were exempt from the antitrust laws under the Noerr-Pennington doctrine. Because under the Noerr-Pennington doctrine the decision of the Fire Marshal cannot be fairly traced to the defendants, Diamond cannot **[*8]** fairly trace its injury to the plaintiffs. Thus, Diamond's does not have standing.

**B. The Rule 12(e) Motion Applied to Plaintiff Big Bear**

**1. Legal Standard**

[HN3] A motion for a more definite statement should not be granted unless a pleading is "so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." *Fed. R. Civ. P. 12(e)*. Rule 12(e) is consistent with Rule 8(a)(2) which allows pleadings that contain merely a "short and plain statement of the claim." The Rules thus anticipate that the parties will familiarize themselves with the claims and ultimate facts through the discovery process.

The Rules do not, however, sanction pleadings that are simply "legal conclusions . . . cast in the form of factual allegations." *Western Mining Council v. Watt, 643 F.2d 618, 624,* cert. denied, *454 U.S. 1031, 70 L. Ed. 2d 474, 102 S. Ct. 567 (1981)*. For instance, a mere assertion

Case 5:06-cv-01839-PVT    Document 13-2    Filed 05/19/2006    Page 5 of 6

1992 U.S. Dist. LEXIS 21918, *    Page 4

that defendants have eliminated competition is insufficient without "some factual basis for such a charge." *Hahn, 615 F.2d at 844.* In addition, heightened specificity is required when the complaint alleges fraud, [*9] Fed. R. Civ. P. 9(b), or implicates the Noerr-Pennington doctrine.

[HN4] In an antitrust action, courts tend to be less rigorous in requiring specificity. The antitrust plaintiff is usually a bystander without access to evidence of the anticompetitive actions. Often only anticompetitive consequences, such as high market share, are observable without discovery. The Ninth Circuit follows a "policy disfavoring the pre-trial dismissal of antitrust actions because the proof lies largely in the hands of the defendants." *Ernest W. Hahn v. Codding, 615 F.2d 830, 834 (9th Cir. 1980).* This admonition is most compelling when dismissal is sought prior to discovery. The admonition carries no weight, however, where specific allegations are within the plaintiff's knowledge. See generally, 2 Phillip Areeda & Donald Turner, Antitrust Law § 317 (1978).

### 2. Big Bear's Incorporated Allegations of Anticompetitive Conduct

Big Bear's complaint alleges eight claims for relief against the defendants for violations of the federal and California antitrust laws. The complaint makes several allegations that are incorporated into each of the eight claims. First, [*10] the claims incorporate detailed allegations regarding the general marketplace for fireworks, the relevant product and geographic markets, and defendants' competitive structure of the market, and defendants' market power. (Complaint PP 16-36) These allegations describe the observable consequences of market power that courts often allow as a substitute for factual allegations of wrongful acts, when such facts would not be available to the plaintiff before discovery. 2 Areeda & Turner at § 317. At oral argument, however, Big Bear's attorney conceded that Big Bear is capable of pleading specific factual allegations of wrongful acts. Thus, conclusory allegations are not appropriate.

Second, the claims incorporate allegations of unlawful acts. (Complaint PP 37(a)-(i)) The wrongful acts alleged include horizontal price fixing, Id. at P 37(a), vertical price fixing, Id. at P 37(b), group boycott, Id. at P 37(c), monopolization, Id. at P 37(f), attempted monopolization, Id. at P 37(f), division of territories, Id. at P 37(g), and division of customers, Id. at P 37(h). Each of these allegations is stated as a legal conclusion. While the plaintiffs enumerate an impressive list [*11] of legal theories upon which courts have upheld antitrust claims, these conclusory statements of law do not even minimally inform the defendants or the Court regarding the

factual basis for the charges. Thus, these allegations are deficient under Rule 12(e).

Two of the alleged wrongful acts, however, include factual allegations. First, Big Bear's assertion of conspiracy, Complaint P 37(i), contains some details. Specifically, Big Bear alleges that defendants have made fraudulent statements to both the Fire Marshal and buyers of wholesale fireworks. Id. As previously discussed, however, the complaint's allegations regarding the Fire Marshal do not meet the heightened specificity requirements of the Noerr-Pennington doctrine. The allegation of fraud on the buyers is similarly deficient. [HN5] Under *Fed. Rule Civ. P. 9(b)*, an allegation of fraud requires pleading with particularity. Plaintiffs have not met this requirement.

Big Bear's allegation asserting an illegal tying arrangement also goes beyond a restatement of antitrust law. (Complaint P 37(d)) The allegation includes both the tying product and the tied products. Defendants argue that these details are not enough to survive [*12] the Rule 12(e) motion. However, their reliance on *Roberts v. Elaine Powers Figure Salons, Inc., 708 F.2d 1476 (9th Cir. 1983),* is misplaced. Roberts applied a stricter standard because the motion was for summary judgment. The details alleged in this case are sufficient to place the tie-in beyond the minimal requirements of Rule 12(e). See *Datagate, Inc. v. Hewlett-Packard Co., 941 F.2d 864, 870 (1991).* Thus, the alleged anticompetitive tie-in will be incorporated into the claims.

### 3. Big Bear's Claims

Claims one (price fixing), two (group boycott), four (monopolization), and six (vertical non-price restraints) all suffer from the same defect. They consist of conclusory allegations without sufficient factual detail to survive defendants' Rule 12(e) motion.

The first claim, for price fixing, is a good example. The only factual details alleged are that the prices were fixed at meetings, and that the time period for the price fixing was 1988 to the present. (Complaint P 46) These broad allegations are insufficient to meet even the lenient Rule 12(e) standard. Thus, defendants' motion for a more definite statement [*13] is granted with respect to claims one, two, four, and six.

The third claim alleges an illegal tying arrangement under § 1 of the Sherman Act and § 3 of the Clayton Act. As previously discussed, the complaint describes the tying arrangement with sufficient specificity. Thus, defendants' motions regarding the third claim are denied.

The fifth claim alleges attempted monopolization under § § 1 and 2 of the Sherman Act. Traditionally, the Supreme Court requires [HN6] a plaintiff to prove three elements in order to establish attempted monopolization.

Case 5:06-cv-01839-PVT    Document 13-2    Filed 05/19/2006    Page 6 of 6

1992 U.S. Dist. LEXIS 21918, *                    Page 5

The elements are a specific intent to monopolize, an overt act and a dangerous probability of success. *Swift & Co. v. U.S., 196 U.S. 375, 396, 49 L. Ed. 518, 25 S. Ct. 276 (1905).*

Big Bear's allegation of an overt act is essentially set out as a legal conclusion as in the claims already dismissed. However, the claim also incorporates the factually sufficient allegation of a tying arrangement. Any act that leads to monopoly, including a tying arrangement, can be the overt act required for this claim. See *Datagate, 941 F.2d at 870* ("if effectively enforced, . . . a tie-in would likely have a significant impact on competition"). **[*14]** Thus, Big Bear's allegations are sufficiently specific to survive the Rule 12(e) motion. Defendants' motions regarding the fifth claim are denied.

The eighth claim alleges that the previously discussed behavior also violates various California statutes. At the September 22, 1992 hearing, counsel for the defendants indicated that the defendants' motion should only be considered if all of the federal law claims are dismissed. Because claims three and five have not been dismissed with respect to plaintiff Big Bear, the Court considers defendants' motions with respect to claim eight withdrawn.

## III. CONCLUSION

The Court having reviewed and considered all of the papers filed in connection with this motion, as well as the argument presented at the September 22, 1992 hearing, and for the reasons stated above,

IT IS HEREBY ORDERED THAT

(1) Diamond's claims are not justiciable because they do not fulfill the standing requirements. All of Diamond's claims are DISMISSED.

(2) Defendants' motion for a more definite statement is GRANTED with respect to claims one, two, four, six and seven.

(3) Defendants' motion to dismiss for failure to state a claim and for a more definite statement, **[*15]** are DENIED with respect to claims three, five, and eight.

(4) Plaintiffs are GRANTED leave to amend their complaint within 30 days from the date this ORDER is filed.

(5) A status conference shall take place on December 17, 1992, at 3:45 p.m. in Courtroom 14 of the above-captioned court. The parties shall file a status conference statement-- jointly if possible-- not less than ten days prior to the date of the status conference. Failure to do so may result in sanctions.

IT IS SO ORDERED.

DATED: October 22, 1992

SAUNDRA BROWN ARMSTRONG

United States District Judge

# EXHIBIT 2

LEXSEE

**AHMAD FARUQUI, Plaintiff, v. STATE OF CALIFORNIA, et al., Defendants.**

**C 93-20297 RMW (EAI)**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*1994 U.S. Dist. LEXIS 8676*

**May 23, 1994, Decided**
**May 24, 1994, Filed; May 31, 1994, Entered**

**JUDGES:** [*1] WHYTE

**OPINIONBY:** RONALD M. WHYTE

**OPINION:**

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE

The motion to dismiss of defendants California Unemployment Insurance Appeals Board ("Board") and Administrative Law Judge Tyler ("ALJ Tyler") was heard on May 20, 1994. The court has read the moving and responding papers and heard the oral argument on the motion. For the reasons discussed below, the court grants the defendants' motion and dismisses plaintiff's complaint.

**II. Background**

On November 5, 1993, plaintiff filed his first amended complaint against numerous defendants including Board and ALJ Tyler as well as the Governor and Attorney General of California, the Chief Justice of the California Supreme Court, two of plaintiff's former employers and officers and managers of those companies, the attorneys who successfully represented those employers in lawsuits brought by plaintiff, a utilities company, the trial and appellate court judges in Santa Clara County who had involvement with any one of plaintiff's many lawsuits, one of plaintiff's former attorneys, a court clerk, and a court reporter. The complaint alleges violations of plaintiff's civil rights and due process rights as well as violations [*2] of *18 U.S.C. § 1961* (RICO), conspiracy, mail fraud, wire fraud, securities fraud, and numerous other statutory and constitutional violations. The Board and ALJ Tyler move this court for dismissal pursuant to *Federal Rule of Civil Procedure 12(b)(6)* on the ground that the plaintiff has failed to alleged facts constituting a claim for relief and on the ground that

plaintiff's claims against the moving defendants are barred by the doctrine of judicial immunity. The Board and ALJ Tyler also move for dismissal on the ground of insufficient service of process pursuant to *Federal Rule of Civil Procedure 12(b)(4)*.

**III. Legal Standards**

In ruling on a motion to dismiss, district courts must accept all material allegations of fact alleged in the complaint as true, and resolve all doubts in favor of the plaintiff. *Blake v. Dierdorff, 856 F.2d 1365, 1368 (9th Cir. 1988)*. However, courts do not accept as true legal conclusions cast in the form of factual allegations if such conclusions cannot be reasonably drawn from the facts alleged. Similarly, the court need not accept unreasonable inferences or unwarranted deductions of [*3] fact. *Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981)*, cert. denied, *454 U.S. 1031, 70 L. Ed. 2d 474, 102 S. Ct. 567 (1981)*; *Dubbs v. C.I.A., 769 F. Supp. 1113, 1115 (N.D.Cal. 1990)*. The court may dismiss a complaint as a matter of law for either of two reasons: (1) lack of a cognizable legal theory, or (2) the pleading of insufficient facts under a cognizable legal theory. *Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533 (9th Cir. 1984)*.

Furthermore, under *Federal Rule of Civil Procedure 8(a)*, a claim for relief must provide fair notice both of the nature of the claim and the facts which underlie the claim. *Grid Systems Corp. v. Texas Instruments, Inc., 771 F. Supp. 1033, 1037 (N.D.Cal. 1991)*. Thus, conclusory allegations unsupported by any specific facts are not sufficient to defeat a motion to dismiss. Id. ; *McCarthy v. Mayo, 827 F.2d 1310, 1316 (9th Cir. 1987)*.

The Supreme Court has directed federal courts to read pro se papers liberally. [*4] *Hughes v. Rowe, 449 U.S. 5, 9, 66 L. Ed. 2d 163, 101 S. Ct. 173 (1980)*; *Haines v. Kerner, 404 U.S. 519, 520, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972)*. However, if it is clear that no relief

could be granted under any set of facts that could be proved consistent with the allegations, the court must dismiss the complaint. *Neitzke v. Williams, 490 U.S. 319, 327, 104 L. Ed. 2d 338, 109 S. Ct. 1827 (1987).* Thus, the court has the authority to dismiss claims against defendants who are immune from suit, claims of infringement of nonexistent rights, and claims describing "fantastic or delusional scenarios." Id.

This court reviewed the allegations of plaintiff's complaint with these standards in mind.

**IV. Discussion**

The First Amended Complaint begins with a series of vague, conclusory allegations apparently directed at all the defendants including that the defendants engaged in mail fraud, securities fraud, wire fraud, obstruction of justice, extortion and conspiracy. The complaint also alleges that the [*5] defendants (other than the state of California, Pete Wilson and Daniel Lundgren) have "operated as a corrupt organization in a racketeering fashion for these actions." Thereafter, section IV of the First Amended Complaint states that the "specific actions" taken by the defendants include: "Refusing to follow the law", "ignoring legal findings," "denying plaintiff's right to discovery", "showing bias in favor of members of the legal profession" and a number of other acts. First Amended Complaint at pp.2-3. These allegations not only fail to distinguish among the many defendants, but also fall far short of being "specific." Rather, these allegations, like those discussed above, are vague, general, and conclusory and contain no facts to support them. Therefore, these allegations fail to give the notice required by rule 8(a), fail to state a claim upon which relief can be granted, and, therefore, may be dismissed. *Corcoran v. Yorty, 347 F.2d 222, 223 (9th Cir. 1965)* (verbose, confused and redundant complaint properly dismissed), cert. denied, *382 U.S. 1002, 15 L. Ed. 2d 492, 86 S. Ct. 584 (1965).* [*6]

Section VII of the First Amended Complaint also alleges a number of actions taken by the Board and ALJ Tyler. (First Amended Complaint at pp. 12-13). Plaintiff alleges that ALJ Tyler (mistakenly referred to as Taylor) placed the burden of proof upon plaintiff at an administrative hearing regarding plaintiff's unemployment benefits. He alleges that ALJ Tyler ignored promises made to plaintiff, admitted hearsay evidence, became an advocate

for the employer, did not act impartially, obstructed justice, and participated in corrupt actions among other improprieties. Concerning the Board, plaintiff alleges that the Board did not allow plaintiff to produce new evidence and allowed the production of "surprise" evidence. Plaintiff further contends that ALJ Tyler and the Board violated sections of the California Unemployment Insurance Code.

These allegations albeit somewhat more specific than those discussed above, also fail to state a claim, because all of these allegations involve judicial acts for which there is absolute immunity. "Judges and those performing judge-like functions are absolutely immune from damage liability for acts performed in their official capacity." *Ashelman v. Pope, 793 F.2d 1072, 1075 (9th Cir. 1986)* [*7] (en banc). In *Butz v. Economou, 438 U.S. 478, 57 L. Ed. 2d 895, 98 S. Ct. 2894 (1978),* the Supreme Court extended the doctrine of judicial immunity to officers performing adjudicatory functions in federal administrative proceedings, including administrative law judges. See also, *Taylor v. Mitzel, 82 Cal.App.3d 665, 671, 147 Cal. Rptr. 323 (1978)* (noting extension of judicial immunity to those acting in a judicial capacity).

Moreover, the Board, as a state agency, is immune from suit under the Eleventh Amendment. *Austin v. State Industrial Insurance Program, 939 F.2d 676, 679 (9th Cir. 1991).*

This court generally allows plaintiffs to amend a defective complaint. However, in this case plaintiff has already amended his complaint once, and it appears clear to the court that plaintiff could not possibly cure the defects in his complaint by amendment. See e.g. *Perkins v. Silverstein, 939 F.2d 463, 472 (7th Cir. 1991)* (court need not allow futile amendment). This is especially true where the defendants are entitled to absolute [*8] immunity for all of the acts alleged.

**V. Order**

Good cause appearing therefor, defendants' motion to dismiss is granted with prejudice.

Dated: May 23, 1994

RONALD M. WHYTE

United States District Judge

# EXHIBIT 3

LEXSEE

**FORMULA ONE LICENSING, B.V., Plaintiff, v. PURPLE INTERACTIVE LTD., et al., Defendants; FORMULA1.COM LTD., et al., Counterclaim Plaintiffs v. FORMULA ONE LICENSING, B.V., et al., Counterclaim Defendants**

No. C 00-2222 MMC

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

*2001 U.S. Dist. LEXIS 2968*

February 6, 2001, Decided
February 6, 2001, Filed

**DISPOSITION:** [*1] Counter-defendants' motion to dismiss GRANTED and, with the exception of Count Nine of Formula1.com's FAAC, all counterclaims DISMISSED with leave to amend to cure the deficiencies noted.

**COUNSEL:** For FORMULA ONE LICENSING B.V., Plaintiff: David W. Slaby, McDermott Will & Emery, Menlo Park, CA.

For PURPLE INTERACTIVE LIMITED, FORMULA1.COM LTD, PURPLE TRAINING LTD, defendants: Victoria E. Brieant, Coudert Brothers, San Francisco, CA.

For PURPLE INTERACTIVE LIMITED, FORMULA1.COM LTD, PURPLE TRAINING LTD, BRUCE MCDIFFETT, FORMULA 1 INTERNET, defendants: Jeffrey G. Benz, Mark H. Wildasin, Coudert Brothers, San Francisco, CA.

For PURPLE INTERACTIVE LIMITED, FORMULA1.COM LTD, PURPLE TRAINING LTD, Counter-claimants: Victoria E. Brieant, Coudert Brothers, San Francisco, CA.

For PURPLE INTERACTIVE LIMITED, FORMULA1.COM LTD, PURPLE TRAINING LTD, BRUCE MCDIFFETT, FORMULA 1 INTERNET, Counter-claimants: Jeffrey G. Benz, Mark H. Wildasin, Coudert Brothers, San Francisco, CA.

For FORMULA ONE LICENSING B.V., Counter-defendant: David W. Slaby, McDermott Will & Emery, Menlo Park, CA.

**JUDGES:** MAXINE M. CHESNEY, United States District Judge.

**OPINIONBY:** MAXINE M. CHESNEY

**OPINION:**

**ORDER GRANTING** [*2] **COUNTER-DEFENDANTS' MOTION TO DISMISS; VACATING HEARING**

Before the Court is the motion of plaintiff/counter-defendant Formula One Licensing B.V. ("FOLBV") and counter-defendants Federation Internationale de L'Automobile ("FIA") and Formula One Management Limited ("FOM") (collectively "counter-defendants") to dismiss amended counterclaims pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure.* Defendants/Counterclaimants Formula1.com Ltd., Purple Training Ltd., Purple Interactive Ltd., Bruce McDiffett, First One Co., and Formula 1 Internet (collectively "counterclaimants") filed opposition, to which counter-defendants replied. The Court deems the matter appropriate for decision on the papers filed in support of and in opposition to the motion, VACATES the hearing scheduled for February 2, 2001, and rules as follows.

**BACKGROUND**

Plaintiff FOLBV, in its First Amended Complaint ("FAC"), alleges that it owns and maintains trademarks and trade names used in connection with the annual FIA Formula One World Championship motor sport race, including F1, F1 Formula 1 and Design, Formula One, Formula 1, and FIA Formula 1 World Championship and Design. FOLBV alleges that defendants [*3] Formula1.com Ltd. and Purple Training Ltd (collectively "Formula1.com"), n1 defendant Purple Interactive Ltd. ("Purple Interactive"), and defendants Bruce McDiffett,

Case 5:06-cv-01839-PVT    Document 13-4    Filed 05/19/2006    Page 3 of 6

2001 U.S. Dist. LEXIS 2968, *                                    Page 2

First One Co., and Formula 1 Internet (collectively "McDiffett"), n2 are infringing FOLBV's trademarks.

> n1 In its First Amended Answer and Counterclaims ("FAAC"), Formula1.com Ltd. and Purple Training Ltd. state that they are the same entity. "Purple Training Ltd. was the prior name of the entity currently known as Formula1.com Limited." (Formula1.com's FAAC at P 104.)

> n2 According to the FAC and McDiffett's First Amended Answer and Counterclaims ("FAAC"), McDiffett is an individual who does business as First One Co. and as Formula 1 Internet.

Formula1.com's FAAC pleads eight antitrust claims (Counts One through Eight), one trademark cancellation claim (Count Nine), n3 and two state law claims, respectively, unfair competition, *Cal. Bus. & Prof. Code § 17200*, (Count Ten) and tortious interference with existing and prospective economic advantage [*4] ("IPEA") (Count Eleven). Formula1.com alleges that it competes with counter-defendants in a market defined as "the market for sales of FIA Formula One Championship-related motor sport goods and services." (See Formula1.com's FAAC at P 121.) Formula1.com alleges that counter-defendants have engaged in the following allegedly anti-competitive activity: (1) filing an allegedly meritless proceeding under the Uniform Domain Name Dispute Resolution Policy ("UDRP") against McDiffett; n4 (2) filing a meritless complaint in this action; (3) publishing knowingly false statements in the marketplace accusing Formula1.com of trademark infringement; (4) refusing to supply photographs relating to the FIA Formula One World Championship to certain websites, including that owned by Formula1.com; (5) excluding Formula1.com from the market by refusing to deal with Formula1.com; and (6) instructing a Ferrari apparel licensee, TSS&P, not to supply Formula1.com with Ferrari merchandise.

> n3 Count Nine is not challenged by the instant motion.

> n4 UDRP proceedings are held before the World Intellectual Property Organization ("WIPO") Arbitration and Mediation Center. See *PACCAR, Inc. v. TeleScan Technologies, L.L.C., 115 F. Supp. 2d 772, 777 n.4 (E.D. Mich. 2000)*. "Operated by the World Intellectual Property Organization (WIPO), the WIPO Arbitration and Mediation Center mediates and arbitrates cases involving Internet domain name disputes." Id.

[*5]

Separate amended counterclaims have been filed by defendants Purple Interactive and McDiffett. Both of these counterclaimants plead a single IPEA claim, which claims are, in all respects, identical.

## DISCUSSION

### I. Antitrust Claims

#### A. Noerr-Pennington Doctrine

All eight antitrust claims brought by Formula1.com are based, in part, upon FOLBV's filing a complaint in the instant action. To the extent the counterclaims are based on FOLBV's Initiation of the instant action, counter-defendants contend they are immune from liability under the Noerr-Pennington doctrine. Under the Noerr-Pennington doctrine, "those who petition government for redress are generally immune from antitrust liability." See *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, 508 U.S. 49, 56, 123 L. Ed. 2d 611, 113 S. Ct. 1920 (1993); see also Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 5 L. Ed. 2d 464, 81 S. Ct. 523 (1961); United Mine Workers v. Pennington, 381 U.S. 657, 14 L. Ed. 2d 626, 85 S. Ct. 1585 (1965)*. The doctrine applies to "petitions to courts." See *Oregon Natural Resources Council v. Mohla, 944 F.2d 531, 533 (9th Cir. 1991)*. [*6]

Where an antitrust plaintiff challenges the filing of a complaint, "immunity from antitrust liability is lost only if a party engages in 'sham' petitioning." See *USS-Posco Industries v. Contra Costa County Building & Construction Trades Council, AFL-CIO, 31 F.3d 800, 810 (9th Cir. 1994)*. To state a claim based on the "sham exception," "the antitrust plaintiff must demonstrate that the lawsuit was (1) objectively baseless, and (2) a concealed attempt to interfere with the plaintiff's business relationships." See *Kottle v. Northwest Kidney Centers, 146 F.3d 1056, 1060 (9th Cir. 1998)*. Such allegations must be pleaded with specificity. See *Boone v. Redevelopment Agency, 841 F.2d 886, 894 (9th Cir. 1988); see, e.g., Oregon Natural Resources Councll, 944 F.2d at 535* (holding dismissal of antitrust claim based on filing lawsuit proper where plaintiff "failed to plead with particularity that [defendant's lawsuit] was a sham").

Counter-defendants are thus entitled to immunity from antitrust liability based on the filing of the instant action unless Formula1.com pleads with particularity facts to show that it can establish [*7] the "sham exception." See *Kottle, 146 F.3d at 1060, 1063*. The only allegation made by Formula1.com specific to such claim is the following: "FOLBV has instigated a meritless trademark infringement action against the defendants in this action alleging the infringement of unenforceable, ge-

Case 5:06-cv-01839-PVT    Document 13-4    Filed 05/19/2006    Page 4 of 6

2001 U.S. Dist. LEXIS 2968, *                                                    Page 3

neric marks." (See Formula1.com's FAAC at P 123.) Such allegation is insufficient to meet the heightened pleading requirement. Accordingly, to the extent Formula1.com's eight antitrust claims are based on FOLBV's filing of the instant complaint, such claims are DISMISSED with leave to amend to state with particularity facts necessary to plead the "sham exception" to the Noerr-Pennington doctrine.

## B. Monopolization Claims

Formula1.com alleges in the first six counts that counter-defendants are violating § 2 of the Sherman Act by engaging in monopolization and attempted monopolization. All such claims require Formula1.com to identify a relevant product market. "Without a definition of the market there is no way to measure [the defendant's] ability to lesson or destroy competition." *Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456, 122 L. Ed. 2d 247, 113 S. Ct. 884 (1993)* [*8] (citation omitted) (holding monopolization claims must be appraised in terms of alleged relevant market).

Counter-defendants contend Formula1.com's identification of a relevant product market is deficient in that, inter alia, Formula1.com has defined the product market in terms of trademarks. "Product markets are not defined in terms of one trademark or another; trademarks simply identify the origin of a product." *Generac Corp. v. Caterpillar, Inc., 172 F.3d 971, 977 (7th Cir. 1999);* see, e.g., *Weber v. National Football League, 112 F. Supp. 2d 667, 673-74 (N.D. Ohio 2000)* (holding seller of internet domain names misidentified relevant product market as market for two specific domain names in which defendants held trademarks; actual relevant product market was market for domain names generally). Here, by identifying the allegedly relevant product market as "the market for sales of FIA Formula One Championship-related motor sport goods and services," (see Formula1.com's FAAC at P 121), Formula1.com appears to have defined a product market in terms of one or more trademarks. Accordingly, these antitrust claims are DISMISSED with leave to amend [*9] to identify a product market not defined in terms of trademarks. n5

n5 Counter-defendants also argue that Formula1.com fails to sufficiently allege that counter-defendants have monopoly power in the relevant product market. As stated above monopoly power allegations must be appraised in light of the relevant product market. Given the Court's finding that Formula1.com has not sufficiently identified a relevant product market, the Court need not decide whether Formula1.com has adequately alleged monopoly power.

## C. Group Boycott Claims

Formula1.com alleges in Counts Seven and Eight that counter-defendants are violating § 1 of the Sherman Act by conspiring to engage in a group boycott to prevent Formula1.com from competing in the relevant product market. Count Seven is pleaded under a per se theory. Count Eight is pleaded under a rule of reason theory.

"Sherman Act § 1 prohibits agreements that unreasonably restrain trade." *Big Bear Lodging Assoc. v. Snow Summit, Inc., 182 F.3d 1096, 1101 (9th Cir. 1999).* [*10] "Certain kinds of agreements will so often prove so harmful to competition and so rarely prove justified that the antitrust laws do not require proof that an agreement of that kind is, in fact, anticompetitive in the particular circumstances. An agreement of such a kind is unlawful per se.'" Id. (quoting *NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 133, 142 L. Ed. 2d 510, 119 S. Ct. 493 (1998)).* n6 "Other alleged violations are subject to 'rule of reason' analysis to determine 'whether particular concerted conduct unreasonably restrains competition.'" Id. (quoting *Oltz v. St. Peter's Community Hosp., 861 F.2d 1440, 1445 (9th Cir. 1988)).*

n6 An antitrust plaintiff bringing a claim based upon a per se violation need not identify the relevant product market in which the parties compete. See *id. at 1445-50.*

Where, as here, a claim is based upon an alleged group boycott, a per se analysis is appropriate only if the boycott "involves horizontal agreements among direct competitors. [*11] " See *NYNEX Corp., 525 U.S. at 135;* see, e.g., *Fashion Originators' Guild of America, Inc. v. FTC, 312 U.S. 457, 85 L. Ed. 949, 61 S. Ct. 703 (1941)* (finding per se rule applicable to claim that clothing designers, manufacturers, and suppliers agreed not to sell their products to retailers who bought clothes from competing manufacturers and suppliers).

Counter-defendants argue that Count Seven is deficient because Formula1.com does not allege that FOLBV, FOM, and FIA are direct competitors. Formula1.com alleges that FIA controls "the television and other media rights relating to all FIA sanctioned events," (see Formula1.com's FAAC at P 100), that FOM's "principal business [] is promotion of the FIA Formula One Championship, including . . . marketing the broadcast rights to the Championship," (see id. at P 103), and that FOLBV "claims to own and maintain the 'Formula One family of trademarks and trade names' used in connection with the FIA Formula One World Championship." (See id. at P 106.) Such allegations cannot be reasonably

interpreted to state that FIA, FOM, and FOLBV are direct competitors. Further, to the extent Formula1.com argues [*12] that its group boycott conspiracy claim is premised upon an agreement between Ferrari apparel licensee TSS&P and FOM, no such agreement is pleaded in the counterclaim, nor is any allegation made that TSS&P is a direct competitor of FOM or any other counter-defendant. Accordingly, Count Seven is DISMISSED with leave to amend.

In Count Eight, Formula1.com seeks to plead a rule of reason claim. To state such a claim, Formula1.com must sufficiently identify the relevant product markets in which it and counter-defendants compete, and allege facts demonstrating that counter-defendants conduct has an anticompetitive effect on such markets. See *Big Bear Lodging, 182 F.3d at 1101-02, 1105* (holding plaintiff seeking to prove § 1 violation under rule of reason must identify relevant product markets). As stated above, Formula1.com has not sufficiently alleged a relevant product market. Accordingly, Count Eight is DISMISSED with leave to amend.

## II. State Claims

### A. Unfair Competition

In Count Ten of Formula1.com's FAAC, Formula1.com alleges that counter-defendants' actions constitute a violation of *California Business & Professions Code § 17200.* As pleaded, such [*13] claim is derivative of the antitrust claims. As stated above, however, the antitrust claims are deficiently pleaded. Where a plaintiff fails to state an antitrust claim, and where an unfair competition claim is based upon the same allegations, such state claims are properly dismissed. See *Kentmaster Mfg. Co. v. Jarvis Products Corp., 146 F.3d 691, 695 (9th Cir. 1998).* Accordingly, Formula1.com's unfair competition claim is DISMISSED with leave to amend.

### B. Interference With Prospective Economic Advantage

In Count Eleven, Formula1.com alleges an IPEA claim. In their separate FAACs, Purple Interactive and McDiffett each allege an IPEA claim as well. n7

n7 Although Purple Interactive and McDiffett plead no antitrust claims, their IPEA claims are based on much of the same behavior as alleged by Formula1.com, and, in particular, that counter-defendants Interfered by filing the instant action, by instituting an UDRP proceeding with the WIPO Arbitration and Mediation Center, and by falsely accusing counterclaimants of trademark infringement.

[*14]

To state an IPEA claim, a plaintiff must allege "conduct that [is] wrongful by some legal measure other than the fact of interference itself." See *id. at 695* (citation omitted). Although the California courts have not provided a definitive meaning of "wrongful" conduct, in *Bed, Bath & Beyond v. La Jolla Village Square Venture Partners, 52 Cal. App. 4th 867 (Cal. Ct. App. 1997),* the California Court of Appeal acknowledged that various courts have defined that phrase as follows: (1) conduct that is independently tortious or a restraint of trade; (2) conduct violating a statute, regulation, a recognized rule of common law, or an established standard of a trade or profession, or (3) conduct that is illegal, unfair, or immoral according to common understandings of society. See *id. at 882 n.10.*

Counter-defendants argue that the conduct alleged by counterclaimants is not "wrongful." Counter-defendants further argue that none of the IPEA claims identifies any particular relationship that has been disrupted by counter-defendants.

### 1. Wrongful Conduct

Counter-defendants argue and Formula1.com agrees that the wrongful conduct forming [*15] the basis for Formula1.com's IPEA claim is, in large part, the antitrust activity alleged earlier in the FAAC. Accordingly, each party adopts its arguments made in connection with Formula1.com's antitrust claims. As discussed above, Formula1.com has not sufficiently pleaded an antitrust claim. Consequently, Formula1.com's IPEA claim fails to the extent that claim is derivative of Formula1.com's antitrust claims. See *Kentmaster, 146 F.3d at 695.*

Formula1.com argues, as do Purple Interactive and McDiffett, that they have sufficiently identified "wrongful" conduct by alleging FOLBV's trademark infringement claims are baseless and without merit. Where a plaintiff seeks to base a claim of interference with prospective economic advantage upon the pursuit of litigation, the plaintiff "must allege that the litigation was brought without probable cause and that the litigation concluded in plaintiff's favor." See *Pacific Gas & Elec. Co. v. Bear Stearns, 50 Cal. 3d 1118, 1137, 270 Cal. Rptr. 1, 791 P.2d 587 (Cal. 1990).* Here, counterclaimants cannot allege the subject action concluded in their favor, as the litigation is on going. Accordingly, to the extent [*16] counterclaimants' IPEA claims are based upon the initiation of the Instant action by FOLBV, such claims are premature. n8

n8 Although counterclaimants have alleged that the UDRP proceeding concluded in McDiffett's favor, counterclaimants, for the reasons dis-

Case 5:06-cv-01839-PVT    Document 13-4    Filed 05/19/2006    Page 6 of 6

2001 U.S. Dist. LEXIS 2968, *                                    Page 5

cussed infra, have not sufficiently pleaded a claim based on FOLBV's initiation of that proceeding. For the same reasons, counterclaimants have not sufficiently pleaded an IPEA claim based on the allegation that counter-defendants made false accusations of trademark infringement.

## 2. Disruption of Relationship

The elements of the tort of interference with prospective economic advantage include "an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff," and "actual disruption of the relationship." See *Morton v. Rank America, Inc., 812 F. Supp. 1062, 1075 (C.D. Cal. 1993)* (quoting *Pacific Gas & Elec., 50 Cal. 3d at 1126 n.2)*. Here, counterclaimants [*17] allege in the most general terms that their relationships with "customers" have been disrupted. Counterclaimants fail to identify with any degree of particularity the relationships which form the basis of these claims or the manner in which counter-defendants' actions interfered therewith. As a result, counterclaimants have not provided suffi-

cient information to meet even the minimal pleading requirements under the Federal Rules. See Fed. R. Civ. P. (a); *Conley v. Gibson, 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)* (holding Rule 8(a) requires statement "that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests").

Accordingly, counterclaimants' IPEA claims are DISMISSED with leave to amend.

## CONCLUSION

For the reasons stated, counter-defendants' motion to dismiss is hereby GRANTED and, with the exception of Count Nine of Formula1.com's FAAC, all counterclaims are DISMISSED with leave to amend to cure the deficiencies noted. Any such amended counterclaims shall be filed no later than 30 days from the date of this order.

**IT IS SO ORDERED.**

Dated: FEB X 6 2001

    MAXINE M. CHESNEY

    United [*18] States District Judge

# EXHIBIT 4

LEXSEE

**GOOGLE INC., Plaintiff, v. AMERICAN BLIND & WALLPAPER FACTORY, INC., et al., Defendants. AMERICAN BLIND & WALLPAPER FACTORY, INC., Counterclaimant, v. GOOGLE INC., et al., Counter-Defendant/ Third-Party Defendants.**

**Case Number C 03-05340 JF, [Docket Nos. 36 and 37]**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

*2005 U.S. Dist. LEXIS 6228; 74 U.S.P.Q.2D (BNA) 1385*

**March 30, 2005, Decided**

**PRIOR HISTORY:** *Google Inc. v. Am. Blind & Wallpaper Factory, Inc., 2004 U.S. Dist. LEXIS 27601 (N.D. Cal., Apr. 8, 2004)*

**COUNSEL:** [*1]  For Google Inc., a Delaware corporation, Plaintiff: Michael H. Page, Mark A. Lemley, Ravind Singh Grewal, Keker & Van Nest, LLP, San Francisco, CA.

For American Blind & Wallpaper Factory, Inc., a Delaware corporation doing business as Decoratetoday.com, Inc., Defendant: David A. Rammelt, Dawn Beery, Susan Greenspon, Kelley Drye & Warren LLP, Chicago, IL; Robert Nathan Phillips, Howrey Simon Arnold & White, LLP, San Francisco, CA.

For Earthlink, Inc., Ask Jeeves, Inc., 3rd party defendants: Michael H. Page, Ravind Singh Grewal, Keker & Van Nest LLP, San Francisco, CA.

For Compuserve Interactive Services, Inc., Netscape Communications Corporation, America Online, Inc., 3rd party defendants: Stephen E. Taylor, Taylor & Company Law Offices, Inc., San Francisco, CA.

For American Blind & Wallpaper Factory, Inc., a Delaware corporation, Counter-claimant: Robert Nathan Phillips, Howrey Simon Arnold & White, LLP, San Francisco, CA.

For Google Inc., a Delaware corporation, Counter-defendant: Michael H. Page, Ravind Singh Grewal, Keker & Van Nest, San Francisco, CA.

**JUDGES:** JEREMY FOGEL, United States District Judge.

**OPINIONBY:** JEREMY FOGEL

**OPINION:**

ORDER GRANTING IN PART AND DENYING [*2]  IN PART COUNTER-DEFENDANT'S AND THIRD-PARTY DEFENDANTS' MOTIONS TO DISMISS

Counter-Defendant Google Inc. ("Google") and Third-Party Defendants Ask Jeeves, Inc. ("Ask Jeeves"), Earthlink, Inc. ("Earthlink"), America Online, Inc. ("AOL"), Netscape Communications Corporation ("Netscape"), and Compuserve Interactive Services, Inc. ("Compuserve") (collectively "Defendants") move to dismiss the counterclaims and third-party claims of Counterclaimant American Blind & Wallpaper Factory, Inc. ("American Blind") pursuant to *Federal Rule of Civil Procedure 12(b)(6)* for failure to state a claim upon which relief can be granted. n1 American Blind opposes the motions. The Court has read the moving and responding papers and has considered the oral arguments of counsel presented on September 17, 2004. For the reasons set forth below, the motions to dismiss will be granted in part and denied in part.

n1 Two separate motions to dismiss are before the Court: (1) a motion by Google, Ask Jeeves, and Earthlink to dismiss American Blind's counterclaims and third-party claims and (2) a motion by AOL, Netscape, and Compuserve to dismiss American Blind's third-party claims. AOL, Netscape, and Compuserve adopt and incorporate by reference the arguments set forth in the motion by Google, Ask Jeeves, and Earthlink.

Case 5:06-cv-01839-PVT     Document 13-5     Filed 05/19/2006     Page 3 of 13

2005 U.S. Dist. LEXIS 6228, *; 74 U.S.P.Q.2D (BNA) 1385

Page 2

[*3]

## I. BACKGROUND

Google filed the instant action for declaratory relief on November 26, 2003, seeking a judicial determination that its "Adwords" advertising program does not infringe American Blind's trademarks. On April 12, 2004, the Court denied American Blind's motion to dismiss the complaint or, in the alternative, to stay proceedings in the case. On May 4, 2004, American Blind answered Google's complaint and asserted counterclaims against Google and third-party claims against Ask Jeeves, Earthlink, AOL, Netscape, and Compuserve for trademark infringement and dilution, false representation, injury to business reputation, unfair competition, tortious interference with prospective business advantage, and, in the alternative, contributory trademark infringement and dilution. Now before the Court are Defendants' motions to dismiss American Blind's counterclaims and third-party claims. American Blind's allegations are as follows:

American Blind is a direct-to-consumer retailer of custom window treatments and wall coverings. It sells and promotes its home decorating products and related services across the United States through a Web site n2 and toll-free telephone numbers. A [*4] significant amount of American Blind's business is conducted through its Web site, which it has operated since 1997. n3 It estimates that its Web site receives more than 30,000 visits per day and processes more than 400,000 transactions per year. Since at least 1986, American Blind has used the names and marks "American Blind" and "American Blinds" in connection with its products and services. In addition, American Blind is the owner of and has exclusive rights to use the following trademarks, which are registered with the United States Patent and Trademark Office: "American Blind & Wallpaper Factory," "American Blind Factory," and "DecorateToday." n4 As a result of extensive advertising and promotion and annual revenues in excess of $ 100 million, American Blind alleges that its products and services sold under the American Blind Marks n5 have acquired a fine reputation and are famous among prospective purchasers of home decorating products and related services in the United States.

n2 American Blind owns over a dozen Internet domain names, including www.americanblind.com, www.americanblindandwallpaper.com, and www.americanblindandwallpaperfactory.com.

[*5]

n3 American Blind has spent over $ 10 million developing its Web site, spends over $ 1 million per year maintaining, enhancing, and updating its Web site, and employs over fifty full-time employees in connection with its Internet operations.

n4 The registration dates for these trademarks are December 17, 1996, November 3, 1987, and July 17, 2001, respectively.

n5 Hereinafter, the term "American Blind Marks" refers collectively to the names and marks "AMERICAN BLIND" and "AMERICAN BLINDS" and to American Blind's three registered trademarks.

Google operates an Internet search engine, which allows Internet users to locate Web sites that match the "keywords," or search terms, they enter. A search engine uses algorithms to process the keywords and produce a search-results page that displays links to the Web sites in the search engine's database that match the keywords. Links to the Web sites usually are displayed in order of decreasing relevance, with the most relevant Web sites listed first. Google's free search engine processes hundreds of millions of searches daily and covers billions [*6] of Web pages.

In addition, Google offers a keyword-triggered advertising program called "AdWords." AdWords enables advertisers to purchase or bid on certain keywords. Then, when an Internet user enters those keywords in Google's search engine, the program generates links, known as "Sponsored Links," to the advertisers' Web sites. Sponsored Links appear at the top and on the margins of Google's search-results pages. American Blind alleges that, in many instances, the search-results pages "are designed so that the Sponsored Link' display is inconspicuous or otherwise not apparent," and "it is not apparent who exactly sponsors' these links." Counterclaims P 39. Whenever an Internet user clicks on a Sponsored Link, the corresponding advertiser must pay Google. According to American Blind, Google has reported that ninety-six percent of its net revenues in the first quarter of 2004 were derived from advertising. Google also offers a feature called "AdWords Keyword Suggestions," which recommends additional keyword purchases to its advertising customers to "help you improve your ad relevance." *Id.* P 45 & Ex. B. The suggestions are organized into categories by Google and sometimes are [*7] referred to as "optimization campaigns."

Through AdWords, Google has sold to American Blind's competitors keywords comprised, in whole or part, of the American Blind Marks, including "American Blind," "American Blinds," and "Americanblinds.com,"

2005 U.S. Dist. LEXIS 6228, *; 74 U.S.P.Q.2D (BNA) 1385

Page 3

and these sales have continued over American Blind's objections. Thus, when an Internet user enters these keywords in Google's search engine, Sponsored Links to the competitors' Web sites appear on the search-results page. Moreover, through its AdWords Keyword Suggestions feature, Google actively and deliberately encourages American Blind's competitors to purchase as keywords both the American Blind Marks and "virtually every conceivable, though indistinguishable, iteration of those marks." *Id.* P 45. For example, an advertiser who is considering purchasing the keyword "American Blind" is encouraged also to purchase the keywords "american blinds," "american blinds and wallpaper," and "american blinds and wallpaper factory," among others. Google has labeled the optimization campaign containing these suggestions as the "American Blind optimization campaign."

American Blind alleges that the intended result of AdWords is to divert consumers [*8] who wish to find American Blind's products and services to search-results pages that list the Web sites of American Blind's competitors. That is, Google sells and its advertisers purchase the possibility of intercepting American Blind's potential customers, who may click on the links to the Web sites of American Blind's competitors without realizing that they are being directed to a competitor's Web site or who may eventually recognize the diversion but either fail to search for or be forced to spend time and energy searching for American Blind's Web site. Google has the technological capacity to block the purchase of keywords and in fact, for over four years, operated under a policy pursuant to which it would exercise its discretion to block the purchase of certain keywords once it was advised that a company had purchased as a keyword another company's trademark. n6 Google changed its policy sometime after January 27, 2004, when American Blind filed a lawsuit against Google in the United States District Court for the Southern District of New York. According to American Blind, Google's new policy is not to disable Sponsored Links when advertisers have purchased keyword triggers that [*9] are trademarked terms.

> n6 American Blind alleges that Google falsely represented at one point that it was blocking competitors from purchasing American Blind's registered trademarks as keywords.

Ask Jeeves, Earthlink, AOL, Netscape, and Compuserve (collectively "the non-Google Defendants") operate Web sites that include an Internet search engine. They pay Google to access its Web-searching platform and thus display "similar, if not virtually the same, results of search queries as those displayed by Google." *Id.* P 68.

They also profit each time an Internet user clicks on "any of the links provided by these search results." n7 *Id.*

> n7 Although the meaning of this statement is not entirely clear, it reasonably may be inferred from the broader context of the counterclaims, including the specific allegations against Google, that American Blind alleges that the non-Google Defendants profit when Internet users click on the Sponsored Links or their equivalent and not when they click on literally "any of the links" displayed on a given search-results page.

[*10]

Although American Blind has not given Defendants permission or a license to use the American Blind Marks for the promotion or sale of the products and services of its competitors, it alleges that Defendants are capitalizing illegally on the American Blind Marks by permitting and encouraging American Blind's competitors to purchase keywords n8 that cause links to the competitors' Web sites to be listed "in a position above or next to" the link to American Blind's Web site when Internet users enter search terms "identical or substantially similar to the American Blind Marks." *Id.* P 71. American Blind further alleges that "confusion" regarding sponsorship, authorization, and/or source of the links n9 and "diversion" of Internet users to the Web sites of American Blind's competitors are the "intended result[s]" of Defendants' manner of listing search results. *Id.* P 73. Internet users' ability to distinguish between Sponsored Links and links to American Blind's Web site allegedly is compromised not only by Defendants' use of the label "Sponsored Links," n10 without explanation that the Sponsored Links actually are paid advertisements unaffiliated with American Blind, but also [*11] by Defendants' failure to display Sponsored Links in a different color, typeface, or font size from that used to display other links. Defendants and their advertisers -- rather than American Blind -- are said to be profiting from their use of the American Blind Marks, while American Blind suffers harm to its sales, reputation, customer relationships, and marks.

> n8 Although American Blind levels this particular allegation against all Defendants, its *specific* factual allegations regarding the sale of and profit from the American Blind Marks as keywords are much more detailed with respect to Google than they are with respect to the non-Google Defendants.

> n9 American Blind elaborates that "Defendants' search engines are deceptive and mislead

Case 5:06-cv-01839-PVT    Document 13-5    Filed 05/19/2006    Page 5 of 13

2005 U.S. Dist. LEXIS 6228, *; 74 U.S.P.Q.2D (BNA) 1385

Page 4

consumers into believing falsely that the website links to which they are directed via manipulated search results' links are sponsored or authorized by and/or originating from American Blind" and that the "manipulated search results' engineered by the Defendants fail to inform the consumers that the companies listed therein may have no relationship with -- and, indeed, may directly compete with American Blind -- the trademark owner for which the user was searching." *Id.* PP 75-76.

**[*12]**

n10 Although Defendants explain that some of them use a different term to label their keyword-triggered advertisements, the Court will use the term "Sponsored Links" to refer to all such links displayed by all Defendants.

## II. LEGAL STANDARD

A complaint may be dismissed for failure to state a claim upon which relief can be granted for one of two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal theory. *See Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-34 (9th Cir. 1984).* For purposes of a motion to dismiss, all allegations of material fact in the complaint are taken as true and construed in the light most favorable to the nonmoving party. *Clegg v. Cult Awareness Network, 18 F.3d 752, 754 (9th Cir. 1994).* Although the Court generally may not consider any material beyond the pleadings when ruling on a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6), Cooper v. Pickett, 137 F.3d 616, 622 (9th Cir. 1997),* **[* 13]** it may consider documents that are attached to and part of the complaint, *Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir. 1987).* A complaint should not be dismissed "unless it appears beyond doubt the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Clegg, 18 F.3d at 754.* However, the Court "is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Id. at 754-55.* Motions to dismiss generally are viewed with disfavor under this liberal standard and are granted rarely. *See Gilligan v. Jamco Dev. Corp., 108 F.3d 246, 249 (9th Cir. 1997).*

## III. DISCUSSION

### A. Trademark Infringement, Dilution, False Representation, Unfair Competition, and Injury to Business Reputation

Defendants move to dismiss American Blind's claims of trademark infringement, n11 false representation, n12 and dilution n13 under the *Lanham Act*, dilution and injury to business reputation n14 and unfair competition n15 under the California Business and Professions Code, and trademark **[*14]** infringement and unfair competition under California common law on the ground that American Blind has not alleged actionable trademark "use." *See 15 U.S.C. § 1114(1)(a)* (proscribing particular "use in commerce" of registered mark); *15 U.S.C. § 1125(a)(1)* (proscribing particular "use[] in commerce" of false designation of origin, false or misleading description of fact, or false or misleading representation of fact); *15 U.S.C. § 1125(c)* (proscribing particular "commercial use in commerce" of famous mark); *Playboy Enters., Inc. v. Netscape Communications Corp., 354 F.3d 1020, 1024 n.10 (9th Cir. 2004)* (declining to examine California trademark claims separately because they are "substantially congruent'" to trademark claims under the Lanham Act); *Brookfield Communications, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1047 n.8 (9th Cir. 1999)* (observing that analysis under *sections 32 and 43(a)* of the Lanham Act oftentimes is identical, even though the latter provision protects against a wider range of practices than the former); *Sunset House Distrib. Corp. v. Coffee Dan's, Inc., 240 Cal. App. 2d 748, 50 Cal. Rptr. 49, 52 (Ct. App. 1966)* **[*15]** (requiring, among other things, allegation of defendant's "use of a confusingly similar tradename" to state claim for trade name unfair competition under California law).

n11 *Section 32(1) of the Lanham Act* creates civil liability for "[a]ny person who shall, without the consent of the registrant . . ., use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." *15 U.S.C. § 1114(1)(a).* American Blind alleges that "the unauthorized and willful use of copies, variations, reproductions, simulations or colorable imitations of [its] registered marks in connection with the sale of keyword advertising" constitutes such trademark infringement. Counterclaims P 91.

n12 *Section 43(a) of the Lanham Act* creates civil liability for "[a]ny person who, on or in connection with any goods or services, . . . uses in commerce . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact" that "is likely to cause confusion, or to cause mistake, or to de-

Case 5:06-cv-01839-PVT    Document 13-5    Filed 05/19/2006    Page 6 of 13

Page 5

2005 U.S. Dist. LEXIS 6228, *; 74 U.S.P.Q.2D (BNA) 1385

ceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1). American Blind alleges that "the use of copies, variations, reproductions, simulations or colorable imitations of the American Blind Marks on and in connection with keyword advertising" constitutes a false designation of origin and false description and representation. Counterclaims P 96. Specifically, Defendants' use is alleged to "convey[] the misleading commercial impression to the public that the advertisers other than American Blind listed in the Defendants' manipulated search results' pages, or their products, are approved by, sponsored by or are [sic] somehow affiliated or connected with American Blind." Id. P 95.

[*16]

n13 Section 43(c) of the Lanham Act provides civil remedies for a "person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c). American Blind alleges that Defendants' use of "copies, variations, reproductions, simulations or colorable imitations of the American Blind Marks in connection with the advertising, offering for sale and sale of Defendants' keyword advertising services" constitutes dilution. Counterclaims P 100. Specifically, Defendants' use is alleged to have lessened the capacity of the American Blind Marks to distinguish American Blind's products and services from those of others and to have diluted the distinctive quality of the American Blind Marks.

n14 Section 14330 of the California Business and Professions Code provides a civil remedy for "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, . . . notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." Cal. Bus. & Prof. Code § 14330. American Blind alleges that Defendants' "unauthorized use . . . of copies, variations, reproductions, simulations or colorable imitations of . . . the American Blind Marks in connection with the advertising, offering for sale and sale of Defendants' keyword advertising services" constitutes dilution and injury

to American Blind's business reputation. Counterclaims P 105.

[*17]

n15 Section 17200 of the California Business and Professions Code prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." Cal. Bus. & Prof. Code § 17200. American Blind alleges that Defendants' "unauthorized use . . . of copies, variations, reproductions, simulations or colorable imitations of . . . the American Blind Marks in connection with the advertising, offering for sale and sale of Defendants' keyword advertising services" constitutes unfair competition. Counterclaims P 110. Specifically, Defendants' use is alleged to be "misleading in a material respect" and to "dilute or tarnish American Blind's business reputation and/or the effectiveness of the . . . American Blind Marks." Id. PP 110-11.

In support of their argument that American Blind has not alleged -- and cannot allege -- that they have used the American Blind Marks in a manner that is [*18] cognizable under the trademark laws, Defendants cite a number of authorities from other circuits that either state or can be read to suggest that a defendant is not engaged in the requisite "use" of a trademark or other mark unless the defendant uses the mark to identify the source of its own goods or services. Among them are (1) Interactive Products Corp. v. a2z Mobile Office Solutions, Inc., in which the United States Court of Appeals for the Sixth Circuit identified as a "preliminary question" in a trademark case "whether defendants are using the challenged mark in a way that identifies the source of their goods" and held that if the defendants are using the trademark only "in a non-trademark' way -- that is, in a way that does not identify the source of a product -- then trademark infringement and false designation of origin laws do not apply," n16 Interactive Prods.Corp. v. a2z Mobile Office Solutions, Inc., 326 F.3d 687, 695 (6th Cir. 2003) (emphasis added); (2) U-Haul International, Inc. v. WhenU.com, Inc., in which the United States District Court for the Eastern District of Virginia found that there was no trademark "use" under the Lanham [*19] Act, because, among other things, there was no evidence that the defendant "use[d] [the plaintiff's] trademarks to identify the source of its goods or services," U-Haul Int'l, Inc. v. WhenU.com, Inc., 279 F. Supp. 2d 723, 728 (E.D. Va. 2003) (emphasis added); and (3) Wells Fargo & Co. v.

Case 5:06-cv-01839-PVT    Document 13-5    Filed 05/19/2006    Page 7 of 13

2005 U.S. Dist. LEXIS 6228, *; 74 U.S.P.Q.2D (BNA) 1385

Page 6

*WhenU.com, Inc.*, in which the United States District Court for the Eastern District of Michigan held that "[t]here can be no liability under the Lanham Act absent the use of a trademark in a way that identifies the products and services being advertised *by the defendant," Wells Fargo & Co. v. WhenU.com, Inc., 293 F. Supp. 2d 734, 757 (E.D. Mich. 2003)* (emphasis added). n17 Relying on these authorities, n18 Defendants argue that American Blind's claims that are premised on trademark "use" must be dismissed, because American Blind does not -- and cannot -- allege that Defendants use the American Blind Marks to identify the source of *their own* search engines or advertising products.

n16 Although *Interactive Products* involved a question as to whether the defendant's use of the plaintiff's trademark in the post-domain path of one of the defendant's Web pages signified the source of either the Web page or the product offered for sale therein, the court ultimately decided the case on the basis of lack of evidence of likelihood of confusion rather than on the basis of trademark "use." *See Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc., 326 F.3d 687, 698 (6th Cir. 2003).*

[*20]

n17 Both *U-Haul and Wells Fargo*, as well as a third case, *1-800 Contacts, Inc. v. WhenU.com, 309 F. Supp. 2d 467 (S.D.N.Y. 2003)*, involved trademark disputes arising from the pop-up advertisements generated by WhenU.com's computer software program, "SaveNow." SaveNow contained a "directory of commonly used search phrases, commonly visited web addresses, and various keyword algorithms," and it functioned by scanning an Internet user's activity to "determine whether any of the terms, web addresses, or content match[ed] the information in the directory." *U-Haul, 279 F. Supp. 2d at 725-26.* When it found a match, SaveNow "identifie[d] an associated product or service category" and then, if appropriate, displayed a pop-up advertisement on the user's computer screen. *Id. at 726.* The particular advertisement that was displayed was selected at random from the advertisements that matched the "category of the user's activity." *Id.* WhenU.com ("WhenU") sold "advertising space and opportunities" to merchants but did not sell "individual web addresses" or "guarantee to any advertiser that its ad [would] be shown when a consumer visit[ed] a particular website." *Id.* The plaintiffs

in *U-Haul, Wells Fargo*, and *1-800 Contacts* brought claims for trademark violations under the Lanham Act, among other things, based on SaveNow's display of competitors' pop-up advertisements when Internet users searched for the plaintiffs' Web sites.

The *U-Haul* court granted summary judgment in favor of WhenU as to the trademark claims, finding that WhenU's pop-up advertisements did not constitute "use in commerce" of the plaintiff's trademarks. *See id. at 727.* It reasoned that WhenU's incorporation of the plaintiff's trademarks into the SaveNow directory did not constitute trademark "use" under the Lanham Act, because, among other things, there was no evidence that WhenU "use[d] [the plaintiff's] trademarks to identify the source of its goods or services," and WhenU "merely use[d] the marks for the pure machine-linking function' and in no way advertise[d] or promote[d]" the plaintiff's trademarks. *Id. at 728.* Similarly, the *Wells Fargo* court denied the plaintiffs' motion for a preliminary injunction, in part based on its conclusion that WhenU did not "use" the plaintiffs' marks in commerce. *See Wells Fargo, 293 F. Supp. 2d at 757.* It found that the inclusion of the plaintiffs' marks in the SaveNow directory did not constitute trademark "use," because WhenU did not "use any of the plaintiffs' trademarks to indicate anything about the source of the products and services it advertise[d]." *Id. at 762.* In contrast, the *1-800 Contacts* court, in ruling on the plaintiff's motion for a preliminary injunction, concluded that WhenU had used the plaintiff's mark. *See 1-800 Contacts, 309 F. Supp. 2d at 489.* Among other things, it found that inclusion of a version of the plaintiff's mark in the SaveNow directory was a "use" of the mark "to advertise and publicize companies that are in direct competition with Plaintiff." *Id.* The *1-800 Contacts* court disposed of the contrary findings on "use" in *U-Haul* and *Wells Fargo* in a brief footnote, stating simply that it disagreed with and was not bound by those decisions. *See id. at 490 n.43.*

[*21]

n18 In addition to urging the Court to adopt the reasoning of the aforementioned cases, Defendants also make more general arguments for dismissal drawn from the source-identifying function of trademarks, *see 15 U.S.C. § 1127* (defining the term "trademark" to include "any word, name, symbol, or device, or any combina-

Case 5:06-cv-01839-PVT    Document 13-5    Filed 05/19/2006    Page 8 of 13

Page 7

2005 U.S. Dist. LEXIS 6228, *; 74 U.S.P.Q.2D (BNA) 1385

tion thereof" that is used by a person "to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods"); *New Kids on the Block v. News Am. Publ'g, Inc., 971 F.2d 302, 308 (9th Cir. 1992)* (stating that the "purpose of a trademark" is a "source-identification function"), and the policies behind the trademark laws, *see Prestonettes, Inc. v. Coty, 264 U.S. 359, 368, 68 L. Ed. 731, 44 S. Ct. 350, 1924 Dec. Comm'r Pat. 508 (1924)* (holding that a trademark "only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his"). More recent decisions from the United States Supreme Court and the United States Court of Appeals for the Ninth Circuit provide a fuller explanation of the policies and objectives of the trademark laws. *See, e.g., Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 163-64, 131 L. Ed. 2d 248, 115 S. Ct. 1300 (1995)* (stating that the "basic objectives" of trademark law are, "by preventing others from copying a source-identifying mark, [to] reduce[] the customer's costs of shopping and making purchasing decisions,' for it quickly and easily assures a potential customer that *this* item -- the item with this mark -- is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past. . . . [and to] help[] assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product") (internal citation omitted); *Intel Corp. v. Terabyte Int'l, Inc., 6 F.3d 614, 618 (9th Cir. 1993)* (stating that "[t]rademark policies are designed (1) to protect consumers from being misled as to the enterprise, or enterprises, from which the goods or services emanate or with which they are associated; (2) to prevent an impairment of the value of the enterprise which owns the trademark; and (3) to achieve these ends in a manner consistent with the objectives of free competition") (internal quotation marks omitted).

[*22]

The Court has given careful consideration to the arguments and authorities presented by Defendants, as well as to their attempts to analogize this case to non-Internet situations in which they assert that there would be no question as to the absence of any viable trademark claims. n19 However, in light of the uncertain state of the law, the Court does not find Defendants' arguments sufficient to warrant dismissal of American Blind's counterclaims and third-party claims at the pleading stage. In particular, given the most relevant Ninth Circuit decision

-- *Playboy Enterprises, Inc. v. Netscape Communications Corp., 354 F.3d 1020 (9th Cir. 2004)* -- it does not appear "beyond doubt" that American Blind "can prove no set of facts in support of [its] claim[s] that would entitle [it] to relief," *Clegg, 18 F.3d at 754.*

n19 Defendants analogize the instant case to Ford's payment to have *Car and Driver* magazine run Ford advertisements facing every Toyota advertisement in order to target Toyota's customers or a pizzeria owner's handing flyers to customers on their way to Domino's. While it is of no consequence to the outcome of the instant motions, the Court notes that, as alleged by American Blind, Defendants themselves would not be the analogs to Ford and the pizzeria owner, because they are not alleged to be the advertisers.

[*23]

In *Playboy*, the Ninth Circuit reversed a summary judgment in favor of two companies that operate Internet search engines, Netscape and Excite, Inc., finding that genuine issues of material fact precluded summary judgment on the plaintiff's claims of trademark infringement and dilution. *See Playboy, 354 F.3d at 1022.* The case involved a practice called "keying," whereby advertisers could target Internet users with particular interests by linking their advertisements to certain search terms that were grouped into lists by the defendants. *See id. at 1022-23.* When a user entered one or more of those terms into the search engines, advertisements that were "keyed" to the terms would appear as "banner ads" running along the top or side of the search-results page. *Id. at 1023.* The defendants were paid a fee by the advertisers for the "keying" service. *Id.* The list containing terms related to sex and adult-oriented entertainment, to which the defendants required adult-oriented companies to link their advertisements, contained two of the plaintiff's trademarks: "playboy" and "playmate." *Id.* The adult-oriented banner ads often were [*24] graphic in nature, were confusingly labeled or not labeled at all, and contained buttons reading "click here" that, when clicked, made the search-results page disappear and opened the advertiser's Web site. *Id.*

In concluding that a genuine issue of material fact precluded summary judgment as to the claim of trademark infringement, the *Playboy* court focused on the element of likelihood of confusion. n20 *See id. at 1024-29.* It found adequate evidence of initial interest confusion n21 in the appearance of unlabeled banner ads -- many of which took users to the advertisers' Web sites when they accepted the invitation to "click here" -- immediately after users entered the plaintiff's trademarks as

Case 5:06-cv-01839-PVT    Document 13-5    Filed 05/19/2006    Page 9 of 13

Page 8

2005 U.S. Dist. LEXIS 6228, *; 74 U.S.P.Q.2D (BNA) 1385

search terms in the defendants' search engines. *See id. at 1025-26.* The court further concluded that the defendants' alleged "use" of the plaintiff's trademarks -- a "misappropriat[ion]" of the goodwill of the plaintiff's marks by defendants "in conjunction with advertisers," whereby Internet users were led to the Web sites of the plaintiff's competitors -- was "actionable." *Id.* Accordingly, the court allowed the case to proceed under theories of [*25] direct and contributory liability, because the defendants were "potentially liable" under one theory or the other. n22 *Id. at 1024* (observing that the question of "[w]hether the defendants are directly or merely contributorily liable proves to be a tricky question").

> N20 Likelihood of confusion is the " core element of trademark infringement.'" *Id. at 1024* (quoting *Brookfield Communications, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1053 (9th Cir. 1999)).*

> n21 The term "initial interest confusion" describes a situation in which, although the consumer does not experience confusion as to the source of goods or services, the defendant, by diverting or capturing the consumer's initial attention, improperly benefits from the goodwill that the plaintiff developed in its mark. *Brookfield Communications, 174 F.3d at 1062-63; see also Playboy, 354 F.3d at 1025* (discussing *Brookfield Communications* and reaffirming that initial interest confusion -- "customer confusion that creates initial interest in a competitor's product . . . [a]lthough dispelled before an actual sale occurs" -- is actionable trademark infringement). The existence of initial interest confusion does not depend on whether a sale is completed as a result of the confusion. *Brookfield Communications, 174 F.3d at 1062.* In *Brookfield Communications,* the Ninth Circuit, reviewing the district court's denial of the plaintiff's motion for a preliminary injunction, concluded that the defendant's use of its competitor's trademark in the metatags of its Web site was likely to cause initial interest confusion. *See id. at 1066.* Metatags are "HTML code not visible to Web users but used by search engines in determining which sites correspond to the keywords entered by a Web user." *Id. at 1061 n.23.*

[*26]

> n22 The *Playboy* court also concluded that genuine issues of material fact precluded summary judgment as to the claim of dilution. *See id.*

*at 1031.* As relevant to the instant case, the court rejected the defendants' argument that dilution could not be found because they did not "label their own goods with [the plaintiff's] marks," observing that, "[a]ccording to [the plaintiff's] evidence, in the minds of consumers, defendants implicitly label the goods of [the plaintiff's] competitors with its marks." *Id. at 1033.*

Defendants attempt to distinguish *Playboy* on two grounds, neither of which is persuasive for present purposes. First, they argue that, because the "issue raised by the instant motion -- whether the use of a trademark as a keyword to trigger advertising can be actionable under trademark law -- was not before the *Playboy* court," Mot. by Google, Ask Jeeves, & Earthlink to Dismiss Countercls. & Third-Party Claims at 6 n.8, the case is inapposite. Defendants are correct that the *Playboy* court did not undertake a separate discussion of the element of trademark [*27] "use" and that the court observed that there was "[n]o dispute" as to whether the defendants had "used the marks in commerce." *Playboy, 354 F.3d at 1024.* However, it is not at all clear that the court's ultimate conclusion that the defendants' alleged "use" of the plaintiff's trademarks was "actionable," *id. at 1026,* was not based on an implicit, preliminary determination of actionable trademark "use" in the sense discussed by Defendants. If the use were not actionable in the latter sense, it is unclear why the court would have undertaken a lengthy and, by Defendants' apparent reading of the case, wholly unnecessary likelihood-of-confusion analysis. n23 Moreover, the possibility of such an implicit determination does not appear to have been precluded by the court's observation that there was "[n]o dispute" as to whether the defendants had "used the marks in commerce," as the accompanying footnote suggests that the observation concerned only the jurisdictional requirement of use *"in commerce"* and not the separate requirement of trademark "use." *Id. at 1024* (emphasis added); *see id. at 1024 n.11* ("Federal jurisdiction [*28] over trademark cases rests on the *Commerce Clause,* sweeps as broadly as possible, and clearly encompasses the circumstances of this case.").

> n23 Indeed, Defendants themselves, in the midst of presenting arguments to distinguish *Playboy,* appear inadvertently to acknowledge this point: "Instead of addressing trademark use, the *Playboy* case involved a classic analysis of likelihood of confusion -- an issue that need only be addressed if, in fact, there is a trademark use." Reply by Google, Ask Jeeves, & Earthlink at 7.

Case 5:06-cv-01839-PVT    Document 13-5    Filed 05/19/2006    Page 10 of 13

2005 U.S. Dist. LEXIS 6228, *; 74 U.S.P.Q.2D (BNA) 1385    Page 9

Second, Defendants attempt to distinguish *Playboy* on the ground that its holding was limited to facts not present in the instant case. The *Playboy* court noted that, "if a banner advertisement clearly identified its source or, even better, overtly compared [the plaintiff's] products to the sponsor's own, no confusion would occur under [the plaintiff's] theory." *Id.* at *1025 n.16.* Elsewhere, the court reiterated that it was "not addressing a situation in which a banner [*29] advertisement clearly identifies its source with its sponsor's name, or in which a search engine clearly identifies a banner advertisement's source," noting that those clear identifications "might eliminate the likelihood of initial interest confusion," and it emphasized that it was "evaluating a situation in which defendants display competitors' unlabeled banner advertisements, with no label or overt comparison to [the plaintiff], after Internet users type in [the plaintiff's] trademarks." *Id.* at *1030* & n.43. Defendants assert that, unlike the banner ads in *Playboy*, the Sponsored Links clearly identify the sources of the advertisements and thus cannot result in confusion. However, the distinctions Defendants attempt to draw between *Playboy* and the instant case in order to justify dismissal would require the Court to make factual findings and draw legal conclusions, particularly with regard to likelihood of confusion, that are inappropriate when it is ruling on a motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)* ("*Rule 12(b)(6)*"). In light of the very liberal standard applicable to *Rule 12(b)(6)* motions, [*30] the Ninth Circuit's expansive holding in *Playboy*, n24 and the obvious commercial importance of this case to the parties and others similarly situated, the Court concludes that resolution of the novel legal questions presented by this case should await the development of a full factual record.

n24 Defendants call the Court's attention to Judge Berzon's concurrence in *Playboy*, which suggests that the majority opinion is "fully consistent with the applicable precedents" but "express[es] concern" that one of those precedents -- *Brookfield Communications* -- was "wrongly decided" and may need to be reconsidered. *Id.* at *1034.* Noting the analytical similarity between keyword advertisements and the metatags found to be infringing in *Brookfield Communications*, Judge Berzon disagrees with any application of *Brookfield Communications* that might suggest that there could be a Lanham Act violation even if banner advertisements were "clearly labeled, either by the advertiser or by the search engine." *Id.* She opines that it is not reasonable "to find initial interest confusion when a consumer is never confused as to source or affiliation, but instead knows, or should know, from the outset that a product or web link is not related to that of the trademark holder because the list produced by the search engine so informs him." *Id.* at *1034-35.* Her reasoning is based non-Internet examples where "distracting a potential customer with another *choice*, when it is clear that it is a choice," clearly does not constitute trademark infringement. *Id.* at *1035.* The examples include a department store's displaying its own brand of clothing more prominently than a designer brand that customers may be seeking and a bookstore owner's accepting money from one adult magazine to display that magazine in front of another such magazine. *See id.* Although Judge Berzon's concurrence raises interesting questions for another day, it does not alter the result the Court must reach in ruling on the instant motions to dismiss.

[*31]

Accordingly, Defendants' motions to dismiss American Blind's claims of trademark infringement, false representation, and dilution under the Lanham Act, dilution and injury to business reputation and unfair competition under the California Business and Professions Code, and trademark infringement and unfair competition under California common law are DENIED. n25 In so ruling, the Court emphasizes that it expresses no opinion as to whether Defendants ultimately will prevail in trying to prove that they are not liable to American Blind on these claims. This Order should be understood only as allowing American Blind's counterclaims and third-party claims to proceed beyond the motion-to-dismiss stage, which will enable the Court to consider both the relevant facts and the applicable law in the context of a fuller record. n26

n25 AOL, Netscape, and Compuserve appear to advance an independent ground for dismissal of the third-party claims asserted against them. They argue that American Blind's allegation that they are using Google's Web-searching platform but not that they are "engaging in the other business practices alleged against Google . . . [or] any other independent wrongdoing" does not "provide a sufficient basis to state a claim against [them]." Mot. by AOL, Netscape, & Compuserve to Dismiss Third-Party Claims at 1. Their briefs, however, devote virtually no space to this assertion. The Court declines to dismiss the third-party claims on a basis that has not been briefed adequately.

[*32]

Case 5:06-cv-01839-PVT    Document 13-5    Filed 05/19/2006    Page 11 of 13

Page 10

2005 U.S. Dist. LEXIS 6228, *; 74 U.S.P.Q.2D (BNA) 1385

n26 Although the Court does not rely upon it -- and thus need not discuss Defendants' attempt to distinguish it -- the Court notes that its approach is consistent with the approach taken by the United States District Court for the Eastern District of Virginia in *Government Employees Insurance Co. v. Google, Inc., 330 F. Supp. 2d 700 (E.D. Va. 2004)* (hereinafter *"GEICO"*), a case very similar to this one in which the plaintiff sued Google and Overture Services, Inc., both search engine operators, for trademark infringement, false representation, dilution, and unfair competition, among other things, based on allegations that the defendants are selling its trademarks as keywords that trigger Sponsored Links. *See GEICO, 330 F. Supp. 2d at 701-02.* The defendants in *GEICO* appear to have made the same arguments regarding failure to allege actionable trademark "use" as Defendants make in the instant case, and the *GEICO* court appears to have considered many of the same authorities considered by this Court. *See id. at 702-03.* The *GEICO* court found sufficient allegations of trademark "use" and denied the defendants' motion to dismiss the corresponding claims. *See id. at 703-04* (observing that a "fair reading of the complaint reveals that plaintiff alleges that defendants have unlawfully used its trademarks by allowing advertisers to bid on the trademarks and pay defendants to be linked to the trademarks"). In so ruling, the court explained that the fact-specific issues of whether the defendants are making fair use of the plaintiff's trademarks and whether there is a likelihood of confusion are not properly resolved through a motion to dismiss. *See id. at 704.* Approximately four months later, on December 15, 2004, the *GEICO* court entered an oral ruling granting Google's motion for judgment as a matter of law, finding that the plaintiff had not established that "the mere use of its trademark by Google as a search word or keyword or even using it in their AdWord program standing alone violates the Lanham Act because . . . there's no evidence that that activity *standing alone* causes confusion." Statement of Recent Decision by Google, Ask Jeeves, and Earthlink (Dec. 21, 2004), Ex. A at 16 (emphasis added). Portions of the case still remain pending, and the court has yet to issue a written decision regarding its oral ruling.

[*33]

## B. Contributory Trademark Infringement and Contributory Dilution

Defendants move to dismiss American Blind's alternative claims of contributory trademark infringement n27 and contributory dilution n28 under the Lanham Act. As above, Defendants' arguments are based on a claimed absence of allegations of the requisite "use" of the American Blind Marks -- in this context, by Defendants' advertisers. n29 Defendants reason that, because their advertisers are alleged to use the American Blind Marks only as a trigger for the display of their advertisements and not as an identification of the source of their products, they do not engage in trademark "use" of the American Blind Marks, and therefore, with no direct violation of the trademark laws, Defendants cannot be contributorily liable. However, in light of the foregoing discussion, the Court concludes that American Blind's failure to allege that Defendants' advertisers have used the American Blind Marks to identify the source of their own products is not fatal to American Blind's claims at this stage of the case.

n27 "Contributory infringement occurs when the defendant either intentionally induces a third party to infringe the plaintiff's mark or supplies a product to a third party with actual or constructive knowledge that the product is being used to infringe the service mark." *Lockheed Martin Corp. v. Network Solutions, Inc., 194 F.3d 980, 983 (9th Cir. 1999).* American Blind alleges, in the alternative, that "Defendants' acts, namely the inducement of American Blinds' [sic] competitors to purchase the American Blind Marks as keywords and the refusal to block or otherwise disable American Blind's competitors' advertisements that result from searches for the American Blind Marks (despite Defendants' knowledge that such advertisements infringe the American Blind Marks)" constitute contributory trademark infringement. Counterclaims P 129.

[*34]

n28 American Blind alleges, in the alternative, that "Defendants' acts, namely the inducement of American Blinds' [sic] competitors to purchase the American Blind Marks as keywords and the refusal to block or otherwise disable American Blind's competitors' advertisements that result from searches for the American Blind Marks (despite Defendants' knowledge that such advertisements were being used to dilute the

2005 U.S. Dist. LEXIS 6228, *; 74 U.S.P.Q.2D (BNA) 1385

Page 11

American Blind Marks)" constitute contributory trademark dilution. Counterclaims P 135. The Ninth Circuit has observed that, "[a]lthough courts have discussed contributory dilution, no appellate court or statute has yet established the cause of action," and that, where it has been recognized, it has been defined as "encouraging others to dilute." *Lockheed Martin, 194 F.3d at 986.* In light of its disposition of Defendants' motions and in the absence of any contrary authority, the Court declines to reach the issue at this time.

n29 The Court does not address Defendants' argument that American Blind also has failed to allege that Defendants have done anything "that would qualify as contributory liability," as the argument was raised for the first time in their reply brief. Reply by Google, Ask Jeeves, & Earthlink at 13.

[*35]

This result finds support in *Brookfield Communications*, where the Ninth Circuit concluded that the defendant's use of its competitor's trademark in the metatags of its Web site was likely to cause initial interest confusion. *See Brookfield Communications, 174 F.3d at 1066.* As in *Playboy*, the court's analysis of likelihood of confusion seems to have presumed a preliminary, if implicit, determination of actionable trademark "use" in the sense discussed by Defendants. *See supra* note 23 and accompanying text. The purchase of trademarks as keywords for a Web site and the insertion of trademarks as metatags in the code of a Web site, both of which are employed as means of having links to that Web site appear on a search-results page, are sufficiently analogous that it cannot be said that American Blind has failed to allege actionable trademark "use" by Defendants' advertisers. In sum, given the current state of the governing law, American Blind has made sufficient allegations of direct infringement and dilution by Defendants' advertisers and contributory liability on the part of Defendants such that it does not appear "beyond doubt" that American Blind "can [*36] prove no set of facts in support of [its] claim[s] that would entitle [it] to relief." *Clegg, 18 F.3d at 754.* Accordingly, Defendants' motions to dismiss American Blind's alternative claims of contributory trademark infringement and contributory dilution are DENIED. n30

n30 As above, the Court emphasizes that it expresses no opinion as to whether Defendants ultimately will prevail on these alternative claims.

## C. Tortious Interference with Prospective Business Advantage

Defendants move to dismiss American Blind's state law claim of tortious interference with prospective business advantage. n31 The elements of tortious interference with prospective business advantage are as follows: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff, (2) the defendant's knowledge of the relationship, (3) intentional acts on the part of the defendant designed to disrupt the relationship, which acts are wrongful [*37] by some legal measure other than the fact of interference itself, n32 (4) actual disruption of the relationship, and (5) economic harm to the plaintiff proximately caused by the defendant's acts. *Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 131 Cal. Rptr. 2d 29, 63 P.3d 937, 950-51 (Cal. 2003).* Defendants argue that American Blind fails to allege an independently wrongful act, as required by the third element, or probability of future economic benefit from existing economic relationships, as required by the first element.

n31 American Blind alleges that (1) "[m]any" of its customers are "repeat customers" and "regularly" purchase products from its Web site, (2) it is probable that "such customers and others" will "continue to seek to visit" the Web site and purchase products and services "in the future," (3) Defendants were aware of American Blind's "reasonable expectation of future transactions" with its "returning customers," as well as with customers who "may be attracted" to its goods and services because of its goodwill, advertising, and promotion, (4) "[a]bsent Defendants' intentional and improper interference through their deceptive and manipulated search engine results,' it is reasonably certain that American Blind would realize additional sales from existing customers and/or new customers," (5) Defendants "intentionally and improperly interfered with American Blind's future and prospective sales," and (6) American Blind has suffered and will continue to suffer irreparable injury as a result of Defendants' actions. Counterclaims PP 120-24.

[*38]

n32 An act is independently wrongful if it is "unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or

Case 5:06-cv-01839-PVT     Document 13-5     Filed 05/19/2006     Page 13 of 13

Page 12

2005 U.S. Dist. LEXIS 6228, *; 74 U.S.P.Q.2D (BNA) 1385

other determinable legal standard." *Korea Supply Co., 63 P.3d at 954.*

Defendants' first asserted ground for dismissal of this claim fails, because it rests solely on their argument that American Blind has not alleged actionable trademark "use," an argument that the Court already has rejected. As American Blind's claims of trademark violations, unfair competition, false representation, and injury to business reputation will proceed past the motion-to-dismiss stage, so too can those claims serve, for present purposes, as allegations that satisfy the pleading requirements for the third element of tortious interference with prospective business advantage.

However, the Court agrees with Defendants that American Blind's allegations with respect to the first element of the claim are insufficient. The tort of interference with prospective business advantage applies to "interference with *existing* noncontractual relations which hold the [*39] promise of future economic advantage. In other words, it protects the expectation that the relationship eventually will yield the desired benefit, not necessarily the more speculative expectation that a potentially beneficial relationship will eventually arise." *Westside Ctr. Assocs. v. Safeway Stores 23, Inc., 42 Cal. App. 4th 507, 49 Cal. Rptr. 2d 793, 804, 806 (Ct. App. 1996)* (holding that, "[w]ithout an existing relationship with an identifiable buyer, [the plaintiff's] expectation of a future sale was at most a hope for an economic relationship and a desire for future benefit'"); *see also Roth v. Rhodes, 25 Cal. App. 4th 530, 30 Cal. Rptr. 2d 706, 715 (Ct. App. 1994)* (holding that, in doctor's lawsuit based on defendants' refusal to lease offices to him, doctor failed to allege requisite "existing relationship," because future patients were merely "speculative"). Allegations that amount to a mere "hope for an economic relationship and a desire for future benefit" are inadequate to satisfy the pleading requirements of the first element of the tort. *Blank v. Kirwan, 39 Cal. 3d 311, 216 Cal. Rptr. 718, 703 P.2d 58, 70 (Cal. 1985).*

Even though American Blind has alleged relationships with "repeat customers" [*40] who "probabl[y]" will "continue to seek to visit" its Web site and purchase

its goods and services, Counterclaims P 120, American Blind's alleged expectation of "future and prospective sales" to these customers, *id. P 123,* with which Defendants are alleged to have interfered, is too speculative to support this claim. It does not rise to the level of the requisite "*promise* of future economic advantage," *Westside Ctr. Assocs., 49 Cal. Rptr. 2d at 804* (emphasis added), instead expressing merely a "hope . . . and a desire" for unspecified future sales to unspecified returning customers, *Blank, 703 P.2d at 70,* in the form of a legal conclusion. Moreover, it goes without saying that American Blind's even more speculative allegations regarding "new" customers with whom it cannot claim any past or present interactions, however insubstantial, also are inadequate to support this claim. American Blind has failed to point to any case law suggesting that its allegations regarding the probability of future economic benefit from its existing economic relationships with third parties are sufficient. Accordingly, Defendants' motions to dismiss [*41] American Blind's claim of tortious interference with prospective business advantage are GRANTED. n33

n33 Because the Court has granted Defendants' motions to dismiss on this ground, it need not address their argument that the claim is barred by section 230 of the Communications Decency Act.

## IV. ORDER

Good cause therefore appearing, IT IS HEREBY ORDERED that the motions to dismiss by Counter-Defendant Google and Third-Party Defendants Ask Jeeves, Earthlink, AOL, Netscape, and Compuserve are (1) GRANTED as to American Blind's claim of tortious interference with prospective business advantage and (2) DENIED as to American Blind's other claims.

DATED: March 30, 2005

JEREMY FOGEL

United States District Judge

# EXHIBIT 5

LEXSEE 2004 U.S. DIST LEXIS 22931

**RONALD W. McGEHEE, and McGEHEE DEVELOPMENT, LLC, Plaintiffs, v. COE NEWNES/McGEHEE ULC, THE COE MANUFACTURING COMPANY, and BRIAN ESHER, Defendants.**

No. C 03-5145 MJJ

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2004 U.S. Dist. LEXIS 22931*

November 4, 2004, Decided

**DISPOSITION:** [*1] Defendants' Motions to Dismiss granted in part and denied in part.

**COUNSEL:** For Ronald W. McGehee, an individual, McGehee Development Company, LLC, a California limited liability company, Plaintiffs: Howard A. Slavitt, Coblentz Patch Duffy & Bass LLP, San Francisco, CA; Frederick S. Fields, Coblentz Patch Duffy & Bass, LLP, San Francisco, CA; J. Timothy Nardell, Coblentz, Patch, Duffy & Bass LLP, San Francisco, CA.

For Cae McGehee, Inc., a California corporation, Coe Newness/McGehee ULC, a Canadian unlimited liability company, Defendants: W. Chelsea Chen, Steptoe & Johnson LLP, Washington, DC; Douglas E. Dexter, Farella Braun & Martel LLP, San Francisco, CA; J. William Koegel, Jr., Steptoe & Johnson LLP, Washington, DC; Robert H. Sloss, Farella Braun & Martel LLP, San Francisco, CA.

For Brian Esher, The Coe Manufacturing Company, Defendants: Robert H. Sloss, Farella Braun & Martel [*2] LLP, San Francisco, CA.

For Coe Newness/McGehee ULC, a Canadian unlimited liability company, Counter-claimant: Robert H. Sloss, Farella Braun & Martel LLP, San Francisco, CA.

For Patrick M. Doyle, McGehee Development Company, LLC, Counter-defendants: Howard A. Slavitt, Coblentz Patch Duffy & Bass LLP, San Francisco, CA.

For Ronald W. McGehee, Patrick M. Doyle, McGehee Development Company, LLC, Counter-defendants: Howard A. Slavitt, Coblentz Patch Duffy & Bass LLP, San Francisco, CA.

**JUDGES:** MARTIN J. JENKINS, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** MARTIN J. JENKINS

**OPINION:**

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' 12(b)(6) MOTION TO DISMISS; DENYING DEFENDANT ESHER'S 12(b)(2) MOTION TO DISMISS**

**INTRODUCTION**

Before the Court is a motion to dismiss pursuant to *Federal Rules of Civil Procedure 12(b)(6)* filed by Coe Newnes/McGahee ULC ("Coe Newnes"), the Coe Manufacturing Company, and Brian Esher ("Defendants"). Defendants seek to dismiss two causes of action from the First Amended Complaint ("Amended Complaint"): 1) breach of fiduciary duty; and 2) intentional interference with prospective economic advantage. Additionally, Defendant Esher moves [*3] to dismiss the Third, Fourth, and Fifth causes of action against him on the ground that the Court lacks personal jurisdiction over him under *Federal Rule of Civil Procedure 12(b)(2)*. For the following reasons, the Court **DENIES** Defendants' *12(b)(6)* Motion to Dismiss the breach of fiduciary duty claim with respect to Coe Newnes, and **GRANTS** the motion with leave to amend with respect to Coe Manufacturing and Esher. The Court **GRANTS** Defendants' *12(b)(6)* Motion to Dismiss the intentional interference with prospective economic advantage claim with leave to amend. The Court **DENIES** Esher's *12(b)(2)* Motion to Dismiss.

**FACTUAL BACKGROUND**

On June 29, 2001, Ronald McGehee and McGehee Development Company LLC ("Plaintiffs") entered into a written agreement ("the Agreement") with CAE McGa-

Case 5:06-cv-01839-PVT    Document 13-6    Filed 05/19/2006    Page 3 of 8

2004 U.S. Dist. LEXIS 22931, *    Page 2

hee, Inc. n1 Pursuant to the Agreement, Plaintiffs provided Coe Newnes with product designs for Forest Industry Products and Equipment ("New Products"). Plaintiff Ronald McGahee was to personally perform the services for McGahee Co., except where the nature of the services to be performed did not require his knowledge or expertise. Plaintiffs agreed to assign all of their rights and [*4] interests in the intellectual property and patents arising from their work to Coe Newnes. In return, Coe Newnes agreed to compensate McGehee in two ways: 1) it was required to pay McGahee $ 375,000 per annum; and (b) it was required to pay McGahee a royalty based on the net sales of the New Products.

n1 Defendant Coe Newnes assumed all of CAE McGahee's rights and obligations under the Agreement as part of a corporate acquisition in 2002. That entity will be referred to as Coe Newnes.

Pursuant to the Agreement, Plaintiffs allege they conceived of and designed the "McGahee Optimizing Planer," which optimizes the planing of rough-cut lumber into finished lumber. Plaintiffs allege that Defendant Brian Esher informed them to discontinue developing the planer because Coe Newnes's sister company, Coe Manufacturing, was already in the process of developing a similar product. Plaintiffs allege that contrary to Esher's representation, Coe Manufacturing had not designed or undertaken any development work on a product similar [*5] to Plaintiffs' planar. Plaintiffs assert that all of their inquiries to Defendants regarding the decision to cancel development of the planar were ignored. On or about May 20, 2003, Defendant Esher wrote to McGahee and gave notice of Coe Newnes' termination of the Agreement with Plaintiffs.

Plaintiffs commenced this action in state court on October 26, 2003, by filing a complaint requesting declaratory relief and asking the court to adjudicate the rights and obligations of Plaintiffs and Coe Newnes under the Agreement. Defendants subsequently removed the case to federal court. On September 8, 2004, Plaintiffs amended their Complaint to add four new claims: 1) breach of contract; 2) breach of fiduciary duty; 3) tortious interference with contract; and 4) tortious interference with prospective economic advantage. Plaintiffs also added two new Defendants, Coe Manufacturing and Brian Esher.

## LEGAL STANDARD

A *Rule 12(b)(6)* motion to dismiss tests the legal sufficiency of the claims asserted in the complaint. *See Cahill v. Liberty Mutual Ins. Co., 80 F.3d 336, 337 (9th*

*Cir. 1996).* Dismissal of an action pursuant to *Rule 12(b)(6)* is appropriate only where it "appears [*6] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Levine v. Diamanthuset, Inc., 950 F.2d 1478, 1482 (9th Cir. 1991)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-6, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957))*. In reviewing such a motion, the Court must assume all factual allegations to be true and must construe them in the light most favorable to the nonmoving party. *See North Star v. Arizona Corp. Comm., 720 F.2d 578, 580 (9th Cir. 1983).* The Court will dismiss the complaint or any claim in it without leave to amend only if "it is absolutely clear that the deficiencies of the complaint could not be cured by amendment." *Noll v. Carlson, 809 F.2d 1446, 1448 (9th Cir. 1987).*

In the context of a motion to dismiss, review is limited to the contents of the complaint. *Allarcom Pay Television, Ltd. v. General Instrument Corp., 69 F.3d 381, 385 (9th Cir. 1995).* However, matters properly presented to the court, such as those attached to the complaint and incorporated within its allegations, may be considered as part of the motion to dismiss. *See Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989).* [*7]

*Rule 12(b)(2)* of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a complaint for lack of personal jurisdiction. The plaintiff has the burden of proving that the Court has personal jurisdiction over the defendant. *American Telephone & Telegraph Co. v. Compagnie Bruxelles Lambert, 94 F.3d 586, 588 (9th Cir. 1996).* If the Court rules without holding an evidentiary hearing, dismissal for lack of personal jurisdiction is appropriate only if the plaintiff has not made a prima facie showing of personal jurisdiction. *Id.* In determining whether the plaintiff has met this burden, the uncontroverted allegations in the complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor. *Id. at 588-89.*

There are two limitations on the Court's power to exercise personal jurisdiction over a nonresident defendant: the applicable state or federal personal jurisdiction statute and constitutional principles of due process. *Sher v. Johnson, 911 F.2d 1357, 1360 (9th Cir. 1990).* Where, as here, there is no applicable federal statute governing personal [*8] jurisdiction, the law of the state in which the district sits applies. *See Core-Vent Corp. v. Nobel Industries AB, 11 F.3d 1482, 1484 (9th Cir. 1993).* As California's long-arm statute allows courts to exercise personal jurisdiction to the extent permitted by the *Due Process Clause of the United States Constitution*, the Court need only determine whether personal jurisdiction

Case 5:06-cv-01839-PVT    Document 13-6    Filed 05/19/2006    Page 4 of 8

2004 U.S. Dist. LEXIS 22931, *    Page 3

in this case would meet the requirements of due process. *Id.; see Cal. Code Civ. Proc. § 410.10.*

Federal due process requires that a nonresident defendant have minimum contacts with the forum state such that the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice. *Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834, 838 (9th Cir. 1986)* (citing *International Shoe Co. v. Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945)).* The defendant's conduct and connection with the forum must be such that the defendant should reasonably anticipate being haled into court there. *Sher, 911 F.2d at 1361* (citing *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980)).*

The constitutional [*9] test may be satisfied in either of two ways: through general jurisdiction or specific jurisdiction. General jurisdiction exists if the nonresident's contacts with the forum are continuous and systematic and the exercise of jurisdiction satisfies traditional notions of fair play and substantial justice. *Ziegler v. Indian River County, 64 F.3d 470, 473 (9th Cir. 1995)* (quoting *Reebok Int'l Ltd. v. McLaughlin, 49 F.3d 1387, 1391 (9th Cir. 1995)).* If general jurisdiction exists, the Court has jurisdiction over the defendant even if the cause of action is unrelated to the defendant's forum activities. *Omeluk v. Langsten Slip & Batbyggeri A/S, 52 F.3d 267, 270 (9th Cir. 1995).*

If general jurisdiction does not exist, the Court still may be able to assert specific jurisdiction over the defendant for a cause of action that arises out of the defendant's forum-related activities. *Rano v. Sipa Press, Inc., 987 F.2d 580, 588 (9th Cir. 1993).* The Court applies a three-part test in determining whether it may assert specific jurisdiction over the defendant: (1) the defendant must perform an act or consummate a transaction within [*10] the forum, purposefully availing himself of the privilege of conducting activities in the forum and invoking the benefits and protections of its laws; (2) the claim must arise out of or result from the defendant's forum-related activities; and (3) the exercise of jurisdiction must be reasonable. *Id.*

## ANALYSIS

### I. Motion to Dismiss Pursuant to *Rule 12(b)(6)*

Defendants seek to dismiss two causes of action from the Amended Complaint: 1) breach of fiduciary duty; and 2) intentional interference with prospective economic advantage. The Court will discuss each issue separately.

#### A. Breach of Fiduciary Duty

California courts have defined a fiduciary relationship as follows:

> A fiduciary relationship has been defined as any relation existing between parties to a transaction wherein one of the parties is duty bound to act with the utmost good faith for the benefit of the other party. Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he voluntarily accepts or assumes to accept the confidence, can take no advantage from his acts relating [*11] to the interest of the other party without the latter's knowledge or consent.

*Hydro-Mill Co., Inc. v. Hayward, Tilton and Rolapp, 115 Cal. App. 4th 1145, 1146-47, 10 Cal. Rptr. 3d 582 (2004)* (citation, internal quotation marks, and alterations omitted).

It is well-settled that parties to a contract do not by necessary implication become fiduciaries. *See Wolf v. Superior Court, 107 Cal. App. 4th 25, 31, 130 Cal. Rptr. 2d 860 (2003)* (stating that "every contract requires one party to repose an element of trust and confidence in the other to perform"). In the commercial context, typical examples of fiduciary relationships include "trustee/beneficiary, directors and majority shareholders of a corporation, business partners, joint adventures, and agent/principle." *Id. at 30.* "Inherent in each these relationships is the duty of undivided loyalty the fiduciary owes to its beneficiary, imposing on the fiduciary obligations far more stringent than those required of ordinary contractors. *Id.*

Plaintiffs allege that Coe Newnes owed a fiduciary duty to Plaintiffs because it promised in good faith, to evaluate, develop, market, and promote products presented to it for consideration. [*12] Plaintiffs contend that this promise was broken when Defendants conspired to halt the development of the McGahee Optimizing Planer.

Defendants argue that the breach of fiduciary duty claim against Coe Newnes fails as a matter of law because the allegations asserted in the Amended Complaint give rise only to a breach of contract claim. Furthermore, Defendants contend that Plaintiffs' claim against Coe Manufacturing and Esher for conspiracy to breach a fiduciary duty is not legally cognizable because neither

Defendant owed an independent fiduciary duty to Plaintiffs.

After reviewing the Amended Complaint, the Court finds that Plaintiffs have adequately alleged that the Agreement created a fiduciary relationship between Plaintiffs and Coe Newnes. In *City of Hope Nat. Medical Center v. Genentech, 123 Cal. App. 4th 306, 20 Cal. Rptr. 3d 234, 2004 WL 2361763 (Cal. App. 2 Dist.)*, the court reaffirmed the general notion that the relationship between inventors and those they entrust their secrets to is "confidential or fiduciary in nature." *123 Cal. App. 4th 306, 2004 WL 2361763, at \*25; see also Stevens v. Marco, 147 Cal. App. 2d 357, 305 P.2d 669 (1956)*. The court stated that "there is every reason to afford the utmost protection [\*13] to inventors who entrust their secrets to others for developing, patenting, manufacturing, and licensing the secrets in exchange for royalties . . . . To encourage inventors to disclose their ideas to third parties who can bring the ideas to the market place, those third parties should be held to the standards of a fiduciary." *123 Cal. App. 4th 306, [WL] at \*27*. Although Defendants have argued that the Agreement did not create a fiduciary relationship because Defendants retained discretion to develop all or none of Plaintiffs' inventions, *City of Hope* clearly dismissed this line of argument. n2 The court stated as follows:

> For policy reasons, there should be no distinction between when a third party agrees to develop, patent and exploit an inventor's secret and when a third party is given that option and takes it. The inventor is still in the same position of trusting the third party regarding information and accountings. As well, the policy of encouraging public disclosure of inventions is better served by protecting both types of agreements. In reaching this conclusion, we remain mindful of [plaintiff's] trust, [defendant's] superior position, and the importance of encouraging public disclosure [\*14] of life saving inventions in today's world.

*123 Cal. App. 4th 306, 2004 WL 2361763, at \*29.*

n2 Plaintiffs' reliance upon *Wolf* is misplaced. *Wolf* did not involve the entrustment of secret ideas for patenting purposes, but rather involved the assignment of literary rights. *107 Cal. App. 4th at 28*. According to *City of Hope*, "this distinction is dispositive." *123 Cal. App. 4th 306, 2004 WL 2361763 at \*28.*

In light of *City of Hope*, there can be little doubt that Plaintiffs have adequately plead a breach of fiduciary duty against Coe Newness in the Amended Complaint. However, Coe Manufacturing and Esher cannot be liable for conspiring with Coe Newnes to breach fiduciary duties it owed Plaintiffs because they did not each owe independent duties to Plaintiffs. *See 1-800 Contacts, Inc. v. Steinberg, 107 Cal. App. 4th 568, 590, 132 Cal. Rptr. 2d 789 (2003)*. Furthermore, while Plaintiffs' argue that Coe Manufacturing and Esher "aided and abetting a breach of fiduciary duty," Plaintiffs' Amended Complaint did [\*15] not properly allege such activity. Therefore, the Court grants the motion to dismiss the breach of fiduciary duty claim against Coe Manufacturing and Esher. However, based upon the arguments of Plaintiffs' counsel, the Court finds that it is appropriate to grant Plaintiffs' leave to amend the claim. *See Doe v. United States, 58 F.3d 494, 497 (9th Cir. 1995)*.

**B. Interference with Prospective Economic Relations** (Against Coe Manufacturing and Esher)

Under California law, the following five elements must be established to support a cause of action for interference with prospective economic relations: "(1) the existence of a specific economic relationship between [plaintiff] and third parties that may economically benefit [plaintiff]; (2) knowledge by the [defendants] of this relationship; (3) intentional acts by the [defendants] designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) damages to the [plaintiff]." *Silicon Knights, Inc. v. Crystal Dynamics, Inc., 983 F. Supp. 1303, 1311 (N.D. Cal 1997)* (citation omitted). In addition, a plaintiff must allege conduct that is "wrongful by some measure beyond [\*16] the fact of the interference itself." *Della Penna v. Toyota Motor Sales U.S.A., Inc., 11 Cal. 4th 376, 393, 45 Cal. Rptr. 2d 436, 902 P.2d 740 (1995)* (internal quotation marks and citation omitted).

Defendants' argue that Plaintiffs' claim for intentional interference with prospective economic relations should be dismissed for two reasons. First, Defendants' contend that Plaintiffs have not alleged "wrongful conduct" as defined in *Della Penna*. Second, Defendants' contend that Plaintiffs have failed to allege the existence of any specific business relationships with the probability of future economic benefit that were affected by Defendants' actions.

Plaintiffs argue that "wrongful conduct" was properly plead in the Amended Complaint in the form of "interference with contract" and "aiding and abetting a breach of fiduciary duty." Plaintiffs also contend that they had multiple relationships with third parties with the probability of economic benefit to Plaintiffs.

Case 5:06-cv-01839-PVT    Document 13-6    Filed 05/19/2006    Page 6 of 8

2004 U.S. Dist. LEXIS 22931, *    Page 5

Initially, the Court finds that Plaintiffs' have not adequately alleged "wrongful conduct." Plaintiffs' allegation of "interference with contract" does not constitute wrongful conduct "by some measure beyond the fact of the interference [*17] itself" within the meaning of *Della Penna.* Furthermore, while Plaintiffs' allegation of "aiding and abetting a breach of fiduciary duty" is legally cognizable, *see Neilson v. Union Bank of California, 290 F. Supp. 2d 1101 (C.D. Cal. 2003),* Plaintiffs have not properly plead the claim against Esher or Coe Manufacturing in the Amended Complaint.

In addition, the Court further finds that Plaintiffs have failed to properly plead "intentional interference with prospective economic relations" because Plaintiffs' allegations of future economic harm are too speculative. The Amended Complaint states that Plaintiffs prospective economic relationships were with:

a) Coe Newnes; and

b) Various probable customers for the McGahee Optimizing Planer, including but not limited to probable customers in California, probable customers to whom McGahee has sold forestry products and equipment in the past, and probable customers with whom McGahee has maintained business contacts and/or relationships and/or who are aware of and rely on McGehee's reputation in the market for creating and developing forest products and equipment.

With respect to the business relationships [*18] Plaintiffs had with "probable customers," the Court finds the pleading is severely lacking in detail. *See Brown v. Allstate Ins. Co., 17 F. Supp. 2d 1134, 1139 (S.D. Cal. 1998)* ("Plaintiff must establish an actual economic relationship or a protected expectancy with a third person, not merely a hope of future transactions.").

With respect to Plaintiffs' business relationship with "Coe Newnes," the Court finds that Plaintiffs' intentional interference with prospective economic relations claim fails because Coe Manufacturing and Esher were not "third-party stranger[s]" to that relationship. *Marin Tug & Barge, Inc. v. Westport Petroleum, Inc., 271 F.3d 825, 832 (9th Cir. 2001).* It is well settled "that the core of intentional interference business torts is interference with an economic relationship by a third party stranger to that relationship, so that an entity with a direct interest or involvement in that relationship is not usually liable for harm caused by the pursuit of its interests." *Id.* Here, Coe Manufacturing and Esher cannot be characterized as "strangers" to the business relationship between Coe

Newnes and Plaintiffs. The Court need [*19] not look further than the Amended Complaint to draw this conclusion. In the Amended Complaint, Plaintiffs allege that Esher "has been the Chief Executive Officer and/or Chairman of the Board of Directors of each Coe Newnes and Coe Mfg." Plaintiffs also allege their belief that "Coe Newnes and Coe Mfg. have a common (or closely allied) controlling owner or owners . . . ." And perhaps most telling, Plaintiffs allege that Coe Manufacturing, Esher, and Coe Newnes engaged in a conspiracy to interfere with McGehee's contract rights. Given the totality of these allegations, Plaintiffs' contention that Coe Manufacturing and Esher were "strangers" to the business contract between Coe Newnes and Plaintiffs is, at best, disingenuous.

Therefore, for the reasons set forth above, the Court grants Defendants' motion to dismiss the intentional interference with prospective economic relations claim against Coe Manufacturing and Esher. However, based on the moving papers and the arguments of Plaintiffs' counsel, the Court finds that leave to amend is in order. *See Doe, 58 F.3d at 497.*

## II. Motion to Dismiss Pursuant to *Rule 12(b)(2)*

Defendant Esher seeks to dismiss the action [*20] against him arguing that he did not have the required "minimum contacts" with the state of California. n3 Esher states that he has never resided or owned property in California. He also states that he has never traveled to California for business relating to Coe Newnes or Coe Manufacturing. He admits that he has spoken with McGahee on the phone, but those conversations were initiated almost entirely by McGahee. In any event, Esher argues that he was merely a "secondary participant" in the alleged wrongdoing and Coe Newnes was the "primary participant."

n3 Plaintiffs maintain that the Court should exercise jurisdiction over Esher on the application of specific, rather than general, jurisdiction.

Plaintiffs contend that Esher's conduct was sufficient to satisfy the "minimum contacts" test. First, Plaintiffs argue that Esher committed several intentional torts against McGahee, and the effect of those torts were felt by McGahee in California. Second, Plaintiffs assert that Esher knew that McGahee was a resident of [*21] California. Third, Plaintiffs argue that Esher expressly aimed his intentional conduct at California.

As an initial matter, the Court finds Esher's argument that he was simply a "secondary participant" in the alleged wrongdoing against Plaintiffs to be unpersuasive.

Case 5:06-cv-01839-PVT    Document 13-6    Filed 05/19/2006    Page 7 of 8

2004 U.S. Dist. LEXIS 22931, *                                    Page 6

The Ninth Circuit has recognized that "cases which found personal liability on the part of corporate officers have typically involved instances where the defendant was the 'guiding spirit' behind the wrongful conduct . . . or the 'central figure' in the challenged corporate activity." *Davis v. Metro Productions, Inc., 885 F.2d 515, 524 (9th Cir. 1989)*. In such a scenario, "each defendant's contacts with the forum state must be assessed individually." *Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781, 79 L. Ed. 2d 790, 104 S. Ct. 1473 (1984)*.

Here, Plaintiffs' allegations regarding Esher's individual wrongdoing are unequivocal. Plaintiffs allege that Esher was the CEO and/or Chairman of the Board of both Coe Newnes and Coe Manufacturing. (Comp. P7.) Plaintiffs allege that Esher was in attendance during the March 19, 2000 meeting at which the McGahee Optimizing Planer was first introduced. (Comp. P27.) Plaintiffs allege [*22] that Esher originally showed great enthusiasm for the project. However, only two weeks after the presentation, Esher directed Ray Stevens to send an email to Plaintiffs ordering that all work on the McGahee Optimizing Planer be stopped. (Comp. P28.) Esher allegedly told McGahee that Coe Manufacturing had been working on a similar project for sometime and that the project was already being developed. And perhaps most importantly, Esher sent a letter to Plaintiffs giving notice of Coe Newnes' termination of the contract. (Comp. P33.) In sum, Plaintiffs allegations label Esher as not only the CEO of Coe Newnes and Coe Manufacturing, but also as the "guiding spirit" behind the termination of the Plaintiffs' employment contract. Accordingly, the Court is not restricted in its ability to exercise jurisdiction over Esher as an individual.

Next, the Court must apply Rano's three-step test and determine whether the Court has specific jurisdiction over Esher. To determine whether Esher "purposefully availed" himself to the laws of California, the Court must examine "if the defendant intentionally directed his activities into the forum state." *Brainerd v. Governors of Alberta, 873 F.2d 1257, 1259 (9th Cir. 1989)*. [*23] To meet this test, "the defendant must have 1) committed an intentional act, which was 2) expressly aimed at the forum state, and 3) caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state." *Bancroft & Masters, Inc. v. Augusta National, Inc., 223 F.3d 1082, 1087 (9th Cir. 2000)*.

In *Brainerd*, the court stated that the defendant's "communications were directed to Arizona . . . . [the defendant] knew the injury and harm stemming from his communications would occur in Arizona, where [the plaintiff] planned to live and work." *Id.* Similarly, in *Metropolitan Life Insurance Co. v. Neaves, 912 F.2d 1062 (9th Cir. 1990)*, the court held that an Alabama resident could be haled into a California court on the basis of a letter she sent to an insurance company representing that she was entitled to an insurance payment that actually belonged to a California resident. The critical factor in the court's holding was the defendant "was purposefully defrauding [plaintiff] in California" by sending the letter. *Id. at 1065*.

In this case, Plaintiffs have adequately alleged that Esher knew that Plaintiffs' [*24] resided in California. It is also adequately alleged that Esher was responsible for at least three communications to Plaintiffs in California. Plaintiffs also allege that these communications, culminating in the termination of the Agreement, constituted tortious conduct, including, but not limited to, intentional interference with contractual relations. At this stage of the litigation, the Court must accept Plaintiffs' allegations as truth. Accordingly, the Court finds that Esher engaged in allegedly wrongful conduct targeted at Plaintiffs, and that Esher knew Plaintiffs were residents of California.

Furthermore, there is no doubt that Plaintiffs' claims arise out of Defendants' forum related activities. Plaintiffs' contract claims directly arise from Esher's communications, sent to Plaintiffs in California, that eventually resulted in the termination of the Agreement. Accordingly, the second prong of the *Rano* test is satisfied.

Finally, the Court must determine whether asserting personal jurisdiction over Esher is reasonable. The Ninth Circuit applies a seven factor test to determine the reasonableness of the exercise of personal jurisdiction: 1) the extent of the defendant's [*25] purposeful interjection into the state forum; 2) the burden on the defendant of defending in the chosen forum; 3) the extent of conflict with the sovereignty of defendant's state; 4) the forum state's interest in adjudicating the dispute; 5) the most efficient forum for judicial resolution of the dispute; 6) the importance of the forum to plaintiff's interest in convenient and effective relief; and 7) the existence of an alternative forum. *Core-Vent Corp. v. Nobel Industries A.B., 11 F.3d 1482, 1487 (9th Cir. 1993)*.

Since Esher purposefully directed his activities into California, personal jurisdiction over him is presumed to be reasonable. *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985)*. Esher must present a compelling case that jurisdiction would be unreasonable. *Id.*

The *Core-Vent* factors do not seem to heavily favor either party. Under the first factor, while the extent of Esher's "purposeful interjection" was not overwhelming, it was also not minimal. Esher's email, phone call, and letter were all directed to Plaintiffs in California and were incidents that gave rise to Plaintiffs' claims. This factor weighs in favor of Plaintiffs. [*26]

Case 5:06-cv-01839-PVT    Document 13-6    Filed 05/19/2006    Page 8 of 8

2004 U.S. Dist. LEXIS 22931, *                                              Page 7

Second, while Esher will bear a burden in litigating this case in California, the Ninth Circuit has recognizing that "modern means of communication and transportation have tended to diminish the burden of defense of a lawsuit in a distant forum." *Insurance Co. of North America v. Marina Salina Cruz, 649 F.2d 1266, 1271 (9th Cir. 1981)*. Moreover, Esher's burden "will not be deemed unreasonable unless it constitutes a deprivation of due process." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme, 379 F.3d 1120, 1136 (9th Cir. 2004)*. Esher has alleged no such facts. Therefore, this factor weighs slightly in Esher's favor.

Third, there appears to be no conflict between the laws of California and Georgia, thus this factor appear to be neutral.

Fourth, a state always maintains a strong interest in providing an effective means of redress for its residents who are tortiously injured. *Brainerd, 873 F.3d at 1260*. Thus, this factor weighs in favor of Plaintiffs.

Fifth, "the efficient-resolution factor considers the availability of evidence and witnesses and the forum which is more familiar with the facts and history of the case. [*27] " *Yahoo!, 379 F.3d at 1137*. Plaintiff's business records and most of their witnesses are located in California. Esher has not stated where the majority of his witnesses and evidence would be located. Accordingly, this factor is neutral or favors Plaintiff.

Sixth, there can be little question that California is the more convenient and effective forum from Plaintiffs' perspective. However, courts have noted that this factor is "not of paramount importance." *Harris Rutsky & Co.*

*Ins. Servs., Inc. v. Bell & Clements Ltd., 328 F.3d 1122, 1129 (9th Cir. 2003)*. This factor is either neutral or favor Plaintiffs.

Finally, Georgia is a possible alternative forum. There is no question that a federal court in Georgia would properly have personal jurisdiction over Esher. Thus, this factor favors Esher.

In sum, the majority of the *Core-Vent* factors either favor Plaintiffs or are neutral. As previously stated, Esher carries the burden to present a compelling case that the exercise of jurisdiction is unreasonable. He has not carried this burden. Accordingly, the Court concludes that it is reasonable to exercise jurisdiction over Esher.

## CONCLUSION

For [*28] the foregoing reasons, Defendants' *12(b)(6)* Motion to Dismiss the breach of fiduciary duty claim is **DENIED** with respect to Coe Newnes, and **GRANTED** with leave to amend with respect to Coe Manufacturing and Esher. Defendants' *12(b)(6)* Motion to Dismiss the intentional interference with prospective economic advantage claim is **GRANTED** with leave to amend. Defendant Esher's *12(b)(2)* Motion to Dismiss is **DENIED**.

**IT IS SO ORDERED.**

Dated: November 4, 2004

MARTIN J. JENKINS

UNITED STATES DISTRICT JUDGE

# EXHIBIT 6

LEXSEE

**Polyclad Laminates, Inc., and Fry Metals, Inc.; d/b/a PC Fab Division of Alpha Metals, Inc., Plaintiffs v. MacDermid, Incorporated, Defendant**

Civil No. 99-162-M

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE

*1999 U.S. Dist. LEXIS 22563*

**July 22, 1999, Decided**

**DISPOSITION:**    [*1]    Plaintiff' motion to dismiss GRANTED.

**COUNSEL:** For POLYCLAD LAMINATES, INC., FRY METALS, INC., plaintiffs: Michael Lenehan, Esq., Garry R. Lane, Esq., Ransmeier & Spellman, Concord, NH.

For POLYCLAD LAMINATES, INC., FRY METALS, INC., plaintiffs: Howard J. Susser, Esq., Mintz Levin Cohn Ferris Glovsky & Popeo PC, Boston, MA.

For POLYCLAD LAMINATES, INC., FRY METALS, INC., plaintiffs: John M. Delehanty, Esq., Mintz Levin Cohn Ferris Glovsky & Popeo, New York, NY.

For MACDERMID INCORPORATED, defendant: Daniel J. Gleason, Esq., Nutter, McClennan & Fish, Steven M. Bauer, Esq., Testa Hurwitz & Thibeault LLP, Boston, MA.

For MACDERMID INCORPORATED, defendant: Steven M. Gordon, Esq., Shaheen & Gordon, Concord, NH.

For MACDERMID INCORPORATED, defendant: James K. Robertson, Esq., Carmody & Torrance, Waterbury, CT.

**JUDGES:** Steven J. McAuliffe, United States District Judge.

**OPINIONBY:** Steven J. McAuliffe

**OPINION:**

    **ORDER**

Federal patent law preemption in this case is limited - the state tortious interference with existing and prospective contractual relations claim is preempted only if "as applied" that state law conflicts with federal patent law. *Hunter Douglas, Inc. v. Harmonic Design, Inc., 153 F.3d 1318, 1335 (Fed. Cir. 1998).* [*2] "Accordingly, in a case involving a patent holder's conduct in obtaining or publicizing its patent, if the plaintiff were to fail to allege that the defendant patent holder was guilty of fraudulent conduct before the PTO or bad faith [in the market place] in the publication of the patent, then the complaint would be dismissed for failure to state a claim upon which relief can be granted because of federal preemption." Hunter, at 1336.

Here, defendant's second counterclaim fails to meet the pleading requirements described in Hunter as necessary to avoid preemption. Defendant argues, in effect, that much should be read into its choice of general pleading terms, but the second count cannot be stretched as far as defendant says. To remain viable, the second counterclaim must fairly plead facts supporting an articulated claim that the tortious interference at issue included a patent-law predicate, e.g. that the patent holder engaged in fraud before the PTO, or that the patent holder engaged in bad faith in the marketplace in publicizing the patent (e.g. they had no good faith belief that the patents were valid, or enforceable, or were being infringed).

Because the second [*3] counterclaim cannot fairly be read to include allegations necessary to avoid federal preemption, plaintiff' motion to dismiss is hereby GRANTED, but without prejudice to defendant filing a motion to add a new counterclaim containing the requisite allegations (if it can do so consistently with the requirements of *Federal Rule of Civil Procedure 11*).

**SO ORDERED.**

Case 5:06-cv-01839-PVT    Document 13-7    Filed 05/19/2006    Page 3 of 3

1999 U.S. Dist. LEXIS 22563, *    Page 2

Steven J. McAuliffe

United States District Judge                    July 22, 1999

# EXHIBIT 7

LEXSEE

**JOSEPH ROBINSON, Plaintiff, v. STATE OF CALIFORNIA, et al., Defendants.**

**No. CIV.S-04-1888 GEB DAD PS**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA**

*2005 U.S. Dist. LEXIS 24692*

**October 21, 2005, Decided**

**COUNSEL:** [*1] For Joseph -- Robinson, Plaintiff: Pro se, Frederick, MD.

For Plumas County, Greg Hagwood, James Reichle, Jeff Cunan, Gary McGowan, Hagwood, Defendants: Terence John Cassidy, Porter Scott Weiberg and Delehant, Sacramento, CA.

**JUDGES:** DALE A. DROZD, UNITED STATES MAGISTRATE JUDGE.

**OPINIONBY:** DALE A. DROZD

**OPINION:**

FINDINGS AND RECOMMENDATIONS

This action came before the court on October 14, 2005, for hearing on the motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, or in the alternative summary judgment, filed on behalf of defendants Plumas County; Greg Hagwood; James Reichle; Jeff Cunan; and Gary McGowan. n1 Plaintiff, proceeding pro se, appeared telephonically on his own behalf at the hearing on the motion. Kristina M. Hall appeared on behalf of defendants. For the reasons explained below, the undersigned will recommend that defendants' motion to dismiss be granted and plaintiff's second amended complaint be dismissed without further leave to amend. n2

n1 These are the only remaining defendants in this action. Defendants State of California; Ira Kaufman; William Pangman; Garrett Olney; and Doug Prouty have been dismissed by earlier order of the district court. (See Order filed January 21, 2005.)

[*2]

n2 As indicated on the record during the hearing, the privilege of appearing telephonically in this matter is revoked as to plaintiff, who is now required to personally appear at any future proceedings.

**LEGAL STANDARDS**

A motion to dismiss pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* tests the sufficiency of the complaint. See *North Star Int'l v. Arizona Corp. Comm'n, 720 F.2d 578, 581 (9th Cir. 1983)*. Dismissal of the complaint or of any claim within it "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990)*; see also *Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 534 (9th Cir. 1984)*.

In considering a motion to dismiss for failure to state a claim, the court accepts as true all material allegations in the complaint and construes those allegations, as well as the reasonable inferences that can be drawn from them, in the light [*3] most favorable to the plaintiff. See *Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984)*; *Love v. United States, 915 F.2d 1242, 1245 (9th Cir. 1989)*. In a case where the plaintiff is pro se, the court has an obligation to construe the pleadings liberally. *Bretz v. Kelman, 773 F.2d 1026, 1027 n.1 (9th Cir. 1985)* (en banc). However, the court's liberal interpretation of a pro se complaint may not supply essential elements of a claim that are not pled. *Pena v. Gardner, 976 F.2d 469, 471 (9th Cir. 1992)*; *Ivey v. Bd. of Regents of Univ. of Alaska, 673 F.2d 266, 268 (9th Cir. 1982)*.

**ANALYSIS**

This action arises from plaintiff Joseph Robinson's conviction, following a jury trial in the Plumas County Municipal and Superior Court, and his imprisonment for

possession of marijuana for sale, transporting marijuana and offering to sell, furnish or give away marijuana, all while being armed with a firearm. In this civil action, plaintiff is challenging those criminal proceedings on a variety of purported constitutional grounds. n3

> n3 The California Court of Appeal for the Third Appellate District reversed the judgment of conviction, finding that plaintiff did not waive his right to the assistance of counsel at his preliminary examination and was erroneously denied appointed counsel at that preliminary examination. The undersigned has taken judicial notice of the unpublished decision of the Court of Appeal attached to plaintiff's request for judicial notice. Pursuant to *Federal Rule of Evidence 201*, the court may take judicial notice of its own files and state court records. See *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank, 136 F.3d 1360, 1364 (9th Cir. 1998)*; *United States v. Wilson, 631 F.2d 118, 119 (9th Cir. 1980)*. "[W]hen a court takes judicial notice of another court's opinion, it may do so 'not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.'" *Lee v. City of Los Angeles, 250 F.3d 668, 690 (9th Cir. 2001)*(quoting *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd., 181 F.3d 410, 426-27 (3rd Cir. 1999))*.

**[*4]**

As a preliminary matter, in his written opposition and at the hearing on the motion, plaintiff voluntarily requested that defendants District Attorney James Reichle and Detective Greg Hagwood be dismissed from this action. Defendants do not object to plaintiff's request. Therefore, the court will recommend that defendants Reichle and Hagwood be dismissed from this action pursuant to plaintiff's voluntary request. See *Fed. R. Civ. P. 41(a)(2)*.

The remaining defendants are Plumas County and deputy district attorneys Jeff Cunan and Gary McGowan. Plaintiff's second amended complaint continues to allege that defendants wrongfully convicted and imprisoned plaintiff in violation of his constitutional rights. However, as was the case with plaintiff's amended complaint, it appears that the second amended complaint does not contain a short and plain statement as required by *Federal Rule of Civil Procedure 8(a)(2)*. As plaintiff has been advised previously, while the Federal Rules adopt a flexible pleading policy, a complaint must give fair notice and state the elements of the claim plainly and suc-

cinctly. *Jones v. Community Redev. Agency, 733 F.2d 646, 649 (9th Cir. 1984)*. **[*5]** Plaintiff is required to allege with at least some degree of particularity overt acts which defendants engaged in that support plaintiff's claim. Id.

The second amended complaint, consisting of six "counts," fails to meet these requirements. The first and second counts are for "Conspiracy to Wrongfully Convict and Imprison Plaintiff" and "Wrongful Conviction and Imprisonment," respectively. The third and fourth counts are for "Conspiracy to Violate Plaintiff's Right to be Free From Unreasonable Search and Seizure" and "Violation of Plaintiff's Right to be Secure Against Unreasonable Search and Seizure," respectively. The fifth and sixth counts are for "Conspiracy to Violate Plaintiff's Right to the Assistance of Counsel" and "Violation of Plaintiff's Right to the Assistance of counsel," respectively. However, the allegations under those headings are conclusory and sprinkled with references to the denial of "reasonable bail," the denial of the right "to present a defense to the jury at trial," violations of "due process rights," and so on. Thus, just like plaintiff's earlier pleadings, the precise nature of the attempted claims in the second amended complaint is unclear. As such, **[*6]** the second amended complaint's allegations do not amount to a short plain statement of a claim showing that plaintiff is entitled to relief. See *Fed. R. Civ. P. 8(a)(1)*.

The attachment of the 23-page, 611-paragraph "statement of facts" to plaintiff's second amended complaint does not impact the undersigned's analysis in this regard. That statement is not "short and plain." The order dismissing the amended complaint with leave to amend expressly admonished plaintiff that a similar 24-page, 593-paragraph declaration did not amount to a short and plain statement of a claim. Further, like the rest of the second amended complaint, the attached statement of facts confusingly contains numerous allegations regarding defendants whom were long ago dismissed from this case.

Even if the second amended complaint were found to comply with the requirements of *Rule 8*, it also clearly fails to state a cognizable claim. While the second amended complaint makes reference to *42 U.S.C. § 1983* (Second Am. Compl. at 2), like the amended complaint it still does not allege how the conduct complained of has resulted in a deprivation of a right, **[*7]** privilege or immunity secured by the Constitution or federal law by a person acting under color of state law. *L.W. v. Grubbs, 974 F.2d 119, 120 (9th Cir. 1992)*; *Lopez v. Dept. of Health Serv., 939 F.2d 881, 883 (9th Cir. 1991)*. (See Order filed June 30, 2005, at 5-6.) Additionally, as discussed at the hearing on the motion, the conduct attributed to defendants Cunan and McGowan by plaintiff occurred entirely in the course of their appearances as the

prosecutors assigned to plaintiff's case in the state court criminal proceedings. The fact that the state trial court erred as a matter of state law by allowing the prosecutors to participate in hearings with respect to the appointment of counsel, thereby prohibiting plaintiff from presenting a confidential financial statement at those hearings, does not effect that conclusion. Regardless of the state trial court's errors, the prosecutors were performing functions "intimately associated with the judicial phase of a criminal proceeding." *Imbler v. Pachtman, 424 U.S. 409, 430, 47 L. Ed. 2d 128, 96 S. Ct. 984 (1976).* A prosecutor is entitled to absolute immunity from a civil action for damages under § 1983 in connection [*8] with such conduct. See *Burns v. Reed, 500 U.S. 478, 486, 114 L. Ed. 2d 547, 111 S. Ct. 1934 (1991); Imbler, 424 U.S. at 431; KRL v. Moore, 384 F.3d 1105, 1110-13 (9th Cir. 2004).*

Finally, as to defendant Plumas County the second amended complaint still fails to sufficiently allege a claim of municipal liability arising from any policy of Plumas County. n4 See *Monell v. Department of Social Servs., 436 U.S. 658, 690-91, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978); Gillette v. Delmore, 979 F.2d 1342, 1346-47 (9th Cir. 1992).* In this regard, plaintiff has again failed to even allege in conclusory fashion that the injury complained of was the consequence "of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy. . . ." *Monell, 436 U.S. at 694.* Each of these deficiencies also existed in the amended complaint and plaintiff has been unable to correct them.

---

n4 Further, it would appear that to the extent plaintiff is attempting to state a Monell claim against the County of Plumas, it is based solely on the actions of District Attorney Reichle. However, in electing to prosecute a district attorney in California acts on behalf of the state, not the county. *Weiner v. San Diego County, 210 F.3d 1025, 1031 (9th Cir. 2000)* ("We conclude that a California district attorney is a state officer when deciding whether to prosecute an individual."); see also *Pitts v. County of Kern, 17 Cal. 4th 340, 70 Cal. Rptr. 2d 823, 949 P.2d 920 (1998).* State officials are not subject to suit under § 1983. *Will v. Michigan Dept. of State Police, 491 U.S. 58, 71, 105 L. Ed. 2d 45, 109 S. Ct. 2304 (1989).* Accordingly, the County of Plumas is not subject to liability under § 1983 for the actions of District Attorney Reichle.

[*9]

The undersigned also recognizes that the second amended complaint makes reference to *42 U.S.C. § 1985(3).* (See Second Am. Compl. at 2.) However, plaintiff has failed to allege specific facts from which a conspiracy between defendants could be inferred. See *Olsen v. Idaho State Bd. of Medicine, 363 F.3d 916, 929-30 (9th Cir. 2004); Burns v. County of King, 883 F.2d 819, 821 (9th Cir. 1989).* Additionally, plaintiff's failure to allege a § 1983 deprivation of rights precludes a § 1985 conspiracy claim predicated on the same allegations. See *Olsen, 363 F.3d at 930; Caldeira v. County of Kauai, 866 F.2d 1175, 1182 (9th Cir. 1989).* The second amended complaint must be dismissed for these reasons as well.

Because of these deficiencies, plaintiff's second amended complaint must be dismissed. Granting leave to amend would be futile in light of the nature of the deficiencies noted above. See *Schmier v. United States Court of Appeals for the Ninth Circuit, 279 F.3d 817, 824 (9th Cir. 2002).* Therefore, the undersigned will recommend that the second amended complaint be dismissed [*10] without further leave to amend.

**CONCLUSION**

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Defendants Reichle and Hagwood be dismissed from this action pursuant to plaintiff's voluntary request. See *Fed. R. Civ. P. 41(a)(2);*

2. The pending motion to dismiss pursuant to *Rule 12(b)(6)* be granted as to defendants Plumas County, Jeff Cunan and Gary McGowan; and

3. Plaintiff's second amended complaint be dismissed without further leave to amend.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of *28 U.S.C. § 636(b)(1).* Within ten (10) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. See *Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).*

DATED: October 21, 2005.

DALE A. [*11] DROZD

UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 8

LEXSEE

**LEONARD D. ROSS, Plaintiff, v. MARJORIE A. SLABACH, et al., Defendants.**

No. C 02-1349 SI

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2002 U.S. Dist. LEXIS 22908*

**November 26, 2002, Decided**
**November 26, 2002, Filed; November 26, 2002, Entered in Civil Docket**

**DISPOSITION:** [*1] Defendant's motion to dismiss complaint with prejudice granted. Complaint dismissed. Judgment entered.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*
[HN1] A complaint must give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. Thus, a complaint that is replete with detail but that fails to concisely and clearly identify whom plaintiffs are suing for what wrongs, fails to perform the essential functions of a complaint. Two provisions of the Federal Rules of Civil Procedure address the problem posed by a vague or confusing complaint. Fed. R. Civ. P. 8 provides that a complaint shall contain a short and plain statement of the claim showing that the pleader is entitled to relief and that each averment of a pleading shall be simple, concise and direct. Fed. R. Civ. P. 8(a)(2), (e). Fed. R. Civ. P. 12(e) provides that if a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court*
*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*
*Civil Procedure > Dismissals > General Overview*
[HN2] It is within a district court's discretion to fashion a remedy for violation of Fed. R. Civ. P. 8 and 12, which may include ordering amendment of the complaint, dismissal of a complaint with leave to amend, or dismissal with prejudice. Fed. R. Civ. P. 41(b).

**COUNSEL:** Leonard D. Ross, Plaintiff, Pro se, San Francisco, CA.

For Marjorie A. Slabach, Defendant: Terry Senne, City Attorney's Office, County of Alameda, Oakland, CA.

**JUDGES:** SUSAN ILLSTON, United States District Judge.

**OPINIONBY:** SUSAN ILLSTON

**OPINION:**

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT WITHOUT LEAVE TO AMEND**

On November 25, 2002 the Court heard arguments on defendant's motion to dismiss plaintiff's amended complaint. Having carefully considered the arguments of the parties and the papers submitted, the Court hereby GRANTS defendant's motion to dismiss for the reasons set forth below.

**BACKGROUND**

On March 19, 2002 plaintiff filed a complaint against Marjorie A. Slabach and "Does 1-10,000." On July 31, 2002 the Court granted defendant's motion for a more definite statement and ordered plaintiff to file an amended complaint. The Court wrote:

> First, the complaint is difficult to decipher because the type is blurry and faded. Further, Ross appears to have interspersed bits of an official form without including

any facts specifically related to his circumstances. Second, based on the [*2] legible portions of the complaint, Ross does not state a valid claim or set forth a basis for federal jurisdiction. Third, Ross attaches a discrimination claim (see Compl., Ex. A) he filed with the EEOC against the City and County of San Francisco but he fails to demonstrate any connection between the EEOC claim and his current complaints.

Order at 4.

Accordingly, the Court ordered Ross to file an EEOC "Right-to-Sue" letter and an amended complaint. The Court ordered that the amended complaint provide "a statement of the relevant facts, state at least one cause of action, and set forth grounds for federal jurisdiction." Order at 4. Plaintiff has not provided any letter from the EEOC for this case, but has filed a "Right-to-Sue" letter from the California Department of Fair Employment and Housing, relating to a claim by Ross against the City and County of San Francisco. Plaintiff has also filed an amended complaint. Marjorie A. Slabach remains the only named defendant.

**LEGAL STANDARD**

[HN1] A complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson, 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. [*3] Thus, a complaint that is replete with detail but that fails to concisely and clearly identify "whom plaintiffs are suing for what wrongs, fails to perform the essential functions of a complaint." *McHenry v. Renne, 84 F.3d 1172, 1179-80 (9th Cir. 1996)*. Two provisions of the Federal Rules of Civil Procedure address the problem posed by a vague or confusing complaint. *Federal Rule of Civil Procedure 8* provides that a complaint "shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief" and that "each averment of a pleading shall be simple, concise and direct." *Fed. R. Civ. P. 8(a)(2) & (e) (1999)*. *Federal Rule of Civil Procedure 12(e)* provides that "if a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading." *Fed. R. Civ. P. 12(e) (1999)*. [HN2] It is within a district court's discretion to fashion a remedy for violation of Rules 8 and 12, which may include ordering amendment of the complaint, dismissal of a complaint with leave to amend, [*4] or dismissal with prejudice. See *Fed. R.*

*Civ. P. 41(b) (1999)*; *McHenry, 84 F.3d at 1177*; *Nevijel v. North Coast Life Ins. Co., 651 F.2d 671, 673 (1981)*.

**DISCUSSION**

Plaintiff's amended complaint is typed and legible. Plaintiff has, however, still failed to state a claim. There is not a single assertion of fact in the amended complaint regarding the only named defendant in this case, Marjorie A. Slabach. The amended complaint does contain an allegation, also lacking any factual foundation, of malicious prosecution against an individual named "Moss," but otherwise undescribed in the complaint. See Am. Compl. at 2. Plaintiff recounts the frustration he experienced while trying to apply for a legal assistant position, but does not state a claim against any party to this case. See id. The remainder of plaintiff's amended complaint is otherwise filed with statutory references that are unconnected to factual allegations of any kind.

At the hearing on this motion, Mr. Ross provided additional information relating to his grievances. It appears that he seeks this Court's intervention related to certain San Francisco Superior Court/Family [*5] Court orders, which prevent him from having unsupervised visitation with his children despite a stipulation reached by the parties with a mediator. He also described himself as a "frustrated litigant," and displayed for the Court a March, 2002 prefiling review order from the San Francisco Superior Court which suggests that Mr. Ross has been found to be a vexatious litigant in accordance with state law. The additional information provided by Mr. Ross underscores this Court's conviction that there is no federal jurisdiction over the claims he seeks to bring. Mr. Ross does not point to, nor has this Court found, any source of federal jurisdiction over disputes concerning state law family court orders. Moreover, State Court judges, including Commissioners, have absolute judicial immunity for actions performed in their judicial capacity. The DFEH Right-to-Sue letter, if it relates to Mr. Ross' current claims, would allow only "a private lawsuit in State court."

Because the amended complaint does not give defendant fair notice of alleged wrongdoing, defendant cannot be required to answer. Because no federal jurisdiction appears to exist in this matter, leave to amend again would be futile. [*6] Accordingly, defendant's motion to dismiss the complaint with prejudice, that is, without leave to amend, pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, is GRANTED.

**IT IS SO ORDERED.**

DATED: November 26, 2002

SUSAN ILLSTON

United States District Judge

2002 U.S. Dist. LEXIS 22908, *

## JUDGMENT

Plaintiff's complaint has been dismissed without leave to amend for failure to state a claim. Accordingly, judgment is hereby entered in favor of defendant and against plaintiff Leonard Ross.

**IT IS SO ORDERED AND ADJUDGED.**

DATED: November 26, 2002

SUSAN ILLSTON

United States District Judge

# EXHIBIT 9

LEXSEE

**SHARPER IMAGE CORPORATION, a Delaware corporation, Plaintiff, V. TARGET CORPORATION, a Minnesota corporation, IONIC PRO, LLC, a Delaware corporation, IDEAL PRODUCTS, LLC, a Nevis (offshore) corporation, SYLMARK, INC., a Delaware corporation, SYLMARK, LLC, a Delaware corporation, QWIK COOK, INC. d/b/a HOME TRENDS, a New York corporation, FACTORIES2U, LLC, a California corporation, and CHAIM MARK BESS, an individual, Defendants.**

No. C 04-0824 CW

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2006 U.S. Dist. LEXIS 24851*

**March 29, 2006, Decided
March 29, 2006, Filed**

**COUNSEL:** [*1] For Sharper Image Corporation, a Delaware corporation, Plaintiff: Alan L. Barry, Amy Gast O'Toole, Heather A. Boice, Bell, Boyd & Lloyd, Chicago, IL; David Lawrence Aronoff, Scott Pomerantz, Gayle Irene Jenkins, Thelen Reid & Priest LLP, Los Angeles, Ca; E. Robert (Bob) Wallach, Law Offices of E. Robert (Bob) Wallach, San Francisco, CA; Patrick M. Ryan, Thelen Reid & Priest LLP, San Francisco, CA.

For The May Department Stores Company, a Delaware corporation, Defendant: Jonathan S Kagan, Irell & Manella LLP, Los Angeles, CA.

For Ionic Pro, LLC, a Delaware corporation, Qwik Cook, Inc., a New York corporation doing business as Home Trends, Target Corporation, a Minnesota corporation, Factories2u, LLC, Sylmark, LLC, Sylmark, Inc., Ideal Products, LLC, Defendants: Elizabeth L Rosenblatt, Jonathan S Kagan, Mary Ann Novak, Irell & Manella LLP, Los Angeles, CA.

For Chaim Mark Bess, Peter Spiegel, Defendants: Elizabeth L Rosenblatt, Mary Ann Novak, Morgan Chu, Jonathan S Kagan, Irell & Manella LLP, Los Angeles, CA.

For Factories2u, LLC, Ionic Pro, LLC, a Delaware corporation, Qwik Cook, Inc., a New York corporation, Target Corporation, a Minnesota corporation, Counter-claimants: [*2] Elizabeth L Rosenblatt, Jonathan S Kagan, Irell & Manella LLP, Los Angeles, CA.

For Sharper Image Corporation, a Delaware corporation, Counter-defendant: Elizabeth L Rosenblatt, Irell & Manella LLP, Los Angeles, CA; Patrick M. Ryan, Thelen Reid & Priest LLP, San Francisco, CA.

**JUDGES:** CLAUDIA WILKEN, United States District Judge.

**OPINIONBY:** CLAUDIA WILKEN

**OPINION:**

ORDER ADDRESSING CROSS-MOTIONS FOR SUMMARY JUDGMENT

Defendants Target Corporation, Ionic Pro, LLC, Qwik Cook, Inc. d/b/a Home Trends, Ideal Products, LLC (Ideal Products), Sylmark, Inc. (Sylmark), Sylmark, LLC, Factories2U, LLC and Chaim Mark Bess (collectively, Defendants) move for summary adjudication of Plaintiff Sharper Image Corporation's claims of patent infringement, trade dress infringement and unfair competition and of Defendants' counterclaims for non-infringement of the asserted patents. Plain-

tiff opposes the motion, and separately moves to strike portions of it. Defendants move to strike the opposition. n1 Plaintiff separately moves to strike, under California Code of Civil Procedure § 425.16, Defendants' tort and State law counterclaims, and in the alternative moves for judgment on the pleadings of the counterclaims, [*3] and for partial summary adjudication on its utility patent infringement claim. Defendants oppose those motions, and purportedly cross-move for summary judgment. n2 Plaintiff separately moves for leave to file a Third Amended Complaint (TAC) and to join additional defendants. Defendants oppose the motion.

> n1 Both parties' motions to strike are denied; the arguments therein go toward the weight and import of the evidence, and do not provide the Court with any reason to strike the initial filings.

> n2 Plaintiff has filed an "ex parte motion to compel" Defendants to withdraw the reply Defendants filed in support of their purported cross-motion. Defendants oppose the ex parte motion to compel. The Court denies Plaintiff's purported ex parte motion. However, the Court strikes Defendants' reply; because Defendants separately filed their own motion for summary judgment, they are not entitled to file an additional cross-motion and reply.

These matters were heard on January 27, 2006. Having considered the [*4] papers filed by the parties and oral argument on the motions, the Court grants in part Defendants' motion for summary adjudication of patent and trade dress infringement, as described below. The Court grants Plaintiff's motion for summary adjudication of Defendants' tort and State law counterclaims. The Court grants Plaintiff leave to join Mr. Spiegel as a defendant, but otherwise denies the motion for leave to amend.

BACKGROUND

Plaintiff is a corporation with its principal place of business in San Francisco, California. Plaintiff manufactures its own line of consumer products, known as the Sharper Image Design products, which it sells to wholesale and retail customers through a multi-channel distribution system. One of Plaintiff's recent, highly successful products is the Ionic Breeze Quadra (IBQ) air purifier, which purports to clean air without the use of filters, by using wire electrodes to charge airborne particulates, which are then attracted to oppositely-charged plates.

Ionic Pro, LLC is the manufacturer of a cheaper, competing filter-less air purifier, the Ionic Pro. Ideal Products, LLC is a sister company, and shares some employees with Ionic Pro, LLC. Sylmark, LLC is [*5] the parent corporation of both Ionic Pro, LLC and Ideal Products, LLC. Sylmark and Sylmark, LLC (referred to collectively as "the Sylmark entities") share common owners, and both provide services to Ionic Pro, LLC. Specifically, Sylmark's employees provide customer service support for sales of Ionic Pro. Barry Decl., Ex. G, IP 5767. Chaim Mark Bess is the former President of Ionic Pro, LLC and former co-President of Sylmark. Proposed defendant Peter Spiegel is the Managing Director of Sylmark, LLC and former Chief Strategic Officer of Ionic Pro, LLC.

Defendants Target, Home Trends and Factories2U are retailers of the Ionic Pro.

Additional facts are set forth in the discussion section below.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. *Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).*

The moving party bears the [*6] burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. *Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.* The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).*

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).*

> The moving party may produce evidence negating [*7] an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

Id.

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. Id.; see also *Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).* If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan, 929 F.2d at 1409.*

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative [*8] evidence of such negation. *Nissan, 210 F.3d at 1105.* If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. Id. This is true even though the non-moving party bears the ultimate burden of persuasion at trial. *Id. at 1107.*

Where the moving party bears the burden of proof on an issue at trial, it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a prima facie showing in support of its position on that issue. *UA Local 343 v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1994).* That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. Id.; see also *Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th Cir. 1991).* Once it has done so, the non-moving party must set forth specific [*9] facts controverting the moving party's prima facie case. *UA Local 343, 48 F.3d at 1471.* The non-moving party's "burden of contradicting [the moving party's] evidence is not negligible." Id. This standard does not change merely because resolution of the relevant issue is "highly fact specific." Id.

DISCUSSION

I. Infringement of 484 (Utility) Patent

Defendants move for summary adjudication of non-infringement of the *484 patent*. Plaintiff has affirmed that it does not allege that Defendants' second-generation Ionic Pro infringes the *484 patent*, and covenants not to sue Defendants for such infringement. Barry Decl. P 8. Accordingly, the Court grants Defendants' motion for summary adjudication of non-infringement and dismisses with prejudice any *484 patent* infringement claims based on the second-generation Ionic Pro. With respect to the first-generation Ionic Pro, however, Plaintiff opposes Defendants' motion for summary adjudication, and separately moves for summary adjudication of its claim of infringement of the *484 patent*.

A. Factual Background

Plaintiff is the assignee of *U.S. Patent No. 6,709,484* (the *484 patent*), issued on March 23, 2004. The [*10] *484 patent*'s asserted claims pertain to a method for cleaning the emitter electrodes of an "electro-kinetic electro-static air conditioner." Of the asserted claims, only Claim 29 and 32 are independent. Claim 29 discloses,

> A method for cleaning an emitter electrode with an electrode cleaning mechanism, . . . the method comprising:

(a) rotating the housing from the upright position so that the electrode cleaning mechanism travels, from an initial position, along the emitter electrode and frictionally removes debris from the emitter electrode; and

(b) rotating the housing generally back to the upright position so that the electrode cleaning mechanism travels back to the initial position.

*'484 patent* 18:66-19:10. Claim 32 is the same except that it discloses "generally inverting" the housing instead of "rotating" the housing. Id. at 20:4-10.

Plaintiff accuses Defendants of infringing the *484 patent* due to their recommended method of cleaning the first-generation of the Ionic Pro. Sylmark was responsible for designing the Ionic Pro Owner's Guide. Barry Decl., Ex. K, IP-2287. The Owner's Guide distributed with the first-generation Ionic Pro recommended [*11] that users clean the "internal ionizing wires" "after every eight to ten days of use or whenever you hear excessive noise." Barry Decl., Ex. E, Owner's Guide at 9. In order to do so, the Owner's Guide instructed users to "tilt the unit upside down for a few seconds and then right side up again to allow the internal wire cleaner to work." Inverting the Ionic Pro caused a cleaning plate to slide along the wire emitter electrodes. Spiegel Decl. P 7. Mr. Spiegel also specifically recommended in an email that Wal-Mart should clean the first-generation Ionic Pro units by rotating them upside down. Barry Decl., Ex. H, IP 8584.

According to Mr. Spiegel, early feedback from sales of the first-generation Ionic Pro "indicated that consumers either did not read the instructions for inverting the purifier to clean the emitter electrodes, or that they were unwilling to go to the trouble of physically lifting and inverting the Pro just to clean the emitter electrodes." Spiegel Decl. P 8. In order to overcome this consumer resistence, Ionic Pro, LLC developed a second-generation product with a "new cleaning mechanism that works without physically inverting the air purifier." Spiegel Decl. P 9. Internal [*12] company emails suggest an additional motivation for the new design, however. Plaintiff had already brought its patent infringement charges, and in a May 26, 2004 email, Paul Shellhammer reported that Ionic Pro, LLC had "turned both Patent challenges into positive changes." Barry Decl., Ex. G, IP 11037, May 26, 2004 Email from Paul Shellhammer to Yu Shen. The new mechanism is described and claimed in *U.S. Patent No. 6,855,190* (the 190 patent), of which Sylmark Holdings, Ltd. is the assignee. The application for this patent was filed on April 12, 2004, and the PTO issued it on February 15, 2005.

Manufacturing of the first-generation Ionic Pro ceased in early February, 2004. Spiegel Decl. P 7. However, as Defendants conceded at the hearing, Ionic Pro, LLC continued to ship its first-generation product after the *484 patent* was issued. Between February and June, 2004, Mr. Spiegel admits that orders were filled from the existing inventory of first-generation products. Barry Decl., Ex. B, Spiegel Dep. 249:15-17. In April, 2004, Sylmark employees insured that manuals accompanied Ionic Pro units. Barry Decl., Ex. B, IP 8414. A May 13, 2004 email exchange among Sylmark employees shows that [*13] the Ionic Pro continued to be advertised after the *484 patent* issued. See Barry Decl., Ex. G, IP 5758 Email from Joel Chamberlain to Rick Shiu (noting Ionic Pro advertisement and offering product for sale). A June 23, 2004 email from a Sylmark employee stated that the company "only started making [second-generation Ionic Pros] a week ago." Barry Decl., Ex. L.

Plaintiff identifies evidence of two Ionic Pro users who directly infringed the asserted method claims after the patent issued. n3 On August 29, 2004, an Ionic Pro customer wrote the manufacturer to say that she noticed "when I turn the unit upside down I have to really shake it to make whatever slides up and down move. I'm sure it's gummy inside" due to her smoking. Barry Decl., Ex. H, Email from Marlaine to Inbox. On June 7, 2004, another Ionic Pro customer wrote to complain that the red light kept going on, explaining, "The first couple of times this happened we cleaned everything as per the instruction, even though the blades were not dirty." Id., Email from Cheryl Welsh-Carrier to Inbox. Defendants object to use of these customers' emails to prove direct infringement on the grounds that they are not authenticated. [*14] This objection is sustained, and the Court does not consider the consumer statements for the truth of the matters asserted therein.

n3 A user also submitted a review to Amazon.com on March 21, 2004, two days before the *484 patent* issued, including the statement "cleaning is very easy." Barry Decl., Ex. H, IP 12322.

On July 26, 2004, Plaintiffs' counsel ordered two Ionic Pro air purifiers, one first-generation and one second-generation, from Target. The first-generation product arrived just two days later. Barry Decl. P 15. The second-generation version was not delivered until October, 2004. Id. P 7. Factories 2U sold several Ionic Pros in late August and early September, but the sales records do not indicate that these were first-generation products. Barry Decl., Ex. I, Factories 2U, LLC, Sales by Item Detail, January through December 2004. There is no evidence showing that any of these products was accompanied by an Owners' Manual.

On August 23, 2004, in connection with Plaintiff's motion for a preliminary [*15] injunction, Mr. Spiegel declared to the Court that he believed that all Ionic Pro units being sold at that time by his company or other Defendants were second-generation products. August 23, 2004 Spiegel Decl. However, he acknowledged in his deposition that other retailers may have been continuing to sell first-generation Ionic Pros at that time. Spiegel Dep. 252:14.

The parties dispute which entities and individuals participated in selling or offering for sale the first-generation Ionic Pro. The purpose of Ideal Products is to "open up the retail trade for the infomercial products, the wholesale trade, in other words, to sell to mass merchandisers, the carriage trade, that group." Barry Decl., Ex. C, McConnell Dep. 21:19-22. As evidence that Ideal Products sold the Ionic Pro product, Plaintiff points to the testimony of Andrew Parker, Senior Vice President for Sharper Image Design, and Estelle Cohen, former CFO for Sylmark. Mr. Parker states that in February, 2004, he saw the Ionic Pro product for sale in a booth rented by Ideal Products. Parker Decl. P 6. Ms. Cohen testified, "If Ideal Products sold" Ionic Pro products, "then it would be reflected on the Ideal Products' financial [*16] statements." Barry Decl., Ex. U., Cohen Dep. 215:20-22. Plaintiff notes that Defendants produced a 2004 projected sales chart for the Ionic Pro labeled, "Ideal Product, L.L.C. Ionic Pro." Barry Decl., Ex. XX. Mr. Shellhammer, its author, testified that he mistakenly labeled the sales chart using an Ideal Products template and neglected to change the name. Shellhammer Reply Decl. P 3.

Plaintiff also accuses Mr. Bess, who served as president of Ionic Pro, LLC until June, 2005 and holds a minority interest in its parent company. He testified that, other than his formal duties as a company officer, he had "almost no involvement" with the Ionic Pro, which was developed and managed by Mr. Spiegel. Rosenblatt Decl., Ex. M., Bess Dep. 104-05. Mr. Bess did attend a meeting in which it was decided that a disclaimer would be added to the Ionic Pro box stating that it was not a Sharper Image product. Barry Decl., Ex. TT, Bess Dep. 19:18-20:12. He also participated in a sales meeting with prospective retailer Wal-Mart in September, 2004. Barry Decl., Ex. UU, IP 9098-9100. Also in September, 2004, Mr. Bess was included in an email exchange in which he stated that he would "steal [*17] a container [of Ionic Pros] at the factory for Harriet Carter (1100). They have almost 500 backorders, and may put us on the front cover for Christmas if we can solve this problem." Id. at IP 9144. Finally, at an unspecified time, Mr. Bess was involved in analyzing the effectiveness of an Ionic Pro advertisement that ran in USA Today. Barry Decl., Ex. WW, 45, 51.

B. Applicable Law

Title 35 U.S.C. § 271(b) provides, "Whoever actively induces infringement of a patent shall be liable as an infringer." Absent direct infringement, there can be no inducement of infringement. *Met-Coil Sys. Corp. v. Korners Unlimited, Inc., 803 F.2d 684, 687 (Fed. Cir. 1986)* (citing *Stukenborg v. Teledyne, Inc., 441 F.2d 1069, 1072 (9th Cir. 1971))*. Circumstantial evidence is sufficient to establish direct infringement and inducing infringement, and "may also be more certain, satisfying and persuasive than direct evidence.". *Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1272 (Fed. Cir. 1986)* (quoting *Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 330, 81 S. Ct. 6, 5 L. Ed. 2d 20 (1960))*. In *Arthrocare Corp. v. Smith & Nephew, Inc., 406 F.3d 1365, 1377 (Fed. Cir. 2005),* [*18] the court found "strong circumstantial evidence" that users directly infringed a patent, including both testimony regarding the intended infringing design and sales literature instructing customers to follow an accused method. See also *Golden Blount v. Robert H. Peterson Co., 438 F.3d 1354 (Fed. Cir. 2006)* (finding direct infringement could be inferred from evidence of sales of unassembled product with instructions to users for creating infringing configuration).

Intent is also a required element of induced infringement. To be liable for inducing infringement, the alleged infringer "must be shown . . . to have knowingly induced infringement." *Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 553 (Fed. Cir. 1990)* (emphasis in original).

As a general rule, "inducement of infringement under § 271(b) does not lie when the acts of inducement occurred before there existed a patent to be infringed." *Nat'l Presto Indus., Inc. v. W. Bend Co., 76 F.3d 1185, 1196 (Fed. Cir. 1996)*.

## C. Analysis

### 1. Ionic Pro, LLC and Sylmark Entities

With respect to Defendants Ionic Pro, LLC and the Sylmark entities, neither Plaintiff nor Defendants [*19] are entitled to summary judgment on the issue of inducement of infringement. Defendants do not deny that a user who followed the cleaning instructions accompanying the first-generation Ionic Pro would directly infringe once the *484 patent* was issued. Defendants nevertheless contend that they cannot be liable for inducing infringement because Plaintiff has introduced no evidence that any Ionic Pro users indeed directly infringed.

In Moleculon Research, the plaintiff met its burden of showing infringement of a puzzle method claim under § 271(b) by showing "circumstantial evidence of extensive puzzle sales, dissemination of an instruction sheet teaching the method of restoring the preselected pattern with each puzzle, and the availability of a solution booklet on how to solve the puzzle." *793 F.2d at 1272.* Here, there is similar circumstantial evidence that Ionic Pro users infringed after the patent was issued: the Owner's Guide instructed users to invert the product to clean the wires, which provides circumstantial evidence that those who followed the product instructions infringed the *484 patent.* The market research showing that consumers were unwilling to clean [*20] the first-generation Ionic Pro by inverting it is evidence that some, and possibly many, consumers did not infringe. Based on the evidence, however, a reasonable trier of fact could also draw the inference that at least some customers did follow the instructions. Therefore, the Court finds that a disputed issue of material fact exists as to whether Ionic Pro users directly infringed the asserted claims of the *484 utility patent.*

Defendants also contend that, in the time period after the patent issued, no evidence shows that they acted with the necessary intent to be held liable for inducement. With respect to Ionic Pro, LLC and Sylmark, the evidence contradicts Defendants' assertions. These entities undisputedly learned of the *484 patent* when Plaintiff filed suit. Sales records show that Ionic Pro, LLC continued to sell what Mr. Spiegel admits was first-generation product for months after the *484 patent* was issued. After the *484 patent* was issued, but before the second-generation product was available, Sylmark employees advertised the product for sale and insured that instruction manuals were included with the product. Therefore, those sales of first-generation product, in combination [*21] with the instruction manuals designed in part by Sylmark, are some evidence of a knowing intent to induce infringement. Disputed issues of fact thus preclude summary adjudication of Plaintiff's utility patent infringement claims against Ionic Pro LLC and the Sylmark entities.

With respect to the retail Defendants, however, Plaintiff has not identified evidence of intent sufficient to withstand summary judgment. There is no evidence that Factories 2U, Target or Qwik Cook knowingly sold the instruction manual with first-generation products after they were made aware of Plaintiff's claims of infringement. For this reason, Court denies Plaintiff's motion for summary judgment of infringement of the *484 patent* by Defendants Factories 2U, Target and Qwik Cook, and grants Defendants' motion for summary adjudication with respect to these retailers.

### 2. Ideal Products

Defendants move for summary adjudication of Plaintiff's claims against Defendant Ideal Products, on the grounds that there is no evidence that Ideal Products was involved in the sale or manufacture of the Ionic Pro.

Neither Mr. Parker's nor Ms. Cohen's testimony is direct evidence that Ideal Products sold the Ionic Pro at a [*22] time when doing so could constitute inducement of infringement of the *484 utility patent,* i.e. after March 23, 2004. Mr. Parker says only that he observed the Ionic Pro in an Ideal Products sales booth in February, 2004. Ms. Cohen had left the company by the time the *484 patent* was issued. Nevertheless, Mr. Parker's testimony is evidence that Ideal Products at some point sold the Ionic Pro or offered it for sale. Because Ideal Products' admitted purpose is to promote the trade of Sylmark products such as the Ionic Pro, Mr. Parker and Ms. Cohen's testimony would allow the trier of fact to draw a reasonable inference that Ideal Products continued to offer to sell the Ionic Pro after the March 23 patent issue date. For this reason, the Court denies Defendants' motion for summary adjudication with respect to Ideal Products.

### 3. Chaim Mark Bess

Defendants move for summary adjudication of Plaintiff's claims against Mr. Bess, on the grounds that he lacks sufficient involvement with Ionic Pro to be held liable for any of Plaintiff's claims against him.

Plaintiff claims that the Court should "pierce the corporate veil" and hold Mr. Bess liable under the alter ego theory. The Court may pierce [*23] the corporate veil only where the following two conditions are met: "(1) there is such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased, and

Case 5:06-cv-01839-PVT     Document 13-10     Filed 05/19/2006     Page 8 of 19

Page 7
2006 U.S. Dist. LEXIS 24851, *

(2) an adherence to the fiction of the separate existence of the corporation would sanction a fraud or promote injustice." *SEC v. Hickey, 322 F.3d 1123, 1128 (9th Cir. 2003)* (citations and quotation marks omitted).

Plaintiff has failed to show any evidence to justify piercing the corporate veil. Plaintiff's allegations of deceit are directed generally toward "Mr. Bess and his associates," and therefore do not show that the separateness between Mr. Bess, specifically, and the Defendant corporations had ceased. Accordingly, it is not appropriate to pierce the corporate veil and hold Mr. Bess liable for all of his company's actions.

Plaintiff has also failed to raise a dispute of fact regarding the question of whether Mr. Bess personally should be held liable for inducement of infringement. Although the evidence shows that Mr. Bess understated his own involvement in the development and marketing of the Ionic Pro, it does not show that Mr. Bess was actively [*24] involved in developing and marketing the first-generation Ionic Pro, with the knowledge that this would induce the infringing acts, after the issuance of the *484 patent*.

Therefore, the Court grants Defendants' motion for summary adjudication of Mr. Bess' liability for infringement.

II. Infringement of 494 (Design) Patent

Defendants move for summary adjudication of non-infringement of the *494 design patent*.

A. Factual Background

Plaintiff is also the assignee of *U.S. Design Patent No. 433,494* (the 494 patent). The *494 patent* was issued on November 7, 2000 and claims an ornamental design for an air purifier.

Tristan Christianson, a co-inventor of the patent and Plaintiff's *Rule 30(b)(6)* designee on the topics of the design and selection of trade dress for IBQ, testified that there were only three aspects of the design that "did not arise from functional need": the scalloped cut-outs on either side of the body, the curved button below the handle and the handle itself. Rosenblatt Decl., Ex. AA, Christianson Dep. 198:2-10. In prior briefing before this Court, however, Mr. Christianson had explained that, viewing the *494 patent* as a whole, the following features were part [*25] of the claimed ornamental design: "an overall tower-shape, size, shape and configuration (see Figures 1 through 6); (b) an oval cross-section; (c) a circular base, which is not flush with the bottom of the air cleaner's housing; (d) numerous (approximately 50) sleek, smooth horizontal inlet and outlet vents located along the front and back of the air purifier's tower that are interrupted by a vertical seam; and (e) operational controls that are situated at the top of the housing, which is slightly sloped downward." Docket No. 60, May 18, 2004 Declaration of Tristan Christianson.

Andrew J. Parker, Senior Vice President of Sharper Image Design, declares that the following features of the IBQ are "ornamental in nature and selected to create a visually attractive product": the rounded tower shape; the downward slant of the top and upper surface; the clean design lines of the top surface, including the recessed handle; the cross-sectional shape creating a narrow, tapered impression; the horizontal orientation and arrangement of the vents; the wrapping around to the sides of the vents; the narrow, vertical airflow band; and the vertical band separating front vents from the rear vents. Parker [*26] Decl. PP 3-11. Mr. Parker identifies other competitors' air purifiers that do not include some of those features; for instance, Duracraft air purifiers are short and boxy. Id. P 4.

B. Applicable Law and Analysis

Determining whether a design patent is infringed requires (1) construction of the patent claim and (2) comparison of the construed claim to the accused product. *Elmer v. ICC Fabricating, Inc., 67 F.3d 1571, 1577 (Fed. Cir. 1995)*.

1. Construction of the 494 Patent

"In construing a design patent claim, the scope of the claimed design encompasses its visual appearance as a whole,' and in particular the visual impression it creates.'" *Contessa Food Prods., Inc., v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002)* (citing *Durling v. Spectrum Furniture Co., 101 F.3d 100, 104-05 (Fed. Cir. 1996)*). If the design contains both functional and non-functional elements, then "the scope of the claim must be construed in order to identify the non-functional aspects of the design." *OddzOn Prods., Inc. v. Just Toys, Inc., 122 F.3d 1396, 1405 (Fed. Cir. 1997)* (citing *Lee v. Dayton-Hudson Corp., 838 F.2d 1186, 1188 (Fed. Cir. 1988)*). [*27] However, the fact that a particular feature of a design performs a function does not mean that the feature cannot be part of a claimed design; as the Federal Circuit has explained in relation to a dispute over a design patent for shoes,

There is no dispute that shoes are functional and that certain features of the shoe designs in issue perform functions. However, a distinction exists between the functionality of an article or features thereof and the functionality of the particular design of such article or features thereof that perform a function. Were that not true, it would not be possible to obtain a design patent on a utilitarian article of manufacture, or to obtain both design and utility patents on the same article.

*Avia Group Int'l, Inc., v. L.A. Gear Cal., Inc., 853 F.2d 1557, 1563 (Fed. Cir. 1988).*

Defendants urge the Court to adopt a construction of the design patent based only on those aspects of the design which Mr. Christianson testified did not arise from functional need, specifically the scalloped cut-outs on the sides, the crescent-shaped curved button below the handle and the recessed handle itself. n4 Plaintiff, on the other hand, **[*28]** asks the Court to rely exclusively on the declaration of Mr. Parker and his much broader view of the design's ornamental features in order to determine the scope of the patented design.

n4 Plaintiff moves to strike the portions of Defendants' motion which rely on Mr. Christianson's testimony for the purpose of construing the *494 patent's* claim, arguing that such extrinsic, inventor testimony cannot be considered. Plaintiff's motion to strike is denied. While Mr. Christianson's testimony is not, in itself, evidence of the proper construction of the claim, it is relevant to the Court's determination of which features are ornamental in nature and which are functional, an inquiry which must precede construction of claimed design and which is not answered by the patent itself. See *Key Pharms. v. Hercon Labs. Corp., 161 F.3d 709, 716-17 (Fed. Cir. 1998)* (noting that district courts properly consider extrinsic evidence to resolve questions in claim construction not answered by the intrinsic evidence of the patent and its file history). Mr. Christianson's testimony is consistent with the intrinsic evidence of the patent itself; all of the ornamental features he identifies are clearly visible in the patent drawings.

**[*29]**

The Court finds that all of the features identified by the declarants are significant parts of the "overall visual impression" given by the patented design. Mr. Christianson's and Mr. Parker's testimony is not necessarily inconsistent. The fact that some of the features described by Mr. Parker provide the IBQ with functional as well as aesthetic advantages (and thus were not listed as "purely" ornamental by Mr. Christianson) does not mean that those features are purely functional. Furthermore, the three ornamental attributes specifically identified by Mr. Christianson, considered in isolation, do not encompass, as the construction of a design patent must, an overall visual impression of the design (which Mr. Christianson himself testifies to be a "sleeker, more sculptured appearance"). Christianson Dep. 199:2-3. On the other hand, those distinctive, purely ornamental features identified by Mr. Christianson are also part of the design's overall visual impression.

Therefore, the Court gives the following claim construction to the *494 patent*. The *494 patent* is directed toward an ornamental design for a tower-type air purifier. The housing has a narrow and tall shape with an oval cross-section, **[*30]** as shown in Figure 1, fixed on top of a circular base which is bigger than the bottom of the housing, see Fig. 2. Figures 1, 2 and 5 show many horizontal vents which are located along the front and back of the tower, separated by scalloped cut-outs on either side of its body. A crescent-shaped control button is located on top of the unit, below the handle. Figures 1 and 7. As seen from the perspective of Figures 5 and 6, the top of the unit is slanted downward. A boomerang-shaped handle (see Fig. 7) is located in a recessed cavity and protrudes up from the top. See Figs. 5 and 6.

2. Comparison

The trier of fact need not find that the patented and accused designs are identical in order to find design patent infringement. *Braun Inc. v. Dynamics Corp. of Am., 975 F.2d 815, 820 (Fed. Cir. 1992).* Comparison of the accused product "includes two distinct tests, both of which must be satisfied in order to find infringement: (a) the ordinary observer' test, and (b) the point of novelty' test." *Contessa Food Prods., Inc., v. Conagra, Inc., 282 F.3d 1370, 1377 (Fed. Cir. 2002).* Because the Court finds that Plaintiff has failed to raise a disputed **[*31]** issue of material fact under the point of novelty test, it need not decide whether the Ionic Pro infringes under the ordinary observer test.

The point of novelty test requires that the accused product "contain substantially the same points of novelty that distinguished the patented design from the prior art." *Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co., Inc.,*

*162 F.3d 1113, 1118 (Fed. Cir. 1998)* (citing *L.A. Gear, Inc., v. Thom McAn Shoe Co., 988 F.2d 1117, 1125 (Fed. Cir. 1993)).* The purpose of the point of novelty test is to focus only on those aspects of a design which render it different from prior art designs. *Winner Int'l Corp. v. Wolo Mfg. Corp., 905 F.2d 375, 376 (Fed. Cir. 1990),* overruled on other grounds by *Cardinal Chem. Co., v. Morton Int'l, 508 U.S. 83, 92 n.12, 113 S. Ct. 1967, 124 L. Ed. 2d 1 (1993),* (citing *Litton Sys., Inc., v. Whirlpool Corp., 728 F.2d 1423, 1444 (Fed. Cir. 1984)).*

Plaintiff objects to Defendants' use of prior art not cited by Plaintiff to the PTO during prosecution, specifically *U.S. Patent No. Des. 389,567* (the Gudefin patent) and *U.S. Patent No. Des. 375,546* (the Lee patent), **[\*32]** in order to establish the *494 patent's* points of novelty. Plaintiff relies on Bernhardt, LLC v. Collezione Europa USA, Inc., in which the Federal Circuit held that to satisfy the points of novelty test in a design patent infringement case, the patentee must "at minimum" introduce as evidence "the design patent at issue, its prosecution history, and the relevant prior art references cited in the prosecution history." *386 F.3d 1371, 1384 (Fed. Cir. 2004).* However, nothing in Bernhardt suggests that prior art not cited during prosecution may not also be considered in determining which aspects of a design are novel.

Plaintiff also argues that design patent features are points of novelty if the particular combination of features is not found in the prior art. Plaintiff relies on an overly-broad interpretation of *Rubbermaid Commercial Prods., Inc., v. Contico Int'l, Inc., 836 F.Supp. 1247, 1259 (W.D. Va. 1993),* where the court stated (in the context of a challenge to a design patent's validity, not infringement), that the overall arrangement of individual elements could be considered a point of novelty. The Rubbermaid court's approach has since **[\*33]** been abrogated by the Federal Circuit's decision in *Lawman Armor Corp. v. Winner Int'l, LLC, 437 F.3d 1383 (Fed. Cir. 2006)* that a new combination of elements shown in the prior art could not, in itself, constitute a "point of novelty" in the new design. n5

n5 After the hearing on their motions, both parties submitted short supplemental briefs addressing the Federal Circuit's recent holding in Lawman.

Plaintiff fails to identify points of novelty in light of the uncited prior art Gudefin and Lee patents. Of the elements of the claimed design, as construed by the Court, virtually none of those proffered by Plaintiff as points of novelty are, in fact, new. The Lee design shows a round cross-section with horizontal vents that wrap around both the front and back of the housing. The Gudefin design shows a narrow and tall housing shape, fixed on top of a circular base which is bigger than the bottom of the housing, with many vents located on the front and back of the unit, separated on the sides **[\*34]** by solid portions with no vents. The Gudefin design also places the controls on the top of the unit, and the top of the unit angles downward. See Gudefin Patent Figs. 3 and 5. Thus, only the following elements of the 494 patented design, as construed by the Court, remain as potential points of novelty: the oval cross-section; the scalloped cut-outs separating the vents on either side of the body; the crescent-shaped control button; and the boomerang-shaped handle located in a recessed cavity and protruding from the top. Of these, the only element arguably shared by the Ionic Pro is the placement of the handle in a recessed cavity. Otherwise, the Ionic Pro does not share the IBQ's points of novelty: its cross-section (rounded like Gudefin's) is guitar-pick rather than oval-shaped; its vents are separated by a narrow, solid seam rather than scalloped cut-outs; its control button is round; and its handle is formed by two round holes, which do not protrude from the top.

The Court finds that Plaintiff has failed to introduce a triable issue of material fact under the required point of novelty test. Accordingly, the Court grants Defendants' motion for summary adjudication of Plaintiff's **[\*35]** claim of design patent infringement.

## III. Trade Dress Infringement

Defendants also move for summary adjudication of Plaintiff's claim of trade dress infringement.

### A. Factual Background

Plaintiff claims that its trade dress consists of the combined use of the following five elements: (1) upright, rounded tower shape; (2) number, arrangement and design of its sleek, smooth, horizontal wrap-around vents; (3) slanted top; (4) placement and design of the handle for the removable collector grid; and (5) design, placement and designation of the operational controls.

According to Jeffrey Forgan, a Sharper Image CFO, Plaintiff has conducted an "extensive advertising and marketing campaign" for the IBQ using its trade dress. Forgan Decl. P 3. The IBQ is featured prominently in every Sharper Image catalog, a publication into which Plaintiff puts substantial resources. Id. P 6. Plaintiff has spent huge amounts of money advertising the IBQ in newspapers, magazines and informercials. Id. PP 8-9. The IBQ has also received unsolicited media coverage, including appearances in two popular television shows. Id. P 11. Defendants' and other competitors' advertisements and infomercials [*36] have featured the IBQ without identifying it by name. Id. P 12.

Before the release of the Ionic Pro, an employee in Sylmark's product development office ordered two IBQ air purifiers, explaining that these were "needed for China," where Ionic Pros were being manufactured. Barry Decl., Ex. G, IP 5661. As Plaintiff suggests, a reasonable inference is that Defendants used those IBQs to assist in manufacturing. Other internal Sylmark emails show that Ionic Pro manufacturers imitated the internal working of the IBQ. See, e.g., id. at IP 10306 (noting that, although Ionic Pro has three wires and IBQ has two, both products produced the "same result" and used the "same metal piece"). Ms. Cohen testified that, in her personal opinion, the Ionic Pro product "was meant to have the same look and feel and same functionality as The Sharper Image product." Barry Decl., Ex. U, Cohen Dep. 70:16-18. Plaintiff also notes that Defendants used the same or similar marketing techniques such as offering free shipping.

Plaintiff's expert, Walter McCullough, conducted consumer research showing a twenty-one percent level of "design related confusion" between the IBQ and Ionic Pro products. McCullough [*37] Decl., Ex. A, Report on a Test of Source Confusion for the Sharper Image Ionic Breeze Quadra Air Purifier. In addition to comparing consumer reactions to the IBQ and Ionic Pro air purifiers, Mr. McCullough also did a comparison between the IBQ and the Trion Rx, another vented, tower air purifier of the same color that is less similar in shape to the IBQ than is the Ionic Pro. The results of the survey showed that three percent of consumers were confused about the source of the Trion Rx, twenty-four percent were confused about the source of the Ionic Pro, and thus twenty-one percent were confused by the similarity in appearance between IBQ and Ionic Pro, specifically.

Both parties have been contacted on several occasions by consumers confused about the source of the Ionic Pro. For instance, one consumer wrote to Sylmark to complain, "i did not realize that the ionic pro was not part of the sharper image co. that was due to my own fault i have not used this and would like to know about returning costs etc [sic]." Barry Decl., Ex. A, IP 14192. An internal memorandum from Mr. Spiegel provided Ionic Pro, LLC sales staff and Sylmark customer service employees with answers to questions [*38] regarding the Ionic Pro and IBQ, such as, "Why is the Ionic Pro so much less expensive that the Ionic Breeze by Sharper Image?" and "Is the Ionic Pro as good as the Ionic Breeze by Sharper Image?". Barry Decl., Ex. G, IP 5767. Two consumers have tried to return an Ionic Pro to Plaintiff for a refund. Arney Decl. P 4. Consumer Richard Jankowitz, after watching an Ionic Pro infomercial, was confused about the source of the product because of the "similarities of the Ionic Pro and the Ionic Breeze(R) Quadra(R) infomercials as well as similarities in the appearance of the products themselves." Jankowitz Decl. P 2. Upon ordering an Ionic Pro and realizing it was not a Sharper Image product, Mr. Jankowitz felt deceived. Id. P 5.

As direct evidence of consumer association of its trade dress and the Sharper Image source, Plaintiff provides twenty unsworn declarations of consumers, which it submitted to the PTO in the context of its application to register its trademark. Barry Decl., Ex. P. Only the spaces for name and number of years as a Sharper Image customer are completed by the declarants; each form is pre-printed to state,

> I have purchased air purifiers/air cleaners from [*39] Sharper Image, and am aware of the air purifier product that is the subject of this application. I instantly recognize tower-shaped air cleaners with forward sloping heads and double-sided, crescent shaped, horizontal vents, as products of Sharper Image only, and not of any other company in the field.
>
> It is my belief that the tower-shaped air cleaners, as described and shown above, come from Sharper Image and have the same high quality and performance as other products from Sharper Image.

Plaintiff also provides sworn statements from Sharper Image retailers with similar content. Barry Decl., Ex. Q.

Plaintiff sought and eventually received protection for its trade dress from the Patent Office. At one point, the PTO examining attorney rejected Plaintiff's attempt to establish acquired distinctiveness for its trade dress based on the similarity of the design to others on the market, referring Plaintiff to twenty examples of "third party use of similar product

Case 5:06-cv-01839-PVT     Document 13-10     Filed 05/19/2006     Page 12 of 19

Page 11
2006 U.S. Dist. LEXIS 24851, *

configurations for tower air purifiers and air cleaners," including the accused Ionic Pro. Rosenblatt Decl., Ex. II, SI-IP 009345. In its Amendment and Response to the PTO, Plaintiff insisted that, of the twenty competitors [*40] identified by the examining attorney, "not one of them references a product comprised of the same design features as those found within Applicant's product."

B. Applicable Law

A product's "trade dress" is its total image and overall appearance; it may include "features such as size, shape, color, color combinations, texture, or graphics." *Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 613 (9th Cir. 1989)* (internal quotation and citation omitted). Trade dress, including a product's design, may be a protected mark under the Lanham Act. *Wal-Mart Stores, Inc., v. Samara Bros., Inc., 529 U.S. 205, 209, 120 S. Ct. 1339, 146 L. Ed. 2d 182 (2000).* A claim for infringement of trade dress requires a plaintiff to prove three required elements: (1) distinctiveness, (2) non-functionality and (3) likelihood of confusion. *Kendall-Jackson Winery Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042, 1046-47 (9th Cir. 1998).* Defendants argue that Plaintiff has failed to introduce sufficient evidence to raise a triable issue of material fact on either distinctiveness or likelihood of confusion. n6

> n6 Defendants also criticize as overbroad Plaintiff's characterization of its trade dress because Plaintiff includes functional elements, but Defendants do not move for summary adjudication on this ground.

[*41]

C. Analysis

1. Distinctiveness

In an action for infringement of unregistered trade dress under *§ 43(a)* of the Lanham Act, "a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning." *Wal-Mart Stores, 529 U.S. at 216.* Whether trade dress has acquired secondary meaning is a question of fact. *Lindy Pen Co., Inc., v. Bic Pen Co., 725 F.2d 1240, 1246 (9th Cir. 1984),* cert. den., *469 U.S. 1188, 105 S. Ct. 955, 83 L. Ed. 2d 962 (1985),* (citation omitted). In the Ninth Circuit, secondary meaning is defined as "the mental association by a substantial segment of consumers and potential consumers between the alleged mark and a single source of the product.'" *Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1354 (9th Cir. 1985)* (quoting in part 1 J. McCarthy, § § 15:2 at 659 and 15:11(B) at 686)). Factors to be assessed in determining secondary meaning include whether actual purchasers associate the product design with its source, the degree and manner of the plaintiff's advertising, the length and manner of the plaintiff's use of the design and whether the plaintiff's use of the design has been exclusive. [*42] *Clamp Mfg. Co. v. Enco Mfg. Co., 870 F.2d 512, 517 (9th Cir. 1989),* cert. den., *493 U.S. 872, 110 S. Ct. 202, 107 L. Ed. 2d 155 (1989).* "Extensive use and advertising over a substantial period of time is enough to establish secondary meaning." Id. (citing *First Brands v. Fred Meyer, 809 F.2d 1378, 1383 (9th Cir. 1987));* but see *Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25, 44 (1st Cir. 2001)* (finding that even a plaintiff who relies on circumstantial evidence of secondary meaning must show "some evidence that consumers associate the trade dress with the source") (emphasis in original). "Proof of exact copying, without any opposing proof," may also be sufficient. *Transgo, Inc., v. Ajac Transmission Parts Corp., 768 F.2d 1001 (9th Cir. 1985)* (citing *Audio Fidelity, Inc., v. High Fidelity Recordings, Inc., 283 F.2d 551, 557 (9th Cir. 1960).*

The only direct evidence identified by Plaintiff of consumer association of the combined use of the five elements of Plaintiff's asserted trade dress with the Sharper Image source is the twenty unsworn, pre-printed consumer declarations. Even setting aside their [*43] questionable admissibility and probative value, this small collection of pre-printed declarations is not evidence of a mental association by a "substantial segment" of consumers. Furthermore, these declarations do not address the specific combination of five elements which Plaintiff claims constitutes its protected trade dress; specifically, the declarants do not mention "placement and design of the handle for the removable collector grid" or "design, placement and designation of the operational controls." Likewise, the sworn statements of Sharper Image retailers are not probative of association in the minds of the consuming public. See *Yankee Candle, 259 F.3d at n.14* (noting that opinions of retailers and those active in the field not evidence of views of the consuming public). Plaintiff produces no consumer surveys showing association between its trade dress and the Sharper Image brand.

Plaintiff also alleges that Defendants deliberately copied the IBQ in designing the Ionic Pro. However, the evidence it cites refers primarily to the internal workings and performance of the IBQ, rather than to its trade dress. The only evidence related to appearance is the "personal opinion" [*44] of Ms. Cohen that Ionic Pro was generally designed to

"look and feel" similar to the IBQ; this clearly is not sufficient to show that the IBQ is distinctive. Furthermore, as described in Section 2 below, the Ionic Pro is in fact not an exact copy.

Finally, Plaintiff points to media coverage (including its own competitors' advertisements) and its copious spending on advertising the Ionic Breeze product. Advertising and media coverage are factors indicating distinctiveness. However, evidence of a heavy advertising campaign is not, in itself, sufficient to allow a reasonable inference of consumer association between Plaintiff's alleged trade dress and its source. In contrast to the product in Clamp Mfg., where the Ninth Circuit found that a plaintiff could prove distinctiveness, without showing direct evidence of consumer association, based on decades of exclusive trade dress use, Plaintiff has only sold the current version of the IBQ since 2000. Forgan Decl. P 2. Although it is true that Plaintiff has successfully obtained two consent judgments permanently enjoining its competitors based on its allegedly distinctive trade dress, neither of those judgments indicates that the trade [*45] dress issue was subject to discovery or dispute. See Barry Decl. Ex. T, Consent Judgment and Permanent Injunction, Sharper Image Corp. v. Bluebargain, Inc., No. CV-05-6755 AHM (C.D. Cal., September 28, 2005); Consent Judgment and Permanent Injunction, Sharper Image Corp. v. Master Household, Inc., No. 03-03257-RMW (N.D. Cal., August 28, 2003). In fact, those cases, in addition to evidence of Ionic Pro sales, indicate that Plaintiff has not had exclusive use of its alleged trade dress, but has faced similar-looking competitors almost from the beginning.

For these reasons, the Court finds that Plaintiff has failed to introduce evidence that would allow a reasonable jury to conclude that its trade dress is distinctive or that a substantial segment of consumers and potential consumers has a mental association between the alleged trade dress and the Sharper Image source.

2. Likelihood of Confusion

Although Plaintiff's failure to show distinctiveness in itself would entitle Defendants to summary judgment on the trade dress infringement claim, the Court finds that Plaintiff has also failed to show a triable issue of material fact under the likelihood of confusion prong.

Eight [*46] factors are relevant to likelihood of confusion. *AMF, Inc., v. Sleekcraft, 599 F.2d 341, 348-49 (9th Cir. 1979)*. However, summary judgment on likelihood of confusion is appropriate when marks are so dissimilar that there can be no likelihood of confusion. See *Chesebrough-Pond's, Inc., v. Faberge, Inc., 666 F.2d 393, 397-98 (9th Cir. 1982)* (affirming summary judgment of non-infringement where marks clearly dissimilar and conclusory expert affidavit unlikely to assist trier of fact).

Plaintiff's representation to the PTO that the Ionic Pro is not "comprised of the same design features as" the IBQ significantly undercuts Plaintiff's present claim that the products share similar trade dress. See *Petro Stopping Centers, L.P. v. James River Petroleum, Inc., 130 F.3d 88, 94 (4th Cir. 1997)* (noting that trademark applicant's representation to PTO that term in mark was very dilute significantly undercut later claim in infringement action that term was strong mark).

Other than attorney argument and suggestions that the Court view each air purifier from a distance, Plaintiff offers no evidence of similarity of trade dress. Defendants do offer [*47] evidence of some dissimilarity, based on the testimony of Plaintiff's own witnesses, such as the IBQ's guitar-pick shaped cross-section and angled vents. As the initial response from the PTO shows, there are many generally similar tower-type air purifiers on the market. Given the range of generally similar products on the market, Plaintiff's evidence of actual confusion is de minimis, and it certainly is not probative of confusion based on trade dress. Indeed, consumers could easily become confused based on generic similarities shared by the other nineteen tower air purifiers identified by the PTO examining attorney.

For these reasons, the Court finds that Plaintiff has failed to raise a triable issue of material fact as to whether consumers are likely to be confused by Ionic Pro's alleged use of IBQ's trade dress. Accordingly, on the bases of both distinctiveness and likelihood of confusion, the Court grants Defendants' motion for summary adjudication of Plaintiff's claim for trade dress infringement.

IV. Plaintiff's Unfair Competition Claim

Defendants move for summary adjudication of Plaintiff's unfair competition claim under *California Business and Professions Code § 17200* [*48] . At the hearing, Plaintiff explained that its UCL claim was based only on Defendants' alleged trade dress infringement. Because the Court grants Defendants' motion with respect to the trade dress issue, it also grants Defendants' motion with respect to Plaintiff's *§ 17200* claim.

V. Defendants' Counterclaims

2006 U.S. Dist. LEXIS 24851, *

Defendants bring counterclaims for tortious interference with economic advantage and unfair competition under *California Business and Professions Code § 17200*. Plaintiff moves to strike those counterclaims under California's Code of Civil Procedure § *425.16*, which provides for special motions to strike claims based on the defendant's right of petition or free speech in connection with a public issue, and for judgment on the pleadings under *Federal Rule of Civil Procedure 12(c)* and, in the alternative, for summary adjudication, on the grounds that the counterclaims are barred by three absolute defenses, the litigation privilege, the competition privilege and the *First Amendment*. Defendants oppose the motion.

A. Factual Background

At issue in Defendants' tort and State law counterclaims are emails sent [*49] by Plaintiff to retailers advising them of this lawsuit, and asking them not to carry the Ionic Pro product. A sample email, sent July 20, 2004 from a Sharper Image employee to an official at the Boise Cascade/Office Max store, stated, in part, "Sharper Images [sic] wishes to make you aware of the serious legal consequences we expect the distributors of the Ionic Pro to suffer because of the direct assault upon Sharper Image's Ionic Breeze Quadra Silent Air Purifier." Plaintiff's Request for Judicial Notice (RJN), Ex. 4, Novak Decl., Ex A, SI-IP001199. It warned, "Sharper Image pursues all its legal rights against any entity or individual which is involved in the further publication of Ionic Pro's infringing product and fraudulent claims." Id. The end of the emailed letter listed Robert Schultz, Vice-President of Business and Legal Affairs for Sharper Image Corporation, and also included the name and contact information of Plaintiff's outside general counsel, e. robert wallach. Michelle Arney, a Sharper Image *Rule 30(b)(6)* designee, testified that the purpose of the letters was to "make sure the retailers were aware that this litigation was ongoing and to understand that ultimately [*50] they may not be able to rely on their indemnification from Ionic Pro."

Plaintiff also contacted various media outlets with its claims of infringement. A form letter for this purpose, also signed by Mr. Schultz and Mr. wallach, stated, in part,

> Sharper Image has been informed that the manufacturers and distributors of the Ionic Pro indoor air purifier have provided or will soon provide a commercial presentation for viewing on your station. We have viewed the Ionic Pro video presentation and are writing this letter to make you aware of the serious legal consequences we expect the distributors of the Ionic Pro to suffer. . . . As you would expect, Sharper Image pursues all its legal rights against any entity or individual which is involved in the further publication of Ionic Pro's infringing product and fraudulent claims. We request that you give strong consideration to rejecting this misleading advertisement instead of being a party to its further exposure.

Plaintiff's RJN, Ex. 5, SI-IP001260.

The letters referred to Plaintiff's then-pending motions in this Court for a temporary restraining order and for preliminary injunctive relief. The Court denied the motion for [*51] a preliminary injunction on September 9, 2004.

Although the text of the letters to retailers is threatening, the evidence also shows that Plaintiff hoped for commercial relationships with these retailers. Plaintiff's *Rule 30(b)(6)* designee Roger Bensinger testified that "what we wanted was to get Sharper Image Ionic Breeze in" to JC Penney and other retail stores. Novak Decl., Ex. L, Bensinger Dep. 75:6-8.

B. Applicability of Special Motion to Strike

California Code of Civil Procedure § *425.16(b)(1)* provides,

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

The California legislature recently amended this law so that it

does not apply to any cause of action brought against a person primarily engaged in the business of selling or leasing goods and services . . . arising from any statement or conduct by that [*52] person if both of the following conditions exist:

> (1) The statement or conduct consists of representations of fact about that person's or a business competitor's business operations, goods, or services, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services, or the statement or conduct was made in the course of delivering the person's goods or services.

> (2) The intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer. . .

*Cal. Civ. Proc. § 425.17(c)*. This exception was "intended to apply to commercial disputes." *Brill Media Co. v. TCW Group, Inc., 132 Cal. App. 4th 324, 342, 33 Cal. Rptr. 3d 371 (2005)*. Even in the context of a commercial dispute, however, "promises made to induce settlement of a lawsuit" are not statements of fact and do not fall within the exception created by *§ 425.17(c)*. *Navarro v. IHOP Prop., Inc., 134 Cal. App. 4th 834, 841, 36 Cal. Rptr. 3d 385 (2005)*.

The letters at issue contain representations of fact regarding Plaintiff's [*53] business competitor's goods. Although those factual representations contain implicit legal threats, they are far removed from the settlement promises made in Navarro. Plaintiff's own witnesses testify that one purpose of the letters was to promote Sharper Image products. The retail recipients were clearly potential buyers of the IBQ, and the media representatives were advertisers whose business is to influence potential customers. Plaintiff's argument that Defendants' counterclaims attack protected speech activity is inapposite; *§ 425.17(c)* specifically excludes from *§ 425.16*'s coverage speech activity that would otherwise be protected under *§ 425.16*. Plaintiff has shown no legal basis for its argument that *§ 425.16*'s heightened procedural protections for non-commercial speech are unconstitutional. Cf. *R.A.V. v. City of St. Paul, 505 U.S. 377, 381, 112 S. Ct. 2538, 120 L. Ed. 2d 305* (invalidating State statute which placed special prohibitions on certain categories of fighting words).

Accordingly, the Court concludes that *§ 425.17* prevents a special motion to strike in this case. Therefore, the Court considers Plaintiff's motion to be a motion for judgment on the pleadings, or, in the alternative, [*54] for summary adjudication pursuant to *Rule 56*.

## C. Litigation Privilege

Defendants assert, and Plaintiff does not dispute, that they have presented sufficient evidence to raise material issues of fact regarding all of the elements of their State law claim for tortious interference with economic advantage. Therefore, the question for the Court is whether any of Plaintiff's proposed defenses applies as a bar.

### 1. Applicable Law

Under *California Civil Code § 47(b)*, communications made in or related to judicial proceedings are absolutely immune from tort liability. The purpose of the privilege is "to afford litigants . . . the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." *Silberg v. Anderson, 50 Cal. 3d 205, 213, 266 Cal. Rptr. 638, 786 P.2d 365 (1990)*.

The litigation privilege applies to any communications (1) made in a judicial proceeding; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; (4) that have some connection or logical relation to the action. *Silberg, 50 Cal. 3d at 212; Premier Communications Network, Inc. v. Fuentes, 880 F.2d 1096, 1102 (9th Cir. 1987)*; [*55] see also *Rubin v. Green, 4 Cal. 4th 1187, 1194, 17 Cal. Rptr. 2d 828, 847 P.2d 1044 (1993)* (noting that Silberg and other decisions emphasized the "importance of virtually unhindered access to the courts"). Once these requirements are met, *§ 47(b)* operates as an absolute privilege. *Silberg, 50 Cal. 3d at 216*. Courts have applied the litigation privilege to all torts, with the exception of actions for malicious prosecution. See *Edwards v. Centex, 53 Cal. App. 4th 15, 29, 61 Cal. Rptr. 2d 518 (1997)*. "Any doubt about whether the privilege applies is resolved in favor of applying it." *Kashian v. Harriman, 98 Cal. App. 4th 892, 913, 120 Cal. Rptr. 2d 576 (2002)*.

The first prong of the litigation privilege test is quite broad. It covers "any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is involved." *Silberg, 50 Cal. 3d at 216.*

The parties dispute the meaning of the second prong. In *Silberg,* the California Supreme Court stated that "republications to nonparticipants in the action are generally not [*56] privileged under *section 47(2),* and are thus actionable unless privileged on some other basis." *50 Cal. 3d at 219.* For instance, statements "to the general public through the press" are not privileged, because the public and press have no particular connection to the proceeding. *Susan A. v. County of Sonoma, 2 Cal. App. 4th 88, 93, 94, 3 Cal. Rptr. 2d 27 (1991);* but see *Designing Health, Inc. v. Erasmus, 2001 U.S. Dist. LEXIS 25952, *13 (C.D. Cal., Apr. 24, 2001)* (finding that press release fell within California's litigation privilege). However, those non-litigants possessing a "substantial interest in the outcome of the litigation" are "authorized participants" for purposes of the litigation privilege. *Costa v. Superior Court, 157 Cal. App. 3d 673, 678, 204 Cal. Rptr. 1 (1984);* see also *Adams v. Superior Court, 2 Cal. App. 4th 521, 529, 3 Cal. Rptr. 2d 49 (1992)* (noting that "the privilege is not restricted to the parties in the lawsuit but need merely be connected or related to the proceedings") (citing *Profile Structures, Inc., v. Long Beach Bldg. Material Co., 181 Cal. App. 3d 437, 442, 226 Cal. Rptr. 192 (1986)).* Although Defendants claim that authorized participants [*57] must have a "formal association" with a party to the litigation, this requirement is not supported by the case law and has not been recognized by other district courts. See, e.g., *eCash Techs. Inc. v. Guagliardo, 127 F. Supp. 2d 1069, 1076, 1082 (C.D. Cal. 2000)* (finding allegedly false letter sent to a third party domain name auction service to be privileged under California law). Defendants attempt to distinguish eCash on the grounds that the letter there was found not to be false or misleading; however, the court made that finding after concluding that the litigation privilege did apply, reasoning that "even if" the privilege didn't apply, the tort claim would fail. Therefore, the Court concludes that, to meet the second prong of the litigation privilege, Plaintiff need only show that the recipients of its letter possessed a "substantial interest" in the litigation.

The California Supreme Court "has characterized the third prong of the foregoing [Silberg] test . . . as being simply part' of the fourth, the requirement that the communication be connected with, or have some logical relation to, the action." *Rothman v. Jackson, 49 Cal. App. 4th 1134, 1141, 57 Cal. Rptr. 2d 284 (1996)* [*58] (citing Silberg). The "'connection or logical relation' which a communication must bear to litigation in order for the privilege to apply, is a functional connection," i.e., the communication must "function as a necessary or useful step in the litigation process and must serve its purposes." *Id. at 1146* (emphasis omitted). The test "cannot be satisfied by communications which only serve interests that happen to parallel or complement a party's interests in the litigation," including vindication in the court of public opinion. *Id. at 1147.* Instead, the "connection or logical relation" prong of the test "can be satisfied only by communications which function intrinsically, and apart from any consideration of the speaker's intent, to advance a litigant's case." *Id. 1148.*

When litigation is not yet underway, statements may still meet the requirement of "some connection or logical relation to the action" if an action is "contemplated in good faith and under serious consideration." *Aronson v. Kinsella, 58 Cal. App. 4th 254, 262, 266, 68 Cal. Rptr. 2d 305 (1997).* Thus, the privilege "has been broadly applied to demand letters and other prelitigation [*59] communications by attorneys." *Blanchard v. DIRECTV, Inc., 123 Cal. App. 4th 903, 919, 20 Cal. Rptr. 3d 385 (2004)* (citing *Rubin v. Green, 4 Cal. 4th 1187, 1194, 17 Cal. Rptr. 2d 828, 847 P.2d 1044 (1993)* and *Knoell v. Petrovich, 76 Cal. App. 4th 164, 169, 90 Cal. Rptr. 2d 162 (1999));* Premier Communications Network, Inc., v. Fuentes, 880 F.2d 1096, 1102 (9th Cir. 1987).* However, "it is not the mere threat of litigation that brings the privilege into play, but rather the actual good faith contemplation of an imminent, impending resort to the judicial system for the purpose of resolving a dispute." *Eisenberg v. Alameda Newspapers, Inc., 74 Cal. App. 4th 1359, 1380, 88 Cal. Rptr. 2d 802 (1999)* (citing *Edwards v. Centex Real Estate Corp., 53 Cal. App. 4th 15, 35-36, 61 Cal. Rptr. 2d 518 (1997)* (emphasis in original).

2. Litigation Privilege Analysis

Plaintiff proffers two alternative theories by which the litigation privilege applies to its letters to retailers and the media. First, Plaintiff argues that the recipients of the letters were "authorized participants" in its existing litigation against Defendants, because the recipients possessed a substantial interest in the outcome of the litigation. Second, [*60] Plaintiff argues that potential litigation against the recipients was contemplated in good faith and under serious consideration, and thus the letters were protected pre-litigation communications. Because the Court finds that the first theory provides Plaintiff with absolute immunity from suit, it need not consider the factual question of whether Plaintiff seriously contemplated suing the retailers and media outlets. n7

n7 Accordingly, the parties' various objections to evidence regarding Sharper Image's intent in sending the letters are denied as moot.

Even if Plaintiff's threats against them were not serious, the retailer and media recipients possessed a substantial interest in the underlying dispute. At that time, Plaintiff was seeking injunctive relief which, if granted, would have significantly disrupted the recipients' business arrangements with Defendants. Furthermore, even if Plaintiff did not intend to follow through on its threats to sue the recipients for infringement, a finding by the Court that the [*61] Ionic Pro likely infringed Plaintiff's patents would have significantly increased the legal liability of the letter recipients.

In disputing whether the second prong of the litigation privilege applies here, Defendants rely on cases such as Susan A., where a California court held that statements to the general public through reporters were not privileged because the press and the public at large had no connection with the criminal case being litigated. Here, however, the statements were not broadcast to the entire media through a press release, or to the public generally, but to specific media representatives who carried advertisements for the Ionic Pro. Although their interest in the underlying action may not have been as great as that of Ionic Pro retailers, the media outlets faced a potential disruption if the Court had granted the injunctive relief sought by Plaintiff. Therefore, the Court finds that the undisputed evidence shows that the recipients of the letters had a substantial interest in Plaintiff's lawsuit against Defendants. Because none of the other prongs of the litigation privilege is in dispute, the litigation privilege applies as an absolute bar to Defendants' [*62] counterclaims.

## VI. Plaintiff's Motion for Leave to File TAC

Plaintiff moves for leave to file a TAC adding Peter Spiegel, Mehran Gabbay, Sylmark Holdings, Ltd. and Great Products, Ltd. as defendants; adding the Ionic Pro Compact as an accused product; and adding allegations of tax fraud as additional bases for Plaintiff's § 17200 unfair competition claim. The motion was filed on November 28, 2005, and is based primarily on the testimony of Ms. Cohen, who was deposed on November 10, 2005. Defendants oppose the motion.

### A. Factual Background

Mr. Spiegel was significantly involved in the development of the Ionic Pro. Mr. Bess has testified that he is transferring all of his interest in the Sylmark entities to Mr. Spiegel. Barry Decl., Ex. F, Bess Dep. 113:11-16. According to Mr. Spiegel, an entity called Tetra Partners will soon own ninety percent of the Sylmark partnership interests.

According to Ms. Cohen, Sylmark Holdings, an Irish company, has the same owners as the Sylmark entities, including Mr. Spiegel. Cohen Dep., 96-97. Mr. Spiegel testified that Irish company Great Products, which owns the rights to Ionic Pro, received a nine percent royalty on the United States license [*63] to sell the Ionic Pro (later reduced to six percent). Spiegel Dep. 325-326.

Mehran Gabbay is the registered owner of www.factoryprices4U.com. Barry Decl. P 9. Since January 1, 2005, internet users logging onto Defendant Factories2U's website have been directed to www.factoryprices4U.com, where the Ionic Pro product is being sold. Id. P 8. Mr. Gabbay is one of only two employees of Factories2U. Barry Decl., Ex. G, Gabbay Dep. 7.

In October, 2005, Plaintiff became aware of the commercial availability of the new "Ionic Pro Compact" product. Barry Decl. P 12. Plaintiff asserts that the Ionic Pro Compact has the same design, shape and features as the original Ionic Pro.

### B. Legal Standard

Federal Rule of Civil Procedure 15(a) provides that leave of the court allowing a party to amend its pleading "shall be freely given when justice so requires." Leave to amend lies within the sound discretion of the trial court, which discretion "must be guided by the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities." United States v. Webb, 655 F.2d 977, 979 (9th Cir. 1981) (citations [*64] omitted). Thus, Rule 15's policy of favoring amendments to pleadings should be applied with "extreme liberality." Id.; DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 186 (9th Cir. 1987) (citations omitted).

The Supreme Court has identified four factors relevant to whether a motion for leave to amend should be denied: undue delay, bad faith or dilatory motive, futility of amendment, and prejudice to the opposing party. Foman v. Davis,

*371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)*. The Ninth Circuit holds that these factors are not of equal weight; specifically, delay alone is insufficient ground for denying leave to amend. *Webb, 655 F.2d at 980*. Further, the "liberality in granting leave to amend is not dependent on whether the amendment will add causes of action or parties." *DCD Programs, 833 F.2d at 186*. Rather, the court should consider whether the proposed amendment would cause the opposing party undue prejudice, is sought in bad faith, or constitutes an exercise in futility. Id. (citing *Acri v. Int'l Ass'n of Machinists & Aerospace Workers, 781 F.2d 1393, 1398-99 (9th Cir. 1986); United States v. City of Twin Falls, 806 F.2d 862, 876 (9th Cir. 1986); [*65] Howey v. United States, 481 F.2d 1187, 1190-91 (9th Cir. 1973); Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau, 701 F.2d 1276, 1293 (9th Cir. 1983))*.

Prejudice typically arises where the opposing party is surprised with new allegations which require more discovery or will otherwise delay resolution of the case. See, e.g., *Acri, 781 F.2d at 1398-99; Guthrie v. J.C. Penney Co., 803 F.2d 202, 210 (5th Cir. 1986)*. The party opposing the motion bears the burden of showing prejudice. *DCD Programs, 833 F.2d at 186; Beeck v. Aquaslide N' Dive Corp., 562 F.2d 537, 540 (8th Cir. 1977)*.

C. Analysis

1. Mr. Gabbay and Ionic Pro Compact

Plaintiff asserts that the Ionic Pro Compact, introduced in October, 2005, shares the design, shape and features of the original Ionic Pro and thus infringes the *494 patent* and the Sharper Image trade dress. Because the Court grants Defendants' motion for summary adjudication of the design patent and trade dress claims, the Court also denies on grounds of futility the motion to add the Ionic Pro Compact as an accused product.

With respect to Mr. Gabbay, [*66] there are no claims remaining in this case which are relevant to his activities after January 1, 2005, when Factories2U ceased directly selling the accused products. Furthermore, Plaintiff has known about Mr. Gabbay's additional website since January, 2005, and offers no grounds to justify its delay in adding him as a defendant. Therefore, the Court denies leave to add Mr. Gabbay.

Similarly, with respect to Sylmark Holdings, Ltd., and Great Products, Ltd., Plaintiff has failed to show that these entities were involved or intertwined in Defendants' activities during the specific time frame for which the Court has found that a triable claim for infringement exists. Instead, it appears that Plaintiff wishes to add these proposed defendants for purposes of its additional § 17200 claim. Because, as described below, the Court denies Plaintiff leave to add claims based on the allegedly illegal Sylmark corporate structure, leave to add Sylmark Holdings, Ltd., and Great Products, Ltd. is also denied.

2. Mr. Spiegel

On the other hand, Plaintiff has shown evidence that Mr. Spiegel was personally and actively involved in selling the first-generation Ionic Pro after the *484 patent* issued. [*67] Defendants do not identify any prejudice that will flow from adding Mr. Spiegel. Although Plaintiff was aware of Mr. Spiegel's involvement since at least July, 2004, when he submitted a declaration describing his role, Plaintiff has recent cause to believe that Mr. Spiegel is needed as a named defendant in order to satisfy any judgment in Plaintiff's favor. Therefore, the Court grants Plaintiff's motion to add Mr. Spiegel.

3. Additional Claims

The Court denies Plaintiff leave to amend to add its proposed additional claims relating to international tax fraud. These proposed additions introduce an entirely new theory of liability and could substantially delay this action. Even assuming, as Plaintiff argues, that all of the relevant information is within Defendants' possession, another round of case-dispositive motions would be appropriate, and the May 8, 2006 trial date would be lost. Such a disruption to the schedule would cause undue prejudice to Defendants. Accordingly, Plaintiff's motion to add these claims is denied.

CONCLUSION

For the foregoing reasons, the Court GRANTS in part Defendants' motion for summary adjudication (Docket No. 670) of Plaintiff's claims of infringement [*68] of the *484 utility patent* based on the second-generation Ionic Pro product; infringement of the *494 design patent*; infringement of Plaintiff's trade dress; and unfair competition under *California Business and Professions Code § 17200*. The Court also grants summary adjudication in Defendants' favor with respect to Plaintiff's remaining claims against Mr. Bess and the retail Defendants Target, Qwik Cook d/b/a Home Trends and Factories2U. Otherwise, the Court denies Defendants' motion for summary adjudication.

The Court GRANTS Plaintiff's motion for summary adjudication of Defendants' tort and State law counterclaims against it (Docket Nos. 520 and 625). Otherwise, the Court denies Plaintiff's motion for summary adjudication.

The parties' motions to strike based on evidentiary objections are denied (Dockets No. 661 and 677), as is Plaintiff's ex parte application requesting that Defendants withdraw their reply brief (Docket No. 701).

The Court GRANTS in part Plaintiff's motion for leave to file a TAC (Docket No. 467). Plaintiff may add Mr. Spiegel as a defendant. Otherwise, Plaintiff's motion for leave is denied. The TAC must be filed within three [*69] days of the date of this order. Mr. Spiegel may stand on the Answer already filed.

Remaining for trial are Defendants' invalidity counterclaims and Plaintiff's claim against Mr. Spiegel, Ionic Pro, LLC, Ideal Products, Sylmark and Sylmark, LLC for inducing infringement of its utility patent.

IT IS SO ORDERED.

Dated: March 29, 2006

CLAUDIA WILKEN

United States District Judge

# EXHIBIT 10

LEXSEE 2004 U.S. DIST LEXIS 22934

**SMITH & HAWKEN, LTD., Plaintiff, v. GARDENDANCE, INC., et al., Defendants.**

**No. C 04-1664 SBA**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2004 U.S. Dist. LEXIS 22934; Copy. L. Rep. (CCH) P28,903*

**November 5, 2004, Decided**

**SUBSEQUENT HISTORY:** Summary judgment granted by *Smith & Hawken, Ltd. v. Gardendance, Inc., 2005 U.S. Dist. LEXIS 21465 (N.D. Cal., July 27, 2005)*

**DISPOSITION:** [*1] Plaintiff's motion to dismiss granted. Defendants granted leave to file amended counterclaims.

**COUNSEL:** For Smith & Hawken, Ltd., a Delaware Corporation, Plaintiff: Susan E Hollander, Manatt Phelps & Phillips LLP, Palo Alto, CA; Jennifer A. Golinveaux, Winston & Strawn, San Francisco, CA; Laura M. Franco, Manatt, Phelps & Phillips, Palo Alto, CA; Ryan S. Hilbert, Manatt Phelps & Phillips, Palo Alto, CA.

For Gardendance, Inc., a North Carolina Corporation, Mark Donley, an individual, Defendants: Venus Soltan, Soltan & Associates, Costa Mesa, CA; Joel David Joseph, Joseph & Associates, Bethesda, MD.

For Mark Donley, an individual, Gardendance, Inc., a North Carolina Corporation, Counter-claimants: Venus Soltan, Soltan & Associates, Costa Mesa, CA; Joel David Joseph, Joseph & Associates, Bethesda, MD.

For Smith & Hawken, Ltd., a Delaware Corporation, Counter-defendant: Ryan S. Hilbert, Manatt Phelps & Phillips, Palo Alto, CA; Susan E Hollander, Manatt Phelps & Phillips LLP, Palo Alto, CA.

**JUDGES:** SAUNDRA BROWN ARMSTRONG, United States District Judge.

**OPINIONBY:** SAUNDRA BROWN ARMSTRONG

**OPINION:**

**ORDER**

[Docket No. 11]

This matter comes before the Court [*2] on Plaintiff Smith & Hawken, Ltd.'s ("Plaintiff") motion to dismiss Defendants Gardendance, Inc. ("Gardendance") and Mark Donley's (collectively, "Defendants") Second, Third, Fourth, Fifth and Sixth Counterclaims and to strike Defendants' prayer for punitive damages [Docket No. 11]. Having read and considered the papers submitted by the parties and being fully informed, the Court finds this matter appropriate for resolution without a hearing. The Court hereby GRANTS Plaintiff's motion to dismiss. Defendants are granted leave to file amended counterclaims in accordance with this Order.

**BACKGROUND**

Plaintiff is a provider of home and garden products. Compl. P8. Among its garden products, Plaintiff manufactures, markets and sells an outdoor garden torch, product number 759704 ("Torch"). *Id.* P9.

On January 15, 2004, Plaintiff received a letter from outside counsel for Gardendance, which alleged that Gardendance owned "copyright VA-967-403 for a Tiki Design Torch" and demanded that Plaintiff cease and desist from selling the "infringing torches," "item # 759704." *Id.* P10. On April 28, 2004, Plaintiff filed the instant complaint for declaratory relief, seeking a determination [*3] that it had not infringed any copyright owned by Defendants by reason of its sale of the Torches. *Ibid.*

On June 25, 2004, Defendants filed an answer and asserted six counterclaims [Docket No. 7]. Defendants allege that between March 1999 and January 2001, Plaintiff ordered 3,555 Torches from Defendants. Counterclaim P1. Defendants claim that Plaintiff copied Defendants' Torches "down to the smallest detail" and imported the copies from China. *Id.* P5. Defendants further assert that Plaintiff "has the infringing torches made for

2004 U.S. Dist. LEXIS 22934, *; Copy. L. Rep. (CCH) P28,903

it in China by workers who are not paid decent wages, workers who live under slave-like conditions, by employees of the People's Liberation Army and by prison workers." *Id.* P7. Defendants contend that Plaintiff's actions have cost them "hundreds of thousands of dollars in lost sales." *Id.* P8. Defendants assert six counterclaims: Copyright Infringement (First Counterclaim); Trade Dress Infringement (Second Counterclaim); Unfair Competition (Third Counterclaim); RICO (Fourth and Fifth Counterclaims); and Declaratory and Injunctive Relief (Sixth Counterclaim). Defendants pray for compensatory and special damages in the amount of two million dollars [*4] and punitive damages in the amount of one hundred million dollars.

On August 2, 2004, Plaintiff filed the instant motion to dismiss Defendants' Second, Third, Fourth, Fifth and Sixth Counterclaims and to strike Defendants' prayer for punitive damages [Docket No. 11].

### LEGAL STANDARDS

#### A. *Rule 12(b)(6)*

Under *FRCP 12(b)(6)*, a motion to dismiss should be granted only if it appears beyond a doubt that the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).* For purposes of such a motion, the complaint is construed in a light most favorable to the plaintiff and all properly pleaded factual allegations are taken as true." *Jenkins v. McKeithen, 395 U.S. 411, 421, 23 L. Ed. 2d 404, 89 S. Ct. 1843 (1969)*; *Everest and Jennings, Inc. v. American Motorists Ins. Co., 23 F.3d 226, 228 (9th Cir. 1994).* All reasonable inferences are to be drawn in favor of the plaintiff. *Jacobson v. Hughes Aircraft, 105 F.3d 1288, 1296 (9th Cir. 1997).*

As a general rule, "a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) [*5] motion." *Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001)* (citation omitted). There are, however, two exceptions to the requirement that consideration of extrinsic evidence converts a 12(b)(6) motion to a summary judgment motion. *Id.* First, a court may consider "material which is properly submitted as part of the complaint" on a motion to dismiss without converting the motion to dismiss into a motion for summary judgment. *Id., citing, Branch v. Tunnell, 14 F.3d 449, 453 (9th Cir. 1994).* If the documents are not physically attached to the complaint, they may be considered if the documents' "authenticity . . . is not contested" and "the plaintiff's complaint necessarily relies" on them. *Id., citing, Parrino v. FHP, Inc., 146 F.3d 699, 705-06 (9th Cir. 1998).* Second, under *Fed. R. Evid. 201*, a court may take judicial notice of "matters of public record." *Id. at*

688-89, citing, *Mack v. South Bay Beer Distrib., 798 F.2d 1279, 1282 (9th Cir. 1986).*

The court does not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. *Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981)*; [*6] *see Miranda v. Clark County, Nev., 279 F.3d 1102, 1106 (9th Cir. 2002)* ("Conclusory allegations of law and unwarranted inferences will not defeat a motion to dismiss for failure to state a claim."); *Sprewell v. Golden State Warriors, 266 F.3d 979, 987 (9th Cir. 2001)* ("Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."), *as amended, 275 F.3d 1187 (9th Cir. 2001)*; *McGlinchy v. Shell Chem. Co., 845 F.2d 802, 810 (9th Cir. 1988)* ("Conclusory allegations without more are insufficient to defeat a motion to dismiss for failure to state a claim.").

When a complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986).* The court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies [*7] by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express, 885 F.2d 531, 538 (9th Cir. 1989).* Of these factors, prejudice to the opposing party is the most important. *See Jackson v. Bank of Hawaii, 902 F.2d 1385, 1387 (9th Cir. 1990)* (citing *Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330-31, 28 L. Ed. 2d 77, 91 S. Ct. 795 (1971)).* Leave to amend is properly denied "where the amendment would be futile." *DeSoto Yellow Freight Sys., 957 F.2d 655, 658 (9th Cir. 1992).*

### ANALYSIS

#### A. Second Counterclaim (Trade Dress Infringement)

"Trade dress refers to the total image of a product and may include features such as size, shape, color, color combinations, texture or graphics." *International Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 822 (9th Cir. 1993)* (internal quotation marks and citation omitted). If a seller uses a trade dress that is confusingly similar to a competitor's, that conduct is actionable as unfair competition under section 43(a) of the Lanham Act, *15 U.S.C. § 1125(a).* [*8] *Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 613 (9th Cir. 1989).*

"To state an infringement claim under § 43(a) - whether it be a trademark claim or a trade dress claim - a

Case 5:06-cv-01839-PVT    Document 13-11    Filed 05/19/2006    Page 4 of 10

Page 3

2004 U.S. Dist. LEXIS 22934, *; Copy. L. Rep. (CCH) P28,903

[counterclaimant] must meet three basic elements: (1) distinctiveness, (2) nonfunctionality, and (3) likelihood of confusion." *Kendall-Jackson Winery v. E. & J. Gallo Winery, 150 F.3d 1042, 1046-1047 (9th Cir. 1998).*

The Second Counterclaim is wholly deficient. Defendants merely assert that the Torch has secondary meaning and that Plaintiff's copying of Defendants' Torch "causes confusion to consumers and retailers and constitutes a violation of *Section 43(a) of the Lanham Act.*" Counterclaim PP15-18. Defendants fail to allege or plead nonfunctionality. Defendants offer no explanation as to the nature, scope or elements making up its allegedly protectable "trade dress." The counterclaim does not even describe the Torch. Given this, there are no facts in Defendants' counterclaim that would allow the Court to determine whether the Torches are distinctive, whether they are nonfunctional or whether there exists a likelihood of confusion. Because Defendants have failed to [*9] provide anything but conclusory allegations to support this counterclaim, Plaintiff's motion to dismiss is GRANTED with respect to Defendants' Second Counterclaim. *See, e.g., Accuimage Diagnostics Corp. v. Terarecon, Inc., 260 F. Supp. 2d 941, 949-950 (N.D. Cal. 2003)* (dismissing claim for trade dress infringement because plaintiff's complaint did "little more than mimic the language of the statute," because plaintiff failed to plead with specificity how the trade dress was unique and inherently distinctive, and because plaintiff failed to plead sufficient facts for the court to determine whether the alleged trade dress was nonfunctional). The Second Counterclaim is DISMISSED WITHOUT PREJUDICE. Defendants are granted leave to amend their Second Counterclaim in accordance with this Order.

**B. Third Counterclaim (Unfair Competition)**

In their Third Counterclaim, Defendants appear to bring a state law unfair competition claim. Counterclaim PP19-23. n1 Defendants claim that Plaintiff wrongfully misappropriated, sold and distributed unauthorized duplications of Defendants' Torches and that stores and consumers alike have been confused by these "inferior" duplications, [*10] believing that Defendants were the source of the duplications. *Id.*

n1 Defendants do not specifically allege common law unfair competition as opposed to statutory unfair competition under *Cal. Bus. & Prof. Code § 17200.* The common law tort of unfair competition is generally thought to be synonymous with the act of "passing off" one's goods as those of another and requires a showing of competitive injury. *Bank of the West v. Superior Court, 2 Cal. 4th 1254, 1263, 10 Cal. Rptr.*

2d 538, 833 P.2d 545 (1992). In contrast, statutory "unfair competition" extends to all unfair and deceptive business practices. *Id. at 1264.*

Plaintiff argues that Defendants' unfair competition claim is preempted by federal copyright law. And to the extent that Defendants' unfair competition claim is not preempted by federal copyright law, Plaintiff further argues that Defendants have failed to state a claim.

**1. Preemption**

"A state law cause of action is preempted by the *Copyright Act* if two elements are present. First, the [*11] rights that a [counterclaimant] asserts under state law must be 'rights that are equivalent' to those protected by the Copyright Act. Second, the work involved must fall within the 'subject matter' of the Copyright Act as set forth in *17 U.S.C. § § 102 and 103.*" *Kodadek v. MTV Networks, 152 F.3d 1209, 1212 (9th Cir. 1998).* In order to survive preemption, "the state claim must have an 'extra element' which changes the nature of the action." *Watermark Publrs. v. High Tech. Sys., 1997 U.S. Dist. LEXIS 22512, at *13 (S.D. Cal. 1997), citing, Del Madera Properties v. Rhodes & Gardner, Inc., 820 F.2d 973, 977 (9th Cir. 1987).*

To establish a claim of copyright infringement, the counterclaimant must prove that (1) it owns a valid copyright on a work and (2) the counterclaim-defendant copied constituent elements of the work that are original. *Watermark Publrs., 1997 U.S. Dist. LEXIS 22512, at *22, citing, Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 113 L. Ed. 2d 358, 111 S. Ct. 1282 (1991).*

In *Kodadek,* the plaintiff's complaint alleged that defendants "have [*12] been publishing and placing on the market for sale products bearing the images subject to the copyright ownership of the plaintiff and has thereby been engaging in unfair trade practices and unfair competition against plaintiffs [sic] and to plaintiffs' [sic] irreparable damage." *Id.* Plaintiff's unfair competition claim incorporated by reference paragraphs from the copyright infringement claim. *Id.* Specifically, plaintiff alleged that defendants released a cartoon derived from plaintiff's drawings without plaintiff's authorization and released merchandise derived from plaintiff's drawings without plaintiff's authorization. *Id. at 1212-13.* The Ninth Circuit held that plaintiff's complaint "expressly based his unfair competition claim on rights granted by the Copyright Act." Because "the Copyright Act grants rights 'to reproduce the copyrighted work in copies,' 'to prepare derivative works based upon the copyrighted work,' 'to distribute copies . . . to the public,' and 'to display the copyrighted work publicly,'" the court held that plaintiff's state law unfair competition claim was based

"solely on rights equivalent to those protected by the federal copyright laws." [*13] *Id.* The court further found that the drawings-at-issue were "pictorial works" as defined by *17 U.S.C. § 102(a)(5)*; thus, the work that plaintiff sought to protect was clearly a work that fell within the "subject matter" of the Copyright Act. *Id.* Given this, the court found that plaintiff's state law unfair competition claim was preempted. *Id.*

In this case, Defendants allege that they own a copyright on the Torch. Counterclaim PP1, 11. According to Defendants, Plaintiff "wrongfully misappropriated, sold and distributed unauthorized duplications of the Defendants' designs." *Id.* P21. And "as a direct and proximate result of this unauthorized copying, Defendants have suffered injury to its reputation and a loss of income." *Id.* P23. Defendants fail to allege an "extra element" that changes the nature of the action from that of an infringement action. Thus, as in *Kododek,* Defendants' Third Counterclaim is based solely on rights equivalent to those protected by federal copyright laws.

With respect to the second *Kododek* prong, construing the counterclaim in a light most favorable to Defendants and taking all properly pleaded factual allegations [*14] as true, the Court finds that the Torch is a "sculptural work" as defined by *17 U.S.C. § 102(a)(5)* and thus falls within the subject matter of the Copyright Act. Counterclaim P11 ("Defendants are owners of copyright VA-967-403 for a Tiki Design Torch"); *see* 1-2 Nimmer on Copyright § 2.08 (noting the general rule that "any useful article, at least if it is aesthetically pleasing in appearance, is subject to copyright protection with respect to its form"); *but see Carol Barnhart, Inc. v. Economy Cover Corp., 773 F.2d 411, 418 (2d Cir. 1985)* (if a useful article has aesthetic features that cannot be identified separately from the article, copyright protection is not available).

Accordingly, to the extent that Defendants' Third Counterclaim is based on rights equivalent to those protected by the Copyright Act, the counterclaim is preempted by the Copyright Act. n2 *See, e.g., Sony Pictures Entm't, Inc. v. Fireworks Entm't Group, Inc., 156 F. Supp. 2d 1148, 1164 (C.D. Cal. 2001)* (finding statutory and common law claims for unfair competition preempted by the Copyright Act).

n2 Defendants appear to concede as much. *See* Opp. at 5 ("While the copyright laws may preempt unlawful business practices, they do not preempt unfair or fraudulent business practices. . . . Assuming that there was no copyright at issue, Defendants contend that they should be allowed to pursue an unfair competition claim during discovery.")

[*15]

## 2. Failure to State a Claim

In their opposition, Defendants argue that their unfair competition counterclaim is not preempted by the Copyright Act because they are asserting a counterclaim for unfair and/or fraudulent business practices, based on their allegation that Plaintiff has wrongfully substituted an imported Torch for the domestic Torch Plaintiff formerly sold. Opp. at 5. Assuming, *arguendo,* that such a claim would not be preempted by the Copyright Act, Defendants have failed to state a claim upon which relief can be granted. n3

n3 It is unclear from the counterclaim whether Defendants intend to bring a statutory unfair competition claim or a common law unfair competition claim. Regardless, as discussed, *infra,* Defendants' allegations are insufficient to support either claim.

### a. Statutory Unfair Competition

"A [counterclaimant] alleging unfair business practices under the unfair competition statutes 'must state with reasonable particularity the facts supporting the statutory [*16] elements of the violation.'" *Silicon Knights v. Crystal Dynamics, 983 F. Supp. 1303, 1316 (N.D. Cal. 1997), citing, Khoury v. Maly's of California, 14 Cal. App. 4th 612, 619, 17 Cal. Rptr. 2d 708 (1993).* Cal. Bus. & Prof. Code § 17200 defines unfair competition as "any unlawful, unfair or fraudulent business act or practice" and establishes three types of unfair competition-- unlawful, unfair, or fraudulent acts or practices. *Qarbon.com, Inc. v. eHelp Corp., 315 F. Supp. 2d 1046, 1051 (N.D. Cal. 2004), citing, Schnall v. Hertz Corp., 78 Cal. App. 4th 1144, 1153, 93 Cal. Rptr. 2d 439 (2000).* "Unlawful" practices are those practices that are prohibited by law, whether "civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." *Saunders v. Superior Court, 27 Cal. App. 4th 832, 839, 33 Cal. Rptr. 2d 438 (citing People v. McKale, 25 Cal. 3d 626, 632, 159 Cal. Rptr. 811, 602 P.2d 731 (1979)).* "Unfair" practices are those practices "whose harm to the victim outweighs its benefits." *Id.* (citing *Motors, Inc. v. Times Mirror Co., 102 Cal. App. 3d 735, 740, 162 Cal. Rptr. 543 (1980)).* "Fraudulent" practices are those practices that are likely to deceive the public [*17] and do not refer to the tort of fraud. *Id.; Heighley v. J.C.Penney Life Ins. Co., 257 F. Supp. 2d 1241, 1259 (C.D. Cal. 2003)* (citing *Committee on Children's Television, Inc. v. General Foods Corp., 35 Cal. 3d 197, 211, 197 Cal. Rptr. 783, 673 P.2d 660 (1983).*

Case 5:06-cv-01839-PVT    Document 13-11    Filed 05/19/2006    Page 6 of 10

Page 5

2004 U.S. Dist. LEXIS 22934, *; Copy. L. Rep. (CCH) P28,903

As noted, *supra,* Defendants argue that they are asserting a claim for "unfair" and/or "fraudulent" business practices. Opp. at 5.

The California Courts of Appeal have stated that an "unfair" business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *People v. Casa Blanca Convalescent Homes, Inc., 159 Cal. App. 3d 509, 530, 206 Cal. Rptr. 164 (1984); see Bernardo v. Planned Parenthood Federation of America, 115 Cal. App. 4th 322, 353, 9 Cal. Rptr. 3d 197 (2004)* (noting that some recent California Courts of Appeal have found that any finding of unfairness to competitors under [Business and Professions Code] *section 17200* must "be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition"). Here, Defendants have alleged that Plaintiff's infringing Torches were [*18] made in China by workers "who are not paid decent wages, workers who live under slave-like conditions, by employees of the People's Liberation Army and by prison workers." Counterclaim P7. But Defendants provide no factual support whatsoever for these allegations. Moreover, Defendants' Third Counterclaim fails to identify an established public policy which is offended by these practices or allege that these practices are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. Counterclaim PP19-23.

"The 'fraud' prong of Business and Professions Code *section 17200* is unlike common law fraud or deception. A violation can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage. Instead, it is only necessary to show that members of the public are likely to be deceived." *Shvarts v. Budget Group, Inc., 81 Cal. App. 4th 1153, 1159-1160, 97 Cal. Rptr. 2d 722 (2000).* While Defendants have alleged that Plaintiff's Torches have "virtually identical shapes and designs" to Defendants' Torches and that customers have "been confused by plaintiff's products," there are no facts to support these conclusory allegations. As [*19] noted, *supra,* Defendants do not even describe the Torches in question and have provided no facts that suggest that the Torches have "virtually identical shapes and designs." Accordingly, the Court cannot determine whether members of the public are likely to be deceived by Plaintiff's conduct.

In light of the foregoing, the Court finds that, to the extent that Defendants' statutory unfair competition claim is not preempted by the Copyright Act, Defendants have nevertheless failed to allege sufficient facts to state a statutory unfair competition claim.

**b. Common Law Unfair Competition**

While it is unclear from Defendants' pleading whether they intend to bring a common law unfair competition claim, Defendants have similarly failed to allege sufficient facts to support such a claim.

As noted, *supra,* "the common law tort of unfair competition is generally thought to be synonymous with the act of 'passing off' one's goods as those of another." *Bank of the West v. Superior Court, 2 Cal. 4th at 1263; Trovan, Ltd. v. Pfizer, Inc., 2000 U.S. Dist. LEXIS 7522, at \*19-20 (C.D. Cal. 2000).* As explained by the *Bank of the West* court, "the [*20] tort developed as an equitable remedy against the wrongful exploitation of trade names and common law trademarks that were not otherwise entitled to legal protection." *Id.* (citing 1 Callmann, Unfair Competition, Trademarks & Monopolies (4th ed. 1981) § § 2.01-2.03.). The court recognized that the tort also includes "acts analogous to 'passing off,' such as the sale of confusingly similar products, by which a person exploits a competitor's reputation in the market." *Id.* The cause of action has three elements: "(1) the [counterclaimant] has invested substantial time and money in development of its . . . 'property'; (2) the [counterclaim] defendant has appropriated the [property] at little or no cost; and (3) the [counterclaimant] has been injured by the [counterclaim] defendant's conduct." *Balboa Ins. Co. v. Trans Global Equities, 218 Cal. App. 3d 1327, 1342, 267 Cal. Rptr. 787 (1990)* (modifications in original).

While Defendants allege that they spent "more than $ 40,000" producing the Torch, and that Plaintiff has produced an "identical" Torch, Defendants do not provide a description of either their Torch or Plaintiff's Torch. Accordingly, the Court cannot determine [*21] whether or not Plaintiff has appropriated Defendants' Torch. Although Defendants further allege that they have lost "hundreds of thousands of dollars" in sales, there are no facts in the counterclaim to suggest that this injury was caused by Plaintiff's conduct. Thus, to the extent that Defendants' common law unfair competition claim is not preempted by the Copyright Act, Defendants have nevertheless failed to allege sufficient facts to state such a claim.

**3. Summary**

Given the dearth of factual support for any of the allegations in Defendants' Third Counterclaim, coupled with Defendants' failure to allege an "extra element" to distinguish this claim from a copyright infringement claim, Plaintiff's motion to dismiss the Third Counterclaim is GRANTED. The Third Counterclaim is DISMISSED WITHOUT PREJUDICE. Defendants are granted leave to amend the Third Counterclaim in accordance with this Order. Any such amendment must clearly state whether Defendants are pursuing a statutory unfair

Case 5:06-cv-01839-PVT    Document 13-11    Filed 05/19/2006    Page 7 of 10

Page 6

2004 U.S. Dist. LEXIS 22934, *; Copy. L. Rep. (CCH) P28,903

competition claim or a common law unfair competition claim or both. n4

n4 In order to avoid preemption, Defendants must provide sufficient facts in their amended counterclaim to support a finding that an "extra element" exists to distinguish this claim from a copyright infringement claim. *Watermark Publrs., 1997 U.S. Dist. LEXIS 22512 at *14.* However, the Court takes no position with respect to the possible preemption of any amended unfair competition claim.

[*22]

### C. Fourth and Fifth Counterclaims (RICO)

RICO provides a private right of action to "any person injured in his business or property by reason of a violation of *section 1962* of this chapter." *Diaz v. Gates, 354 F.3d 1169, 1171 (9th Cir. 2004),* citing, *18 U.S.C. § 1964(c) (2003).* Section 1962, in turn, lists four separate acts which form the basis for RICO liability: (a) investing income derived from a pattern of racketeering activity in an enterprise; (b) acquiring or maintaining an interest in an enterprise through a pattern of racketeering activity; (c) conducting the affairs of an enterprise through a pattern of racketeering activity; or (d) conspiring to commit any of the above acts. *Id.,* citing, *18 U.S.C. § 1962(a)-(d).*

Defendants bring their Fourth and Fifth Counterclaims under *18 U.S.C. §§ 1962(a), (c) & (d).*

#### 1. *18 U.S.C. § 1962(c)*

Liability under RICO, *18 U.S.C. § 1962(c),* requires (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Smith v. Jackson, 84 F.3d 1213, 1217 (9th Cir. 1996),* [*23] citing, *Sun Savings & Loan Assoc. v. Dierdorff, 825 F.2d 187, 191 (9th Cir. 1987).* "Racketeering activity" is any act indictable under several provisions of U.S.C. Title 18, as enumerated in *18 U.S.C. § 1961.*

##### a. Enterprise

The United States Supreme Court has held that, for RICO purposes, an enterprise is an "entity. . . associated together for a common course of conduct." *United States v. Turkette, 452 U.S. 576, 583, 69 L. Ed. 2d 246, 101 S. Ct. 2524 (1981).* In the Ninth Circuit, "a RICO enterprise must have an ascertainable structure separate and apart from the structure inherent in the conduct of the pattern of racketeering activity." *Chang v. Chen, 80 F.3d 1293, 1295 (9th Cir. 1996).* That is, a RICO enterprise "at a minimum . . . must exhibit 'some sort of structure . . . for

the making of decisions, whether it be hierarchical or consensual.' The structure should provide 'some mechanism for controlling and directing the affairs of the group on an on-going, rather than an ad hoc, basis.'" *Id. at 1299* (internal citations omitted). The organization must have an "existence beyond [*24] that which is merely necessary to commit the predicate acts of racketeering." *Id.*

A court must grant a RICO counterclaim defendant's motion to dismiss where the counterclaimant has failed to "allege a structure to the organization beyond that which [is] inherent in the alleged acts of racketeering activity," and failed to allege that the defendant "utilized a structure separate and apart from the predicate acts to distribute proceeds of the transactions." *Id. at 1300; see also Simon v. Value Behavioral Health, Inc., 208 F.3d 1073, 1083-84 (9th Cir. 2000).*

Defendants do not allege any facts that meet the *Chang* test. In support of their RICO claims, Defendants allege that "pursuant to the numerous agreements that were negotiated and executed between the Plaintiff and Chinese suppliers as well as through their course of conduct" Plaintiff has formed a "series of association-in-fact enterprises" for the "purpose of committing numerous acts of racketeering activity." Counterclaim P29. The enterprise is identified as "the Peoples [sic] Liberation Army of China (PLA)" and "Departments of the Government of the People's Republic of China" and [*25] "other Chinese suppliers." *Id.* Defendants do not allege that Plaintiff, the People's Liberation Army of China, various unnamed "Departments of the Government" of China and various other unnamed Chinese suppliers, have established a decision making structure that exists "beyond that which is merely necessary to commit the predicate acts of racketeering." Indeed, the counterclaim fails to provide any facts to explain how Plaintiff, a commercial supplier of home and garden products, could be part of an alleged RICO enterprise with arms of the sovereign government of China as well as unnamed Chinese suppliers. Defendants have offered no facts indicating how the enterprise is organized, explaining the "chain of command" or operation of the enterprise, or how Plaintiff is involved in the enterprise at all. Clearly, Defendants have failed to allege sufficient facts to establish the existence of an independent decision-making structure or an independent proceeds-distributing structure, which is what *Chang* requires "at a minimum" to sustain an allegation of enterprise. *See Chang, 80 F.3d at 1299-1300; Wagh v. Metris Direct, Inc., 2002 U.S. Dist. LEXIS 2905, at *8-9* [*26] *(N.D. Cal. 2002).* Accordingly, Defendants' *§ 1962(c)* counterclaim must be dismissed.

##### b. Pattern of Racketeering Activity

Case 5:06-cv-01839-PVT    Document 13-11    Filed 05/19/2006    Page 8 of 10

Page 7
2004 U.S. Dist. LEXIS 22934, *; Copy. L. Rep. (CCH) P28,903

Defendants have also failed to establish a pattern of racketeering activity. A pattern of racketeering activity requires the commission within a ten year period of at least two predicate acts that violate laws listed in *18 U.S.C. § 1961(1). See Royce Int'l Broadcasting Corp. v. Field, 2000 U.S. Dist. LEXIS 2369, at *7-8 (N.D. Cal. 2000)*. These acts must be related and must amount to, or threaten the continued likelihood of, continued criminal activity. *See H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 106 L. Ed. 2d 195, 109 S. Ct. 2893, 2899 (1989)*.

Defendants claim that Plaintiff has committed the following "predicate acts": theft, theft of services, receiving stolen property and copyright infringement. n5 Counterclaim P36. Defendants allege in a conclusory fashion that Plaintiff's acts constitute a "pattern of racketeering activity." *Id.* PP30, 38.

> n5 Defendants also allege that the "importation of products made by slave and prison labor in violation of *19 U.S.C. § 1307*" is "racketeering activity." Counterclaim P29. However, a violation of this statute is *not* "racketeering activity" as defined by *18 U.S.C. § 1961(1)*.

[*27]

Defendants first allege that Plaintiff's acts constitute the predicate act of robbery. *See 18 U.S.C. § 1961(1)(A)*. In order to constitute "racketeering activity" said robbery must be "chargeable under State law and punishable by imprisonment for more than one year." *Id.* Defendants, however, merely allege that Plaintiff "took and used the copyrights and trademarks of Defendants with the intent to permanently deprive them of remuneration for those services" and "knowingly received the stolen services of Defendants." Counterclaim P36. Even construing the counterclaim in a light most favorable to Defendants, Defendants have provided no basis whatsoever in their counterclaim to support a finding that Plaintiff's acts constitute felonious robbery, as defined in *18 U.S.C. § 1961(1)(A)*.

In the alternative, Defendants allege that Plaintiff's acts constitute "racketeering activity" because they are acts "'indictable under' any of a number of provisions of" Title 18 United States Code. *See 18 U.S.C. § 1961(1)(B)*. However, Defendants do not identify a single applicable provision enumerated in *§ 1961(1)(B)*. Thus, [*28] the Court cannot determine whether any of Plaintiff's acts constitute racketeering activity. Moreover, in order to state a RICO claim, Defendants must establish two related acts of racketeering activity. Considering that Defendants have failed to allege that any racketeer-

ing activity even occurred, it is clear that they cannot establish a pattern of racketeering activity. n6

> n6 In an attempt to establish a pattern of racketeering activity, Defendants state that "Plaintiff has stolen the trade dress rights of Belle Mead Hot Glass as described in more detail in the counterclaim filed in this court in Case No. C 03-0002 VRW," that "Plaintiff has stolen the patent and trade dress rights of Steven Lecon as described in the complaint filed in this court in Case No. 4:02CV04960," and that "Plaintiff has stolen the trade dress rights and copyrights of Mary Taylor as described in the complaint filed in Case No. 2:04cv00819 in the United District Court for the Western District of Washington." Counterclaim PP31-33. This is the extent to which these cases are discussed in Defendants' pleading. These complaints are not attached to Defendants' counterclaims and these cases have not been related to the instant case. Moreover, Plaintiff asserts that it has no record of any counterclaim being filed in the Belle Mead Hot Glass Case. Hilbert Decl P2. Defendants have failed to allege any facts to suggest that these cases involved racketeering activity or that the acts alleged in these cases are somehow related to this one. Defendants' counterclaim must be self-contained; it is inappropriate to reference documents that were filed in other cases, which are not before this Court, without providing any factual basis whatsoever in the pleading itself to explain the relevance of these other cases to the instant case. Given this, Defendants' bare citation to these other cases is insufficient to establish a pattern of racketeering activity.

[*29]

c. Summary

In light of the above analysis, it is clear that Defendants' *§ 1962(c)* counterclaim must be dismissed for failure to state a claim upon which relief may be granted. Defendants' pleading and theory of liability regarding Plaintiff's allegedly wrongful conduct is far too scant and cursory for this Court to give it any credence. Accordingly, Plaintiff's motion to dismiss Defendants' *§ 1962(c)* counterclaim is GRANTED. Defendants' *§ 1962(c)* counterclaim is DISMISSED WITHOUT PREJUDICE. Defendants are granted leave to amend this counterclaim in accordance with this Order.

### 2. 18 U.S.C. § 1962(a)

*18 U.S.C. § 1962(a)* provides in relevant part:

Case 5:06-cv-01839-PVT    Document 13-11    Filed 05/19/2006    Page 9 of 10

Page 8

2004 U.S. Dist. LEXIS 22934, *; Copy. L. Rep. (CCH) P28,903

It shall be unlawful for any person who has received any income derived . . . from a pattern of racketeering activity or through collection of an unlawful debt . . . to use or invest . . . any part of such income . . . in acquisition of any interest in, or the establishment or operation of, any enterprise.

*Id.*

As discussed, *supra,* Defendants have failed to allege either an "enterprise" or a "pattern of racketeering activity." Accordingly, Defendants' **[*30]** § 1962(a) counterclaim must also be DISMISSED WITHOUT PREJUDICE for failure to state a claim. Defendants are granted leave to amend this counterclaim in accordance with this Order.

### 3. 18 U.S.C. § 1962(d)

18 U.S.C. § 1962(d) provides that "it shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Since Defendants have not satisfied the pleading requirements for any of those sub-sections, they have also not alleged sufficient facts to state a claim under this section of the RICO statute. *See Wagh v. Metris Direct, Inc., 363 F.3d 821, 831 (9th Cir. 2003)* (dismissing RICO conspiracy claim when plaintiff failed to satisfy the pleading requirements for *subsection (a), (b),* or *(c)).* Accordingly, Defendants' § 1962(d) counterclaim is DISMISSED WITHOUT PREJUDICE. Defendants are granted leave to amend this counterclaim in accordance with this Order.

### D. Sixth Counterclaim (Declaratory and Injunctive Relief)

In their Sixth Counterclaim, Defendants seek declaratory and injunctive relief. Counterclaim PP49-53. Given that the Court **[*31]** dismisses without prejudice Defendants' Second, Third, Fourth and Fifth Counterclaims, to the extent that the Sixth Counterclaim depends on those counterclaims, it is also DISMISSED WITHOUT PREJUDICE. Defendants are granted leave to amend this counterclaim in accordance with this Order.

### E. Punitive Damages

Defendants seek an award of $ 100 million in punitive and exemplary damages. Defendants argue that this prayer should be stricken because punitive damages are not available under the Copyright Act. *Design Art v.*

*NFL Props., Inc., 2000 U.S. Dist. LEXIS 20172, at *14 (C.D. Cal. 2000),* citing, *Oboler v. Goldin, 714 F.2d 211, 213 (2d Cir. 1983)* ("Punitive damages are not available under the Copyright Act.").

"Punitive damages are not available under the Lanham Act." *Duncan v. Stuetzle, 76 F.3d 1480, 1490 (9th Cir. 1996).* However, Defendants have been granted leave to amend their state law unfair competition claim. While punitive damages are not available under *section 17200* of the Business and Professions Code, *see Czechowski v. Tandy Corp., 731 F. Supp. 406, 410 (N.D. Cal. 1990),* such damages may be **[*32]** available under a sufficiently alleged common law unfair competition claim. *Duncan, 76 F.3d at 1490,* citing, *Cal. Civil Code § 3294* ("We are aware of no authority which suggests that [punitive damages under § 3294] may not be applied to common law unfair competition claims."). Nevertheless, because Defendants' unfair competition claim has been dismissed with leave to amend, Defendants' request for punitive damages is also STRICKEN WITHOUT PREJUDICE. Defendants are granted leave to reassert their prayer for punitive damages in accordance with this Order, if appropriate.

### CONCLUSION

Accordingly,

IT IS HEREBY ORDERED THAT Plaintiff's motion to dismiss Defendants' Second, Third, Fourth, Fifth and Sixth Counterclaims and to strike Defendants' prayer for punitive damages [Docket No. 11] is GRANTED. Defendants' Second, Third, Fourth, Fifth and Sixth Counterclaims are DISMISSED WITHOUT PREJUDICE. Defendants' prayer for punitive damages is STRICKEN WITHOUT PREJUDICE. Defendants are granted leave to file amended counterclaims, in accordance with this Order, **by no later than thirty (30) days from the date of this Order.** Any and all amended counterclaims **[*33]** must specifically set forth each cause of action that Defendants seek to bring against Plaintiff and **provide factual allegations consistent with the original pleading sufficient to support each such cause of action.** Defendants are further advised that any such amendment must comply with *Federal Rule of Civil Procedure 11.* If Defendants fail to file amended counterclaims that comply with this Order by the above-indicated date, the Court may **dismiss Defendants' counterclaims with prejudice,** either sua sponte or on motion of the Plaintiff.

IT IS FURTHER ORDERED THAT the case management conference currently scheduled for November 9, 2004 is VACATED. The parties shall appear for a telephonic Case Management Conference on **Thursday, January 6, 2005 at 3:30 p.m.** The parties shall **meet and confer** prior to the conference and shall prepare a

2004 U.S. Dist. LEXIS 22934, *; Copy. L. Rep. (CCH) P28,903

joint Case Management Conference Statement which shall be filed no later than ten (10) days prior to the Case Management Conference. Plaintiff shall be responsible for filing the statement as well as for arranging the conference call. All parties shall be on the line and shall call (510) 637-3559 at the above indicated [*34] date and time.

IT IS SO ORDERED.

Dated: 11-5-04

SAUNDRA BROWN ARMSTRONG

United States District Judge