1

2

3

4

5

6

7

8

9

10

11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

12

ELANTECH DEVICES CORPORATION, a
corporation existing under the laws of Taiwan,
R.O.C.,

13

14

Plaintiff,

15

v.

16

SYNAPTICS, INC., a Delaware corporation;
AVERATEC, INC., a California corporation; and
PROSTAR COMPUTER, INC., a California
corporation,

17

18

19

Defendants.

20

AND RELATED COUNTERCLAIMS.

21

Case No.    C06-01839 CRB

**JOINT CLAIM CONSTRUCTION
AND PREHEARING
STATEMENT**

22

23

24

25

26

27

28

1    The parties to the above-entitled action, Plaintiff and Counterclaim Defendant Elantech

2    Devices Corporation ("Elantech"), Counterclaimant and Defendant Synaptics, Inc. ("Synaptics"),

3    and Defendant Averatec, Inc. ("Averatec") respectfully submit this Joint Claim Construction and

4    Prehearing Statement pursuant to Patent Local Rule 4-3.

5    **Patent Local Rule 4-3(a)**

6    Attached hereto as Exhibit A is a table setting forth the construction of those claim terms,

7    phrases, or clauses in the patents at issue on which the parties agree, as well as each party's

8    proposed construction of each disputed claim term, phrase, or clause in the patents at issue.  The

9    agreed-upon definitions in the attached chart include a single definition that spans both columns

10    signifying each party's position.  Averatec joins in the claim construction positions set forth by

11    Synaptics.  The parties will continue to meet and confer to narrow the issues for the claim

12    construction briefing.

13    **Patent Local Rule 4-3(b)**

14    Attached hereto as Exhibit B is an identification of any intrinsic or extrinsic evidence on

15    which Elantech currently intends to rely either in support of its own proposed construction or in

16    opposition to Synaptics' and Averatec's proposed construction.

17    Attached hereto as Exhibit C is an identification of any intrinsic or extrinsic evidence on

18    which Synaptics and Averatec currently intend to rely either in support of its own proposed

19    construction or in opposition to Elantech's proposed construction.

20    **Patent Local Rule 4-3(c)**

21    The parties anticipate that the length of time necessary for the Claim Construction Hearing

22    is three hours.  The parties will be prepared to complete the tutorial session with an hour or less

23    per side.

24    **Patent Local Rule 4-3(d)**

25    At present, Synaptics believes that any expert testimony concerning claim construction

26    that the Court may wish to consider is most easily submitted in the form of declarations in support

27    of or in opposition to the briefing on claim construction.  However, Synaptics reserves the right to

28    call Dr. Andrew Wolfe as a witness at the Claim Construction Hearing in the event that such

1  testimony is needed to clarify points raised in the briefing or in response to questions that the

2  Court may wish to raise in connection with claim construction.  Dr. Wolfe has provided two

3  expert reports in connection with claim construction pursuant to the parties agreement to

4  exchange such reports.  Those reports, served on November 20 and 30, 2006 are attached as

5  Exhibit D hereto (without exhibits, so as not to burden the court).  Averatec also intends to rely

6  on the reports and expert testimony by Dr. Wolfe.

7      **Patent Local Rule 4-3(e)**

8      The parties have set a briefing schedule for the claim construction hearing as follows:

9      - Opening Claim Construction Briefs For Each Patentee: January 29, 2007

10     - Responsive Claim Construction Briefs For Each Defendant: February 12, 2007

11     - Reply Claim Construction Briefs For Each Patentee: February 21, 2007

12     The tutorial for the Court is set for March 6, 2007, at 2:30 p.m.  The hearing on claim

13  construction is set for March 8, 2007 at 2:30 p.m.  Since no date has been previously set, the

14  parties propose that a short prehearing conference be scheduled on March 6, 2006 after the

15  tutorial.

16

17  Dated:  December 18, 2006              KARL J. KRAMER
                                          ELLEN S. REINSTEIN
18                                        ERIKA L. LABIT
                                          MORRISON & FOERSTER LLP
19

20
                                          By:   /s/ Karl J. Kramer
21                                              Karl J. Kramer

22                                        Attorneys for Defendant and
                                          Counterclaimant Synaptics, Inc.
23

24

25

26

27

28

1

2
Dated:  December 18, 2006                    SCOTT R. RABER
                                             KASTNER BANCHERO LLP
3

4                                            KAREN H. BROMBERG
                                             ELIZABETH F. BERNHARDT
5                                            DAMIR CEFO
                                             COHEN & GRESSER LLP
6                                            Admitted *Pro Hac Vice*

7                                            By:   /s/ Damir Cefo
                                             _____
8                                                    Damir Cefo

9                                            Attorneys for Defendant
                                             Averatec, Inc.
10

11
Dated:  December 18, 2006                    YITAI HU
12                                           SEAN P. DEBRUINE
                                             HSIN-YI CINDY FENG
13                                           AKIN GUMP STRAUSS HAUER & FELD
                                             LLP
14

15                                           By:   /s/ Sean P. DeBruine
                                             _____
16                                                   Sean P. DeBruine

17                                           Attorneys for Plaintiff and Counter-
                                             Defendant Elantech Devices Corp.
18

19

20

21

22

23

24

25

26

27

28

1       I, KARL J. KRAMER, am the ECF User whose ID and password are being used to file

2  this JOINT CLAIM CONSTRUCTION AND PREHEARING STATEMENT.  In compliance

3  with General Order 45, X.B., I hereby attest that Damir Cefo and Sean P. DeBruine have

4  concurred in this filing.

5      Dated:  December 18, 2006

6                        MORRISON & FOERSTER LLP

7

8                       By:   /s/ Karl J. Kramer
                            Karl J. Kramer

9                       Attorneys for Defendant and
10                     Counterclaimant Synaptics, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

# JOINT CLAIM CONSTRUCTION CHART

| Claim Terms | Synaptics Claim Construction Disclosure | Elantech Claim Construction Disclosure |
|---|---|---|
| 1. "tap gesture" ('931/'591) | "a quick tap of the finger on the pad, of short duration and involving little or no X or Y finger motion, that is presented to the host as a brief click of the mouse button" | |
| 2. "X and Y position information" ('931/'591) | "information about the horizontal and vertical positioning of an object on a touch sensor" | "two-dimensional location on a touch-sensor pad" |
| 3. "initiating a first signal to the host indicating the occurrence of said gesture" ('591) | "initiating transmission of a first set of data to a computer, or other device that can take as input the output of a touch-sensor pad, that indicates that a tap gesture has occurred on the touch-sensor pad" | "outputting to the host a high state of a signal that has a low and a high state, and the high signal state represents that a double tap gesture will potentially occur on the touch-sensor pad" |
| 4. "terminating said first signal" ('591) | "terminating the previous signal" | "changing the state of the signal from the high signal state to the low signal state" |
| 5. "sending a second signal to said host indicating said second gesture" ('591) | "sending a second set of data to a computer, or other device that can take as input the output of a touch-sensor pad, that indicates that a second tap gesture has occurred on the touch-sensor pad" | "changing the state of the signal from a low signal state to a high signal state for a predetermined period of time, and sending the high signal state to the host which interprets the termination of the first signal and the existence of a second high signal state as being a double tap gesture" This claim construction presumes that "said second gesture" should have read "said gesture" or "said double tap gesture." Absent such a presumption, no claim construction can be made because there is no antecedent basis for "said second gesture." |
| 6. "initiating a drag gesture signal to the host indicating the occurrence of a gesture" ('591) | "initiating transmission of a first set of data to a computer or other device that can take as input the output of a touch-sensor pad, that indicates that a gesture has occurred on the touch-sensor pad" | "outputting to a host a high state of a signal that has a low and high state, and the high signal state represents that a drag gesture will potentially occur on the touch-sensor pad" |
| 7. "maintaining said drag gesture signal" ('591) | "to continue, retain, or repeat the drag gesture signal" | "continuously outputting the high signal state" |
| 8. "repeatedly sending X and Y position information to said host for the duration of said second presence" ('591) | "after the second presence is detected, repeatedly sending information about the horizontal and vertical positioning of an object on a touch sensor to a computer, or other device that can take as input the output of a touch-sensor pad while the second presence continues" | "continuously sending the current two-dimensional location of the object on the touch-sensor pad to the host as long as the object continues to be in proximity to the touch-sensor pad" |
| 9. "initiating a signal to the host indicating the occurrence of said tap gesture" ('931) | "initiating the transmission of a set of data to a computer, or other device that can take as input the output of a touch-sensor pad, that indicates that a tap gesture has occurred on the touch-sensor pad" | "outputting to the host a high state of a signal that has a low and a high state, where the high signal state represents that a tap gesture occurred on the touch-sensor pad" |
| 10. "maintaining said signal for a predetermined period of time" ('931) | "to continue, retain, or repeat the signal for a period of time that was determined before" | "continuously outputting the high state of the signal only for a predetermined time period (i.e., changing the signal state from high to low at the end of the predetermined time period)" |
| 11. "detecting in which of at least one corner of the touch-sensor pad said tap gesture occurred" ('931) | "detecting that a tap gesture has occurred in at least one corner, the identity of which is distinguished in some way from other corners of the touch-sensor pad" | "after detecting the occurrence of the tap gesture, separately detecting in which of at least one corner of the touch-sensor pad the tap gesture occurred" |

# JOINT CLAIM CONSTRUCTION CHART

| | | |
|---|---|---|
| 12. "data packet processor" ('052) | "hardware and/or program code, for example, software executed on a central processing unit, that examines data packets" | "software for processing data packets and sending messages" |
| 13. "incrementally move" ('411) | "to move in increments" | movement defined by the second component of Equations 12 and 13 in the '411 patent, namely, $S(X_{cur} - X_{center})$ and $S(Y_{cur} - Y_{center})$ |
| 14. "operative coupling" ('352) | "finger-induced electrical effect" | |
| 15(a) "scanning the touch sensor" | "sequentially measuring the traces in the touch sensor" | "examining information associated with the touch sensor" |
| 15(b) "means for scanning the touch sensor . . ." ('352) | 112 ¶6 Claimed Function<br>"scanning the touch sensor to (a) identify a first maxima in a signal corresponding to a first finger, (b) identify a minima following the first maxima, and (c) identify a second maxima in a signal corresponding to a second finger following said minima," as those terms are defined below | |
| | 112 ¶6 Corresponding Structures<br>analog multiplexor 45, capacitance measuring circuit 70, analog to digital converter 80, microcontroller 60 | |
| 16. "scanning the touch sensor to . . . identify a first maxima in a signal corresponding to a first finger" ('352) | "measuring the trace values of the touch sensor corresponding to a first finger and determining the point at which the measured values cease to increase and begin to decrease" | "identify a first peak value in a finger profile obtained from scanning the touch sensor" |
| 17. "scanning the touch sensor to . . . identify a minima following the first maxima" ('352t) | "measuring the trace values of the touch sensor following, in scan order, after the first maxima and determining the point at which the measured values cease to decrease and begin to increase" | "identify the lowest value in the finger profile that occurs after the first peak value, and before another peak value is identified" |
| 18. "scanning the touch sensor to . . . identify a second maxima in a signal corresponding to a second finger following said minima" ('352) | "measuring the trace values corresponding to a second finger following, in scan order, said minima and determining the point at which the measured values cease to decrease and begin to increase" | "after identifying the lowest value in the finger profile, identify a second peak value in the finger profile" |
| 19(a) "providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" ('352) | No further construction necessary since ordinary meaning is sufficient. | |
| 19(b) "means for providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" ('352) | 112 ¶6 Claimed Function<br>"providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" | |
| | 112 ¶6 Corresponding Structure<br><br>None | 112 ¶6 Corresponding Structure<br><br>microcontroller 60 |

# Exhibit B

**Exhibit B**

# ELANTECH'S PROPOSED CONSTRUCTION AND EVIDENTIARY SUPPORT

| Claim Terms | Elantech Claim Construction Disclosure | Evidentiary Support |
|---|---|---|
| 1. "Tap gesture". | Not in dispute.'591 patent, | |
| 2. "X and Y position information" ('931/'591) | "two-dimensional location on a touch-sensor pad" | column 5, lines 1-8 of the '931 patent; column 44, lines 20-23 of the '931 patent |
| 3. "initiating a first signal to the host indicating the occurrence of said gesture" ('591) | "outputting to the host a high state of a signal that has a low and a high  state, and the high signal state represents that a double tap gesture will potentially occur on the touch-sensor pad" | '591 patent, Fig. 15D (first pulse in "OUT" signal); column 34, lines 12-22; column 37, lines 2-3 |
| 4. "terminating said first signal"  ('591) | "changing the state of the signal from the high signal state to the low signal state" | '591 patent, Fig. 15D and Figs. 17A-17F |
| 5. "sending a second signal to said host indicating said second gesture" ('591) | "changing the state of the signal from a low signal state to a high signal state for a predetermined period of time, and sending the high signal state to the host which interprets the termination of the first signal and the existence of a second high signal state as being a double tap gesture" This claim construction presumes that "said second gesture" should have read "said gesture" or "said double tap gesture." Absent such a presumption, no claim construction can be made because there is no antecedent basis for "said second gesture." | '591 patent, Fig. 15D (second pulse in "OUT" signal) |
| 6. "initiating a drag gesture signal to the host indicating the occurrence of a gesture" ('591) | "outputting to a host a high state of a signal that has a low and high state, and the high signal state represents that a drag gesture will potentially occur on the touch-sensor pad" | '591 patent, Fig. 15B "OUT" signal; column 33, lines 31-44 |
| 7. "maintaining said drag gesture signal" ('591) | "continuously outputting the high signal state" | '591 patent, Fig. 15B "OUT signal; column 33, lines 31-44; |
| 8. "repeatedly sending X and Y position information to said host for the duration of said second presence" ('591) | "continuously sending the current two-dimensional location of the  object on the touch-sensor pad to the host as long as the object continues to be in proximity to the touch-sensor pad" | '591 patent, column 21, lines 39-43; column 39, lines 24-26 |
| 9. "initiating a signal to the host indicating the occurrence of said tap gesture" ('931) | "outputting to the host a high state of a signal that has a low and a high state, where the high signal state represents that a tap gesture occurred on the touch-sensor pad" | '931 patent, Fig. 15a "OUT" signal; column 34, line 28; column 35, lines 57-59 |
| 10. "maintaining said signal for a predetermined period of time" ('931) | "continuously outputting the high state of the signal only for a predetermined time period (i.e., changing the signal state from high to low at the end of the predetermined time period)" | '931 patent, Fig. 15a "OUT" signal; column 34, line 28; column 35, lines 57-59 |
| 11. "detecting in which of at least one | "after detecting the occurrence of the tap gesture, separately detecting in which of at least one | '931 patent, Figs. 17A-17C |

**Exhibit B**

## ELANTECH'S PROPOSED CONSTRUCTION AND EVIDENTIARY SUPPORT

| | | |
|---|---|---|
| corner of the touch-sensor pad said tap gesture occurred" ('931) | corner of the touch-sensor pad the tap gesture occurred" | |
| 12. "incrementally move" ('411) | movement defined by the second component of Equations 12 and 13 in the '411 patent, namely, $S(X_{cur} - X_{center})$ and $S(Y_{cur} - Y_{center})$ | '411 patent, Fig. 11; column 28, line 16 through column 29, line 9<br><br>Definition of "increment" in *The American Heritage® Dictionary of the English Language, Fourth Edition*, Houghton Mifflin Company, Copyright © 2000, page 889. |
| 13. "data packet processor" ('052) | "software for processing data packets and sending messages" | '052 patent, column 1, line 55 through column 2, line 8; column 2, lines 35-39; column 2, lines 53-62; column 3, lines 12-30; column 6, lines 21-26; Fig. 2 |
| 14. "operative coupling" ('352) | Not in dispute. | |
| 15a. "scanning the touch sensor ('352)" | 15a. "examining information associated with the touch sensor" | '352 patent, 15a. column 5, line 58 through column 6, line 5; column 7, lines 34-48;<br><br>Definition of "scanning" in 'The IEEE Standard Dictionary of Electrical and Electronics Terms, Sixth Edition, 1996, page 947. ("the process of examining information in a systematic manner")<br><br>column 7, lines 34-37 |
| 15b. "means for scanning the touch sensor to (a) identify a first maxima in a signal corresponding to a first finger, (b) identify a minima following the first maxima, and (c) identify a second maxima in a signal corresponding to a second finger following said minima" ('352) | 35 U.S.C. § 112(6) claim element: Corresponding means structure: analog multiplexor 45, capacitance measuring circuit 70, analog to digital converter 80, microcontroller 60 | '352 patent, column 5, lines 20-51 |
| 16. "scanning the touch sensor to . . . identify a first maxima in a signal corresponding to a first finger" ('352) | "identify a first peak value in a finger profile obtained from scanning the touch sensor" | '352 patent, Figs. 3 and 4 and column 6, lines 26-47; column 5, line 50; column 4, lines 55-59; column 8, line 64 through column 9, line 12; column 12, lines 22-23 |
| 17. "scanning the touch sensor to . . . identify a minima following the first | "identify the lowest value in the finger profile that occurs after the first peak value, and before another peak value is identified" | '352 patent, Figs. 3 and 4 and column 6, lines 26-47; column 5, line 50; ; column 4, lines 55-59; column 8, line 64 through column 9, line 12; column 12, lines 22-23 |

**Exhibit B**

## ELANTECH'S PROPOSED CONSTRUCTION AND EVIDENTIARY SUPPORT

| maxima" ('352t) | | |
|---|---|---|
| 18. "scanning the touch sensor to . . . identify a second maxima in a signal corresponding to a second finger following said minima" ('352) | "after identifying the lowest value in the finger profile, identify a second peak value in the finger profile" | '352 patent, Figs. 3 and 4 and column 6, lines 26-47; column 5, line 50; ; column 4, lines 55-59; column 8, line 64 through column 9, line 12; column 12, lines 22-23 |
| 19a: "providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima"<br><br>19b. "means for providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" | 19b. 35 U.S.C. § 112(6) claim element: microcontroller 60 | 19b. '352 patent, column 5, lines 48-55 |

7710763 v2 EAST

# Exhibit C

# EXHIBIT C: SYNAPTICS' IDENTIFICATION OF REFERENCES/EVIDENCE

| Claim Terms | INTRINSIC REFERENCES AND EXTRINSIC EVIDENCE[*] |
|---|---|
| 1. "tap gesture" ('931/'591) | **Intrinsic Evidence** **'591 Patent,** 30:24-27 ("Touch sensor pointing devices can offer "gestures," which are special finger motions that simulate mouse button actions without the need for physical switches."), 31:32-35 ("The basic "tap" gesture is a quick tap of the finger on the pad. Such a tap, of short duration and involving little or no X or Y finger motion during the tap, is presented to the host as a brief click of the mouse button."), 34:12-22 at SYN 00044415-4417 (double tap is two taps); Fig. 15A at SYN 00004387; U.S. Pat. App. 08/320158 March 27, 1996 Amendment After Final Rejection Pursuant to 37 C.F.R. §1.116, at SYN 00000881 ("It is intended that these labels for the gestures are also an expression of the intention of the inventors to be their own lexicographers to define particular gestures and their equivalents."); Abstract ("Tapping, pushing, hopping, and zigzag gestures are recognized by analyzing the position, pressure, and movement of the conductive object on the sensor pad during the time of a suspected gesture, and signals are sent to a host indicating the occurrence of these gestures."); *see also* 6:36-29; 11:15-20 **'931 Patent,** 33:23-26 ("Touch sensor pointing devices can offer "gestures," which are special finger motions that simulate mouse button actions without the need for physical switches."), 34:31-34 at SYN 00004557 ("The basic "tap" gesture is a quick tap of the finger on the pad. Such a tap, of short duration and involving little or no X or Y finger motion during the tap, is presented to the host as a brief click of the mouse button."); Fig. 15A at SYN 00004526; U.S. Pat. App. 08/320158, U.S. Pat. App. 08/320158, March 27, 1996 Amendment After Final Rejection Pursuant to 37 C.F.R. §1.116, at SYN 00000881 ("It is intended that these labels for the gestures are also an expression of the intention of the inventors to be their own lexicographers to define particular gestures and their equivalents."); Abstract ("Tapping, pushing, hopping, and zigzag gestures are recognized by analyzing the position, pressure, and movement of the conductive object on the sensor pad during the time of a suspected gesture, and signals are sent to a host indicating the occurrence of these gestures."); *see also* 6:45-48; 11:37-41. **Extrinsic Evidence** Rebuttal Opinions of Dr. Andrew Wolfe |
| 2. "X and Y position information" ('931/'591) | **Intrinsic Evidence** **'591 Patent,** 21:40-43 at SYN 00004411 ("Current mouse standards update position information 40 times per second, and thus the apparatus of the present invention may easily be operated at this repetition rate." And "mouse standard" is relative motion packets.); 27:5-30 at SYN 00004414 (describes host computer as receiving "?X" and "?Y" after information "translated in the standard fashion into motion events"); 29:10-11 ("Finally, the resultant packet (?X=dX+eX, ?Y=dY+eY) is transmitted to the host computer."), 30:36-37 (same); Fig. 1 at SYN 00004375 (output of "Motion Unit" is "?X" and "?Y" and Figure 1 is described as "an overall block diagram of the capacitive position sensing system of the present invention" (7:10-11; 8:58-60), and claim 6 recites "a touch-sensor pad in a touch-sensing system."); all claims' preambles and claim 9 body and 29:10-11 and Fig. 1. *See also* 2:15-18; 5:41-44; 21:40-43; 26:27-30 at SYN 00004401, 4403, 4411 and 4413. **'931 Patent,** 22:8-11 at SYN 00004551 ("Current mouse standards update position information 40 times per second, and thus the apparatus of the present invention may easily be operated at this repetition rate." And "mouse standard" is relative motion packets.); 27:36-60 at SYN 00004554 (describes host computer as receiving "?X" and "?Y" after information "translated in the standard fashion into motion events"); 31:55-56 ("Finally, the resultant packet (?X=dX+eX, ?Y=dY+eY) is transmitted to the host computer."); 33:34-36 (same); Fig. 1 at SYN 00004513 (output of "Motion Unit" is "?X" and "?Y" and Figure 1 is described as "an overall block diagram of the capacitive position sensing system of the present invention" (7:25-26; 9:12-14), and claims 1 and 5 recites "a touch-sensor pad in a touch-sensing system."; claim 9 of the '591 Patent and 31:55-56 and Fig. 1; all claims of the '931. *See also* 2:18-21; 5:50-53, 22:8-11, 26:58-61 at SYN 00004541, 4543, 4551 and 4553. **Extrinsic Evidence:** PS/2 Mouse Protocol (SYN 00103389-3410); Rebuttal Opinions of Dr. Andrew Wolfe |

# EXHIBIT C: SYNAPTICS' IDENTIFICATION OF REFERENCES/EVIDENCE

| | |
|---|---|
| 3. "initiating a first signal to the host indicating the occurrence of said gesture" ('591) | Intrinsic Evidence<br>**'591 Patent**, 9:10-16 ("host") at SYN 00004405; 31:24-32:64, 34:12-22 (double tap) at SYN 00004416-4417; Fig. 15D at SYN 00004438; 42:38 at SYN 00004421; 35:23-32 at SYN 00004418; 37:6-9 at SYN 00004419 ("In an alternate approach, one or more extra packets indicating a release of the virtual buttons can be inserted into the regular packet stream, rather than using a suppress flag as shown herein.")<br><br>Extrinsic Evidence<br>The New Shorter Oxford English Dictionary (1993), at SYN 00103319 ("initiate" means "Begin, introduce, set going, originate"); The IEEE Standard Dictionary of Electrical and Electronics Terms (1996), at SYN 00103299 ( "signal" (computers) means "The event or phenomenon that conveys data from one point to another"); Rebuttal Opinions of Dr. Andrew Wolfe. |
| 4. "terminating said first signal" ('591) | Intrinsic Evidence<br>**'591 Patent**, 31:24-32:64, 34:12-22 at SYN 00004416-4417; Fig. 15D at SYN 00004388; 42:38 at SYN 00004421; 35:23-32 at SYN 00004418; 37:6-9 at SYN 00004419 ("In an alternate approach, one or more extra packets indicating a release of the virtual buttons can be inserted into the regular packet stream, rather than using a suppress flag as shown herein.").<br><br>Extrinsic Evidence<br>The New Shorter Oxford English Dictionary (1993), at SYN 00103328 ("terminate" means (3) ("Bring to an end, put an end to, cause to cease; finish, end"); The IEEE Standard Dictionary of Electrical and Electronics Terms (1996), at SYN 00103299 ( "signal" (computers) means "The event or phenomenon that conveys data from one point to another"); PS/2 Mouse Protocol (SYN 00103389-3410); Rebuttal Opinions of Dr. Andrew Wolfe. |
| 5. "sending a second signal to said host indicating said second gesture" ('591) | Intrinsic Evidence<br>**'591 Patent**, 9:10-16 ("host") at SYN 00004405; 31:24-32:64, 34:12-22 (double tap) at SYN 00004416-4417; Fig. 15D at SYN 00004388; 42:38 at SYN 00004421; 35:23-32 at SYN 00004418; 37:6-9 at SYN 00004419 ("In an alternate approach, one or more extra packets indicating a release of the virtual buttons can be inserted into the regular packet stream, rather than using a suppress flag as shown herein.").<br><br>Extrinsic Evidence<br>IEEE Standard Dictionary of Electrical and Electronics Terms (1996), at SYN 00103299 ( "signal" (computers) means "The event or phenol-menon that conveys data from one point to another"); PS/2 Mouse Protocol (SYN 00103389-3410); Rebuttal Opinions of Dr. Andrew Wolfe. |
| 6. "initiating a drag gesture signal to the host indicating the occurrence of a gesture" ('591) | Intrinsic Evidence<br>**'591 Patent**, 9:10-16 ("host") at SYN 00004405, 32:65-34:11, 35:58-36:39 at SYN 00004416-4418; Fig. 15B at SYN 00004387; 42:38 at SYN 00004421; 35:23-32 at SYN 00004418; 37:6-9 at SYN 00004419 ("In an alternate approach, one or more extra packets indicating a release of the virtual buttons can be inserted into the regular packet stream, rather than using a suppress flag as shown herein.").<br><br>Extrinsic Evidence<br>The New Shorter Oxford English Dictionary (1993), at SYN 00103319 ("initiate" means "Begin, introduce, set going, originate"); The IEEE Standard Dictionary of Electrical and Electronics Terms (1996), at SYN00103299 ("signal" (computers) means "The event or phenomenon that conveys data from one point to another"); PS/2 Mouse Protocol (SYN 00103389-3410); Rebuttal Opinions of Dr. Andrew Wolfe. |
| 7. "maintaining said drag gesture signal" ('591) | Intrinsic Evidence<br>**'591 Patent**, 32:65-34:11 and 33:1-3 at SYN00004417, 35:58-36:39 at SYN 00004418, 37:6-9 at SYN00004419, 39:13-23 at SYN0004420; Fig. 15B at SYN 00004387; 42:38 at SYN 00004421; 35:23-32 at SYN 00004418; 37:6-9 at SYN 00004419 ("one or more extra packets |

# EXHIBIT C: SYNAPTICS' IDENTIFICATION OF REFERENCES/EVIDENCE

| | |
|---|---|
| | indicating a release of the virtual buttons can be inserted into the regular packet stream, rather than using a suppress flag as shown herein."). <br> Extrinsic Evidence <br> The New Shorter Oxford English Dictionary (1993), at SYN 00103320 ("maintain" means "2a Carry on or prosecute . . . b Go on with, continue, persevere in . . . c Preserve or retain. . . ."); The IEEE Standard Dictionary of Electrical and Electronics Terms (1996), at SYN00103299 ("signal" (computers) means "The event or phenomenon that conveys data from one point to another"); PS/2 Mouse Protocol (SYN 00103389-3410); Rebuttal Opinions of Dr. Andrew Wolfe. |
| 8. "repeatedly sending X and Y position information to said host for the duration of said second presence" ('591) | Intrinsic Evidence <br> '591 Patent, 9:10-16 ("host") at SYN 00004405; 21:40-43, 27:5-30, 29:10-11, 30:36-37, 31:32-42, 32:65-34:11, 35:58-36:39 at SYN 00004411, 00004414-4418; Figs. 1 and 15B at SYN 00004375 and 00004387. *See also* 27:5-30 at SYN 00004414, 29:10-11 and 30:36-37 at SYN 00004415; 32:65-34:11, 35:58-36:39, 39:13-23 at SYN 00004420, 44:23-56 at SYN 00004422; 21:40-43 at SYN 00004411 ("Current mouse standards update position information 40 times per second, and thus the apparatus of the present invention may easily be operated at this repetition rate." And "mouse standard" is relative motion packets.); 27:5-30 at SYN 00004414 (describes host computer as receiving "?X" and "?Y" after information "translated in the standard fashion into motion events"); 29:10-11 ("Finally, the resultant packet (?X=dX+eX, ?Y=dY+eY) is transmitted to the host computer."), 30:36-37 (same); Fig. 1 at SYN 00004375 (output of "Motion Unit" is "?X" and "?Y" and Figure 1 is described as "an overall block diagram of the capacitive position sensing system of the present invention" (7:10-11; 8:58-60), and claim 6 recites "a touch-sensor pad in a touch-sensing system."); all claims' preambles and claim 9 body and 29:10-11 and Fig. 1. *See also* 2:15-18; 5:41-44; 21:40-43; 26:27-30 at SYN 00004401, 4403, 4411 and 4413. <br><br> Extrinsic Evidence <br> The New Shorter Oxford English Dictionary (1993), at SYN 00103317 ("The continuance or length of time; the time during which anything continues."); PS/2 Mouse Protocol (SYN 00103389-3410); Rebuttal Opinions of Dr. Andrew Wolfe. |
| 9. "initiating a signal to the host indicating the occurrence of said tap gesture" ('931) | Intrinsic Evidence <br> '931 Patent, 9:31-38 ("host") at SYN 00004545, 33:20-31, 34:31-41 at SYN 00004557; Fig. 15A at SYN 00004526;. 49:3-7 at SYN 00004565; 40:47-57 at SYN 00004560;43:12-21 at SYN 00004562 ("In an alternate approach, one or more extra packets indicating a release of the virtual buttons can be inserted into the regular packet stream, rather than using a suppress flag as shown herein."). <br><br> Extrinsic Evidence <br> The New Shorter Oxford English Dictionary (1993), at SYN 00103319 ("initiate" means "Begin, introduce, set going, originate"); The IEEE Standard Dictionary of Electrical and Electronics Terms (1996), at SYN 00103299 ( "signal" (computers) means "The event or phenomenon that conveys data from one point to another"); PS/2 Mouse Protocol (SYN 00103389-3410); Rebuttal Opinions of Dr. Andrew Wolfe. |
| 10. "maintaining said signal for a predetermined period of time" ('931) | Intrinsic Evidence <br> '931 Patent, 34:31-41 at SYN 00004557; Fig. 15A at SYN 00004526; 49:3-7 at SYN 00004565; 40:47-57 at SYN 00004560;43:12-21 at SYN 00004562 ("In an alternate approach, one or more extra packets indicating a release of the virtual buttons can be inserted into the regular packet stream, rather than using a suppress flag as shown herein."). <br><br> Extrinsic Evidence <br> The New Shorter Oxford English Dictionary (1993), at SYN 00103320 ("maintain" means "2a Carry on or prosecute . . . b Go on with, continue, persevere in . . . c Preserve or retain. . . ."); The New Shorter Oxford English Dictionary (1993), at SYN 00103326 ("predetermine" means "3 Determine or resolve beforehand or previously") ; The IEEE Standard Dictionary of Electrical and Electronics Terms (1996), at SYN 00103299 ( "signal" (computers) means "The event or phenomenon that conveys data from one point to another"); PS/2 Mouse Protocol (SYN |

# EXHIBIT C: SYNAPTICS' IDENTIFICATION OF REFERENCES/EVIDENCE

| | |
|---|---|
| | 00103389-3410); Rebuttal Opinions of Dr. Andrew Wolfe. |
| 11. "detecting in which of at least one corner of the touch-sensor pad said tap gesture occurred" ('931) | **Intrinsic Evidence**<br>**'931 Patent**, 40:15-46, 44:13-33 at SYN 00004560 and 00004562; Figs. 16b and 17c at SYN 00004529 and 00004532.<br><br>**Extrinsic Evidence**<br>The New Shorter Oxford English Dictionary (1993), at SYN 00103329 ("which" means "Used in asking the identity of a choice made from a definite (stated or implied) set of alternatives") ; PS/2 Mouse Protocol (SYN 00103389-3410); Rebuttal Opinions of Dr. Andrew Wolfe. |
| 12. "data packet processor" ('052) | **Intrinsic Evidence**<br>**'052 Patent**, Abstract, 2:53-55 at SYN 00004503; 3:14-17 at SYN 00004504, Fig. 2 at SYN 00004500.<br><br>**Extrinsic Evidence**<br>The Illustrated Dictionary of Microcomputers (1990), at SYN 00103304 ("processor" means "A hardware data processor or a program that performs the functions of compiling, assembling, and translating for a specific language. Processor operations can involve registers, accumulators, program counters and stacks, input/output control, and internal instruction control."); Rebuttal Opinions of Dr. Andrew Wolfe |
| 13. "incrementally move" ('411) | **Intrinsic Evidence**<br>**'411 Patent**, 29:1-9, 29:18-52, 30:37-50, 31:9-38, 34:8-51 at SYN 00004475-77; Figs. 12-13 at SYN00004443-45; Claims 7, 10, 12, 15, 22, 32, 44, and 56.<br><br>**Extrinsic Evidence**<br>The New Shorter Oxford English Dictionary (1993), at SYN 00103318 ("incremental" means "Of or pertaining to an increment or increments; advancing by increments" and "increments" means "The action or process of (esp. gradually) increasing or becoming greater; an increase, a growth, esp. a uniform or regular one."); Rebuttal Opinions of Dr. Andrew Wolfe |
| 14. "operative coupling" ('352) | **Intrinsic Evidence**<br>**'352 Patent**, 1:32-39, 2:48-52 at ETD0000295; 5:6-10, 5:56-6:1, 6:14-18, 6:26-38, 6:42-45, 7:54-56 at ETD0000297-298; 11:16-19, 12:14-17, 12:42-45 at ETD0000300; 15:34-37, 15:51-54 at ETD0000302; Figs. 1-4, 7A-7F at ETD0000278-280, 0000284-290. April 18, 1997 Office Action at ETD0000348 ("Claims 1-6, 14, 18 and 20-23 are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention. In regards to claims 1-6 they are incomplete for omitting essential steps, such omission amounting to a gap between the steps. See MPEP § 2173.05(1). The omitted steps are: the applicant does not clearly state that there is a cooperative relationship between the fingers being put on the touch sensor and a scan of the touch sensor produces a maxima and minima. As it stands now it is not clear what causes the maxima and minima to be produced and what the maxima and minima are."); August 18, 1997 Amendment at ETD0000366 ("Claims 1-6 were indicated as incomplete for omitting to indicate the cooperative relationship with the fingers to produce the maxima and minima. Claim 1 has been amended to address this, and is now believed to be allowable." [Added scanning the touch sensor to identify a first maxima in a signal corresponding to a first finger, scanning the touch sensor to identify a minima following the first maxima, and scanning the touch sensor to identify a second maxima in a signal corresponding to a second finger following the minima.])<br>**Extrinsic Evidence**<br>Opinions and Rebuttal Opinions of Dr. Andrew Wolfe; The New Shorter Oxford English Dictionary (1993), at SYN 00103325 ("operative" means "Being in operation or force; exerting force or influence."); McGraw-Hill Dictionary of Scientific and Technical Terms (3rd Ed. 1984), at SYN 00103310 ("coupling" means "A mutual relation between two circuits that permits energy transfer from one to another, through a wire, resistor, transformer, capacitor, or other device."); Modern Dictionary of Electronics (1984), at SYN 00103313 ("coupling" means "The |

# EXHIBIT C: SYNAPTICS' IDENTIFICATION OF REFERENCES/EVIDENCE

| | association or mutual relationship of two or more circuits or systems in such a way that power may be transferred from one to another."). |
|---|---|
| 15. "[means for] scanning the touch sensor/means for scanning the touch sensor to" ('352) | **Intrinsic Evidence**<br>**'352 Patent**, 5:20-61, 6:14-26 at ETD0000297; Fig. 2 at ETD0000279.<br><br>**Extrinsic Evidence**<br>Opinions and Rebuttal Opinions of Dr. Andrew Wolfe; The Illustrated Dictionary of Microcomputers (1990), at SYN 00103305 ("To examine sequentially using a part-by-part technique.")<br><br>Corresponding "Means" Structures<br>Fig. 2 (items 45, 70, 80 and 60) at ETD0000279 and described at column 5, line 20 through column 6, line 8, and column 7, lines 1 through 6 at ETD0000297-298; Opinions and Rebuttal Opinions of Dr. Andrew Wolfe. |
| 16. "scanning the touch sensor to . . . identify a first maxima in a signal corresponding to a first finger" ('352) | **Intrinsic Evidence**<br>**'352 Patent**, 6:28-47 at ETD0000297; 9:39-60 at ETD0000299; Figs. 3-5, 6 and 9 at ETD0000280, 282-83; April 18, 1997 Office Action at ETD0000348 ("Claims 1-6, 14, 18 and 20-23 are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention. In regards to claims 1-6 they are incomplete for omitting essential steps, such omission amounting to a gap between the steps. See MPEP § 2173.05(1). The omitted steps are: the applicant does not clearly state that there is a cooperative relationship between the fingers being put on the touch sensor and a scan of the touch sensor produces a maxima and minima. As it stands now it is not clear what causes the maxima and minima to be produced and what the maxima and minima are."); August 18, 1997 Amendment at ETD0000366 ("Claims 1-6 were indicated as incomplete for omitting to indicate the cooperative relationship with the fingers to produce the maxima and minima. Claim 1 has been amended to address this, and is now believed to be allowable." [Added scanning the touch sensor to identify a first maxima in a signal corresponding to a first finger, scanning the touch sensor to identify a minima following the first maxima, and scanning the touch sensor to identify a second maxima in a signal corresponding to a second finger following the minima.])<br><br>**Extrinsic Evidence**<br>Opinions and Rebuttal Opinions of Dr. Andrew Wolfe; The New Shorter Oxford English Dictionary (1993), at SYN 00103321 ("maximum" means "3 Math. The greatest value which a variable may have; the largest element in a set; a point at which a continuously varying quantity ceases to increase and begins to decrease.") |
| 17. "scanning the touch sensor to . . . identify a minima following the first maxima" ('352t) | **Intrinsic Evidence**<br>**'352 Patent**, Abstract at ETD0000277; 5:65-6:13, 6:28-47, 6:59-68, 8:62-65, 9:51-10:8, 10:46-65, 10:66-11:5, 11:45-55 at ETD0000297-300; Figs. 3-5, 6 and 9 at ETD0000280, 282-83; April 18, 1997 Office Action at ETD0000348 ("Claims 1-6, 14, 18 and 20-23 are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention. In regards to claims 1-6 they are incomplete for omitting essential steps, such omission amounting to a gap between the steps. See MPEP § 2173.05(1). The omitted steps are: the applicant does not clearly state that there is a cooperative relationship between the fingers being put on the touch sensor and a scan of the touch sensor produces a maxima and minima. As it stands now it is not clear what causes the maxima and minima to be produced and what the maxima and minima are."); August 18, 1997 Amendment at ETD0000366 ("Claims 1-6 were indicated as incomplete for omitting to indicate the cooperative relationship with the fingers to produce the maxima and minima. Claim 1 has been amended to address this, and is now believed to be allowable." [Added scanning the touch sensor to identify a first maxima in a signal corresponding to a first finger, scanning the touch sensor to identify a minima following the first maxima, and scanning the touch sensor to identify a second maxima in a signal corresponding to a second finger following the minima.]) |

# EXHIBIT C: SYNAPTICS' IDENTIFICATION OF REFERENCES/EVIDENCE

| | |
|---|---|
| | Extrinsic Evidence<br>Opinions and Rebuttal Opinions of Dr. Andrew Wolfe; The New Shorter Oxford English Dictionary (1993), at SYN 00103322 ("minimum" means "3 Math. The least value which variable or a function may have; the smallest element in a set; a point at which a continuously varying quantity ceases to decrease and begins to increase; the value of a quantity at such a point.") |
| 18. "scanning the touch sensor to . . . identify a second maxima in a signal corresponding to a second finger following said minima" ('352) | Intrinsic Evidence<br>**'352 Patent**, Abstract at ETD0000277; 6:28-47 at ETD0000297, Figs. 3-4 at ETD0000280; April 18, 1997 Office Action at ETD0000348 ("Claims 1-6, 14, 18 and 20-23 are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.  In regards to claims 1-6 they are incomplete for omitting essential steps, such omission amounting to a gap between the steps.  See MPEP § 2173.05(1).  The omitted steps are:  the applicant does not clearly state that there is a cooperative relationship between the fingers being put on the touch sensor and a scan of the touch sensor produces a maxima and minima.  As it stands now it is not clear what causes the maxima and minima to be produced and what the maxima and minima are."); August 18, 1997 Amendment at ETD0000366 ("Claims 1-6 were indicated as incomplete for omitting to indicate the cooperative relationship with the fingers to produce the maxima and minima.  Claim 1 has been amended to address this, and is now believed to be allowable."  [Added scanning the touch sensor to identify a first maxima in a signal corresponding to a first finger, scanning the touch sensor to identify a minima following the first maxima, and scanning the touch sensor to identify a second maxima in a signal corresponding to a second finger following the minima.])<br><br>Extrinsic Evidence<br>Opinions and Rebuttal Opinions of Dr. Andrew Wolfe; The New Shorter Oxford English Dictionary (1993), at SYN 00103321 ("maximum" means "3 Math. The greatest value which a variable may have; the largest element in a set; a point at which a continuously varying quantity ceases to increase and begins to decrease.") |
| 19. "[means for] providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" ('352) | Corresponding "Means" Structures<br>None<br><br>Extrinsic Evidence<br>Opinions and Rebuttal Opinions of Dr. Andrew Wolfe. |

---

[*] The references and evidence cited below for each claim term may be used in connection with other related claim terms and will not be reiterated in each of the separate claim terms to which it may be relevant. For example, the term "signal" is used in many claim limitations beginning with Claim Term 3.  Synaptics will not necessarily repeat the references and evidence for such repeated or interrelated terms but, instead, hereby incorporates the references and evidence into each subsequent claim term.

# Exhibit D



1  KARL J. KRAMER (CA SBN 136433)
   ELLEN S. REINSTEIN (CA SBN 227833)
2  ERIKA L. LABIT (CA SBN 234919)
   MORRISON & FOERSTER LLP
3  755 Page Mill Road
   Palo Alto, California  94304-1018
4  Telephone: (650) 813-5600
   Facsimile: (650) 494-0792
5  kkramer@mofo.com

6  Attorneys for Defendant
   SYNAPTICS, INC.
7

8                     UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                      SAN FRANCISCO DIVISION

11

12  ELANTECH DEVICES CORPORATION, a          Case No.    C06-01839 CRB
    corporation existing under the laws of Taiwan,
13  R.O.C.,                                  **EXPERT REPORT OF ANDREW
                                             WOLFE Ph.D. CONCERNING
14                     Plaintiff,            CLAIM CONSTRUCTION**

15          v.

16  SYNAPTICS, INC., a Delaware corporation;
    AVERATEC, INC., a California corporation; and
17  PROSTAR COMPUTER, INC., a California
    corporation,
18
                       Defendants.
19

20  AND RELATED COUNTERCLAIMS.

21

22

23

24

25

26

27

28

I.    BACKGROUND AND QUALIFICATIONS.

A.    EDUCATION AND PROFESSIONAL EXPERIENCE.

1.    I received a B.S.E.E. degree in Electrical Engineering and Computer Science from The Johns Hopkins University in 1985, an M.S. degree in Electrical and Computer Engineering from Carnegie Mellon University in 1987, and a Ph.D degree in Computer Engineering from Carnegie Mellon University in 1992. I was a visiting Assistant Professor at Carnegie Mellon University in 1992 and an Assistant Professor in the Electrical Engineering Department of Princeton University from 1991 to 1997. From 1999 to 2002 I served as a Consulting Professor at Stanford University, where I taught courses in computer architecture and microprocessor design. Attached to this Report as Exhibit 1 is a true and correct copy of my curriculum vitae.

2.    I have been an active participant in the development of touch sensor technologies for over 20 years. From 1983 to 1985, I was a Senior Design Engineer at Touch Technology, Inc. in Annapolis, Maryland. In 1986 and 1987, I was a contractor at Carroll Touch Division, AMP Inc., in Round Rock, Texas, where I designed technologies for touch-screen systems. In 1989, I founded and developed technologies for The Graphics Technology Company, Inc., which developed touch-sensitive components and systems for PDA ("personal digital assistant") and other interactive systems. I worked at The Graphics Technology Company, Inc. on touch-sensor technology development from 1989 through 1995. From 1997 through 2002, I served in varying capacities, including Director of Technology and Chief Technical Officer, for SONICblue, Inc., a leading networked consumer electronics company. I also co-founded and served as Chief Technical Officer for RGB Inc., where in 2003 I developed architectural specifications for programmable video signal processors and other devices. Since 2002 I have also consulted for a number of companies on a range of technology development, investment, and intellectual property matters.

3.    I am a named inventor on numerous patents relating to electrical and computer engineering. In particular, I am the named inventor on at least four patents relevant to touch-

1  sensitive interfacing devices such as those at issue in this litigation: U.S. Pat. Nos. 5,041,701;

2  5,438,168; 5,736,688; and 6,037,930.

3          4.      I have an intimate knowledge of the state of touchpad technology development

4  during the 1990's and can accurately reflect the state of that development from my own work

5  experience.  I have specific experience in the design of touch-sensor systems.  I have supervised

6  other engineers in the development of touch-sensor systems.  I have studied and am familiar with

7  the circuit and software design concepts utilized in the inventions claimed in the U.S. Patent No.

8  5,825,352, (the "'352 Patent") (attached as Exhibit 4 hereto), which Elantech Devices

9  Corporation ("Elantech") is asserted in this litigation.

10          5.      A list of publications that I have authored within the preceding ten years is

11  attached as Exhibit 2.  A listing of any other cases in which I have testified as an expert at trial or

12  by deposition within the preceding four years is attached as Exhibit 3.

13          6.      With a broad knowledge of touchpad technology, with a solid grounding in

14  pertinent circuit and software design, with a historical perspective based on active personal

15  participation, and with experience with the patent process, I believe that I am qualified to provide

16  an accurate assessment of the technical issues in this case.

17      **B.      Summary Of Task.**

18          7.      I was asked to review materials and provide technical teaching and opinions

19  regarding the patents that the parties are asserting in this case.  In this Report, I present an

20  explanation of the historical and technical background for the technology at issue in this case,

21  including an explanation of the state of the relevant art in 1994-97 (the time that the original

22  patent applications leading to the patents-in-suit were first filed).  Also included in this Report is

23  an explanation concerning the technical concepts and terms relevant to the interpretation of some

24  of the claim limitations at issue.  The documents that I reviewed and relied upon for my opinions

25  are typically referenced expressly below.  I also understand that Elantech Devices, Inc.

26  ("Elantech") may present its interpretation of some of the disputed claim terms at issue at the

27  same time that this report is served.  If necessary, I may present rebuttal opinions to such

28

1    proposed interpretations at a later date. I reserve the right to modify or supplement the

2    explanations and evidence presented in this report accordingly.

3        **C.**    **Compensation.**

4        8.    Regardless of the content of my opinions or the outcome of the case, I am being

5    compensated at my ordinary rate of $350 an hour for my time devoted to participating as an

6    expert in this case.

7    **II.**    **OPINIONS TO BE EXPRESSED.**

8        9.    The patents at issue in this case are directed to the use of touch-sensor devices to

9    interpret and convey information relating to gestures performed on touch-sensor devices. In this

10   report I will address the interpretation of certain terms used in the claims of the '352 Patent. The

11   '352 Patent claims an apparatus and method "for detecting the operative coupling of multiple

12   fingers" on a "touch sensor."

13       10.    In the mid-1990's, the people who were developing technology for use in touch

14   sensor devices would have had at least a B.S.E.E. and three or so years of practical experience.

15   Of course, the higher the educational training, the less practical experience one would need. For

16   example, an engineer with a master's degree would need probably only a year or two of

17   experience in the area to be able to tackle the design of such circuitry.

18       11.    In explaining how one of ordinary skill in the art would interpret the words in the

19   claims of the patents-in-suit, I understand that I am to focus on the teachings in the patent itself

20   and on the correspondence recorded in the prosecution of the patents. I also understand that I am

21   to explain how one of ordinary skill in the art would understand the claim terms in January 1996,

22   roughly the time of the "inventions" claimed in the '352 Patent. In my analysis I will also present

23   excerpts from dictionaries, both scientific and non-scientific, and statements in the relevant

24   literature with respect to the terms and concepts that are claimed. In using this type of reference

25   that is not directly tied to the patent, I will only refer to information that is consistent with the

26   teachings and definitions used by the inventors in the patent at issue. I understand that I am not to

27   impose my own interpretation of the words or to present evidence of the meaning of terms that

28   contradicts or varies the meanings as used in the patents. I understand that a key issue in

1  determining the meaning of the claims is how certain terms were used and understood by skilled

2  artisans in or about 1996.

3      **B.**    **'352 Patent Claim Terms To Be Construed.**

4      12.    I understand that the asserted claims of the '352 Patent are claims 1 and 18

5  (Exhibit 4 at ETD0000302-03).  The claims are set out in full below:

6          1. A method for detecting the operative coupling of multiple

7          fingers to a touch sensor involving the steps of

8          scanning the touch sensor to (a) identify a first maxima in a signal
        corresponding to a first finger, (b) identify a minima following the
        first maxima, (c) identify a second maxima in a signal

9          corresponding to a second finger following said minima, and

10          providing an indication of the simultaneous presence of two
        fingers in response to identification of said first and second

11          maxima.

12          * * * *

13          18. A touch sensor for detecting the operative coupling of multiple
        fingers comprising:

14   

15          means for scanning the touch sensor to (a) identify a first maxima
        in a signal corresponding to a first finger, (b) identify a minima
        following the first maxima, and (c) identify a second maxima in a

16          signal corresponding to a second finger following said minima, and

17          means for providing an indication of the simultaneous presence of
        two fingers in response to identification of said first and second

18          maxima.

19      **1.**    **"Operative Coupling"**

20      13.    The term "operative coupling" is used in the preamble of claims 1 and 18 of the

21  '352 Patent.  After reviewing the claims and specification of the '352 Patent, I conclude that the

22  preambles of the claims at issue constitute limitations to the claims because they are necessary to

23  give meaning to key terms in the body of the claims.  There are two main factors that lead me to

24  this conclusion.

25      14.    First, the body of each of claims 1 and 18 refers to "the touch sensor."  There is no

26  antecedent basis for "the touch sensor" in the body of the claims.  Rather, the antecedent basis,

27  and the first instance in which "touch sensor" is introduced in the claims is in the preamble,

28  which recites "a touch sensor."  The phrase "the touch sensor" in the body of the claims

1    necessarily refers back to the recitation of "a touch sensor" in the preamble. Because the body of

2    the claims relies upon this recitation in the preamble, I conclude that the preambles were

3    obviously intended to be and are properly understood to be limitations of the claims.

4        15.    Second, it is my opinion that one of ordinary skill in the art would conclude that

5    the claims do not have meaning without the recitation of "operative coupling" in the preambles to

6    the claims. The body of each of the claims at issue recites a requirement of a "maxima" in a

7    signal that represents some unstated measured property "corresponding to a first finger;" "a

8    minima" of some unstated entity which one might reasonably assume is the same signal that

9    represents some unstated measured property "following the first maxima;" and "a second

10    maxima," again in a signal that represents some unstated measured property, "corresponding to a

11    second finger." The body of each of the asserted claims contains no description of the property

12    that is being measured to establish the recited signal and thus no hint as to where to find

13    "maxima" and "minima" values. Although the preamble recitation of "operative coupling" is

14    extremely vague, it at least breathes some life and meaning into the claim term signal and thus

15    into the claim terms "maxima" and "minima." Put another way, the claim terms "signal",

16    "maxima", and "minima" would lack any definite meaning without the recitation of "operative

17    coupling" in the preamble of the claims.

18        16.    In the context of the claims read in light of the specification of the '352 Patent, the

19    claim term "operative coupling" would have meant to one of ordinary skill in the art in 1996, and

20    today, "finger-induced electrical effect" between the "touch sensor" and "multiple fingers." This

21    is how the phrase is used in the specification of the '352 Patent. ['352 Patent, 1:32-39, 2:48-52 at

22    ETD0000295; 5:6-10, 5:56-6:1, 6:14-18, 6:26-38, 6:42-45, 7:54-56 at ETD0000297-298; 11:16-

23    19, 12:14-17, 12:42-45 at ETD0000300; 15:34-37, 15:51-54 at ETD0000302; Figs. 1-4, 7A-7F at

24    ETD0000278-280, 0000284-290.]

25        17.    This understanding of "operative coupling" is also consistent with common

26    dictionary definitions of the terms "operative" and "coupling" in the context of the field of art in

27    which the claimed invention was developed. [Exhibit 5, The New Shorter Oxford English

28    Dictionary (1993), at SYN 00103325 ("operative" means "Being in operation or force; exerting

1    force or influence."); Exhibit 6, McGraw-Hill Dictionary of Scientific and Technical Terms (3rd

2    ed. 1984), at SYN 00103310 ("coupling" means "A mutual relation between two circuits that

3    permits energy transfer from one to another, through a wire, resistor, transformer, capacitor, or

4    other device."); Exhibit 7, Modern Dictionary of Electronics (6th ed. 1984), at SYN 00103313

5    ("coupling" means "The association or mutual relationship of two or more circuits or systems in

6    such a way that power may be transferred from one to another.").]

7                    **2.    "Scanning The Touch Sensor"**

8        18.    Both of the asserted claims of the '352 Patent require "scanning the touch sensor."

9    Claim 18 also requires that there is a "means" that performs a variety of functions in connection

10   with "scanning the touch sensor." The phrase "scanning the touch sensor" would mean to one of

11   ordinary skill in the art at the relevant time and in the relevant field the process of "sequentially

12   measuring the traces in the touch sensor." The specification expressly describes "scanning the

13   touch sensor" in these terms. ['352 Patent, 5:20-61, 6:14-26 at ETD0000297; Fig. 2 at

14   ETD0000279.] This reading is also consistent with common dictionary definitions of "scanning."

15   [Exhibit 8, The IEEE Standard Dictionary of Electrical and Electronics Terms (1996), at SYN

16   00103298 ("scanning" means "(6) The process of examining information in a systematic

17   manner."); Exhibit 9, The Illustrated Dictionary of Microcomputers (1990), at SYN 00103305

18   ("To examine sequentially using a part-by-part technique.")]

19       19.    The "means" term for this limitation in claim 18 is recited as performing a series

20   of functions, namely "for scanning the touch sensor to (a) identify a first maxima in a signal

21   corresponding to a first finger, (b) identify a minima following the first maxima, and (c) identify a

22   second maxima in a signal corresponding to a second finger following said minima." It is my

23   understanding that this is a means plus function element, the scope of which would be determined

24   under USC 35 Section 112, Paragraph 6. The corresponding structures that are disclosed in the

25   specification of the '352 Patent as performing the recited functions of this "means" limitation are

26   shown in Fig. 2 (items 30, 45, 70, 80 and 60) at ETD0000279 and described at column 5, line 20

27   through column 6, line 8, and column 7, lines 1 through 6 at ETD0000297-298.

28

1
        **3.**    **"Identify A First Maxima In A Signal Corresponding To A First**

2
               **Finger"**

3
      20.    In both claims 1 and 18 of the '352 Patent, the claims recite "scanning the touch

4
sensor to (a) identify a first maxima in a signal corresponding to a first finger." This claim phrase

5
means "measuring the trace values of the touch sensor corresponding to a first finger and

6
determining the point at which the measured values cease to increase and begin to decrease." I

7
have previously described the "scanning" aspect of this claim limitation but repeat it here to make

8
clear what is being claimed.

9
      21.    The key term in understanding this claim phrase is the notion of a "maxima." In

10
general, "maxima" is the plural of "maximum." The term "maximum" has two different mean-

11
ings in general use, that of a local maximum and that of a global maximum. A local maximum is

12
"a point at which a continuously varying quantity ceases to increase and begins to decrease." A

13
global maximum is "The greatest value which a variable may have" or "the largest element in a

14
set." In the context of this claim, "maxima" and "maximum" refer to a local maximum.

15
      22.    "Maximum" in the context of scanning a series of values as in this claim means

16
"the point at which the measured values cease to increase and begin to decrease." [Exhibit 5, The

17
New Shorter Oxford English Dictionary (1993), at SYN 00103321 ("maximum" means "3 Math.

18
The greatest value which a variable may have; the largest element in a set; a point at which a

19
continuously varying quantity ceases to increase and begins to decrease.").] This is exactly how

20
"maxima" is identified in the operation of the invention as described in the specification. [Exhibit

21
4, '352 Patent, Figs. 3-5, 6 and 9, ETD0000280 and ETD0000282-83, and corresponding text;

22
9:39-60 ETD0000299.]

23
      23.    Note two other important things about the use of the term "maxima." First, the

24
"maxima" must be a value that relates to "a signal corresponding to a first finger." This means

25
that "maxima" does not refer to the highest value generally in the set of values measure

26
throughout the touch sensor, but rather a local maximum associated with the subset of samples

27
corresponding to a first finger. Second, the plural "maxima" is used rather than "maximum"

28
implying that other local "maxima" values may be read at other points on the touch sensor.

1                  **4.    "Identify A Minima Following The First Maxima"**

2          24.    In both claims 1 and 18 of the '352 Patent, the claims recite "scanning the touch

3    sensor to . . . (b) identify a minima following the first maxima. . . ." This claim phrase means

4    "measuring the trace values of the touch sensor following, in scan order, after the first maxima

5    and determining the point at which the measured values cease to decrease and begin to increase."

6    I have previously described the "scanning" aspect of this claim limitation but repeat it here to

7    make clear what is being claimed.

8          25.    The key term in understanding this claim phrase is the notion of a "minima." In

9    general, "minima" is the plural of "minimum." In the context of this claim, "minima" and

10   "minimum" refer to a local minimum. "Minimum" in the context of scanning a series of values as

11   in this claim means "the point at which the measured values cease to decrease and begin to

12   increase." [Exhibit 5, The New Shorter Oxford English Dictionary (1993), at SYN 00103322

13   ("minimum" means "3 Math. The least value which a variable or a function may have; the

14   smallest element in a set; a point at which a continuously varying quantity ceases to decrease and

15   begins to increase; the value of a quantity at such a point.").] This is exactly how "minima" is

16   identified in the operation of the invention as described in the specification. [Exhibit 4, '352

17   Patent, Figs. 3-5, 6 and 9, ETD0000280, and corresponding text; Abstract, ETD0000277; 5:65-

18   6:13, 6:28-47, 6:59-68, 8:62-65, 9:51-10:8, 10:46-65, 10:66-11:5, 11:45-55, ETD0000297-300.]

19         26.    Note two other important things about the use of the term "minima." First, the

20   "minima" must be a value that follows, in scan order, "a signal corresponding to a first finger."

21   This means that "minima" does not refer to the lowest value generally in the set of values

22   measure throughout the touch sensor, but rather a local minimum between the first finger signal

23   and the second finger signal. Second, the plural "minima" is used rather than "minimum,"

24   implying that other local "minima" values may be read at other points on the touch sensor.

25                  **5.    "Identify A Second Maxima In A Signal Corresponding To A Second**

26                           **Finger Following Said Minima"**

27         27.    In both claims 1 and 18 of the '352 Patent, the claims recite "scanning the touch

28   sensor to . . . (c) identify a second maxima in a signal corresponding to a second finger following

1    said minima." This claim phrase means "measuring the trace values corresponding to a second

2    finger following, in scan order, said minima and determining the point at which the measured

3    values cease to decrease and begin to increase." I have previously described the "scanning"

4    aspect of this claim limitation but repeat it here to make clear what is being claimed.

5        28.    The key term in understanding this claim phrase is the notion of a "maxima." In

6    general, "maxima" is the plural of "maximum." The term "maximum" has two different

7    meanings in general use, that of a local maximum and that of a global maximum. A local

8    maximum is "a point at which a continuously varying quantity ceases to increase and begins to

9    decrease." A global maximum is "The greatest value which a variable may have" or "the largest

10    element in a set." In the context of this claim, "maxima" and "maximum" refer to a local

11    maximum.

12        29.    "Maximum" in the context of scanning a series of values as in this claim means

13    "the point at which the measured values cease to increase and begin to decrease." [Exhibit 5, The

14    New Shorter Oxford English Dictionary (1993), at SYN 00103321 ("maximum" means "3 Math.

15    The greatest value which a variable may have; the largest element in a set; a point at which a

16    continuously varying quantity ceases to increase and begins to decrease.").] This is exactly how

17    "maxima" is identified in the operation of the invention as described in the specification. [Exhibit

18    4, '352 Patent, Figs. 3-5, 6 and 9, ETD0000280 and ETD0000282-83, and corresponding text;

19    9:39-10:25, ETD0000299.]

20        30.    Note two other important things about the use of the term "maxima." First, the

21    "maxima" must be a value that relates to "a signal corresponding to a second finger." This means

22    that "maxima" does not refer to the highest value generally in the set of values measure

23    throughout the touch sensor, but rather a local maximum associated with the subset of samples

24    corresponding to a second finger. Second, the plural "maxima" is used rather than "maximum"

25    implying that other local "maxima" values may be read at other points on the touch sensor.

26

27

28

1          **6.      "Providing An Indication Of The Simultaneous Presence Of Two**

2                 **Fingers In Response To Identification Of Said First And Second**

3                 **Maxima."**

4          31.    Claims 1 and 18 both recite "providing an indication of the simultaneous presence

5    of two fingers in response to identification of said first and second maxima." Claim 18 recites

6    this function as being performed by a "means" and thus requiring identification of the function

7    performed and the corresponding structure under USC 35  Section 112, Paragraph 6.  The

8    function "providing an indication of the simultaneous presence of two fingers in response to

9    identification of said first and second maxima" should be construed consistent with the

10   constructions I set forth above and the ordinary meaning of the words in the claim.  However, in

11   reviewing the specification, I did not find any specific disclosure of a structure that is literally or

12   inherently linked to the precise functions recited in the claims.  I did see that "the simultaneous

13   presence of two fingers in response to identification of said first and second maxima" is

14   *determined* at item 980 in Figure 9-2.  However, there is no disclosure of a precise structure that

15   is used to "provide an indication" once that information has been determined.  One of ordinary

16   skill in the art today and in 1996 could not establish what would be identical or equivalent to an

17   undisclosed structure.  Therefore, I conclude that this limitation is indefinite.

18         32.    I understand that I may be called upon to respond to any issues raised by the

19   Elantech's expert or experts or the Court.  I also understand that Elantech has not disclosed yet its

20   proposed claim construction.  I anticipate that I might supplement or modify the opinions in this

21   report in view of any such new information or other new information that might arise between

22   now and the time of the briefing and hearing on the claim construction issues.

23

24

25   Dated:  November 20, 2006

26                                            Andrew Wolfe, Ph.D

27

28

EXPERT REPORT OF ANDREW WOLFE PH.D
CONCERNING CLAIM CONSTRUCTION
CASE NO. 3:06-CV-01839 CRB                        10

1   KARL J. KRAMER (CA SBN 136433)
    ELLEN S. REINSTEIN (CA SBN 227833)
2   ERIKA L. LABIT (CA SBN 234919)
    MORRISON & FOERSTER LLP
3   755 Page Mill Road
    Palo Alto, California 94304-1018
4   Telephone: (650) 813-5600
    Facsimile: (650) 494-0792
5   kkramer@mofo.com

6   Attorneys for Defendant
    SYNAPTICS, INC.
7

8                   UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                    SAN FRANCISCO DIVISION

11

12  ELANTECH DEVICES CORPORATION, a           Case No.    C06-01839 CRB
    corporation existing under the laws of Taiwan,
13  R.O.C.,                                    **REBUTTAL EXPERT REPORT
                                               OF ANDREW WOLFE Ph.D.
14                     Plaintiff,              CONCERNING CLAIM
                                               CONSTRUCTION**
15         v.

16  SYNAPTICS, INC., a Delaware corporation;
    AVERATEC, INC., a California corporation; and
17  PROSTAR COMPUTER, INC., a California
    corporation,
18
                       Defendants.
19

20  AND RELATED COUNTERCLAIMS.

21

22  **I.     BACKGROUND AND QUALIFICATIONS.**

23         1.     My background and qualifications are set forth in my Expert Report dated

24  November 20, 2006, paragraphs 1 through 6 and 8. I hereby incorporate by reference the

25  statements I made in my Expert Report of November 20, 2006. I have studied and am familiar

26  with the circuit and software design concepts utilized in the inventions claimed in the U.S. Patent

27  No. 5,825,352, ("the '352 Patent"), apparently held by Elantech Devices Corporation

28  ("Elantech"), and four patents owned by Synaptics, Inc. ("Synaptics"): U.S. Patent

1    Nos. 5,543,591 ("the '591 patent"), 5,880,411 ("the '411 patent"), 5,943,052 ("the '052 patent"),

2    and 6,380,931 ("the '931 patent").

3        2.        I have reviewed Plaintiff and Counterdefendant Elantech Devices Corp.'s

4    Preliminary Claim Construction and Preliminary Identification of Extrinsic Evidence Pursuant to

5    Patent L.R. 4-2, dated November 20, 2006 ("Elantech's Claim Construction"). I submit this

6    Rebuttal Expert Report to rebut some of the assertions made in Elantech's Claim Construction.

7    Obviously, my rebuttal may address only some of the problems in Elantech's Claim Construction

8    and my silence as to other problems with Elantech's Claim Construction should not be interpreted

9    as agreement with any such aspect of Elantech's Claim Construction. The other documents that I

10   reviewed and relied upon for my opinions are typically referenced expressly below. I reserve the

11   right to modify or supplement the explanations and evidence presented in this report accordingly.

12   **II.    OPINIONS TO BE EXPRESSED.**

13       3.        The patents at issue in this case are directed to the use of touch-sensor devices to

14   interpret and convey information relating to gestures performed on touch-sensor devices.

15       **1.    "Tap Gesture"**

16       4.        Elantech asserts that '591 and '931 Patent claim term "tap gesture" means "the act

17   of an object applying more than a predetermined threshold of pressure for an amount of time that

18   is less than a predetermined amount of time." In the context of these patents, I disagree.

19       5.        The authors of the '931 and '591 Patents expressly defined the phrase "tap

20   gesture:" "The basic 'tap' gesture is a quick tap of the finger on the pad. Such a tap, of short

21   duration and involving little or no X or Y finger motion during the tap, is presented to the host as

22   a brief click of the mouse button." [Exhibit 10, '591 Patent, 31:32-35 at SYN 00004416;

23   Exhibit 13, '931 Patent, 34:31-34 at SYN 00004557.] During prosecution, the inventors

24   underscored that they had specially defined the term "tap gesture," in stating that "It is intended

25   that these labels for the gestures are also an expression of the intention of the inventors to be their

26   own lexicographers to define particular gestures and their equivalents." [Exhibit 14, U.S. Pat.

27   App. 08/320158, March 27, 1996 Amendment After Final Rejection Pursuant to 37 C.F.R.

28   §1.116, at SYN 00000881.]   The concepts of a "predetermined threshold of pressure" and a

1  "predetermined amount of time" are restrictions that are not present in the author's definitions.

2  Consequently, one of ordinary skill in the relevant art would understand "tap gesture" to mean "A

3  quick tap of the finger on the pad. Such a tap, of short duration and involving little or no X or Y

4  finger motion during the tap, is presented to the host as a brief click of the mouse button."

5  **2.    "Providing X and Y Position Information To A Host"**

6  6.    Elantech asserts that "X and Y position information" means "two-dimensional

7  location on a touch-sensor pad." In the context of these patents, I disagree.

8  7.    Elantech's asserted claim construction appears to limit the information being sent

9  to the host to the specific physical location of the finger on the touch sensor. In the art, this is

10  referred to as "absolute" position information; in other words, the specific current position of the

11  finger within the coordinate system of the touchpad. This would seem to exclude other forms of

12  X and Y position information such as "relative" X and Y position information, often abbreviated

13  as $\Delta X$ and $\Delta Y$, that describe the change in position, or motion, of the finger on the touch pad in

14  the X and Y dimensions. Elantech's narrow construction of "X and Y position information"

15  contradicts the express teachings of the '591 and '931 Patents.

16  8.    One express purpose of the invention is the use of the touch sensor device to

17  simulate or emulate a computer mouse or trackball. [Exhibit 10, '591 Patent, 2:15-18; 5:41-44;

18  21:40-43; 26:27-30 at SYN 00004401, 4403, 4411 and 4413; for example Exhibit 13, '931 Patent,

19  2:18-21, 5:50-53, 22:8-11, 26:58-61 at SYN 00004541, 4543, 4551 and 4553.] The objective of

20  a computer mouse or trackball is to communicate relative X and Y position information (motion)

21  and not the absolute X and Y position (coordinate position). One of ordinary skill at the time

22  would have understood "X and Y position information" to include the relative position

23  information generally communicated by a mouse or trackball.

24  9.    Although the ordinary meaning of "X and Y position information" might include

25  "absolute" position information, it is not limited to that. Indeed, in *all* of the examples and

26  descriptions in the '591 and '931 Patents, the information sent to the host is "relative" X and Y

27  position information. For example, in Figure 1 of both the '591 and '931 Patents, the output of

28  the "position sensing system of the present invention" (Exhibit 10, '591 Patent, 7:10-11; 8:58-60

1  at SYN 00004404; Exhibit 13, '931 Patent, 7:25-26; 9:12-14 at SYN 00004544-4545), is "ΔX"

2  and "ΔY," not absolute X and Y information. The written description of the '591 and '931

3  Patents also expressly states that the X and Y position information sent to the host is "ΔX" and

4  "ΔY" information that has been "translated in the standard fashion into motion events."

5  [Exhibit 10, '591 Patent, 27:5-30 at SYN 00004414, 29:10-11, 30:36-37 at SYN 00004415;

6  Exhibit 13, '931 Patent, 27:36-60 at SYN 00004554; 31:55-56, 33:34-36 at SYN 00004556-

7  4557.] This description is further supported by express statements that the information is sent

8  using current mouse standards. [Exhibit 10, '591 Patent, 21:40-43 at SYN 00004411; Exhibit 13,

9  '931 Patent, 22:8-11 at SYN 00004551.] In 1996, and today, the standard method of

10  communicating X and Y position information to a host is by transmitting data packets of "ΔX"

11  and "ΔY" information that reflects the relative change in X and Y position. Elantech's asserted

12  claim construction is thus too narrow to encompass any of the disclosed embodiments.

13       10. I conclude that Elantech's asserted claim construction is incorrect. The ordinary

14  meaning of the phrase "X and Y position information" should apply and the proper interpretation

15  of "X and Y position information" should be "information about the horizontal and vertical

16  positioning of an object on a touch sensor." This definition includes all types of "X and Y

17  position information," including "relative" *or* "absolute" "X and Y position information."

18

### 3. "Initiating a First Signal to the Host Indicating the Occurrence of Said Gesture"

20       11. Elantech asserts that this limitation of the '591 Patent means "outputting to the

21  host a high state of a signal that has a low and a high state, and the high signal state represents

22  that a double tap gesture will potentially occur on the touch-sensor pad." Apparently, Elantech is

23  limiting the claim to a particular type of "signal," one "that has a low and a high state," and then

24  further limits the claimed signal to one that indicates the occurrence of a gesture by "a high state"

25  of the signal. By their literal terms, the claims are not so limited.

26       12. The term "signal" has a broad meaning to those of ordinary skill in the art of

27  touch-sensor technology. In ordinary terms, "signal" means "The event or phenomenon that

28  conveys data from one point to another". [Exhibit 15, The IEEE Standard Dictionary of

1    Electrical and Electronics Terms (1996), at SYN 00103331.] The term "signal" is not limited to a

2    particular type of signal (such as one having "a low and a high state"), and certainly does not

3    require that a particular state, i.e. the "high state," indicates that a "gesture" has occurred.

4        13.    In the description of the embodiments in the '591/'931 Patents, the "signals" sent

5    to the host that signify "gestures" are standard "mouse packets" of data, not separate instances of

6    a "high" or "low" state. [*See, e.g.,* Exhibit 10, '591 Patent, 42:38 at SYN 00004421; Exhibit 13,

7    '931 Patent, 49:3-7 at SYN 00004565.] Moreover, the patent expressly states that the invention

8    can be implemented "as a software program, hardware state machine, or otherwise. All such

9    implementations are intended to fall within the scope of the present invention." [Exhibit 10, '591

10   Patent, 35:23-32 at SYN 00004418; Exhibit 13, '931 Patent, 40:47-57 at SYN 00004560.] In

11   such other embodiments, the "signal" obviously need not be a voltage level on a single wire that

12   has a "high" state and a "low" state. Indeed, "signals" may simply be "flags" or "messages"

13   residing in memory or registers or communicated over I/O channels, for example. One such

14   example is expressly set forth in the patent: "In an alternate approach, one or more extra packets

15   indicating a release of the virtual buttons can be inserted into the regular packet stream, rather

16   than using a suppress flag as shown herein." [Exhibit 10, '591 Patent, 37:6-9 at SYN 00004419;

17   Exhibit 13, '931 Patent, 43:12-15 at SYN 00004562.] This teaching contradicts Elantech's

18   narrow construction of the gesture "signal" as being limited to a single "high" state electrical

19   pulse transmitted along a wire. The claims are not limited to any particular type of "signal."

20       14.    I also believe that "host" should be construed to clarify the claimed "signal." The

21   meaning of "host" is expressly defined in the '591 and '931 Patents: "Those of ordinary skill in

22   the art will recognize, that as used herein, 'host' may mean a stand-alone computer such as an

23   IBM or compatible PC or computer made by Apple Computers, hand-held control units, personal

24   digital assistants, remote communication devices, or the like, or to any other devices or systems

25   which can take as input the output of a touch tablet." [Exhibit 10, '591 Patent, 9:10-16 ("host") at

26   SYN 00004405; Exhibit 13, '931 Patent, 9:31-38 ("host") at SYN 00004545.]

27       15.    I disagree with Elantech's asserted claim construction and conclude that the claim

28   terms mean to one of ordinary skill in the art "initiating transmission of a first set of data to a

1    computer, or other device that can take as input the output of a touch-sensor pad, that indicates

2    that a tap gesture has occurred on the touch-sensor pad."

3         **4.    "Terminating Said First Signal"**

4         16.    Elantech asserts that "terminating said first signal" means "changing the state of

5    the signal from the high signal state to the low signal state." This exact claim phrase occurs twice

6    in the '591 Patent claims. This asserted construction is narrower than disclosed embodiments and

7    ignores the plain meaning of the words that are used in the claims. Nothing in the words of the

8    claim or the teachings in the patent limit the signal that is terminated to one that was in a high

9    state. The ordinary meaning of the claim term is simply "terminating the previous signal." The

10   claim terms permit any type of "signal" and any method for "terminating" the previous signal.

11        **5.    "Sending a Second Signal to Said Host Indicating Said Second Gesture"**

12        17.    Elantech asserts that this '591 Patent claim phrase means "changing the state of the

13   signal from a low signal state to a high signal state for a predetermined period of time, and

14   sending the high signal state to the host which interprets the termination of the first signal and the

15   existence of a second high signal state as being a double tap gesture." Elantech also asserts that

16   "This claim construction presumes that 'said second gesture' should have read 'said gesture' or

17   'said double tap gesture.' Absent such a presumption, no claim construction can be made because

18   there is no antecedent basis for 'said second gesture.'" I disagree with Elantech's assertions.

19        18.    First, Elantech's construction narrows the claims to only a particular type of signal

20   and particular states of that signal. The claims literally only require "sending a second signal"

21   and do not literally require "changing the state of the signal from a low signal state to a high

22   signal state for a predetermined period of time, and sending the high signal state to the host."

23   Again, Elantech's construction reads into the claims limitations that are not present in the literal

24   words of the claims nor implied by the specification or prosecution history. I believe the ordinary

25   construction of "signal" I explained above applies because the inventors did not limit or specially

26   define the term "signal" in the specification.

27        19.    Second, the word "host" should be defined as I have stated above. However, there

28   is nothing in the claim that suggests that the "host" is required to "interpret" the signal nor to

1  "interpret" it in a specific way (i.e. "as being a double tap gesture.")

2      20.    Finally, the claims are not incorrect and do not lack an antecedent basis for the

3  term "said second gesture." As is obvious from the preamble to the claims, there are two "tap

4  gestures" that are made in the claimed invention, (a "double tap gesture.") A prior limitation of

5  this claim recites the first "said gesture," in other words, the first "tap gesture" referenced in the

6  preamble. This limitation then logically recites the "second gesture" that is recited in the

7  preamble claim term "double tap gesture." The plain meaning of these terms makes clear that the

8  antecedent basis of the term "gesture" is the "tap gesture" referenced in the preamble to the claim.

9      21.    I disagree with Elantech's asserted claim construction for this claim term and

10  conclude that one of ordinary skill in the art would construe these claim terms to mean "sending a

11  second set of data to a computer, or other device that can take as input the output of a touch-

12  sensor pad, that indicates that a second tap gesture has occurred on the touch-sensor pad"

13

14  **6.    "Initiating a Drag Gesture Signal to the Host Indicating the Occurrence of a Gesture""**

15      22.    Elantech asserts that this '591 Patent claim term means "outputting to a host a high

16  state of a signal that has a low and high state, and the high signal state represents that a drag

17  gesture will potentially occur on the touch-sensor pad." I disagree with Elantech's insertion of

18  the words "a high state of a signal that has a low and high state, and the high signal state." These

19  words do not exist in the claim and, as I have explained above, the claim term "signal" is not

20  limited either in the claims or in the specification to any particular type of signal or state of a

21  signal. Consistent with the evidence I outlined above with respect to "signal" and "host," I

22  conclude that one of ordinary skill in the art would interpret these terms to mean "initiating

23  transmission of a first set of data to a computer or other device that can take as input the output of

24  a touch-sensor pad, that indicates that a gesture has occurred on the touch-sensor pad."

25  **7.    "Maintaining Said Drag Gesture Signal"**

26      23.    Elantech asserts that this '591 Patent claim term means "continuously outputting

27  the high signal state." I disagree with this asserted construction. First, as outlined above, the

28  claims are not limited to a "high signal state," but rather, include all types and states of "signal."

24.    Second, the ordinary meaning of the word "maintaining" is not limited to "continuously."  The ordinary meaning of "maintaining" includes the concepts of "Go on with, continue, persevere in" or "Preserve or retain." [Exhibit 17, The New Shorter Oxford English Dictionary (1993), at SYN 00103337.]  In the descriptions in the specification of the '591 Patent, signals are "maintained" in variety of ways.  For example, the specification teaches that a signal previously sent may apply until it is, in effect, rescinded. [Exhibit 10, '591 Patent, 33:1-3; 37:6-9 at SYN 00004417 and SYN 00004419.]  The patent also teaches that a signal previously sent will dictate the operation in question while subsequent signals are suppressed. [Exhibit 10, '591 Patent, 39:13-23 at SYN 00004420.]  In other words, the patent teaches that gesture signals may be maintained even while not "continuously outputting the high signal state."  This directly contradicts the narrow construction that Elantech asserts.

25.    Elantech's construction again reads into the claims further limitations that are not literally present in the claim words.  I conclude that one of ordinary skill in the art would construe this claim limitation to mean "to continue, retain, or repeat the drag gesture signal."

## 8.    "Repeatedly Sending X and Y Position Information to Said Host for the Duration of Said Second Presence"

26.    Elantech asserts that this claim limitation of the '591 Patent means "continuously sending the current two-dimensional location of the  object on the touch-sensor pad to the host as long as the object continues to be in proximity to the touch-sensor pad."  I disagree with this construction for many reasons.

27.    First, the claim term "repeatedly" does not mean "continuously."  The plain meaning of "repeatedly" is that the signal is "repeated."  The plain meaning of "repeatedly" does not require a continuous sending of a signal, but permits breaks in transmission so long as the signal is repeated over time.  This is also clear from the teachings in the specification of the '591 Patent.  As described above, signals may be sent repeatedly despite the fact that they are not sent continuously. [Exhibit 10, '591 Patent, 39:13-23 at SYN 00004420.]  The patent further describes a mechanism by which individual $\Delta X$ and $\Delta Y$ samples may be suppressed or delayed under certain circumstances. [Exhibit 10, '591 Patent, 44:23-56 at SYN 00004422.]

28.    Second, as described above, the claim phrase "X and Y position information," is not limited to "current two-dimensional location of an object on the touch-sensor pad." As stated above, all of the embodiments in the patent teach that the host is sent "relative" position information, such as "ΔX" and "ΔY," not absolute X and Y information. [Exhibit 10, '591 Patent, 27:5-30 at SYN 00004414, 29:10-11, 30:36-37 at SYN 00004415.] For the reasons stated above, with respect to "X and Y position information," Elantech's asserted construction is incorrect.

29.    As noted above, the term "host" should be construed to clarify the claims. As stated above, the inventors expressly defined "host" in the specification of the '591 Patent.

30.    I conclude that Elantech's construction is incorrect because it ignores the plain meaning of the claim terms. Consistent with my previous explanations, I conclude that one of ordinary skill in the art of touch-sensor technology would construe this claim limitation to mean "after the second presence is detected, repeatedly sending information about the horizontal and vertical positioning of an object on a touch sensor to a computer, or other device that can take as input the output of a touch-sensor pad while the second presence continues."

9.    **"Initiating a Signal to the Host Indicating the Occurrence of Said Tap Gesture"**

31.    Elantech asserts that this claim limitation of the '931 Patent means "outputting to the host a high state of a signal that has a low and a high state, where the high signal state represents that a tap gesture occurred on the touch-sensor pad." For the same reasons I explained above with respect to the term "signal," Elantech's claim construction reads into the claims the words "a high state of a signal that has a low and a high state, where the high signal state." The claims are not literally so limited and nothing in the patent specification or prosecution history narrows the term "signal" to a particular type or state of signal. Instead, consistent with my prior explanation of the terms "signal" and "host," this claim limitation would mean to one of ordinary skill in the art of touch-sensor technology in or about 1996 "initiating the transmission of a set of data, to a computer or other device that can take as input the output of a touch-sensor pad, that indicates that a tap gesture has occurred on the touch-sensor pad."

10.    **"Maintaining Said Signal for a Predetermined Period of Time"**

32.    Elantech asserts that this '931 Patent claim term should be limited to "continu-

1    ously outputting the high state of the signal only for a predetermined time period (i.e., changing

2    the signal state from high to low at the end of the predetermined time period)." This construction

3    suffers from the same problems I have identified previously. The claims are not limited to a

4    particular type or state of signal. Also, in the context of this patent, the term "maintaining" does

5    not mean "continuously outputting." I conclude that Elantech's construction is too narrow and

6    that one of ordinary skill in the art of touch-sensor technology would construe these terms to

7    mean "to continue, retain, or repeat the signal for a period of time that was determined before."

8

9    **11.    "Detecting in Which of at Least One Corner of the Touch-Sensor Pad Said Tap Gesture Occurred"**

10    33.    Elantech asserts that this claim limitation of the '931 Patent should be limited to

11    the step of "after detecting the occurrence of the tap gesture, separately detecting in which of at

12    least one corner of the touch-sensor pad the tap gesture occurred." I disagree.

13    34.    Elantech limits the literal meaning of the claims by adding the concepts of "after"

14    and "separately." There is no necessary relationship between the timing of the detection of the

15    tap gesture and the location of the tap gesture that is recited in the claims. The claims literally

16    require only that the tap gesture be detected and that the corner in which the tap gesture occurs be

17    detected. Thus, the claims literally cover a system as otherwise described by the claims that

18    detects a presence in one corner of the touch-sensor and then recognizes that presence as a "tap

19    gesture." Also, the claims cover a concurrent operation in which the tap gesture and location are

20    determined simultaneously. Both of these examples would be excluded by adding the words

21    "after" and "separately" as Elantech asserts. I disagree with this interpretation and conclude that

22    one of ordinary skill in the art would understand the plain meaning of the claim terms to mean

23    "detecting that a tap gesture has occurred in at least one corner, the identity of which is

24    distinguished in some way from other corners of the touch-sensor pad."

25    **12.    "Data Packet Processor"**

26    35.    Elantech asserts that "data packet processor" in the claims of the '052 Patent

27    means "software for processing data packets and sending messages." I disagree because Elantech

28    is attempting to limit the "data packet processor" to the preferred embodiment. The '052 Patent

1  expressly states that "*Preferably*, packet processor 20 is computer software executed on a central

2  processing unit and working in conjunction with a touchpad driver (not shown) to influence

3  display window 30 and scroll bar 15." [Exhibit 12, '052 Patent, 3:14-17 at SYN 00004504

4  (emphasis supplied).] One of ordinary skill in the art of touch-sensor technology in or about 1996

5  would have understood "packet processor" to mean any of a variety of known implementations of

6  "packet processor," including packet processors implemented in "hardware" or "software," or

7  both. [Exhibit 16, The Illustrated Dictionary of Microcomputers (1990), at SYN 00103334

8  ("processor" means "A hardware data processor or a program that performs the functions of

9  compiling, assembling, and translating for a specific language."). I conclude, based upon the

10  teachings in the '052 Patent, and the ordinary meaning of the term those of ordinary skill in the

11  art, that "data packet processor" would include "hardware and/or program code, for example,

12  software executed on a central processing unit, that processes data packets."

13      36.    I also think that the claim phrase "data packet processor" does not require the

14  function of "sending messages." Again, this is an unnecessary attempt to read limitations from

15  the specification into the claims.

16      **13.    "Incrementally Move"**

17      37.    Elantech asserts that the '411 Patent claim term "incrementally move" means

18  "movement defined by the second component of Equations 12 and 13 in the '411 patent, namely,

19  $S(X_{cur} - X_{center})$ and $S(Y_{cur} - Y_{center})$". I disagree.

20      38.    The ordinary meaning of "incrementally move" means merely to move in

21  increments. As is evident from Elantech's own cited dictionary definition, "increment" means

22  "The process of increasing in number, size, quantity, or extent." [Elantech's Claim Construction,

23  Exhibit A.] Claim 46 of the '411 Patent does not limit the "increment" to any particular value.

24      39.    There is nothing in the patent that suggests that the inventors specially defined the

25  term "increment" to mean anything other than its ordinary meaning. Although, there is an

26  example of an increment applied in an embodiment of the '411 Patent (Exhibit 11, '411 Patent,

27  29:18-52, 30:37-50, 31:9-38, 34:8-51 at SYN 00004475-4477; Figs. 12-13 at SYN 00004443-

28  4445), I see no reason to limit the term "increment" to that embodiment.

40.    The intent of the inventors not to limit "increments" used in the "second cursor motion signals" to any particular value is also clear from the other claims of the '411 Patent. For example, claims 7, 10, 12, 15, 22, 32, 44, and 56 of the '411 Patent, the "increment" added in the second cursor motion signal is more specifically claimed. Claim 7, which depends upon claim 6, for example, recites generating a second cursor motion signal "representing the difference between" the X and Y coordinate position of the object and the X and Y coordinate "of a fixed position on said sensing plane," and further specifies that the fixed position "is the geometric center of said sensing plane." Thus, claim 7 recites the more narrow formulation of "increment" that is set forth as an example embodiment in equations 12 and 13, which specifically refer to non-orthogonal type edge motion which is based upon S(Xcur –Xcenter) and S(Ycur - Ycenter) cited at 29:1-9 (SYN 00004475). Because there are claims that more narrowly express the value of the "increment" to be added in the second cursor motion signal, these limitations should not be read into claim 46, which more broadly recites any "increment."

### 14.    "Operative Coupling"

41.    Elantech asserts that the preamble to claims 1 and 18 of the '352 Patent are not limitations to the claims. For the reasons stated in my Expert Report of November 20, 2006, I disagree. However, Elantech has set forth no evidence, intrinsic or extrinsic, for me to address.

42.    I disagree with Elantech's position that "operative coupling" would mean "operative proximity" to one of ordinary skill in the art in 1996. Elantech has not offered an interpretation of the term "operative." I disagree with Elantech's assertion that "coupling" would mean "proximity" to one of ordinary skill in the art. The claims use the term "coupling" in the ordinary sense that one of ordinary skill in the art of touch-pad technology would: the "finger-induced electrical effect" between the "touch sensor" and "multiple fingers." This may or may not be proportional to "proximity," the physical distance between the finger and the sensor. [Exhibit 4, '352 Patent, 1:32-39, 2:48-52 at ETD0000295; 5:6-10, 5:56-6:1, 6:14-18, 6:26-38, 6:42-45, 7:54-56 at ETD0000297-298; 11:16-19, 12:14-17, 12:42-45 at ETD0000300; 15:34-37, 15:51-54 at ETD0000302; Figs. 1-4, 7A-7F at ETD0000278-280, 0000284-290.] This understanding of "coupling" is also consistent with common dictionary definitions of the terms

1    "coupling." [Exhibit 6, McGraw-Hill Dictionary of Scientific and Technical Terms (3rd ed.

2    1984), at SYN 00103310 ("coupling" means "A mutual relation between two circuits that permits

3    energy transfer from one to another, through a wire, resistor, transformer, capacitor, or other

4    device."); Exhibit 7, Modern Dictionary of Electronics (6th ed. 1984), at SYN 00103313

5    ("coupling" means "The association or mutual relationship of two or more circuits or systems in

6    such a way that power may be transferred from one to another.").] Indeed, the specific

7    measurement of "maxima" and "minima" in the body of the claims is meaningless unless a

8    substantive limitation is present in the claims to signify what is being measured. Thus,

9    "coupling" is an important claim term and cannot reasonably be ignored.

10        **15.    "Scanning The Touch Sensor"**

11        43.    Elantech asserts that the '352 Patent claim term "scanning the touch sensor" means

12    "examining information associated with the touch sensor" to someone of ordinary skill in the art.

13    I disagree. First, the claims do not say scanning "information" – the claims say "scanning the

14    touch sensor." The literal claim words require that the object that is being scanned is "the touch

15    sensor," not "information associated with the touch sensor."

16        44.    Second, the "scanning" that is described in the claims is a particular kind of

17    "examining," namely an examination that entails a measurement. This is clear from the recitation

18    of the purpose of the "scanning," namely, "to . . . identify" the claimed "maxima" and "minima."

19    It is also clear from the disclosure in the specification. I conclude from these facts that

20    "scanning" in this context means "measuring the traces in the touch sensor."

21        45.    Third, Elantech ignores that "scanning" means not just any "examining." Rather,

22    as taught expressly in the '352 Patent and in accordance with the ordinary meaning applied by

23    those of ordinary skill in the art of touch-sensor technology, "scanning" means to sequentially and

24    systematically examine the traces in the touch sensor. [Exhibit 4, '352 Patent, 5:20-61, 6:14-26 at

25    ETD0000297; Fig. 2 at ETD0000279; Exhibit 8, The IEEE Standard Dictionary of Electrical and

26    Electronics Terms (1996), at SYN 00103298 ("scanning" means "(6) The process of examining

27    information in a systematic manner"); Exhibit 9, The Illustrated Dictionary of Microcomputers

28    (1990), at SYN 00103305 ("To examine sequentially using a part-by-part technique").]

46.    I agree with the assertion in Elantech's Claim Construction, that the corresponding structures that are disclosed in the specification of the '352 Patent as performing the recited functions of the "means for scanning" limitation in claim 18 are shown in Fig. 2 (items 45, 70, 80 and 60) at ETD0000279 and described at column 5, line 20 through column 6, line 8, and column 7, lines 1 through 6 at ETD0000297-298.  I had originally included item 30 as well in the identification of corresponding structure for the "scanning means," but now conclude that the better reading of the specification would exclude that element from the corresponding means.

### 16.    "Identify A First Maxima In A Signal Corresponding To A First Finger"

47.    Elantech's proposed construction for the '352 Patent claim terms "scanning the touch sensor to (a) identify a first maxima in a signal corresponding to a first finger" is slightly different from the construction that I proposed in my Expert Report of November 20, 2006. Elantech proposes that this claim phrase means "identify a first peak value in a finger profile obtained from scanning the touch sensor."  There are two aspects of Elantech's construction that I conclude should be clarified in the manner proposed in my construction.

48.    First, "peak value" suggests that the value identified is a "peak value" for the overall "profile obtained from scanning the touch sensor."  As I explained in my Expert Report of November 20, 2006, the appropriate understanding of the term "maxima" in the claim is a local "maxima" value corresponding to a first finger on the touch sensor.  "Maximum" can mean in some contexts such an overall peak value: "The greatest value which a variable may have; the largest element in a set." [Exhibit 5, The New Shorter Oxford English Dictionary (1993), at SYN 00103321]  However, for the reasons set forth in my Expert Report of November 20, 2006, this "peak value" meaning is not how the term "maxima" is used in the claims or the specification. Rather, the "maxima" in the context of the claims and the specification, means a localized "maxima," which is "the point at which the measured values cease to increase and begin to decrease." [Exhibit 5, The New Shorter Oxford English Dictionary (1993), at SYN 00103321] This is exactly how "maxima" is identified in the operation of the invention as described in the specification. [Exhibit 4, '352 Patent, Figs. 3-5, 6 and 9, at ETD0000280 and ETD0000282-83, and corresponding text; 9:39-60 at ETD0000299.]  I conclude, therefore, that "peak value" is

1  inadequately specific and the claim construction of this claim term should rather include the

2  phrase "the point at which the measured values cease to increase and begin to decrease."

3       49.    Second, Elantech's reference to "a finger profile," is ambiguous with respect to

4  this claim limitation and misleading when coupled with Elantech's remaining proposed claim

5  constructions for claims 1 and 18 of the '352 Patent. The claims specifically recite that the signal

6  must correspond to "a first finger." That specific limitation should not be read out of the claims.

7       **17.   "Identify A Minima Following The First Maxima"**

8       50.    Elantech asserts that the '352 Patent claim limitation "scanning the touch sensor to

9  . . . (b) identify a minima following the first maxima. . . ." means "identify the lowest value in the

10  finger profile that occurs after the first peak value, and before another peak value is identified." I

11  am largely in agreement with this construction, except for two aspects of the definition. First, the

12  reference to "lowest value" and "peak value" is not precisely correct. I have previously explained

13  the correct construction of "maxima." I conclude that the more appropriate definition of

14  "minima" is "the point at which the measured values cease to decrease and begin to increase."

15  [Exhibit 5, The New Shorter Oxford English Dictionary (1993), at SYN 00103322.] I reach this

16  conclusion because, as with the term "maxima," it is clear from the claim language itself and the

17  patent specification description of the invention that the named inventors of the '352 Patent were

18  not referring to the overall "minimum" value of the capacitance of the touch-sensor device.

19  Rather, they were expressing "minima" as one of the points at which the measured trace values

20  are stop decreasing and start to increase. [Exhibit 4, '352 Patent, Figs. 3-5, 6 and 9 at

21  ETD0000280, and corresponding text; Abstract at ETD0000277; 5:65-6:13, 6:28-47, 6:59-68,

22  8:62-65, 9:51-10:8, 10:46-65, 10:66-11:5, 11:45-55 at ETD0000297-300.]

23       51.    Second, the claims are directed to a "scanning" that is systematically measuring

24  the trace values such that the "minima" value is "following the first maxima" value that

25  corresponds to the first finger on the touch sensor in scan order. Although expressly claimed, this

26  concept is not expressly contained in Elantech's proposed claim construction.

27

28

18.    **"Identify A Second Maxima In A Signal Corresponding To A Second Finger Following Said Minima"**

52.    Elantech construes this '352 Patent claim term as meaning "after identifying the lowest value in the finger profile, identify a second peak value in the finger profile." Conceptually, this proposed definition suffers from the same faults identified above with respect to the "minima" claim limitation.  The claimed "maxima" is, again, not the peak value associated with the overall "profile" of the touch-sensor device.  We know this because the claim states expressly that the "maxima" at issue is associated with "a second finger."  Moreover, the term "maxima" is used in the plural, which signifies that the claims are not reciting an overall "peak value."  Also, since the claims already recited previously a "maxima" corresponding to a first finger, it is self-evident that the second recited "maxima" is not a "peak value" of the "finger profile."  Rather, this claim limitation is directed to a localized "maxima" of a trace measurement corresponding to a second finger, which is more properly understood as the "point at which a continuously varying quantity ceases to increase and begins to decrease." [Exhibit 5, The New Shorter Oxford English Dictionary (1993) at SYN 00103321.]  This is exactly how the second "maxima" is identified in the operation of the invention as described in the specification. [Exhibit 4, '352 Patent, Figs. 3-5, 6 and 9 at ETD0000280 and ETD0000282-83, and corresponding text; 9:39-10:25 at ETD0000299.]

53.    I also conclude that Elantech's proposed definition again ignores the requirement that the step of identifying a maxima a corresponding a second finger is done by "scanning the touch sensor."  As with the previous two claim limitations, there is recited a specific order of the scanning process and this claim limitation requires that the claimed apparatus or method must "identify" a "maxima" associated with a second finger "following" the identified "minima."  In other words, the measurement of a trace on the touch sensor can be identified as the second "maxima" only if it follows the identified "minima" in scan order, which, in turn, is "following' the first "maxima" in scan order.

1

2

**19.    "Providing An Indication Of The Simultaneous Presence Of Two Fingers In Response To Identification Of Said First And Second Maxima."**

54.    Elantech asserts that this '352 Patent claim limitation should be interpreted as meaning "indicating that two fingers are simultaneously in proximity to the touch sensor if first and second peak values are identified." I disagree with Elantech's interpretation of this claim limitation because it ignores the express claim term "said" in the claim phrase "in response to identification of said first and second maxima." I understand "said" in this context to have its ordinary meaning of referring back to the previously identified first "maxima" and the previously identified second "maxima." Elantech's interpretation would require only identification of unspecified "first and second peak values," which is simply wrong. The "indicating" step is not performed in accordance with the claims unless the scanning process identifies in order a "maxima" corresponding to a first finger, then a "minima" after the first finger, and then a "maxima" corresponding to a second finger following the "minima." The word "said" makes clear that the identification is based upon the previously recited steps all being present. Elantech's interpretation obscures that requirement.

55.    I also disagree with Elantech's assertion that one of ordinary skill in the art would be able to establish that the "microcontroller" 60 in Figure 2 of the '352 Patent is the structure disclosed in the '352 Patent specification as corresponding to the "providing" requirement of this claim limitation. I nothing see in the '352 Patent specification that links the microcontroller 60 as "providing" that indication. The presence of multiple fingers is determined at step 980 in Figure 9-2, but there is nothing disclosed about how that information is then provided to any other part of the system. Indeed, as shown in Figure 9-2, the next step in the process that is disclosed is "end" (320). That cannot logically or reasonably be interpreted as "providing" anything.

56.    I understand that I may be called upon to respond to any issues raised by the Elantech's expert or experts or the Court. I also understand that Elantech has not disclosed yet its proposed claim construction. I anticipate that I might supplement or modify the opinions in this report in view of any such new information or other new information that might arise between now and the time of the briefing and hearing on the claim construction issues.

Dated:  November 30, 2006

Andrew Wolfe, Ph.D

# Exhibit E

*The*

# American
# Heritage® Dictionary
## *of the English Language*

FOURTH EDITION





HOUGHTON MIFFLIN COMPANY
Boston   New York

Words are included in this Dictionary on the basis of their usage.
Words that are known to have current trademark registrations are
shown with an initial capital and are also identified as trademarks. No
investigation has been made of common-law trademark rights in any
word, because such investigation is impracticable. The inclusion of any
word in this Dictionary is not, however, an expression of the
Publisher's opinion as to whether or not it is subject to proprietary
rights. Indeed, no definition in this Dictionary is to be regarded as
affecting the validity of any trademark.

American Heritage® and the eagle logo are registered trademarks of
Forbes Inc. Their use is pursuant to a license agreement with
Forbes Inc.

Copyright © 2000 Houghton Mifflin Company. All rights reserved.

No part of this work may be reproduced or transmitted in any form or
by any means, electronic or mechanical, including photocopying and
recording, or by any information storage or retrieval system without
the prior written permission of Houghton Mifflin Company unless
such copying is expressly permitted by federal copyright law. Address
inquiries to Reference Permissions, Houghton Mifflin Company,
222 Berkeley Street, Boston, MA 02116.

Visit our Web site: www.hmco.com/trade.

*Library of Congress Cataloging-in-Publication Data*

The American Heritage dictionary of the English language.–4th ed.
    p.    cm.
    ISBN 0-395-82517-2 (hardcover) — ISBN 0-618-08230-1
    (hardcover with CD ROM)
    1. English language–Dictionaries
PE1628 .A623 2000
423–dc21

                                        00-025369

Manufactured in the United States of America

**increase** of 15 percent. **3.** *Obsolete* Reproduction and spread; propagation. —*idiom:* **on the increase** Increasing, especially in frequency or occurrence: *Crime is on the increase.* [Middle English *encresen*, from Old French *encreistre*, *encreiss-*, from Latin *increscere* : *in-*, intensive pref.; see IN-² + *crescere*, to grow; see ker-² in Appendix I.] —**in•creas′a•ble** *adj.* —**in•creas′er** *n.* —**in•creas′ing•ly** *adv.*

**Synonyms** *increase, expand, enlarge, extend, augment, multiply* These verbs mean to make or become greater or larger. *Increase* sometimes suggests steady growth: *The mayor's political influence rapidly increased. "No increase ... reaches the possibilities of life. They only increase the possibilities of idleness"* (John Ruskin). To *expand* is to increase in size, area, volume, bulk, or range: *He inhaled deeply, expanding his chest. "Work expands so as to fill the time available for its completion"* (C. Northcote Parkinson). *Enlarge* refers to expansion in size, extent, capacity, or scope: *The landowner enlarged her property by repeated purchases. My knowledge of literature has enlarged considerably since I joined a reading group.* To *extend* is to lengthen in space or time or to broaden in range: *The transit authority extended the subway line to the next town. The baseball season extends into October. Augment* usually applies to what is already developed or well under way: *She augmented her collection of books each month. His depression augments with each visit to the hospital.* To *multiply* is to increase in number, especially by propagation or procreation: *"As for my cats, they multiplied"* (Daniel Defoe). *"May thy days be multiplied!"* (Sir Walter Scott).

**in•cre•ate** (ĭn′krē-āt′, ĭn-krē′tĭ) *adj.* Existing without having been created. [Middle English *increat*, from Late Latin *increātus* : Latin *in-*, not; see IN-¹ + Latin *creātus*, past participle of *creāre*, to create; see CRE-ATE.] —**in′cre•ate′ly** *adv.*

**in•cred•i•ble** (ĭn-krĕd′ə-bəl) *adj.* **1.** So implausible as to elicit disbelief: *gave an incredible explanation of the cause of the accident.* **2.** Astonishing: *dressed with incredible speed.* [Middle English, from Latin *incrēdibilis* : *in-*, not; see IN-¹ + *crēdibilis*, believable; see CREDIBLE.] —**in•cred′i•bil′i•ty**, **in•cred′i•ble•ness** *n.* —**in•cred′i•bly** *adv.*

**in•cre•du•li•ty** (ĭn′krĭ-do͞o′lĭ-tē, -dyo͞o′-) *n.* The state or quality of being incredulous; disbelief.

**in•cred•u•lous** (ĭn-krĕj′ə-ləs) *adj.* **1.** Skeptical; disbelieving: *incredulous of stories about flying saucers.* **2.** Expressive of disbelief: *an incredulous stare.* [From Latin *incrēdulus* : *in-*, not; see IN-¹ + *crēdulus*, believing; see CREDULOUS.] —**in•cred′u•lous•ly** *adv.* —**in•cred′u•lous•ness** *n.*

**in•cre•ment** (ĭn′krə-mənt, ĭng′-) *n.* **1.** The process of increasing in number, size, quantity, or extent. **2.** Something added or gained: *a swelled by increments from allied armies.* **3.** A slight, often barely perceptible augmentation. **4.** One of a series of regular additions or contributions: *accumulating a fund by increments.* **5.** *Mathematics* A small positive or negative change in the value of a variable. [Middle English, from Latin *incrēmentum*, from *incrēscere*, to increase. See INCREASE.] —**in′cre•men′tal** (-mĕn′tl) *adj.* —**in′cre•men′tal•ly** *adv.*

**in•cre•ment•al•ism** (ĭn′krə-mĕn′tl-ĭz′əm) *n.* Social or political gradualism. —**in′cre•men′tal•ist** *n.*

**in•cres•cent** (ĭn-krĕs′ənt) *adj.* Showing a progressively larger lighted surface; waxing: *the increscent moon.* [Latin *incrēscēns*, *incrēscent-*, present participle of *incrēscere*, to increase. See INCREASE.]

**in•cre•tion** (ĭn-krē′shən) *n.* **1.** The process of internal secretion characteristic of endocrine glands. **2.** The product of this process; a hormone. [IN-² + (SE)CRETION¹.]

**in•crim•i•nate** (ĭn-krĭm′ə-nāt′) *tr.v.* **-nat•ed**, **-nat•ing**, **-nates** **1.** To accuse of a crime or other wrongful act. **2.** To cause to appear guilty of a crime or fault; implicate: *testimony that incriminated the defendant.* [Late Latin *incrīmināre*, *incrīminât-* : Latin *in-*, causative pref.; see IN-² + Latin *crīmen*, *crīmin-*, crime; see CRIME.] —**in•crim′i•na′tion** *n.* —**in•crim′i•na•to′ry** (-nə-tôr′ē, -tōr′ē) *adj.*

**in•crust** (ĭn-krŭst′) *v.* Variant of encrust.

**in•crus•ta•tion** (ĭn′krŭ-stā′shən) also **en•crus•ta•tion** (ĕn′-) *n.* **1a.** The act of encrusting. **b.** The state of being encrusted. **2.** A crust or coating: *an incrustation of salt on the window.* **3a.** A decorative technique in which a contrasting material is applied to a surface as an inlay or overlay. **b.** A material so applied. **4.** *Biology* A coating of hardened exudate or other material on a body or body part; a scale or scab.

**in•cu•bate** (ĭn′kyə-bāt′, ĭng′-) *v.* **-bat•ed**, **-bat•ing**, **-bates** —*tr.* **1.** To sit on (eggs) to provide heat, so as to promote embryonic development and the hatching of young; brood. **2a.** To maintain (eggs, organisms, or living tissue) at optimal environmental conditions for growth and development. **b.** To maintain (a chemical or biochemical system) under specific conditions in order to promote a particular reaction. **3.** To form or consider slowly and protectively, as if hatching: *incubated the idea for a while, then announced it.* —*intr.* **1.** To brood eggs. **2.** To develop and hatch. **3.** To undergo incubation. [Latin *incubāre*, *incubāt-*, to lie down on : *in-*, on; see IN-² + *cubāre*, to lie down.] —**in′cu•ba′tive** *adj.*

**in•cu•ba•tion** (ĭn′kyə-bā′shən, ĭng′-) *n.* **1a.** The act of incubating. **b.** The state of being incubated. **2.** *Medicine* The development of an infection from the time the pathogen enters the body until signs or symptoms first appear. **3.** *Medicine* The maintenance of an infant, especially a premature infant, in an environment of controlled temperature, humidity, and oxygen concentration in order to provide optimal conditions for growth and development. —**in′cu•ba′tion•al** *adj.*

**in•cu•ba•tor** (ĭn′kyə-bā′tər, ĭng′-) *n.* **1.** An apparatus in which environmental conditions, such as temperature and humidity, can be controlled, often used for growing bacterial cultures, hatching eggs artificially, or providing suitable conditions for a chemical or biological reaction. **2.** *Medicine* An apparatus for maintaining an infant, especially a premature infant, in an environment of controlled temperature, humidity, and oxygen concentration. **3.** A place or situation that permits or encourages the formation and development, as of new ideas: *a college that was an incubator of new approaches to sociology.*

**in•cu•bus** (ĭn′kyə-bəs, ĭng′-) *n., pl.* **-bus•es** or **-bi** (-bī′) **1.** An evil spirit supposed to descend upon and have sexual intercourse with women as they sleep. **2.** A nightmare. **3.** An oppressive or nightmarish burden. [Middle English, from Late Latin, alteration of Latin *incubō*, from *incubāre*, to lie down on. See INCUBATE.]

**in•cus•des** (ĭng-kyo͞o′dēz) *n.* Plural of incus.

**in•cul•cate** (ĭn-kŭl′kāt′, ĭn′kŭl-) *tr.v.* **-cat•ed**, **-cat•ing**, **-cates** **1.** To impress (something) upon the mind of another by frequent instruction or repetition; instill: *inculcating sound principles.* **2.** To teach (others) by frequent instruction or repetition; indoctrinate: *inculcate the young with a sense of duty.* [Latin *inculcāre*, *inculcāt-*, to force upon : *in-*, on; see IN-² + *calcāre*, to trample (from *calx*, *calc-*, heel).] —**in′cul•ca′tion** *n.* —**in•cul′ca′tor** *n.*

**in•cul•pa•ble** (ĭn-kŭl′pə-bəl) *adj.* Free of guilt; blameless.

**in•cul•pate** (ĭn-kŭl′pāt′, ĭn′kŭl-) *tr.v.* **-pat•ed**, **-pat•ing**, **-pates** To incriminate. [Latin *inculpāre*, *inculpāt-* : *in-*, on; see IN-² + *culpāre*, to blame (from *culpa*, fault).] —**in′cul•pa′tion** *n.* —**in•cul′pa•to′ry** (-pə-tôr′ē, -tōr′ē) *adj.*

**in•cult** (ĭn-kŭlt′) *adj.* Not cultured; coarse. [Latin *incultus* : *in-*, not; see IN-¹ + *cultus*, past participle of *colere*, to till, cultivate; see k*ʷel-*¹ in Appendix I.]

**in•cum•ben•cy** (ĭn-kŭm′bən-sē) *n., pl.* **-cies** **1.** The quality or condition of being incumbent. **2.** Something incumbent; an obligation. **3a.** The holding of an office or ecclesiastical benefice. **b.** The term of an office or benefice.

**in•cum•bent** (ĭn-kŭm′bənt) *adj.* **1.** Imposed as an obligation or duty; obligatory: *felt it was incumbent on us all to help.* **2.** Lying, leaning, or resting on something else: *incumbent rock strata.* **3.** Currently holding a specified office: *the incumbent mayor.* ✦ *n.* A person who holds an office or ecclesiastical benefice: *The incumbent was reelected to another term.* [Middle English, holder of an office, from Medieval Latin *incumbēns*, *incumbent-*, from Latin, present participle of *incumbere*, to lean upon, apply oneself to : *in-*, on; see IN-² + *-cumbere*, to recline.] —**in•cum′bent•ly** *adv.*

**in•cu•na•ble** (ĭn-kyo͞o′nə-bəl) *n.* An incunabulum. [French, from New Latin *incūnābulum.* See INCUNABULUM.]

**in•cu•nab•u•lum** (ĭn′kyə-nāb′yə-ləm, ĭng′-) *n., pl.* **-la** (-lə) **1.** A book printed before 1501; an incunable. **2.** An artifact of an early period. [New Latin *incūnābulum*, from sing. of Latin *incūnābula*, swaddling clothes, cradle : *in-*, in; see IN-² + *cūnābula*, cradle, infancy (from *cūnae*, cradle; see kei-¹ in Appendix I.).] —**in′cu•nab′u•lar** (-lər) *adj.*

**in•cur** (ĭn-kûr′) *tr.v.* **-curred**, **-cur•ring**, **-curs** **1.** To acquire or come into (something usually undesirable); sustain: *incurred substantial losses during the stock market crash.* **2.** To become liable or subject to as a result of one's actions; bring upon oneself: *incur the anger of a friend.* [Middle English *incurren*, from Old French *encorir*, from Latin *incurrere*, to run upon : *in-*, on; see IN-² + *currere*, to run; see kers- in Appendix I.]

**in•cur•a•ble** (ĭn-kyo͞or′ə-bəl) *adj.* **1.** Being such that a cure is impossible; not curable: *an incurable disease.* **2.** Incapable of being altered, as in disposition or habits: *an incurable optimist; an incurable smoker.* —**in•cur′a•bil′i•ty**, **in•cur′a•ble•ness** *n.* —**in•cur′a•ble** *n.* —**in•cur′a•bly** *adv.*

**in•cu•ri•ous** (ĭn-kyo͞or′ē-əs) *adj.* Lacking intellectual inquisitiveness or natural curiosity; uninterested. —**in•cu′ri•os′i•ty** (-ŏs′ĭ-tē), **in•cu′ri•ous•ness** *n.* —**in•cu′ri•ous•ly** *adv.*

**in•cur•rent** (ĭn-kûr′ənt, -kŭr′-) *adj.* Affording passage to an inflowing current. [Latin *incurrēns*, *incurrent-*, present participle of *incurrere*, to run upon. See INCUR.]

**in•cur•sion** (ĭn-kûr′zhən, -shən) *n.* **1.** An aggressive entrance into foreign territory; a raid or invasion. **2.** The act of entering another's territory or domain. **3.** The act of entering or running into; *homes damaged by the incursion of floodwater.* [Middle English, from Old French, from Latin *incursiō*, *incursiōn-*, from *incursus*, past participle of *incurrere*, to run upon. See INCUR.]

**in•cur•vate** (ĭn-kûr′vāt′, ĭn′kûr-) *tr.v.* **-vat•ed**, **-vat•ing**, **-vates** To cause to bend into an inward curve. ✦ *adj.* Curved inward. —**in′cur•va′tion** *n.* —**in•cur′va•ture′** (-və-cho͝or′, -chər) *n.*

**in•curve** (ĭn-kûrv′, ĭn′kûrv′) *tr.* & *intr.v.* **-curved**, **-curv•ing**, **-curves** To cause to bend or to bend into an inward curve. ✦ *n.* (ĭn′kûrv′) An inward curve. [Middle English *incurven*, to twist, distort, from Latin *incurvāre*, to curve in, be crooked : *in-*, on; see IN-² + *curvus*, curve; see CURVE.]

**in•cus** (ĭng′kəs) *n., pl.* **in•cu•des** (ĭng-kyo͞o′dēz) **1.** An anvil-shaped bone between the malleus and the stapes in the mammalian middle ear. Also called anvil. **2.** A thunderhead. [Latin *incūs*, *incūd-*, anvil, from *incūsus*, past participle of *incūdere*, to forge with a hammer : *in-*, intensive pref.; see IN-² + *cūdere*, to beat, forge; see kau- in Appendix I.]

**in•cuse** (ĭn-kyo͞oz′, -kyo͞os′) *adj.* Formed by hammering, stamping, or pressing: *an incuse design on a coin.* [Latin *incūdere*, *incūs-*, to forge with a hammer. See INCUS.]

**ind.** *abbr.* **1a.** independence **b.** independent **2.** index **3a.** industrial **b.** industry

**Ind.** *abbr.* **1.** India **2.** Indian **3.** Indiana **4.** Indies

**in•da•ba** (ĭn-dä′bə) *n.* **1.** A council or meeting of indigenous peoples of southern Africa to discuss an important matter. [Zulu *in-daba*, affair, topic for discussion, conference : *in-*, n. pref. + *-daba*, affair.]



**incubator**
students observing chicks hatching in an incubator

| | |
|---|---|
| ă pat | oi boy |
| ā pay | ou out |
| âr care | o͝o took |
| ä father | o͞o boot |
| ĕ pet | ŭ cut |
| ē be | ûr urge |
| ĭ pit | th thin |
| ī pie | th this |
| îr pier | hw which |
| ŏ pot | zh vision |
| ō toe | ə about; item |
| ô paw | ᵊ regionalism |

Stress marks: ′ (primary);
′ (secondary), as in
dictionary (dĭk′shə-nĕr′ē)

# The IEEE Standard Dictionary of Electrical and Electronics Terms

## Sixth Edition

**Standards Coordinating Committee 10, Terms and Definitions**
**Jane Radatz, Chair**

This standard is one of a number of information technology dictionaries being developed by standards organizations accredited by the American National Standards Institute. This dictionary was developed under the sponsorship of voluntary standards organizations, using a consensus-based process.

ISBN 1-55937-833-6



90000

9 781559 378338

hematical notation such as fixed-.
(C) 610.5-1990

'o change the size of a display el-
:oordinates by a constant value,
iled by the same amount in each
aling) or by a different amount in
(C) 610.6-1991

control that represents a quantity
range of possible values for that
ige the value of the quantity.
{C) 1295-1993

and registers) Denotes, with re-
1, dual-range single-pointer form,
id registers, the relationship be-
f the register and the kilovolt am-
ter with which the register is used.
(ELM) C12.4-1984

: testing) (measuring system) (of
actor by which the output indica-
ne the measured value of the input
(PE) 4-1995

uting) A number used as a factor
also: scale.    (C) 1084-1986w
the multiplication factor necessary
les into computer variables. Note:
riable appearing in the mathemat-
i computer variable is a dependent
the computer.
(C) 165-1977w, 610.10-1994

yros) The ratio of a change in out-
it intended to be measured. Scale
:d as the slope of the straight line
method of least squares to input
arying the input cyclically within
gyro) The ratio of change in an-
ie input axis to a change in output
e laser gyro scale factor is always
ath length and operating wave-
ortional to the effective enclosed
(AE) 528-1994

celerometer) (gyros) The differ-
:tor measured with positive input
jative input, specified as a fraction
i over the input range. Scale factor
slope of the input-output function
put. It must be distinguished from
(AE) 528-1994

iee: parameter potentiometer.

ments) The length of the path de-
neans or the tip of the pointer in
he scale to the other. Notes: 1. In
iters and others extending beyond
the pointer shall be considered as
the shortest scale division marks.
the longest scale shall be used to
. 2. In the case of antiparallax in-
type with graduations on a raised
Ijacent to the pointer tip, the scale
l by the end of the scale divisions
See also: instrument.
(EEC) [102]

lel that resembles a given system,
ale; for example, a replica of an
of the actual airplane.
(C) 610.3-1989

-flop circuit in which successive
a common point, cause the circuit
i conditions of permanent stability.
(EEC/PE) [119]

An instrument incorporating one or
used for registering the number of
anticoincidence.    (ED) [45]

**scaler, pulse (pulse techniques)** A device that produces an out-
put signal whenever a prescribed number of input pulses has
been received. It frequently includes indicating devices for
interpolation. See also: pulse.    (NPS) 175-1960w

**scale span (instrument)** The algebraic difference between the
values of the actuating electrical quantity corresponding to
the two ends of the scale. See also: instrument.
(EEC/PE) [119]

**scaling (A)** The formation at high temperatures of thick corro-
sion product layer(s) on a metal surface. (B) The deposition
of water-insoluble constituents on a metal surface (as on the
interior of water boilers).    (IA) [59]

**scaling circuit (radiation counters)** A device that produces an
output pulse whenever a prescribed number of input pulses
has been received. See also: anticoincidence.    (ED) [45]

**scalloping (navigation aid terms)** The irregularities in the field
pattern of the ground facility due to unwanted reflections from
obstructions or terrain features, exhibited in flight as cyclical
variations in bearing error. Synonym: course scalloping.
(AE) 172-1983w

**scan (1) (general)** To examine sequentially part by part.
(C) [20], [85]

(2) (oscillography) The process of deflecting the electron
beam. See also: graticule area; oscillograph; phosphor screen;
uniform luminance area.    (IM) [40]

(3) (interrogation) (supervisory control, data acquisition,
and automatic control) The process by which a data acqui-
sition system interrogates remote stations or points for data.
(PE/SWG/SUB) C37.1-1994, C37.100-1992

(4) (data management) To examine a set of items sequen-
tially.    (C) 610.5-1990

(5) The process by which a data acquisition system interro-
gates remote terminals or points for data.
(SUB) 999-1992

(6) A sampling process of observing attribute values at a spec-
ified point in time.    (C/LM) 802.1F-1993

(7) To examine stored information sequentially, part by part.
(C) 610.10-1994

**scan angle** The angle between the direction of the maximum of
the major lobe or a directional null and a reference direction.
Notes: 1. The term beam angle applies to the case of a pencil
beam antenna. 2. The reference boresight is usually chosen
as the reference direction. Synonym: beam angle.
(AP) 145-1993

**scan conversion** The process of redefining an image from one
that is composed of lines, points, and areas to one that is
expressed in an array of pixels.    (C) 610.6-1991

**scan converter** A device on which a display can be written in
refresh line-drawing mode and read out in raster scan mode.
(C) 610.10-1994

**scan cycle (supervisory control, data acquisition, and auto-
matic control)** The time in seconds required to obtain a col-
lection of data (for example, all data from one remote, all
data from all remotes, and all data of a particular type from
all remotes).
(PE/SWG/SUB) C37.1-1994, C37.100-1992

**scan design** A design technique that introduces shift-register
paths into digital electronic circuits and thereby improves
their testability.    (C/TT) 1149.1-1990

**scan function check** Accomplished when control function
check has been performed with all remotes. A check of master
and remote station equipment by exercising a predefined com-
ponent or capability.    (PE/SUB) C37.1-1994

**scan head** A head within a scanner that sweeps across the item
being scanned and transmits the contents of that item to be
processed by the scanner.    (C) 610.10-1994

**scanner (1) (facsimile)** That part of the facsimile transmitter
which systematically translates the densities of the subject
copy into signal waveform. See also: scanning.
(COM) 168-1956w

(2) (A) A multiplexing arrangement that sequentially con-
nects one channel to a number of channels. (B) An arrange-

ment that progressively examines a surface for information.
See also: control system, feedback.    (IA) [60], [69]
(3) (test, measurement, and diagnostic equipment) A de-
vice that sequentially samples a number of data points. See
also: flying spot scanner; optical scanner; visual scanner.
(MIL) [2]
(4) (computer graphics) A graphical input device that ex-
amines a spatial pattern and generates analog or digital sig-
nals, which can be used as input to a computer system.
(C) 610.6-1991
(5) (A) A graphic input device that automatically digitizes
images for input to a computer. See also: bar code scanner;
magnetic ink scanner; optical scanner; scan head. (B) Any
device that is capable of scanning.    (C) 610.10-1994

**scanning (1) (navigation aids)** A programmed motion given to
the major lobe of an antenna for the purpose of searching a
larger angular region than can be covered with a single di-
rection of the beam, or for measuring angular location of a
target; also, the analogous process using range gates and fre-
quency domain filters. See also: supervisory control.
(AE) 172-1983w, 686-1990w
(2) (television) The process of analyzing or synthesizing suc-
cessively, according to a predetermined method, the light val-
ues of picture elements constituting a picture area.
(BT) 202-1954w
(3) (facsimile) The process of analyzing successively the den-
sities of the subject copy according to the elements of a
predetermined pattern. Note: The normal scanning is from
left to right and top to bottom of the subject copy as when
reading a page of print. Reverse direction is from right to left
and top to bottom of the subject copy.
(COM) 168-1956w
(4) (telephone switching systems) The periodic examination
of circuit states under common control.
(COM) 312-1977w
(5) (of an antenna beam) A repetitive motion given to the
major lobe of an antenna.    (AP) 145-1993
(6) The process of examining information in a systematic
manner.    (C) 610.10-1994

**scanning, high-velocity (electron tube)** The scanning of a tar-
get with electrons of such velocity that the secondary-emis-
sion rate is greater than unity. See also: television.
(ED) 161-1971w

**scanning line (television)** A single continuous narrow strip that
is determined by the process of scanning. Note: In most tele-
vision systems, the scanning lines that occur during the re-
trace intervals are blanked. The total number of scanning lines
is numerically equal to the ratio of line frequency to frame
frequency.    (BT) 201-1979w

**scanning linearity (television)** A measure of the uniformity of
scanning speed during the unblanked trace interval.
(BT) 201-1979w

**scanning line frequency** See: stroke speed.

**scanning line length (facsimile)** The total length of scanning
line is equal to the spot speed divided by the scanning line
frequency. Note: This is generally greater than the length of
the available line. See also: scanning.
(COM) 168-1956w

**scanning loss (1) (radar system employing a scanning an-
tenna)** The reduction in sensitivity, usually expressed in dec-
ibels, due to scanning across a target, compared with that
obtained when the beam is directed constantly at the target.
See also: antenna.    (AP) 145-1983s
(2) The reduction in sensitivity of a scanning radar due to
motion of the beam between transmission and reception of
the signal. See also: beamshape loss.    (AE) 686-1990w

**scanning, low-velocity (electron tube)** The scanning of a target
with electrons of velocity less than the minimum velocity to
give a secondary-emission ratio of unity. See also: television.
(BT/ED) [34], [45], 161-1971w

**scanning speed (television)** The time rate of linear displace-
ment of the scanning spot.    (BT) 201-1979w