1  KARL J. KRAMER (CA SBN 136433)
   ELLEN S. REINSTEIN (CA SBN 227833)
2  ERIKA L. LABIT (CA SBN 234919)
   MORRISON & FOERSTER LLP
3  755 Page Mill Road
   Palo Alto, California  94304-1018
4  Telephone: (650) 813-5600
   Facsimile: (650) 494-0792
5  kkramer@mofo.com

6  Attorneys for Defendant
   SYNAPTICS, INC.
7

8                UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10                 SAN FRANCISCO DIVISION

11

12  ELANTECH DEVICES CORPORATION, a          Case No.    C06-01839 CRB
    corporation existing under the laws of Taiwan,
13  R.O.C.,                                  SYNAPTICS, INC.'S OPENING
                                             CLAIM CONSTRUCTION
14                      Plaintiff,           BRIEF

15           v.

16
    SYNAPTICS, INC., a Delaware corporation;
17  AVERATEC, INC., a California corporation;
    and PROSTAR COMPUTER, INC., a
18  California corporation,

19
                        Defendants.
20

21  AND RELATED COUNTERCLAIMS

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    SUMMARY OF CLAIM CONSTRUCTION ARGUMENT ............................................. 1

II.   LEGAL STANDARDS FOR CLAIM CONSTRUCTION ................................................ 1

III.  CONSTRUCTION OF THE ASSERTED SYNAPTICS PATENT CLAIMS ................. 2

       A.    "Incrementally Move" ('411 Patent: Joint Claim Term 13) ................................. 3

       B.    "Data Packet Processor" ('052 Patent: Joint Claim Term 12) .............................. 4

       C.    "X and Y Position Information" ('591/'931 Patents: Joint Claim
             Terms 2, 8) ............................................................................................................. 5

       D.    The Signaling Steps ('591/'931 Patents: Joint Claim Terms 3-10) ....................... 6

             1.    "Signal" (Joint Claim Terms 3, 4, 5, 6, 7, 9 and 10) ................................. 6

             2.    Elantech's Extraneous Limitations (Joint Claim Terms 3, 5, 6) ............... 8

             3.    "Terminating" (Joint Claim Term 9) ......................................................... 8

             4.    "Maintaining" (Joint Claim Terms 7, 10) ................................................. 9

             5.    "Repeatedly Sending" (Joint Claim Term 8) ........................................... 10

       E.    "Double Tap Gesture" ('591 Patent: Joint Claim Term 5) ................................... 10

       F.    Corner Tap ('931 Patent: Joint Claim Term 11) ................................................. 11

IV.   CONCLUSION ..................................................................................................................... 13

# TABLE OF AUTHORITIES

## CASES

*Altiris v. Symantec Corp.*,
  318 F.3d 1363 (Fed. Cir. 2003) ................................................................. 12

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
  320 F.3d 1339 (Fed. Cir. 2003) ................................................................... 1

*Burke, Inc. v. Bruno Indep. Living Aids, Inc.*,
  183 F.3d 1334 (Fed. Cir. 1999) ................................................................... 2

*CCS Fitness, Inc. v. Brunswick Corp.*,
  288 F.3d 1359 (Fed. Cir. 2002) ................................................................... 1

*Comark Commc'ns v. Harris Corp.*,
  156 F.3d 1182 (Fed. Cir. 1998) ................................................................... 2

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*,
  No. C 03-1341 SBA, 2006 U.S. Dist. LEXIS 36788 (N.D. Cal. May 25, 2006) ................... 1, 4

*Gart v. Logitech, Inc.*,
  254 F.3d 1334 (Fed. Cir. 2001) ................................................................... 5

*Gemstar-TV Guide Int'l, Inc. v. ITC*,
  383 F.3d 1352 (Fed. Cir. 2004) ................................................................... 4

*Globetrotter Software, Inc. v. Elan Computer Group, Inc.*,
  362 F.3d 1367 (Fed. Cir. 2004) ................................................................... 6

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004) ................................................................... 1

*Interactive Gift Express, Inc. v. Compuserve Inc. et al.*,
  256 F.3d 1323 (Fed. Cir. 2001) ................................................................. 11

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005)
  *cert. denied*, 126 S. Ct. 1332 (2006) ........................................................... 2

*Moba B.V. et al. v. Diamond Automation, Inc.*,
  325 F.3d 1306 (Fed. Cir. 2003) ................................................................. 11

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ................................................................... 2

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
  400 F.3d 901 (Fed. Cir. 2005) ................................................................. 1, 2

*SanDisk Corp v. Memorex Prods., Inc.*,
  415 F.3d 1278 (Fed. Cir. 2005) .............................................................. 4, 10

*Scanner Techs. Corp. v. ICOS Vision Sys. Corp., N.V.*,
  365 F.3d 1299 (Fed. Cir. 2004) ................................................................... 1

1

*Toshiba Corp. v. Hynics Semiconductor Inc.*,
No. 04-4708, 2006 U.S. Dist. LEXIS 63313 (N.D. Cal. Aug. 21, 2006)...................................6

*United States v. Telectronics, Inc.*,
857 F.2d 778 (Fed. Cir. 1988) ...............................................................................3

*Varco, L.P. v. Pason Sys. USA Corp.*,
436 F.3d 1368 (Fed. Cir. 2006) .........................................................................4, 5

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ........................................................................6, 12

*Yodlee, Inc. v. CashEdge, Inc.*,
No. C 05-01550 SI, 2006 U.S. Dist. LEXIS 48614, (N.D. Cal. July 7, 2006)..........................8

*Zelinski v. Brunswick Corp.*,
185 F.3d 1311 (Fed. Cir. 1999) ...............................................................................1

1    **I.      SUMMARY OF CLAIM CONSTRUCTION ARGUMENT**

2              The disputed claim terms of the four Synaptics, Inc. ("Synaptics") patents should be

3    given their natural breadth in accordance with the ordinary meaning of the claim terms and

4    the teachings in the patent specifications.  Defendant Elantech Corporation ("Elantech")

5    attempts to narrow the correct meaning of the claims by ignoring the ordinary meaning of

6    words and importing into the claims features of example embodiments from the patent

7    specifications.  Common sense and a careful review of the specifications of the patents at

8    issue preclude the narrow readings that Elantech asserts.  (The parties' respective claim

9    constructions are included in the Amended Joint Claim Chart, Appendix A hereto.)

10   **II.     LEGAL STANDARDS FOR CLAIM CONSTRUCTION**

11             "[T]he claim construction inquiry . . . begins and ends in all cases with the actual

12   words of the claim." *Scanner Techs. Corp. v. ICOS Vision Sys. Corp., N.V.*, 365 F.3d 1299,

13   1303 (Fed. Cir. 2004) (citation omitted).  Courts "indulge a 'heavy presumption' that a claim

14   term carries its ordinary and customary meaning." *CCS Fitness, Inc. v. Brunswick Corp.*,

15   288 F.3d 1359, 1366 (Fed. Cir. 2002) (citation omitted); *Zelinski v. Brunswick Corp.*, 185

16   F.3d 1311, 1315 (Fed. Cir. 1999) ("Absent an express definition in the specification of a

17   particular claim term, the words are given their ordinary and accustomed meaning; if a term

18   of art, it is given the ordinary and accustomed meaning as understood by those of ordinary

19   skill in the art."); *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,

20   320 F.3d 1339, 1347 (Fed. Cir. 2003).  To determine that ordinary and customary meaning,

21   "a court looks to those sources available to the public that show what a person of skill in the

22   art would have understood disputed claim language to mean." *Innova/Pure Water, Inc. v.

23   Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).  Extrinsic evidence,

24   including expert testimony, may be appropriate to elucidate the meaning of the claim terms

25   and the technology described in the patent. *Playtex Prods., Inc. v. Procter & Gamble Co.*,

26   400 F.3d 901, 908 n.1 (Fed. Cir. 2005); *see also Fresenius Med. Care Holdings, Inc. v.

27   Baxter Int'l, Inc.*, No. C 03-1341 SBA, 2006 U.S. Dist. LEXIS 36788, at *43 (N.D. Cal. May

28   25, 2006).

1    Claims should be construed in light of the specification of the patent.  *Phillips v.*

2    *AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 1332 (2006).  In

3    particular, courts should reject offered claim constructions that contradict the teachings in the

4    specification.  *See, e.g.*, *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1374

5    (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 488 (2005).  On the other hand, it is not permissible

6    to rewrite the plain terms of a patent under the guise of "interpretation" by "adding an

7    extraneous limitation appearing in the specification" to the claims.  *Burke, Inc. v. Bruno*

8    *Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999).  Thus, specific embodiments

9    of the invention, even preferred embodiments, do not limit the scope of the claims.  *Comark*

10   *Commc'ns v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998); *Playtex Prods., Inc.*,

11   400 F.3d at 907.  These claim construction rules preclude Elantech's proffered claim

12   constructions and support the ordinary meanings that Synaptics offers.

13   **III.    CONSTRUCTION OF THE ASSERTED SYNAPTICS PATENT CLAIMS**

14   Synaptics is the world leader in the development of touch-sensitive input devices.

15   Synaptics has an extensive patent portfolio representing fundamental inventions in the

16   development of such input devices, which are typically used in notebook computers and

17   hand-held devices.

18   Each of the claims of the four Synaptics patents at issue in this case relates to a

19   method for recognizing certain "gestures" that can be made on a touch-sensor device.  (*See*

20   *generally*, Expert Declaration of Andrew Wolfe Ph.D Concerning Claim Construction of

21   Synaptics' Patents ("Wolfe Decl."), ¶¶ 12–14.)  These methods include interacting with a

22   touch sensor with "tap," corner-tap, "double-tap," "drag," edge-motion, and "scrolling"

23   gestures.  (*Id.*)  For each of these, Synaptics developed methods that enable the user to

24   implement natural and intuitive gestures on a touchpad to control or interact with the

25   activities on a computer screen.  (*Id.*)  Using these methods, the user can select and activate

26   functions on the computer, move items on the screen, and scroll up and down or side to side

27   in particular windows on the screen, all with just a simple touchpad.  (*Id.*)  Elantech has

28   copied all of these patented features into its touchpad products.

## A.    "Incrementally Move" ('411 Patent: Joint Claim Term 13)

The asserted claims of U.S. Patent No. 5,880,411 ("the '411 Patent"), solve a problem that a touchpad user might face when moving the "cursor" from one place to another on the display screen: the touchpad itself is much smaller than the display screen and the user will consequently run into the edge of the touchpad before the user has moved the cursor to a more remote location on the screen.  (Wolfe Decl., ¶ 15.)  Synaptics' invention was to continue the movement on the screen when the user reaches the edge of the touchpad by combining the actual motion of the user's finger with an additional movement value representing an increment in the direction of the near edge of the touchpad.  Independent claim 46 recites, in relevant part:  "second cursor motion signals for causing said cursor to incrementally move on the display screen a selected distance in a fixed direction relative towards said outer edge of said sensing plane to which said object is proximate."  The only '411 Patent claim term in dispute is "incrementally move."

The ordinary meaning of "incrementally move" is to "move in increments."  (*Id.*, ¶ 16.)  As is evident from Elantech's own cited dictionary definition, "increment" means "The process of increasing in number, size, quantity, or extent."  (*Id.*, ¶ 16 and Ex. 11.)  The literal ordinary meaning of the term "incrementally move" is not limited to a particular value of increment.  This is evident from the claim itself, which recites that the incremental movement is "a selected distance in a fixed direction."  (*Id.*, Ex. 2, '411 Patent, Col. 63, lines 35-39.)  The ordinary meaning of "incrementally move" should apply.  (*Id.*, ¶¶ 16, 61.)

Other claims of the '411 Patent that are not asserted in this case do recite specific ways of deriving the "selected distance."  (*Id.*, ¶ 18 and Ex. 2, claims 7, 10, 12, 15, 22, 32, 44 and 56.)  The Court should not read those limitations into the asserted claims.  *United States v. Telectronics, Inc.*, 857 F.2d 778, 784 (Fed. Cir. 1988) (district court erred in reading limitations from another claim into claim at issue, since "where some claims are broad and others narrow, the narrow claim limitations cannot be read into the broad whether to avoid invalidity or to escape infringement").  Moreover, the '411 Patent specification teaches several different methods for deriving the "selected distance."  (Wolfe Decl., ¶ 17 and Ex. 2.)

1   By choosing broad language, "incrementally move . . . a selected distance," the inventors

2   intended to cover all embodiments, not just one embodiment using one type of "increment."

3   *Gemstar-TV Guide Int'l, Inc. v. ITC*, 383 F.3d 1352, 1372 (Fed. Cir. 2004) (holding that one

4   embodiment of a claim term in the written description "does not limit the otherwise broad

5   claim language"); *Fresenius Med. Care Holdings,* 2006 U.S. Dist. LEXIS 36788, at *95-96

6   (preferred embodiment cannot be used to limit a claim).

7        Elantech asserts that the '411 Patent claim term "incrementally move" means

8   "movement defined by the second component of Equations 12 and 13 in the '411 patent,

9   namely, $S(X_{cur} - X_{center})$ and $S(Y_{cur} - Y_{center})$."  (Appendix A, Claim Term 13.)  Elantech's

10  asserted claim construction is contrary to the plain meaning of "incrementally move . . . a

11  selected distance," cannot be squared with the use of narrower terms in other claims, and is

12  contrary to several embodiments that are taught in the '411 Patent specification.  In essence,

13  Elantech is attempting to limit the broad claim term to one particular embodiment disclosed

14  in the specification.  That is impermissible as a matter of law.  *Varco, L.P. v. Pason Sys. USA

15  Corp.*, 436 F.3d 1368, 1375 (Fed. Cir. 2006); *SanDisk Corp v. Memorex Prods., Inc.*, 415

16  F.3d 1278, 1286 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 829 (2005) (references to a

17  preferred embodiment are not claim limitations).

18        **B.     "Data Packet Processor" ('052 Patent: Joint Claim Term 12)**

19        The claims of U.S. Patent 5,943,052 ("the '052 Patent"), recite a method for using a

20  "scrolling zone" on a "touchpad" to generate "scrolling messages" that scroll a document or

21  window up and down, or from side to side, on the display screen.  (Wolfe Decl., ¶ 20.)

22  Claim 14 recites "forwarding a plurality of data packets from a cursor-control input device

23  which includes a touchpad having a scrolling zone to a data packet processor."  The parties

24  dispute the meaning of the word "processor" in the phrase "data packet processor."

25        The ordinary meaning of "processor" in the claim phrase "data packet processor" is

26  "hardware and/or program code, for example, software executed on a central processing unit,

27  that processes data packets."  (Wolfe Decl., ¶ 21 and Ex. 7.)  That ordinary meaning should

28  apply to the claim term.  (*Id.*, ¶¶ 21-22, 60.)

1    Although in the '052 Patent specification, the inventors describe a "data packet

2    processor" of software running on a hardware processor, they expressly describe that

3    embodiment as merely a preferred embodiment:  "*Preferably*, packet processor 20 is

4    computer software executed on a central processing unit. . . ."  (*Id.*, ¶ 22 and Ex. 3, '052

5    Patent, Col. 3, lines 14-17.)  The court should not limit the claimed "processor" to only

6    "software."  *Varco*, 436 F.3d at 1375; *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1343 (Fed. Cir.

7    2001) ("[I]t is well established that broad claims supported by the written description should

8    not be limited in their interpretation to a preferred embodiment").

9    Elantech asserts that the '052 Patent claim term "data packet processor" means

10    "software for processing data packets and sending messages."  (Appendix A, Claim

11    Term 12.)  Elantech's asserted claim construction is contrary to the plain meaning of

12    "processor," and impermissibly narrows the claims to a preferred embodiment.  *See, e.g.*,

13    *Gart*, 254 F.3d at 1343.  Moreover, the claim term "data packet processor" does not, in itself,

14    require "sending messages."  (Wolfe Decl., ¶ 23.)  Elantech is simply adding those words.

15    The ordinary meaning of "processor" should be applied in this case.

16    **C.     "X and Y Position Information" ('591/'931 Patents: Joint Claim Terms 2, 8)**

17    The asserted U.S. Patent Nos. 5,543,591 ("the '591 Patent"), and 6,380,931 ("the

18    '931 Patent") have highly related patent specification disclosures.  The asserted claims of

19    these two patents relate to "tap," "double tap," "corner tap," and "drag" gestures performed

20    on a touch-sensor pad.  Each of the asserted claims of these two patents, recites that the

21    touch-sensing system is "providing X and Y position information to a host."  The parties

22    dispute whether "providing X and Y position information to a host" covers information that

23    describes a change in X and Y position, often called "relative position" information and

24    abbreviated "?X" and "?Y."

25    The ordinary meaning of the phrase "X and Y position information" that should apply

26    in this case is "information about the horizontal and vertical positioning of an object on a

27    touch sensor."  (Wolfe Decl., ¶¶ 24-29.)  Those of ordinary skill in the art would understand

28    the claim term to include all types of "X and Y position information," including "absolute" X

1    and Y coordinate position information, as well as "relative" position information, such as

2    "?X" and "?Y." (*Id.*, ¶¶ 26-28, 50, 56.)  That meaning should apply in this case.

3        This understanding of the ordinary meaning of the phrase is perfectly consistent with

4    the teachings of the specification.  Indeed, all of the embodiments in the '591 and '931

5    Patents disclose that the information sent to the host is relative "?X" and "?Y" position

6    information. (*Id.*, ¶¶ 27-28.)  These teachings in the patent specifications cannot be ignored.

7    *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1381 (Fed. Cir.

8    2004) ("A claim interpretation that excludes a preferred embodiment from the scope of the

9    claim 'is rarely, if ever, correct,'" (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d

10   1576, 1583 (Fed. Cir. 1996))); *Toshiba Corp. v. Hynics Semiconductor Inc.*, No. 04-4708,

11   2006 U.S. Dist. LEXIS 63313, at *35 (N.D. Cal. Aug. 21, 2006) (rejecting construction that

12   would exclude numerous embodiments in the specification).

13       Elantech asserts that "X and Y position information" means "two-dimensional

14   location on a touch-sensor pad," which apparently excludes "relative" position information.

15   (Appendix A, Claim Terms 2 and 8.)  Once again, Elantech's asserted claim construction is

16   contrary to the plain meaning of the recited claim term and is contrary to the embodiments

17   that are disclosed in the patent specifications.  The claim term should be given its ordinary

18   meaning and should not be limited as Elantech urges.

19       **D.    The Signaling Steps ('591/'931 Patents: Joint Claim Terms 3-10)**

20       The asserted independent claims of the '591 and '931 Patents involve a series of

21   signals by which the particular claimed gesture is detected and indicated to a "host" computer

22   or system.  Addressed below are a series of related disputes that recur in a number of the

23   Joint Claim Terms relating to these signaling steps in the asserted method claims of those

24   two patents.

25       **1.    "Signal" (Joint Claim Terms 3, 4, 5, 6, 7, 9 and 10)**

26       Joint Claim Terms 3-7, 9 and 10, all recite the claim term "signal" to describe the

27   process of transmitting information.  The parties dispute the meaning of the term "signal."

28

1  The term "signal" is not specially defined in the patents, and thus must be given its

2  ordinary meaning of "The event or phenomenon that conveys data from one point to

3  another." (Wolfe Decl., ¶ 34 and Ex. 10.) The ordinary term "signal" is not limited to a

4  particular type of signal (such as one having "a low and a high state"), and certainly does not

5  require that a particular state, *i.e.*, the "high state," indicates that a "gesture" has occurred.

6  This ordinary meaning should apply in this case.

7  The ordinary meaning of "signal" is also consistent with the teachings in the patents,

8  which disclose a variety of signaling methods. The patents expressly state that the inventions

9  can be implemented "as a software program, hardware state machine, or otherwise. All such

10 implementations are intended to fall within the scope of the present invention." (*Id.*, ¶ 35 and

11 Ex. 4, '591 Patent, Col. 35, lines 23-32; Ex. 5, '931 Patent, Col. 40, lines 47-57.) In such

12 embodiments, the "signal" need not be a voltage level on a single wire that has a "high" state

13 and a "low" state. Indeed, "signals" may simply be "flags" or "messages" residing in

14 memory or registers or communicated over I/O channels, for example. (*Id.*, ¶ 35.)

15 Moreover, the patents expressly disclose that the signaling for the inventions may be

16 implemented with packets of data defined by the then well-known computer mouse

17 communication protocols, which are not separate instances of a "high" or "low" state. (*Id.*)

18 Each of these signaling types is contemplated within the broad designation "signal." (*Id.*,

19 ¶¶ 34-35, 51-55, 57, 58.)

20 Elantech ignores the ordinary meaning of "signal," and instead asserts that "signal"

21 means "outputting to the host a high state of a signal that has a low and a high state, and the

22 high signal state represents" the signal at issue. (Appendix A, Claim Terms 3-7, 9 and 10.)

23 Once again, Elantech is limiting the claim to a particular example in the patent specification.

24 In this instance, Elantech narrows the claim to the specific illustration in the conceptual

25 timing diagrams in Figures 15A-E of the '591 Patent. However, the claims literally cover all

26 "signals," and nothing in the claims or patent specifications narrows the type of "signal" that

27 the claims cover. Elantech's narrow construction of "signal" ignores the plain meaning of

28 the term and contradicts the express teachings in the patents.

**2.      Elantech's Extraneous Limitations (Joint Claim Terms 3, 5, 6)**

Compounding the problem with Elantech's construction of "signal" is Elantech's habit of adding further extraneous limitations not found in the claimed signaling steps. For example, Joint Claim Term 5 recites "sending a second signal to said host indicating said second gesture," but Elantech asserts the proper claim construction of this phrase is "changing the state of the signal from a low signal state to a high signal state *for a predetermined period of time*, and sending the high signal state to the host *which interprets the termination of the first signal and the existence of a second high signal state* as being a double tap gesture." (Appendix A, Claim Term 5 (emphasis added).) Elantech offers no explanation for adding the phrases "for a predetermined period of time," and "which interprets the termination of the first signal and the existence of a second high signal state." Nothing in the claims or the patent specification requires these additional phrases to be added to this particular claim phrase. (Wolfe Decl., ¶¶ 37, 53.) Elantech is again simply adding to the claims limitations found in example embodiments in the patents.

Similarly, Elantech adds extraneous limitations to Joint Claim Terms 3 and 6. In both cases, the claims require that a signal be sent "indicating the occurrence" of a gesture. Elantech asserts that the claims require that the signals represent that the "gesture *will potentially occur* on the touch-sensor pad." (Appendix A, Terms 3 and 6 (emphasis added).) Nothing in the claims or the teachings of the patents requires these words in the recited claim phrase. (Wolfe Decl., ¶¶ 38, 51, 54.) Elantech has simply added these words without explanation. That is impermissible under the law. *See, e.g.*, *Yodlee, Inc. v. CashEdge, Inc.*, No. C 05-01550 SI, 2006 U.S. Dist. LEXIS 48614, at *14-15 (N.D. Cal. July 7, 2006) (no support in the facts for adding words to a claim).

**3.      "Terminating" (Joint Claim Term 9)**

The remaining disputes with the signaling steps of the '591 and '931 Patents all relate back to the fundamental dispute over the meaning of "signal." The patents teach, and those of ordinary skill in the art at the relevant time would have been aware of, a rich variety of signaling methods available to implement the signaling steps recited in the disputed claims.

(Wolfe Decl., ¶ 35.)  Elantech's construction, on the other hand, permits only one type of signal—a "high" state voltage level in a signaling system that recognizes only a "high" or "low" signal level.  As a consequence of this dispute, the parties also dispute the words in the claims that describe how the "signal" is managed.

For example, Elantech asserts that "terminating said first signal" means "changing the state of the signal from the high signal state to the low signal state."  This construction is narrower than disclosed embodiments and ignores the plain meaning of the words that are used in the claims.  Consistent with the variety of signal methods taught in the patent specifications and known to those of skill in the art at the relevant time, signals could be "terminated" with a "low signal state," with a flag or register value that is set to indicate the end of the signal state, or by transmitting new, different or no data packets in the well-known mouse protocol.  (Wolfe Decl., ¶ 39 and Ex. 4, '591 Patent, Col. 37, lines 6-9; Ex. 5, '931 Patent, Col. 43, lines 12-15.)  Nothing in the words of the claim or the teachings in the patent limit the signal that is terminated to one that was in a high state.  The ordinary meaning of the claim term is simply "terminating the previous signal."  (*Id.*, ¶¶ 39, 52.)  The claim terms permit any type of "signal" and any method for "terminating" the previous signal.

### 4.     "Maintaining" (Joint Claim Terms 7, 10)

Similarly, the parties dispute the term "maintaining" in the context of "maintaining" a prior "signal."  The ordinary meaning of "maintaining" a signal includes the concepts of "to continue, retain, or repeat."  (Wolfe Decl., ¶ 40 and Ex. 10; ¶¶ 55, 58.)  Elantech, on the other hand, asserts that "maintaining" means "continuously outputting the high signal state." (Appendix A, Claim Terms 7, 10.)  This definition is inconsistent with the ordinary meaning, and does not fit with the plain teachings in the patent specification.

In the '591 Patent embodiments, signals are "maintained" in variety of ways.  For example, the specification teaches that a signal previously sent may be retained until it is, in effect, rescinded.  (Wolfe Decl., ¶ 41 and Ex. 4, '591 Patent, Col. 33, lines 1-3, Col. 37, lines 6-9.)  The patent also teaches that a signal previously sent will dictate the operation in question while subsequent signals are suppressed.  (*Id.*)  Moreover, the standard mouse

1   protocol at the time included all of the concepts of "to continue, retain, or repeat" in

2   maintaining signals relating to gestures.  (*Id.*)  These teachings are also perfectly consistent

3   with the wide variety of ways those of skill in the art would have known to "maintain" a

4   signal in the context of touch-pad technology.  (*Id.*)  The Court should reject Elantech's

5   effort to narrow the claims beyond their ordinary meaning.

6             **5.**        **"Repeatedly Sending" (Joint Claim Term 8)**

7           The parties also dispute the meaning of "repeatedly sending" in the claim phrase

8   "repeatedly sending X and Y position information to said host."  The plain meaning of

9   "repeatedly sending" is that the signal is sent "repeatedly."  (Wolfe Decl., ¶ 43 and Ex. 4,

10  '591 Patent, Col. 39, lines 13-23; Col. 44, lines 23-56.)  The plain meaning of "repeatedly"

11  does not require a continuous sending of a signal, but permits breaks in transmission so long

12  as the signal is repeated over time.  (*Id.*)  This is also clear from the teachings in the

13  specification of the '591 Patent.  As described above, signals may be sent repeatedly despite

14  the fact that they are not sent continuously.  (*Id.*)  The patent further describes a mechanism

15  by which individual ?X and ?Y samples may be suppressed or delayed under certain

16  circumstances. (*Id.*)  The plain meaning, as supported by the various teachings in the patent,

17  should apply.  (*Id.*, ¶¶ 43, 56.)

18          Despite the plain meaning of the claim words and the teachings in the patent

19  specification, Elantech, however, changes the claim word "repeatedly" to "continuously" in

20  its proffered definition.  (Appendix A, Claim Term 8.)  The Court should reject that

21  definition as a matter of law.  *Sandisk Corp.*, 415 F.3d at 1286 (plain meaning of claims

22  should be consistent with specification).

23          **E.**        **"Double Tap Gesture" ('591 Patent: Joint Claim Term 5)**

24          Elantech suggests that claim 6 of the '591 patent may be indefinite because "no claim

25  construction can be made because there is no antecedent basis for 'said second gesture.'"

26  (Appendix A, Claim Term 5.)  Elantech is wrong.

27          In contradistinction to claim 5 of the '931 Patent, which claims a single "*tap gesture*,"

28  the preamble of claim 6 of the '591 Patent recites a "double *tap gesture*" function.  Thus, as

is plain from claim 6, the *tap gesture* will be performed twice (hence the word "double"). The claim first recites "a first signal to the host indicating the occurrence of said gesture" to signify that the first of the two or "double" tap-gesture events has occurred.  The claim then recites that a "second presence" on the touchpad is detected and a "a second signal to said host indicating said second gesture" to signify that the second of the two or "double" *tap gesture* events has occurred.  In each instance the "said gesture" refers to a specified one of the two "*tap gesture*" events that are described in the preamble.  (Wolfe Decl., ¶¶ 44-45.) There is no error or lack of antecedent basis for these claim terms.

**F.    Corner Tap ('931 Patent: Joint Claim Term 11)**

Claim 5 of the '931 Patent relates to a corner tap function.  As explained in the '931 Patent specification, the user can define a particular function to be performed if a tap occurs in a pre-defined corner of the touch-sensor device.  (Wolfe Decl., ¶¶ 46-47.)  The claim recites the step of "detecting in which of at least one corner of the touch-sensor pad said tap gesture occurred."  The claims do not require that the steps of "detecting" a tap and "detecting" the corner have to occur in any particular order.  Elantech transforms the claim phrase "detecting in which of at least one corner of the touch-sensor pad said tap gesture occurred" into "after detecting the occurrence of the tap gesture, separately detecting in which of at least one corner of the touch-sensor pad the tap gesture occurred."  Elantech impermissibly limits the literal meaning of the claims by adding the concepts of "after" and "separately."  *See, e.g.*, *Moba B.V. et al. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1314 (Fed. Cir. 2003) (claimed method steps were not limited to sequential order, but allowed simultaneous performance of the steps).

As an initial matter, steps of a claimed "method," such as recited in claim 5, are not construed to require performance in the order listed in the patent claim unless the claim or specification explicitly or implicitly requires such a narrow construction.  *Interactive Gift Express, Inc. v. Compuserve Inc. et al.*, 256 F.3d 1323, 1342-43 (Fed. Cir. 2001).  Thus, the mere order of the steps as recited in the claim does not limit the claim.

1    Elantech's proposal to add the words "after" and "separately" is also contrary to the

2    teaching of the '931 Patent specification.  In the specification, the inventors set forth several

3    diagrams that describe an example algorithm that might be used to implement a corner-tap

4    function.  (Wolfe Decl., ¶ 48.)  Figure 17 describes an algorithm for processing the additional

5    data measured for each sampling of the touch sensor traces that occurs many times a second

6    in order to detect whether a touch of the sensor is a "tap gesture" and whether the touch

7    occurred in a selected corner or other specified location.  (*Id.*, ¶ 48 and Exhibit 5, '931

8    Patent, Col. 40, line 66-Col. 41, line 4.)  These detection processes execute concurrently and

9    the individual steps of the detection algorithm are interleaved.  In particular, many of the

10   important steps in detecting which corner has been tapped occur prior to finally determining

11   that a tap gesture has occurred in the preferred embodiment.  (*Id.*, ¶ 48.)  Therefore, with

12   respect to the sole embodiment in the '931 Patent, there is no "separate" process and no

13   required order in the algorithm for detecting a tap gesture and detecting the corner in which

14   the tap gesture occurred.  (*Id.*)  Elantech's proposed construction impermissibly would

15   exclude the embodiment disclosed in the patent.  *Vitronics*, 90 F.3d at 1583 (A construction

16   that excludes the preferred embodiment would "rarely, if ever, [be] correct . . . .").

17   Instructive on this point, is the Federal Circuit's ruling in *Altiris v. Symantec Corp.*,

18   318 F.3d 1363, 1370 (Fed. Cir. 2003).  In *Altiris*, plaintiff Altiris asserted a method claim that

19   first listed a "testing automatically" step that was followed by other steps that were

20   conditioned upon the result of the "testing" step.  The conditional language stated, for

21   example, "booting normally, *if said testing automatically step* indicates a boot sequence

22   stored internal to said digital computer."  In addition, the "automatically testing" step recited

23   that the "testing" included "reading a boot selection flag," and a later step recited "*setting*

24   *said* boot selection flag."  The Court held, 318 F.3d at 1370-71:

25                Beginning with the claim language, it neither grammatic-
              ally nor logically indicates that the "setting" step must
26            occur in a particular order compared to the other steps.  The
              only order mandated by the claim language is the
27            conditional language in several of the steps indicating that
              they must be performed after the "testing" step.

28

1    Looking next to the written description, it clearly only
2    discusses a single "preferred" embodiment in which the
     "setting" step occurs after the "testing" step and before the
3    "booting normally" step. Nowhere, however, is there any
     statement that this order is important, any disclaimer of any
     other order of steps, or any prosecution history indicating a
4    surrender of any other order of steps.

5    Similarly, there is nothing in the claims, the specification, or the prosecution history

6    of the '931 Patent that suggests the inventors disclaimed a particular order of the method

7    steps at issue. The Court should not limit the claims as Elantech requests. (Wolfe Decl.,

8    ¶¶ 47-48, 59.)

9    **IV.    CONCLUSION**

10   Synaptics' proposed claim constructions rely upon the ordinary meaning of the words

11   in the claims and the teachings of the patent specifications. On the other hand, Elantech's

12   proposed constructions impermissibly add limitations to the claims without legal or factual

13   justification. Accordingly, the claims should be construed as Synaptics requests.

14

15   Dated: January 29, 2007                KARL J. KRAMER
                                            ELLEN S. REINSTEIN
16                                          ERIKA L. LABIT
                                            MORRISON & FOERSTER LLP
17

18

19                                          By:  /s/ Karl J. Kramer
                                                 Karl J. Kramer
20
                                            Attorneys for Defendant
21                                          SYNAPTICS, INC.

22

23

24

25

26

27

28

# APPENDIX A

# AMENDED JOINT CLAIM CONSTRUCTION CHART

| Claim Terms | Synaptics Claim Construction Disclosure | Elantech Claim Construction Disclosure |
|---|---|---|
| 1. "tap gesture" ('931/'591) | "a quick tap of the finger on the pad, of short duration and involving little or no X or Y finger motion, that is presented to the host as a brief click of the mouse button" | |
| 2. "X and Y position information" ('931/'591) | "information about the horizontal and vertical positioning of an object on a touch sensor" | "two-dimensional location on a touch-sensor pad" |
| 3. "initiating a first signal to the host indicating the occurrence of said gesture" ('591) | "initiating transmission of a first set of data to a host that indicates that a tap gesture has occurred on the touch-sensor pad" | "outputting to the host a high state of a signal that has a low and a high state, and the high signal state represents that a double tap gesture will potentially occur on the touch-sensor pad" |
| 4. "terminating said first signal" ('591) | "terminating the previous signal" | "changing the state of the signal from the high signal state to the low signal state" |
| 5. "sending a second signal to said host indicating said second gesture" ('591) | "sending a second set of data to a host that indicates that a second tap gesture has occurred on the touch-sensor pad" | "changing the state of the signal from a low signal state to a high signal state for a predetermined period of time, and sending the high signal state to the host which interprets the termination of the first signal and the existence of a second high signal state as being a double tap gesture" This claim construction presumes that "said second gesture" should have read "said gesture" or "said double tap gesture." Absent such a presumption, no claim construction can be made because there is no antecedent basis for "said second gesture." |
| 6. "initiating a drag gesture signal to the host indicating the occurrence of a gesture" ('591) | "initiating transmission of a first set of data to a host that indicates that a gesture has occurred on the touch-sensor pad" | "outputting to a host a high state of a signal that has a low and high state, and the high signal represents that a drag gesture will potentially occur on the touch-sensor pad" |
| 7. "maintaining said drag gesture signal" ('591) | "to continue, retain, or repeat the drag gesture signal" | "continuously outputting the high signal state" |
| 8. "repeatedly sending X and Y position information to said host for the duration of said second presence" ('591) | "after the second presence is detected, repeatedly sending information about the horizontal and vertical positioning of an object on a touch sensor to a host while the second presence continues" | "continuously sending the current two-dimensional location of the object on the touch-sensor pad to the host as long as the object continues to be in proximity to the touch-sensor pad" |
| 9. "initiating a signal to the host indicating the occurrence of said tap gesture" ('931) | "initiating the transmission of a set of data to a host that indicates that a tap gesture has occurred on the touch-sensor pad" | "outputting to the host a high state of a signal that has a low and a high state, where the high signal state represents that a tap gesture occurred on the touch-sensor pad" |
| 10. "maintaining said signal for a predetermined period of time" ('931) | "to continue, retain, or repeat the signal for a period of time that was determined before" | "continuously outputting the high state of the signal only for a predetermined time period (i.e., changing the signal state from high to low at the end of the predetermined time period)" |
| 11. "detecting in which of at least one corner of the touch-sensor pad said tap gesture occurred" ('931) | "detecting that a tap gesture has occurred in at least one corner, the identity of which is distinguished in some way from other corners of the touch-sensor pad" | "after detecting the occurrence of the tap gesture, separately detecting in which of at least one corner of the touch-sensor pad the tap gesture occurred" |

# AMENDED JOINT CLAIM CONSTRUCTION CHART

| 12. "data packet processor" ('052) | "hardware and/or program code, for example, software executed on a central processing unit, that examines data packets" | "software for processing data packets and sending messages" |
|---|---|---|
| 13. "incrementally move" ('411) | "to move in increments" | movement defined by the second component of Equations 12 and 13 in the '411 patent, namely, $S(X_{cur} - X_{center})$ and $S(Y_{cur} - Y_{center})$ |
| 14. "operative coupling" ('352) | "finger-induced electrical effect" | |
| 15(a) "scanning the touch sensor" | "sequentially measuring the traces in the touch sensor" | "examining information associated with the touch sensor" |
| 15(b) "means for scanning the touch sensor . . ." ('352) | <p style="text-align:center">112 ¶6 Claimed Function</p> "scanning the touch sensor to (a) identify a first maxima in a signal corresponding to a first finger, (b) identify a minima following the first maxima, and (c) identify a second maxima in a signal corresponding to a second finger following said minima," as those terms are defined below <p style="text-align:center">112 ¶6 Corresponding Structures</p> analog multiplexor 45, capacitance measuring circuit 70, analog to digital converter 80, microcontroller 60 | |
| 16. "scanning the touch sensor to . . . identify a first maxima in a signal corresponding to a first finger" ('352) | "measuring the trace values of the touch sensor corresponding to a first finger and determining the point at which the measured values cease to increase and begin to decrease" | "identify a first peak value in a finger profile obtained from scanning the touch sensor" |
| 17. "scanning the touch sensor to . . . identify a minima following the first maxima" ('352t) | "measuring the trace values of the touch sensor following, in scan order, after the first maxima and determining the point at which the measured values cease to decrease and begin to increase" | "identify the lowest value in the finger profile that occurs after the first peak value, and before another peak value is identified" |
| 18. "scanning the touch sensor to . . . identify a second maxima in a signal corresponding to a second finger following said minima" ('352) | "measuring the trace values corresponding to a second finger following, in scan order, said minima and determining the point at which the measured values cease to decrease and begin to increase" | "after identifying the lowest value in the finger profile, identify a second peak value in the finger profile" |
| 19(a) "providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" ('352) | No further construction necessary since ordinary meaning is sufficient. | |
| 19(b) "means for providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" ('352) | <p style="text-align:center">112 ¶6 Claimed Function</p> "providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" 112 ¶6 Corresponding Structure<br><br>None | 112 ¶6 Corresponding Structure<br><br>microcontroller 60 |

1

2

3

4

5

6

7

8               UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10               SAN FRANCISCO DIVISION

11

| | |
|---|---|
| 12  ELANTECH DEVICES CORPORATION, a corporation existing under the laws of Taiwan, R.O.C.,<br><br>13<br><br>14                          Plaintiff,<br><br>15<br><br>16           v.<br><br>17  SYNAPTICS, INC., a Delaware corporation; AVERATEC, INC., a California corporation; and PROSTAR COMPUTER, INC., a California corporation,<br><br>18<br>19<br><br>20                          Defendants.<br>21  AND RELATED COUNTERCLAIMS | Case No.    C06-01839 CRB<br><br>**[PROPOSED] ORDER ON CLAIM CONSTRUCTION OF SYNAPTICS' PATENTS** |

22

23

24

25

26

27

28

1    Having considered the arguments and evidence submitted and for good cause appearing:

2    IT IS HEREBY ORDERED that the claims of U.S. Patent Nos. 5,880,411 ("the '411

3    patent"), 5,943,052 ("the '052 patent"), 5,543,591 ("the '591 patent"), and 6,380,931 ("the '931

4    patent"), shall be interpreted as a matter of law as set forth below:

5    1.    In the context of claims of 1, 5, and 6 of the '931 Patent and claims 6 and 9 of the

6    '591 Patent, the claim term "tap gesture," identified by the parties as Joint Claim Term 1, means

7    "a quick tap of the finger on the pad, of short duration and involving little or no X or Y finger

8    motion, that is presented to the host as a brief click of the mouse button."

9    2.    In the context of claims of 1, 5, and 6 of the '931 Patent and claims 6 and 9 of the

10    '591 Patent, the claim term "X and Y position information," identified by the parties as Joint

11    Claim Term 2, means "information about the horizontal and vertical positioning of an object on a

12    touch sensor."  This definition includes both "relative" and "absolute" X and Y position

13    information.

14    3.    In the context of claim 6 of the '591 Patent, the claim term "initiating a first signal

15    to the host indicating the occurrence of said gesture," identified by the parties as Joint Claim

16    Term 3, means "initiating transmission of a first set of data to a host that indicates that a tap

17    gesture has occurred on the touch-sensor pad."  In each instance in any claim of the Synaptics

18    Patents, the term "signal" means "The event or phenomenon that conveys data from one point to

19    another."

20    4.    In the context of claim 6 of the '591 Patent, the claim term "terminating said first

21    signal," identified by the parties as Joint Claim Term 4, means "terminating the previous signal."

22    5.    In the context of claim 6 of the '591 Patent, the claim term "sending a second

23    signal to said host indicating said second gesture," identified by the parties as Joint Claim Term 5,

24    means  "sending a second set of data to a host that indicates that a second tap gesture has occurred

25    on the touch-sensor pad."  Joint Claim Term 5 is not indefinite or "incorrect."  The antecedent

26    basis for "said second gesture" is the second "tap gesture" of the "double tap gesture" recited in

27    the preamble of claim 6.

28

1    6.    In the context of claim 9 of the '591 Patent, the claim term "initiating a drag

2    gesture signal to the host indicating the occurrence of a gesture," identified by the parties as Joint

3    Claim Term 6, means "initiating transmission of a first set of data to a host that indicates that a

4    gesture has occurred on the touch-sensor pad."

5    7.    In the context of claim 9 of the '591 Patent, the claim term "maintaining said drag

6    gesture signal," identified by the parties as Joint Claim Term 7, means "to continue, retain, or

7    repeat the drag gesture signal."

8    8.    In the context of claim 9 of the '591 Patent, the claim term "repeatedly sending X

9    and Y position information to said host for the duration of said second presence," identified by

10   the parties as Joint Claim Term 8, means "after the second presence is detected, repeatedly

11   sending information about the horizontal and vertical positioning of an object on a touch sensor to

12   a host while the second presence continues."

13   9.    In the context of claim 1 of the '931 Patent, the claim term  "initiating a signal to

14   the host indicating the occurrence of said tap gesture," identified by the parties as Joint Claim

15   Term 9, means "initiating the transmission of a set of data to a host that indicates that a tap

16   gesture has occurred on the touch-sensor pad."

17   10.   In the context of claim 1 of the '931 Patent, the claim term  "maintaining said

18   signal for a predetermined period of time," identified by the parties as Joint Claim Term 10,

19   means "to continue, retain, or repeat the signal for a period of time that was determined before."

20   11.   In the context of claims 5 and 6 of the '931 Patent, the claim term "detecting in

21   which of at least one corner of the touch-sensor pad said tap gesture occurred," identified by the

22   parties as Joint Claim Term 11, means "detecting that a tap gesture has occurred in at least one

23   corner, the identity of which is distinguished in some way from other corners of the touch-sensor

24   pad."

25   12.   In the context of claims 14-15 and 18-19 of the '052 Patent, the claim term "data

26   packet processor," identified by the parties as Joint Claim Term 12, means "hardware and/or

27   program code, for example, software executed on a central processing unit, that examines data

28   packets."

1    13.    In the context of claims 46 and 48-52 of the '411 Patent, the claim term

2 "incrementally move," identified by the parties as Joint Claim Term 13, means "to move in

3 increments."

4

5

6 IT IS SO ORDERED

7 Dated: _____, 2007          By: _____

8                                              United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28