1  Yitai Hu (SBN 248085) (yhu@akingump.com)
   Sean P. DeBruine (SBN 168071) (sdebruine@akingump.com)
2  Hsin-Yi Cindy Feng (SBN 215152) (cfeng@akingump.com)
   AKIN GUMP STRAUSS HAUER & FELD LLP
3  3000 El Camino Real, Suite 400
   Palo Alto, California  94306
4  Telephone:          650-838-2000
   Facsimile:          650-838-2001
5
6  Attorneys for Plaintiff and Counterdefendant
   ELANTECH DEVICES CORPORATION
7
8              UNITED STATES DISTRICT COURT
9            NORTHERN DISTRICT OF CALIFORNIA
10              SAN FRANCISCO DIVISION
11
12 ELANTECH DEVICES CORP.,              ) Case No. 3:06-CV-01839 CRB
                                        )
13              Plaintiff,              ) **DECLARATION OF SEAN P. DEBRUINE**
                                        ) **IN SUPPORT OF ELANTECH DEVICES**
14       vs.                            ) **CORP.'S OPENING CLAIM**
                                        ) **CONSTRUCTION BRIEF FOR U.S.**
15 SYNAPTICS, INC.;                     ) **PATENT NO. 5,825,352**
   AVERATEC, INC,                       )
16                                      )
                Defendants.             )
17 _____     )
18
19
20
21
22
23
24
25
26
27

I, Sean P. DeBruine declare and state as follows:

1.      I am an attorney with the law firm of Akin Gump Strauss Hauer & Feld LLP, counsel to Elantech Devices Corporation ("Elantech") in the above captioned matter.  I am a member of good standing of the State Bar of California.  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, would testify competently, under oath, to the facts stated below.

2.      Attached as exhibit A is a true and correct copy of United States Patent No. 5,825,352 ("the '352 patent").

3.      Attached as exhibit B is a true and correct copy of the Joint Claim Construction and Prehearing Statement filed in this case.

4.      Attached as exhibit C is a true and correct copy of Amendment B dated April 6, 1998 of the '352 prosecution history.

5.      Attached as exhibit D is a true and correct copy of  the entry for "scanning" from the IEEE Standard Dictionary of Electrical and Electronic Terms, 947 (6th Ed.).

6.      Attached as exhibit E is a true and correct copy of  the entries for "maxima" and "minima" from the New Shorter Oxford English Dictionary on History Principles, Volume 1, 1720 (1993).

7.      Attached as exhibit F is a true and correct copy of Amendment A dated August 18, 1997 of the '352 prosecution history.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 29, 2007, at Palo Alto, California.


AKIN GUMP STRAUSS HAUER & FELD LLP



By:_____/s/_____
        SEAN P. DEBRUINE

        Attorney For Plaintiff and Counterdefendant
        ELANTECH DEVICES CORPORATION

2

# EXHIBIT A

US005825352A

# United States Patent [19]

## Bisset et al.

[11] **Patent Number:** 5,825,352

[45] **Date of Patent:** Oct. 20, 1998

[54] **MULTIPLE FINGERS CONTACT SENSING METHOD FOR EMULATING MOUSE BUTTONS AND MOUSE OPERATIONS ON A TOUCH SENSOR PAD**

[75] Inventors: **Stephen J. Bisset**, Palo Alto; **Bernard Kasser**, Menlo Park, both of Calif.

[73] Assignee: **Logitech, Inc.**, Fremont, Calif.

[21] Appl. No.: **608,116**

[22] Filed: **Feb. 28, 1996**

**Related U.S. Application Data**

[63] Continuation of Ser. No. 582,768, Jan. 4, 1996, abandoned.

[51] **Int. Cl.**[6] .................................. **G09G 5/00**; G09G 5/08
[52] **U.S. Cl.** ............................................. **345/173**; 345/157
[58] **Field of Search** ..................................... 345/156, 157, 345/160, 173, 174, 145; 178/18; 341/33

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 3,921,166 | 11/1975 | Volpe . | |
| 4,103,252 | 7/1978 | Bobick | 345/174 |
| 4,455,452 | 6/1984 | Schuyler | 345/173 |
| 4,550,221 | 10/1985 | Mabush | 345/173 |
| 4,639,720 | 1/1987 | Rympalski et al. | 345/174 |
| 4,686,332 | 8/1987 | Greanias et al. | 345/173 |
| 4,733,222 | 3/1988 | Evans | 341/33 |
| 4,736,191 | 4/1988 | Matzke et al. | 345/157 |
| 4,914,624 | 4/1990 | Dunthorn | 345/173 |

| | | | |
|---|---|---|---|
| 5,016,008 | 5/1991 | Gruaz et al. | 345/173 |
| 5,203,704 | 4/1993 | McCloud | 434/156 |
| 5,327,161 | 7/1994 | Logan et al. | 345/173 |
| 5,365,461 | 11/1994 | Stein et al. | 364/550 |
| 5,376,946 | 12/1994 | Mikan | 345/173 |
| 5,432,531 | 7/1995 | Calder et al. | 345/173 |
| 5,442,376 | 8/1995 | Tannenbaum et al. | 345/156 |
| 5,463,388 | 10/1995 | Boie et al. | 341/33 |
| 5,495,077 | 2/1996 | Miller et al. | 345/173 |
| 5,528,266 | 6/1996 | Arbeitman et al. | 345/173 |
| 5,543,591 | 8/1996 | Gillespie et al. | 178/18 |
| 5,565,658 | 10/1996 | Gerpheide et al. | 345/173 |
| 5,648,642 | 7/1997 | Miller et al. | 178/18 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO 91/03039 | 3/1991 | WIPO . | |
| WO 97/18508 | 5/1997 | WIPO | G06F 3/033 |

OTHER PUBLICATIONS

Synaptics Brochure, "Synaptics Touch Pad," pp. 1–39.

*Primary Examiner*—Jeffery Brier
*Assistant Examiner*—Paul A. Bell
*Attorney, Agent, or Firm*—Townsend and Townsend and Crew

[57] **ABSTRACT**

Method and apparatus for detecting an operative coupling between one or more fingers or other appropriate objects and a touch pad includes processes for detection of multiple maxima with intermediate minima in appropriate sequences to emulate the operations of cursor control and button actuations in a pointing and control device.

**31 Claims, 17 Drawing Sheets**





*FIG. 1.*



*FIG. 2.*



FIG. 3.

FIG. 4.



FIG. 5.



FIG. 6-1.



*FIG. 6-2.*



FIG. 7A.



*FIG. 7B.*



FIG. 7C.





*FIG. 7D.*



FIG. 7E.



*FIG. 7F-1.*



*FIG. 7F-2.*



FIG. 8-1.



*FIG. 8-2.*



*FIG. 9-1.*



*FIG. 9-2.*

5,825,352

1

# MULTIPLE FINGERS CONTACT SENSING METHOD FOR EMULATING MOUSE BUTTONS AND MOUSE OPERATIONS ON A TOUCH SENSOR PAD

## RELATED APPLICATION

This application is a continuation of U.S. patent application Ser. No. 08/582,768, filed Jan. 4, 1996, abandoned.

## FIELD OF THE INVENTION

The present invention relates generally to touchpad devices, and more particularly relates to touchpad devices which detect at least the presence of one or more objects such as fingers to effectuate preselected control functions.

## BACKGROUND OF THE INVENTION

Touch sensing devices are well known, and take a number of different forms. Perhaps the best known are resistive-membrane position sensors, which have been used in a number of different applications for many years. Such devices have been used as keyboards, position indicators, and so forth. Other types of touch sensing devices include resistive tablets, surface acoustic wave devices, touch sensors based on strain gages or pressure sensors, and optical sensors.

Yet another touch sensing technology is capacitive sensing, in which the location of a finger (or in some instances another object such as a stylus) over a sensing device is determined by virtue of variations in capacitance under and around the location of the finger. Typical of capacitive touch sensing devices are touch screens and capacitive pads which employ a matrix of row and column electrodes and detect, for example, either the transcapacitance between row and column electrodes or the effective capacitance to virtual ground. Other capacitive techniques are also known. Some touch sensitive devices are known to use interpolation for more precisely identifying the location of a finger or stylus.

Typical of each of these prior art devices is that each of them senses any contact as that of only one finger at a time. Cursor movement is straightforward with one finger, and tapping of a finger on the surface of the pad can be detected and acted upon in a manner similar to detecting the actuation of a button on a mouse. Single and double taps can be used as simple equivalents of single and double mouse clicks.

With a single-finger touchpad, the click and drag function is more difficult. With single finger detection, dragging has been implemented with schemes such as uptap (finger lifted and placed down again quickly), tap-and-a-half, and sticky drag (drag lock turns on automatically after the finger is placed in one location without moving for more than a certain time, such as one second). All of these methods take more time and/or more finger motions than it takes to perform the equivalent function with a mouse, and are not intuitive to users familiar with electronic mice. Prior art touch pads are thus less attractive for general use than a mouse.

Another commonly used function in the prior art is that of clicking a box (or icon or displayed "button") or series of boxes (such as "connecting the dots"). With a mouse, the cursor is moved into position by moving the mouse, then the click occurs with a down-up motion of the finger to actuate a button or switch. With a touchpad typical of the prior art, the cursor is moved into position with the finger, then the click occurs with a tap of the finger which moved the cursor.

2

This requires an up-down-up-down finger motion to do the same thing as simply the "down-up" motion of the mouse button. In general, any touchpad equivalent to a mouse button-clicking function requires an extra "up . . . up" motion of the finger, because the finger must be lifted off the pad before and after the tap.

The time and stress associated with the extra motion is significant. Human factors studies have shown that such touchpads yield lower productivity than a mouse in many applications. This somewhat limits touchpads to those applications, such as portable computing, where use of a mouse is inconvenient due to space or other considerations. There is therefore a need for a touchpad capable of yielding the same productivity as a mouse.

## SUMMARY OF THE INVENTION

The present invention provides a novel method and apparatus for sensing the proximity of multiple simultaneous fingers or other appropriate objects to a touch sensor. The present invention may be implemented based on any conventional touch sensing technology, although an exemplary embodiment involves the use of a capacitive touch sensing device similar to that described in U.S. patent application Ser. No. 08/478,290, entitled Touch Sensing Method and Apparatus, filed Jun. 7, 1995, and assigned to the assignee of the present application. The numerous modifications to such a basic device required to implement the present invention are described generally below, and in detail hereinafter. Alternatively, the present invention may be used with the method and apparatus described in the U.S. patent application Ser. No. 08/582,769, entitled Touch Pad Sensing Method and Apparatus, having as inventors Bemi Joss, Bernard Kasser and Stephen Bisset, filed on Jan. 4, 1996, and assigned to the assignee of the present invention, the relevant portions of which are incorporated herein by reference.

Operation of the present invention includes two aspects: detection of multiple objects, typically fingers, and assignment of various functions to particular actions by the movement of one or both fingers. The detection function can be general, but in a simple, exemplary implementation can be limited to a two-finger function such as the combination of the index finger and middle finger. In general, these are the two most dextrous fingers, and they work well together. As a result, for this exemplary embodiment, the touchpad need only distinguish between the two fingers in one dimension since the two fingers are typically side by side. In addition, the touchpad need only detect the second finger in reasonably close proximity to the first finger. In most situations, the distance between finger centers will be less than five centimeters. Additional combinations of fingers, such as three fingers tapping simultaneously or other combinations, may also be implemented in accordance with the methodology of the present invention.

For clarity of explanation, the present invention can be described in most of its applications by establishing one finger as controlling movement of the cursor, and the second finger as controlling functions equivalent to a mouse button or switch. In this context, one finger may be considered the "point" finger, while the other is the "click" finger. Various conventional functions may then be defined accordingly. For example, "drag" may be effected by moving the two fingers in unison, "point and click" may be effected by moving the cursor with the first finger and tapping with the second finger, "point and double click" may be effected by moving the cursor with the first finger and double tapping with the

5,825,352

3

second finger, and so on. "Click and Drag" may be performed simply by moving the cursor to the appropriate position with the first finger, placing both first and second fingers on the pad, and moving both fingers together. The function may be concluded by simply raising one or both fingers. Similarly, connecting the dots may be performed simply by moving the cursor from dot to dot with the first finger, and then clicking on the dot by tapping with the second finger. It will be apparent to those skilled in the art that these functions may be defined differently and still fall within the scope of the present invention. It will also be apparent that many of these operations will be intuitive to experienced mouse users, as soon as the correspondence between mouse functions and the two fingers is demonstrated to the user, and thus their implementation in a touchpad context makes them especially desirable.

In addition to the foregoing functions, which can be performed (albeit awkwardly and less intuitively) with conventional touch pads, there are additional functions that can be performed with two fingers and which can have substantial analogs to the use of a mouse or even go beyond conventional mouse functions. For example, detection and location of two fingers will permit the touchpad to report to a host system the distance between the two fingers. This can be used, for example, in paint or other programs to determine line width or other spacing functions, or any other "variable value" function. Similarly, tapping with both fingers at the same time may be defined as an alternate, shorthand method for a double tap (such as may be defined for the middle button in a Logitech mouse) or may be defined as a special function, similar to the "right button" functions of a mouse. Such special functions may have particular value in operating systems such as Windows 95 where, for example, implementation of the Object Viewer function is an important special function. Such functions can be implemented readily with a triple finger tap, a double tap of two fingers, or other convenient combination.

Another function which may be implemented with two finger detection is "drag lock". This function may be used when a drag function is underway, but at least one of the fingers reaches the edge of the pad before the drag function is complete. Touchpad operation may be controlled to maintain the drag mode if, for example, both fingers are lifted off the pad within a threshold period of one another, and are then placed down on the pad again within a suitable time period. In some implementations, highly extended time periods may be suitable in this context.

A further function which may be readily implemented with the present invention is the ability to operate in relative mode, where a first finger performs a key function, and a second finger controls some attribute of the operation performed by the first finger. For example, a first finger contacting a touch pad may cause a cursor to move across a screen, while contact (and removal) of a second finger with the screen may turn an image, or "ink" on (and off). The resulting image, or "ink", is defined by the motion of the first finger during the period when the second finger is also in contact with the pad; gaps in the "ink" occur when the second finger is lifted away from the pad. The function may, in some ways, be thought of as electronic finger painting, but has the additional advantage of allowing multiple characters to be written on a touch pad. Thus, with the use of two fingers, hand printing of text with gaps between the letters and words becomes feasible and convenient, whereas it is impractical with the prior art "tap and a half" method of turning on the ink.

Yet another function which may be implemented with the present invention is use of the touchpad in absolute mode.

4

Most prior art touchpad devices operate, like mice, in relative mode by indicating the distance travelled relative to the starting point of the motion. Touchpads, on the other hand, can also be operated in absolute mode, where the absolute position of the finger on the pad is detected and reported to the host system or application. In absolute mode, multi-finger detection allows the first finger to point to the desired absolute position, while the second finger performs whatever "click" operation is desired without requiring a removal of the first finger which might lessen accuracy or resolution.

Also included within the present invention is the detection and location of more than two fingers, with accompanying functional definitions permitting such multiple contacts to indicate pointing device or other control operations, such as musical keyboards.

It is therefore one object of the present invention to provide a touchpad system capable of detecting a plurality of contacts such as fingers.

It is a further object of the present invention to provide a touchpad device capable of locating a plurality of contacts such as fingers.

It is a further object of the present invention to provide a method for detecting the presence of more than one finger on a touch pad device.

It is a still further object of the present invention to provide a method for locating each of a plurality of fingers on a touch pad device.

It is yet another object of the present invention to provide a method for effecting the "point and click" function on a touchpad through the use of multiple fingers.

Yet a further object of the present invention is to provide a method for effecting the "click and drag" function on a touchpad through the use of multiple fingers.

A still further object of the present invention is to provide a method for effecting on a touchpad, through the use of multiple finger contacts, a plurality of conventional mouse button functions.

Yet another object of the present invention is to provide a method and apparatus for effecting on a touchpad, through the use of multiple finger contacts, a plurality of enhanced functions.

Yet a further object of the present invention is to provide a method and apparatus for electronic finger painting.

These and other objects of the invention may be better appreciated from the following detailed description of the invention, taken together with the appended figures.

THE FIGURES

FIG. 1 shows a perspective view of a device according to the present invention.

FIG. 2 shows in block diagram form the electronics of the present invention.

FIG. 3 shows a finger profile for two non-overlapping fingers as sensed by the present invention.

FIG. 4 shows a finger profile for two closely-spaced fingers as sensed by the present invention.

FIG. 5 shows in flow diagram form the steps for a high level algorithm for a pointing device according to the present invention.

FIG. 6 shows in flow diagram form the steps for computing motion and "button" states.

FIGS. 7A–7F2 show in diagrammatic form an exemplary sequence of finger contacts and movements across a touch sensor.

5,825,352

FIG. **8** shows a more generalized case of FIG. **5**.

FIG. **9** shows a more generalized case of FIG. **6**.

## DETAILED DESCRIPTION OF THE INVENTION

Referring first to FIG. **1**, a plurality of a user's fingers **10A** and **10B** are shown positioned over a touchpad **20** in sufficiently close proximity to be operatively connected thereto. Movement of a single finger over the touchpad causes the cursor to move in a now-conventional manner. However, unlike prior art devices, various control functions may be performed by the use of the second finger, typically in combination with the same or a related operation of the first finger. Operations involving more than two fingers may also be performed. In an exemplary embodiment, the touchpad of the present invention reports to a host either the relative motion of a finger across the touchpad or changes in "button" status.

Referring next to FIG. **2**, the operation of the touchpad **20** may be better appreciated. In particular, FIG. **2** shows in block diagram form the electronics implemented to form an exemplary touchpad **20**. A touchpad matrix **30** is composed of a plurality of rows **35** and columns **40** of wires or traces arranged in a conventional manner; see U.S. patent application Ser. No. 08/321,987, filed 12 Oct. 1994, entitled Touch Pad Sensor with Simultaneous Sensing, commonly assigned with the present application. The rows and columns are connected to an analog multiplexor **45** through a plurality of X (row) direction conductors **50** and a plurality of Y (column) direction conductors **55**, one conductor for each row and each column. Under the control of a microcontroller **60**, the analog multiplexor **45** selects which traces of the matrix **30** will be sampled, and the output of those traces is then provided to a capacitance measuring circuit **70**. One suitable capacitance measuring circuit is described in aforementioned U.S. patent application Ser. No. 08/321,987, commonly assigned with the present invention and incorporated herein by reference; another is described in U.S. patent application Ser. No. 08/478,290, filed 7 Jun. 1995, entitled Touch Sensing Method and Apparatus and also commonly assigned with the present invention and incorporated herein by reference.

The output of the capacitance measuring circuit is then provided to an analog to digital converter **80**, which operates as described in either of the above-referenced patent applications to convert the capacitance values from the circuit **70** into a digital representation. The analog to digital converter **80** then supplies the signals to the microcontroller **60**, which operates to form, among other things, a finger profile for one or more fingers, X-Y cursor data, and control signals. Depending on the operation being performed at the particular time, the output of microcontroller **60** is then supplied to an interface to a PC or other device, such as a PS/2 interface, an RS-232 interface, or an Apple Desktop Bus (ADB).

A key feature of the present invention is its ability to distinguish the presence of multiple fingers either touching or in operative proximity to the touchpad **30**. In a typical embodiment, the operation of the circuit of FIG. **2** cycles continuously. As noted above, the cycle begins by scanning the traces and measuring the capacitance on each trace. Then the portion of each measured capacitance that is induced by the presence of a finger is extracted, and this finger-induced capacitance is stored in RAM, as X(1) through X(Xcon) and Y(1) through Y(Ycon), as described below. The finger-induced portion of the measured capacitance is determined by subtracting a value, for each trace, representing the

capacitance when no finger is present. This "no-finger" capacitance is measured and stored at a time previous to the beginning of the cycle described herein, and is described more fully in U.S. patent application Ser. No. 08/478,290, filed 7 Jun. 1995 and commonly assigned.

It has also been found by applicant that it is not necessary, in all embodiments, to subtract the "no-finger" capacitance if techniques other than calculation of a centroid are used to locate the position of the fingers, and such subtraction is not required even in all instances in which a centroid is calculated. However, in at least some embodiments the sensitivity and hence the resolution of the calculated finger location is enhanced by such subtraction.

Referring again to the exemplary embodiment, the values of finger-induced capacitance are then processed to calculate a position, detect whether one or more fingers is in operative contact with the pad surface, and to detect any changes in the number of fingers operatively coupled to the pad. If the cycle is repeated rapidly enough to update a graphical user interface approximately 30 times per second or more, the appearance of smooth and instantaneous response is provided to the user. For functions other than pointing, such as handwriting with the finger, a faster scan rate may be required and may, for example, be on the order of 200 scans per second.

Referring next to FIG. **3**, a finger profile is shown indicative of the presence of two fingers, spaced apart from one another. In particular, the circuitry, software or firmware of the touchpad circuitry, such as that shown in FIG. **2**, detects a first maxima **85** indicative of a first finger in operative proximity to the touchpad **30**, followed by a minima **90** indicative of a space between the fingers, and further followed by another maxima **95** indicative of a second finger operatively coupled to the touchpad **30**. It will be appreciated that, for operations involving more than two fingers, more maxima will be detected with an appropriate number of intermediate minima.

Although the finger profile shown in FIG. **3** suggests that the intermediate minima separating the two fingers is a zero value, it is not necessary in all instances that the minima be zero. Thus, for example, FIG. **4** reflects a finger profile with a nonzero local minima **100** intermediate the two maxima **105** and **110** indicative of two fingers operatively coupled to the touchpad. This finger profile simply reflects two fingers placed closely to one another, but still yields a valley for measurement of the minima.

To operate effectively, the present invention must detect and distinguish the presence of a single finger, and the presence of multiple fingers. As noted previously, the second or additional fingers are typically involved to provide "button" or control functions, similar to actuation of the buttons or switches on a mouse. Although the following example describes in detail the use of only two fingers, one for cursor control and a second as a button, the teachings herein are believed sufficient to permit those skilled in the art to construct apparata using multiple fingers for additional buttons.

To avoid artifacts, a threshold may be applied to the both the maximum and minimum distance between the maxima representative of multiple fingers. For example, a threshold requiring the maxima to be within five centimeters of one another may be used to limit the maximum distance between the fingers; other thresholds may be appropriate in some embodiments. A threshold representative of the minimum distance may be configured by establishing a maximum value of the local minima **100**.

5,825,352

7

In an exemplary embodiment, the operation of the system of FIG. 2 is controlled in either firmware, software or hardware. Shown in FIG. 5 is a flow diagram showing the general operation of such software or firmware which is capable of detecting multiple fingers, and which uses the algorithm of FIG. 6, discussed hereinafter. The variables found in the flow diagram of FIG. 5 are defined below:

| Name | Definition |
|------|-----------|
| Xabsolute | Finger position in X direction, calculated during the current cycle relative to the sensor pad. |
| XabsolutePrevious | The value above stored from the previous cycle. |
| Yabsolute | Similar to Xabsolute. |
| YabsolutePrevious | Similar to XabsolutePrevious. |
| Xbutton | Has value Up or Down (regardless of previous state). |
| XbuttonPrevious | The value above stored from the previous cycle. |
| Ybutton | Similar to Xbutton. |
| YbuttonPrevious | Similar to XbuttonPrevious. |
| Xmotion | Cursor motion in the X direction, relative to the cursor position of the previous cycle (only reported if either or both Xmotion and Ymotion are non-zero). |
| Ymotion | Similar to Xmotion. |
| Button | May be Up or Down (only reported if a change from the previous cycle). |

It will be understood by those skilled in the art that a "report" means transmitting information to an application process executing on a host, such that the cursor is moved or a function is performed. In some instances, driver software executing on the host may ascertain the existence of finger movement, while in other instances including the exemplary embodiment described herein the determination of finger movement occurs in the firmware in the pointing device.

Referring still to FIG. 5, the cyclical process begins at step 400, and continues at step 410 by scanning the conductor sensors. The sensors may be scanned sequentially or concurrently, depending on the hardware implementation. The scan process measures the values of finger-induced capacitance for each of the conductors, and stores the values in RAM at step 420. The cycle process continues by performing the Xcompute loop of FIG. 6 discussed hereinafter, and also the Ycompute loop analogous to FIG. 6, at step 430 and 440, respectively. In general, the function of the Xcompute and Ycompute processes is simply to evaluate the current measurements by calculating the centroid of the finger measurement, and by detecting whether a second finger is touching the pad—which determines the button state.

In the exemplary embodiment, only a change in the button state is reported. As a result, at step 450 the value of Button is set to No Change. In addition, in the exemplary embodiment a tap or double click by only a first finger is not acted upon, although a tap by a second finger or by multiple fingers is acted upon. In the exemplary arrangement, a "button down" condition is only reported if both fingers are in operative contact with the touchpad.

The process continues by comparing the current and previous button states of the X and Y conductors. First, at step 460, the state of Xbutton is checked to see if it is Down and the state of XbuttonPrevious is checked to see if it is Up. If both compares are true, then the variable Button is set to Down at step 465. In addition, at step 470, the state of Ybutton is checked to see if it is Down and the state of YbuttonPrevious is checked to see if it is Up. If both compares are true, the variable Button is also set to Down.

Alternatively, as determined at step 480, if the state of Xbutton is Up and the state of XbuttonPrevious is Down, or,

8

as checked at step 490, the state of Ybutton is up and YbuttonPrevious is Down, then the variable Button is set to Up at step 495.

If the button was set to Down at state 465, or Up at step 495, or if the results at steps 480 and 490 are NO, the process advances to step 510.

At step 510, Xmotion is set to the sum of Xabsolute less XabsolutePrevious, and at step 520, Ymotion is set to the sum of Yabsolute less YabsolutePrevious. Then, at step 530, the state of Button is checked and, if it is changed by being either Up or Down, both Xmotion and Ymotion are set to zero at step 535, indicating that the user has actuated a button and no cursor movement should occur.

In addition, if Button equals Up or Down, the state of Button is reported at step 540. At step 550, Xmotion and Ymotion are compared to zero, and if either is not zero then both Xmotion and Ymotion are reported to the microcontroller. It will be apparent that this indicates a cursor movement, typically reflective of the movement of a single finger over the touchpad, or two fingers in some modes such as Click-and-Drag.

Further, at step 560, whether there is motion reported or not, the variable XabsolutePrevious is set to the value of Xabsolute, and at step 570 the variable YabsolutePrevious is set to the value of Yabsolute. Similarly, at step 580 the value of XbuttonPrevious is set to Xbutton, and at step 590 the value of YabsolutePrevious is set to Yabsolute. The cycle then repeats by returning to step 400. It will be apparent that the foregoing algorithm can be readily extended to include additional fingers beyond two, representative of additional buttons. In such an instance, compare steps for current and previous states of each button would be conducted, and "up," or "down" conditions would be reported for each such button. In some embodiments it may be desired to report "no change" conditions, and the foregoing algorithm could be readily modified to provide such reporting.

Depending on the desired configuration, second and third buttons may be implemented, for example, either by requiring a combination of two or more fingers to indicate operation of a second button, or by the independent movement of additional fingers or other objects. In this latter embodiment, it may be desirable to implement distance thresholding, to ensure that movement of a second or additional button finger is not mistaken for movement of the first or other button finger.

Set forth in FIG. 6 is a flow diagram setting forth the steps for computing motion and "button" states in the X direction, or what may be referred to as "Xcompute." An analogous calculation is performed for the Y direction, or what may be referred to as "Ycompute." The algorithm uses the following variables and constants:

| Name | Definition |
|------|-----------|
| X(N) | Values, stored in memory, of finger-induced portion of capacitance measured on each conductor. N varies from 1 to Xcon. [When no finger is contacting the pad above a conductor, the value is approximately zero. In addition, X(0) is initialized to a value of 0.] |
| X(N-1) | Value of finger-induced sensor conductor capacitance for the previous conductor. |
| Xcon | The number of sensor conductors in the X direction. |
| Fthresh | The minimum threshold that X must reach before a finger is considered to be present. [Sets the touch sensitivity of the pad.] |
| Xpeak1 | Variable to store the value of the first peak X value. |
| Xvalley | Variable to store the value of a local minimum (if any) between 2 peaks. |

5,825,352

<table>
<tr><td colspan="2" align="center">9</td></tr>
<tr><td colspan="2" align="center">-continued</td></tr>
<tr><td>Name</td><td>Definition</td></tr>
<tr><td>Xpeak2</td><td>Variable to store the value of the second peak X value (if any).</td></tr>
<tr><td>Xsum</td><td>Variable to accumulate the sum of the X values, for centroid calculation.</td></tr>
<tr><td>XweightSum</td><td>Variable to accumulate the sum of the X values, weighted by N (the position of the conductor), for centroid calculation.</td></tr>
<tr><td>Xstate</td><td>A variable which can have values Peak1, Valley, Peak2 or Tail, to indicate which part of the finger profile we are currently searching for. The Tail state is simply the remainder of the scan after a second peak (in the exemplary embodiment) has been identified.</td></tr>
</table>

It will be apparent to those skilled in the art that the "Ycompute" variables and constants differ only in replacing X by Y.

The algorithm for Xcompute starts at step 200, followed by initialization of variables at step 205. For Xcompute, the variables initialized are N, which is set to zero, and the value of X(0), which is also set to zero. In addition, Xpeak1, Xvalley, Xpeak2, Xsum and XweightSum, are all set to zero. In addition, the state of Xstate is set to Peak1.

At step 210 a loop, referred to as "Xloop" starts. The purpose of Xloop is to calculate the X centroid, by accumulating the sum and weighted sum of the X values for all the X conductors from one to Xcon. Thus, the loop typically starts with the value of N=0 and increments by one at the beginning of each cycle until the value of N=Xcon. The steps of the loop include step 215, where N is incremented to N+1 and the value X(N) of the current conductor is added to the prior accumulated value, Xsum, which then becomes the new value of Xsum. The loop then continues at step 220, where the prior value of XweightSum is added to a weighted value of X(N), where the weighting is done by multiplying X(N) by the number N of the conductor being sampled. The sum of XweightSum and N*X(N) then becomes the new value of XweightSum.

The XLoop continues at step 225, where one of a series of subloops is selected depending on the value of Xstate. Since Xstate is initially set to Peak1, the first subloop entered is the Peak1 subloop, beginning at step 230. At step 230 the value of X(N) is compared to the value of X(N−1) and, if X(N) is greater than or equal to the value of X(N−1), the first peak has not yet been reached. As a result, the loop jumps to step 235, at which points the value of N is compared to the value of Xcon. If the finger-induced capacitance measured at the last conductor has not been evaluated, the result is a NO and the process jumps to step 215 to repeat with an incremented value of N.

At some value of N the value of X(N) is less than the value of X(N−1), at which point the check at step 230 yields a NO. At this point, the peak has been found and at step 232 the value of Xpeak1 is set to X(N−1) and the value of Xstate is set to Valley. The system then jumps to step 235, where a check is made to see if the last conductor has been measured by comparing N to Xcon. As before, if the capacitance change measured at the last conductor has not been checked, the result is a NO, and the process loops to step 215 and repeats.

When the process begins with the next increment of N, a NO will result at step 225, so that the process will jump to step 250, where a check is made to see if Xstate equal Xvalley. Since it now does, a YES results and the process branches to step 255. At step 255 a X(N) is compared to X(N−1). If X(N−1) is not greater than or equal to X(N), the valley has not yet been found, causing a further jump to step

235 and a repeat with an incrementally higher N. If a second finger is touching the pad then eventually the value of X(N−1) will be geater than or equal to the value of X(N), such that the valley is detected. At this point, at step 262, the value of Xvalley is set to X(N−1) and Xstate is set to Peak2. The process then jumps to step 235, where it repeats from step 215 unless the last conductor in the matrix has been evaluated.

On the next cycle, a NO result is reached at both step 225 and step 250, causing a jump to step 270. At step 270 the state of Xstate is compared to Peak2, and a YES result will occur. This results in a compare between X(N) and X(N−1) at step 275, to look for a second peak, in a manner substantially identical to the process by which the first peak was found. As long as X(N) is greater than or equal to X(N−1), the peak has not been found, so the process jumps to step 235, and then to step 215 until the change measured at the last conductor has been evaluated.

As before, the value of X(N) will eventually start to decrease, such that X(N) will be less than X(N−1). At this point, at step 278, the value of Xpeak2 is set to the value of X(N−1) and the state of Xstate is set to Tail. The "tail" is the remaining portion of FIG. 4 following the second peak. While a Tail state is used in the exemplary embodiment, such a state may not be necessary in all embodiments.

The process then cycles through until the last conductor measurement has been considered, at which point N does equal Xcon when the check at step 235 is made. With a YES result, the process branches to a thresholding comparison at step 290.

In an exemplary embodiment, the Xcompute process then continues by calculating the centroid for the fingers detected, so long as the maxima exceed a threshold value. In accordance with the present invention, two approaches may be used in calculating centroid values. In a first implementation, only a single centroid value is calculated for the combination of one or more fingers. In this arrangement, it will be apparent that, when a second finger contacts the touchpad, the centroid "jumps" laterally approximately to the midpoint of the two fingers. In a second implementation, a centroid value may be calculated for each maxima, yielding multiple centroid values when multiple fingers interact with the pad. For purposes of clarity, the following description will be limited to the first implementation.

Thus, at step 290 the values of Xpeak1 and Xpeak2 are compared to Fthresh, and if either or both are greater then Xabsolute is set to the value of XweightSum/Xsum at step 295, which causes the X centroid to be calculated. If neither peak exceeds Fthresh, then no finger is deemed present and Xbutton is set to Up at step 315.

If both Xpeak1 and Xpeak2 were greater than Fthresh, the Xcompute process continues at step 305 by comparing the difference between Xpeak1 and Valley to the value of Xpeak1 divided, for example, by four. If the difference is the greater of the two, then the difference between Xpeak2 and Valley is compared to the value of Xpeak2 divided, for example, by four. If the difference is greater than the dividend, the Xbutton is set to Up at step 310. Otherwise, the value of Xbutton is set to Up at step 315. The comparison described above is provided to ensure that a legitimate valley and two legitimate peaks have been detected, to avoid artifacts. It will be appreciated, given the teachings herein, that other comparison methods or divisors other than four may be used for this purpose.

The Xcompute loop then ends at step 320. It will be appreciated by those skilled in the art that the foregoing is

5,825,352

11

a simplified algorithm and does not include compensation for settling, moisture and noise. Noise thresholding may be provided in at least some embodiments, if noise causes the curve to be non-monotonic; settling and moisture may be dealt with in a similar manner.

The Ycompute loop is performed similarly, as noted above. Depending on the particular arrangement desired, and the associated hardware, the X and Y compute processes may be performed sequentially in either order or concurrently.

While the foregoing example describes identification of minima and maxima in the X and Y directions, it will be apparent that an analysis along a diagonal or some other angular direction may be preferred in some instances, and is still within the scope of the present invention.

It will be appreciated that the foregoing describes a new and useful method and apparatus for detecting a plurality of fingers operatively coupled to a touch pad sensor for enabling a variety of mouse-like operations. A second portion of the invention involves using the previously detection methodology to perform various cursor movement and control functions similar to those well known to users of electronic mice and trackballs.

As previously noted, the first finger is most commonly associated, in the prior art, with cursor movement, while various tapping motions [e.g., tap and tap-and-a half] of that first finger have been implemented to perform various control functions. Unlike such prior art, however, various movements (including sequences of taps) of additional fingers or combinations of the first and additional fingers are provided to enable such control functions in the present invention. Depending on the implementation desired, it is also possible to implement a superset of the prior art control functions together with the more robust control function set available with the present invention.

Note that in the preferred embodiment, the user may arbitrarily choose which finger he or she uses as the "first" or "second" or additional fingers. Thus, for example, one user may choose the index finger as the first finger and the middle finger as the second finger, while another user may prefer the reverse or some different combination. In the preferred embodiment, the only distinction between the first, second and additional fingers is the sequence in which they are placed in contact with the touchpad surface, or removed from it. In any case where a second or additional finger or fingers is placed down after a first finger, or multiple fingers, is already in contact with the pad, the newly placed fingers can be in any relationship to those already in contact with the pad, such as to the left, to the right, above or below. The only requirement is that, in the profile of finger-induced capacitances, the profile of the newly placed finger exhibits a zero value or a local minimum on each side of its peak value, in at least one of the X and Y directions, so that it may be distinguished from the other finger(s) in contact with the touchpad.

In particular, the ability of the previously described methodology to recognize multiple fingers allows the first finger to serve, essentially, as the "point" finger, while additional fingers serve as the "click" finger(s). Combinations of the first, second, and perhaps additional fingers can then enable numerous conventional functions to be performed based on the mapping of a variety of sequences of taps or finger movements to a set of conventional pointing device functions, where the pointing device could be a touchpad, mouse, trackball, joystick, or stylus, for example. It will be apparent to those skilled in the art, given the foregoing description, that the present invention can detect, for

12

example, relative movement of the first finger, together with a tap of the second or more fingers at some point, followed either by removal of both fingers, further movement of the first finger, or further movement of both fingers. Such sequences can, essentially, be viewed as a series of scans in which one or more fingers were found to be either present or absent in any given scan, with motion, or lack thereof, of the finger or fingers across the touch sensor interspersed between changes in the number of fingers in contact with the touchpad. The specific sequence can then be analyzed to determine whether only a cursor movement is involved or whether a control function is intended. If a control function is intended, the specific control function can then be identified.

Referring to FIGS. 7A–7F, there is shown in diagrammatic form an exemplary sequence involving operative coupling of a plurality of fingers with a touch sensor to cause both a cursor movement and a control function. More specifically, FIG. 7A shows a series of movements of one or more fingers across a touch sensor, including various finger taps. FIGS. 7B–7F show, for each of the numeric references in FIG. 7A, an exemplary video display, an exemplary position of one or more fingers on the touchpad, and X and Y finger profiles appropriate to that finger contact. It will be helpful to define certain conventions used in FIGS. 7A–7F before discussing these figures. In FIG. 7A–7F, contact between a finger and the touch pad is indicated by a solid circle within the fingertip; an absence of contact between a fingertip and the touch sensor is indicated by the absence of circle within the finger tip. A tap—i.e., an up and down motion—by a finger is indicated by a dashed circle. Movement of the fingers from a first to a second point while in contact with the touch sensor is indicated by a solid arrow. Movement of the fingers from a first to a second point with the fingers not in contact is indicated by a dashed arrow. With these conventions in mind, FIGS. 7A–7F can be better understood.

In particular, and with reference to FIG. 7A in combination with FIG. 7B, an initial series of scans 700 indicates the presence of a single finger in contact with the touch sensor, with the changing X,Y location between 700 and 705 indicating relative motion by the finger across the touch sensor. At 710, a second finger is detected in contact with the touch sensor, and continues to be operatively coupled to the sensor for several more scans without significant relative motion across the sensor. At 720, the second finger is removed, while the first finger remains. From 720 until 730 (shown in FIG. 7C) the first finger continues its relative motion, while at 740 the second finger is again placed down. The scans of the sensor then detect both the first and second finger being moved together across the sensor until the scan at 750, then both fingers are removed at 755. Thereafter, both fingers are again placed on the sensor at 760 (shown in FIG. 7D), where they remain for a few more scans until 770, at which time they are both removed. Three fingers are placed on the sensor at 780, and removed a few scans later at 790. Thereafter, three fingers are placed on the sensor at 800 (FIG. 7E), moved across the touch sensor for a few scans from 800 to 805, and are then removed at 810. Finally, as shown at 820 (FIGS. 7F1–2), one finger is placed down while the adjacent finger is moved, such as might be desirable for marking text or other functions. When the finger is moved as far as is practicable, the moving finger is picked up at 825 and placed down again at 830 for further movement. The moving finger can be picked up and placed down again as often as desired. Eventually the other, substantially fixed finger is lifted at 835, causing a "button up" condition.

5,825,352

**13**

While the foregoing sequence can be programmed to define any number of cursor movement and control functions, an exemplary definition of the functions associated with such sequences can be the following: For the period from **700** through **705** the relative motion of a single finger can be defined to mean cursor movement for that period, from the beginning point until the relative ending point. During the period **710** to **720**, a second finger is detected and then removed, which is defined in an exemplary embodiment as a single finger tap which may be a "select" function such as selecting one item from a screen menu. During the period **720** until **730**, the single finger again moves the cursor, while at **740** the second finger reappears to enable a different function. The second finger moves across the sensor, together with the first finger, until at **755** both fingers are removed. Again, such sequences—all of which may be regarded as gestures—can be mapped to control functions in numerous ways, but one reasonable definition is that the presence of two fingers engaged in relative motion is a "drag function," such as where an entity was selected by the first tap and dragged to a new location, where it is dropped by the removal of both fingers at **750**.

Then, at **760**, both fingers reappear and remain for a few additional scans until both are removed at **770**. This gesture, which may be considered a "two finger tap," can enable numerous functions, but an exemplary definition is the classical "double-click" of a standard left mouse button, or the click of a middle button on some three button mice, such as those sold by Logitech, Inc., and could, for example, activate a function or application associated with the item to which the cursor is pointing.

Next, the sequence from **780** to **790**, when the three fingers reappear and are then removed, is a "three finger tap", and can be regarded, for example, as a right mouse button click which may, for example, activate a menu specific to the item to which the cursor is pointing. Finally, the sequence from **800** until **810**, in which three fingers reappear, move across the touch sensor and are then removed, may in an exemplary embodiment be seen as a shortcut to a multi-sequence function. For example, such a movement might be defined as a scroll function, which might otherwise require the user to move the cursor to a scroll bar, drag and drop a scroll box, and return the cursor to the working area of the screen. Finally, the sequence from **820** through **830** can be analogized to holding down a mouse button (for example the left mouse button), rolling a mouse whatever distance is convenient for the user, then picking up the mouse (while continuing to hold down the button) and placing the mouse down again at a position convenient for further movement of the mouse. One example of the use of such a sequence is the marking of text. The algorithm for recognizing movement by one "cursor" finger while the other "button" finger is maintained in position is a generalized case of the algorithm shown in FIGS. **5** and **6**, and is described in greater detail in FIGS. **8** and **9**. Other functions which can be implemented with such gestures include an "ink" function (mentioned above), entry of variable values, and use of the sensor in absolute mode.

Referring next to FIGS. **8** and **9**, the generalized case associated with FIGS. 7F1–2, but also applicable to the remaining functions, may be better appreciated. In the exemplary algorithm shown in FIGS. **8** and **9**, a determination is made whether zero, one or two fingers in contact with the touchpad. Depending on how many fingers are identified, various operations are permitted. It will be appreciated that FIG. **8** is analogous to FIG. **5**, while FIG. **9** is analogous to FIG. **6**. For convenience, steps unchanged from

**14**

FIGS. **5** and **6** are in most cases referred to by the reference numerals used in those figures.

In FIG. **8**, the process begins in a manner identical to FIG. **5**, starting at step **400** and followed by scanning the conductors and storing the results of the scan in memory at step **405**, followed by Xcompute and Ycompute at steps **430** and **440**, respectively. For this embodiment, Xcompute is shown in FIG. **9**, and Ycompute is identical to Xcompute. At step **850**, a determination is made whether two fingers are in contact with the touchpad by evaluating both Xcompute and Ycompute. If neither Xcompute nor Ycompute indicate the presence of two fingers, the answer is NO and the process drops to step **855**. However, if either the Xcompute routine or the Ycompute routine indicates the presence of two fingers, the answer at step **850** is YES and the process moves to step **860**, where the value of the variable FINGER is set to 2.

If the answer at step **850** was NO, then a determination has to be made at step **855** whether one or no fingers are in contact with the touch sensor. If variables Xfinger and Yfinger do not both equal 1, then the comparison at step **850** is a NO and it is determined that no fingers are in contact with the touch sensor. In this case, the variable FINGER is set to 0 at step **865**. However, if the variables both yield a 1, then a determination is made that one finger is in contact with the sensor, and the variable FINGER is set to 1 at step **870**.

In either event, the process then moves to step **875**, where Xmotion and Ymotion are calculated in a manner identical with FIG. **5**. The process then continues at step **880**, where the variable Finger is compared to the value of FingerPrevious. If the value of Finger differs from the value of FingerPrevious, then a button actuation is assumed to have occurred, and Xmotion and Ymotion are set to zero at step **885**. However, if the value of Finger equals the value of FingerPrevious (i.e., the current number of fingers contacting the pad is the same as in the previous state), then the comparison of step **880** yields a YES, and the process moves to step **890**. At step **890** a comparison is made to determine whether there has been motion in either the X or Y directions. If neither Xmotion nor Ymotion is nonzero, a NO results and the process moves to step **895** where the variable Motion is set to NO. The same results obtains if the process goes through step **885**. However, if either Xmotion or Ymotion is nonzero, a YES results at step **890**, and the process moves to step **900** where the variable Motion is set to YES.

From either step **895** or step **900**, the process moves to step **905**, where a check is made to determine whether ButtonPrevious was up and the number of fingers detected is two. If the answer is NO, the process moves to step **910**. However, if a YES is obtained, the process moves to step **915** where the state of the Button variable is reported to the host as DOWN, and the variable ButtonPrevious is set to Down.

Referring again to step **910**, a check is made to determine whether either of two groups of conditions exist. A YES result may be obtained if ButtonPrevious is DOWN and and the value of the Finger variable is zero; or if ButtonPrevious is Down and the variable Motion is set to YES and the variable Finger is set to one. If none of these conditions exist, a NO result and the process moves to step **920**. However, if a YES does result, then the process moves to step **925** and reports to the host that Button is Up, while also setting the variable ButtonPrevious to Up.

If a NO resulted at step **910**, at step **920** a comparison is made between variables FingerPrevious and Finger, and the

5,825,352

**15**

state of the Motion variable. If FingerPrevious is the same value as Finger, and Motion has occurred (i.e., Motion is Yes), the process moves to step **930** and both Xmotion and Ymotion are reported. The process then moves to step **935**. However, if the comparison at step **920** yields a No, the process moves directly to step **935**. At step **935**, the value of XabsolutePrevious is set to the value of Xabsolute, the value of YabsolutePrevious is set to the value of Yabsolute, and the value of FingerPrevious is set to the value of Finger. The process then moves to step **940**, where it recycles by jumping back to start.

Referring next to FIG. **9**, the Xcompute process is shown in detail for the generalized case shown in FIG. **8**. As noted previously, the Ycompute process is identical and is therefore not shown separately. The process of FIG. **9** is identical to that shown in FIG. **6** up through step **290**, and the preceding steps will therefore not be discussed again. However, if a No results from the comparison at step **290**, a determination is made that no fingers are in contact with the pad. This causes the variable Xfinger to be set to zero at step **970**.

Steps **295** and **305** are unchanged from FIG. **6** and will not be discussed further. However, if a No results from the comparison at step **305**, then a determination is made that one finger is in contact with the sensor, and the value of the variable Xfinger is set to one at step **975**. By contrast, if the result at step **305** is a Yes, then a determination is made that two fingers are in contact with the sensor and the variable Xfinger is set to two at step **980**. Regardless of the number of fingers in contact with the sensor, the process moves to step **320** and ends until the next cycle.

Another function achievable with the detection method and apparatus of the present invention may be referred to as edge lock. Because a touch sensor can detect, in absolute terms, where on the sensor the operative coupling occurs, it is possible to detect that one or more fingers have reached the edge of the sensor. In some instances, the user intends to continue the movement he was engaged in when he hit the edge; for example, a drag function involving two fingers, in which the two fingers hit the edge before the object being dragged has reached its destination. In the environment of a mouse, the user simply picks up the mouse while holding the button down, puts it back down and moves again. In the context of a touchpad, however, removal of the two fingers may be perceived as termination of the function even though such termination was not intended. To avoid such problems, the function in which the user was engaged at the time the fingers hit the edge may remain active—i.e., locked in—for a delay period. If the fingers are placed down on the touchpad within the delay period, the user continues with the earlier function. If the user does not place down the fingers within a predefined delay, the function is terminated and a new function begins when the user again places the fingers in operative contact with the sensor.

It will be appreciated from the foregoing that the present invention allows numerous multi-finger gestures to be detected and converted to mouse-related functions for moving a cursor and control of operating environments or applications programs. However, while some exemplary functions and exemplary definitions for particular sequences have been provided above, it is to be understood that the present invention is not limited to the association of a particular function with a particular sequence or to any particular set of functions. Instead this aspect of the invention is directed to the ability to identify and process various sequences in which one or more fingers are either absent or present, interspersed with motion or lack of motion of the

**16**

finger or fingers across the touch sensor, to evaluate those sequences either locally or via software on the host, and to report appropriate signals to cause cursor movements or control functions to occur in applications programs or operating environments.

Having fully described various embodiments of the present invention, numerous alternatives and equivalents which do not depart from the invention will be apparent to those skilled in the art. It is therefore intended that the invention not be limited by the foregoing description, but only by the appended claims.

What is claimed is:

1. A method for detecting the operative coupling of multiple fingers to a touch sensor involving the steps of

    scanning the touch sensor to (a) identify a first maxima in a signal corresponding to a first finger, (b) identify a minima following the first maxima, (c) identify a second maxima in a signal corresponding to a second finger following said minima, and

    providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima.

2. The method of claim 1 further including the step of causing a pointing device click function to occur in response to the detection of at least a second maxima.

3. The method of claim 1 further including the step of enabling a "drag" function to occur in response to the detection of at least a second maxima.

4. The method of claim 1 further including the step of enabling a "select" function in response to the detection of at least a second maxima.

5. The method of claim 1 further including the step of enabling an "ink" function in response to the detection of at least a second maxima.

6. The method of claim 1 wherein said touch sensor includes a plurality of lines, said maxima being a largest local variation in a signal value on one of said lines due to capacitive coupling of a finger.

7. The method of claim 6 wherein said maxima are peaks.

8. The method of claim 1 further comprising the step of comparing a distance between said first maxima and said second maxima to a predefined threshold.

9. The method of claim 1 further comprising the steps of:

    providing a first control function in response to the detection of the movement of two fingers:

    detecting the reaching of an edge of said touch sensor by said two fingers;

    detecting a first time corresponding to the removal of said fingers from said touch sensor;

    detecting a second time corresponding to the replacement of said two fingers on said touch sensor; and

    continuing said first control function if said first and second times are within a predetermined time limit of each other.

10. The method of claim 1 further comprising the step of:

    detecting a distance between said first and second maxima.

11. The method of claim 1 further comprising the step of:

    providing a drag control function in response to detecting a movement in substantial unison of two said fingers.

12. The method of claim 1 further comprising the step of:

    providing a click function in response to the removal and reappearance of said second maxima within a predetermined period of time.

5,825,352

17

18

13. The method of claim 1 further comprising the steps of:

detecting a movement of said first maxima;

detecting a removal and replacement of said maxima within a predetermined time period;

controlling a cursor function in response to said movement of said first maxima; and

providing a control function in response to said removal and replacement of said second maxima.

14. The method of claim 1 further comprising the step of:

selecting an appropriate control function based on a combination of a number of fingers detected, an amount of time said fingers are detected, and any movement of said fingers.

15. The method of claim 1 further comprising the step of determining if said first and second maxima are within 5 centimeters, and only providing said indication of the presence of two fingers if said first and second maxima are within 5 centimeters.

16. The method of claim 1 further comprising the step of calculating first and second centroids corresponding to said first and second fingers.

17. The method of claim 1 wherein said first and second maxima are required to be higher than a first threshold, and said minima is required to be less than a second threshold.

18. A touch sensor for detecting the operative coupling of multiple fingers comprising:

means for scanning the touch sensor to (a) identify a first maxima in a signal corresponding to a first finger, (b) identify a minima following the first maxima, and (c) identify a second maxima in a signal corresponding to a second finger following said minima, and

means for providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima.

19. The touch sensor of claim 18 further comprising:

means for selecting an appropriate control function based on a combination of a number of fingers detected, an amount of time said fingers are detected, and any movement of said fingers.

20. The touch sensor of claim 18 wherein said touch sensor includes a plurality of lines, said maxima being a largest local variation in a signal value on one of said lines due to capacitive coupling of a finger.

21. The touch sensor of claim 18 wherein said maxima are peaks.

22. The touch sensor of claim 18 further comprising means for comparing a distance from said first maxima to said second maxima to a predefined threshold.

23. The touch sensor of claim 18 further comprising:

means for providing a first control function in response to the detection of the movement of two fingers:

means for detecting the reaching of an edge of said touch sensor by said two fingers;

means for detecting a first time corresponding to the removal of said fingers from said touch sensor;

means for detecting a second time corresponding to the replacement of said two fingers on said touch sensor; and

means for continuing said first control function if said first and second times are within a predetermined time limit of each other.

24. The touch sensor of claim 18 further comprising:

means for detecting a distance between said first and second maxima.

25. The touch sensor of claim 18 further comprising:

means for providing a drag control function in response to detecting a movement in substantial unison of two said fingers.

26. The touch sensor of claim 18 further comprising:

means for providing a click function in response to the removal and reappearance of said second maxima within a predetermined period of time.

27. The touch sensor of claim 18 further comprising:

means for detecting a movement of said first maxima;

means for detecting a removal and replacement of said maxima within a predetermined time period;

means for controlling a cursor function in response to said movement of said first maxima; and

means for providing a control function in response to said removal and replacement of said second maxima.

28. The touch sensor of claim 18 further comprising:

means for selecting an appropriate control function based on a combination of a number of fingers detected, an amount of time said fingers are detected, and any movement of said fingers.

29. The sensor of claim 18 further comprising means for determining if said first and second maxima are within 5 centimeters, and only providing said indication of the presence of two fingers if said first and second maxima are within 5 centimeters.

30. The sensor of claim 18 further comprising means for calculating first and second centroids corresponding to said first and second fingers.

31. The sensor of claim 18 wherein said first and second maxima are required to be higher than a first threshold, and said minima is required to be less than a second threshold.

*  *  *  *  *

# EXHIBIT B

1
2
3
4
5
6
7
8
9
10
11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

12
13
14
15
16
17
18
19

| | |
|---|---|
| ELANTECH DEVICES CORPORATION, a corporation existing under the laws of Taiwan, R.O.C., <br><br> Plaintiff, <br><br> v. <br><br> SYNAPTICS, INC., a Delaware corporation; AVERATEC, INC., a California corporation; and PROSTAR COMPUTER, INC., a California corporation, <br><br> Defendants. | Case No.    C06-01839 CRB <br><br> **JOINT CLAIM CONSTRUCTION AND PREHEARING STATEMENT** |

20

AND RELATED COUNTERCLAIMS.

21
22
23
24
25
26
27
28

The parties to the above-entitled action, Plaintiff and Counterclaim Defendant Elantech Devices Corporation ("Elantech"), Counterclaimant and Defendant Synaptics, Inc. ("Synaptics"), and Defendant Averatec, Inc. ("Averatec") respectfully submit this Joint Claim Construction and Prehearing Statement pursuant to Patent Local Rule 4-3.

**Patent Local Rule 4-3(a)**

Attached hereto as Exhibit A is a table setting forth the construction of those claim terms, phrases, or clauses in the patents at issue on which the parties agree, as well as each party's proposed construction of each disputed claim term, phrase, or clause in the patents at issue.  The agreed-upon definitions in the attached chart include a single definition that spans both columns signifying each party's position.  Averatec joins in the claim construction positions set forth by Synaptics.  The parties will continue to meet and confer to narrow the issues for the claim construction briefing.

**Patent Local Rule 4-3(b)**

Attached hereto as Exhibit B is an identification of any intrinsic or extrinsic evidence on which Elantech currently intends to rely either in support of its own proposed construction or in opposition to Synaptics' and Averatec's proposed construction.

Attached hereto as Exhibit C is an identification of any intrinsic or extrinsic evidence on which Synaptics and Averatec currently intend to rely either in support of its own proposed construction or in opposition to Elantech's proposed construction.

**Patent Local Rule 4-3(c)**

The parties anticipate that the length of time necessary for the Claim Construction Hearing is three hours.  The parties will be prepared to complete the tutorial session with an hour or less per side.

**Patent Local Rule 4-3(d)**

At present, Synaptics believes that any expert testimony concerning claim construction that the Court may wish to consider is most easily submitted in the form of declarations in support of or in opposition to the briefing on claim construction.  However, Synaptics reserves the right to call Dr. Andrew Wolfe as a witness at the Claim Construction Hearing in the event that such

1   testimony is needed to clarify points raised in the briefing or in response to questions that the

2   Court may wish to raise in connection with claim construction.  Dr. Wolfe has provided two

3   expert reports in connection with claim construction pursuant to the parties agreement to

4   exchange such reports.  Those reports, served on November 20 and 30, 2006 are attached as

5   Exhibit D hereto (without exhibits, so as not to burden the court).  Averatec also intends to rely

6   on the reports and expert testimony by Dr. Wolfe.

7   **Patent Local Rule 4-3(e)**

8   The parties have set a briefing schedule for the claim construction hearing as follows:

9   - Opening Claim Construction Briefs For Each Patentee: January 29, 2007

10  - Responsive Claim Construction Briefs For Each Defendant: February 12, 2007

11  - Reply Claim Construction Briefs For Each Patentee: February 21, 2007

12  The tutorial for the Court is set for March 6, 2007, at 2:30 p.m.  The hearing on claim

13  construction is set for March 8, 2007 at 2:30 p.m.  Since no date has been previously set, the

14  parties propose that a short prehearing conference be scheduled on March 6, 2006 after the

15  tutorial.

16

17  Dated:  December 18, 2006                   KARL J. KRAMER
                                                ELLEN S. REINSTEIN
18                                              ERIKA L. LABIT
                                                MORRISON & FOERSTER LLP
19

20
                                                By:   /s/ Karl J. Kramer
21                                                     Karl J. Kramer

22                                              Attorneys for Defendant and
                                                Counterclaimant Synaptics, Inc.
23

24

25

26

27

28

Dated:  December 18, 2006              SCOTT R. RABER
                                       KASTNER BANCHERO LLP


                                       KAREN H. BROMBERG
                                       ELIZABETH F. BERNHARDT
                                       DAMIR CEFO
                                       COHEN & GRESSER LLP
                                       Admitted *Pro Hac Vice*


                                       By:   /s/ Damir Cefo
                                                 Damir Cefo

                                       Attorneys for Defendant
                                       Averatec, Inc.


Dated:  December 18, 2006              YITAI HU
                                       SEAN P. DEBRUINE
                                       HSIN-YI CINDY FENG
                                       AKIN GUMP STRAUSS HAUER & FELD
                                       LLP


                                       By:    /s/ Sean P. DeBruine
                                                 Sean P. DeBruine

                                             Attorneys for Plaintiff and Counter-
                                             Defendant Elantech Devices Corp.

1    I, KARL J. KRAMER, am the ECF User whose ID and password are being used to file

2  this JOINT CLAIM CONSTRUCTION AND PREHEARING STATEMENT.  In compliance

3  with General Order 45, X.B., I hereby attest that Damir Cefo and Sean P. DeBruine have

4  concurred in this filing.

5    Dated:  December 18, 2006

6                                  MORRISON & FOERSTER LLP

7

8                                  By:   /s/ Karl J. Kramer
                                          Karl J. Kramer

9                                  Attorneys for Defendant and
10                                 Counterclaimant Synaptics, Inc.

# Exhibit A

# JOINT CLAIM CONSTRUCTION CHART

| Claim Terms | Synaptics Claim Construction Disclosure | Elantech Claim Construction Disclosure |
|---|---|---|
| 1. "tap gesture" ('931/'591) | "a quick tap of the finger on the pad, of short duration and involving little or no X or Y finger motion, that is presented to the host as a brief click of the mouse button" | |
| 2. "X and Y position information" ('931/'591) | "information about the horizontal and vertical positioning of an object on a touch sensor" | "two-dimensional location on a touch-sensor pad" |
| 3. "initiating a first signal to the host indicating the occurrence of said gesture" ('591) | "initiating transmission of a first set of data to a computer, or other device that can take as input the output of a touch-sensor pad, that indicates that a tap gesture has occurred on the touch-sensor pad" | "outputting to the host a high state of a signal that has a low and a high state, and the high signal state represents that a double tap gesture will potentially occur on the touch-sensor pad" |
| 4. "terminating said first signal" ('591) | "terminating the previous signal" | "changing the state of the signal from the high signal state to the low signal state" |
| 5. "sending a second signal to said host indicating said second gesture" ('591) | "sending a second set of data to a computer, or other device that can take as input the output of a touch-sensor pad, that indicates that a second tap gesture has occurred on the touch-sensor pad" | "changing the state of the signal from a low signal state to a high signal state for a predetermined period of time, and sending the high signal state to the host which interprets the termination of the first signal and the existence of a second high signal state as being a double tap gesture" This claim construction presumes that "said second gesture" should have read "said gesture" or "said double tap gesture." Absent such a presumption, no claim construction can be made because there is no antecedent basis for "said second gesture." |
| 6. "initiating a drag gesture signal to the host indicating the occurrence of a gesture" ('591) | "initiating transmission of a first set of data to a computer or other device that can take as input the output of a touch-sensor pad, that indicates that a gesture has occurred on the touch-sensor pad" | "outputting to a host a high state of a signal that has a low and high state, and the high signal state represents that a drag gesture will potentially occur on the touch-sensor pad" |
| 7. "maintaining said drag gesture signal" ('591) | "to continue, retain, or repeat the drag gesture signal" | "continuously outputting the high signal state" |
| 8. "repeatedly sending X and Y position information to said host for the duration of said second presence" ('591) | "after the second presence is detected, repeatedly sending information about the horizontal and vertical positioning of an object on a touch sensor to a computer, or other device that can take as input the output of a touch-sensor pad while the second presence continues" | "continuously sending the current two-dimensional location of the object on the touch-sensor pad to the host as long as the object continues to be in proximity to the touch-sensor pad" |
| 9. "initiating a signal to the host indicating the occurrence of said tap gesture" ('931) | "initiating the transmission of a set of data to a computer, or other device that can take as input the output of a touch-sensor pad, that indicates that a tap gesture has occurred on the touch-sensor pad" | "outputting to the host a high state of a signal that has a low and a high state, where the high signal state represents that a tap gesture occurred on the touch-sensor pad" |
| 10. "maintaining said signal for a predetermined period of time" ('931) | "to continue, retain, or repeat the signal for a period of time that was determined before" | "continuously outputting the high state of the signal only for a predetermined time period (i.e., changing the signal state from high to low at the end of the predetermined time period)" |
| 11. "detecting in which of at least one corner of the touch-sensor pad said tap gesture occurred" ('931) | "detecting that a tap gesture has occurred in at least one corner, the identity of which is distinguished in some way from other corners of the touch-sensor pad" | "after detecting the occurrence of the tap gesture, separately detecting in which of at least one corner of the touch-sensor pad the tap gesture occurred" |

# JOINT CLAIM CONSTRUCTION CHART

| | | |
|---|---|---|
| 12. "data packet processor" ('052) | "hardware and/or program code, for example, software executed on a central processing unit, that examines data packets" | "software for processing data packets and sending messages" |
| 13. "incrementally move" ('411) | "to move in increments" | movement defined by the second component of Equations 12 and 13 in the '411 patent, namely, $S(X_{cur} - X_{center})$ and $S(Y_{cur} - Y_{center})$ |
| 14. "operative coupling" ('352) | "finger-induced electrical effect" | |
| 15(a) "scanning the touch sensor" | "sequentially measuring the traces in the touch sensor" | "examining information associated with the touch sensor" |
| 15(b) "means for scanning the touch sensor . . ." ('352) | 112 ¶6 Claimed Function "scanning the touch sensor to (a) identify a first maxima in a signal corresponding to a first finger, (b) identify a minima following the first maxima, and (c) identify a second maxima in a signal corresponding to a second finger following said minima," as those terms are defined below | |
| | 112 ¶6 Corresponding Structures analog multiplexor 45, capacitance measuring circuit 70, analog to digital converter 80, microcontroller 60 | |
| 16. "scanning the touch sensor to . . . identify a first maxima in a signal corresponding to a first finger" ('352) | "measuring the trace values of the touch sensor corresponding to a first finger and determining the point at which the measured values cease to increase and begin to decrease" | "identify a first peak value in a finger profile obtained from scanning the touch sensor" |
| 17. "scanning the touch sensor to . . . identify a minima following the first maxima" ('352t) | "measuring the trace values of the touch sensor following, in scan order, after the first maxima and determining the point at which the measured values cease to decrease and begin to increase" | "identify the lowest value in the finger profile that occurs after the first peak value, and before another peak value is identified" |
| 18. "scanning the touch sensor to . . . identify a second maxima in a signal corresponding to a second finger following said minima" ('352) | "measuring the trace values corresponding to a second finger following, in scan order, said minima and determining the point at which the measured values cease to decrease and begin to increase" | "after identifying the lowest value in the finger profile, identify a second peak value in the finger profile" |
| 19(a) "providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" ('352) | No further construction necessary since ordinary meaning is sufficient. | |
| 19(b) "means for providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" ('352) | 112 ¶6 Claimed Function "providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" | |
| | 112 ¶6 Corresponding Structure<br><br>None | 112 ¶6 Corresponding Structure<br><br>microcontroller 60 |

# Exhibit B

# Exhibit B

# ELANTECH'S PROPOSED CONSTRUCTION AND EVIDENTIARY SUPPORT

| Claim Terms | Elantech Claim Construction Disclosure | Evidentiary Support |
|---|---|---|
| 1. "Tap gesture". | Not in dispute.'591 patent, | |
| 2. "X and Y position information" ('931/'591) | "two-dimensional location on a touch-sensor pad" | column 5, lines 1-8 of the '931 patent; column 44, lines 20-23 of the '931 patent |
| 3. "initiating a first signal to the host indicating the occurrence of said gesture" ('591) | "outputting to the host a high state of a signal that has a low and a high  state, and the high signal state represents that a double tap gesture will potentially occur on the touch-sensor pad" | '591 patent, Fig. 15D (first pulse in "OUT" signal); column 34, lines 12-22; column 37, lines 2-3 |
| 4. "terminating said first signal"  ('591) | "changing the state of the signal from the high signal state to the low signal state" | '591 patent, Fig. 15D and Figs. 17A-17F |
| 5. "sending a second signal to said host indicating said second gesture" ('591) | "changing the state of the signal from a low signal state to a high signal state for a predetermined period of time, and sending the high signal state to the host which interprets the termination of the first signal and the existence of a second high signal state as being a double tap gesture" This claim construction presumes that "said second gesture" should have read "said gesture" or "said double tap gesture." Absent such a presumption, no claim construction can be made because there is no antecedent basis for "said second gesture." | '591 patent, Fig. 15D (second pulse in "OUT" signal) |
| 6. "initiating a drag gesture signal to the host indicating the occurrence of a gesture" ('591) | "outputting to a host a high state of a signal that has a low and high state, and the high signal state represents that a drag gesture will potentially occur on the touch-sensor pad" | '591 patent, Fig. 15B "OUT" signal; column 33, lines 31-44 |
| 7. "maintaining said drag gesture signal" ('591) | "continuously outputting the high signal state" | '591 patent, Fig. 15B "OUT signal; column 33, lines 31-44; |
| 8. "repeatedly sending X and Y position information to said host for the duration of said second presence" ('591) | "continuously sending the current two-dimensional location of the  object on the touch-sensor pad to the host as long as the object continues to be in proximity to the touch-sensor pad" | '591 patent, column 21, lines 39-43; column 39, lines 24-26 |
| 9. "initiating a signal to the host indicating the occurrence of said tap gesture" ('931) | "outputting to the host a high state of a signal that has a low and a high state, where the high signal state represents that a tap gesture occurred on the touch-sensor pad" | '931 patent, Fig. 15a "OUT" signal; column 34, line 28; column 35, lines 57-59 |
| 10. "maintaining said signal for a predetermined period of time" ('931) | "continuously outputting the high state of the signal only for a predetermined time period (i.e., changing the signal state from high to low at the end of the predetermined time period)" | '931 patent, Fig. 15a "OUT" signal; column 34, line 28; column 35, lines 57-59 |
| 11. "detecting in which of at least one | "after detecting the occurrence of the tap gesture, separately detecting in which of at least one | '931 patent, Figs. 17A-17C |

1

**Exhibit B**

# ELANTECH'S PROPOSED CONSTRUCTION
## AND EVIDENTIARY SUPPORT

| | | |
|---|---|---|
| corner of the touch-sensor pad said tap gesture occurred" ('931) | corner of the touch-sensor pad the tap gesture occurred" | |
| 12. "incrementally move" ('411) | movement defined by the second component of Equations 12 and 13 in the '411 patent, namely, $S(X_{cur} - X_{center})$ and $S(Y_{cur} - Y_{center})$ | '411 patent, Fig. 11; column 28, line 16 through column 29, line 9<br><br>Definition of "increment" in *The American Heritage® Dictionary of the English Language, Fourth Edition*, Houghton Mifflin Company, Copyright © 2000, page 889. |
| 13. "data packet processor" ('052) | "software for processing data packets and sending messages" | '052 patent, column 1, line 55 through column 2, line 8; column 2, lines 35-39; column 2, lines 53-62; column 3, lines 12-30; column 6, lines 21-26; Fig. 2 |
| 14. "operative coupling" ('352) | Not in dispute. | |
| 15a. "scanning the touch sensor ('352)" | 15a. "examining information associated with the touch sensor" | '352 patent, 15a. column 5, line 58 through column 6, line 5; column 7, lines 34-48;<br><br>Definition of "scanning" in 'The IEEE Standard Dictionary of Electrical and Electronics Terms, Sixth Edition, 1996, page 947. ("the process of examining information in a systematic manner")<br><br>column 7, lines 34-37 |
| 15b. "means for scanning the touch sensor to (a) identify a first maxima in a signal corresponding to a first finger, (b) identify a minima following the first maxima, and (c) identify a second maxima in a signal corresponding to a second finger following said minima" ('352) | 35 U.S.C. § 112(6) claim element: Corresponding means structure: analog multiplexor 45, capacitance measuring circuit 70, analog to digital converter 80, microcontroller 60 | '352 patent, column 5, lines 20-51 |
| 16. "scanning the touch sensor to . . . identify a first maxima in a signal corresponding to a first finger" ('352) | "identify a first peak value in a finger profile obtained from scanning the touch sensor" | '352 patent, Figs. 3 and 4 and column 6, lines 26-47; column 5, line 50; column 4, lines 55-59; column 8, line 64 through column 9, line 12; column 12, lines 22-23 |
| 17. "scanning the touch sensor to . . . identify a minima following the first | "identify the lowest value in the finger profile that occurs after the first peak value, and before another peak value is identified" | '352 patent, Figs. 3 and 4 and column 6, lines 26-47; column 5, line 50; ; column 4, lines 55-59; column 8, line 64 through column 9, line 12; column 12, lines 22-23 |

**Exhibit B**

## ELANTECH'S PROPOSED CONSTRUCTION
## AND EVIDENTIARY SUPPORT

| maxima" ('352t) | | |
|---|---|---|
| 18. "scanning the touch sensor to . . . identify a second maxima in a signal corresponding to a second finger following said minima" ('352) | "after identifying the lowest value in the finger profile, identify a second peak value in the finger profile" | '352 patent, Figs. 3 and 4 and column 6, lines 26-47; column 5, line 50; ; column 4, lines 55-59; column 8, line 64 through column 9, line 12; column 12, lines 22-23 |
| 19a: "providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima"<br><br>19b. "means for providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" | 19b. 35 U.S.C. § 112(6) claim element: microcontroller 60 | 19b. '352 patent, column 5, lines 48-55 |

7710763 v2 EAST

3

# Exhibit C

# EXHIBIT C: SYNAPTICS' IDENTIFICATION OF REFERENCES/EVIDENCE

| Claim Terms | INTRINSIC REFERENCES AND EXTRINSIC EVIDENCE[*] |
|---|---|
| 1. "tap gesture" ('931/'591) | **Intrinsic Evidence**<br>**'591 Patent,** 30:24-27 ("Touch sensor pointing devices can offer "gestures," which are special finger motions that simulate mouse button actions without the need for physical switches."), 31:32-35 ("The basic "tap" gesture is a quick tap of the finger on the pad. Such a tap, of short duration and involving little or no X or Y finger motion during the tap, is presented to the host as a brief click of the mouse button."), 34:12-22 at SYN 00044415-4417 (double tap is two taps); Fig. 15A at SYN 00004387; U.S. Pat. App. 08/320158 March 27, 1996 Amendment After Final Rejection Pursuant to 37 C.F.R. §1.116, at SYN 00000881 ("It is intended that these labels for the gestures are also an expression of the intention of the inventors to be their own lexicographers to define particular gestures and their equivalents."); Abstract ("Tapping, pushing, hopping, and zigzag gestures are recognized by analyzing the position, pressure, and movement of the conductive object on the sensor pad during the time of a suspected gesture, and signals are sent to a host indicating the occurrence of these gestures."); *see also* 6:36-29; 11:15-20<br>**'931 Patent,** 33:23-26 ("Touch sensor pointing devices can offer "gestures," which are special finger motions that simulate mouse button actions without the need for physical switches."), 34:31-34 at SYN 00004557 ("The basic "tap" gesture is a quick tap of the finger on the pad. Such a tap, of short duration and involving little or no X or Y finger motion during the tap, is presented to the host as a brief click of the mouse button."); Fig. 15A at SYN 00004526; U.S. Pat. App. 08/320158, U.S. Pat. App. 08/320158, March 27, 1996 Amendment After Final Rejection Pursuant to 37 C.F.R. §1.116, at SYN 00000881 ("It is intended that these labels for the gestures are also an expression of the intention of the inventors to be their own lexicographers to define particular gestures and their equivalents."); Abstract ("Tapping, pushing, hopping, and zigzag gestures are recognized by analyzing the position, pressure, and movement of the conductive object on the sensor pad during the time of a suspected gesture, and signals are sent to a host indicating the occurrence of these gestures."); *see also*  6:45-48; 11:37-41.<br><br>**Extrinsic Evidence**<br>Rebuttal Opinions of Dr. Andrew Wolfe |
| 2. "X and Y position information" ('931/'591) | **Intrinsic Evidence**<br>**'591 Patent,** 21:40-43 at SYN 00004411 ("Current mouse standards update position information 40 times per second, and thus the apparatus of the present invention may easily be operated at this repetition rate."  And "mouse standard" is relative motion packets.); 27:5-30 at SYN 00004414 (describes host computer as receiving "?X" and "?Y" after information "translated in the standard fashion into motion events"); 29:10-11 ("Finally, the resultant packet (?X=dX+eX, ?Y=dY+eY) is transmitted to the host computer."), 30:36-37 (same); Fig. 1 at SYN 00004375 (output of "Motion Unit" is "?X" and "?Y" and Figure 1 is described as "an overall block diagram of the capacitive position sensing system of the present invention" (7:10-11; 8:58-60), and claim 6 recites "a touch-sensor pad in a touch-sensing system."); all claims' preambles and claim 9 body and 29:10-11 and Fig. 1.  *See also* 2:15-18; 5:41-44; 21:40-43; 26:27-30 at SYN 00004401, 4403, 4411 and 4413.<br>**'931 Patent,** 22:8-11 at SYN 00004551 ("Current mouse standards update position information 40 times per second, and thus the apparatus of the present invention may easily be operated at this repetition rate."  And "mouse standard" is relative motion packets.); 27:36-60 at SYN 00004554 (describes host computer as receiving "?X" and "?Y" after information "translated in the standard fashion into motion events"); 31:55-56 ("Finally, the resultant packet (?X=dX+eX, ?Y=dY+eY) is transmitted to the host computer."); 33:34-36 (same); Fig. 1 at SYN 00004513 (output of "Motion Unit" is "?X" and "?Y" and Figure 1 is described as "an overall block diagram of the capacitive position sensing system of the present invention" (7:25-26; 9:12-14), and claims 1 and 5 recites "a touch-sensor pad in a touch-sensing system."; claim 9 of the '591 Patent and 31:55-56 and Fig. 1; all claims of the '931. *See also* 2:18-21; 5:50-53, 22:8-11, 26:58-61 at SYN 00004541, 4543, 4551 and 4553.<br><br>**Extrinsic Evidence:**<br>PS/2 Mouse Protocol (SYN 00103389-3410); Rebuttal Opinions of Dr. Andrew Wolfe |

# EXHIBIT C: SYNAPTICS' IDENTIFICATION OF REFERENCES/EVIDENCE

| | |
|---|---|
| 3. "initiating a first signal to the host indicating the occurrence of said gesture" ('591) | **Intrinsic Evidence**<br>**'591 Patent,** 9:10-16 ("host") at SYN 00004405; 31:24-32:64, 34:12-22 (double tap) at SYN 00004416-4417; Fig. 15D at SYN 00004438; 42:38 at SYN 00004421; 35:23-32 at SYN 00004418; 37:6-9 at SYN 00004419 ("In an alternate approach, one or more extra packets indicating a release of the virtual buttons can be inserted into the regular packet stream, rather than using a suppress flag as shown herein.")<br><br>**Extrinsic Evidence**<br>The New Shorter Oxford English Dictionary (1993), at SYN 00103319 ("initiate" means "Begin, introduce, set going, originate"); The IEEE Standard Dictionary of Electrical and Electronics Terms (1996), at SYN 00103299 ( "signal" (computers) means "The event or phenomenon that conveys data from one point to another"); Rebuttal Opinions of Dr. Andrew Wolfe. |
| 4. "terminating said first signal" ('591) | **Intrinsic Evidence**<br>**'591 Patent,** 31:24-32:64, 34:12-22 at SYN 00004416-4417; Fig. 15D at SYN 00004388; 42:38 at SYN 00004421; 35:23-32 at SYN 00004418; 37:6-9 at SYN 00004419 ("In an alternate approach, one or more extra packets indicating a release of the virtual buttons can be inserted into the regular packet stream, rather than using a suppress flag as shown herein.").<br><br>**Extrinsic Evidence**<br>The New Shorter Oxford English Dictionary (1993), at SYN 00103328 ("terminate" means (3) ("Bring to an end, put an end to, cause to cease; finish, end"); The IEEE Standard Dictionary of Electrical and Electronics Terms (1996), at SYN 00103299 ( "signal" (computers) means "The event or phenomenon that conveys data from one point to another"); PS/2 Mouse Protocol (SYN 00103389-3410); Rebuttal Opinions of Dr. Andrew Wolfe. |
| 5. "sending a second signal to said host indicating said second gesture" ('591) | **Intrinsic Evidence**<br>**'591 Patent,** 9:10-16 ("host") at SYN 00004405; 31:24-32:64, 34:12-22 (double tap) at SYN 00004416-4417; Fig. 15D at SYN 00004388; 42:38 at SYN 00004421; 35:23-32 at SYN 00004418; 37:6-9 at SYN 00004419 ("In an alternate approach, one or more extra packets indicating a release of the virtual buttons can be inserted into the regular packet stream, rather than using a suppress flag as shown herein.").<br><br>**Extrinsic Evidence**<br>IEEE Standard Dictionary of Electrical and Electronics Terms (1996), at SYN 00103299 ( "signal" (computers) means "The event or phenol-menon that conveys data from one point to another"); PS/2 Mouse Protocol (SYN 00103389-3410); Rebuttal Opinions of Dr. Andrew Wolfe. |
| 6. "initiating a drag gesture signal to the host indicating the occurrence of a gesture" ('591) | **Intrinsic Evidence**<br>**'591 Patent,** 9:10-16 ("host") at SYN 00004405, 32:65-34:11, 35:58-36:39 at SYN 00004416-4418; Fig. 15B at SYN 00004387; 42:38 at SYN 00004421; 35:23-32 at SYN 00004418; 37:6-9 at SYN 00004419 ("In an alternate approach, one or more extra packets indicating a release of the virtual buttons can be inserted into the regular packet stream, rather than using a suppress flag as shown herein.").<br><br>**Extrinsic Evidence**<br>The New Shorter Oxford English Dictionary (1993), at SYN 00103319 ("initiate" means "Begin, introduce, set going, originate"); The IEEE Standard Dictionary of Electrical and Electronics Terms (1996), at SYN00103299 ("signal" (computers) means "The event or phenomenon that conveys data from one point to another"); PS/2 Mouse Protocol (SYN 00103389-3410); Rebuttal Opinions of Dr. Andrew Wolfe. |
| 7. "maintaining said drag gesture signal" ('591) | **Intrinsic Evidence**<br>**'591 Patent,** 32:65-34:11 and 33:1-3 at SYN00004417, 35:58-36:39 at SYN 00004418, 37:6-9 at SYN00004419, 39:13-23 at SYN0004420; Fig. 15B at SYN 00004387; 42:38 at SYN 00004421; 35:23-32 at SYN 00004418; 37:6-9 at SYN 00004419 ("one or more extra packets |

# EXHIBIT C: SYNAPTICS' IDENTIFICATION OF REFERENCES/EVIDENCE

| | |
|---|---|
| | indicating a release of the virtual buttons can be inserted into the regular packet stream, rather than using a suppress flag as shown herein."). <br> Extrinsic Evidence <br> The New Shorter Oxford English Dictionary (1993), at SYN 00103320 ("maintain" means "2a Carry on or prosecute . . . b Go on with, continue, persevere in . . . c Preserve or retain. . . ."); The IEEE Standard Dictionary of Electrical and Electronics Terms (1996), at SYN00103299 ("signal" (computers) means "The event or phenomenon that conveys data from one point to another"); PS/2 Mouse Protocol (SYN 00103389-3410); Rebuttal Opinions of Dr. Andrew Wolfe. |
| 8. "repeatedly sending X and Y position information to said host for the duration of said second presence" ('591) | Intrinsic Evidence <br> '591 Patent, 9:10-16 ("host") at SYN 00004405; 21:40-43, 27:5-30, 29:10-11, 30:36-37, 31:32-42, 32:65-34:11, 35:58-36:39 at SYN 00004411, 00004414-4418; Figs. 1 and 15B at SYN 00004375 and 00004387. *See also* 27:5-30 at SYN 00004414, 29:10-11 and 30:36-37 at SYN 00004415; 32:65-34:11, 35:58-36:39, 39:13-23 at SYN 00004420, 44:23-56 at SYN 00004422; 21:40-43 at SYN 00004411 ("Current mouse standards update position information 40 times per second, and thus the apparatus of the present invention may easily be operated at this repetition rate." And "mouse standard" is relative motion packets.); 27:5-30 at SYN 00004414 (describes host computer as receiving "?X" and "?Y" after information "translated in the standard fashion into motion events"); 29:10-11 ("Finally, the resultant packet (?X=dX+eX, ?Y=dY+eY) is transmitted to the host computer."), 30:36-37 (same); Fig. 1 at SYN 00004375 (output of "Motion Unit" is "?X" and "?Y" and Figure 1 is described as "an overall block diagram of the capacitive position sensing system of the present invention" (7:10-11; 8:58-60), and claim 6 recites "a touch-sensor pad in a touch-sensing system."); all claims' preambles and claim 9 body and 29:10-11 and Fig. 1. *See also* 2:15-18; 5:41-44; 21:40-43; 26:27-30 at SYN 00004401, 4403, 4411 and 4413. <br><br> Extrinsic Evidence <br> The New Shorter Oxford English Dictionary (1993), at SYN 00103317 ("The continuance or length of time; the time during which anything continues."); PS/2 Mouse Protocol (SYN 00103389-3410); Rebuttal Opinions of Dr. Andrew Wolfe. |
| 9. "initiating a signal to the host indicating the occurrence of said tap gesture" ('931) | Intrinsic Evidence <br> '931 Patent, 9:31-38 ("host") at SYN 00004545, 33:20-31, 34:31-41 at SYN 00004557; Fig. 15A at SYN 00004526;. 49:3-7 at SYN 00004565; 40:47-57 at SYN 00004560;43:12-21 at SYN 00004562 ("In an alternate approach, one or more extra packets indicating a release of the virtual buttons can be inserted into the regular packet stream, rather than using a suppress flag as shown herein."). <br><br> Extrinsic Evidence <br> The New Shorter Oxford English Dictionary (1993), at SYN 00103319 ("initiate" means "Begin, introduce, set going, originate"); The IEEE Standard Dictionary of Electrical and Electronics Terms (1996), at SYN 00103299 ( "signal" (computers) means "The event or phenomenon that conveys data from one point to another"); PS/2 Mouse Protocol (SYN 00103389-3410); Rebuttal Opinions of Dr. Andrew Wolfe. |
| 10. "maintaining said signal for a predetermined period of time" ('931) | Intrinsic Evidence <br> '931 Patent, 34:31-41 at SYN 00004557; Fig. 15A at SYN 00004526; 49:3-7 at SYN 00004565; 40:47-57 at SYN 00004560;43:12-21 at SYN 00004562 ("In an alternate approach, one or more extra packets indicating a release of the virtual buttons can be inserted into the regular packet stream, rather than using a suppress flag as shown herein."). <br><br> Extrinsic Evidence <br> The New Shorter Oxford English Dictionary (1993), at SYN 00103320 ("maintain" means "2a Carry on or prosecute . . . b Go on with, continue, persevere in . . . c Preserve or retain. . . ."); The New Shorter Oxford English Dictionary (1993), at SYN 00103326 ("predetermine" means "3 Determine or resolve beforehand or previously") ; The IEEE Standard Dictionary of Electrical and Electronics Terms (1996), at SYN 00103299 ( "signal" (computers) means "The event or phenomenon that conveys data from one point to another"); PS/2 Mouse Protocol (SYN |

# EXHIBIT C: SYNAPTICS' IDENTIFICATION OF REFERENCES/EVIDENCE

|  | 00103389-3410); Rebuttal Opinions of Dr. Andrew Wolfe. |
|---|---|
| 11. "detecting in which of at least one corner of the touch-sensor pad said tap gesture occurred" ('931) | Intrinsic Evidence<br>**'931 Patent**, 40:15-46, 44:13-33 at SYN 00004560 and 00004562; Figs. 16b and 17c at SYN 00004529 and 00004532.<br><br>Extrinsic Evidence<br>The New Shorter Oxford English Dictionary (1993), at SYN 00103329 ("which" means "Used in asking the identity of a choice made from a definite (stated or implied) set of alternatives") ; PS/2 Mouse Protocol (SYN 00103389-3410); Rebuttal Opinions of Dr. Andrew Wolfe. |
| 12. "data packet processor" ('052) | Intrinsic Evidence<br>**'052 Patent**, Abstract, 2:53-55 at SYN 00004503; 3:14-17 at SYN 00004504, Fig. 2 at SYN 00004500.<br><br>Extrinsic Evidence<br>The Illustrated Dictionary of Microcomputers (1990), at SYN 00103304 ("processor" means "A hardware data processor or a program that performs the functions of compiling, assembling, and translating for a specific language.  Processor operations can involve registers, accumulators, program counters and stacks, input/output control, and internal instruction control."); Rebuttal Opinions of Dr. Andrew Wolfe |
| 13. "incrementally move" ('411) | Intrinsic Evidence<br>**'411 Patent**, 29:1-9, 29:18-52, 30:37-50, 31:9-38, 34:8-51 at SYN 00004475-77; Figs. 12-13 at SYN00004443-45; Claims 7, 10, 12, 15, 22, 32, 44, and 56.<br><br>Extrinsic Evidence<br>The New Shorter Oxford English Dictionary (1993), at SYN 00103318 ("incremental" means "Of or pertaining to an increment or increments; advancing by increments" and "increments" means "The action or process of (esp. gradually) increasing or becoming greater; an increase, a growth, esp. a uniform or regular one."); Rebuttal Opinions of Dr. Andrew Wolfe |
| 14. "operative coupling" ('352) | Intrinsic Evidence<br>**'352 Patent**, 1:32-39, 2:48-52 at ETD0000295; 5:6-10, 5:56-6:1, 6:14-18, 6:26-38, 6:42-45, 7:54-56 at ETD0000297-298; 11:16-19, 12:14-17, 12:42-45 at ETD0000300; 15:34-37, 15:51-54 at ETD0000302; Figs. 1-4, 7A-7F at ETD0000278-280, 0000284-290. April 18, 1997 Office Action at ETD0000348 ("Claims 1-6, 14, 18 and 20-23 are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.  In regards to claims 1-6 they are incomplete for omitting essential steps, such omission amounting to a gap between the steps.  See MPEP § 2173.05(1).  The omitted steps are: the applicant does not clearly state that there is a cooperative relationship between the fingers being put on the touch sensor and a scan of the touch sensor produces a maxima and minima.  As it stands now it is not clear what causes the maxima and minima to be produced and what the maxima and minima are."); August 18, 1997 Amendment at ETD0000366 ("Claims 1-6 were indicated as incomplete for omitting to indicate the cooperative relationship with the fingers to produce the maxima and minima.  Claim 1 has been amended to address this, and is now believed to be allowable."  [Added scanning the touch sensor to identify a first maxima in a signal corresponding to a first finger, scanning the touch sensor to identify a minima following the first maxima, and scanning the touch sensor to identify a second maxima in a signal corresponding to a second finger following the minima.])<br>Extrinsic Evidence<br>Opinions and Rebuttal Opinions of Dr. Andrew Wolfe; The New Shorter Oxford English Dictionary (1993), at SYN 00103325 ("operative" means "Being in operation or force; exerting force or influence."); McGraw-Hill Dictionary of Scientific and Technical Terms (3rd Ed. 1984), at SYN 00103310 ("coupling" means "A mutual relation between two circuits that permits energy transfer from one to another, through a wire, resistor, transformer, capacitor, or other device."); Modern Dictionary of Electronics (1984), at SYN 00103313 ("coupling" means "The |

4

# EXHIBIT C: SYNAPTICS' IDENTIFICATION OF REFERENCES/EVIDENCE

| | association or mutual relationship of two or more circuits or systems in such a way that power may be transferred from one to another."). |
|---|---|
| 15. "[means for] scanning the touch sensor/means for scanning the touch sensor to" ('352) | **Intrinsic Evidence**<br>**'352 Patent**, 5:20-61, 6:14-26 at ETD0000297; Fig. 2 at ETD0000279.<br><br>**Extrinsic Evidence**<br>Opinions and Rebuttal Opinions of Dr. Andrew Wolfe; The Illustrated Dictionary of Microcomputers (1990), at SYN 00103305 ("To examine sequentially using a part-by-part technique.")<br><br>Corresponding "Means" Structures<br>Fig. 2 (items 45, 70, 80 and 60) at ETD0000279 and described at column 5, line 20 through column 6, line 8, and column 7, lines 1 through 6 at ETD0000297-298; Opinions and Rebuttal Opinions of Dr. Andrew Wolfe. |
| 16. "scanning the touch sensor to . . . identify a first maxima in a signal corresponding to a first finger" ('352) | **Intrinsic Evidence**<br>**'352 Patent**, 6:28-47 at ETD0000297; 9:39-60 at ETD0000299; Figs. 3-5, 6 and 9 at ETD0000280, 282-83; April 18, 1997 Office Action at ETD0000348 ("Claims 1-6, 14, 18 and 20-23 are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention. In regards to claims 1-6 they are incomplete for omitting essential steps, such omission amounting to a gap between the steps. See MPEP § 2173.05(1). The omitted steps are: the applicant does not clearly state that there is a cooperative relationship between the fingers being put on the touch sensor and a scan of the touch sensor produces a maxima and minima. As it stands now it is not clear what causes the maxima and minima to be produced and what the maxima and minima are."); August 18, 1997 Amendment at ETD0000366 ("Claims 1-6 were indicated as incomplete for omitting to indicate the cooperative relationship with the fingers to produce the maxima and minima. Claim 1 has been amended to address this, and is now believed to be allowable." [Added scanning the touch sensor to identify a first maxima in a signal corresponding to a first finger, scanning the touch sensor to identify a minima following the first maxima, and scanning the touch sensor to identify a second maxima in a signal corresponding to a second finger following the minima.])<br><br>**Extrinsic Evidence**<br>Opinions and Rebuttal Opinions of Dr. Andrew Wolfe; The New Shorter Oxford English Dictionary (1993), at SYN 00103321 ("maximum" means "3 Math. The greatest value which a variable may have; the largest element in a set; a point at which a continuously varying quantity ceases to increase and begins to decrease.") |
| 17. "scanning the touch sensor to . . . identify a minima following the first maxima" ('352t) | **Intrinsic Evidence**<br>**'352 Patent**, Abstract at ETD0000277; 5:65-6:13, 6:28-47, 6:59-68, 8:62-65, 9:51-10:8, 10:46-65, 10:66-11:5, 11:45-55 at ETD0000297-300; Figs. 3-5, 6 and 9 at ETD0000280, 282-83; April 18, 1997 Office Action at ETD0000348 ("Claims 1-6, 14, 18 and 20-23 are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention. In regards to claims 1-6 they are incomplete for omitting essential steps, such omission amounting to a gap between the steps. See MPEP § 2173.05(1). The omitted steps are: the applicant does not clearly state that there is a cooperative relationship between the fingers being put on the touch sensor and a scan of the touch sensor produces a maxima and minima. As it stands now it is not clear what causes the maxima and minima to be produced and what the maxima and minima are."); August 18, 1997 Amendment at ETD0000366 ("Claims 1-6 were indicated as incomplete for omitting to indicate the cooperative relationship with the fingers to produce the maxima and minima. Claim 1 has been amended to address this, and is now believed to be allowable." [Added scanning the touch sensor to identify a first maxima in a signal corresponding to a first finger, scanning the touch sensor to identify a minima following the first maxima, and scanning the touch sensor to identify a second maxima in a signal corresponding to a second finger following the minima.]) |

# EXHIBIT C: SYNAPTICS' IDENTIFICATION OF REFERENCES/EVIDENCE

| | |
|---|---|
| | Extrinsic Evidence<br>Opinions and Rebuttal Opinions of Dr. Andrew Wolfe; The New Shorter Oxford English Dictionary (1993), at SYN 00103322 ("minimum" means "3 Math. The least value which variable or a function may have; the smallest element in a set; a point at which a continuously varying quantity ceases to decrease and begins to increase; the value of a quantity at such a point.") |
| 18. "scanning the touch sensor to . . . identify a second maxima in a signal corresponding to a second finger following said minima" ('352) | Intrinsic Evidence<br>'352 Patent, Abstract at ETD0000277; 6:28-47 at ETD0000297, Figs. 3-4 at ETD0000280; April 18, 1997 Office Action at ETD0000348 ("Claims 1-6, 14, 18 and 20-23 are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.  In regards to claims 1-6 they are incomplete for omitting essential steps, such omission amounting to a gap between the steps.  See MPEP § 2173.05(1).  The omitted steps are:  the applicant does not clearly state that there is a cooperative relationship between the fingers being put on the touch sensor and a scan of the touch sensor produces a maxima and minima.  As it stands now it is not clear what causes the maxima and minima to be produced and what the maxima and minima are."); August 18, 1997 Amendment at ETD0000366 ("Claims 1-6 were indicated as incomplete for omitting to indicate the cooperative relationship with the fingers to produce the maxima and minima.  Claim 1 has been amended to address this, and is now believed to be allowable."  [Added scanning the touch sensor to identify a first maxima in a signal corresponding to a first finger, scanning the touch sensor to identify a minima following the first maxima, and scanning the touch sensor to identify a second maxima in a signal corresponding to a second finger following the minima.])<br><br>Extrinsic Evidence<br>Opinions and Rebuttal Opinions of Dr. Andrew Wolfe; The New Shorter Oxford English Dictionary (1993), at SYN 00103321 ("maximum" means "3 Math. The greatest value which a variable may have; the largest element in a set; a point at which a continuously varying quantity ceases to increase and begins to decrease.") |
| 19. "[means for] providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" ('352) | Corresponding "Means" Structures<br>None<br><br>Extrinsic Evidence<br>Opinions and Rebuttal Opinions of Dr. Andrew Wolfe. |

---

* The references and evidence cited below for each claim term may be used in connection with other related claim terms and will not be reiterated in each of the separate claim terms to which it may be relevant. For example, the term "signal" is used in many claim limitations beginning with Claim Term 3.  Synaptics will not necessarily repeat the references and evidence for such repeated or interrelated terms but, instead, hereby incorporates the references and evidence into each subsequent claim term.

# Exhibit D

1   KARL J. KRAMER (CA SBN 136433)
    ELLEN S. REINSTEIN (CA SBN 227833)
2   ERIKA L. LABIT (CA SBN 234919)
    MORRISON & FOERSTER LLP
3   755 Page Mill Road
    Palo Alto, California  94304-1018
4   Telephone: (650) 813-5600
    Facsimile: (650) 494-0792
5   kkramer@mofo.com

6   Attorneys for Defendant
    SYNAPTICS, INC.
7

8                   UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                    SAN FRANCISCO DIVISION

11

12  ELANTECH DEVICES CORPORATION, a          Case No.   C06-01839 CRB
    corporation existing under the laws of Taiwan,
13  R.O.C.,                                   **EXPERT REPORT OF ANDREW
                                              WOLFE Ph.D. CONCERNING
14                  Plaintiff,                CLAIM CONSTRUCTION**

15          v.

16  SYNAPTICS, INC., a Delaware corporation;
    AVERATEC, INC., a California corporation; and
17  PROSTAR COMPUTER, INC., a California
    corporation,
18
                    Defendants.
19

20  AND RELATED COUNTERCLAIMS.

21

22

23

24

25

26

27

28

# I.   BACKGROUND AND QUALIFICATIONS.

## A.   EDUCATION AND PROFESSIONAL EXPERIENCE.

1.     I received a B.S.E.E. degree in Electrical Engineering and Computer Science from The Johns Hopkins University in 1985, an M.S. degree in Electrical and Computer Engineering from Carnegie Mellon University in 1987, and a Ph.D degree in Computer Engineering from Carnegie Mellon University in 1992.  I was a visiting Assistant Professor at Carnegie Mellon University in 1992 and an Assistant Professor in the Electrical Engineering Department of Princeton University from 1991 to 1997.  From 1999 to 2002 I served as a Consulting Professor at Stanford University, where I taught courses in computer architecture and microprocessor design.  Attached to this Report as Exhibit 1 is a true and correct copy of my curriculum vitae.

2.     I have been an active participant in the development of touch sensor technologies for over 20 years.  From 1983 to 1985, I was a Senior Design Engineer at Touch Technology, Inc. in Annapolis, Maryland.  In 1986 and 1987, I was a contractor at Carroll Touch Division, AMP Inc., in Round Rock, Texas, where I designed technologies for touch-screen systems.  In 1989, I founded and developed technologies for The Graphics Technology Company, Inc., which developed touch-sensitive components and systems for PDA ("personal digital assistant") and other interactive systems.  I worked at The Graphics Technology Company, Inc. on touch-sensor technology development from 1989 through 1995.  From 1997 through 2002, I served in varying capacities, including Director of Technology and Chief Technical Officer, for SONICblue, Inc., a leading networked consumer electronics company.  I also co-founded and served as Chief Technical Officer for RGB Inc., where in 2003 I developed architectural specifications for programmable video signal processors and other devices.  Since 2002 I have also consulted for a number of companies on a range of technology development, investment, and intellectual property matters.

3.     I am a named inventor on numerous patents relating to electrical and computer engineering.  In particular, I am the named inventor on at least four patents relevant to touch-

1   sensitive interfacing devices such as those at issue in this litigation: U.S. Pat. Nos. 5,041,701;

2   5,438,168; 5,736,688; and 6,037,930.

3       4.      I have an intimate knowledge of the state of touchpad technology development

4   during the 1990's and can accurately reflect the state of that development from my own work

5   experience.  I have specific experience in the design of touch-sensor systems.  I have supervised

6   other engineers in the development of touch-sensor systems.  I have studied and am familiar with

7   the circuit and software design concepts utilized in the inventions claimed in the U.S. Patent No.

8   5,825,352, (the "'352 Patent") (attached as Exhibit 4 hereto), which Elantech Devices

9   Corporation ("Elantech") is asserted in this litigation.

10      5.      A list of publications that I have authored within the preceding ten years is

11  attached as Exhibit 2.  A listing of any other cases in which I have testified as an expert at trial or

12  by deposition within the preceding four years is attached as Exhibit 3.

13      6.      With a broad knowledge of touchpad technology, with a solid grounding in

14  pertinent circuit and software design, with a historical perspective based on active personal

15  participation, and with experience with the patent process, I believe that I am qualified to provide

16  an accurate assessment of the technical issues in this case.

17      **B.      Summary Of Task.**

18      7.      I was asked to review materials and provide technical teaching and opinions

19  regarding the patents that the parties are asserting in this case.  In this Report, I present an

20  explanation of the historical and technical background for the technology at issue in this case,

21  including an explanation of the state of the relevant art in 1994-97 (the time that the original

22  patent applications leading to the patents-in-suit were first filed).  Also included in this Report is

23  an explanation concerning the technical concepts and terms relevant to the interpretation of some

24  of the claim limitations at issue.  The documents that I reviewed and relied upon for my opinions

25  are typically referenced expressly below.  I also understand that Elantech Devices, Inc.

26  ("Elantech") may present its interpretation of some of the disputed claim terms at issue at the

27  same time that this report is served.  If necessary, I may present rebuttal opinions to such

28

1    proposed interpretations at a later date.  I reserve the right to modify or supplement the

2    explanations and evidence presented in this report accordingly.

3    **C.      Compensation.**

4          8.      Regardless of the content of my opinions or the outcome of the case, I am being

5    compensated at my ordinary rate of $350 an hour for my time devoted to participating as an

6    expert in this case.

7    **II.     OPINIONS TO BE EXPRESSED.**

8          9.      The patents at issue in this case are directed to the use of touch-sensor devices to

9    interpret and convey information relating to gestures performed on touch-sensor devices.  In this

10   report I will address the interpretation of certain terms used in the claims of the '352 Patent.  The

11   '352 Patent claims an apparatus and method "for detecting the operative coupling of multiple

12   fingers" on a "touch sensor."

13         10.     In the mid-1990's, the people who were developing technology for use in touch

14   sensor devices would have had at least a B.S.E.E. and three or so years of practical experience.

15   Of course, the higher the educational training, the less practical experience one would need.  For

16   example, an engineer with a master's degree would need probably only a year or two of

17   experience in the area to be able to tackle the design of such circuitry.

18         11.     In explaining how one of ordinary skill in the art would interpret the words in the

19   claims of the patents-in-suit, I understand that I am to focus on the teachings in the patent itself

20   and on the correspondence recorded in the prosecution of the patents.  I also understand that I am

21   to explain how one of ordinary skill in the art would understand the claim terms in January 1996,

22   roughly the time of the "inventions" claimed in the '352 Patent.  In my analysis I will also present

23   excerpts from dictionaries, both scientific and non-scientific, and statements in the relevant

24   literature with respect to the terms and concepts that are claimed.  In using this type of reference

25   that is not directly tied to the patent, I will only refer to information that is consistent with the

26   teachings and definitions used by the inventors in the patent at issue.  I understand that I am not to

27   impose my own interpretation of the words or to present evidence of the meaning of terms that

28   contradicts or varies the meanings as used in the patents.  I understand that a key issue in

1   determining the meaning of the claims is how certain terms were used and understood by skilled

2   artisans in or about 1996.

### B.   '352 Patent Claim Terms To Be Construed.

12.   I understand that the asserted claims of the '352 Patent are claims 1 and 18

(Exhibit 4 at ETD0000302-03).  The claims are set out in full below:

> 1. A method for detecting the operative coupling of multiple
> fingers to a touch sensor involving the steps of

> scanning the touch sensor to (a) identify a first maxima in a signal
> corresponding to a first finger, (b) identify a minima following the
> first maxima, (c) identify a second maxima in a signal
> corresponding to a second finger following said minima, and

> providing an indication of the simultaneous presence of two
> fingers in response to identification of said first and second
> maxima.

* * * *

> 18. A touch sensor for detecting the operative coupling of multiple
> fingers comprising:

> means for scanning the touch sensor to (a) identify a first maxima
> in a signal corresponding to a first finger, (b) identify a minima
> following the first maxima, and (c) identify a second maxima in a
> signal corresponding to a second finger following said minima, and

> means for providing an indication of the simultaneous presence of
> two fingers in response to identification of said first and second
> maxima.

### 1.   "Operative Coupling"

13.   The term "operative coupling" is used in the preamble of claims 1 and 18 of the

'352 Patent.  After reviewing the claims and specification of the '352 Patent, I conclude that the

preambles of the claims at issue constitute limitations to the claims because they are necessary to

give meaning to key terms in the body of the claims.  There are two main factors that lead me to

this conclusion.

14.   First, the body of each of claims 1 and 18 refers to "the touch sensor."  There is no

antecedent basis for "the touch sensor" in the body of the claims.  Rather, the antecedent basis,

and the first instance in which "touch sensor" is introduced in the claims is in the preamble,

which recites "a touch sensor."  The phrase "the touch sensor" in the body of the claims

1   necessarily refers back to the recitation of "a touch sensor" in the preamble. Because the body of

2   the claims relies upon this recitation in the preamble, I conclude that the preambles were

3   obviously intended to be and are properly understood to be limitations of the claims.

4        15.     Second, it is my opinion that one of ordinary skill in the art would conclude that

5   the claims do not have meaning without the recitation of "operative coupling" in the preambles to

6   the claims. The body of each of the claims at issue recites a requirement of a "maxima" in a

7   signal that represents some unstated measured property "corresponding to a first finger;" "a

8   minima" of some unstated entity which one might reasonably assume is the same signal that

9   represents some unstated measured property "following the first maxima;" and "a second

10  maxima," again in a signal that represents some unstated measured property, "corresponding to a

11  second finger." The body of each of the asserted claims contains no description of the property

12  that is being measured to establish the recited signal and thus no hint as to where to find

13  "maxima" and "minima" values. Although the preamble recitation of "operative coupling" is

14  extremely vague, it at least breathes some life and meaning into the claim term signal and thus

15  into the claim terms "maxima" and "minima." Put another way, the claim terms "signal",

16  "maxima", and "minima" would lack any definite meaning without the recitation of "operative

17  coupling" in the preamble of the claims.

18       16.     In the context of the claims read in light of the specification of the '352 Patent, the

19  claim term "operative coupling" would have meant to one of ordinary skill in the art in 1996, and

20  today, "finger-induced electrical effect" between the "touch sensor" and "multiple fingers." This

21  is how the phrase is used in the specification of the '352 Patent. ['352 Patent, 1:32-39, 2:48-52 at

22  ETD0000295; 5:6-10, 5:56-6:1, 6:14-18, 6:26-38, 6:42-45, 7:54-56 at ETD0000297-298; 11:16-

23  19, 12:14-17, 12:42-45 at ETD0000300; 15:34-37, 15:51-54 at ETD0000302; Figs. 1-4, 7A-7F at

24  ETD0000278-280, 0000284-290.]

25       17.     This understanding of "operative coupling" is also consistent with common

26  dictionary definitions of the terms "operative" and "coupling" in the context of the field of art in

27  which the claimed invention was developed. [Exhibit 5, The New Shorter Oxford English

28  Dictionary (1993), at SYN 00103325 ("operative" means "Being in operation or force; exerting

1    force or influence."); Exhibit 6, McGraw-Hill Dictionary of Scientific and Technical Terms (3rd

2    ed. 1984), at SYN 00103310 ("coupling" means "A mutual relation between two circuits that

3    permits energy transfer from one to another, through a wire, resistor, transformer, capacitor, or

4    other device."); Exhibit 7, Modern Dictionary of Electronics (6th ed. 1984), at SYN 00103313

5    ("coupling" means "The association or mutual relationship of two or more circuits or systems in

6    such a way that power may be transferred from one to another.").]

7                    **2.    "Scanning The Touch Sensor"**

8           18.    Both of the asserted claims of the '352 Patent require "scanning the touch sensor."

9    Claim 18 also requires that there is a "means" that performs a variety of functions in connection

10   with "scanning the touch sensor."  The phrase "scanning the touch sensor" would mean to one of

11   ordinary skill in the art at the relevant time and in the relevant field the process of "sequentially

12   measuring the traces in the touch sensor."  The specification expressly describes "scanning the

13   touch sensor" in these terms.  ['352 Patent, 5:20-61, 6:14-26 at ETD0000297; Fig. 2 at

14   ETD0000279.]  This reading is also consistent with common dictionary definitions of "scanning."

15   [Exhibit 8, The IEEE Standard Dictionary of Electrical and Electronics Terms (1996), at SYN

16   00103298 ("scanning" means "(6) The process of examining information in a systematic

17   manner."); Exhibit 9, The Illustrated Dictionary of Microcomputers (1990), at SYN 00103305

18   ("To examine sequentially using a part-by-part technique.")]

19          19.    The "means" term for this limitation in claim 18 is recited as performing a series

20   of functions, namely "for scanning the touch sensor to (a) identify a first maxima in a signal

21   corresponding to a first finger, (b) identify a minima following the first maxima, and (c) identify a

22   second maxima in a signal corresponding to a second finger following said minima."  It is my

23   understanding that this is a means plus function element, the scope of which would be determined

24   under USC 35 Section 112, Paragraph 6.  The corresponding structures that are disclosed in the

25   specification of the '352 Patent as performing the recited functions of this "means" limitation are

26   shown in Fig. 2 (items 30, 45, 70, 80 and 60) at ETD0000279 and described at column 5, line 20

27   through column 6, line 8, and column 7, lines 1 through 6 at ETD0000297-298.

28

3. **"Identify A First Maxima In A Signal Corresponding To A First Finger"**

20. In both claims 1 and 18 of the '352 Patent, the claims recite "scanning the touch sensor to (a) identify a first maxima in a signal corresponding to a first finger." This claim phrase means "measuring the trace values of the touch sensor corresponding to a first finger and determining the point at which the measured values cease to increase and begin to decrease." I have previously described the "scanning" aspect of this claim limitation but repeat it here to make clear what is being claimed.

21. The key term in understanding this claim phrase is the notion of a "maxima." In general, "maxima" is the plural of "maximum." The term "maximum" has two different meanings in general use, that of a local maximum and that of a global maximum. A local maximum is "a point at which a continuously varying quantity ceases to increase and begins to decrease." A global maximum is "The greatest value which a variable may have" or "the largest element in a set." In the context of this claim, "maxima" and "maximum" refer to a local maximum.

22. "Maximum" in the context of scanning a series of values as in this claim means "the point at which the measured values cease to increase and begin to decrease." [Exhibit 5, The New Shorter Oxford English Dictionary (1993), at SYN 00103321 ("maximum" means "3 Math. The greatest value which a variable may have; the largest element in a set; a point at which a continuously varying quantity ceases to increase and begins to decrease.").] This is exactly how "maxima" is identified in the operation of the invention as described in the specification. [Exhibit 4, '352 Patent, Figs. 3-5, 6 and 9, ETD0000280 and ETD0000282-83, and corresponding text; 9:39-60 ETD0000299.]

23. Note two other important things about the use of the term "maxima." First, the "maxima" must be a value that relates to "a signal corresponding to a first finger." This means that "maxima" does not refer to the highest value generally in the set of values measure throughout the touch sensor, but rather a local maximum associated with the subset of samples corresponding to a first finger. Second, the plural "maxima" is used rather than "maximum" implying that other local "maxima" values may be read at other points on the touch sensor.

1          **4.    "Identify A Minima Following The First Maxima"**

2         24.    In both claims 1 and 18 of the '352 Patent, the claims recite "scanning the touch

3 sensor to . . . (b) identify a minima following the first maxima. . . ." This claim phrase means

4 "measuring the trace values of the touch sensor following, in scan order, after the first maxima

5 and determining the point at which the measured values cease to decrease and begin to increase."

6 I have previously described the "scanning" aspect of this claim limitation but repeat it here to

7 make clear what is being claimed.

8         25.    The key term in understanding this claim phrase is the notion of a "minima." In

9 general, "minima" is the plural of "minimum." In the context of this claim, "minima" and

10 "minimum" refer to a local minimum. "Minimum" in the context of scanning a series of values as

11 in this claim means "the point at which the measured values cease to decrease and begin to

12 increase." [Exhibit 5, The New Shorter Oxford English Dictionary (1993), at SYN 00103322

13 ("minimum" means "3 Math. The least value which a variable or a function may have; the

14 smallest element in a set; a point at which a continuously varying quantity ceases to decrease and

15 begins to increase; the value of a quantity at such a point.").] This is exactly how "minima" is

16 identified in the operation of the invention as described in the specification. [Exhibit 4, '352

17 Patent, Figs. 3-5, 6 and 9, ETD0000280, and corresponding text; Abstract, ETD0000277; 5:65-

18 6:13, 6:28-47, 6:59-68, 8:62-65, 9:51-10:8, 10:46-65, 10:66-11:5, 11:45-55, ETD0000297-300.]

19         26.    Note two other important things about the use of the term "minima." First, the

20 "minima" must be a value that follows, in scan order, "a signal corresponding to a first finger."

21 This means that "minima" does not refer to the lowest value generally in the set of values

22 measure throughout the touch sensor, but rather a local minimum between the first finger signal

23 and the second finger signal. Second, the plural "minima" is used rather than "minimum,"

24 implying that other local "minima" values may be read at other points on the touch sensor.

25         **5.    "Identify A Second Maxima In A Signal Corresponding To A Second**

26                **Finger Following Said Minima"**

27         27.    In both claims 1 and 18 of the '352 Patent, the claims recite "scanning the touch

28 sensor to . . . (c) identify a second maxima in a signal corresponding to a second finger following

EXPERT REPORT OF ANDREW WOLFE PH.D CONCERNING CLAIM CONSTRUCTION         8
CASE NO. 3:06-CV-01839 CRB

1    said minima." This claim phrase means "measuring the trace values corresponding to a second

2    finger following, in scan order, said minima and determining the point at which the measured

3    values cease to decrease and begin to increase." I have previously described the "scanning"

4    aspect of this claim limitation but repeat it here to make clear what is being claimed.

5          28.     The key term in understanding this claim phrase is the notion of a "maxima." In

6    general, "maxima" is the plural of "maximum." The term "maximum" has two different

7    meanings in general use, that of a local maximum and that of a global maximum. A local

8    maximum is "a point at which a continuously varying quantity ceases to increase and begins to

9    decrease." A global maximum is "The greatest value which a variable may have" or "the largest

10    element in a set." In the context of this claim, "maxima" and "maximum" refer to a local

11    maximum.

12          29.     "Maximum" in the context of scanning a series of values as in this claim means

13    "the point at which the measured values cease to increase and begin to decrease." [Exhibit 5, The

14    New Shorter Oxford English Dictionary (1993), at SYN 00103321 ("maximum" means "3 Math.

15    The greatest value which a variable may have; the largest element in a set; a point at which a

16    continuously varying quantity ceases to increase and begins to decrease.").] This is exactly how

17    "maxima" is identified in the operation of the invention as described in the specification. [Exhibit

18    4, '352 Patent, Figs. 3-5, 6 and 9, ETD0000280 and ETD0000282-83, and corresponding text;

19    9:39-10:25, ETD0000299.]

20          30.     Note two other important things about the use of the term "maxima." First, the

21    "maxima" must be a value that relates to "a signal corresponding to a second finger." This means

22    that "maxima" does not refer to the highest value generally in the set of values measure

23    throughout the touch sensor, but rather a local maximum associated with the subset of samples

24    corresponding to a second finger. Second, the plural "maxima" is used rather than "maximum"

25    implying that other local "maxima" values may be read at other points on the touch sensor.

26

27

28

6. **"Providing An Indication Of The Simultaneous Presence Of Two Fingers In Response To Identification Of Said First And Second Maxima."**

31. Claims 1 and 18 both recite "providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima." Claim 18 recites this function as being performed by a "means" and thus requiring identification of the function performed and the corresponding structure under USC 35 Section 112, Paragraph 6. The function "providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" should be construed consistent with the constructions I set forth above and the ordinary meaning of the words in the claim. However, in reviewing the specification, I did not find any specific disclosure of a structure that is literally or inherently linked to the precise functions recited in the claims. I did see that "the simultaneous presence of two fingers in response to identification of said first and second maxima" is *determined* at item 980 in Figure 9-2. However, there is no disclosure of a precise structure that is used to "provide an indication" once that information has been determined. One of ordinary skill in the art today and in 1996 could not establish what would be identical or equivalent to an undisclosed structure. Therefore, I conclude that this limitation is indefinite.

32. I understand that I may be called upon to respond to any issues raised by the Elantech's expert or experts or the Court. I also understand that Elantech has not disclosed yet its proposed claim construction. I anticipate that I might supplement or modify the opinions in this report in view of any such new information or other new information that might arise between now and the time of the briefing and hearing on the claim construction issues.

Dated: November 20, 2006

Andrew Wolfe, Ph.D

KARL J. KRAMER (CA SBN 136433)
ELLEN S. REINSTEIN (CA SBN 227833)
ERIKA L. LABIT (CA SBN 234919)
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California  94304-1018
Telephone: (650) 813-5600
Facsimile: (650) 494-0792
kkramer@mofo.com

Attorneys for Defendant
SYNAPTICS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ELANTECH DEVICES CORPORATION, a corporation existing under the laws of Taiwan, R.O.C.,<br><br>               Plaintiff,<br><br>    v.<br><br>SYNAPTICS, INC., a Delaware corporation; AVERATEC, INC., a California corporation; and PROSTAR COMPUTER, INC., a California corporation,<br><br>               Defendants. | Case No.   C06-01839 CRB<br><br>**REBUTTAL EXPERT REPORT OF ANDREW WOLFE Ph.D. CONCERNING CLAIM CONSTRUCTION** |
| AND RELATED COUNTERCLAIMS. | |

## I.   BACKGROUND AND QUALIFICATIONS.

1.     My background and qualifications are set forth in my Expert Report dated November 20, 2006, paragraphs 1 through 6 and 8.  I hereby incorporate by reference the statements I made in my Expert Report of November 20, 2006.  I have studied and am familiar with the circuit and software design concepts utilized in the inventions claimed in the U.S. Patent No. 5,825,352, ("the '352 Patent"), apparently held by Elantech Devices Corporation ("Elantech"), and four patents owned by Synaptics, Inc. ("Synaptics"):  U.S. Patent

Nos. 5,543,591 ("the '591 patent"), 5,880,411 ("the '411 patent"), 5,943,052 ("the '052 patent"), and 6,380,931 ("the '931 patent").

2.      I have reviewed Plaintiff and Counterdefendant Elantech Devices Corp.'s Preliminary Claim Construction and Preliminary Identification of Extrinsic Evidence Pursuant to Patent L.R. 4-2, dated November 20, 2006 ("Elantech's Claim Construction"). I submit this Rebuttal Expert Report to rebut some of the assertions made in Elantech's Claim Construction. Obviously, my rebuttal may address only some of the problems in Elantech's Claim Construction and my silence as to other problems with Elantech's Claim Construction should not be interpreted as agreement with any such aspect of Elantech's Claim Construction. The other documents that I reviewed and relied upon for my opinions are typically referenced expressly below. I reserve the right to modify or supplement the explanations and evidence presented in this report accordingly.

## II.    OPINIONS TO BE EXPRESSED.

3.      The patents at issue in this case are directed to the use of touch-sensor devices to interpret and convey information relating to gestures performed on touch-sensor devices.

### 1.    "Tap Gesture"

4.      Elantech asserts that '591 and '931 Patent claim term "tap gesture" means "the act of an object applying more than a predetermined threshold of pressure for an amount of time that is less than a predetermined amount of time." In the context of these patents, I disagree.

5.      The authors of the '931 and '591 Patents expressly defined the phrase "tap gesture:" "The basic 'tap' gesture is a quick tap of the finger on the pad. Such a tap, of short duration and involving little or no X or Y finger motion during the tap, is presented to the host as a brief click of the mouse button." [Exhibit 10, '591 Patent, 31:32-35 at SYN 00004416; Exhibit 13, '931 Patent, 34:31-34 at SYN 00004557.] During prosecution, the inventors underscored that they had specially defined the term "tap gesture," in stating that "It is intended that these labels for the gestures are also an expression of the intention of the inventors to be their own lexicographers to define particular gestures and their equivalents." [Exhibit 14, U.S. Pat. App. 08/320158, March 27, 1996 Amendment After Final Rejection Pursuant to 37 C.F.R. §1.116, at SYN 00000881.]  The concepts of a "predetermined threshold of pressure" and a

1  "predetermined amount of time" are restrictions that are not present in the author's definitions.

2  Consequently, one of ordinary skill in the relevant art would understand "tap gesture" to mean "A

3  quick tap of the finger on the pad. Such a tap, of short duration and involving little or no X or Y

4  finger motion during the tap, is presented to the host as a brief click of the mouse button."

5      **2.   "Providing X and Y Position Information To A Host"**

6      6.    Elantech asserts that "X and Y position information" means "two-dimensional

7  location on a touch-sensor pad." In the context of these patents, I disagree.

8      7.    Elantech's asserted claim construction appears to limit the information being sent

9  to the host to the specific physical location of the finger on the touch sensor. In the art, this is

10 referred to as "absolute" position information; in other words, the specific current position of the

11 finger within the coordinate system of the touchpad. This would seem to exclude other forms of

12 X and Y position information such as "relative" X and Y position information, often abbreviated

13 as $\Delta X$ and $\Delta Y$, that describe the change in position, or motion, of the finger on the touch pad in

14 the X and Y dimensions. Elantech's narrow construction of "X and Y position information"

15 contradicts the express teachings of the '591 and '931 Patents.

16     8.    One express purpose of the invention is the use of the touch sensor device to

17 simulate or emulate a computer mouse or trackball. [Exhibit 10, '591 Patent, 2:15-18; 5:41-44;

18 21:40-43; 26:27-30 at SYN 00004401, 4403, 4411 and 4413; for example Exhibit 13, '931 Patent,

19 2:18-21, 5:50-53, 22:8-11, 26:58-61 at SYN 00004541, 4543, 4551 and 4553.] The objective of

20 a computer mouse or trackball is to communicate relative X and Y position information (motion)

21 and not the absolute X and Y position (coordinate position). One of ordinary skill at the time

22 would have understood "X and Y position information" to include the relative position

23 information generally communicated by a mouse or trackball.

24     9.    Although the ordinary meaning of "X and Y position information" might include

25 "absolute" position information, it is not limited to that. Indeed, in *all* of the examples and

26 descriptions in the '591 and '931 Patents, the information sent to the host is "relative" X and Y

27 position information. For example, in Figure 1 of both the '591 and '931 Patents, the output of

28 the "position sensing system of the present invention" (Exhibit 10, '591 Patent, 7:10-11; 8:58-60

1   at SYN 00004404; Exhibit 13, '931 Patent, 7:25-26; 9:12-14 at SYN 00004544-4545), is "ΔX"

2   and "ΔY," not absolute X and Y information.  The written description of the '591 and '931

3   Patents also expressly states that the X and Y position information sent to the host is "ΔX" and

4   "ΔY" information that has been "translated in the standard fashion into motion events."

5   [Exhibit 10, '591 Patent, 27:5-30 at SYN 00004414, 29:10-11, 30:36-37 at SYN 00004415;

6   Exhibit 13, '931 Patent, 27:36-60 at SYN 00004554; 31:55-56, 33:34-36 at SYN 00004556-

7   4557.]  This description is further supported by express statements that the information is sent

8   using current mouse standards.  [Exhibit 10, '591 Patent, 21:40-43 at SYN 00004411; Exhibit 13,

9   '931 Patent, 22:8-11 at SYN 00004551.]  In 1996, and today, the standard method of

10  communicating X and Y position information to a host is by transmitting data packets of "ΔX"

11  and "ΔY" information that reflects the relative change in X and Y position.  Elantech's asserted

12  claim construction is thus too narrow to encompass any of the disclosed embodiments.

13      10.     I conclude that Elantech's asserted claim construction is incorrect.  The ordinary

14  meaning of the phrase "X and Y position information" should apply and the proper interpretation

15  of "X and Y position information" should be "information about the horizontal and vertical

16  positioning of an object on a touch sensor."  This definition includes all types of "X and Y

17  position information," including "relative" *or* "absolute" "X and Y position information."

### 3.    "Initiating a First Signal to the Host Indicating the Occurrence of Said Gesture"

20      11.     Elantech asserts that this limitation of the '591 Patent means "outputting to the

21  host a high state of a signal that has a low and a high state, and the high signal state represents

22  that a double tap gesture will potentially occur on the touch-sensor pad."  Apparently, Elantech is

23  limiting the claim to a particular type of "signal," one "that has a low and a high state," and then

24  further limits the claimed signal to one that indicates the occurrence of a gesture by "a high state"

25  of the signal.  By their literal terms, the claims are not so limited.

26      12.     The term "signal" has a broad meaning to those of ordinary skill in the art of

27  touch-sensor technology.  In ordinary terms, "signal" means "The event or phenomenon that

28  conveys data from one point to another".  [Exhibit 15, The IEEE Standard Dictionary of

1  Electrical and Electronics Terms (1996), at SYN 00103331.]  The term "signal" is not limited to a

2  particular type of signal (such as one having "a low and a high state"), and certainly does not

3  require that a particular state, i.e. the "high state," indicates that a "gesture" has occurred.

4        13.    In the description of the embodiments in the '591/'931 Patents, the "signals" sent

5  to the host that signify "gestures" are standard "mouse packets" of data, not separate instances of

6  a "high" or "low" state.  [*See, e.g.,* Exhibit 10, '591 Patent, 42:38 at SYN 00004421; Exhibit 13,

7  '931 Patent, 49:3-7 at SYN 00004565.]  Moreover, the patent expressly states that the invention

8  can be implemented "as a software program, hardware state machine, or otherwise.  All such

9  implementations are intended to fall within the scope of the present invention."  [Exhibit 10, '591

10  Patent, 35:23-32 at SYN 00004418; Exhibit 13, '931 Patent, 40:47-57 at SYN 00004560.]  In

11  such other embodiments, the "signal" obviously need not be a voltage level on a single wire that

12  has a "high" state and a "low" state.  Indeed, "signals" may simply be "flags" or "messages"

13  residing in memory or registers or communicated over I/O channels, for example.  One such

14  example is expressly set forth in the patent:  "In an alternate approach, one or more extra packets

15  indicating a release of the virtual buttons can be inserted into the regular packet stream, rather

16  than using a suppress flag as shown herein."  [Exhibit 10, '591 Patent, 37:6-9 at SYN 00004419;

17  Exhibit 13, '931 Patent, 43:12-15 at SYN 00004562.]  This teaching contradicts Elantech's

18  narrow construction of the gesture "signal" as being limited to a single "high" state electrical

19  pulse transmitted along a wire.  The claims are not limited to any particular type of "signal."

20        14.    I also believe that "host" should be construed to clarify the claimed "signal."  The

21  meaning of "host" is expressly defined in the '591 and '931 Patents:  "Those of ordinary skill in

22  the art will recognize, that as used herein, 'host' may mean a stand-alone computer such as an

23  IBM or compatible PC or computer made by Apple Computers, hand-held control units, personal

24  digital assistants, remote communication devices, or the like, or to any other devices or systems

25  which can take as input the output of a touch tablet."  [Exhibit 10, '591 Patent, 9:10-16 ("host") at

26  SYN 00004405; Exhibit 13, '931 Patent, 9:31-38 ("host") at SYN 00004545.]

27        15.    I disagree with Elantech's asserted claim construction and conclude that the claim

28  terms mean to one of ordinary skill in the art "initiating transmission of a first set of data to a

computer, or other device that can take as input the output of a touch-sensor pad, that indicates

that a tap gesture has occurred on the touch-sensor pad."

### 4. "Terminating Said First Signal"

16.    Elantech asserts that "terminating said first signal" means "changing the state of

the signal from the high signal state to the low signal state." This exact claim phrase occurs twice

in the '591 Patent claims. This asserted construction is narrower than disclosed embodiments and

ignores the plain meaning of the words that are used in the claims. Nothing in the words of the

claim or the teachings in the patent limit the signal that is terminated to one that was in a high

state. The ordinary meaning of the claim term is simply "terminating the previous signal." The

claim terms permit any type of "signal" and any method for "terminating" the previous signal.

### 5. "Sending a Second Signal to Said Host Indicating Said Second Gesture"

17.    Elantech asserts that this '591 Patent claim phrase means "changing the state of the

signal from a low signal state to a high signal state for a predetermined period of time, and

sending the high signal state to the host which interprets the termination of the first signal and the

existence of a second high signal state as being a double tap gesture." Elantech also asserts that

"This claim construction presumes that 'said second gesture' should have read 'said gesture' or

'said double tap gesture.' Absent such a presumption, no claim construction can be made because

there is no antecedent basis for 'said second gesture.'" I disagree with Elantech's assertions.

18.    First, Elantech's construction narrows the claims to only a particular type of signal

and particular states of that signal. The claims literally only require "sending a second signal"

and do not literally require "changing the state of the signal from a low signal state to a high

signal state for a predetermined period of time, and sending the high signal state to the host."

Again, Elantech's construction reads into the claims limitations that are not present in the literal

words of the claims nor implied by the specification or prosecution history. I believe the ordinary

construction of "signal" I explained above applies because the inventors did not limit or specially

define the term "signal" in the specification.

19.    Second, the word "host" should be defined as I have stated above. However, there

is nothing in the claim that suggests that the "host" is required to "interpret" the signal nor to

1    "interpret" it in a specific way (i.e. "as being a double tap gesture.")

2         20.    Finally, the claims are not incorrect and do not lack an antecedent basis for the

3    term "said second gesture." As is obvious from the preamble to the claims, there are two "tap

4    gestures" that are made in the claimed invention, (a "double tap gesture.") A prior limitation of

5    this claim recites the first "said gesture," in other words, the first "tap gesture" referenced in the

6    preamble. This limitation then logically recites the "second gesture" that is recited in the

7    preamble claim term "double tap gesture." The plain meaning of these terms makes clear that the

8    antecedent basis of the term "gesture" is the "tap gesture" referenced in the preamble to the claim.

9         21.    I disagree with Elantech's asserted claim construction for this claim term and

10   conclude that one of ordinary skill in the art would construe these claim terms to mean "sending a

11   second set of data to a computer, or other device that can take as input the output of a touch-

12   sensor pad, that indicates that a second tap gesture has occurred on the touch-sensor pad"

13

14       **6.    "Initiating a Drag Gesture Signal to the Host Indicating the Occurrence of a
         Gesture""**

15        22.    Elantech asserts that this '591 Patent claim term means "outputting to a host a high

16   state of a signal that has a low and high state, and the high signal state represents that a drag

17   gesture will potentially occur on the touch-sensor pad." I disagree with Elantech's insertion of

18   the words "a high state of a signal that has a low and high state, and the high signal state." These

19   words do not exist in the claim and, as I have explained above, the claim term "signal" is not

20   limited either in the claims or in the specification to any particular type of signal or state of a

21   signal. Consistent with the evidence I outlined above with respect to "signal" and "host," I

22   conclude that one of ordinary skill in the art would interpret these terms to mean "initiating

23   transmission of a first set of data to a computer or other device that can take as input the output of

24   a touch-sensor pad, that indicates that a gesture has occurred on the touch-sensor pad."

25       **7.    "Maintaining Said Drag Gesture Signal"**

26        23.    Elantech asserts that this '591 Patent claim term means "continuously outputting

27   the high signal state." I disagree with this asserted construction. First, as outlined above, the

28   claims are not limited to a "high signal state," but rather, include all types and states of "signal."

24.     Second, the ordinary meaning of the word "maintaining" is not limited to "continuously." The ordinary meaning of "maintaining" includes the concepts of "Go on with, continue, persevere in" or "Preserve or retain." [Exhibit 17, The New Shorter Oxford English Dictionary (1993), at SYN 00103337.] In the descriptions in the specification of the '591 Patent, signals are "maintained" in variety of ways. For example, the specification teaches that a signal previously sent may apply until it is, in effect, rescinded. [Exhibit 10, '591 Patent, 33:1-3; 37:6-9 at SYN 00004417 and SYN 00004419.] The patent also teaches that a signal previously sent will dictate the operation in question while subsequent signals are suppressed. [Exhibit 10, '591 Patent, 39:13-23 at SYN 00004420.] In other words, the patent teaches that gesture signals may be maintained even while not "continuously outputting the high signal state." This directly contradicts the narrow construction that Elantech asserts.

25.     Elantech's construction again reads into the claims further limitations that are not literally present in the claim words. I conclude that one of ordinary skill in the art would construe this claim limitation to mean "to continue, retain, or repeat the drag gesture signal."

### 8.     "Repeatedly Sending X and Y Position Information to Said Host for the Duration of Said Second Presence"

26.     Elantech asserts that this claim limitation of the '591 Patent means "continuously sending the current two-dimensional location of the object on the touch-sensor pad to the host as long as the object continues to be in proximity to the touch-sensor pad." I disagree with this construction for many reasons.

27.     First, the claim term "repeatedly" does not mean "continuously." The plain meaning of "repeatedly" is that the signal is "repeated." The plain meaning of "repeatedly" does not require a continuous sending of a signal, but permits breaks in transmission so long as the signal is repeated over time. This is also clear from the teachings in the specification of the '591 Patent. As described above, signals may be sent repeatedly despite the fact that they are not sent continuously. [Exhibit 10, '591 Patent, 39:13-23 at SYN 00004420.] The patent further describes a mechanism by which individual $\Delta X$ and $\Delta Y$ samples may be suppressed or delayed under certain circumstances. [Exhibit 10, '591 Patent, 44:23-56 at SYN 00004422.]

28.     Second, as described above, the claim phrase "X and Y position information," is not limited to "current two-dimensional location of an object on the touch-sensor pad." As stated above, all of the embodiments in the patent teach that the host is sent "relative" position information, such as "ΔX" and "ΔY," not absolute X and Y information. [Exhibit 10, '591 Patent, 27:5-30 at SYN 00004414, 29:10-11, 30:36-37 at SYN 00004415.] For the reasons stated above, with respect to "X and Y position information," Elantech's asserted construction is incorrect.

29.     As noted above, the term "host" should be construed to clarify the claims. As stated above, the inventors expressly defined "host" in the specification of the '591 Patent.

30.     I conclude that Elantech's construction is incorrect because it ignores the plain meaning of the claim terms. Consistent with my previous explanations, I conclude that one of ordinary skill in the art of touch-sensor technology would construe this claim limitation to mean "after the second presence is detected, repeatedly sending information about the horizontal and vertical positioning of an object on a touch sensor to a computer, or other device that can take as input the output of a touch-sensor pad while the second presence continues."

**9.     "Initiating a Signal to the Host Indicating the Occurrence of Said Tap Gesture"**

31.     Elantech asserts that this claim limitation of the '931 Patent means "outputting to the host a high state of a signal that has a low and a high state, where the high signal state represents that a tap gesture occurred on the touch-sensor pad." For the same reasons I explained above with respect to the term "signal," Elantech's claim construction reads into the claims the words "a high state of a signal that has a low and a high state, where the high signal state." The claims are not literally so limited and nothing in the patent specification or prosecution history narrows the term "signal" to a particular type or state of signal. Instead, consistent with my prior explanation of the terms "signal" and "host," this claim limitation would mean to one of ordinary skill in the art of touch-sensor technology in or about 1996 "initiating the transmission of a set of data, to a computer or other device that can take as input the output of a touch-sensor pad, that indicates that a tap gesture has occurred on the touch-sensor pad."

**10.     "Maintaining Said Signal for a Predetermined Period of Time"**

32.     Elantech asserts that this '931 Patent claim term should be limited to "continu-

ously outputting the high state of the signal only for a predetermined time period (i.e., changing the signal state from high to low at the end of the predetermined time period)." This construction suffers from the same problems I have identified previously. The claims are not limited to a particular type or state of signal. Also, in the context of this patent, the term "maintaining" does not mean "continuously outputting." I conclude that Elantech's construction is too narrow and that one of ordinary skill in the art of touch-sensor technology would construe these terms to mean "to continue, retain, or repeat the signal for a period of time that was determined before."

### 11. "Detecting in Which of at Least One Corner of the Touch-Sensor Pad Said Tap Gesture Occurred"

33. Elantech asserts that this claim limitation of the '931 Patent should be limited to the step of "after detecting the occurrence of the tap gesture, separately detecting in which of at least one corner of the touch-sensor pad the tap gesture occurred." I disagree.

34. Elantech limits the literal meaning of the claims by adding the concepts of "after" and "separately." There is no necessary relationship between the timing of the detection of the tap gesture and the location of the tap gesture that is recited in the claims. The claims literally require only that the tap gesture be detected and that the corner in which the tap gesture occurs be detected. Thus, the claims literally cover a system as otherwise described by the claims that detects presence in one corner of the touch-sensor and then recognizes that presence as a "tap gesture." Also, the claims cover a concurrent operation in which the tap gesture and location are determined simultaneously. Both of these examples would be excluded by adding the words "after" and "separately" as Elantech asserts. I disagree with this interpretation and conclude that one of ordinary skill in the art would understand the plain meaning of the claim terms to mean "detecting that a tap gesture has occurred in at least one corner, the identity of which is distinguished in some way from other corners of the touch-sensor pad."

### 12. "Data Packet Processor"

35. Elantech asserts that "data packet processor" in the claims of the '052 Patent means "software for processing data packets and sending messages." I disagree because Elantech is attempting to limit the "data packet processor" to the preferred embodiment. The '052 Patent

1    expressly states that "*Preferably*, packet processor 20 is computer software executed on a central

2    processing unit and working in conjunction with a touchpad driver (not shown) to influence

3    display window 30 and scroll bar 15." [Exhibit 12, '052 Patent, 3:14-17 at SYN 00004504

4    (emphasis supplied).] One of ordinary skill in the art of touch-sensor technology in or about 1996

5    would have understood "packet processor" to mean any of a variety of known implementations of

6    "packet processor," including packet processors implemented in "hardware" or "software," or

7    both. [Exhibit 16, The Illustrated Dictionary of Microcomputers (1990), at SYN 00103334

8    ("processor" means "A hardware data processor or a program that performs the functions of

9    compiling, assembling, and translating for a specific language."). I conclude, based upon the

10   teachings in the '052 Patent, and the ordinary meaning of the term those of ordinary skill in the

11   art, that "data packet processor" would include "hardware and/or program code, for example,

12   software executed on a central processing unit, that processes data packets."

13       36.    I also think that the claim phrase "data packet processor" does not require the

14   function of "sending messages." Again, this is an unnecessary attempt to read limitations from

15   the specification into the claims.

16       **13.    "Incrementally Move"**

17       37.    Elantech asserts that the '411 Patent claim term "incrementally move" means

18   "movement defined by the second component of Equations 12 and 13 in the '411 patent, namely,

19   $S(X_{cur} - X_{center})$ and $S(Y_{cur} - Y_{center})$". I disagree.

20       38.    The ordinary meaning of "incrementally move" means merely to move in

21   increments. As is evident from Elantech's own cited dictionary definition, "increment" means

22   "The process of increasing in number, size, quantity, or extent." [Elantech's Claim Construction,

23   Exhibit A.] Claim 46 of the '411 Patent does not limit the "increment" to any particular value.

24       39.    There is nothing in the patent that suggests that the inventors specially defined the

25   term "increment" to mean anything other than its ordinary meaning. Although, there is an

26   example of an increment applied in an embodiment of the '411 Patent (Exhibit 11, '411 Patent,

27   29:18-52, 30:37-50, 31:9-38, 34:8-51 at SYN 00004475-4477; Figs. 12-13 at SYN 00004443-

28   4445), I see no reason to limit the term "increment" to that embodiment.

40. The intent of the inventors not to limit "increments" used in the "second cursor motion signals" to any particular value is also clear from the other claims of the '411 Patent. For example, claims 7, 10, 12, 15, 22, 32, 44, and 56 of the '411 Patent, the "increment" added in the second cursor motion signal is more specifically claimed. Claim 7, which depends upon claim 6, for example, recites generating a second cursor motion signal "representing the difference between" the X and Y coordinate position of the object and the X and Y coordinate "of a fixed position on said sensing plane," and further specifies that the fixed position "is the geometric center of said sensing plane." Thus, claim 7 recites the more narrow formulation of "increment" that is set forth as an example embodiment in equations 12 and 13, which specifically refer to non-orthogonal type edge motion which is based upon S(Xcur – Xcenter) and S(Ycur - Ycenter) cited at 29:1-9 (SYN 00004475). Because there are claims that more narrowly express the value of the "increment" to be added in the second cursor motion signal, these limitations should not be read into claim 46, which more broadly recites any "increment."

### 14. "Operative Coupling"

41. Elantech asserts that the preamble to claims 1 and 18 of the '352 Patent are not limitations to the claims. For the reasons stated in my Expert Report of November 20, 2006, I disagree. However, Elantech has set forth no evidence, intrinsic or extrinsic, for me to address.

42. I disagree with Elantech's position that "operative coupling" would mean "operative proximity" to one of ordinary skill in the art in 1996. Elantech has not offered an interpretation of the term "operative." I disagree with Elantech's assertion that "coupling" would mean "proximity" to one of ordinary skill in the art. The claims use the term "coupling" in the ordinary sense that one of ordinary skill in the art of touch-pad technology would: the "finger-induced electrical effect" between the "touch sensor" and "multiple fingers." This may or may not be proportional to "proximity," the physical distance between the finger and the sensor. [Exhibit 4, '352 Patent, 1:32-39, 2:48-52 at ETD0000295; 5:6-10, 5:56-6:1, 6:14-18, 6:26-38, 6:42-45, 7:54-56 at ETD0000297-298; 11:16-19, 12:14-17, 12:42-45 at ETD0000300; 15:34-37, 15:51-54 at ETD0000302; Figs. 1-4, 7A-7F at ETD0000278-280, 0000284-290.] This understanding of "coupling" is also consistent with common dictionary definitions of the terms

"coupling." [Exhibit 6, McGraw-Hill Dictionary of Scientific and Technical Terms (3rd ed. 1984), at SYN 00103310 ("coupling" means "A mutual relation between two circuits that permits energy transfer from one to another, through a wire, resistor, transformer, capacitor, or other device."); Exhibit 7, Modern Dictionary of Electronics (6th ed. 1984), at SYN 00103313 ("coupling" means "The association or mutual relationship of two or more circuits or systems in such a way that power may be transferred from one to another.").] Indeed, the specific measurement of "maxima" and "minima" in the body of the claims is meaningless unless a substantive limitation is present in the claims to signify what is being measured. Thus, "coupling" is an important claim term and cannot reasonably be ignored.

### 15. "Scanning The Touch Sensor"

43. Elantech asserts that the '352 Patent claim term "scanning the touch sensor" means "examining information associated with the touch sensor" to someone of ordinary skill in the art. I disagree. First, the claims do not say scanning "information" – the claims say "scanning the touch sensor." The literal claim words require that the object that is being scanned is "the touch sensor," not "information associated with the touch sensor."

44. Second, the "scanning" that is described in the claims is a particular kind of "examining," namely an examination that entails a measurement. This is clear from the recitation of the purpose of the "scanning," namely, "to . . . identify" the claimed "maxima" and "minima." It is also clear from the disclosure in the specification. I conclude from these facts that "scanning" in this context means "measuring the traces in the touch sensor."

45. Third, Elantech ignores that "scanning" means not just any "examining." Rather, as taught expressly in the '352 Patent and in accordance with the ordinary meaning applied by those of ordinary skill in the art of touch-sensor technology, "scanning" means to sequentially and systematically examine the traces in the touch sensor. [Exhibit 4, '352 Patent, 5:20-61, 6:14-26 at ETD0000297; Fig. 2 at ETD0000279; Exhibit 8, The IEEE Standard Dictionary of Electrical and Electronics Terms (1996), at SYN 00103298 ("scanning" means "(6) The process of examining information in a systematic manner"); Exhibit 9, The Illustrated Dictionary of Microcomputers (1990), at SYN 00103305 ("To examine sequentially using a part-by-part technique").]

46.     I agree with the assertion in Elantech's Claim Construction, that the corresponding structures that are disclosed in the specification of the '352 Patent as performing the recited functions of the "means for scanning" limitation in claim 18 are shown in Fig. 2 (items 45, 70, 80 and 60) at ETD0000279 and described at column 5, line 20 through column 6, line 8, and column 7, lines 1 through 6 at ETD0000297-298.  I had originally included item 30 as well in the identification of corresponding structure for the "scanning means," but now conclude that the better reading of the specification would exclude that element from the corresponding means.

### 16.     "Identify A First Maxima In A Signal Corresponding To A First Finger"

47.     Elantech's proposed construction for the '352 Patent claim terms "scanning the touch sensor to (a) identify a first maxima in a signal corresponding to a first finger" is slightly different from the construction that I proposed in my Expert Report of November 20, 2006. Elantech proposes that this claim phrase means "identify a first peak value in a finger profile obtained from scanning the touch sensor."  There are two aspects of Elantech's construction that I conclude should be clarified in the manner proposed in my construction.

48.     First, "peak value" suggests that the value identified is a "peak value" for the overall "profile obtained from scanning the touch sensor."  As I explained in my Expert Report of November 20, 2006, the appropriate understanding of the term "maxima" in the claim is a local "maxima" value corresponding to a first finger on the touch sensor.  "Maximum" can mean in some contexts such an overall peak value: "The greatest value which a variable may have; the largest element in a set." [Exhibit 5, The New Shorter Oxford English Dictionary (1993), at SYN 00103321]  However, for the reasons set forth in my Expert Report of November 20, 2006, this "peak value" meaning is not how the term "maxima" is used in the claims or the specification. Rather, the "maxima" in the context of the claims and the specification, means a localized "maxima," which is "the point at which the measured values cease to increase and begin to decrease." [Exhibit 5, The New Shorter Oxford English Dictionary (1993), at SYN 00103321] This is exactly how "maxima" is identified in the operation of the invention as described in the specification. [Exhibit 4, '352 Patent, Figs. 3-5, 6 and 9, at ETD0000280 and ETD0000282-83, and corresponding text; 9:39-60 at ETD0000299.]  I conclude, therefore, that "peak value" is

1    inadequately specific and the claim construction of this claim term should rather include the

2    phrase "the point at which the measured values cease to increase and begin to decrease."

3        49.    Second, Elantech's reference to "a finger profile," is ambiguous with respect to

4    this claim limitation and misleading when coupled with Elantech's remaining proposed claim

5    constructions for claims 1 and 18 of the '352 Patent. The claims specifically recite that the signal

6    must correspond to "a first finger." That specific limitation should not be read out of the claims.

### 17.    "Identify A Minima Following The First Maxima"

8        50.    Elantech asserts that the '352 Patent claim limitation "scanning the touch sensor to

9    . . . (b) identify a minima following the first maxima. . . ." means "identify the lowest value in the

10   finger profile that occurs after the first peak value, and before another peak value is identified." I

11   am largely in agreement with this construction, except for two aspects of the definition. First, the

12   reference to "lowest value" and "peak value" is not precisely correct. I have previously explained

13   the correct construction of "maxima." I conclude that the more appropriate definition of

14   "minima" is "the point at which the measured values cease to decrease and begin to increase."

15   [Exhibit 5, The New Shorter Oxford English Dictionary (1993), at SYN 00103322.] I reach this

16   conclusion because, as with the term "maxima," it is clear from the claim language itself and the

17   patent specification description of the invention that the named inventors of the '352 Patent were

18   not referring to the overall "minimum" value of the capacitance of the touch-sensor device.

19   Rather, they were expressing "minima" as one of the points at which the measured trace values

20   are stop decreasing and start to increase. [Exhibit 4, '352 Patent, Figs. 3-5, 6 and 9 at

21   ETD0000280, and corresponding text; Abstract at ETD0000277; 5:65-6:13, 6:28-47, 6:59-68,

22   8:62-65, 9:51-10:8, 10:46-65, 10:66-11:5, 11:45-55 at ETD0000297-300.]

23       51.    Second, the claims are directed to a "scanning" that is systematically measuring

24   the trace values such that the "minima" value is "following the first maxima" value that

25   corresponds to the first finger on the touch sensor in scan order. Although expressly claimed, this

26   concept is not expressly contained in Elantech's proposed claim construction.

27

28

### 18. "Identify A Second Maxima In A Signal Corresponding To A Second Finger Following Said Minima"

52.     Elantech construes this '352 Patent claim term as meaning "after identifying the lowest value in the finger profile, identify a second peak value in the finger profile." Conceptually, this proposed definition suffers from the same faults identified above with respect to the "minima" claim limitation. The claimed "maxima" is, again, not the peak value associated with the overall "profile" of the touch-sensor device. We know this because the claim states expressly that the "maxima" at issue is associated with "a second finger." Moreover, the term "maxima" is used in the plural, which signifies that the claims are not reciting an overall "peak value." Also, since the claims already recited previously a "maxima" corresponding to a first finger, it is self-evident that the second recited "maxima" is not a "peak value" of the "finger profile." Rather, this claim limitation is directed to a localized "maxima" of a trace measurement corresponding to a second finger, which is more properly understood as the "point at which a continuously varying quantity ceases to increase and begins to decrease." [Exhibit 5, The New Shorter Oxford English Dictionary (1993) at SYN 00103321.] This is exactly how the second "maxima" is identified in the operation of the invention as described in the specification. [Exhibit 4, '352 Patent, Figs. 3-5, 6 and 9 at ETD0000280 and ETD0000282-83, and corresponding text; 9:39-10:25 at ETD0000299.]

53.     I also conclude that Elantech's proposed definition again ignores the requirement that the step of identifying a maxima a corresponding a second finger is done by "scanning the touch sensor." As with the previous two claim limitations, there is recited a specific order of the scanning process and this claim limitation requires that the claimed apparatus or method must "identify" a "maxima" associated with a second finger "following" the identified "minima." In other words, the measurement of a trace on the touch sensor can be identified as the second "maxima" only if it follows the identified "minima" in scan order, which, in turn, is "following' the first "maxima" in scan order.

19. **"Providing An Indication Of The Simultaneous Presence Of Two Fingers In Response To Identification Of Said First And Second Maxima."**

54.    Elantech asserts that this '352 Patent claim limitation should be interpreted as meaning "indicating that two fingers are simultaneously in proximity to the touch sensor if first and second peak values are identified." I disagree with Elantech's interpretation of this claim limitation because it ignores the express claim term "said" in the claim phrase "in response to identification of said first and second maxima." I understand "said" in this context to have its ordinary meaning of referring back to the previously identified first "maxima" and the previously identified second "maxima." Elantech's interpretation would require only identification of unspecified "first and second peak values," which is simply wrong. The "indicating" step is not performed in accordance with the claims unless the scanning process identifies in order a "maxima" corresponding to a first finger, then a "minima" after the first finger, and then a "maxima" corresponding to a second finger following the "minima." The word "said" makes clear that the identification is based upon the previously recited steps all being present. Elantech's interpretation obscures that requirement.

55.    I also disagree with Elantech's assertion that one of ordinary skill in the art would be able to establish that the "microcontroller" 60 in Figure 2 of the '352 Patent is the structure disclosed in the '352 Patent specification as corresponding to the "providing" requirement of this claim limitation. I nothing see in the '352 Patent specification that links the microcontroller 60 as "providing" that indication. The presence of multiple fingers is determined at step 980 in Figure 9-2, but there is nothing disclosed about how that information is then provided to any other part of the system. Indeed, as shown in Figure 9-2, the next step in the process that is disclosed is "end" (320). That cannot logically or reasonably be interpreted as "providing" anything.

56.    I understand that I may be called upon to respond to any issues raised by the Elantech's expert or experts or the Court. I also understand that Elantech has not disclosed yet its proposed claim construction. I anticipate that I might supplement or modify the opinions in this report in view of any such new information or other new information that might arise between now and the time of the briefing and hearing on the claim construction issues.

Dated:  November 30, 2006

_____

Andrew Wolfe, Ph.D

# Exhibit E

*The*

# American
# Heritage® Dictionary
## *of the English Language*

FOURTH EDITION





HOUGHTON MIFFLIN COMPANY
Boston   New York

Words are included in this Dictionary on the basis of their usage.
Words that are known to have current trademark registrations are
shown with an initial capital and are also identified as trademarks. No
investigation has been made of common-law trademark rights in any
word, because such investigation is impracticable. The inclusion of any
word in this Dictionary is not, however, an expression of the
Publisher's opinion as to whether or not it is subject to proprietary
rights. Indeed, no definition in this Dictionary is to be regarded as
affecting the validity of any trademark.

American Heritage® and the eagle logo are registered trademarks of
Forbes Inc. Their use is pursuant to a license agreement with
Forbes Inc.

Copyright © 2000 Houghton Mifflin Company. All rights reserved.

No part of this work may be reproduced or transmitted in any form or
by any means, electronic or mechanical, including photocopying and
recording, or by any information storage or retrieval system without
the prior written permission of Houghton Mifflin Company unless
such copying is expressly permitted by federal copyright law. Address
inquiries to Reference Permissions, Houghton Mifflin Company,
222 Berkeley Street, Boston, MA 02116.

Visit our Web site: www.hmco.com/trade.

*Library of Congress Cataloging-in-Publication Data*

The American Heritage dictionary of the English language.–4th ed.
    p.    cm.
    ISBN 0-395-82517-2 (hardcover) — ISBN 0-618-08230-1
    (hardcover with CD ROM)
    1. English language–Dictionaries
PE1628 .A623 2000
423–dc21
                                    00-025369

Manufactured in the United States of America

Case 5:96-cv-01839-PVR Document 662 Filed 01/29/2007 Page 83 of 86
Case 5:06-cv-01839-CRB Document 63 Filed 12/19/2008 Page 83 of 86

*gets increase* of 15 percent. **3.** *Obsolete* Reproduction and spread; propagation. —**idiom: on the increase** Increasing, especially in frequency of occurrence: *Crime is on the increase.* [Middle English *encresen*, from Old French *encreistre, encreiss-*, from Latin *incrēscere : in-*, intensive pref.; see IN-² + *crēscere*, to grow; see **ker-²** in Appendix I.] —**in•creas′a•ble** *adj.* —**in•creas′ing•ly** *adv.*

**Synonyms** *increase, expand, enlarge, extend, augment, multiply* These mean to make or become greater or larger. *Increase* sometimes suggests steady growth: *The mayor's political influence rapidly increased. "No limit could remove the possibilities of life. They only increase the possibilities of likeness"* (John Ruskin). To *expand* is to increase in size, area, volume, bulk, or range: *He inhaled deeply, expanding his chest. "Work expands so as to fill the time available for its completion"* (C. Northcote Parkinson). *Enlarge* refers to expansion in size, extent, capacity, or scope: *The landowner enlarged her property by repeated purchases. My knowledge of literature has enlarged considerably since I joined a reading group.* To *extend* is to lengthen in space or time or to broaden in range: *The transit authority extended the subway line to the next town. The baseball season extends into October. Augment* usually applies to what is already developed or well under way: *She augmented her collection of books each month. His depression augments with each visit to the hospital.* To *multiply* is to increase in number, especially by propagation or procreation: *"As for my cats, they multiplied"* (Daniel Defoe). *"May thy days be multiplied!"* (Sir Walter Scott).

**in•cre•ate** (ĭn′krē-āt′, ĭn-krē′ĭt) *adj.* Existing without having been created. [Middle English *increat*, from Late Latin *increātus : Latin in-*, not; see IN-¹ + Latin *creātus*, past participle of *creāre*, to create; see CREATE.] —**in′cre•ate′ly** *adv.*

**in•cred•i•ble** (ĭn-krĕd′ə-bəl) *adj.* **1.** So implausible as to elicit disbelief: *gave an incredible explanation of the cause of the accident.* **2.** Astonishing: *dressed with incredible speed.* [Middle English, from Latin *incrēdibilis : in-*, not; see IN-¹ + *crēdibilis*, believable; see CREDIBLE.] —**in•cred′i•bil′i•ty, in•cred′i•ble•ness** *n.* —**in•cred′i•bly** *adv.*

**in•cre•du•li•ty** (ĭn′krĭ-dōō′lĭ-tē, -dyōō′-) *n.* The state or quality of being incredulous; disbelief.

**in•cred•u•lous** (ĭn-krĕj′ə-ləs) *adj.* **1.** Skeptical; disbelieving: *incredulous of stories about flying saucers.* **2.** Expressive of disbelief: *an incredulous stare.* [From Latin *incrēdulus : in-*, not; see IN-¹ + *crēdulus*, believing; see CREDULOUS.] —**in•cred′u•lous•ly** *adv.* —**in•cred′u•lous•ness** *n.*

**in•cre•ment** (ĭn′krə-mənt, ĭng′-) *n.* **1.** The process of increasing in number, size, quantity, or extent. **2.** Something added or gained: *A fortune swelled by increments from allied armies.* **3.** A slight, often barely perceptible augmentation. **4.** One of a series of regular additions or contributions: *accumulating a fund by increments.* **5.** *Mathematics* A small positive or negative change in the value of a variable. [Middle English, from Latin *incrēmentum*, from *incrēscere*, to increase. See INCREASE.] —**in′cre•men′tal** (-mĕn′tl) *adj.* —**in′cre•men′tal•ly** *adv.*

**in•cre•men•tal•ism** (ĭn′krə-mĕn′tl-ĭz′əm) *n.* Social or political gradualism. —**in′cre•men′tal•ist** *n.*

**in•cres•cent** (ĭn-krĕs′ənt) *adj.* Showing a progressively larger lighted surface; waxing: *the increscent moon.* [Latin *incrēscēns, incrēscent-*, present participle of *incrēscere*, to increase. See INCREASE.]

**in•cre•tion** (ĭn-krē′shən) *n.* **1.** The process of internal secretion characteristic of endocrine glands. **2.** The product of this process; a hormone. [IN-² + (SE)CRETION.]

**in•crim•i•nate** (ĭn-krĭm′ə-nāt′) *tr.v.* **-nat•ed, -nat•ing, -nates 1.** To accuse of a crime or other wrongful act. **2.** To cause to appear guilty of a crime or fault; implicate: *testimony that incriminated the defendant.* [Late Latin *incrīmināre, incrīminat- : Latin in-*, causative pref.; see IN-² + Latin *crīmen, crīmin-*, crime; see CRIME.] —**in•crim′i•na′tion** *n.* —**in•crim′i•na•to′ry** (-nə-tôr′ē, -tōr′ē) *adj.*

**in•crust** (ĭn-krŭst′) *v.* Variant of encrust.

**in•crus•ta•tion** (ĭn′krŭ-stā′shən) also **en•crus•ta•tion** (ĕn′-) *n.* **1a.** The act of encrusting. **b.** The state of being encrusted. **2.** A crust or coating: *an incrustation of salt on the window.* **3a.** A decorative technique in which a contrasting material is applied to a surface as an inlay or overlay. **b.** A material so applied. **4.** *Biology* A coating of hardened exudate or other material on a body or body part; a scale or scab.

**in•cu•bate** (ĭn′kyə-bāt′, ĭng′-) *v.* **-bat•ed, -bat•ing, -bates** —*tr.* **1.** To sit on (eggs) to provide heat, so as to promote embryonic development and the hatching of young; brood. **2a.** To maintain (eggs, organisms, or living tissue) at optimal environmental conditions for growth and development. **b.** To maintain (a chemical or biochemical system) under specific conditions in order to promote a particular reaction. **3.** To form or consider slowly and protectively, as if hatching: *incubated the idea for a while, then announced it.* —*intr.* **1.** To brood eggs. **2.** To develop and hatch. **3.** To undergo incubation. [Latin *incubāre, incubāt- :* to lie down on : *in-*, on; see IN-² + *cubāre*, to lie down.] —**in′cu•ba′tive** *adj.*

**in•cu•ba•tion** (ĭn′kyə-bā′shən, ĭng′-) *n.* **1a.** The act of incubating. **b.** The state of being incubated. **2.** *Medicine* The development of an infection from the time the pathogen enters the body until signs or symptoms first appear. **3.** *Medicine* The maintenance of an infant, especially a premature infant, in an environment of controlled temperature, humidity, and oxygen concentration in order to provide optimal conditions for growth and development. —**in′cu•ba′tion•al** *adj.*

**in•cu•ba•tor** (ĭn′kyə-bā′tər, ĭng′-) *n.* **1.** An apparatus in which environmental conditions, such as temperature and humidity, can be controlled, often used for growing bacterial cultures, hatching eggs artificial-ly; or providing suitable conditions for a chemical or biological reaction. **2.** *Medicine* An apparatus for maintaining an infant, especially a premature infant, in an environment of controlled temperature, humidity, and oxygen concentration. **3.** A place or situation that permits or encourages the formation and development, as of new ideas: *a college that was an incubator of new approaches to sociology.*

**in•cu•bus** (ĭn′kyə-bəs, ĭng′-) *n., pl. -bus•es* or **-bi** (-bī′) **1.** An evil spirit supposed to descend upon and have sexual intercourse with women as they sleep. **2.** A nightmare. **3.** An oppressive or nightmarish burden. [Middle English, from Late Latin, alteration of Latin *incubō*, from *incubāre*, to lie down on. See INCUBATE.]

**in•cus•des** (ĭng-kyōō′dēz) *n.* Plural of **incus.**

**in•cul•cate** (ĭn-kŭl′kāt′, ĭn′kŭl-) *tr.v.* **-cat•ed, -cat•ing, -cates 1.** To impress (something) upon the mind of another by frequent instruction or repetition; instill: *inculcating sound principles.* **2.** To teach (others) by frequent instruction or repetition; indoctrinate: *inculcate the young with a sense of duty.* [Latin *inculcāre, inculcāt-*, to force upon : *in-*, on; see IN-² + *calcāre*, to trample (from *calx, calc-*, heel).] —**in′cul•ca′tion** *n.* —**in•cul′ca′tor** *n.*

**in•cul•pa•ble** (ĭn-kŭl′pə-bəl) *adj.* Free of guilt; blameless.

**in•cul•pate** (ĭn-kŭl′pāt′, ĭn′kŭl-) *tr.v.* **-pat•ed, -pat•ing, -pates** To incriminate. [Latin *inculpāre, inculpāt- : in-*, on; see IN-² + *culpāre*, to blame (from *culpa*, fault).] —**in′cul•pa′tion** *n.* —**in•cul′pa•to′ry** (-pə-tôr′ē, -tōr′ē) *adj.*

**in•cult** (ĭn-kŭlt′) *adj.* Not cultured; coarse. [Latin *incultus : in-*, not; see IN-¹ + *cultus*, past participle of *colere*, to till, cultivate; see **kʷel-¹** in Appendix I.]

**in•cum•ben•cy** (ĭn-kŭm′bən-sē) *n., pl. -cies* **1.** The quality or condition of being incumbent. **2.** Something incumbent; an obligation. **3a.** The holding of an office or ecclesiastical benefice. **b.** The term of an office or benefice.

**in•cum•bent** (ĭn-kŭm′bənt) *adj.* **1.** Imposed as an obligation or duty; obligatory: *felt it was incumbent on us all to help.* **2.** Lying, leaning, or resting on something else: *incumbent rock strata.* **3.** Currently holding a specified office: *the incumbent mayor.* ✦ *n.* A person who holds an office or ecclesiastical benefice: *The incumbent was reelected to another term.* [Middle English, holder of an office, from Medieval Latin *incumbēns, incumbent-*, from Latin, present participle of *incumbere*, to lean upon, apply oneself to : *in-*, on; see IN-² + *-cumbere*, to recline.] —**in•cum′bent•ly** *adv.*

**in•cu•nab•u•la** (ĭn-kyōō′nab′yə-lə, ĭng′-) *n.* An incunabulum. [From New Latin *incūnābulum*. See INCUNABULUM.]

**in•cu•nab•u•lum** (ĭn′kyə-nab′yə-ləm, ĭng′-) *n., pl. -la* (-lə) **1.** A book printed before 1501; an incunable. **2.** An artifact of an early period. [New Latin *incūnābulum*, from sing. of Latin *incūnābula*, swaddling clothes, cradle : *in-*, in; see IN-² + *cūnābula*, cradle, infancy (from *cūnae*, cradle; see **kei-³** in Appendix I.)] —**in′cu•nab′u•lar** (-lər) *adj.*

**in•cur** (ĭn-kûr′) *tr.v.* **-curred, -cur•ring, -curs 1.** To acquire or come into (something usually undesirable); sustain: *incurred substantial losses during the stock market crash.* **2.** To become liable or subject to as a result of one's actions; bring upon oneself: *incur the anger of a friend.* [Middle English *incurren*, from Old French *encorir*, from Latin *incurrere*, to run upon : *in-*, on; see IN-² + *currere*, to run; see **kers-** in Appendix I.]

**in•cur•a•ble** (ĭn-kyōōr′ə-bəl) *adj.* **1.** Being such that a cure is impossible; not curable: *an incurable disease.* **2.** Incapable of being altered, as in disposition or habits: *an incurable optimist; an incurable smoker.* —**in•cur′a•bil′i•ty, in•cur′a•ble•ness** *n.* —**in•cur′a•ble** *n.* —**in•cur′a•bly** *adv.*

**in•cu•ri•ous** (ĭn-kyōōr′ē-əs) *adj.* Lacking intellectual inquisitiveness or natural curiosity; uninterested. —**in•cu′ri•os′i•ty** (-ŏs′ĭ-tē), **in•cu′ri•ous•ness** *n.* —**in•cu′ri•ous•ly** *adv.*

**in•cur•rent** (ĭn-kûr′ənt, -kŭr′-) *adj.* Affording passage to an inflowing current. [Latin *incurrēns, incurrent-*, present participle of *incurrere*, to run upon. See INCUR.]

**in•cur•sion** (ĭn-kûr′zhən, -shən) *n.* **1.** An aggressive entrance into foreign territory; a raid or invasion. **2.** The act of entering another's territory or domain. **3.** The act of entering or running into; *homes damaged by the incursion of floodwater.* [Middle English, from Old French, from Latin *incursiō, incursiōn-*, from *incursus*, past participle of *incurrere*, to run upon. See INCUR.]

**in•cur•vate** (ĭn-kûr′vāt′, ĭn′kûr-) *tr.v.* **-vat•ed, -vat•ing, -vates** To cause to bend into an inward curve. ✦ *adj.* Curved inward. —**in′cur•va′tion** *n.* —**in•cur′va•ture′** (-və-chōōr′, -chər) *n.*

**in•curve** (ĭn-kûrv′, ĭn′kûrv′) *tr. & intr.* **-curved, -curv•ing, -curves** To cause to bend or to bend into an inward curve. ✦ *n.* (ĭn′kûrv′) An inward curve. [Middle English *incurven*, to twist, distort, from Latin *incurvāre*, to curve in, be crooked : *in-*, on; see IN-² + *curvus*, curve; see CURVE.]

**in•cus** (ĭng′kəs) *n., pl. in•cu•des* (ĭng-kyōō′dēz) **1.** An anvil-shaped bone between the malleus and the stapes in the mammalian middle ear. Also called **anvil. 2.** A thunderhead. [Latin *incūs, incūd-*, anvil, from *incūsus*, past participle of *incūdere*, to forge with a hammer : *in-*, intensive pref.; see IN-² + *cūdere*, to beat, forge; see **kau-** in Appendix I.]

**in•cuse** (ĭn-kyōōz′, -kyōōs′) *adj.* Formed by hammering, stamping, or pressing: *an incuse design on a coin.* [Latin *incūdere, incūs-*, to forge with a hammer. See INCUS.]

**ind.** *abbr.* **1a.** independence **b.** independent **2.** index **3a.** industrial **b.** industry

**Ind.** *abbr.* **1.** India **2.** Indian **3.** Indiana **4.** Indies

**in•da•ba** (ĭn-dä′bə) *n.* A council or meeting of indigenous peoples of southern Africa to discuss an important matter. [Zulu *in-daba*, affair, topic for discussion, conference : *in-*, n. pref. + *-dāba*, affair.]



**incubator**
students observing chicks hatching in an incubator

| ă | pat | oi | boy |
| ā | pay | ou | out |
| âr | care | ŏŏ | took |
| ä | father | ōō | boot |
| ĕ | pet | ŭ | cut |
| ē | be | ûr | urge |
| ĭ | pit | th | thin |
| ī | pie | th | this |
| îr | pier | hw | which |
| ŏ | pot | zh | vision |
| ō | toe | ə | about; item |
| ô | paw | ¶ | regionalism |

Stress marks: ′ (primary);
′ (secondary); as in
dictionary (dĭk′shə-nĕr′ē)

889

Case 5:06-cv-01839-PVT    Document 66-2    Filed 01/29/2007    Page 85 of 86
Case 3:06-cv-01839-CRB    Document 63    Filed 12/18/2006    Page 6 of 7

IEEE Std 100-1996

# The IEEE Standard Dictionary of Electrical and Electronics Terms

## Sixth Edition

**Standards Coordinating Committee 10, Terms and Definitions**
**Jane Radatz, Chair**

This standard is one of a number of information technology dictionaries being developed by standards organizations accredited by the American National Standards Institute. This dictionary was developed under the sponsorship of voluntary standards organizations, using a consensus-based process.

ISBN 1-55937-833-6



9 781559 378338

90000

hematical notation such as fixed-.
(C) 610.5-1990
to change the size of a display el-
coordinates by a constant value.
sled by the same amount in each
aling) or by a different amount in
(C) 610.6-1991
control that represents a quantity
range of possible values for that
ige the value of the quantity.
(C) 1295-1993

**:and registers)** Denotes, with re-
i, dual-range single-pointer form,
id registers, the relationship be-
f the register and the kilovolt am-
ter with which the register is used.
(ELM) C12.4-1984

**: testing) (measuring system)** (of
actor by which the output indica-
ne the measured value of the input
(PE) 4-1995

**uting)** A number used as a factor
*also:* scale.   (C) 1084-1986w
the multiplication factor necessary
les into computer variables. *Note:*
riable appearing in the mathemat-
A computer variable is a dependent
the computer.
(C) 165-1977w, 610.10-1994

**yros)** The ratio of a change in out-
it intended to be measured. Scale
:d as the slope of the straight line
nethod of least squares to input
arying the input cyclically within
**gyro)** The ratio of change in an-
ne input axis to a change in output
e laser gyro scale factor is always
path length and operating wave-
ortional to the effective enclosed
(AE) 528-1994

**celerometer) (gyros)** The differ-
:tor measured with positive input
;ative input, specified as a fraction
l over the input range. Scale factor
: slope of the input-output function
put. It must be distinguished from
(AE) 528-1994

*ee:* parameter potentiometer.

**ments)** The length of the path de-
neans or the tip of the pointer in
he scale to the other. *Notes:* 1. In
iters and others extending beyond
the pointer shall be considered as
the shortest scale division marks.
the longest scale shall be used to
. 2. In the case of antiparallax in-
type with graduations on a raised
ljacent to the pointer tip, the scale
l by the end of the scale divisions
*See also:* instrument.
(EEC) [102]

lel that resembles a given system,
ale; for example, a replica of an
of the actual airplane.
(C) 610.3-1989

--flop circuit in which successive
a common point, cause the circuit
o conditions of permanent stability.
(EEC/PE) [119]

An instrument incorporating one or
ased for registering the number of
anticoincidence.   (ED) [45]

**scaler, pulse (pulse techniques)** A device that produces an out-
put signal whenever a prescribed number of input pulses has
been received. It frequently includes indicating devices for
interpolation. *See also:* pulse.   (NPS) 175-1960w

**scale span (instrument)** The algebraic difference between the
values of the actuating electrical quantity corresponding to
the two ends of the scale. *See also:* instrument.
(EEC/PE) [119]

**scaling (A)** The formation at high temperatures of thick corro-
sion product layer(s) on a metal surface. **(B)** The deposition
of water-insoluble constituents on a metal surface (as on the
interior of water boilers).   (IA) [59]

**scaling circuit (radiation counters)** A device that produces an
output pulse whenever a prescribed number of input pulses
has been received. *See also:* anticoincidence.   (ED) [45]

**scalloping (navigation aid terms)** The irregularities in the field
pattern of the ground facility due to unwanted reflections from
obstructions or terrain features, exhibited in flight as cyclical
variations in bearing error. *Synonym:* course scalloping.
(AE) 172-1983w

**scan (1) (general)** To examine sequentially part by part.
(C) [20], [85]
**(2) (oscillography)** The process of deflecting the electron
beam. *See also:* graticule area; oscillograph; phosphor screen;
uniform luminance area.   (IM) [40]
**(3) (interrogation) (supervisory control, data acquisition,
and automatic control)** The process by which a data acqui-
sition system interrogates remote stations or points for data.
(PE/SWG/SUB) C37.1-1994, C37.100-1992
**(4) (data management)** To examine a set of items sequen-
tially.   (C) 610.10-1994
**(5)** The process by which a data acquisition system interro-
gates remote terminals or points for data.
(SUB) 999-1992
**(6)** A sampling process of observing attribute values at a spec-
ified point in time.   (C/LM) 802.1F-1993
**(7)** To examine stored information sequentially, part by part.
(C) 610.10-1994

**scan angle** The angle between the direction of the maximum of
the major lobe or a directional null and a reference direction.
*Notes:* 1. The term beam angle applies to the case of a pencil
beam antenna. 2. The reference boresight is usually chosen
as the reference direction. *Synonym:* beam angle.
(AP) 145-1993

**scan conversion** The process of redefining an image from one
that is composed of lines, points, and areas to one that is
expressed in an array of pixels.   (C) 610.6-1991

**scan converter** A device on which a display can be written in
refresh line-drawing mode and read out in raster scan mode.
(C) 610.10-1994

**scan cycle (supervisory control, data acquisition, and auto-
matic control)** The time in seconds required to obtain a col-
lection of data (for example, all data from one remote, all
data from all remotes, and all data of a particular type from
all remotes).
(PE/SWG/SUB) C37.1-1994, C37.100-1992

**scan design** A design technique that introduces shift-register
paths into digital electronic circuits and thereby improves
their testability.   (C/TT) 1149.1-1990

**scan function check** Accomplished when control function
check has been performed with all remotes. A check of master
and remote station equipment by exercising a predefined com-
ponent or capability.   (PE/SUB) C37.1-1994

**scan head** A head within a scanner that sweeps across the item
being scanned and transmits the contents of that item to be
processed by the scanner.   (C) 610.10-1994

**scanner (1) (facsimile)** That part of the facsimile transmitter
which systematically translates the densities of the subject
copy into signal waveform. *See also:* scanning.
(COM) 168-1956w
**(2) (A)** A multiplexing arrangement that sequentially con-
nects one channel to a number of channels. **(B)** An arrange-

ment that progressively examines a surface for information.
*See also:* control system, feedback.   (IA) [60], [69]
**(3) (test, measurement, and diagnostic equipment)** A de-
vice that sequentially samples a number of data points. *See
also:* flying spot scanner; optical scanner; visual scanner.
(MIL) [2]
**(4) (computer graphics)** A graphical input device that ex-
amines a spatial pattern and generates analog or digital sig-
nals, which can be used as input to a computer system.
(C) 610.6-1991
**(5) (A)** A graphic input device that automatically digitizes
images for input to a computer. *See also:* bar code scanner;
magnetic ink scanner; optical scanner; scan head. **(B)** Any
device that is capable of scanning.   (C) 610.10-1994

**scanning (1) (navigation aids)** A programmed motion given to
the major lobe of an antenna for the purpose of searching a
larger angular region than can be covered with a single di-
rection of the beam, or for measuring angular location of a
target; also, the analogous process using range gates and fre-
quency domain filters. *See also:* supervisory control.
(AE) 172-1983w, 686-1990w
**(2) (television)** The process of analyzing or synthesizing suc-
cessively, according to a predetermined method, the light val-
ues of picture elements constituting a picture area.
(BT) 202-1954w
**(3) (facsimile)** The process of analyzing successively the den-
sities of the subject copy according to the elements of a
predetermined pattern. *Note:* The normal scanning is from
left to right and top to bottom of the subject copy as when
reading a page of print. Reverse direction is from right to left
and top to bottom of the subject copy.
(COM) 168-1956w
**(4) (telephone switching systems)** The periodic examination
of circuit states under common control.
(COM) 312-1977w
**(5) (of an antenna beam)** A repetitive motion given to the
major lobe of an antenna.   (AP) 145-1993
**(6)** The process of examining information in a systematic
manner.   (C) 610.10-1994

**scanning, high-velocity (electron tube)** The scanning of a tar-
get with electrons of such velocity that the secondary-emis-
sion rate is greater than unity. *See also:* television.
(ED) 161-1971w

**scanning line (television)** A single continuous narrow strip that
is determined by the process of scanning. *Note:* In most tele-
vision systems, the scanning lines that occur during the re-
trace intervals are blanked. The total number of scanning lines
is numerically equal to the ratio of line frequency to frame
frequency.   (BT) 201-1979w

**scanning linearity (television)** A measure of the uniformity of
scanning speed during the unblanked trace interval.
(BT) 201-1979w

**scanning line frequency** *See:* stroke speed.

**scanning line length (facsimile)** The total length of scanning
line is equal to the spot speed divided by the scanning line
frequency. *Note:* This is generally greater than the length of
the available line. *See also:* scanning.
(COM) 168-1956w

**scanning loss (1) (radar system employing a scanning an-
tenna)** The reduction in sensitivity, usually expressed in dec-
ibels, due to scanning across a target, compared with that
obtained when the beam is directed constantly at the target.
*See also:* antenna.   (AP) 145-1983s
**(2)** The reduction in sensitivity of a scanning radar due to
motion of the beam between transmission and reception of
the signal. *See also:* beamshape loss.   (AE) 686-1990w

**scanning, low-velocity (electron tube)** The scanning of a target
with electrons of velocity less than the minimum velocity to
give a secondary-emission ratio of unity. *See also:* television.
(BT/ED) [34], [45], 161-1971w

**scanning speed (television)** The time rate of linear displace-
ment of the scanning spot.   (BT) 201-1979w

# EXHIBIT C

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Assistant Commissioner for Patents, Washington, D.C. 20231, on April 6, 1998.

TOWNSEND and TOWNSEND and CREW LLP

By _Augusta S. Rogers_

# #10/B

PATENT

OIPE
APR 0 8 1998
PATENT & TRADEMARK OFFICE

Attorney Docket No. 009623-010010

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re application of: | ) | |
| | ) | |
| STEPHEN J. BISSET ET AL. | ) | Examiner: Paul Bell |
| | ) | |
| Application No.: 08/608,116 | ) | Art Unit: 2775 |
| | ) | |
| Filed: February 28, 1996 | ) | AMENDMENT |
| | ) | |
| For: MULTI-CONTACT SENSING | ) | |
| METHOD AND APPARATUS | ) | |

Assistant Commissioner for Patents
Washington, D.C.  20231

Sir:

In response to the Office Action mailed December 5, 1997, please amend the above-referenced application as follows:

In the Claims

Please cancel claims 2, 7-13, 15-17, and 20-23.  Please amend claims 1, 28, and 35, and add new claims 48-51 as follows:

Sub C1

B'

1    1.    (Amended)  A method for detecting the operative
2  coupling of multiple fingers to a touch sensor involving the
3  steps of
4         scanning the touch sensor to identify a first maxima in
5  a signal corresponding to a first finger,
6         scanning the touch sensor to identify a minima
7  following the first maxima, [and]
8         scanning the touch sensor to identify a second maxima
9  in a signal corresponding to a second finger following the
10  minima, and

STEPHEN J. BISSET ET AL.                                    PATENT
Application No.: 08/608,116
Page 2

11      providing an indication of the presence of two fingers

12      in response to identification of said first and second

13      maxima.

1       28.   (Amended)   The method of claim 1 further

2       comprising the step of comparing a distance [from] between said

3       first maxima [to] and said second maxima to a predefined

4       threshold.

1       35.   (Amended)   A touch sensor for detecting the

2       operative coupling of multiple fingers comprising:

3            means for scanning the touch sensor to identify a first

4       maxima in a signal corresponding to a first finger;

5            means for scanning the touch sensor to identify a

6       minima following the first maxima; [and]

7            means for scanning the touch sensor to identify a

8       second maxima in a signal corresponding to a second finger

9       following the minima, and

10           means for providing an indication of the presence of

11      two fingers in response to identification of said first and

12      second maxima.

1       15.   (New)   The method of claim 1 further comprising

2       the step of determining if said first and second maxima are

3       within 5 centimeters, and only providing said indication of the

4       presence of two fingers if said first and second maxima are

5       within 5 centimeters.

1       16.   (New)   The method of claim 1 further comprising

2       the step of calculating first and second centroids corresponding

3       to said first and second fingers.

1       17.   (New)   The method of claim 1 wherein said first

2       and second maxima are required to be higher than a first

3       threshold, and said minima is required to be less than a second

4       threshold.

STEPHEN J. BISSET ET AL.                                    PATENT
Application No.: 08/608,116
Page 3

29. (New)  The sensor of claim 18 further comprising
means for determining if said first and second maxima are within
5 centimeters, and only providing said indication of the presence
of two fingers if said first and second maxima are within 5
centimeters.

30. (New)  The sensor of claim 18 further comprising
means for calculating first and second centroids corresponding to
said first and second fingers.

31. (New)  The sensor of claim 18 wherein said first
and second maxima are required to be higher than a first
threshold, and said minima is required to be less than a second
threshold.

                              REMARKS
          Claims 1, 3-6, and 24-51 are pending in this
application.
          Claims 2, and 15-17 were rejected under §112 as being
indefinite.  These claims have been cancelled.
          The remaining claims are independent method and
apparatus claims 1 and 35, and claims dependent thereon.  These
claims are directed to the feature of the invention which detects
multiple fingers by detecting the multiple maxima in the profile
on the touchpad.  This distinguishes the prior art, which
calculates multiple fingers by detecting a rapid movement in the
total centroid.  This rapid movement of the prior art is due to
the centroid being calculated on the combination of the two
fingers, with the result being that the centroid moves rapidly
when one finger is lifted.

Miller
          Claims 1, 3-13, and 26-34 were rejected as being
obvious in view of Miller.  Miller nowhere suggests detecting two
fingers, and rather the Examiner is citing Miller as showing that
it would generate the profile of two fingers if they were applied
to Miller, since a value is obtained for each line.  Claims 1 and

STEPHEN J. BISSET ET AL.                                    PATENT
Application No.: 08/608,116
Page 4

35 have been amended to further clarify the distinction of the
invention from Miller.  The present invention uniquely utilizes
the detection of two maxima to determine if two fingers are
present on the touchpad.  Nowhere does Miller suggest analyzing
profile information to obtain this result, or to use the result
to provide an indication of two fingers.

        In fact, Synaptics, the Assignee of the Miller patent,
has also been issued Patent No. 5,543,591, enclosed with an IDS
submitted with this application.  That patent teaches away from
the method of the present invention for multiple fingers, instead
calculating the rapid movement of the centroid as a second finger
is placed down on the touchpad and subsequently lifted, referred
to as a "zig-zag" movement.  (See, for example, column 40, line
53 of the '591 patent.)  A disadvantage of the system of the '591
patent, as described in column 31, lines 43-48, is that it is
"impossible to tell ... while the finger is still down" if two
fingers are present.  Rather, the determination of the presence
of two fingers is achievable from the rapid movement of the
centroid (zig-zag) when a finger is lifted or placed down.  Thus,
for example, if both fingers were placed down at the same time,
the '591 patent method would not be able to tell that two fingers
were present, and would not be able to react to a movement of the
two fingers and subsequent lifting until after the second finger
has been lifted.

        The present invention addresses this deficiency of the
'591 method by detecting two maxima in the profile information.
This allows the detection of two fingers being present even if
they are both placed down at the same time.  Such a method is not
shown or suggested by either of the Synaptics patents, which in
fact teach away from this method.

Dunthorn

        Claims 2, 15-17, 20-22, and 24-25 were rejected as
being anticipated by Dunthorn.  All of the rejected claims have
been cancelled.  It is noted that Dunthorn, similarly to the '591
patent, determines the presence of multiple fingers from the

STEPHEN J. BISSET ET AL.                                    PATENT
Application No.: 08/608,116
Page 5

speed of movement of the centroid of the combination of multiple
fingers.


Greanias

        Claims 2, 15, and 20 have been rejected as being
anticipated by Greanias.  These claims have been cancelled.

        New claims 46-51 are method and apparatus dependent
claims.  Claims 46 and 49 are directed to the requirement that
the first and second maxima be within 5 centimeters of each other
to provide an indication of two fingers.  None of the cited
references teach such a feature, as described in the application
on page 9, line 2, for instance.

        Claims 47 and 50 are directed to the embodiment where
first and second centroids are calculated from the first and
second maxima, as described in the application on page 13, lines
35-37, for instance.  None of the cited art show or suggest such
a feature.

        Claims 48 and 51 are directed to the requirement that
the first and second maxima must be higher than a first
threshold, and the minima be lower than a second threshold.  This
is described, for example, on page 8, line 39 - page 9, line 6.

        In view of the foregoing, Applicants believe all claims
now pending in this application are in condition for allowance.
The issuance of a formal Notice of Allowance at an early date is
respectfully requested.

        If the Examiner believes a telephone conference would
expedite prosecution of this application, please telephone the
undersigned at (650) 326-2400.

                        Respectfully submitted,

                        Paul C. Haughey
                        Reg. No. 31,836

TOWNSEND and TOWNSEND and CREW LLP
Two Embarcadero Center, 8th Floor
San Francisco, California  94111-3834
(650) 326-2400
Fax (650) 326-2422                              (j:\logitech\-1001.am2)

#11 *LRogers*
04-13-98

PATENT

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Assistant Commissioner for Patents, Washington, D.C. 20231, on April 6, 1998.

TOWNSEND and TOWNSEND and CREW LLP

By *Lugenia J. Rogers*

Attorney Docket No. 009623-010010

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:                )
                                     )
STEPHEN J. BISSET ET AL.             )    Examiner: Paul Bell
                                     )
Application No.: 08/608,116          )    Art Unit: 2775
                                     )
Filed: February 28, 1996             )    INFORMATION DISCLOSURE
                                     )    STATEMENT UNDER
For: MULTI-CONTACT SENSING           )    37 CFR §1.97 and §1.98
     METHOD AND APPARATUS            )
—————————————————————————————————————)

Assistant Commissioner for Patents
Washington, D.C.  20231

Sir:

The references cited on attached form PTO-1449 are being called to the attention of the Examiner.  A copy of each is enclosed.

It is respectfully requested that the cited information be expressly considered during the prosecution of this application, and the references be made of record therein and appear among the "references cited" on any patent to issue therefrom.

This IDS is being filed after the mailing date of the first Office Action and after three months of the filing date, but prior to the Notice of Allowance or Final Office Action.

Please charge $240.00, pursuant to 37 CFR § 1.17p, to Deposit Account No. 20-1430.  This Petition is submitted in triplicate.

//

//

//

//

# EXHIBIT D

Case 5:06-cv-01839-PVT   Document 66-3   Filed 01/29/2007   Page 9 of 27
Case 3:06-cv-01839-CRB   Document 63   Filed 12/18/2006   Page 6 of 7

IEEE Std 100-1996

# The IEEE Standard Dictionary of Electrical and Electronics Terms

## Sixth Edition

**Standards Coordinating Committee 10, Terms and Definitions**
**Jane Radatz, Chair**

This standard is one of a number of information technology dictionaries being developed by standards organizations accredited by the American National Standards Institute. This dictionary was developed under the sponsorship of voluntary standards organizations, using a consensus-based process.

ISBN 1-55937-833-6



9 781559 378338

90000

scaler, pulse                                                    947                                                    scanning speed

hematical notation such as fixed-. (C) 610.5-1990

o change the size of a display el-coordinates by a constant value. uled by the same amount in each aling) or by a different amount in (C) 610.6-1991

control that represents a quantity range of possible values for that age the value of the quantity. (C) 1295-1993

and registers) Denotes, with re-s, dual-range single-pointer form, d registers, the relationship be-f the register and the kilovolt am-ter with which the register is used. (ELM) C12.4-1984

testing) (measuring system) (of actor by which the output indica-ne the measured value of the input (PE) 4-1995

uting) A number used as a factor also: scale. (C) 1084-1986w the multiplication factor necessary les into computer variables. Note: riable appearing in the mathemat-A computer variable is a dependent the computer. (C) 165-1977w, 610.10-1994

yros) The ratio of a change in out-t intended to be measured. Scale :d as the slope of the straight line method of least squares to approx-arying the input cyclically within gyro) The ratio of change in an-ne input axis to a change in output e laser gyro scale factor is always ath length and operating wave-ortional to the effective enclosed (AE) 528-1994

celerometer) (gyros) The differ-:tor measured with positive input tative input, specified as a fraction d over the input range. Scale factor slope of the input-output function put. It must be distinguished from (AE) 528-1994

iee: parameter potentiometer.

ments) The length of the path de-neans or the tip of the pointer in he scale to the other. Notes: 1. In aters and others extending beyond the pointer shall be considered as the shortest scale division marks. the longest scale shall be used to . 2. In the case of antiparallax in-type with graduations on a raised ljacent to the pointer tip, the scale l by the end of the scale divisions See also: instrument. (EEC) [102]

lel that resembles a given system, ale; for example, a replica of an of the actual airplane. (C) 610.3-1989

-flop circuit in which successive a common point, cause the circuit o conditions of permanent stability. (EEC/PE) [119]

An instrument incorporating one or used for registering the number of anticoincidence. (ED) [45]

scaler, pulse (pulse techniques) A device that produces an out-put signal whenever a prescribed number of input pulses has been received. It frequently includes indicating devices for interpolation. See also: pulse. (NPS) 175-1960w

scale span (instrument) The algebraic difference between the values of the actuating electrical quantity corresponding to the two ends of the scale. See also: instrument. (EEC/PE) [119]

scaling (A) The formation at high temperatures of thick corro-sion product layer(s) on a metal surface. (B) The deposition of water-insoluble constituents on a metal surface (as on the interior of water boilers). (IA) [59]

scaling circuit (radiation counters) A device that produces an output pulse whenever a prescribed number of input pulses has been received. See also: anticoincidence. (ED) [45]

scalloping (navigation aid terms) The irregularities in the field pattern of the ground facility due to unwanted reflections from obstructions or terrain features, exhibited in flight as cyclical variations in bearing error. Synonym: course scalloping. (AE) 172-1983w

scan (1) (general) To examine sequentially part by part. (C) [20], [85]

(2) (oscillography) The process of deflecting the electron beam. See also: graticule area; oscillograph; phosphor screen; uniform luminance area. (IM) [40]

(3) (interrogation) (supervisory control, data acquisition, and automatic control) The process by which a data acqui-sition system interrogates remote stations or points for data. (PE/SWG/SUB) C37.1-1994, C37.100-1992

(4) (data management) To examine a set of items sequen-tially. (C) 610.10-1994

(5) The process by which a data acquisition system interro-gates remote terminals or points for data. (SUB) 999-1992

(6) A sampling process of observing attribute values at a spec-ified point in time. (C/LM) 802.1F-1993

(7) To examine stored information sequentially, part by part. (C) 610.10-1994

scan angle The angle between the direction of the maximum of the major lobe or a directional null and a reference direction. Notes: 1. The term beam angle applies to the case of a pencil beam antenna. 2. The reference boresight is usually chosen as the reference direction. Synonym: beam angle. (AP) 145-1993

scan conversion The process of redefining an image from one that is composed of lines, points, and areas to one that is expressed in an array of pixels. (C) 610.6-1991

scan converter A device on which a display can be written in refresh line-drawing mode and read out in raster scan mode. (C) 610.10-1994

scan cycle (supervisory control, data acquisition, and auto-matic control) The time in seconds required to obtain a col-lection of data (for example, all data from one remote, all data from all remotes, and all data of a particular type from all remotes). (PE/SWG/SUB) C37.1-1994, C37.100-1992

scan design A design technique that introduces shift-register paths into digital electronic circuits and thereby improves their testability. (C/TT) 1149.1-1990

scan function check Accomplished when control function check has been performed with all remotes. A check of master and remote station equipment by exercising a predefined com-ponent or capability. (PE/SUB) C37.1-1994

scan head A head within a scanner that sweeps across the item being scanned and transmits the contents of that item to be processed by the scanner. (C) 610.10-1994

scanner (1) (facsimile) That part of the facsimile transmitter which systematically translates the densities of the subject copy into signal waveform. See also: scanning. (COM) 168-1956w

(2) (A) A multiplexing arrangement that sequentially con-nects one channel to a number of channels. (B) An arrange-

ment that progressively examines a surface for information. See also: control system, feedback. (IA) [60], [69]

(3) (test, measurement, and diagnostic equipment) A de-vice that sequentially samples a number of data points. See also: flying spot scanner; optical scanner; visual scanner. (MIL) [2]

(4) (computer graphics) A graphical input device that ex-amines a spatial pattern and generates analog or digital sig-nals, which can be used as input to a computer system. (C) 610.6-1991

(5) (A) A graphic input device that automatically digitizes images for input to a computer. See also: bar code scanner; magnetic ink scanner; optical scanner; scan head. (B) Any device that is capable of scanning. (C) 610.10-1994

scanning (1) (navigation aids) A programmed motion given to the major lobe of an antenna for the purpose of searching a larger angular region than can be covered with a single di-rection of the beam, or for measuring angular location of a target; also, the analogous process using range gates and fre-quency domain filters. See also: navigation. (AE) 172-1983w, 686-1990w

(2) (television) The process of analyzing or synthesizing suc-cessively, according to a predetermined method, the light val-ues of picture elements constituting a picture area. (BT) 202-1954w

(3) (facsimile) The process of analyzing successively the den-sities of the subject copy according to the elements of a predetermined pattern. Note: The normal scanning is from left to right and top to bottom of the subject copy as when reading a page of print. Reverse direction is from right to left and top to bottom of the subject copy. (COM) 168-1956w

(4) (telephone switching systems) The periodic examination of circuit states under common control. (COM) 312-1977w

(5) (of an antenna beam) A repetitive motion given to the major lobe of an antenna. (AP) 145-1993

(6) The process of examining information in a systematic manner. (C) 610.10-1994

scanning, high-velocity (electron tube) The scanning of a tar-get with electrons of such velocity that the secondary-emis-sion rate is greater than unity. See also: television. (ED) 161-1971w

scanning line (television) A single continuous narrow strip that is determined by the process of scanning. Note: In most tele-vision systems, the scanning lines that occur during the re-trace intervals are blanked. The total number of scanning lines is numerically equal to the ratio of line frequency to frame frequency. (BT) 201-1979w

scanning linearity (television) A measure of the uniformity of scanning speed during the unblanked trace interval. (BT) 201-1979w

scanning line frequency See: stroke speed.

scanning line length (facsimile) The total length of scanning line is equal to the spot speed divided by the scanning line frequency. Note: This is generally greater than the length of the available line. See also: scanning. (COM) 168-1956w

scanning loss (1) (radar system employing a scanning an-tenna) The reduction in sensitivity, usually expressed in dec-ibels, due to scanning across a target, compared with that obtained when the beam is directed constantly at the target. See also: antenna. (AP) 145-1983s

(2) The reduction in sensitivity of a scanning radar due to motion of the beam between transmission and reception of the signal. See also: beamshape loss. (AE) 686-1990w

scanning, low-velocity (electron tube) The scanning of a target with electrons of velocity less than the minimum velocity to give a secondary-emission ratio of unity. See also: television. (BT/ED) [34], [45], 161-1971w

scanning speed (television) The time rate of linear displace-ment of the scanning spot. (BT) 201-1979w

# EXHIBIT E

# THE
# NEW SHORTER
# OXFORD ENGLISH
# DICTIONARY

## ON HISTORICAL PRINCIPLES

EDITED BY

**LESLEY BROWN**

VOLUME 1

A–M

CLARENDON PRESS · OXFORD

SYN 00103315

*Oxford University Press, Great Clarendon Street, Oxford* OX2 6DP
*Oxford New York*
*Athens Auckland Bangkok Bogota Buenos Aires Calcutta*
*Cape Town Chennai Dar es Salaam Delhi Florence Hong Kong Istanbul*
*Karachi Kuala Lumpur Madrid Melbourne Mexico City Mumbai*
*Nairobi Paris São Paolo Singapore Taipei Tokyo Toronto Warsaw*
*and associated companies in*
*Berlin Ibadan*

*Oxford is a registered trade mark of Oxford University Press*

*Published in the United States by*
*Oxford University Press Inc., New York*

© *Oxford University Press 1973, 1993*

*First Edition 1933*
*Second Edition 1936*
*Third Edition 1944*
*Reprinted with revised Etymologies and Enlarged Addenda 1973*
*This Edition 1993*

*All rights reserved. No part of this publication may be reproduced,*
*stored in a retrieval system, or transmitted, in any form or by any means,*
*without the prior permission in writing of Oxford University Press.*
*Within the UK, exceptions are allowed in respect of any fair dealing for the*
*purpose of research or private study, or criticism or review, as permitted*
*under the Copyright, Designs and Patents Act, 1988, or in the case of*
*reprographic reproduction in accordance with the terms of the licences*
*issued by the Copyright Licensing Agency. Enquiries concerning*
*reproduction outside these terms and in other countries should be*
*sent to the Rights Department, Oxford University Press,*
*at the address above*

*British Library Cataloguing in Publication Data*
*Data available*

*Library of Congress Cataloging in Publication Data*
*Data available*

*ISBN 0-19-861134-X Plain Edition*
*ISBN 0-19-861271-0 Thumb Index Edition*
*ISBN 0-19-863142-1 Luxury Edition*
*ISBN 0-19-195804-2 Leather Bound Edition*

10

*Printed in the United States of America*
*on acid-free paper*

SYN 00103316

**mavis**    1720    **Maxwell**

legal claim; steal. L19. 2 *v.i.* Stray or wander like a maverick. E20.

**mavis** /ˈmeɪvɪs/ *n.* Now *poet.* & *dial.* LME. [(O)Fr. *mauvis*.] A song thrush.
*red wavis:* see RED *a.*

**Mavors** /ˈmeɪvɔːz/ *n. literary.* L16. [L: see MARS.] = MARS 2.

**mavourneen** /məˈvʊəniːn/ *n. Anglo-Ir.* E19. [Ir. *mo mhuirnín*, f. *mo* my + *muirnín* dim. of *muirn* affection: see -EEN².] My darling.

**mavrodaphne** /mavrəˈdafni/ *n.* E20. [mod.Gk f. late Gk *mauros* dark (Gk *amauros*) + *daphnē* laurel.] A dark-red sweet Greek wine; the grape from which this is made.

**mavrone** /məˈvrəʊn/ *int. Anglo-Ir.* L19. [Ir. *mo bhrón*, f. *mo* my + *brón* grief.] Expr. sorrow.

**maw** /mɔː/ *n.¹* [OE *maga* corresp. to OFris. *maga*, MDu. *maghe* (Du. *maag*), OHG *mago* (G. *Magen*), ON *magi*, f. Gmc.] 1 The stomach of an animal or (now *joc.*) a person; the cavity of the stomach. Formerly *spec.*, the abomasum or fourth stomach of a ruminant. OE. 2†a Any of various internal organs, as (a) the abdominal cavity as a whole; the belly; (b) the womb; (c) the liver. ME–E16. b The swim-bladder of a fish. LME. 3 The throat, the gullet; *esp.* the jaws or mouth of a voracious mammal or fish. LME. †4 Appetite, inclination, liking. L16–818.
▸ N. HAWTHORNE Destined to glut the ravenous maw of that detestable man-brute. 3 *Trout & Salmon* It stuck its head up out of the river .. and it opened its great maw wide. *transf.:* K. KESEY We'll face the terrible maw of a muzzle-loading shotgun. 4 C. CISBER I have no great Maw to that Business, methinks.

**maw** /mɔː/ *n.²* Long *obs.* exc. *Sc.* & *north.* LME. [Reduced form of MALLOW.] *sing.* & (usu.) in *pl.* (treated as *sing.*). A mallow.

**maw** /mɔː/ *n.³* *obs.* exc. *dial.* LME. [ON *már* = OE *mǣw:* see MEW *n.¹*] A gull, *esp.* the common gull, *Larus canus.*

**maw** /mɔː/ *n.⁴* *obs.* exc. *Hist.* M16. [Origin unkn.] A Gaelic card-game from which twenty-five and spoil five developed.

**maw** /mɔː/ *n.⁵* *colloq.* & *dial.* (chiefly US). E20. [Repr. a pronunc. of MA *n.:* cf. PAW *n.³*] = MA *n.*

**mawk** /mɔːk/ *n.* *obs.* exc. *dial.* LME. [ON *maðkr:* see MADDOCK.] A maggot.

**mawkin** *n.* var. of MALKIN.

**mawkish** /ˈmɔːkɪʃ/ *a.* M17. [f. MAWK + -ISH².] 1 Inclined to sickness; without appetite. *obs.* exc. *dial.* M17. 2 Having a nauseating, sickly, or insipid taste. L17. 3 Feebly sentimental; imbued with sickly or false sentiment. 818.
▸ 2 P. V. WHITE She reached out for the .. barley water .. and tried to find comfort in .. that mawkish stuff. 3 C. P. SNOW Dickens made a mawkish cult of Mary Hogarth, and idolised her. . .
**mawkishly** *adv.* M18. **mawkishness** *n.* 818.

**mawky** /ˈmɔːki/ *a.* *obs.* exc. *dial.* L18. [f. MAWK + -Y¹.] 1 Maggoty (*lit.* & *fig.*). L18. 2 = MAWKISH 3. M19.

**mawm** *n.* see MAUM.

†**mawmish** *a.* M17–M19. [f. base of MALM *n.* + -ISH¹.] = MAWKISH 2, 3.

**mawseed** /ˈmɔːsiːd/ *n. arch.* M18. [Partial tr. G dial. *Mahsaat*, *Mohsamen*, f. *Mah*, *Moh* poppy (G *Mohn*) + *Saat*, *Samen* seed.] The seed of the opium poppy, *Papaver somniferum.*

**mawther** *n.* var. of MAUTHER.

**mawworm** /ˈmɔːwəːm/ *n.¹* Now *rare* or *obs.* E17. [f. MAW *n.¹* + WORM *n.*] A parasitic worm, *esp.* a nematode, infesting the gut of humans and other mammals.

**mawworm** /ˈmɔːwəːm/ *n.²* M19. [*Mawworm*, a character in Isaac Bickerstaffe's play *The Hypocrite*, 1769.] A hypocritical pretender to sanctity.

†**max** *n.¹* E–M19. [Origin unkn.] Gin.

**max** /maks/ *n.¹* & *a. N. Amer. colloq.* M19. [Abbrev. of MAXIMUM.] A *n.* 1 A maximum figure, achievement, etc. M19. 2 A maximum security prison. M20.
1 GRODY *to the max.*
B *attrib.* or as *adj.* Maximum. M20.

**max q** *Astronaut.* the maximum dynamic pressure exerted on an aircraft or spacecraft in the course of its flight; the part of a flight during which the highest aerodynamic pressures are encountered.

**max** /maks/ *v. US colloq.* L19. [f. prec.] 1 *v.i.* & *t.* (usu. foll. by *out*). Do (a thing) well; perform to the limit of one's capacity, endurance, etc. L19. 2 *v.i.* Complete a maximum prison sentence. L20.

**max** /maks/ *adv. US colloq.* L20. [f. as prec.] At the maximum, at the most.

**maxi** /ˈmaksi/ *n. colloq.* M20. [f. next.] A thing that is large or long of its kind; *spec.* (a) a maxi-skirt; (b) *Austral.* & *NZ* a maxi-yacht.

**maxi–** /ˈmaksi/ *comb. form.* M20. [f. MAXI(MUM: cf. MINI–.] Forming chiefly *ns.* denoting a thing that is large or long of its kind, *esp.* a garment of (*Austral.* & *NZ*) a racing yacht, as *maxi-coat*, *maxi-skirt*, etc.

**maxilla** /makˈsɪlə/ *n.* Pl. **-llae** /-liː/. LME. [L = jaw.] 1 A jaw, a jawbone; *spec.* either of a pair of bones forming (part of) the upper jaw in vertebrates. LME. 2 In insects and other arthropods, either of a pair of mouthparts posterior to and accessory to the mandibles. L18.
¶ *Cf.* MANDIBLE.
†**maxillar** *a.* & *n.* (a) *maxillary* L16–818. **maxillary** *a. & n.* (a) *adj.* M17 of, pertaining to, or designating a maxilla; forming part of a maxilla; (b) *n.* a maxillary bone; a maxilla: 817.

**maxilliped** /makˈsɪlɪpɛd/ *n.* Also **-pede** /-piːd/. M19. [f. MAXILLA + -I- + L *ped-*, *pes* foot.] *Zool.* In crustaceans, an appendage modified for feeding and occurring in pairs behind the maxillae.

**maxillo–** /makˈsɪləʊ/ *comb. form.* [f. MAXILLA: see -O-.] Forming adjs. w. the sense pertaining to the maxilla and —', as *maxillofacial*, *maxillo-mandibular*, etc., and ns. etc. derived from them.

**maxim** /ˈmaksɪm/ *n.¹* LME. [Fr. *maxime* or its source *med.L. maxima* use as *n.* (sc. *propositio* proposition) of fem. of *maximus:* see MAXIMUM. Cf. MAXIMA *n.*] ¶1 A self-evident proposition assumed as a premiss in mathematical or dialectical reasoning. LME–L17. 2 A proposition, *esp.* a pithily-worded one, expressing a general truth drawn from science, law, or experience. Cf. earlier MAXIMUM 1. L16. 3 A rule or principle of conduct; a pithily-expressed precept of morality or prudence. L16.
▸ 1 R. BENTLEY It is urged as an universal Maxim, That Nothing can procede from Nothing. 2 *Weekly Notes* He considered at length the meaning of the maxim, 'a man's house is his castle.' J. BERMAN She acts out the psychoanalytic maxim that wishes and fears are often inextricably related. 3 D. M. FRAME The maxim 'Know thyself' was on the temple of Apollo at Delphi.

**Maxim** /ˈmaksɪm/ *n.²* L19. [Sir Hiram S. *Maxim* (1840–1916), US-born Brit. inventor.] In full *Maxim (machine-)gun.* A single-barrelled quick-firing machine-gun with a barrel surrounded by an outer casing filled with water to keep the parts cool.

†**maxima** *n.¹* M16. [med.L: see MAXIM *n.¹*] 1 = MAXIM *n.* M–L16. 2 *Mus.* = LARGE *n.* 4. M18–E19.

**maxima** *n.⁴* pl. of MAXIMUM *n.*

**maximal** /ˈmaksɪm(ə)l/ *a.* L19. [f. MAXIMUM + -AL².] Consisting of or relating to a maximum; of the greatest possible size, duration, or capacity.
**maxi'mality** *n.* the property of being maximal. M20. **maximally** *adv.* L19.

**maximalist** /ˈmaksɪm(ə)lɪst/ *n.* & *a.* Also M–. E20. [f. prec. + -IST, after Russ. *maksimalist.* Cf. BOLSHEVIK.] A *n.* A person who holds out for the maximum of his or her demands and rejects compromises; *spec.* (*Hist.*) a member of the part of the Russian Social-Democratic Party which favoured extreme methods; a member of 'any similar group outside the former USSR. E20. B *attrib.* or as *adj.* Of, pertaining to, or characteristic of maximalists or maximalism. M20.

**maximalism** *n.* the beliefs or practices of maximalists E20.

**maximand** /ˈmaksɪmand/ *n.* M20. [f. MAXIM(IZE *v.* + -AND.] A thing which is to be maximized.

**maximin** /ˈmaksɪmɪn/ *n.* & *a.* M20. [f. MAXI(MUM + MIN(IMUM, after *minimax.*] *Math.* A *n.* The largest of a set of minima. M20. B *attrib.* or as *adj.* Of, pertaining to, or of the nature of a maximin; *spec.* in *Game Theory*, designating a strategy that maximizes the smallest gain that can be relied on by a participant in a game or other situation of conflict. Cf. MINIMAX *n.* & *a.* M20.

**maximize** /ˈmaksɪmʌɪz/ *v.* Also **-ise**. E19. [f. L *maximus* (see MAXIMUM) + -IZE.] 1 *v.t.* Increase to the highest possible degree; enhance to the utmost. E19. 2 *v.t.* Chiefly *Theol.* Maintain the most rigorous or comprehensive interpretation possible of a doctrine or an obligation. L19. 3 *v.i.* Reach a maximum value. L20.
▸ 1 A. S. DALE He .. went to his father for advice on how to maximize his income. 2 W. S. LILLY I am far from wishing to maximize upon this matter. 3 *Globe & Mail* (*Toronto*) If emissions were curtailed now, the resultant ozone destruction would maximize around 1990.
**maximi'zation** *n.* E19. **maximizer** *n.* M19.

**maximum** /ˈmaksɪməm/ *n.* & *a.* M16. [(Fr. f.) L use as *n.* of neut. of L *maximus* superl. of *magnus* great.] A *n.* Pl. **maxima** /ˈmaksɪmə/, **maximums**. †‡1 = MAXIM *n.²* 2. Only in M16.
‡1 †2 The largest portion in which matter can exist. Only in M17. 3 *Math.* The greatest value which a variable may have; the largest element in a set; a point at which a continuously varying quantity ceases to increase and begins to decrease. M18. 4 *gen.* The highest possible magnitude or quantity of something attained, attainable, or customary; an upper limit of magnitude or quantity. M18. b The highest amount (esp. of temperature, barometric pressure, etc.) attained or recorded within a particular period. M19. 5 A superior limit imposed by authority; *esp.* in *Fr. Hist.*, a limit of price for corn. E19.
▸ 4 T. M. LINDSAY A strange compound of minimum of fact and maximum of theory. A. STORR Dependence is at its maximum at birth, when the human infant is most helpless.
*Comb.:* **maximum thermometer**: that records the highest temperature attained since it was last set.
B *attrib.* or as *adj.* Of or pertaining to a maximum, that is a maximum. M19.
Z. TOMIN It was a maximum price: that may not by law etc. be exceeded.

**maxina** /ˈmaksɪnə/ *n.* E20. [Origin unkn.] A kind of ballroom dance in common time, first introduced in England in 1917.

**maxixe** /maˈʃiːks, *foreign* maˈʃiʃə/ *n.* E20. [Port.] A dance for couples, of Brazilian origin, resembling the polka and the local tango.

**Maxwell** /ˈmakswɛl/ *n.* L19. [James Clerk *Maxwell* (1831–79), Sc. physicist.] *Physics.* 1 Used in *possess.* and *attrib.* to designate concepts originated by Maxwell. L19. 2 (**m–**.) A unit of magnetic flux in the cgs system, equal to the flux through an area of one square centimetre normal to a uniform induction of one gauss, and equivalent to 10⁻⁸ weber. E20.
1 Maxwell('s) demon a device (or imaginary being) conceived as allowing only fast-moving molecules to pass through a hole in one direction and only slow-moving ones in the other direction, so that if the hole is in a partition dividing a gas-filled vessel into two parts, one side becomes warmer and the other cooler, in violation of the second law of thermodynamics. Maxwell('s) distribution (a formula describing) the distribution of molecular velocities predicted by Maxwell's law, the number having a velocity between $u$ and $u + du$ being proportional to $\exp(-\frac{1}{2}mu^2/kT)u^2 du$ (where $m$ is the mass of a molecule, $k$ a Boltzmann's constant, and $T$ is the absolute temperature). Maxwell('s) equation each of a set of four linear partial differential equations which summarize the classical properties of the electromagnetic field and relate space and time derivatives of the electric and

b *but*, d *dog*, f *few*, g *get*, h *he*, j *yes*, k *cat*, l *leg*, m *man*, n *no*, p *pen*, r *red*, s *sit*, t *top*, v *van*, w *we*, z *zoo*, ʃ *she*, ʒ *vision*, θ *thin*, ð *this*, ŋ *ring*, tʃ *chip*, dʒ *jar*

SYN 00103321

Case 5:06-cv-01839-PVT    Document 66-3    Filed 01/29/2007    Page 15 of 27

sin. A. HUTSCHNECKER Pride made him minimize his inner terror.
**minimi'zation** n. E19. **minimizer** n. M19.

**minimum** /'mɪnɪməm/ n. & a. M17. [L. use as n. of neut. of *minimus*: see MINIM n. & a.] A n. Pl. **minima** /'mɪnɪmə/. † 1 The smallest portion into which matter is divisible; an atom. Also, the hypothetical smallest possible portion of time or space. M17-M18. 2 The smallest amount or quantity possible, usual, attainable, etc. L17. 3 *Math.* The least value which a variable or a function may have; the smallest element in a set; a point at which a continuously varying quantity ceases to decrease and begins to increase; the value of a quantity at such a point. M18. 4 The lowest amount of a varying quantity (e.g. temperature, pressure, sunspot activity, etc.) attained or recorded within a particular period. E19.

*Comb.:* minimum thermometer: which records the lowest temperature attained since it was last set. B *adj.* That is a minimum; that is the lowest possible, usual, attainable, etc. E19.

*Special collocations:* minimum free form Ling. = MINIMAL free form. minimum leading rate Econ. the minimum percentage at which a central bank will discount bills (abolished in Britain in 1981).

**minimus** /'mɪnɪməs/ n. & a. L16. [L: see MINIM.] A n. Pl. **-mi** /-maɪ/. A very small or insignificant creature. L16. B *adj.* Designating the youngest of several pupils with the same surname or the last to enter a school. (Appended to a surname and used esp. in public schools.) Cf. MINOR a. 1b. L18.
¶ See also GLUTEUS *minimus*.

**mining** /'maɪnɪŋ/ vbl n. E16. [f. MINE v. + -ING².] The action of MINE v.; esp. the act or industry of extracting metals, coal, etc., from a mine.
*coal-mining, gold-mining, hydraulic mining, etc.*
*Comb.:* mining-hole a hole bored to receive a blasting charge in mining; mining town: chiefly inhabited by miners.

**mining** /'maɪnɪŋ/ ppl a. M16. [f. MINE v. + -ING².] That mines.
mining bee any of various solitary bees of the family Andrenidae, many of which nest in tunnels in the ground, sometimes grouped in colonies.

**minion** /'mɪnjən/ n.¹ & a. E16. [Fr. *mignon* repl. OFr. *mignot*: cf. MIGNON.] A n. 1 a A lover; (chiefly *derog.*) a mistress. Formerly also as a form of address. Now *rare* or *obs.* E16. b A favourite of a monarch, prince, or other powerful person; *derog.* a servile agent, a slave. Now also, a follower, an attendant, an assistant, etc. E16. c A favourite child, servant, animal, etc. Also as a form of address. Now *derog.* M16. † 2 A small kind of ordnance. M16-L19. 3 A size of type between nonpareil and brevier. M17. † 4 A kind of peach. Also more fully *minion peach.* L17-M18.
B *adj.* 1 Dainty, elegant, fine, pretty, neat. Now *rare.* E16. 2 Dearly loved, favourite, pet. Now *rare.* E18.
*Special collocations:* † minion peach = sense A4 above.

**minion** /'mɪnjən/ n.² *rare.* E17. [Fr. f. L. MINIUM.] † 1 = MINIUM. E-M17. 2 Calcined iron ore used in cement or mortar. L18.

**miniscule** n. & a. *see* MINUSCULE.

**minish** /'mɪnɪʃ/ v. *arch.* ME. [OFr. *menu(i)sier*, ult. f. L. MINUTIA: cf. MINCE v. & n.] I v.t. 1 = DIMINISH 1, 2. ME. b Break up *into* (parts etc.). *rare.* LME. 2 Disparage, belittle. *rare.* LME. 3 Take away, remove. L15. II v.i. 4 = DIMINISH 6. ME. † 5 Take something away. LME-E16.

**minister** /'mɪnɪstə/ n. ME. [(O)Fr. *ministre* f. L. *minister*, f. *minus* less, adv. corresp. to *minor* MINOR a., parallel in formation to *magister* MASTER n.¹] 1 a A person acting under the authority or as an agent of another; *spec.* † (a) a law officer; † (b) a subordinate officer, an underling. Now *rare.* ME. b A person or thing employed or used to achieve a purpose or intention, convey a gift, etc. Foll. by *of.* Now *rare* exc. as passing into sense 2. LME. 2 *Eccl.* a A person, esp. an ordained one, with a certain liturgical ministry or function; a member of the

clergy, esp. in a Protestant Church, responsible for leading or coordinating preaching, public worship, and pastoral care in a particular church, chapel, community, etc.; a pastor. ME. b A functionary or official of a religion other than Christianity. *Long rare.* LME. c *RC Ch.* (The title of) the superior of certain religious orders. Also *minister general.* LME. 3 † a A servant, an attendant. LME-L18. b A person who ministers to the wants of another. *arch.* E19. 4 *Polit.* (Also M-.) a A person appointed to act for a head of State etc. in a particular government department; a person in charge of a government department; a Secretary of State. E17. b A diplomatic agent officially representing a State or sovereign in a foreign country, esp. one ranking below an ambassador. E18. 5 A fish: = *horn pout* s.v. HORN n. & a. US. M19.

1a S. JOHNSON The community, of which the magistrate is only the minister. b H. P. LIDDON The Angels are ministers of the Divine Will. 2a GEO. ELIOT Something between the Catholic priest and the dissenting minister. L. M. MONTGOMERY That's the way the ministers say it in church. R. A. KNOX You will want human ministers to dispense the sacraments. minister of religion (esp. in official use) a member of the clergy of any denomination. 4a M. E. G. DUFF The King... immediately dismissed his Ministers. *Daily Mirror* At a Cabinet meeting some Ministers.. complained that the Chancellor had got it all wrong. *Foreign Minister:* see FOREIGN. **Minister of State** a minister in the British Government, *esp.* one holding a rank below that of a head of department. **Minister of the Crown** a minister or head of a department in the British Government. **minister** *premier:* see PREMIER *a.* 1. **Minister without Portfolio** a minister in the British Government, with Cabinet rank but not in charge of a specific department. *premier minister:* see PREMIER *a.* 1. *Prime Minister:* see PRIME *a.*

**ministership** *n.* the office or position of a minister M16. † **ministeral** *a.* (*rare*) pertaining to a minister or agent E18-M19.

**minister** /'mɪnɪstə/ v. ME. [(O)Fr. *ministrer* f. L. *ministrare*, f. *minister*: see prec.] I v.i. *Chr. Ch.* Serve or officiate at a service; act as a minister. ME. 2 v.i. Serve, esp. at table; attend to or be the needs of another; assist, be useful, (to a person, cause, etc.); be conducive or contribute to something. LME. 3 v.i. Provide, supply, impart, (something necessary or helpful). Formerly also, administer (justice, a sacrament, etc.). *arch.* LME.

2 **ministering** angel a kind-hearted person, esp. a woman, who nurses or comforts others. 3 A. P. STANLEY The story.. was able to minister true consolation.

**ministerial** /mɪnɪ'stɪərɪəl/ a. & n. M16. [Fr. *ministériel* or late L. *ministerialis*, f. L. *ministerium* MINISTRY, but *app.* interpreted as deriv. of MINISTER *n.*: see -IAL.] A *adj.* 1 Pertaining to the office, function, or character of a minister of religion. M16. 2 Pertaining to or entrusted with the execution of the law or the commands of a superior. L16. 3 Subsidiary or instrumental in achieving a purpose etc. L17. 4 Of or pertaining to a Minister of State or a government department. M17.

3 De QUINCEY We may admit arts of style and ornamental composition as the ministerial part of rhetoric. 4 H. MARTINEAU Parliament was to be dissolved on the first ministerial reverse.

B *n. Hist.* An executive household officer under the feudal system. E19.

**ministerialism** *n.* support for the Government M19. **ministerialist** *n.* a supporter of the Government L18. **ministerially** *adv.* in the manner or capacity of a minister E17.

**ministrable** /'mɪnɪstrəb(ə)l/ a. & n. E20. [Fr., f. as MINISTER v.: see -ABLE.] *Polit.* (A person who is) likely or expected to become a minister.

**ministrant** /'mɪnɪstr(ə)nt/ a. & n. M16. [L. *ministrant-* pres. ppl stem of *ministrare*: see MINISTER v., -ANT¹.] A *adj.* That ministers. M16. B *n.* A person who ministers. E19.

**ministrate** /'mɪnɪstreɪt/ v.t. *rare. Long* L15. [L. *ministrat-* see part., -ATE³.] Administer.

**ministration** /mɪnɪ'streɪ(ʃ)n/ n. ME. [OFr., or L. *ministratio(n-)*, f. *ministrat-* pa. ppl stem of *ministrare* MINISTER v.: see -ATION.] 1 The action

or an act of serving or ministering, esp. in religious matters; in *pl.*, the services of a minister of religion etc. ME. † 2 The action of administering a sacrament, justice, an estate, etc.; administration. ME-L16. † 3 Agency, instrumentality. LME-M16. 4 The action of supplying, providing, or giving something. Foll. by *of.* L16.

**ministrative** /'mɪnɪstrətɪv/ a. M19. [App. f. MINISTER v. + -ATIVE.] Pertaining to or of the nature of ministration; affording service or assistance.

**ministrator** /'mɪnɪstreɪtə/ n. *rare.* LME. [L. f. *ministrare*: see MINISTER v., -ATOR.] A person who ministers or administers. Formerly also, the executor of a will.

**ministress** /'mɪnɪstrɪs/ n. L15. [f. MINISTER v. + -ESS¹.] A person who ministers or serves.

**ministress** /'mɪnɪstrɪs/ n. L15. [f. MINISTER n. + -ESS¹.] A female minister. Chiefly *fig.*
M. AKENSIDE Beauty sent from heaven, The lovely ministress of truth and good.

**ministry** /'mɪnɪstri/ n. LME. [L. *ministerium*, f. MINISTER n.] 1 The action of ministering; ministration. Now *rare* exc. as passing into sense 2a. LME. † b A particular kind of ministration; a function, an office. LME-M17. c The condition or fact of being an agent or instrument; agency, instrumentality. Now *rare.* L16. 2 *Eccl.* a The functions or a particular function proper or pertaining to a minister, priest, etc.; the action or an act of religious ministration. LME. b *collect.* The clergy; the ministers of a Church, esp. the Established Church. Now *rare.* M16. c The period of tenure of a particular minister. E17. d The clerical profession or calling; the office of minister of a church or congregation. E19. 3 *collect.* The body of executive officers responsible for the functions of government or the law; now *spec.* the ministers responsible for the administration of a country or State. Also, the period of government under one Prime Minister. LME. 4 (Also M-.) A government department headed by a minister; the building occupied by a government department. L19.

1 TENNYSON My idea of heaven is the perpetual ministry of one soul to another. c A. PHILIPS Heroic believers become such by the ministry of pious pains. 2a J. SWAN A certain Priest.. was suspended from his ministry. b ANDREW THOMSON Patronage.. was the most effective instrument of placing a hireling ministry in the pulpits. d D. CUPITT Being intended for the ministry he entered Strasburg University to study theology. 4 *Ministry of Agriculture, Ministry of Defence, Ministry of the Interior,* etc.

**minium** /'mɪnɪəm/ n. LME. [L.] 1 Cinnabar, esp. as a red pigment; vermilion. *obs.* exc. *Hist.* LME. 2 Any red earth. *Long rare* or *obs.* E17. 3 = *red lead* s.v. RED a. M17.

**miniver** /'mɪnɪvə/ n. Also **-nev-**. L16. [AN *menuver* f. (O)Fr. *menu vair*, f. *menu* little (see MENU) + VAIR.] 1 A kind of fur (now plain white) used as a lining and trimming in ceremonial dress. L16. 2 Orig., the animal from which this fur was (supposedly) obtained. Now only (*dial.*), a stoat or ermine in its winter coat. M17.

**minivet** /'mɪnɪvɛt/ n. M19. [Origin unkn.] Any of various brightly coloured cuckoo shrikes of the genus *Pericrocotus*, of tropical Asia.

**mink** /mɪŋk/ n. & a. LME. [Origin uncertain: rel. to Sw. *menk, mänk*: cf. LG *mink* otter.] A n. 1 The skins or dark brown fur of the mink (see sense 2 below); a garment made of this fur. LME. 2 Either of two semi-aquatic mammals of the genus *Mustela* that resemble stoats, M. *vison,* native to N. America and farmed for its fur, and the European M. *introla.* E17. 3 A dark brown colour. M20. B *attrib.* or as *adj.* Made of the fur of the mink. Also, of the colour mink. E20.

**minke** /'mɪŋkə, -ki/ n. M20. [Norw., perh. f. *Meincke* a 19th-cent. whaling gunner, who mistook it for the larger blue whale.] In full *minke whale.* A small baleen whale, *Balaenoptera acutorostrata.* Also called *piked whale, lesser rorqual.* .

SYN 00103322

**operational**                    2006                    **ophit**

which a number, quantity, expression, etc. is altered or manipulated according to set formal rules, as those of addition, multiplication, differentiation, negation, etc. E18. **9** A strategic movement of troops, ships, etc., for military action; *gen.* a piece of planned and coordinated activity involving a number of people. (Freq. preceding a code-name.) M18. **10** The action of operating a machine, business, etc. L19.

**2** C. TOURNEUR The Starres whose operations make The fortunes and destinies of men. R. STUART The operation of the condenser pump is very simple. B. SPOCK Psychological concepts .. can seriously interfere with the operation of the parents' good sense. **b** G. LORD He'd put his plan into operation. **3b** MONMOUTH Many remedies had been applyed .. yet none .. procured the desired operation. **4a** J. S. FOSTER An orderly sequence of operations ensures the necessary continuity of work. A. FRANCE The establishment of a trusting relationship is a delicate operation. **b** *Marketing Week* The .. new Sharedrug operation and Northern-based .. Tip Top have both gone public. **6** T. REID By the operations of the mind we understand every mode of thinking. **b** conceive **operations** *Psychol.* in Piaget's theory, the mental processes characteristic of the third stage of cognitive development, in which a child develops the ability to think logically but only about concrete problems. **formal operations** *Psychol.* in Piaget's theory, those mental processes characteristic of the fourth and final stage of cognitive development, in which an individual is capable of abstract thought. **7** F. CUTTING She .. was having a series of operations on her legs. *Caesarean operation, Taliacotian operation, etc. illegal operation:* see ILLEGAL *a.* **8** LOGICAL *operation.* **9** *Listener* General Westmoreland launched 'Operation Final Solution' to sweep the enemy from the surroundings of Saigon. F. FITZGERALD The U. S. forces launched over six search-and-destroy operations. *Hamilton* (Ontario) *Spectator* Money seized in drug operations is turned over to the Federal government. *combined operation:* see COMBINED **2.** *psychological operations:* see PSYCHOLOGICAL *a.*

**Comb.: operations research** *US* = OPERATIONAL *research;* **operations rooms:** from which military or police etc. operations are directed.

**operational** /ɒpəˈreɪʃ(ə)n(ə)l/ *a.* E20. [f. OPERATION + -AL[1].] **1** Of or pertaining to operations; used in the operation of something; *spec.* engaged in or connected with active (military) operations (as opp. to being under training, in reserve, etc.). E20. **b** In a condition of readiness to perform some intended (esp. military) function; able and ready to function. M20. **2** *Math.* Of, pertaining to, or employing operators. E20. **3** Of, pertaining to, or in accordance with operationalism. E20.

**1** L. DEIGHTON Stinnes was my operational name and I have retained it. **b** I. MURDOCH A huge primitive .. machine, obsolete yet still operational.

**Special collocations: operational amplifier** an amplifier with high gain and high input impedance (usu. with external feedback), used esp. in circuits for performing mathematical operations on an input voltage. **operational research** a method of mathematically-based analysis for providing a quantitative basis for management decisions (orig. for military planning).

**operatio'nality** *n.* L20. **operationally** *adv.* in terms of, or as regards, operation(s), esp. those required to define a concept or term (cf. OPERATIONALISM) E20.

**operationalise** *v.* var. of OPERATIONALIZE.

**operationalism** /ɒpəˈreɪʃ(ə)n(ə)lɪz(ə)m/ *n.* M20. [f. OPERATIONAL + -ISM.] *Philos.* A form of positivism which defines scientific concepts in terms of the operations used to determine or prove them.

**operationalist** *n.* & *a.* (*a*) *n.* an adherent of operationalism; (*b*) *adj.* of or pertaining to operationalists or operationalism: M20.

**operationalize** /ɒpəˈreɪʃ(ə)n(ə)laɪz/ *v.t.* Also **-ise.** M20. [f. OPERATIONAL + -IZE.] Express in operational terms.

**operationa'lisable** *a.* L20. **operationali'zation** *n.* M20.

**operatise** *v.* var. of OPERATIZE.

**operative** /ˈɒp(ə)rətɪv/ *a.* & *n.* LME. [Late L *operativus,* f. as OPERATE: see -IVE.] **A** *adj.* **1** Being in operation or force; exerting force or

influence. Also, designating the part of a legal document which expresses the intention to effect the transaction concerned. LME. **2** Effective, efficacious. L16. **b** Significant, important; (of a word) essential to the meaning of the whole, having the principal relevance. E20. **3** Concerned with manual or mechanical work; practical. E17. **4** Pertaining to or based on surgical operations. L18. **5** Of a person: actively engaged in work or production, esp. as a skilled worker or artisan. E19.

**1** P. GROSSKURTH How infantile phantasies .. remained operative in the adult. **2** JAS. MILL Freud was an operative instrument in the hands of this aspiring general. **b** N. MARSH 'It was nice getting your occasional letters,' Patrick said. .. 'Operative word "occasional".'

**B** *n.* **1** An operative mood or condition. Only in E17. **†2** A thing, esp. a drug, which operates. L17–E18. **3** A worker, *esp.* a skilled one; *spec.* a factory worker, an artisan. E19. **4** An agent employed by a detective agency or secret-service; a private investigator. Cf. *OP n.*[2] Orig. & chiefly US. E20.

**3** J. B. C. BODLEY Lawyers and other unproductive operatives. J. S. FOSTER Assembly on site by operatives with specialized skill. **4** *New York Radst .*. rejected the notion that Sebai's killers were PLO operatives. **operatively** *adv.* E17. **operativeness** *n.* E17.

**operatize** /ˈɒp(ə)rətʌɪz/ *v.t.* Also **-ise.** M19. [Irreg. f. OPERA *n.*[1] + -IZE, after *dramatize:* cf. operatic.] Put into operatic form.

**operator** /ˈɒpəreɪtə/ *n.* L16. [Late L, f. as OPERATE: see -OR.] **1** A person (professionally) engaged in performing the practical or mechanical operations of a process, business, etc. L16. **2** A person dealing in such medicines etc. L17–E18. **c** A secret-service agent. M20. **2** An operating surgeon. L16. **3** A person by whose agency something is done. Formerly also, a creator. E17. **4** A person who carries on (speculative) financial operations; a person who operates or acts in a specified way (esp. in *fast, sharp,* or *smooth operator*); a plausible or manipulative person. E19. **5** A person operating a machine; *spec.* a person who works at the switchboard of a telephone exchange. M19. **b** A person licensed to drive a motor vehicle. *N. Amer.* M20. **6** A person who or company which runs a business, enterprise, etc. M19. **7** *Math.* & *Logic.* A symbol or group of symbols indicating an operation or series of operations to be carried out (on a following expression). M19. **8** *Ling.* A form word. Also, in Basic English: an article, particle, preposition, etc., or any of certain words used as substitutes for verbs. E20. **9** *Biol.* A segment of chromosomal DNA believed to control the activity of the structural gene(s) of an operon. M20.

**1** SIR T. BROWNE Culinary operators observe that hard boyles best, when the bones are boyled with it. **4** *Daily News* The market .. eventually improved, due to local operators covering. R. CARVER Harry was an operator That is to say he always had something going. **5** *Pall Mall Gazette* A machine operator, making nine shirts a day. B. F. CONNERS Operator, I'd like to call person to person to Officer Dolan. **6** *Outing* (*US*) A .. distillery .. where owner and operator divide the result of the year's working.

**operatorship** *n.* (*a*) the position of an operator; (*b*) (in the oil and gas industries) the right to operate a well, field, etc. L20.

**opercle** /əˈpɜːk(ə)l/ *n.* L16. [f. OPERCULUM.] **†1** A cover, a covering. Only in L16. **2** *Zool.* & *Bot.* = OPERCULUM. Now rare or obs. M19.

**opercula** *n.* pl. of OPERCULUM.

**opercular** /əˈpɜːkjʊlə/ *a.* & *n.* M19. [f. OPERCULUM + -AR[1].] *Zool.* & *Bot.* Of, pertaining to, or of the nature of an operculum; characterized by the presence of an operculum.

**operculate** /əˈpɜːkjʊlət/ *a.* & *n.* L18. [f. OPERCULUM + -ATE[2].] *Zool.* & *Bot.* **A** *adj.* Provided with or having an operculum; effected by means of an operculum. L18. **B** *n.* Pl. **operculates,** in L form **operculata** /əpɜːkjuˈleɪtə/. A mollusc which bears an operculum. M19.

**operculated** *a.* (*now rare*) = OPERCULATA *a.* L17.

**operculum** /əˈ(ʊ)pɜːkjuləm/ *n.* Pl. **-la** /-lə/. E18. [L = lid, covering, f. *operire* to cover: see -CULE.] **1** *Zool.* Any of various structures covering or closing an aperture; esp. (*a*) the bony plate covering the gills of a fish; (*b*) the calcareous, horny, or fibrous plate secreted by some gastropod molluscs, serving to close the aperture of the shell when the animal is retracted. E18. **2** *Bot.* **a** The lid of the capsule of mosses, covering the peristome. L18. **b** The cap of the ascus in certain ascomycetous fungi. L19. **3** *gen.* A cover. M19.

**opere buffe,** *serie n.* phrs. *pl.* see OPERA BUFFA, SERIA.

**operetta** /ɒpəˈrɛtə/ *n.* L18. [It., dim. of OPERA *n.*[1].] A short, orig. one-act, opera, usu. on a light or humorous theme.

*Savoy operetta:* see SAVOY **3.**

**operettist** *n.* a writer or composer of operettas. E20.

**operette** /ɒpəˈrɛt/ *n.* Also in Fr. form **operette** /ɔpeʁɛt/. L19. [Fr. *operette* f. OPERETTA.] = OPERETTA.

**operon** /ˈɒpərɒn/ *n.* M20. [Fr. *opéron,* f. *opérer* to effect, work: see -ON.] *Biol.* A unit of linked genes which is believed to regulate other genes responsible for protein synthesis, and is conceived as comprising an operator, a promoter, and one or more structural genes.

**operose** /ˈɒpərəʊs/ *a.* L17. [L *operosus,* f. *opus* work: see -OSE[1].] **1** Made with or displaying much industry or effort; laborious. L17. **2** Of a person: industrious, busy. L17.

**1** *New Scientist* Operose and scholarly critical editions. **2** R. NORTH We cannot think such .. operose Compiler of History .. should be ignorant, so remarkable a Passage.

**operosely** *adv.* M17. **operoseness** *n.* M17. **operosity** *n.* E17. †**operose** *a.* = OPEROSE M17–L18.

**Ophelian** /ɒˈfiːlɪən/ *a.* L20. [Ophelia (see below) + -AN.] Resembling or characteristic of Ophelia, the tragic heroine of Shakespeare's *Hamlet.*

**ophicalcite** /ɒfɪˈkælsʌɪt/ *n.* M19. [f. Gk *ophis* snake + CALCITE.] *Geol.* A form of marble consisting of a mixture of serpentine and calcite.

**ophicleide** /ˈɒfɪklʌɪd/ *n.* M19. [Fr. *ophicléide,* f. Gk *ophis* snake + *kleid-, kleis* key.] *Mus.* A deep wind instrument consisting of a U-shaped brass tube with eleven keys, forming a bass version of the key-bugle; a performer on this. M19. **2** A powerful reed-stop on the organ, of a variety of the tuba. M19.

**ophidian** /ɒˈfɪdɪən/ *a.* & *n.* E19. [f. mod.L *Ophidia* (see below), f. Gk *ophid-, ophis* snake: see -IAN[2], -AN.] *A adj.* Of or pertaining to the reptile suborder Serpentes (formerly *Ophidia*) which includes the snakes; of or pertaining to snakes, snakelike. E19. **B** *n.* A snake. M19.

**ophio-** /ˈɒfiəʊ/ *comb. form* of Gk *ophis* snake: -o-.

**ophi'olater** *n.* a snake-worshipper. L19. **ophi'olatry** *n.* snake-worship. L19. **ophi'ologist** *n.* a student of or expert on snakes. E19. **ophi'ology** *n.* the branch of zoology that deals with snakes. E19. **ophiomancy** /ˈɒfiə(ʊ)mansɪ/ *n.* (*rare*) divination by means of snakes. E19. **ophiomorphic** /ɒfiə(ʊ)ˈmɔːfɪk/ *a.* (*rare*) having the form of a snake, snakelike. E20.

**ophiolite** /ˈɒfɪəlʌɪt/ *n.* M19. [f. OPHIO- + -LITE.] *Geol.* **1** Serpentine, an ornamental marble containing serpentine. Now rare. M19. **2** *Geol.* Any of a group of basic and ultrabasic igneous rocks consisting largely of serpentine and thought to have been formed from the submarine eruption of oceanic crustal and upper mantle material. M19.

**ophiolitic** /ɒfɪəˈlɪtɪk/ *a.* M19.

**Comb.: ophiolitic association suite** *Geol.* an assemblage of ophiolites, pillow lava, and radiolarian chert occurring in a characteristic pattern of layers in the Alps and elsewhere.

**ophio'litic** *a.* E20.

**ophiophagous** /ɒfɪˈɒfəɡəs/ *a.* M17. [f. OPHIO- + -PHAGOUS.] Feeding on snakes.

**ophite** /ˈɒfʌɪt/ *n.*[1] M17. [L *ophites* f. Gk *ophitēs* serpentine stone, f. *ophis* snake: see -ITE[1].] Any of various eruptive or metamorphic rocks

b but, d dog, f few, g get, h he, j yes, k cat, l leg, m man, n no, p pen, r red, s sit, t top, v van, w we, z zoo, ʃ she, ʒ vision, θ thin, ð this, ŋ ring, tʃ chip, dʒ

SYN 00103325

# EXHIBIT F

I hereby certify that this correspondence is being
deposited with the United States Postal Service as
first class mail in an envelope addressed to:
Assistant Commissioner for Patents,
Washington, D.C. 20231, on August 18, 1997.

TOWNSEND and TOWNSEND and CREW LLP

PATENT

Attorney Docket No. 009623-010010

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:                )
                                     )
STEPHEN J. BISSET ET AL.             )    Examiner: Paul Bell
                                     )
Application No.: 08/608,116          )    Art Unit: 2609
                                     )
Filed: February 28, 1996             )    AMENDMENT
                                     )
For: MULTI-CONTACT SENSING           )
     METHOD AND APPARATUS            )
                                     )

Assistant Commissioner for Patents
Washington, D.C.  20231

Sir:

          In response to the Office Action mailed April 18, 1997,
please amend the above-referenced application as follows:

In the Title
          Please amend the title to read as follows:
          --A MULTIPLE FINGERS CONTACT SENSING METHOD FOR
EMULATING MOUSE BUTTONS AND MOUSE OPERATIONS ON A TOUCH SENSOR
PAD--.

In the Claims
          Please cancel claims 14, 18, and 19.  Please amend
claims and add claims as follows:

1           1.    (Amended)  A method for detecting the operative
2    coupling of multiple fingers to a touch sensor involving the
3    steps of
4           scanning the touch sensor to identify a first maxima in
5 cont.      a signal corresponding to a first finger,

STEPHEN J. BISSET ET AL.                                      PATENT
Application No.: 08/608,116
Page 2

6           scanning the touch sensor to identify a minima
7      following the first maxima, and
8           scanning the touch sensor to identify a second maxima
9      in a signal corresponding to a second finger following the
10     minima.

1           20.   (Amended)   A method for detecting the operative
2      coupling and decoupling of multiple [fingers] objects to a touch
3      sensor to perform [cursor movement or] a control function[s]
4      involving the steps of
5           detecting the operative coupling of at least two
6      objects [such as two fingers] to a sensor,
7           detecting motion by at least one of the object, [such
8      as a first finger,]
9           detecting the operative coupling of a reduced number of
10     objects,
11          evaluating a substantially stationary position of an
12     object which remains operatively coupled to the sensor in
13     accordance with a predetermined criteria, and
14          reporting to a host signals for causing [cursor
15     movement of] a control function[s] as a result of the
16     evaluation.

1           21.   (Amended)   The [invention] method of claim 20
2      wherein the result of the evaluating step includes maintaining a
3      "button down" condition so long as the object which remains
4      operatively coupled to the sensor after the number of operatively
5      coupled objects is reduced remains in a substantially stationary
6      position.

1           22.   (Amended)   The [invention] method of claim 21
2      wherein the result of the evaluating step further includes
3      ~~responding to the motion of the first object in consideration of~~
4      the "button down" condition caused by the substantially
5      stationary position of the second object.

STEPHEN J. BISSET ET AL.                                    PATENT
Application No.: 08/608,116
Page 3

23.   (Amended)  A method for detecting the operative
coupling and decoupling of multiple fingers to a touch sensor to
perform [cursor movement or] a control function[s] involving the
steps of

        detecting operating coupling of a first group of
objects with a sensor,
        detecting [the presence or absence of motion by]
whether at least one of the objects of the first group of
objects is in motion,
        detecting the operative coupling of a second group of
objects with a sensor, wherein the number of objects in the
second group is different from the number of objects in the
first group,
        detecting [the presence or absence of motion by]
whether at least one of the objects of the second group of
objects is in motion, in which the number of objects in at
least one of [either] the first [or] and second groups of
objects is at least two,
        evaluating the number of objects in the first group and
the motion[, or lack thereof,] of the first group of objects
together with the number of objects in the second group and
the motion[, or lack thereof,] of the second group in
accordance with a predetermined criteria, and
        reporting to a host signals for causing [cursor
movement or] a control function[s] as a result of the
evaluating step.

        24.   (New)  The method of claim 20 wherein said control
function comprises a cursor movement.

        25.   (New)  The method of claim 20 wherein said objects
comprise fingers.

        26.   (New)  The method of claim 1 wherein said touch
sensor includes a plurality of lines, said maxima being a largest
local variation in a signal value on one of said lines due to
capacitive coupling of a finger.

STEPHEN J. BISSET ET AL.                                    PATENT
Application No.: 08/608,116
Page 4

1        ~~27.~~  7  (New)  The method of claim ~~28~~ 6 wherein said maxima
2     are peaks.

1             28.  ~~(New)~~  The method of claim 1 further comprising
2     the step of comparing a ~~distance~~ from said first maxima to said
3     second maxima to a predefined ~~threshold.~~

1             ~~29.~~ 9  (New)  The method of claim 1 further comprising
2     the steps of:
3             providing a first control function in response to the
4        detection of the movement of two fingers:
5             detecting the reaching of an edge of said touch sensor
6        by said two fingers;
7             detecting a first time corresponding to the removal of
8        said fingers from said touch sensor;
9             detecting a second time corresponding to the
10       replacement of said two fingers on said touch sensor; and
11            continuing said first control function if said first
12       and second times are within a predetermined time limit of
13       each other.

1             ~~30.~~ 10  (New)  The method of claim 1 further comprising
2     the step of:
3             detecting a distance between said first and second
4        maxima.

1             ~~31.~~ 11  (New)  The method of claim 1 further comprising
2     the step of:
3             providing a drag control function in response to
4        detecting a movement in substantial unison of two said
5        fingers.

1             ~~32.~~ 12 / (New)  The method of claim 1 further comprising
2     the step of:
3             providing a click function in response to the removal
4        and reappearance of said second maxima within a
5        predetermined period of time.

STEPHEN J. BISSET ET AL.                                    <u>PATENT</u>
Application No.: 08/608,116
Page 5

1       33.  (New)  The method of claim 1 further comprising
2    the steps of:
3            detecting a movement of said first maxima;
4            detecting a removal and replacement of said maxima
5        within a predetermined time period;
6            controlling a cursor function in response to said
7        movement of said first maxima; and
8            providing a control function in response to said
9        removal and replacement of said second maxima.

1       34.  (New)  The method of claim 1 further comprising
2    the step of:
3            selecting an appropriate control function based on a
4        combination of a number of fingers detected, an amount of
5        time said fingers are detected, and any movement of said
6        fingers.

1       35.  (New)  A touch sensor for detecting the operative
2    coupling of multiple fingers comprising:
3            means for scanning the touch sensor to identify a first
4        maxima in a signal corresponding to a first finger;
5            means for scanning the touch sensor to identify a
6        minima following the first maxima; and
7            means for scanning the touch sensor to identify a
8        second maxima in a signal corresponding to a second finger
9        following the minima.

1       36.  (New)  The touch sensor of claim 35 further
2    comprising:
3            means for selecting an appropriate control function
4        based on a combination of a number of fingers detected, an
5        amount of time said fingers are detected, and any movement
6        of said fingers.

1       37.  (New)  The touch sensor of claim 35 wherein said
2    touch sensor includes a plurality of lines, said maxima being a

STEPHEN J. BISSET ET AL.                                    PATENT
Application No.: 08/608,116
Page 6

largest local variation in a signal value on one of said lines
due to capacitive coupling of a finger.

38. (New)  The touch sensor of claim 35 wherein said
maxima are peaks.

39. (New)  The touch sensor of claim 38 further
comprising means for comparing a distance from said first maxima
to said second maxima to a predefined threshold.

40. (New)  The touch sensor of claim 35 further
comprising:
        means for providing a first control function in
      response to the detection of the movement of two fingers;
        means for detecting the reaching of an edge of said
      touch sensor by said two fingers;
        means for detecting a first time corresponding to the
      removal of said fingers from said touch sensor;
        means for detecting a second time corresponding to the
      replacement of said two fingers on said touch sensor; and
        means for continuing said first control function if
      said first and second times are within a predetermined time
      limit of each other.

41. (New)  The touch sensor of claim 35 further
comprising:
        means for detecting a distance between said first and
      second maxima.

42. (New)  The touch sensor of claim 35 further
comprising:
        means for providing a drag control function in response
      to detecting a movement in substantial unison of two said
      fingers.

43. (New)  The touch sensor of claim 35 further
comprising:

STEPHEN J. BISSET ET AL.                                    PATENT
Application No.: 08/608,116
Page 7

3            means for providing a click function in response to the
4       removal and reappearance of said second maxima within a
5       predetermined period of time.

27                                              18
1       44.  (New)  The touch sensor of claim 35 further
2   comprising:
3            means for detecting a movement of said first maxima;
4            means for detecting a removal and replacement of said
5       maxima within a predetermined time period;
6            means for controlling a cursor function in response to
7       said movement of said first maxima; and
8            means for providing a control function in response to
9       said removal and replacement of said second maxima.

28                                              18
1       45.  (New)  The touch sensor of claim 35 further
2   comprising:
3            means for selecting an appropriate control function
4       based on a combination of a number of fingers detected, an
5       amount of time said fingers are detected, and any movement
6       of said fingers.

## REMARKS

        Claims 1-13, 15-17, and 20-45 are pending in this
application.

        Claims 14, 18, and 19 were rejected as being
anticipated by Dunthorn.  These claims have been cancelled.  The
remaining claims have either been allowed, or indicated as
allowable if rewritten to overcome §112 objections.

        Claims 1-6 were indicated as incomplete for omitting to
indicate the cooperative relationship with the fingers to produce
the maxima and minima.  Claim 1 has been amended to address this,
and is now believed to be allowable.

        Claims 20-22 were objected to because of the phrase
"such as".  This phrase has been deleted.  Also, claims 20 and 23
were objected to as using the word "or".  This has also been
deleted, with dependent claims added to address the alternative.
In particular, claim 20 specifies a control function, which could

STEPHEN J. BISSET ET AL.                                    PATENT
Application No.: 08/608,116
Page 8

be a cursor movement, click, etc.  Claim 24 further specifies the
control function is in a particular embodiment a cursor movement.

New claims 24-34 are dependent claims to claims 1 or
20.  Accordingly, these claims are believed to be allowable.  No
new matter is added by these claims.

The plurality of lines of claim 26 are discussed on
page 7, line 2 et seq.

The maxima being peaks set forth in claim 27 are shown,
for example, in Figs. 3 and 4.  It should be obvious to one of
skill in the art that the maxima could be maximum negative
levels, or troughs, depending upon the circuitry used.

The distance of claim 28 is discussed, for instance, on
page 4, lines 19-21.

The fingers moving to the edge as discussed in claim 29
is discussed, for example, on page 4, lines 31-37.

The steps of claim 23 relating to using the first
finger for cursive movement and a second finger for a control
function is discussed, for example, on page 8, lines 31-38.

New claims 35-45 are apparatus claims, with claim 35
being independent and the remaining claims being dependent upon
claim 35.  Claim 35 is an apparatus equivalent of claim 1, and
accordingly is believed allowable for the same reasons.

In view of the foregoing, Applicants believe all claims
now pending in this application are in condition for allowance.
The issuance of a formal Notice of Allowance at an early date is
respectfully requested.

If the Examiner believes a telephone conference would
expedite prosecution of this application, please telephone the
undersigned at (650) 326-2400.

Respectfully submitted,

Paul C. Haughey
Reg. No. 31,836

TOWNSEND and TOWNSEND and CREW LLP
Two Embarcadero Center, 8th Floor
San Francisco, California  94111-3834
(650) 326-2400
Fax (650) 326-2422    (j:\logitech\-100-1.amd)

Amendment

Atty. Docket No. 009623-010010

Date August 18, 1997

. D and TOWNSEND and CREW LLP
barcadero Center, 8th Floor
San Francisco, CA 941 **AUG 2 2 1997**
(415) 576-0200

In re application of: STEPHEN J. BISSETT ET AL.

Appln. No.: 08/608,116

Filed:  February 28, 1996

Group Art Unit: 2609
For:    MULTI-CONTACT SENSING METHOD AND
        APPARATUS

I hereby certify that this is being deposited with the United States Postal Service as first class mail in an envelope addressed to: GROUP 2609

Assistant Commissioner for Patents
Washington, D. C. 20231.

Date: August 18, 1997

Ingrid J. Rogers

THE ASSISTANT COMMISSIONER FOR PATENTS
Washington, D.C.  20231

Sir:

Transmitted herewith is an amendment in the above-identified application.

[X]  Enclosed is a petition to extend time to respond.
[X]
If any extension of time is needed, then this response should be considered a petition therefor.
The filing fee has been calculated as shown below:

|  | (Col. 1) | | (Col. 2) | (Col. 3) | SMALL ENTITY | | OR | OTHER THAN A SMALL ENTITY | |
|---|---|---|---|---|---|---|---|---|---|
|  | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NO. PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE | ADDIT. FEE |  | RATE | ADDIT. FEE |
| TOTAL | *42 | MINUS | **23 | =19 | x11= | $ |  | x22= | $418 |
| INDEP. | * 8 | MINUS | ****9 | =0 | x40= | $ |  | x80= | $ 0 |
| [ ] FIRST PRESENTATION OF MULTIPLE DEP. CLAIM | | | | | +130= | $ |  | +260= | $ |
|  | | | | | TOTAL ADDIT. FEE | $ | OR | TOTAL | $418 |

*       If the entry in Col. 1 is less than the entry in Col. 2,
        write "0" in Col. 3.
**      If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, write "20" in this space.
***     If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, write "3" in this space.
        The "Highest Number Previously Paid For" (Total or Independent) is the highest number found from the equivalent
        box in Col. 1 of a prior amendment or the number of claims originally filed.

        [ ]  No fee is due.

Please charge Deposit Account No. 20-1430 as follows:

                    [X]      Claims fee                                    $418.00
09/18/1997 BALEXAND 00000004 008101430   08608116
01 FC:103                 418.00 CH      Any additional fees associated with this paper or during the pendency of this application.

____1____ extra copies of this sheet are enclosed.

TOWNSEND and TOWNSEND and CREW LLP

Paul C. Haughey
Reg. No.: 31,836
Attorneys for Applicant

AMEND.TRN 9/96



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address:    COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 08/608,116 | 02/28/96 | BISSET | S | P-1930-1 |

LM41/1205

PAUL C. HAUGHEY
TOWNSEND AND TOWNSEND AND CREW LLP
TWO EMBARCADERO CENTER
8TH FLOOR
SAN FRANCISCO CA 94111-3834

| EXAMINER |
|---|
| BELL, P |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2775 | 8 |

DATE MAILED:    12/05/97

**Please find below and/or attached an Office communication concerning this application or proceeding.**

Commissioner of Patents and Trademarks