1  KARL J. KRAMER (CA SBN 136433)
   ELLEN S. REINSTEIN (CA SBN 227833)
2  ERIKA L. LABIT (CA SBN 234919)
   MORRISON & FOERSTER LLP
3  755 Page Mill Road
   Palo Alto, California 94304-1018
4  Telephone: (650) 813-5600
   Facsimile: (650) 494-0792
5  kkramer@mofo.com

6  Attorneys for Defendant
   SYNAPTICS, INC.
7

8                   UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                       SAN FRANCISCO DIVISION

11

12 | ELANTECH DEVICES CORPORATION, a corporation existing under the laws of Taiwan, R.O.C., | Case No. C06-01839 CRB
13 | | **NOTICE OF CORRECTION TO SYNAPTICS, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**
14 | Plaintiff, |
15 | |
   | v. |
16 | |
17 | SYNAPTICS, INC., a Delaware corporation; AVERATEC, INC., a California corporation; and PROSTAR COMPUTER, INC., a California corporation, |
18 | |
19 | |
   | Defendants. |
20 | |
21 | AND RELATED COUNTERCLAIMS |

1  PLEASE TAKE NOTICE of the correction to Synaptics, Inc.'s Opening Claim
2  Construction Brief, filed on January 29, 2007.  In translating the brief into the format
3  acceptable by the Court's e-filing system, counsel's word-processing program inadvertently
4  converted the "Δ" symbols into question marks at page 5, line 24, page 6, lines 2 and 5 and
5  page 10, line 15.  Counsel for Synaptics did not notice the error until after the document was
6  electronically filed.  Attached hereto is a complete corrected brief for the Court's records.

9  Dated: February 5, 2007        KARL J. KRAMER
                                   ELLEN S. REINSTEIN
10                                 ERIKA L. LABIT
                                   MORRISON & FOERSTER LLP

13                                 By:  /s/ Karl J. Kramer
                                        Karl J. Kramer

14                                      Attorneys for Defendant
                                        SYNAPTICS, INC.

1  KARL J. KRAMER (CA SBN 136433)
   ELLEN S. REINSTEIN (CA SBN 227833)
2  ERIKA L. LABIT (CA SBN 234919)
   MORRISON & FOERSTER LLP
3  755 Page Mill Road
   Palo Alto, California  94304-1018
4  Telephone: (650) 813-5600
   Facsimile: (650) 494-0792
5  kkramer@mofo.com

6  Attorneys for Defendant
   SYNAPTICS, INC.
7

8                     UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                       SAN FRANCISCO DIVISION

11

12  ELANTECH DEVICES CORPORATION, a           Case No.   C06-01839 CRB
    corporation existing under the laws of Taiwan,
13  R.O.C.,                                   **CORRECTED SYNAPTICS,
                                              INC.'S OPENING CLAIM
14                  Plaintiff,                CONSTRUCTION BRIEF**

15        v.

16

17  SYNAPTICS, INC., a Delaware corporation;
    AVERATEC, INC., a California corporation;
18  and PROSTAR COMPUTER, INC., a
    California corporation,
19
                    Defendants.
20

21  AND RELATED COUNTERCLAIMS

**TABLE OF CONTENTS**

Page

I. SUMMARY OF CLAIM CONSTRUCTION ARGUMENT ........................................... 1
II. LEGAL STANDARDS FOR CLAIM CONSTRUCTION ..................................................... 1
III. CONSTRUCTION OF THE ASSERTED SYNAPTICS PATENT CLAIMS ................... 2
    A. "Incrementally Move" ('411 Patent: Joint Claim Term 13) ................................... 3
    B. "Data Packet Processor" ('052 Patent: Joint Claim Term 12) ............................... 4
    C. "X and Y Position Information" ('591/'931 Patents: Joint Claim Terms 2, 8) ........................................................................................................... 5
    D. The Signaling Steps ('591/'931 Patents: Joint Claim Terms 3-10) ....................... 6
        1. "Signal" (Joint Claim Terms 3, 4, 5, 6, 7, 9 and 10) .................................. 6
        2. Elantech's Extraneous Limitations (Joint Claim Terms 3, 5, 6) ................ 8
        3. "Terminating" (Joint Claim Term 9) .......................................................... 8
        4. "Maintaining" (Joint Claim Terms 7, 10) ................................................... 9
        5. "Repeatedly Sending" (Joint Claim Term 8) ............................................ 10
    E. "Double Tap Gesture" ('591 Patent: Joint Claim Term 5) ................................... 10
    F. Corner Tap ('931 Patent: Joint Claim Term 11) ................................................... 11
IV. CONCLUSION ................................................................................................................ 13

# TABLE OF AUTHORITIES

## CASES

*Altiris v. Symantec Corp.*,
  318 F.3d 1363 (Fed. Cir. 2003) .................................................................................... 12

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
  320 F.3d 1339 (Fed. Cir. 2003) ...................................................................................... 1

*Burke, Inc. v. Bruno Indep. Living Aids, Inc.*,
  183 F.3d 1334 (Fed. Cir. 1999) ...................................................................................... 2

*CCS Fitness, Inc. v. Brunswick Corp.*,
  288 F.3d 1359 (Fed. Cir. 2002) ...................................................................................... 1

*Comark Commc'ns v. Harris Corp.*,
  156 F.3d 1182 (Fed. Cir. 1998) ...................................................................................... 2

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*,
  No. C 03-1341 SBA, 2006 U.S. Dist. LEXIS 36788 (N.D. Cal. May 25, 2006) .................... 1, 4

*Gart v. Logitech, Inc.*,
  254 F.3d 1334 (Fed. Cir. 2001) ...................................................................................... 5

*Gemstar-TV Guide Int'l, Inc. v. ITC*,
  383 F.3d 1352 (Fed. Cir. 2004) ...................................................................................... 4

*Globetrotter Software, Inc. v. Elan Computer Group, Inc.*,
  362 F.3d 1367 (Fed. Cir. 2004) ...................................................................................... 6

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004) ...................................................................................... 1

*Interactive Gift Express, Inc. v. Compuserve Inc. et al.*,
  256 F.3d 1323 (Fed. Cir. 2001) .................................................................................... 11

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005)
  *cert. denied*, 126 S. Ct. 1332 (2006) ............................................................................. 2

*Moba B.V. et al. v. Diamond Automation, Inc.*,
  325 F.3d 1306 (Fed. Cir. 2003) .................................................................................... 11

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ...................................................................................... 2

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
  400 F.3d 901 (Fed. Cir. 2005) .................................................................................... 1, 2

*SanDisk Corp v. Memorex Prods., Inc.*,
  415 F.3d 1278 (Fed. Cir. 2005) ................................................................................. 4, 10

*Scanner Techs. Corp. v. ICOS Vision Sys. Corp., N.V.*,
  365 F.3d 1299 (Fed. Cir. 2004) ...................................................................................... 1

*Toshiba Corp. v. Hynics Semiconductor Inc.*,
  No. 04-4708, 2006 U.S. Dist. LEXIS 63313 (N.D. Cal. Aug. 21, 2006) ................................... 6

*United States v. Telectronics, Inc.*,
  857 F.2d 778 (Fed. Cir. 1988) .................................................................................................. 3

*Varco, L.P. v. Pason Sys. USA Corp.*,
  436 F.3d 1368 (Fed. Cir. 2006) ............................................................................................ 4, 5

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ............................................................................................ 6, 12

*Yodlee, Inc. v. CashEdge, Inc.*,
  No. C 05-01550 SI, 2006 U.S. Dist. LEXIS 48614, (N.D. Cal. July 7, 2006) ......................... 8

*Zelinski v. Brunswick Corp.*,
  185 F.3d 1311 (Fed. Cir. 1999) ................................................................................................ 1

I.  **SUMMARY OF CLAIM CONSTRUCTION ARGUMENT**

The disputed claim terms of the four Synaptics, Inc. ("Synaptics") patents should be given their natural breadth in accordance with the ordinary meaning of the claim terms and the teachings in the patent specifications. Defendant Elantech Corporation ("Elantech") attempts to narrow the correct meaning of the claims by ignoring the ordinary meaning of words and importing into the claims features of example embodiments from the patent specifications. Common sense and a careful review of the specifications of the patents at issue preclude the narrow readings that Elantech asserts. (The parties' respective claim constructions are included in the Amended Joint Claim Chart, Appendix A hereto.)

II. **LEGAL STANDARDS FOR CLAIM CONSTRUCTION**

"[T]he claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Scanner Techs. Corp. v. ICOS Vision Sys. Corp., N.V.*, 365 F.3d 1299, 1303 (Fed. Cir. 2004) (citation omitted). Courts "indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (citation omitted); *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1315 (Fed. Cir. 1999) ("Absent an express definition in the specification of a particular claim term, the words are given their ordinary and accustomed meaning; if a term of art, it is given the ordinary and accustomed meaning as understood by those of ordinary skill in the art."); *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1347 (Fed. Cir. 2003). To determine that ordinary and customary meaning, "a court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). Extrinsic evidence, including expert testimony, may be appropriate to elucidate the meaning of the claim terms and the technology described in the patent. *Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 908 n.1 (Fed. Cir. 2005); *see also Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. C 03-1341 SBA, 2006 U.S. Dist. LEXIS 36788, at *43 (N.D. Cal. May 25, 2006).

1    Claims should be construed in light of the specification of the patent. *Phillips v.*
2    *AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 1332 (2006).  In
3    particular, courts should reject offered claim constructions that contradict the teachings in the
4    specification.  *See, e.g.*, *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1374
5    (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 488 (2005).  On the other hand, it is not permissible
6    to rewrite the plain terms of a patent under the guise of "interpretation" by "adding an
7    extraneous limitation appearing in the specification" to the claims.  *Burke, Inc. v. Bruno*
8    *Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999).  Thus, specific embodiments
9    of the invention, even preferred embodiments, do not limit the scope of the claims.  *Comark*
10   *Commc'ns v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998); *Playtex Prods., Inc.*,
11   400 F.3d at 907.  These claim construction rules preclude Elantech's proffered claim
12   constructions and support the ordinary meanings that Synaptics offers.

13   **III.   CONSTRUCTION OF THE ASSERTED SYNAPTICS PATENT CLAIMS**

14   Synaptics is the world leader in the development of touch-sensitive input devices.
15   Synaptics has an extensive patent portfolio representing fundamental inventions in the
16   development of such input devices, which are typically used in notebook computers and
17   hand-held devices.

18   Each of the claims of the four Synaptics patents at issue in this case relates to a
19   method for recognizing certain "gestures" that can be made on a touch-sensor device.  (*See*
20   *generally*, Expert Declaration of Andrew Wolfe Ph.D Concerning Claim Construction of
21   Synaptics' Patents ("Wolfe Decl."), ¶¶ 12–14.)  These methods include interacting with a
22   touch sensor with "tap," corner-tap, "double-tap," "drag," edge-motion, and "scrolling"
23   gestures.  (*Id.*)  For each of these, Synaptics developed methods that enable the user to
24   implement natural and intuitive gestures on a touchpad to control or interact with the
25   activities on a computer screen.  (*Id.*)  Using these methods, the user can select and activate
26   functions on the computer, move items on the screen, and scroll up and down or side to side
27   in particular windows on the screen, all with just a simple touchpad.  (*Id.*)  Elantech has
28   copied all of these patented features into its touchpad products.

### A. "Incrementally Move" ('411 Patent: Joint Claim Term 13)

The asserted claims of U.S. Patent No. 5,880,411 ("the '411 Patent"), solve a problem that a touchpad user might face when moving the "cursor" from one place to another on the display screen: the touchpad itself is much smaller than the display screen and the user will consequently run into the edge of the touchpad before the user has moved the cursor to a more remote location on the screen. (Wolfe Decl., ¶ 15.) Synaptics' invention was to continue the movement on the screen when the user reaches the edge of the touchpad by combining the actual motion of the user's finger with an additional movement value representing an increment in the direction of the near edge of the touchpad. Independent claim 46 recites, in relevant part: "second cursor motion signals for causing said cursor to incrementally move on the display screen a selected distance in a fixed direction relative towards said outer edge of said sensing plane to which said object is proximate." The only '411 Patent claim term in dispute is "incrementally move."

The ordinary meaning of "incrementally move" is to "move in increments." (*Id.*, ¶ 16.) As is evident from Elantech's own cited dictionary definition, "increment" means "The process of increasing in number, size, quantity, or extent." (*Id.*, ¶ 16 and Ex. 11.) The literal ordinary meaning of the term "incrementally move" is not limited to a particular value of increment. This is evident from the claim itself, which recites that the incremental movement is "a selected distance in a fixed direction." (*Id.*, Ex. 2, '411 Patent, Col. 63, lines 35-39.) The ordinary meaning of "incrementally move" should apply. (*Id.*, ¶¶ 16, 61.)

Other claims of the '411 Patent that are not asserted in this case do recite specific ways of deriving the "selected distance." (*Id.*, ¶ 18 and Ex. 2, claims 7, 10, 12, 15, 22, 32, 44 and 56.) The Court should not read those limitations into the asserted claims. *United States v. Telectronics, Inc.*, 857 F.2d 778, 784 (Fed. Cir. 1988) (district court erred in reading limitations from another claim into claim at issue, since "where some claims are broad and others narrow, the narrow claim limitations cannot be read into the broad whether to avoid invalidity or to escape infringement"). Moreover, the '411 Patent specification teaches several different methods for deriving the "selected distance." (Wolfe Decl., ¶ 17 and Ex. 2.)

By choosing broad language, "incrementally move . . . a selected distance," the inventors intended to cover all embodiments, not just one embodiment using one type of "increment." *Gemstar-TV Guide Int'l, Inc. v. ITC*, 383 F.3d 1352, 1372 (Fed. Cir. 2004) (holding that one embodiment of a claim term in the written description "does not limit the otherwise broad claim language"); *Fresenius Med. Care Holdings,* 2006 U.S. Dist. LEXIS 36788, at *95-96 (preferred embodiment cannot be used to limit a claim).

Elantech asserts that the '411 Patent claim term "incrementally move" means "movement defined by the second component of Equations 12 and 13 in the '411 patent, namely, $S(X_{cur} - X_{center})$ and $S(Y_{cur} - Y_{center})$." (Appendix A, Claim Term 13.) Elantech's asserted claim construction is contrary to the plain meaning of "incrementally move . . . a selected distance," cannot be squared with the use of narrower terms in other claims, and is contrary to several embodiments that are taught in the '411 Patent specification. In essence, Elantech is attempting to limit the broad claim term to one particular embodiment disclosed in the specification. That is impermissible as a matter of law. *Varco, L.P. v. Pason Sys. USA Corp.*, 436 F.3d 1368, 1375 (Fed. Cir. 2006); *SanDisk Corp v. Memorex Prods., Inc.*, 415 F.3d 1278, 1286 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 829 (2005) (references to a preferred embodiment are not claim limitations).

**B.     "Data Packet Processor" ('052 Patent: Joint Claim Term 12)**

The claims of U.S. Patent 5,943,052 ("the '052 Patent"), recite a method for using a "scrolling zone" on a "touchpad" to generate "scrolling messages" that scroll a document or window up and down, or from side to side, on the display screen. (Wolfe Decl., ¶ 20.) Claim 14 recites "forwarding a plurality of data packets from a cursor-control input device which includes a touchpad having a scrolling zone to a data packet processor." The parties dispute the meaning of the word "processor" in the phrase "data packet processor."

The ordinary meaning of "processor" in the claim phrase "data packet processor" is "hardware and/or program code, for example, software executed on a central processing unit, that processes data packets." (Wolfe Decl., ¶ 21 and Ex. 7.) That ordinary meaning should apply to the claim term. (*Id.*, ¶¶ 21-22, 60.)

1    Although in the '052 Patent specification, the inventors describe a "data packet
2    processor" of software running on a hardware processor, they expressly describe that
3    embodiment as merely a preferred embodiment: "*Preferably*, packet processor 20 is
4    computer software executed on a central processing unit. . . ." (*Id.*, ¶ 22 and Ex. 3, '052
5    Patent, Col. 3, lines 14-17.)  The court should not limit the claimed "processor" to only
6    "software." *Varco*, 436 F.3d at 1375; *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1343 (Fed. Cir.
7    2001) ("[I]t is well established that broad claims supported by the written description should
8    not be limited in their interpretation to a preferred embodiment").

    Elantech asserts that the '052 Patent claim term "data packet processor" means
10    "software for processing data packets and sending messages." (Appendix A, Claim
11    Term 12.)  Elantech's asserted claim construction is contrary to the plain meaning of
12    "processor," and impermissibly narrows the claims to a preferred embodiment. *See, e.g.*,
13    *Gart*, 254 F.3d at 1343.  Moreover, the claim term "data packet processor" does not, in itself,
14    require "sending messages." (Wolfe Decl., ¶ 23.)  Elantech is simply adding those words.
15    The ordinary meaning of "processor" should be applied in this case.

16    **C.    "X and Y Position Information" ('591/'931 Patents: Joint Claim Terms 2, 8)**
17    The asserted U.S. Patent Nos. 5,543,591 ("the '591 Patent"), and 6,380,931 ("the
18    '931 Patent") have highly related patent specification disclosures.  The asserted claims of
19    these two patents relate to "tap," "double tap," "corner tap," and "drag" gestures performed
20    on a touch-sensor pad.  Each of the asserted claims of these two patents, recites that the
21    touch-sensing system is "providing X and Y position information to a host."  The parties
22    dispute whether "providing X and Y position information to a host" covers information that
23    describes a change in X and Y position, often called "relative position" information and
24    abbreviated "$\Delta X$" and "$\Delta Y$."

25    The ordinary meaning of the phrase "X and Y position information" that should apply
26    in this case is "information about the horizontal and vertical positioning of an object on a
27    touch sensor." (Wolfe Decl., ¶¶ 24-29.)  Those of ordinary skill in the art would understand
28    the claim term to include all types of "X and Y position information," including "absolute" X

1  and Y coordinate position information, as well as "relative" position information, such as
2  "ΔX" and "ΔY." (*Id.*, ¶¶ 26-28, 50, 56.) That meaning should apply in this case.
3      This understanding of the ordinary meaning of the phrase is perfectly consistent with
4  the teachings of the specification. Indeed, all of the embodiments in the '591 and '931
5  Patents disclose that the information sent to the host is relative "ΔX" and "ΔY" position
6  information. (*Id.*, ¶¶ 27-28.) These teachings in the patent specifications cannot be ignored.
7  *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1381 (Fed. Cir.
8  2004) ("A claim interpretation that excludes a preferred embodiment from the scope of the
9  claim 'is rarely, if ever, correct,'" (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d
10 1576, 1583 (Fed. Cir. 1996))); *Toshiba Corp. v. Hynics Semiconductor Inc.*, No. 04-4708,
11 2006 U.S. Dist. LEXIS 63313, at *35 (N.D. Cal. Aug. 21, 2006) (rejecting construction that
12 would exclude numerous embodiments in the specification).
13     Elantech asserts that "X and Y position information" means "two-dimensional
14 location on a touch-sensor pad," which apparently excludes "relative" position information.
15 (Appendix A, Claim Terms 2 and 8.) Once again, Elantech's asserted claim construction is
16 contrary to the plain meaning of the recited claim term and is contrary to the embodiments
17 that are disclosed in the patent specifications. The claim term should be given its ordinary
18 meaning and should not be limited as Elantech urges.
19     **D.**    **The Signaling Steps ('591/'931 Patents: Joint Claim Terms 3-10)**
20     The asserted independent claims of the '591 and '931 Patents involve a series of
21 signals by which the particular claimed gesture is detected and indicated to a "host" computer
22 or system. Addressed below are a series of related disputes that recur in a number of the
23 Joint Claim Terms relating to these signaling steps in the asserted method claims of those
24 two patents.
25     **1.**    **"Signal" (Joint Claim Terms 3, 4, 5, 6, 7, 9 and 10)**
26     Joint Claim Terms 3-7, 9 and 10, all recite the claim term "signal" to describe the
27 process of transmitting information. The parties dispute the meaning of the term "signal."
28

1        The term "signal" is not specially defined in the patents, and thus must be given its
2   ordinary meaning of "The event or phenomenon that conveys data from one point to
3   another." (Wolfe Decl., ¶ 34 and Ex. 10.) The ordinary term "signal" is not limited to a
4   particular type of signal (such as one having "a low and a high state"), and certainly does not
5   require that a particular state, *i.e.*, the "high state," indicates that a "gesture" has occurred.
6   This ordinary meaning should apply in this case.
7        The ordinary meaning of "signal" is also consistent with the teachings in the patents,
8   which disclose a variety of signaling methods. The patents expressly state that the inventions
9   can be implemented "as a software program, hardware state machine, or otherwise. All such
10  implementations are intended to fall within the scope of the present invention." (*Id.*, ¶ 35 and
11  Ex. 4, '591 Patent, Col. 35, lines 23-32; Ex. 5, '931 Patent, Col. 40, lines 47-57.) In such
12  embodiments, the "signal" need not be a voltage level on a single wire that has a "high" state
13  and a "low" state. Indeed, "signals" may simply be "flags" or "messages" residing in
14  memory or registers or communicated over I/O channels, for example. (*Id.*, ¶ 35.)
15  Moreover, the patents expressly disclose that the signaling for the inventions may be
16  implemented with packets of data defined by the then well-known computer mouse
17  communication protocols, which are not separate instances of a "high" or "low" state. (*Id.*)
18  Each of these signaling types is contemplated within the broad designation "signal." (*Id.*,
19  ¶¶ 34-35, 51-55, 57, 58.)
20       Elantech ignores the ordinary meaning of "signal," and instead asserts that "signal"
21  means "outputting to the host a high state of a signal that has a low and a high state, and the
22  high signal state represents" the signal at issue. (Appendix A, Claim Terms 3-7, 9 and 10.)
23  Once again, Elantech is limiting the claim to a particular example in the patent specification.
24  In this instance, Elantech narrows the claim to the specific illustration in the conceptual
25  timing diagrams in Figures 15A-E of the '591 Patent. However, the claims literally cover all
26  "signals," and nothing in the claims or patent specifications narrows the type of "signal" that
27  the claims cover. Elantech's narrow construction of "signal" ignores the plain meaning of
28  the term and contradicts the express teachings in the patents.

      **2.**     **Elantech's Extraneous Limitations (Joint Claim Terms 3, 5, 6)**

Compounding the problem with Elantech's construction of "signal" is Elantech's habit of adding further extraneous limitations not found in the claimed signaling steps. For example, Joint Claim Term 5 recites "sending a second signal to said host indicating said second gesture," but Elantech asserts the proper claim construction of this phrase is "changing the state of the signal from a low signal state to a high signal state *for a predetermined period of time*, and sending the high signal state to the host *which interprets the termination of the first signal and the existence of a second high signal state* as being a double tap gesture." (Appendix A, Claim Term 5 (emphasis added).) Elantech offers no explanation for adding the phrases "for a predetermined period of time," and "which interprets the termination of the first signal and the existence of a second high signal state." Nothing in the claims or the patent specification requires these additional phrases to be added to this particular claim phrase. (Wolfe Decl., ¶¶ 37, 53.) Elantech is again simply adding to the claims limitations found in example embodiments in the patents.

Similarly, Elantech adds extraneous limitations to Joint Claim Terms 3 and 6. In both cases, the claims require that a signal be sent "indicating the occurrence" of a gesture. Elantech asserts that the claims require that the signals represent that the "gesture *will potentially occur* on the touch-sensor pad." (Appendix A, Terms 3 and 6 (emphasis added).) Nothing in the claims or the teachings of the patents requires these words in the recited claim phrase. (Wolfe Decl., ¶¶ 38, 51, 54.) Elantech has simply added these words without explanation. That is impermissible under the law. *See, e.g.*, *Yodlee, Inc. v. CashEdge, Inc.*, No. C 05-01550 SI, 2006 U.S. Dist. LEXIS 48614, at *14-15 (N.D. Cal. July 7, 2006) (no support in the facts for adding words to a claim).

      **3.**     **"Terminating" (Joint Claim Term 9)**

The remaining disputes with the signaling steps of the '591 and '931 Patents all relate back to the fundamental dispute over the meaning of "signal." The patents teach, and those of ordinary skill in the art at the relevant time would have been aware of, a rich variety of signaling methods available to implement the signaling steps recited in the disputed claims.

1  (Wolfe Decl., ¶ 35.) Elantech's construction, on the other hand, permits only one type of
2  signal—a "high" state voltage level in a signaling system that recognizes only a "high" or
3  "low" signal level. As a consequence of this dispute, the parties also dispute the words in the
4  claims that describe how the "signal" is managed.

5  For example, Elantech asserts that "terminating said first signal" means "changing the
6  state of the signal from the high signal state to the low signal state." This construction is
7  narrower than disclosed embodiments and ignores the plain meaning of the words that are
8  used in the claims. Consistent with the variety of signal methods taught in the patent
9  specifications and known to those of skill in the art at the relevant time, signals could be
10 "terminated" with a "low signal state," with a flag or register value that is set to indicate the
11 end of the signal state, or by transmitting new, different or no data packets in the well-known
12 mouse protocol. (Wolfe Decl., ¶ 39 and Ex. 4, '591 Patent, Col. 37, lines 6-9; Ex. 5, '931
13 Patent, Col. 43, lines 12-15.) Nothing in the words of the claim or the teachings in the patent
14 limit the signal that is terminated to one that was in a high state. The ordinary meaning of the
15 claim term is simply "terminating the previous signal." (*Id.*, ¶¶ 39, 52.) The claim terms
16 permit any type of "signal" and any method for "terminating" the previous signal.

17  **4.  "Maintaining" (Joint Claim Terms 7, 10)**

18  Similarly, the parties dispute the term "maintaining" in the context of "maintaining" a
19 prior "signal." The ordinary meaning of "maintaining" a signal includes the concepts of "to
20 continue, retain, or repeat." (Wolfe Decl., ¶ 40 and Ex. 10; ¶¶ 55, 58.) Elantech, on the other
21 hand, asserts that "maintaining" means "continuously outputting the high signal state."
22 (Appendix A, Claim Terms 7, 10.) This definition is inconsistent with the ordinary meaning,
23 and does not fit with the plain teachings in the patent specification.

24  In the '591 Patent embodiments, signals are "maintained" in variety of ways. For
25 example, the specification teaches that a signal previously sent may be retained until it is, in
26 effect, rescinded. (Wolfe Decl., ¶ 41 and Ex. 4, '591 Patent, Col. 33, lines 1-3, Col. 37, lines
27 6-9.) The patent also teaches that a signal previously sent will dictate the operation in
28 question while subsequent signals are suppressed. (*Id.*) Moreover, the standard mouse

1  protocol at the time included all of the concepts of "to continue, retain, or repeat" in
2  maintaining signals relating to gestures. (*Id.*)  These teachings are also perfectly consistent
3  with the wide variety of ways those of skill in the art would have known to "maintain" a
4  signal in the context of touch-pad technology. (*Id.*)  The Court should reject Elantech's
5  effort to narrow the claims beyond their ordinary meaning.

6            5.      **"Repeatedly Sending" (Joint Claim Term 8)**

7        The parties also dispute the meaning of "repeatedly sending" in the claim phrase
8  "repeatedly sending X and Y position information to said host."  The plain meaning of
9  "repeatedly sending" is that the signal is sent "repeatedly."  (Wolfe Decl., ¶ 43 and Ex. 4,
10 '591 Patent, Col. 39, lines 13-23; Col. 44, lines 23-56.)  The plain meaning of "repeatedly"
11 does not require a continuous sending of a signal, but permits breaks in transmission so long
12 as the signal is repeated over time. (*Id.*)  This is also clear from the teachings in the
13 specification of the '591 Patent.  As described above, signals may be sent repeatedly despite
14 the fact that they are not sent continuously. (*Id.*)  The patent further describes a mechanism
15 by which individual $\Delta X$ and $\Delta Y$ samples may be suppressed or delayed under certain
16 circumstances. (*Id.*)  The plain meaning, as supported by the various teachings in the patent,
17 should apply. (*Id.*, ¶¶ 43, 56.)

18       Despite the plain meaning of the claim words and the teachings in the patent
19 specification, Elantech, however, changes the claim word "repeatedly" to "continuously" in
20 its proffered definition.  (Appendix A, Claim Term 8.)  The Court should reject that
21 definition as a matter of law. *Sandisk Corp.*, 415 F.3d at 1286 (plain meaning of claims
22 should be consistent with specification).

23       **E.**      **"Double Tap Gesture" ('591 Patent: Joint Claim Term 5)**

24       Elantech suggests that claim 6 of the '591 patent may be indefinite because "no claim
25 construction can be made because there is no antecedent basis for 'said second gesture.'"
26 (Appendix A, Claim Term 5.)  Elantech is wrong.

27       In contradistinction to claim 5 of the '931 Patent, which claims a single "*tap gesture*,"
28 the preamble of claim 6 of the '591 Patent recites a "double *tap gesture*" function.  Thus, as

1   is plain from claim 6, the *tap gesture* will be performed twice (hence the word "double").
2   The claim first recites "a first signal to the host indicating the occurrence of said gesture" to
3   signify that the first of the two or "double" tap-gesture events has occurred.  The claim then
4   recites that a "second presence" on the touchpad is detected and a "a second signal to said
5   host indicating said second gesture" to signify that the second of the two or "double" *tap*
6   *gesture* events has occurred.  In each instance the "said gesture" refers to a specified one of
7   the two "*tap gesture*" events that are described in the preamble.  (Wolfe Decl., ¶¶ 44-45.)
8   There is no error or lack of antecedent basis for these claim terms.

   **F.   Corner Tap ('931 Patent: Joint Claim Term 11)**

10  Claim 5 of the '931 Patent relates to a corner tap function.  As explained in the '931
11  Patent specification, the user can define a particular function to be performed if a tap occurs
12  in a pre-defined corner of the touch-sensor device.  (Wolfe Decl., ¶¶ 46-47.)  The claim
13  recites the step of "detecting in which of at least one corner of the touch-sensor pad said tap
14  gesture occurred."  The claims do not require that the steps of "detecting" a tap and
15  "detecting" the corner have to occur in any particular order.  Elantech transforms the claim
16  phrase "detecting in which of at least one corner of the touch-sensor pad said tap gesture
17  occurred" into "after detecting the occurrence of the tap gesture, separately detecting in
18  which of at least one corner of the touch-sensor pad the tap gesture occurred."  Elantech
19  impermissibly limits the literal meaning of the claims by adding the concepts of "after" and
20  "separately."  *See, e.g., Moba B.V. et al. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1314
21  (Fed. Cir. 2003) (claimed method steps were not limited to sequential order, but allowed
22  simultaneous performance of the steps).
23  As an initial matter, steps of a claimed "method," such as recited in claim 5, are not
24  construed to require performance in the order listed in the patent claim unless the claim or
25  specification explicitly or implicitly requires such a narrow construction.  *Interactive Gift*
26  *Express, Inc. v. Compuserve Inc. et al.*, 256 F.3d 1323, 1342-43 (Fed. Cir. 2001).  Thus, the
27  mere order of the steps as recited in the claim does not limit the claim.
28

Elantech's proposal to add the words "after" and "separately" is also contrary to the teaching of the '931 Patent specification. In the specification, the inventors set forth several diagrams that describe an example algorithm that might be used to implement a corner-tap function. (Wolfe Decl., ¶ 48.) Figure 17 describes an algorithm for processing the additional data measured for each sampling of the touch sensor traces that occurs many times a second in order to detect whether a touch of the sensor is a "tap gesture" and whether the touch occurred in a selected corner or other specified location. (*Id.*, ¶ 48 and Exhibit 5, '931 Patent, Col. 40, line 66-Col. 41, line 4.) These detection processes execute concurrently and the individual steps of the detection algorithm are interleaved. In particular, many of the important steps in detecting which corner has been tapped occur prior to finally determining that a tap gesture has occurred in the preferred embodiment. (*Id.*, ¶ 48.) Therefore, with respect to the sole embodiment in the '931 Patent, there is no "separate" process and no required order in the algorithm for detecting a tap gesture and detecting the corner in which the tap gesture occurred. (*Id.*) Elantech's proposed construction impermissibly would exclude the embodiment disclosed in the patent. *Vitronics*, 90 F.3d at 1583 (A construction that excludes the preferred embodiment would "rarely, if ever, [be] correct . . . .").

Instructive on this point, is the Federal Circuit's ruling in *Altiris v. Symantec Corp.*, 318 F.3d 1363, 1370 (Fed. Cir. 2003). In *Altiris*, plaintiff Altiris asserted a method claim that first listed a "testing automatically" step that was followed by other steps that were conditioned upon the result of the "testing" step. The conditional language stated, for example, "booting normally, *if said testing automatically step* indicates a boot sequence stored internal to said digital computer." In addition, the "automatically testing" step recited that the "testing" included "reading a boot selection flag," and a later step recited "*setting said* boot selection flag." The Court held, 318 F.3d at 1370-71:

> Beginning with the claim language, it neither grammatic-
> ally nor logically indicates that the "setting" step must
> occur in a particular order compared to the other steps. The
> only order mandated by the claim language is the
> conditional language in several of the steps indicating that
> they must be performed after the "testing" step.

1  Looking next to the written description, it clearly only discusses a single "preferred" embodiment in which the "setting" step occurs after the "testing" step and before the "booting normally" step. Nowhere, however, is there any statement that this order is important, any disclaimer of any other order of steps, or any prosecution history indicating a surrender of any other order of steps.

Similarly, there is nothing in the claims, the specification, or the prosecution history of the '931 Patent that suggests the inventors disclaimed a particular order of the method steps at issue. The Court should not limit the claims as Elantech requests. (Wolfe Decl., ¶¶ 47-48, 59.)

## IV.  CONCLUSION

Synaptics' proposed claim constructions rely upon the ordinary meaning of the words in the claims and the teachings of the patent specifications. On the other hand, Elantech's proposed constructions impermissibly add limitations to the claims without legal or factual justification. Accordingly, the claims should be construed as Synaptics requests.

Dated: February 5, 2007

KARL J. KRAMER
ELLEN S. REINSTEIN
ERIKA L. LABIT
MORRISON & FOERSTER LLP

By:  /s/ Karl J. Kramer
     Karl J. Kramer

Attorneys for Defendant
SYNAPTICS, INC.