KARL J. KRAMER (CA SBN 136433)
ELLEN S. REINSTEIN (CA SBN 227833)
ERIKA L. LABIT (CA SBN 234919)
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California  94304-1018
Telephone: (650) 813-5600
Facsimile: (650) 494-0792
kkramer@mofo.com

Attorneys for Defendant
SYNAPTICS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ELANTECH DEVICES CORPORATION, a corporation existing under the laws of Taiwan, R.O.C.,<br><br>Plaintiff,<br><br>v.<br><br>SYNAPTICS, INC., a Delaware corporation; AVERATEC, INC., a California corporation; and PROSTAR COMPUTER, INC., a California corporation,<br><br>Defendants. | Case No.    C06-01839 CRB<br><br>**SYNAPTICS' OPPOSITION TO ELANTECH'S CLAIM CONSTRUCTION BRIEF CONCERNING THE '352 PATENT** |
| AND RELATED COUNTERCLAIMS | |

1

**TABLE OF CONTENTS**

2

Page

3

I.     SUMMARY OF CLAIM CONSTRUCTION ARGUMENT ............................................. 1

4

II.    CONSTRUCTION OF THE '352 PATENT CLAIM TERMS ...................................... 2

5

       A.    The Parties Agree On The Meaning Of "Operative Coupling." ............................ 2

6

7

       B.    "Scanning The Touch Sensor" Should Be Construed In The Context Of
             The Entire Claim And The Teachings in The Specification ................................... 3

8

             1.    "Scanning the Touch Sensor" Entails Measuring The Touch Sensor ........ 3

9

             2.    "Scanning the Touch Sensor" Requires An Ordered Sequence ................ 5

10

             3.    Elantech's Definitions Support Synaptics' Definition Of
                   "Scanning." .............................................................................................. 6

11

12

       C.    "Maxima" And "Minima" Have An Ordinary Meaning That Is Consistent
             With The Claim Words and The Teachings In The Patent ..................................... 7

13

             1.    The Evidence Supports Synaptics' Definitions Of
                   "Maxima/Minima." ................................................................................... 9

14

             2.    Elantech's Definitions Are Contrary To The Evidence ........................... 11

15

             3.    Scan Order Is Required In Sub-Elements (a)-(c) ..................................... 12

16

       D.    Elantech Fails To Show A Teaching In The Patent That Directly Links The
             Claimed "Means For Indicating" Function To A Specific Structure ................... 13

17

III.   CONCLUSION ........................................................................................................ 15

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## CASES

*Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.,*
  261 F.3d 1329 (Fed. Cir. 2001).................................................................................. 10

*Augustine Med., Inc. v. Gaymar Indus., Inc.,*
  181 F.3d 1291 (Fed. Cir. 1999).................................................................................... 2

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,*
  296 F.3d 1106 (Fed. Cir. 2002).................................................................................. 14

*Digital Biometrics, Inc. v. Identix, Inc.,*
  149 F.3d 1335 (Fed. Cir. 1998).................................................................................... 5

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.,*
  No. C 03-1431 SBA, 2006 U.S. Dist. LEXIS 36788 (N.D. Cal. May 25, 2006)...................... 3

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.,*
  222 F.3d 951 (Fed. Cir. 2000)..................................................................................... 10

*Intermatic Inc. v. Lamson & Sessions Co.,*
  273 F.3d 1355 (Fed. Cir. 2001).................................................................................. 12

*Key Pharms. v. Hercon Labs. Corp.,*
  161 F.3d 709 (Fed. Cir. 1998)...................................................................................... 3

*Maurice Mitchell Innovations, L.P. v. Intel Corp.,*
  No. 2:04-CV-450, 2006 U.S. Dist. LEXIS 85194 (E.D. Tex. Nov. 22, 2006) ...................... 14

*Medical Instrumentation and Diagnostics Corp. v. Elekta AB,*
  344 F.3d 1205 (Fed. Cir. 2003)........................................................................... 1, 13, 14

*Nystrom v. Trex Co., Inc.,*
  424 F.3d 1136 (Fed. Cir. 2005)..................................................................................... 4

*Pause Tech. LLC v. TiVo Inc.,*
  419 F.3d 1326 (Fed. Cir. 2005)..................................................................................... 1

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005).................................................................................. 3, 4

*Renishaw PLC v. Marposs Societa' per Azioni,*
  158 F.3d 1243, 1250 (Fed. Cir. 1998)............................................................................ 4

*Vitronics Corp. v. Conceptronic, Inc.,*
  90 F.3d 1576 (Fed. Cir. 1996)..................................................................................... 3, 4

*Yodlee, Inc. v. Cashedge, Inc.,*
  No. 05-1550 SI, 2006 U.S. Dist. LEXIS 48614 (N.D. Cal. July 7, 2006) .......................... 12

## STATUTES

35 U.S.C. § 112 ................................................................................................... 13, 14

SYNAPTICS' OPPOSITION TO ELANTECH'S CLAIM CONSTRUCTION BRIEF CONCERNING THE '352 PATENT
CASE NO. C 06-01839 CRB
pa-1130258

ii

1    **I.    SUMMARY OF CLAIM CONSTRUCTION ARGUMENT**

2    The disputed claim terms of U.S. Patent No. 5,825,352 Patent (the "'352 Patent")

3    should be construed in light of the entire language of the claims and the teachings in the

4    patent specification.  Elantech Devices Corporation's ("Elantech's") proposed constructions

5    require that the Court ignore certain claim words and construe other claim limitations in a

6    vacuum without regard to their use in the claims or the teachings in the patent specification.

7    There are two main areas of dispute.  First, the parties dispute the claim phrase at the

8    heart of the body of each of the asserted claims 1 and 18:

9
         scanning the touch sensor to (a) identify a first maxima in a
         signal corresponding to a first finger, (b) identify a minima
10       following the first maxima, (c) identify a second maxima in a
         signal corresponding to a second finger following said minima
11

12    Elantech's approach is to define separately the term "scanning," without regard to the other

13    words that precede or follow it, and then to define separately, and incorrectly, sub-elements

14    (a) - (c), which recite the "maxima" and "minima."  This artificial parsing of the claim is

15    impermissible because it results in a distorted claim construction that has nothing to do with

16    what is actually claimed or taught in the patent.  *See Pause Tech. LLC v. TiVo Inc.*, 419 F.3d

17    1326, 1331 (Fed. Cir. 2005) (court must construe claim term, not in isolation, but in the

18    context of the entire claim).  When read together, the claim terms require a certain type of

19    "scanning," of something in particular, in a precise order.  Elantech simply ignores these

20    aspects of the claims.

21    Second, the parties dispute whether there is any structure that is linked directly in the

22    patent specification to the precise function recited in the claimed "means for providing an

23    indication of the simultaneous presence of two fingers in response to identification of said

24    first and second maxima."  Nothing in the three sentences that Elantech devotes to this issue,

25    supports the conclusion that the patent specification "clearly links" the claimed function to a

26    specific structure in the patent specification.  *Medical Instrumentation and Diagnostics*

27    *Corp. v. Elekta AB*, 344 F.3d 1205, 1219 (Fed. Cir. 2003) (specification description must

28    "clearly link" the claimed function with a specific structure).

## II.    CONSTRUCTION OF THE '352 PATENT CLAIM TERMS

Synaptics, Inc. ("Synaptics") is the world leader in cutting-edge technology for touch-sensitive input devices.  Contrary to Elantech's unsupported assertions (Elantech Brief at 1:20-21), the named inventors of the '352 Patent were far from the first to invent "the ability to detect the presence of two or more fingers or objects" on a touchpad.  As the Patent Office expressly found during the prosecution of the application leading to the '352 Patent, other inventors had previously invented just that.  (Declaration of Karl J. Kramer ("Kramer Decl."), executed February 12, 2007 ("Kramer Decl."), ¶¶ 3-6 and Exhibits A - D.)  Indeed, the Patent Office awarded Synaptics the dominating patent for multiple-finger detection using finger profiles, which claims priority before the January 1996 filing date of the '352 Patent.  (*Id.*, ¶ 7 and Exhibit E (U.S. Patent No. 7,109,978).)   If the claims of the '352 Patent are valid at all, which Synaptics disputes, they cannot be stretched beyond the specific narrow method and system for detecting multiple fingers that is expressly recited in the asserted claims.  *Augustine Med., Inc. v. Gaymar Indus., Inc.*, 181 F.3d 1291, 1301 (Fed. Cir. 1999) (improvement patents do not deserve a broad scope).  Synaptics does not use the specific and narrow method or apparatus that are actually claimed in the '352 Patent.

### A.    The Parties Agree On The Meaning Of "Operative Coupling."

The two asserted claims recite "[a] method for detecting the operative coupling of multiple fingers to a touch sensor" (claim 1) and "[a] touch sensor for detecting the operative coupling of multiple fingers" (claim 18).  The parties agree that the phrase "operative coupling" means "finger-induced electrical effect."  (*See* Amended Joint Claim Construction Chart attached hereto as Appendix A.)  It is this "electrical effect," that is "detected" during the subsequent steps of the claims.  (Declaration Of Andrew Wolfe Ph.D. Regarding Construction Of The '352 Patent Claims ("Wolfe '352 Patent Decl."), ¶¶ 8-12.)  Consequently, contrary to Elantech's unsupported contentions (Elantech Brief at 6:12-23, 7:27-8:4), the claims are limited to methods and systems that measure the "finger-induced electrical effect" of a finger on a touch sensor.  This agreed-upon claim term is important for a later understanding of other limitations in dispute.

SYNAPTICS' OPPOSITION TO ELANTECH'S CLAIM CONSTRUCTION BRIEF CONCERNING THE '352 PATENT
CASE NO. C 06-01839 CRB
pa-1130258

2

1

**B.    "Scanning The Touch Sensor" Should Be Construed In The Context Of The Entire Claim And The Teachings in The Specification.**

2

The two asserted claims of the '352 Patent both include the following limitations:

3

4    scanning the touch sensor to (a) identify a first maxima in a signal corresponding to a first finger, (b) identify a minima following the first maxima, (c) identify a second maxima in a signal corresponding to a second finger following said minima

5

6    In the context of these words, "scanning the touch sensor" means "measuring the traces in the

7    touch sensor and assigning them to a sequence corresponding to their physical order on the

8    touch sensor." (Wolfe '352 Patent Decl., ¶ 13.)[1]  This definition is consistent with the words

9    in the claims, the teachings in the patent, and the common understanding of those of ordinary

10   skill in the art.  Elantech denies that "scanning" is of "the touch sensor" and denies that the

11   "scanning" has to be ordered or sequenced in any way.  (Elantech Brief at 5:24-25, 6:1-6.)

12   Elantech's isolated definition of "scanning" is contrary to the claim words, the teachings in

13   the patent, and Elantech's own proffered definitions of other claim limitations.

14

**1.    "Scanning the Touch Sensor" Entails Measuring The Touch Sensor.**

15   Elantech asserts that "scanning the touch sensor" means simply "examining

16   information associated with the touch sensor."  (Appendix A hereto.)  Elantech's definition

17   of "scanning" plainly ignores that the claims do not recite scanning "information," but

18   expressly require that the "scanning" is of the "touch sensor" itself.  (Wolfe '352 Patent

19   Decl., ¶¶ 13-15.)  The claims must be construed according to the claim terms.  *Phillips*,

20

21        [1]  Elantech incorrectly suggests that the Court may not rely upon expert testimony when construing the claims.  (Elantech Brief at 4:6-13.)  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318-

22   19 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 1332 (2006), which Elantech cites, expressly held that "because extrinsic evidence can help educate the court regarding the field of the invention

23   and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean, it is permissible for the district court in its sound discretion to admit and use such

24   evidence."  *See also Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998) (Court notes that the *Vitronics* opinion "might be misread by some members of the bar as

25   restricting a trial court's ability to hear such evidence. We intend no such thing.")  This Court has affirmed that expert testimony is both "entirely appropriate" and "perhaps even preferable. . .to

26   ensure that the claim constructions it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical

27   field."  *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. C 03-1431 SBA, 2006 U.S. Dist. LEXIS 36788, at *41-42 (N.D. Cal. May 25, 2006).

28

SYNAPTICS' OPPOSITION TO ELANTECH'S CLAIM CONSTRUCTION BRIEF CONCERNING THE '352 PATENT
CASE NO. C 06-01839 CRB
pa-1130258

3

1    415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243,

2    1250 (Fed. Cir. 1998)) ("The construction that stays true to the claim language and most

3    naturally aligns with the patent's description will be, in the end, the correct construction.").

4    Elantech's selective dictionary definitions are not on point and cannot override the plain

5    meaning of the words used in the claims.  (Wolfe '352 Patent Decl., ¶ 16.)  *See Nystrom v.*

6    *Trex Co., Inc.*, 424 F.3d 1136, 1144-45 (Fed. Cir. 2005) (citing *Phillips*, 415 F.3d at 1321)

7    ("it is improper to read the term to encompass a broader definition simply because it may be

8    found in a dictionary, treatise, or other extrinsic source.").

9        Because the claims require scanning "the touch sensor," Elantech's attempt to

10   eliminate "measuring" from the concept of "scanning the touch sensor" is baseless.  As noted

11   above, the '352 Patent claims are, by agreement, limited to systems and methods for

12   detecting "the finger-induced electrical effect" of a finger on the touch sensor.  (Wolfe '352

13   Patent Decl., ¶ 18; Appendix A hereto.)  Consequently, "scanning the touch sensor" would,

14   to one of ordinary skill in the art, necessarily include measuring the traces (also called

15   conductors) found in all touch sensors that detect such an "electrical effect."  (Wolfe '352

16   Patent Decl., ¶¶ 13, 22.)  This is exactly what the '352 Patent specification says: "The scan

17   process *measures* the values of finger-induced capacitance for each of the conductors, and

18   stores the values in RAM at step 420."  (*Id.*, ¶ 18, and Exhibit 1, 7:38-40 (emphasis added);

19   *see also* 5:20-61, 6:14-26.)  Indeed, these measurements are referred to in the patent as

20   "scans."  (*Id.*, ¶ 19, Exhibit 1, 12:37-42 and 14:3-7, Figs. 7-8.)  Thus, the patent teaches that

21   "scanning the touch sensor" means measuring the traces in the touch sensor.  *Phillips*,

22   415 F.3d at 1315 (The description of the invention in the specification "is the single best

23   guide to the meaning of a disputed term.'") (quoting *Vitronics Corp. v. Conceptronic, Inc.*,

24   90 F.3d 1576, 1582 (Fed. Cir. 1996)).

25       Moreover, the remaining words in the claims also make clear that "scanning"

26   includes measuring the "finger-induced electrical effect" on the touch sensor.  The

27   "scanning" step is expressly recited as the action that is required "to" do the sub-steps (a)-(c)

28   that identify the required "maxima" and "minima" values of "finger-induced electrical

1  effect."  The literal words thus require "scanning" the physical "touch sensor" to "identify"

2  values of a "signal corresponding" to a finger on the touchpad.  This requires that "scanning"

3  includes the act of measuring the required values of the traces in the touch sensor.  (Wolfe

4  '352 Patent Decl., ¶¶ 21-22.)

5        In the face of this uncontroverted intrinsic evidence and the sworn, uncontested

6  testimony of Dr. Wolfe concerning the understanding of those of ordinary skill in the art,

7  Elantech cites but one item of intrinsic evidence.  Elantech excerpts one part of a sentence

8  from the specification that states: "the cycle begins by scanning the traces and measuring the

9  capacitance on each trace."  (Elantech Brief at 6:13-14.)  The obvious plain meaning of this

10  phrase is that the "scanning" entails "measuring" the "traces" in the touch sensor.  (Wolfe

11  '352 Patent Decl., ¶ 20.)  That reading of the phrase is consistent with all of the other

12  disclosures in the patent specification about the "scanning" process, including the express

13  statement that: "The scan process *measures* the values of finger-induced capacitance for each

14  of the conductors, and stores the values in RAM at step 420."  (*Id.*, ¶¶ 17-20, and Exhibit 1,

15  7:38-40 (emphasis added); *see also* 5:20-61, 6:14-26.)  Elantech's proposed reading of the

16  cited phrase from the patent specification is inconsistent with all of the evidence and is

17  unjustified.  *See Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1345 (Fed. Cir.

18  1998) (isolated passage cannot outweigh other strong intrinsic evidence).

19          **2.      "Scanning the Touch Sensor" Requires An Ordered Sequence.**

20        Elantech asserts that the claims do not require that scanning result in any order or

21  sequence of the scanned measurements.  This view is inconsistent with the claim language

22  itself and the teachings in the patent specification.

23        First, the claims literally require that scanning result in an ordered sequence of

24  measurements.  Claims 1 and 18 both say that "scanning the touch sensor" is done "to":

25              (a) identify a *first* maxima in a signal corresponding to a *first finger*,

26              (b) identify a minima *following* the first maxima, [and]

27              (c) identify a *second* maxima in a signal corresponding to a *second*
                   *finger following* said minima

28

1    Logically, the claim terms "first," "second," and "following" all necessitate that the

2  "scanning" of "the touch sensor" results in an order or sequence of the measured values.

3  Otherwise, one could not determine what is first, what is second, or what value follows another.

4  (Wolfe '352 Patent Decl. ¶ 23.)  The express claim terms thus require that the "scanning the touch

5  sensor to identify" results in an ordered sequence that represents the physical touch sensor device.

6  This usage is also consistent with how one of ordinary skill would understand "scanning the touch

7  sensor" in the context of the claims.  (*Id.*, ¶¶ 13, 23.)

8    The '352 Patent specification also expressly teaches that part of "scanning the touch

9  sensor to . . . identify" the required "maxima" and "minima" values is the step of assigning

10  them to a sequence corresponding to their physical order on the touch sensor.  As taught in

11  the '352 Patent specification, the scan measurements are an enumerated sequence of values.

12  (*Id.*, ¶ 24 and Exhibit 1, 5:64-65 ("X(1) through X(Xcon) and Y(1) through Y(Ycon)"), and

13  8:61.)  Thus, the claim language, the teachings in the patent specification, and the undisputed

14  understanding of those of ordinary skill in the art support Synaptics' and contradict

15  Elantech's construction of "scanning the touch sensor."

16    **3.    Elantech's Definitions Support Synaptics' Definition Of "Scanning."**

17    Although Elantech disputes that the claim term "scanning the touch sensor" entails

18  measurement of the touch sensor or an ordered sequence of measured values, Elantech's own

19  definitions require both of these concepts.  Elantech defines the step of "scanning the touch

20  sensor to (a) identify a first maxima in a signal corresponding to a first finger" to mean

21  "identify a first peak value in a *finger profile* obtained from scanning the touch sensor."

22  (Appendix A hereto (emphasis supplied).)  A "finger profile" is a set of values that

23  numerically represent the X or Y sequence of measurements corresponding to the physical

24  order of the traces in the touch sensor.  (Wolfe '352 Patent Decl., ¶ 25.)  As taught in the

25  '352 Patent, the "finger profile" is "the profile of finger-induced capacitances" (*Id.*, ¶¶ 22,

26  25, Exhibit 1, 11:49-51), sensed by "scanning" the touch sensor.  These finger profiles are

27  shown graphically in Figures 3 and 4 of the '352 Patent.  (*Id.*, ¶ 25, Exhibit 1, 4:56-59

28  ("FIG. 3 shows a finger profile . . . .  FIG. 4 shows a finger profile. . . .").)

1    In its definition, Elantech concedes that the "scanning" step of the claim requires that

2    the system "identify a first peak value in a finger profile obtained from scanning the touch

3    sensor."  It is not possible for the "finger profile" values to be "obtained from scanning the

4    touch sensor" unless "scanning the touch sensor" includes *measuring* the "finger-induced

5    electrical effect" on the touch sensor traces.  (Wolfe '352 Patent Decl., ¶ 26.)

6    Furthermore, Elantech's own definition of "minima" shows an ordered sequence,

7    because, as Elantech concedes, the "minima" must be "*after* the first peak value, and *before*

8    another peak value is identified."  (Elantech Brief at 11:22.)  Similarly, Elantech's definition

9    of "second maxima" requires an ordered sequence representing the physical touchpad

10   because the "second maxima" must be "*after* identifying the lowest value in the finger

11   profile, identify a second peak value in the finger profile."  (Elantech Brief at 13:4-5; Wolfe

12   '352 Patent Decl., ¶ 27.)  Indeed, as shown in Figures 3 and 4 of the '352 Patent, a "finger

13   profile" as Elantech asserts *is* the measured values of the traces in the touch sensor after

14   assigning them to a sequence corresponding to their physical order on the touchpad.  (Wolfe

15   '352 Patent Decl., ¶ 27.)  These definitions logically necessitate that a required part of

16   "scanning" is assigning the measured trace values from the touch sensor to a sequence

17   corresponding to their physical order on the touch sensor.  (*Id.*)  Thus, inherent in Elantech's

18   own definitions of the "scanning the touch sensor" limitations (a)-(c) is the requirement of

19   measuring the traces in the touch sensor and assigning the measured trace values to an

20   ordered sequence corresponding to their physical order on the touch sensor.  (*Id.*)

21

22   **C.     "Maxima" And "Minima" Have An Ordinary Meaning That Is Consistent With The Claim Words and The Teachings In The Patent.**

23   The disputed claim language requires that the system or method scan the touch sensor

24   "to (a) identify a first maxima in a signal corresponding to a first finger, (b) identify a

25   minima following the first maxima, [and] (c) identify a second maxima in a signal

26   corresponding to a second finger following said minima."  The parties dispute the meaning of

27   "maxima" and "minima," and dispute whether the claims require a particular ordered

28   sequence to the claimed identifications made by "scanning the touch sensor."

1    The named inventors of the '352 Patent never specially defined the terms "maxima"

2    and "minima" within the patent.  Instead, the named inventors presumed that skilled artisan

3    readers would apply their ordinary understanding of these terms, which are well-known and

4    understood by engineers and mathematicians.  (Wolfe '352 Patent Decl., ¶¶ 32-33.)

5    In general, "maxima" is the plural of "maximum."  The term "minima" is the plural

6    of "minimum."  To those of ordinary skill in the art, the terms "maximum" and "minimum"

7    have two distinct possible meanings depending upon the context: (1) a "local" maximum or

8    minimum, or (2) a "global" maximum or minimum.  (*Id.*)  A *local* maximum is "a point at

9    which a quantity ceases to increase and begins to decrease."  A *local* minimum is "a point at

10    which a quantity ceases to decrease and begins to increase."  (*Id.*)  By contrast, a "global"

11    maximum is "the greatest value which a variable may have" or "the largest element in a set."

12    Similarly, a "global" minimum is the "least value which a variable or a function may have"

13    or "the smallest element in a set."  (*Id.*)

14    The distinction between these uses of maximum and minimum is important.  The

15    "global" maximum or minimum is the largest or smallest value of an entire set and does not

16    permit of more than one such value.  You cannot have two mountains in the world with the

17    global maximum height; there is only one, Mount Everest.  However, every other "peak" or

18    "plateau" around Mount Everest, or anywhere else, is a "local" maximum.  In the same way,

19    you can think of global minimum and local minimum as the lowest point globally (the Dead

20    Sea) or just locally (any other place that changes from lowering in elevation to increasing in

21    elevation).  (*Id.*, ¶ 33.)  These two different definitions of these terms can also be found in

22    standard dictionary definitions.  (*Id.*, ¶ 32 and Exhibit 2, The New Shorter Oxford English

23    Dictionary (1993), at SYN 00103321 ("maximum" means "3 Math. The greatest value which

24    a variable may have; the largest element in a set; a point at which a continuously varying

25    quantity ceases to increase and begins to decrease.") and at SYN 00103322 ("minimum"

26    means "3 Math. The least value which a variable or a function may have; the smallest

27    element in a set; a point at which a continuously varying quantity ceases to decrease and

28    begins to increase; the value of a quantity at such a point.").)

SYNAPTICS' OPPOSITION TO ELANTECH'S CLAIM CONSTRUCTION BRIEF CONCERNING THE '352 PATENT
CASE NO. C 06-01839 CRB
pa-1130258

8

1    The parties appear to dispute which contextual meaning should apply to the claims in

2  this case.  Synaptics asserts that the claims are directed to the common definition of "local"

3  maxima and minima.  Elantech appears to assert that the claims fit the common definition of

4  "global" maximum and minimum.

5         **1.    The Evidence Supports Synaptics' Definitions Of "Maxima/Minima."**

6    In the context of these claims and the disclosure in the '352 Patent disclosure,

7  "maxima" and "minima" are *local* maxima and minima: (a) "identify a . . . maxima" would

8  mean to one of ordinary skill in the art "determining the point at which the measured values

9  cease to increase and begin to decrease," and (b) "identify a minima" would mean to one of

10  ordinary skill in the art "determining the point at which the measured values cease to

11  decrease and begin to increase."  (Wolfe '352 Patent Decl., ¶¶ 31, 34.)

12    First, and most obviously, the inventors chose to use the plural forms of maximum

13  and minimum ("maxima" and "minima"), and indeed recite two distinct "maxima" in the

14  claim terms at issue.  (*Id.*, ¶ 34.)  This precludes the possibility that the inventors intended a

15  "global" maximum and minimum because there cannot be more than one global maximum or

16  minimum.  (*Id.*)

17    Second, Figures 4 and 7B through 7F-2 all have more than one "maxima" present,

18  which again precludes the concept of "global" maximum.  (*Id.*, ¶ 35, Exhibit 1.)  Each of

19  those Figures also depicts a finger profile that includes lower values than the "minima"

20  between the first and second "maxima."  (*Id.*)  Thus, the inventors intended "maxima" and

21  "minima" to have the definition of "local" maximum and minimum, and not "global"

22  maximum and minimum.  (*Id.*)

23    Third, Figure 6-1 of the '352 Patent specifically describes a precise algorithm for

24  identifying the "maxima" and "minima," which exactly corresponds to Synaptics' definition

25  and the ordinary meaning of these terms.  (*Id.*, ¶ 36, Exhibit 1.)  The Figure 6-1 detailed

26  algorithm shows that the "maxima" is identified only after the absolute value of the

27  measurement begins to decrease.  (*Id.*, ¶ 39.)  Similarly, the Figure 6-1 detailed algorithm

28  shows that the "minima" is identified only after the absolute value of the measurement begins

1   to increase.  In each case, the algorithm shown in the flow diagram of Figure 6-1 fits

2   precisely the ordinary meaning of "maxima" and "minima."  (*Id.*, ¶ 36.)  Thus, the clearest

3   teaching in the patent specification is consistent with the definition of local maximum and

4   local minimum and inconsistent with the definition of global maximum and global

5   minimum.[2]  (*Id.*, ¶ 39.)

6        Moreover, nowhere in the '352 Patent specification are "maxima" or "minima" used

7   in the context of "global" maximum or minimum.  (Wolfe '352 Patent Decl., ¶ 39.)  Thus,

8   contrary to Elantech's contention (Elantech Brief at 9:10-14, 11:27-12:2), the alternative

9   definition of maximum and minimum (*i.e.* the concept of global maximum and minimum)

10  stated in the dictionary definitions that Elantech cites, are not consistent with the intrinsic

11  evidence.  (*Id.*)

12       Neither of Elantech's two other criticisms of Synaptics' definition has merit.

13  Elantech incorrectly asserts that Synaptics' proposed definition does not take into account the

14  applicants' statements during prosecution that the claimed maxima could be "negative levels,

15  or troughs, depending upon the circuitry used."  (Elantech Brief at 9:26-27.)  This criticism is

16  unfounded because Synaptics agrees that the "maxima" and "minima" could be negative

17  "maxima" and "minima."  (Wolfe '352 Patent Decl., ¶ 40.)  Moreover, Elantech's argument

18  is simply not logical given that it applies with equal force to Elantech's own definitions.  In

19  the same superficial way, Elantech's criticism would exclude Elantech's offered "peak"

20  definition from being "negative levels, or troughs."  A "peak" cannot be a "trough."  (*Id.*,

21  ¶ 41.)  Elantech's criticism is off point and applies with equal force to Elantech's definitions.

22       [2]  One of ordinary skill in the art would look to this clear explanation in flow-diagram
23  form and would not look to unclear or ambiguous hand-drawn lines on Figures to determine the
    meaning of "maxima" and "minima."  (Wolfe '352 Patent Decl., ¶ 39.)  One of ordinary skill in
24  the art would rely on such clear flow-chart descriptions as they are the most concrete and detailed
    explanation of the concepts claimed in the '352 Patent claims.  (*Id.*)  *See Hockerson-Halberstadt,*
25  *Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000) ("[I]t is well established that
    patent drawings do not define the precise proportions of the elements and may not be relied on to
26  show particular sizes if the specification is completely silent on the issue."); *Advanced*
    *Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 261 F.3d 1329, 1339 (Fed. Cir. 2001) (holding
27  that drawings could not limit the claims without support from the claim language or written
    description).

28

Second, Elantech argues that its definitions of "maxima" as a "peak" and "minima" as "the lowest value" are less ambiguous in determining which scan trace value should be the "maxima" or "minima" when several scan traces in a row have the same value, *i.e.*, along a "plateau" of values. (Elantech Brief at 10:6-20.) However, as shown above, Synaptics' definitions of "maxima" and "minima" are not ambiguous. "Maxima" and "minima" are identified, as shown in detailed algorithm in Figure 6-1 of the '352 Patent, as the last point on the "plateau" moving in the direction of the scan order. (Wolfe '352 Patent Decl., ¶ 42; *see also* ¶¶ 36-39.) On the other hand, Elantech's ambiguity argument applies with full force to Elantech's offered definitions of "maxima" as a "peak" and "minima" as the "lowest value." Under Elantech's proposed definitions, there is no way to determine which point on a "plateau" of values is the "maxima" or the "minima." (*Id.*) The "peak" is a single value and there is no way to know which of several equivalent values (in a "plateau" of equal values) is the "peak." Moreover, the "lowest value" could be any one of several equivalently low values (a plateau), and thus, under Elantech's definition, there would be no way to know which is the "minima." None of Elantech's criticisms has merit.

## 2. Elantech's Definitions Are Contrary To The Evidence.

Elantech's assertions that "maxima" is a "peak" and "minima" is "the lowest value" are inconsistent with the intrinsic evidence and the ordinary understanding of those of skill in the art. As shown above, the alternative meaning of "maxima" and "minima" as global "peak" and global "lowest value," cannot be squared the inventors' use of the plural "maxima" and "minima," or the teachings in the patent. (Wolfe '352 Patent Decl., ¶¶ 34-36.) Also as shown above, Elantech's definitions leave unresolved the ambiguity of how to determine the "maxima" and "minima" in instances in which successive scan traces share the same value. (*Id.*, ¶ 42.)

Moreover, it makes no sense to define the term "maxima" as "peak" given that in the patent the inventors define "peak" as a type of "maxima." Thus, while it may be true that the highest local value may be a single point, or "peak," it is not necessarily so, as provided in the algorithm set forth in Figure 6-1. (*Id.*, ¶ 43.) As shown above, in that detailed algorithm

SYNAPTICS' OPPOSITION TO ELANTECH'S CLAIM CONSTRUCTION BRIEF CONCERNING THE '352 PATENT
CASE NO. C 06-01839 CRB
pa-1130258

11

1  expressly taught in the patent, a "maxima" is not identified if the current scan value is greater

2  than *or equal to* the previous scan value.  (*Id.*)

3         Finally, consistent with the teachings in the patent specification, the inventors

4  expressly distinguished in dependent claims 7 and 21 between the general term "maxima"

5  and the term "peak" as a specific instance of a "maxima."  The *only* difference between those

6  dependent claims, and claims 1 and 18, from which they depend, respectively, is the further

7  limitation "wherein said maxima are peaks" added to the dependent claims.  (Wolfe '352

8  Patent Decl., Exhibit 1.)  This distinction is superfluous if, as Elantech contends, a "maxima"

9  must always be a "peak."  (*Id.*, ¶ 43.)  Under the applicable law, "maxima" cannot be defined

10  as a "peak."  *Intermatic Inc. v. Lamson & Sessions Co*., 273 F.3d 1355, 1364 (Fed. Cir.

11  2001), *subsequently vacated and remanded on other grounds*, 2003 U.S. App. LEXIS 6756

12  (Fed Cir. Mar. 17, 2003) (dependent claim term cannot be read into an independent claim

13  when that term is the only meaningful difference between the two claims); *Yodlee, Inc. v.

14  Cashedge, Inc*., No. 05-1550 SI, 2006 U.S. Dist. LEXIS 48614, at *6 (N.D. Cal. July 7,

15  2006) (impermissible to incorporate term from dependent claim that would render dependent

16  claim superfluous).

17         **3.    Scan Order Is Required In Sub-Elements (a)-(c).**

18         Elantech takes issue with the inclusion of "in scan order" in Synaptics' proposed

19  definitions of sub-elements (b) and (c).  (Elantech Brief at 12:20-13:3, 13:15-17.)  The claims

20  recite:

21         *scanning the touch sensor to* (a) identify a *first* maxima
        in a signal corresponding to a first finger, (b) identify a
22         minima *following the first* maxima, (c) identify a
        *second* maxima in a signal corresponding to a second
23         finger *following said minima*

24         These words in the claims require that there be an identification of values in scan

25  order consistent with the physical touch sensor.  Without an order to the identification in the

26  scanning process, the terms "first," "second," and "following" are nonsensical.  These words

27  only have meaning if, as is inherent in the claim term "scanning the touch sensor," the

28  identification proceeds through the measured values in an order that represents the physical

1  placement of the "first" and "second" finger on the touch sensor.  (Wolfe '352 Patent Decl.,

2  ¶ 44; *see also* ¶¶ 23-24.)

3         As Elantech's own definition concedes (Appendix A hereto, Claim Terms 16-18), the

4  scan order must represent the "finger profile" upon the actual touch sensor or it would be

5  impossible to identify what finger is "first," what finger is "second," and what values are

6  "following" others.  The more exact way to express this relationship is to state explicitly, as

7  in Synaptics' definition, that during the step of "scanning the touch sensor" the claim terms

8  "first," "following," and "second," require an ordered relationship of values that corresponds

9  to the physical touch sensor.  (Wolfe '352 Patent Decl., ¶ 44.)

10

11         **D.    Elantech Fails To Show A Teaching In The Patent That Directly Links
                   The Claimed "Means For Indicating" Function To A Specific Structure**

12         Claim 18 recites a "means for providing an indication of the simultaneous presence of

13  two fingers in response to identification of said first and second maxima."  Elantech has the

14  burden to show that a particular structure in the patent specification has been clearly linked

15  by teachings in the patent to the function recited in claim 18.  *See, e.g.*, *Medical*

16  *Instrumentation and Diagnostics Corp.*, 344 F.3d at 1211.  As the Federal Circuit Court of

17  Appeals explained in *Medical Instrumentation and Diagnostics Corp.*, 344 F.3d at 1211:

18              The duty of a patentee to clearly link or associate structure
                with the claimed function is the quid pro quo for allowing
19              the patentee to express the claim in terms of function under
                section 112, paragraph 6. . . .  If the specification is not
20              clear as to the structure that the patentee intends to
                correspond to the claimed function, then the patentee has
21              not paid that price but is rather attempting to claim in
                functional terms unbounded by any reference to structure in
22              the specification.  Such is impermissible under the statute.

23         In this case, the patent does not directly link any specific structure to the claimed

24  function.  (Wolfe '352 Patent Decl., ¶ 46.)  Although "the simultaneous presence of two

25  fingers in response to identification of said first and second maxima" is *determined* at item

26  980 in Figure 9-2 of the '352 Patent, there is no disclosure of a precise structure that is used

27  to "provide an indication" once that information has been determined.  (*Id*., Exhibit 1.)

28

13

1          To support its argument, Elantech cites only one phrase excerpted out of one sentence

2    of the patent: "supplied to an interface to a PC or other device." (Elantech Brief at 14:13-

3    15.) The full sentence from the '352 Patent specification does not support Elantech's

4    position. The full sentence makes clear that only certain unspecified operations result in such

5    outputs: "*Depending on the operation being performed at the particular time*, the output of

6    microcontroller 60 is then supplied to an interface to a PC or other device. . . ." (Wolfe '352

7    Patent Decl., ¶ 46, Exhibit 1, 5:52-55 (emphasis supplied).) This statement means that not all

8    operations are to be "output" in that manner. This statement does not state that the specific

9    function recited in the "means" limitation in claim 18 is one such operation. Consequently,

10   there is nothing in the specification that specifically links the claimed function, "providing an

11   indication of the simultaneous presence of two fingers in response to identification of said

12   first and second maxima," to a particular structure.

13         One of ordinary skill in the art would have to guess or make an educated surmise on

14   what disclosed structures could be used for that purpose. (Wolfe '352 Patent Decl., ¶ 46.)

15   That is not sufficient to meet the patentee's burden to "clearly link" a specific structure with

16   the precise function recited in claim 18. *Medical Instrumentation and Diagnostics Corp.*,

17   344 F.3d at 1220 ("The public should not be required to guess as to the structure for which

18   the patentee enjoys the right to exclude. The public instead is entitled to know precisely

19   what kind of structure the patentee has selected for the claimed functions, when claims are

20   written according to section 112, paragraph 6."). Consequently, this limitation is indefinite

21   as a matter of law. *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1119

22   (Fed. Cir. 2002); *Maurice Mitchell Innovations, L.P. v. Intel Corp*., No. 2:04-CV-450, 2006

23   U.S. Dist. LEXIS 85194, at **13-15 (E.D. Tex. Nov. 22, 2006). Synaptics requests that in

24   view of the failure of patentee to comply with its obligation under 35 U.S.C. § 112,

25   paragraph 6, claim 18 should be declared invalid. *Cardiac Pacemakers*, 296 F.3d at 1119.

26

27

28

1    III.    **CONCLUSION**

2              Synaptics requests that the Court adopt the definitions that Synaptics has proposed.

3    Those definitions of the disputed claim terms are consistent with the plain language in the

4    claims, the teachings in the patent specification, and the ordinary understanding of those

5    skilled in the art of touch sensor design.

6

7    Dated: February 12, 2007              KARL J. KRAMER
                                            ELLEN S. REINSTEIN
8                                          ERIKA L. LABIT
                                            MORRISON & FOERSTER LLP
9

10
                                    By:   /s/ Karl J. Kramer
11                                           Karl J. Kramer

12                                        Attorneys for Defendant
                                            SYNAPTICS, INC.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SYNAPTICS' OPPOSITION TO ELANTECH'S CLAIM CONSTRUCTION BRIEF CONCERNING THE '352 PATENT
CASE NO. C 06-01839 CRB
pa-1130258

15

# APPENDIX A

# 2nd AMENDED JOINT CLAIM CONSTRUCTION CHART

| Claim Terms | Synaptics Claim Construction Disclosure | Elantech Claim Construction Disclosure |
|---|---|---|
| 1. "tap gesture" ('931/'591) | "a quick tap of the finger on the pad, of short duration and involving little or no X or Y finger motion, that is presented to the host as a brief click of the mouse button" | |
| 2. "X and Y position information" ('931/'591) | "information about the horizontal and vertical positioning of an object on a touch sensor" | "two-dimensional location on a touch-sensor pad" |
| 3. "initiating a first signal to the host indicating the occurrence of said gesture" ('591) | "initiating transmission of a first set of data to a host that indicates that a tap gesture has occurred on the touch-sensor pad" | "outputting to the host a high state of a signal that has a low and a high state, and the high signal state represents that a double tap gesture will potentially occur on the touch-sensor pad" |
| 4. "terminating said first signal" ('591) | "terminating the previous signal" | "changing the state of the signal from the high signal state to the low signal state" |
| 5. "sending a second signal to said host indicating said second gesture" ('591) | "sending a second set of data to a host that indicates that a second tap gesture has occurred on the touch-sensor pad" | "changing the state of the signal from a low signal state to a high signal state for a predetermined period of time, and sending the high signal state to the host which interprets the termination of the first signal and the existence of a second high signal state as being a double tap gesture" This claim construction presumes that "said second gesture" should have read "said gesture" or "said double tap gesture." Absent such a presumption, no claim construction can be made because there is no antecedent basis for "said second gesture." |
| 6. "initiating a drag gesture signal to the host indicating the occurrence of a gesture" ('591) | "initiating transmission of a first set of data to a host that indicates that a gesture has occurred on the touch-sensor pad" | "outputting to a host a high state of a signal that has a low and high state, and the high signal state represents that a drag gesture will potentially occur on the touch-sensor pad" |
| 7. "maintaining said drag gesture signal" ('591) | "to continue, retain, or repeat the drag gesture signal" | "continuously outputting the high signal state" |
| 8. "repeatedly sending X and Y position information to said host for the duration of said second presence" ('591) | "after the second presence is detected, repeatedly sending information about the horizontal and vertical positioning of an object on a touch sensor to a host while the second presence continues" | "continuously sending the current two-dimensional location of the object on the touch-sensor pad to the host as long as the object continues to be in proximity to the touch-sensor pad" |
| 9. "initiating a signal to the host indicating the occurrence of said tap gesture" ('931) | "initiating the transmission of a set of data to a host that indicates that a tap gesture has occurred on the touch-sensor pad" | "outputting to the host a high state of a signal that has a low and a high state, where the high signal state represents that a tap gesture occurred on the touch-sensor pad" |
| 10. "maintaining said signal for a predetermined period of time" ('931) | "to continue, retain, or repeat the signal for a period of time that was determined before" | "continuously outputting the high state of the signal only for a predetermined time period (i.e., changing the signal state from high to low at the end of the predetermined time period)" |
| 11. "detecting in which of at least one corner of the touch-sensor pad said tap gesture occurred" ('931) | "detecting that a tap gesture has occurred in at least one corner, the identity of which is distinguished in some way from other corners of the touch-sensor pad" | "after detecting the occurrence of the tap gesture, separately detecting in which of at least one corner of the touch-sensor pad the tap gesture occurred" |

1

# 2nd AMENDED JOINT CLAIM CONSTRUCTION CHART

| 12. "data packet processor" ('052) | "hardware and/or program code, for example, software executed on a central processing unit, that examines data packets" | "software for processing data packets and sending messages" |
|---|---|---|
| 13. "incrementally move" ('411) | "to move in increments" | movement defined by the second component of Equations 12 and 13 in the '411 patent, namely, $S(X_{cur} - X_{center})$ and $S(Y_{cur} - Y_{center})$ |
| 14. "operative coupling" ('352) | "finger-induced electrical effect" ||
| 15(a) "scanning the touch sensor" | "measuring the traces in the touch sensor and assigning them to a sequence corresponding to their physical order on the touch sensor." | "examining information associated with the touch sensor" |
| 15(b) "means for scanning the touch sensor . . ." ('352) | 112 ¶6 Claimed Function "scanning the touch sensor to (a) identify a first maxima in a signal corresponding to a first finger, (b) identify a minima following the first maxima, and (c) identify a second maxima in a signal corresponding to a second finger following said minima," as those terms are defined below ||
| | 112 ¶6 Corresponding Structures analog multiplexor 45, capacitance measuring circuit 70, analog to digital converter 80, microcontroller 60 ||
| 16. "scanning the touch sensor to . . . identify a first maxima in a signal corresponding to a first finger" ('352) | "measuring the trace values of the touch sensor corresponding to a first finger and determining the point at which the measured values cease to increase and begin to decrease" | "identify a first peak value in a finger profile obtained from scanning the touch sensor" |
| 17. "scanning the touch sensor to . . . identify a minima following the first maxima" ('352t) | "measuring the trace values of the touch sensor following, in scan order, after the first maxima and determining the point at which the measured values cease to decrease and begin to increase" | "identify the lowest value in the finger profile that occurs after the first peak value, and before another peak value is identified" |
| 18. "scanning the touch sensor to . . . identify a second maxima in a signal corresponding to a second finger following said minima" ('352) | "measuring the trace values corresponding to a second finger following, in scan order, said minima and determining the point at which the measured values cease to decrease and begin to increase" | "after identifying the lowest value in the finger profile, identify a second peak value in the finger profile" |
| 19(a) "providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" ('352) | No further construction necessary since ordinary meaning is sufficient. ||
| 19(b) "means for providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" ('352) | 112 ¶6 Claimed Function "providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" ||
| | 112 ¶6 Corresponding Structure<br><br>None | 112 ¶6 Corresponding Structure<br><br>microcontroller 60 |

1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                           NORTHERN DISTRICT OF CALIFORNIA

10                             SAN FRANCISCO DIVISION

11

12   ELANTECH DEVICES CORPORATION, a              Case No.    C06-01839 CRB
     corporation existing under the laws of Taiwan,
13   R.O.C.,                                       **[PROPOSED] ORDER ON CLAIM
                                                   CONSTRUCTION OF THE '352
14                    Plaintiff,                   PATENT**

15            v.

16

17   SYNAPTICS, INC., a Delaware corporation;
     AVERATEC, INC., a California corporation; and
18   PROSTAR COMPUTER, INC., a California
     corporation,
19
                      Defendants.
20

21   AND RELATED COUNTERCLAIMS

22

23

24

25

26

27

28

1     Having considered the arguments and evidence submitted and for good cause appearing:

2     IT IS HEREBY ORDERED that the asserted claims 1 and 18 of U.S. Patent No.

3  5,825,352 Patent (the "'352 Patent"), shall be interpreted as a matter of law as set forth below:

4     1.     In the context of the asserted claims of the '352 Patent, the claim term "operative

5  coupling," identified by the parties as Joint Claim Term 14, means "finger-induced electrical

6  effect."

7     2.     In the context of the asserted claims of the '352 Patent, the claim term "scanning

8  the touch sensor," identified by the parties as Joint Claim Term 15(a), means "measuring the

9  traces in the touch sensor and assigning them to a sequence corresponding to their physical order

10  on the touch sensor."

11     3.     In the context of the asserted claims of the '352 Patent, the claim term "means for

12  scanning the touch sensor," identified by the parties as Joint Claim Term 15(b) has a "function"

13  for purposes of 35 U.S.C. Section 112, Paragraph 6, of "scanning the touch sensor to (a) identify

14  a first maxima in a signal corresponding to a first finger, (b) identify a minima following the first

15  maxima, and (c) identify a second maxima in a signal corresponding to a second finger following

16  said minima," as those terms are defined below.  Furthermore, the corresponding structure

17  disclosed in the specification of the '352 Patent for performing the function of Joint Claim Term

18  15(b) is "analog multiplexor 45, capacitance measuring circuit 70, analog to digital converter 80,

19  microcontroller 60" shown in Figure 2 of the '352 Patent.

20     4.     In the context of the asserted claims of the '352 Patent, the claim term  "scanning

21  the touch sensor to (a) identify a first maxima in a signal corresponding to a first finger,"

22  identified by the parties as Joint Claim Term 16, means "measuring the trace values of the touch

23  sensor corresponding to a first finger and determining the point at which the measured values

24  cease to increase and begin to decrease."

25     5.     In the context of the asserted claims of the '352 Patent, the claim term "scanning

26  the touch sensor to . . . (b) identify a minima following the first maxima," identified by the parties

27  as Joint Claim Term 17, means "measuring the trace values of the touch sensor following, in scan

28  order, after the first maxima and determining the point at which the measured values cease to

1  decrease and begin to increase."

2        6.     In the context of the asserted claims of the '352 Patent, the claim term "scanning

3  the touch sensor to . . . (c) identify a second maxima in a signal corresponding to a second finger

4  following said minima," identified by the parties as Joint Claim Term 18, means "measuring the

5  trace values corresponding to a second finger following, in scan order, said minima and

6  determining the point at which the measured values cease to decrease and begin to increase."

7        7.     In the context of the asserted claims of the '352 Patent, the claim term "providing

8  an indication of the simultaneous presence of two fingers in response to identification of said first

9  and second maxima," identified by the parties as Joint Claim Term 19(a), needs no further

10  construction and should be applied using the corresponding constructions determined above.

11        8.     In the context of the asserted claims of the '352 Patent, the claim term "means for

12  providing an indication of the simultaneous presence of two fingers in response to identification

13  of said first and second maxima," is subject to the restrictions of a "means" claim limitation under

14  35 U.S.C. Section 112, Paragraph 6.  The disclosure in the '352 Patent nowhere clearly links any

15  specific structure with the claimed function of "providing an indication of the simultaneous

16  presence of two fingers in response to identification of said first and second maxima."

17  Consequently, this claim limitation, identified by the parties as Joint Claim Term 19(b) is

18  indefinite, and claim 18 of the '352 Patent is therefore invalid.

19

20

21  IT IS SO ORDERED

22  Dated: _____, 2007      By: _____

23                                 Honorable Charles R. Breyer
                               United States District Court Judge

24

25

26

27

28