KARL J. KRAMER (CA SBN 136433)
ELLEN S. REINSTEIN (CA SBN 227833)
ERIKA L. LABIT (CA SBN 234919)
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California  94304-1018
Telephone: (650) 813-5600
Facsimile: (650) 494-0792
kkramer@mofo.com

Attorneys for Defendant
SYNAPTICS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ELANTECH DEVICES CORPORATION, a corporation existing under the laws of Taiwan, R.O.C.,<br><br>Plaintiff,<br><br>v.<br><br>SYNAPTICS, INC., a Delaware corporation; AVERATEC, INC., a California corporation; and PROSTAR COMPUTER, INC., a California corporation,<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIMS. | Case No.    C06-01839 CRB<br><br>**DECLARATION OF ANDREW WOLFE Ph.D. REGARDING CONSTRUCTION OF THE '352 PATENT CLAIMS** |

## I.      BACKGROUND

1.      My background and qualifications are summarized in paragraphs 2-7 of my declaration of January 26, 2007, which I hereby incorporate by reference into this Declaration. With a broad knowledge of touchpad technology, with a solid grounding in pertinent circuit and software design, with a historical perspective based on active personal participation, and with experience with the patent process, I believe that I am qualified to provide an accurate assessment of the technical issues in this case.

2.      I was asked to review materials and provide technical teaching and opinions regarding U.S. Patent No. 5,825,352, ("the '352 Patent"), that Elantech Devices Corporation ("Elantech") is asserting in this case. A true and correct copy of the '352 Patent is attached as Exhibit 1 hereto. In this Declaration, I present an explanation of the technical concepts and terms relevant to the interpretation of some of the claim limitations at issue. The documents that I reviewed and relied upon for my opinions are typically referenced expressly below.

## II.     EXPERT OPINIONS

3.      The '352 Patent claims an apparatus and method "for detecting the operative coupling of multiple fingers" on a "touch sensor." In this Declaration I will address the interpretation of certain terms used in the claims of the '352 Patent.

4.      In the mid-1990's, the people who were developing technology for use in touch sensor devices would have had at least a B.S.E.E. and three or so years of practical experience. Of course, the higher the educational training, the less practical experience one would need. For example, an engineer with a master's degree would need probably only a year or two of experience in the area to be able to tackle the design of such circuitry.

5.      In explaining how one of ordinary skill in the art would interpret the words in the claims of the patents-in-suit, I understand that I am to focus on the claim language, the teachings in the patent itself, and on the correspondence recorded in the prosecution of the patents. I also understand that I am to explain how one of ordinary skill in the art would understand the claim terms in January 1996, roughly the time of the "inventions" claimed in the '352 Patent. In my analysis I will also present excerpts from dictionaries, both scientific and non-scientific, and

1   statements in the relevant literature with respect to the terms and concepts that are claimed.  In

2   using this type of reference that is not directly tied to the patent, I will only refer to information

3   that is consistent with the teachings and definitions used by the inventors in the patent at issue.  I

4   understand that I am not to impose my own interpretation of the words or to present evidence of

5   the meaning of terms that contradicts or varies the meanings as used in the patents.  I understand

6   that a key issue in determining the meaning of the claims is how certain terms were used and

7   understood by skilled artisans in or about January 1996.

8   **B.    The '352 Patent Claims.**

9       6.      I understand that the asserted claims of the '352 Patent are claims 1 and 18.  The

10  claims are set out in full below:

11          1. A method for detecting the operative coupling of multiple fingers to a
            touch sensor involving the steps of
12
            scanning the touch sensor to (a) identify a first maxima in a signal
13          corresponding to a first finger, (b) identify a minima following the first
            maxima, (c) identify a second maxima in a signal corresponding to a
14          second finger following said minima, and

15          providing an indication of the simultaneous presence of two fingers in
            response to identification of said first and second maxima.
16
17                              * * * *

18          18. A touch sensor for detecting the operative coupling of multiple
            fingers comprising:
19
            means for scanning the touch sensor to (a) identify a first maxima in a
20          signal corresponding to a first finger, (b) identify a minima following
            the first maxima, and (c) identify a second maxima in a signal
21          corresponding to a second finger following said minima, and

22          means for providing an indication of the simultaneous presence of two
            fingers in response to identification of said first and second maxima.

23  **C.    "Operative Coupling"**

24      7.      The term "operative coupling" is used in the preamble of claims 1 and 18 of the

25  '352 Patent.  One of ordinary skill in the art would conclude that the preambles of the claims at

26  issue constitute limitations to the claims because they are necessary to give meaning to key terms

27  in the body of the claims.  There are two main factors that lead me to this conclusion.

28

8.    First, the body of each of claims 1 and 18 refers to "the touch sensor." There is no antecedent basis for "the touch sensor" in the body of the claims. Rather, the antecedent basis, and the first instance in which "touch sensor" is introduced in the claims is in the preamble, which recites "a touch sensor." The phrase "the touch sensor" in the body of the claims necessarily refers back to the recitation of "a touch sensor" in the preamble. Because the body of the claims relies upon this recitation in the preamble, I conclude that the preambles were obviously intended to be and are properly understood by one of ordinary skill in the art to be limitations of the claims.

9.    Second, it is my opinion that one of ordinary skill in the art would conclude that the claims do not have meaning without the recitation of "operative coupling" in the preambles to the claims. The body of each of the claims at issue recites a requirement of a "maxima" in a signal that represents some unstated measured property "corresponding to a first finger;" "a minima" of some unstated entity which one might reasonably assume is the same signal that represents some unstated measured property "following the first maxima;" and "a second maxima," again in a signal that represents some unstated measured property, "corresponding to a second finger." The body of each of the asserted claims contains no description of the property that is being measured to establish the recited signal and thus no hint as to where to find "maxima" and "minima" values. Although the preamble recitation of "operative coupling" is extremely vague, it at least breathes some life and meaning into the claim term signal and thus into the claim terms "maxima" and "minima." Put another way, the claim terms "signal," "maxima," and "minima" would lack any definite meaning without the recitation of "operative coupling" in the preamble of the claims. If instead the preamble is considered to be a limitation on the claim, then the otherwise unstated measurements represented in the various signals can be reasonably interpreted as measurements representing the recited "operative coupling" of a finger or fingers to the touch sensor.

10.    In the context of the claims read in light of the specification of the '352 Patent, the claim term "operative coupling" would have meant to one of ordinary skill in the art in 1996, and today, "finger-induced electrical effect" between the "touch sensor" and "multiple fingers." This

1  is how the phrase is used in the specification of the '352 Patent.  (Exhibit 1 hereto, '352 Patent,

2  1:32-39, 2:48-52; 5:6-10, 5:56-6:1, 6:14-18, 6:26-38, 6:42-45, 7:54-56; 11:16-19, 12:14-17,

3  12:42-45; 15:34-37, 15:51-54 at ETD0000302; Figs. 1-4, 7A-7F.)

4         11.     This understanding of "operative coupling" is also consistent with common

5  dictionary definitions of the terms "operative" and "coupling" in the context of the field of art in

6  which the claimed invention was developed.  (Exhibit 2 hereto, The New Shorter Oxford English

7  Dictionary (1993), at SYN 00103325 ("operative" means "Being in operation or force; exerting

8  force or influence."); Exhibit 3 hereto, McGraw-Hill Dictionary of Scientific and Technical

9  Terms (3rd ed. 1984), at SYN 00103310 ("coupling" means "A mutual relation between two

10 circuits that permits energy transfer from one to another, through a wire, resistor, transformer,

11 capacitor, or other device."); Exhibit 4 hereto, Modern Dictionary of Electronics (6th ed. 1984), at

12 SYN 00103313 ("coupling" means "The association or mutual relationship of two or more

13 circuits or systems in such a way that power may be transferred from one to another.").)

14        12.     I understand that Elantech agrees with this interpretation.  Attached as Exhibit 5

15 hereto is a copy of the Amended Joint Claim Construction Chart, which includes the agreed-upon

16 definition of "operative coupling," which means "finger-induced electrical effect."

17              **D.     "Scanning the Touch Sensor"**

18        13.     Both of the asserted claims of the '352 Patent require "scanning the touch sensor."

19 The phrase "scanning the touch sensor" would mean to one of ordinary skill in the art at the

20 relevant time and in the relevant field the process of "measuring the traces in the touch sensor and

21 assigning them to a sequence corresponding to their physical order on the touch sensor."  In my

22 deposition in this matter, it became clear from questions presented by Elantech's counsel that the

23 definition provided in my expert report could be incorrectly interpreted.  I revised the wording of

24 my original definition during my deposition to clarify that the actual sampling of the traces on the

25 touch sensor need not happen individually as long as the result of such sampling is a sequence of

26 measurements corresponding to the physical order of the traces on the touch sensor.

27        14.     Elantech's proposed definition, "examining information associated with the touch

28 sensor," inserts words that are not present in the claim and as a whole is not consistent with the

patent specification. The claims do not say scanning "information associated with the touch sensor," they say "scanning the touch sensor." It is true that in different contexts outside of this patent, the term "scanning" could have different meanings such as a person "scanning" a piece of paper or a software program "scanning" information stored in memory. However, the claims of the '352 Patent expressly identify what is being "scanned." The asserted claims are limited to "scanning *the touch sensor*."

15.    In addition, the phrase "information associated with the touch sensor," encompasses far more than what is taught in the '352 Patent and would lead to absurd results. For example, "information associated with the touch sensor" would literally include the number of traces in the touch sensor, the color of the material of the touch sensor, the date the touch sensor was manufactured, and other "information associated with the touch sensor" that is completely irrelevant to the claims and the teachings in the patent specification. The only "information associated with the touch sensor" that has any relevance is the sequence of trace measurements used to form the "finger profile" that Elantech repeatedly refers to throughout its definitions and explanations.

16.    Elantech's cited dictionary definition of "scanning" is not directly on point. Elantech relies upon a reference to "information" as the object of "scanning" in one example dictionary definition and then argues that the object of the "scanning" step in the claim should be also be "information," rather than "the touch sensor." This argument ignores that the claims expressly state the object that is being scanned: "scanning *the touch sensor*." Certainly, those of ordinary skill in the art think of "scanning" as the process of examining something in a systematic, part-by-part manner. (Exhibit 6, The IEEE Standard Dictionary of Electrical and Electronics Terms (1996), at SYN 00103298 ("scanning" means "(6) The process of examining information in a systematic manner."); Exhibit 7, The Illustrated Dictionary of Microcomputers (1990), at SYN 00103305 ("To examine sequentially using a part-by-part technique.").) However, in the context of the claim phrase "scanning the touch sensor," the "scanning" or systematic, part-by-part examination, is of "the touch sensor," not "information" or "information associated with the touch sensor." The "scanning" process in the claims is directed to the

1    physical touch sensor.  To those of ordinary skill in the art, this refers to scanning the traces in the

2    touch sensor that react to the "finger-induced electrical effect" of a finger or fingers on the touch

3    sensor by measuring each one.

4         17.    By contrast, the evidence from the patent itself concerning "scanning the touch

5    sensor" supports Synaptics' proposed definition.  In particular, the intrinsic evidence shows that

6    "scanning the touch sensor" includes (a) "measuring" the traces in the touch sensor and (2)

7    assigning the measured values "to a sequence corresponding to their physical order" on the

8    touchpad.  I will address each of these in turn.

9         18.    First, the patent specification describes the scanning process as including a

10    sequence of measurements of the traces in the touch sensor.  (Exhibit 1, '352 Patent, 5:20-61,

11    6:14-26.)  Indeed, the patent specification expressly states that "The scan process measures the

12    values of finger-induced capacitance for each of the conductors, and stores the values in RAM at

13    step 420."  (Exhibit 1, '352 Patent, 7:38-40.)  This language quoted directly from the specification

14    underscores that in the phrase "scanning the touch sensor," the term "scanning" includes the act

15    of measuring the "operative coupling," or as the parties have defined it, the "finger-induced

16    electrical effect," on the touch sensor.

17         19.    Similarly, the measurement results set forth in the patent specification are

18    described as "scans."  In describing the "Tail state" of the graph of data representing the finger

19    profile, the patent states that it "is simply the remainder of the scan after a second peak (in the

20    exemplary embodiment). . . ."  (Exhibit 1, '352 Patent, 9:12-13.)  Figures 7 and 8 also show the

21    results of measurements of the ordered set of traces in the touch sensor.  These sequences of

22    measurements are described (Exhibit 1, '352 Patent, 12:37-42, 14:3-7 (emphasis added)), as

23    "scans":

24         "In particular, and with reference to FIG. 7A in combination with FIG. 7B,
an initial series of ***scans*** 700 indicates the presence of a single finger in

25    contact with the touch sensor, with the changing X,Y location between 700
and 705 indicating relative motion by the finger across the touch sensor."

26

27         "In FIG. 8, the process begins in a manner identical to FIG. 5, starting at
step 400 and followed by scanning the conductors and storing the results
of the ***scan*** in memory at step 405, followed by Xcompute and Ycompute

28    at steps 430 and 440, respectively."

20.    The only citation to the patent specification that Elantech relies upon for its argument that "scanning" does not include measuring is from column 5, lines 60-61 of the '352 Patent.  Elantech's reading of that single sentence is not correct in light of the context of the sentence and in light of the many other express statements in the patent that show that "scanning the touch sensor" means to measure the traces in the touch sensor.  The portion of the specification that Elantech excerpts states "As noted above, the cycle begins by scanning the traces and measuring the capacitance on each trace."  In the context of the patent and in light of the express statements from the specification as noted above that teach that the "[T]he scan process measures the values of finger-induced capacitance for each of the conductors," this sentence does not clearly support Elantech's interpretation of the claims.  The cited sentence describes a single step in the described process, not a sequence of two separate steps.  Indeed, the use of the term "and" in this context is akin to common usage in which one would say one is "picking up and holding a baby."  Obviously, the act of "picking up" a baby requires that one be "holding" the baby as well.  This common reading of the phrase that Elantech cites would make that passage consistent with all of the other passages noted above that treat measuring the traces in the touch sensor as an integral part of "scanning the touch sensor."

21.    The other claim terms used in the claim also make clear that "scanning the touch sensor" is intended to include "measuring the traces in the touch sensor."  In particular, the claim language establishes that the "scanning" process is measuring the "operative coupling" of the fingers to the touch sensor to "identify" two "maxima" and a "minima" of signals corresponding to two fingers on the touch sensor.  The claims literally require that particular measured values be evaluated and classified as "maxima" or "minima" values.  The "scanning" step is expressly recited as the action that is required "to" do the sub-steps (a)-(c) that identify these "maxima" and "minima" values of "finger-induced electrical effect."  By their own terms, the claim phrases that include "scanning the touch sensor to" literally means that "scanning" includes measuring the touch sensor in order to be able to identify the required values.  Once again, this is perfectly consistent with the ordinary meaning of the phrase "scanning the touch sensor" and the teachings in the patent specification.

22.     In addition, I note that Elantech objects to my inclusion of "trace values" in the definitions of "scanning the touch sensor" and suggests that "finger profile" is a better term for describing what is measured.  (Elantech Brief, at 6:17-23).  As previously stated, the "finger profile" is "the profile of finger-induced capacitances" (Exhibit 1, '352 Patent, 11:49-51), *i.e.*, the values sensed by "scanning" the traces on touch sensor.  This is the only type of finger profile taught in the '352 specification.  One of ordinary skill in the art at the time would not have known how to create such a "profile" of a "finger-induced electrical effect" other than by measuring trace values in the touch sensor.  I conclude that the definition of the claim term in dispute should include an explanation of what is being measured.

23.     Second, as noted above, the term "scanning" would be normally understood by those of ordinary skill in the art to include a necessary order or sequence.  This is clear from the dictionary definitions noted above.  In addition, the literal words of the claims require a sequenced ordering of the measurements.  The claim terms say the "scanning" is done "to":

> (a) identify a *first* maxima in a signal corresponding to a *first finger*,
>
> (b) identify a minima *following* the first maxima,
>
> (c) identify a *second* maxima in a signal corresponding to a *second finger following* said minima

The claim terms "first," "second," and "following" all necessitate that the "scanning of the touch sensor" be in some sequence or order.  Otherwise, one could not determine what is first, what is second, or what value follows another.  Thus, in addition to the ordinary meaning of scanning as understood by those of skill in the art, the express words of the claim require that the "scanning the touch sensor to identify" step is conducted in a sequence or order that represents the physical touch sensor device.

24.     The '352 Patent specification also expressly discloses that part of "scanning the touch sensor to . . . identify" the required "maxima" and "minima" values is the step of assigning them to a sequence corresponding to their physical order on the touch sensor.  As described at column 5 of the patent specification, the scan measurements are described as an enumerated sequence of values, for example "X(1) through X(Xcon) and Y(1) through Y(Ycon)."  (Exhibit 1,

1   '352 Patent, 5:64-65)  A table at the bottom of column 8 and the top of column 9 includes an

2   explanation of the sequence order for the measurements and states that "Xcon" represents "the

3   number of sensor conductors in the X direction."  This is consistent with Synaptics' definition.

4       25.    Although the definition Synaptics proposes is correct based upon the intrinsic

5   evidence as understood by those of ordinary skill in the art, I also note that Elantech's own claim

6   construction definitions effectively concede that the claim phrase "scanning the touch sensor to"

7   includes measurement and sequential order.  Elantech defines the step of "scanning the touch

8   sensor to (a) identify a first maxima in a signal corresponding to a first finger" to mean "identify a

9   first peak value in a finger profile obtained from scanning the touch sensor."  As an initial matter,

10  a "finger profile" is a set of values that numerically represent the X or Y sequence of

11  measurements corresponding to the physical order of the traces in the touch sensor.  In essence,

12  the "finger profile" is "the profile of finger-induced capacitances" (Exhibit 1, '352 Patent, 11:49-

13  51), sensed by "scanning" the touch sensor.  These finger profiles are shown graphically in

14  Figures 3 and 4 of the '352 Patent.  (Exhibit 1, '352 Patent, 4:56-59 ("FIG. 3 shows a finger

15  profile . . . .  FIG. 4 shows a finger profile. . . .")  Figure 3, below, shows a graph of the "finger-

16  induced electrical effect" values for each successive trace in one dimension of the touch pad

17  (horizontal or vertical/X or Y).  The little "-" marks in the graph represent the value measured for

18  one specific trace in the touch sensor during the scanning process.  The "finger profile" represents

19  the values for each of the traces as they are physically ordered on the touch sensor.



20

21

22

23

24

25

26

27

28

26.     As noted, in its definition, Elantech concedes that the "scanning" step of the claim requires that the system "identify a first peak value in a finger profile obtained from scanning the touch sensor." It is not possible for the "finger profile" values to be "obtained from scanning the touch sensor" unless "scanning the touch sensor" includes *measuring* the "finger-induced electrical effect" on the touch sensor traces.

27.     Also, as shown in Figures 3 and 4 of the '352 Patent, a "finger profile" that Elantech refers to in its own definitions constitutes the measured values of "the traces in the touch sensor" after "assigning them to a sequence corresponding to their physical order." Elantech also concedes that elements (a), (b) and (c) of the claims entail an ordered sequence since Elantech's own definition is that the "minima" must be "*after* the first peak value, and *before* another peak value is identified." Elantech also concedes that the "second maxima" means "*after* identifying the lowest value in the finger profile, identify a second peak value in the finger profile." These definitions logically necessitate that a required part of "scanning" is assigning the measured trace values from the touch sensor to a sequence corresponding to their physical order on the touch sensor. Thus, inherent in Elantech's own definitions of "scanning the touch sensor" are the requirements of "measuring the traces in the touch sensor and assigning them to a sequence corresponding to their physical order."

28.     I conclude that one of ordinary skill in the art would understand from the patent that the "scanning the touch sensor to" step of the asserted claims of the '352 Patent means "measuring the traces in the touch sensor and assigning them to a sequence corresponding to their physical order on the touch sensor."

**E.     Sub-Elements (a)-(c) of the "Scanning" Step or Function.**

29.     The step or function of "scanning the touch sensor" in claims 1 and 18 of the '352 Patent is recited as follows:

> scanning the touch sensor to (a) identify a first maxima in a signal corresponding to a first finger, (b) identify a minima following the first maxima, [and] (c) identify a second maxima in a signal corresponding to a second finger following said minima

30.     I believe that there are two areas of real dispute between Elantech and Synaptics with respect to the meaning of the sub-elements (a)-(c).  First, there is disagreement about how to explain to the jury the concepts of "maxima" and "minima."  Second, there is disagreement about whether there is an order to the scanning process in sub-steps (a)-(c).  I will address first the concepts of "maxima" and "minima."

### 1.      "Maxima" and "Minima."

### (a) The Proper Definitions of "Maxima" and "Minima."

31.     Leaving aside for the moment the definition of "scanning the touch sensor to" and the issue of what order is required, the "maxima" and "minima" claim terms would mean to one of ordinary skill in the art as follows:

(a) "identify a . . . maxima" would mean to one of ordinary skill in the art "determining the point at which the measured values cease to increase and begin to decrease;" and

(b) "identify a minima" would mean to one of ordinary skill in the art "determining the point at which the measured values cease to decrease and begin to increase."

32.     The key terms in understanding these claim phrases are the concepts of "maxima" and "minima."  The named inventors of the '352 Patent never specially defined these terms within the patent.  These terms are well-known and understood by engineers and mathematicians.  In general, "maxima" is the plural of "maximum."  The term "minima" is the plural of "minimum."  The terms "maximum" and "minimum" have two distinct meanings in general use, that of a "local" maximum or minimum, and that of a "global" maximum or minimum.  A *local* maximum is "a point at which a quantity ceases to increase and begins to decrease."  A *local* minimum is "a point at which a quantity ceases to decrease and begins to increase."  By contrast, a "global" maximum is "the greatest value which a variable may have" or "the largest element in a set."  Similarly, a "global" minimum is the "least value which a variable or a function may have" or "the smallest element in a set."  These definitions can also be found in standard dictionaries.  (Exhibit 2, The New Shorter Oxford English Dictionary (1993), at SYN 00103321 ("maximum" means "3 Math. The greatest value which a variable may have; the largest element in a set; a point at which a continuously varying quantity ceases to increase and begins to decrease.") and at SYN 00103322 ("minimum" means "3 Math. The least value which a variable

1    or a function may have; the smallest element in a set; a point at which a continuously varying

2    quantity ceases to decrease and begins to increase; the value of a quantity at such a point.").)  As I

3    noted above, these concepts are well established for engineers and mathematicians.

4        33.    The distinction between these uses of maximum and minimum is important.  The

5    "global" maximum or minimum is the largest or smallest value of an entire set and does not

6    permit of more than one such value.  You cannot have two mountains in the world with the global

7    maximum height; there is only one, Mount Everest.  However, you can have a "local" maximum

8    on any number of hills or plateaus that may be in your neighborhood.  In the same way, you can

9    think of global minimum and local minimum as the lowest point globally (the Dead Sea) or just

10    locally (at the bottom of a small hole in your backyard).

11        34.    In the context of these claims and the disclosure in the '352 Patent disclosure,

12    "maxima" and "maximum" refer to *local* maximum and minimum.  I reach this conclusion for a

13    number of reasons.  First, and most obviously, the inventors chose to use the plural forms of

14    maximum and minimum ("maxima" and "minima"), and indeed recite two distinct "maxima" in

15    the claim terms at issue.  This eliminates the possibility that the inventors intended a "global"

16    maximum and minimum because one cannot have more than one global maximum or minimum.

17    Because the inventors chose carefully a plural form of these terms, they clearly intended to refer

18    only to a "local" maximum and a "local" minimum.

19        35.    Second, Figures 4 and 7B through 7F-2 all show that there are more than one

20    "maxima" present, which again precludes the concept of "global" maximum.  (Exhibit 1.)  Each

21    of those Figures also depicts a finger profile of lower values than the "minima" between the first

22    and second "maxima."  Thus, the inventors intended "maxima" and "minima" to have the

23    definition of "local" maximum and minimum and not "global" maximum and minimum.

24        36.    Third, Figure 6-1 of the '352 Patent specifically describes a precise algorithm for

25    identifying the "maxima" and "minima," which exactly corresponds to Synaptics' definition and

26    the ordinary meaning of these terms.  (Exhibit 1.)  In step 230, contained within the iterative loop

27    from steps 215 through 235 in Figure 6-1, is depicted the formula "$X(N) \geq X(N-1)$."  In this

28    algorithm, the "$X(N)$" refers to the current scan trace being evaluated and $X(N-1)$ refers to the

1  previous scan trace that was evaluated.  "N" represents a number that is used to count through

2  each of the traces as they are evaluated.  Step 230 of the algorithm searches for a "maxima."  It

3  continues to search for a "maxima" so long as the current trace being evaluated ("X(N)") is

4  greater than or equal to ("≥") the previous scan trace ("X(N-1)"), *i.e.*, the measured values have

5  not yet begun to decrease.  If, and only if, a measured value is less than the previous value, then

6  step 232 identifies the precise scan measurement, X(N-1), for which the measured values cease to

7  increase and begin to decrease, as the first "maxima."

8          37.     Similarly, step 250 in Figure 6-1, contained within the iterative loop from steps

9  215 through 235, depicts the formula "X(N) ≤ X(N-1)."  (Exhibit 1.)  In this algorithm, the

10  "X(N)" again refers to the current scan trace being evaluated and X(N-1) refers again to the

11  previous scan trace that was evaluated.  Step 250 of the algorithm searches for a "minima."  It

12  continues to search for a "minima" so long as the current trace being evaluated ("X(N)") is less

13  than or equal to ("≤") the previous scan trace ("X(N-1)"), *i.e.*, the measured values have not yet

14  begun to increase.  If, and only if, a measured value is greater than the previous value, then step

15  262 identifies the precise scan measurement, X(N-1), for which the measured values cease to

16  decrease and begin to increase, as the "minima."

17          38.     Finally, step 275, contained within the iterative loop from steps 215 through 235 in

18  Figure 6-1, depicts the formula "X(N) ≥ X(N-1)."  (Exhibit 1.)  In this algorithm, the "X(N)"

19  refers to the current scan trace being evaluated and X(N-1) refers to the previous scan trace that

20  was evaluated.  "N" represents a number that is used to count through each of the traces that are

21  evaluated.  Step 275 of the algorithm searches for the second "maxima."  It continues to search

22  for the second "maxima" so long as the current trace being evaluated ("X(N)") is greater than or

23  equal to ("≥") the previous scan trace ("X(N-1)"), *i.e.*, the measured values have not yet begun to

24  decrease.  If, and only if, a measured value is less than the previous value, then step 278 identifies

25  the precise scan measurement, X(N-1), for which the measured values cease to increase and begin

26  to decrease, as the second "maxima."

27          39.     In each case, the algorithm shown in the flow diagram of Figure 6-1 fits precisely

28  the ordinary meaning of "maxima" and "minima."  In each instance of a "maxima," the patent

1    specification teaches that the "maxima" is "the point at which the measured values cease to

2    increase and begin to decrease." Similarly, the "minima" is "the point at which the measured

3    values cease to decrease and begin to increase." Thus, the clearest teaching in the patent

4    specification is consistent with the definition of local maximum and local minimum and

5    inconsistent with the definition of global maximum and global minimum. One of ordinary skill in

6    the art would look to this clear explanation in flow-diagram form and would not look to unclear

7    or ambiguous hand-drawn lines on Figures to determine the meaning of "maxima" and "minima."

8    One of ordinary skill in the art would rely on such clear flow-chart descriptions as they are the

9    most concrete and detailed explanation of the concepts claimed in the '352 Patent claims.

10    Nowhere in the '352 Patent specification are the concepts of "maxima" or "minima" used in the

11    context of "global" maximum or minimum. Thus, contrary to Elantech's contention (Elantech's

12    Brief at 9:10-14, 11:27-12:2), the alternative definition of maximum and minimum (*i.e.*, the

13    concept of global maximum and minimum) stated in the dictionary definitions that Elantech cites,

14    are not consistent with the intrinsic evidence.

15                    **(b)  Elantech's Criticisms Of Synaptics' Definitions.**

16           40.      Elantech's first criticism is that Synaptics' proposed definition does not take into

17    account the applicants statements during prosecution that the claimed maxima "could be

18    maximum negative levels, or troughs, depending upon the circuitry used." This criticism is

19    unfounded. In a circuit in which "operative coupling" of a finger to a touch sensor causes a

20    negative signal, the "value" for which a "maxima" is being determined is clearly the negative

21    level of the signal or, in mathematical terms, its absolute value. The definition that Synaptics

22    proposes does not preclude such an embodiment. This would be self-evident to one of ordinary

23    skill in the art.

24           41.      Moreover, Elantech's argument is simply not logical given that it applies with

25    equal force to Elantech's own definitions of "maximum" as a "peak," and "minimum" as "lowest

26    value." In the same superficial way, "peak" would seem to exclude "negative levels, or troughs"

27    (a "peak" cannot be a "trough"), and "lowest value" would describe the "maximum" finger

28    coupling, not the "minimum" finger coupling, if the circuitry measured negative values. But, as

1    noted, this argument, whether applied to Synaptics' definition or Elantech's definition, is

2    irrelevant given that one of ordinary skill in the art would apply the claim in the context of the

3    circuitry being used (whether negative or positive measurements are used).   In the end, this is not

4    relevant criticism of either party's definition because, as noted above, for the same reason, both

5    definitions are consistent with the inventors' statement during prosecution.

6         42.    Elantech's second criticism is that Elantech's definition of "maxima" as a "peak"

7    is more accurate and helpful than Synaptics' definition of "maxima."  This is wrong for several

8    reasons.  First, "peak" is ambiguous since it does not help solve the problem of which point on a

9    "plateau" should be identified as the "maxima."  In fact, the word "peak" means that there is a

10   single point that represents the "maxima."  Thus, "peak" suffers from the very ambiguity that

11   Elantech suggests (incorrectly) undermines Synaptics' proposed definition.  By contrast, there is

12   no ambiguity in definition of "maxima" as "the point at which the measured values cease to

13   increase and begin to decrease."  Under that definition, the last point on the plateau (going in the

14   direction of the scan order), will be the "maxima."  That is consistent with the ordinary meaning

15   of the term "maxima" and it fits perfectly with the clear and detailed algorithm of the preferred

16   embodiment in Figure 6-1 of the '352 Patent (discussed in detail above).  (Exhibit 1.)

17        43.    Second, it makes no sense to define the term "maxima" as "peak" given that in the

18   patent the inventors define "peak" as a type of "maxima."  Thus, while it may be true that a

19   "maxima" may be a single point, or "peak," it is not necessarily so, as provided in the algorithm

20   set forth in Figure 6-1.   As shown above, in that algorithm, a maxima is not identified if the

21   current scan value is greater than *or equal to* the previous scan value.  The inventors made this

22   distinction express when they drafted claims 7 and 21 of the '352 Patent.  In those claims,

23   dependent from claims 1 and 18, respectively, the inventors recited "wherein said maxima are

24   peaks."  (Exhibit 1.)  This distinction makes no sense to one of ordinary skill in the art if, as

25   Elantech contends, a "maxima" must always be a "peak."

26        **2.    Scan Order Is Required In Sub-Elements (a)-(c)**

27        44.    Elantech states in its brief that the phrase "in scan order" in Synaptics' proposed

28   definitions of sub-elements (b) and (c) is incorrect.  (Elantech Brief at 12:20-13:3, 13:15-17.)

1   The claims recite:

2       *scanning the touch sensor to* (a) identify a *first* maxima in a signal
        corresponding to a first finger, (b) identify a minima *following the*
3       *first* maxima, (c) identify a *second* maxima in a signal
        corresponding to a second finger *following said minima*
4

5   As noted above in paragraphs 23 -28 of this Declaration, the words in the claims require that there

6   be an identification of values in scan order.  Without an order to the identification in the scanning

7   process, the terms "first," "second," and "following" are nonsensical.  They only have meaning if,

8   as is inherent in the meaning of "scanning," the identification proceeds through the measured

9   values in an order that represents the physical placement of the "first" and "second" finger on the

10  touch sensor.  This order is necessary due to the use of the word "scanning" and the express

11  statement that the "scanning" identifies a "first maxima," "a minima following the first maxima,"

12  and "a second maxima . . . following said minima."  As Elantech's own definition concedes

13  (Amended Joint Claim Construction Chart, Exhibit 5 hereto, Elantech's definitions for Claim

14  Terms 16-18), the scan order must represent the "finger profile" upon the actual touch sensor or it

15  would be impossible to identify what finger is "first," what finger is "second" and what values are

16  "following" others.  The more exact way to express this relationship is to state it explicitly, as

17  Synaptics has in its definitions.

18      45.    In summary, based upon the intrinsic evidence and the normal understanding of

19  one of ordinary skill in the art, the claim limitations labeled (a)-(c) in the asserted claims would

20  be understood by one of ordinary skill in the art to mean as follows:

21

22
| "scanning the touch sensor to (a) identify a first maxima in a signal corresponding to a first finger" | "measuring the trace values of the touch sensor corresponding to a first finger and determining the point at which the measured values cease to increase and begin to decrease" |
|---|---|
| "scanning the touch sensor to . . . (b) identify a minima following the first maxima" | "measuring the trace values of the touch sensor following, in scan order, after the first maxima and determining the point at which the measured values cease to decrease and begin to increase" |
| "scanning the touch sensor to . . . (c) identify a second maxima in a signal corresponding to a second finger following said minima" | "measuring the trace values corresponding to a second finger following, in scan order, said minima and determining the point at which the measured values cease to increase and begin to decrease" |

23
24
25
26
27
28

1    **F.    "Providing An Indication Of The Simultaneous Presence Of Two Fingers In Response To Identification Of Said First And Second Maxima."**

2

3    46.    Claims 1 and 18 both recite "providing an indication of the simultaneous presence

4    of two fingers in response to identification of said first and second maxima." Claim 18 recites

5    this function as being performed by a "means." The function "providing an indication of the

6    simultaneous presence of two fingers in response to identification of said first and second

7    maxima" would be understood by one of ordinary skill in the art to have the ordinary meaning of

8    the words outlined above.  However, in reviewing the specification, I did not find any specific

9    disclosure of a structure that is literally or necessarily linked to the precise functions recited in the

10    claims.  I did see that "the simultaneous presence of two fingers in response to identification of

11    said first and second maxima" is *determined* at item 980 in Figure 9-2.  (Exhibit 1.)  However,

12    there is no disclosure of a precise structure that is used to "provide an indication" once that

13    information has been determined.  In its brief, Elantech excerpts one phrase from a sentence to

14    suggest that the claimed operation "has its output 'supplied to an interface to a PC or other

15    device. . . .'" (Elantech Brief at 14:13-15.)  However, the full statement makes clear that only

16    certain unspecified operations result in such outputs:  "Depending on the operation being

17    performed at the particular time, the output of microcontroller 60 is then supplied to an interface

18    to a PC or other device. . . ."  (Exhibit 1, '352 Patent, 5:52-55.)  This statement plainly suggests

19    that not all operations are to be output in that manner and certainly does not state that the specific

20    function in these claims is one such operation.  Consequently, I conclude that one of ordinary

21    skill in the art today and in 1996 would find nothing in the specification that specifically links the

22    claimed function, "providing an indication of the simultaneous presence of two fingers in

23    response to identification of said first and second maxima," to a particular structure.  One of

24    ordinary skill in the art would have to guess or make an educated surmise on what disclosed

25    structures could be used for that purpose.  Therefore, I conclude that this limitation is indefinite.

26    47.    I anticipate that I might supplement or modify the opinions in this Declaration in

27    view of any such new information that might arise between now and the time of the hearing on

28    the claim construction issues.

1     I declare under penalty of perjury under the laws of the United States of America that, to

2   the best of my knowledge, the foregoing is true and correct.  Executed on February 9, 2007, in

3   Cupertino, California.

4

5                                   Andrew Wolfe, Ph.D

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

US005825352A

# United States Patent [19]

**Bisset et al.**

[11]    **Patent Number:** 5,825,352

[45]    **Date of Patent:** Oct. 20, 1998

[54] **MULTIPLE FINGERS CONTACT SENSING METHOD FOR EMULATING MOUSE BUTTONS AND MOUSE OPERATIONS ON A TOUCH SENSOR PAD**

[75] Inventors: **Stephen J. Bisset**, Palo Alto; **Bernard Kasser**, Menlo Park, both of Calif.

[73] Assignee: **Logitech, Inc.**, Fremont, Calif.

[21] Appl. No.: **608,116**

[22] Filed: **Feb. 28, 1996**

### Related U.S. Application Data

[63] Continuation of Ser. No. 582,768, Jan. 4, 1996, abandoned.

[51] **Int. Cl.**[6] ................................ **G09G 5/00**; G09G 5/08
[52] **U.S. Cl.** ............................................ **345/173**; 345/157
[58] **Field of Search** .................................. 345/156, 157, 345/160, 173, 174, 145; 178/18; 341/33

[56]    **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,921,166 | 11/1975 | Volpe . | |
| 4,103,252 | 7/1978 | Bobick | 345/174 |
| 4,455,452 | 6/1984 | Schuyler | 345/173 |
| 4,550,221 | 10/1985 | Mabusth | 345/173 |
| 4,639,720 | 1/1987 | Rympalski et al. | 345/174 |
| 4,686,332 | 8/1987 | Greanias et al. | 345/173 |
| 4,733,222 | 3/1988 | Evans | 341/33 |
| 4,736,191 | 4/1988 | Matzke et al. | 345/157 |
| 4,914,624 | 4/1990 | Dunthorn | 345/173 |

| | | | |
|---|---|---|---|
| 5,016,008 | 5/1991 | Gruaz et al. | 345/173 |
| 5,203,704 | 4/1993 | McCloud | 434/156 |
| 5,327,161 | 7/1994 | Logan et al. | 345/173 |
| 5,365,461 | 11/1994 | Stein et al. | 364/550 |
| 5,376,946 | 12/1994 | Mikan | 345/173 |
| 5,432,531 | 7/1995 | Calder et al. | 345/173 |
| 5,442,376 | 8/1995 | Tannenbaum et al. | 345/156 |
| 5,463,388 | 10/1995 | Boie et al. | 341/33 |
| 5,495,077 | 2/1996 | Miller et al. | 345/173 |
| 5,528,266 | 6/1996 | Arbeitman et al. | 345/173 |
| 5,543,591 | 8/1996 | Gillespie et al. | 178/18 |
| 5,565,658 | 10/1996 | Gerpheide et al. | 345/174 |
| 5,648,642 | 7/1997 | Miller et al. | 178/18 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO 91/03039 | 3/1991 | WIPO . | |
| WO 97/18508 | 5/1997 | WIPO | G06F 3/033 |

#### OTHER PUBLICATIONS

Synaptics Brochure, "Synaptics Touch Pad," pp. 1–39.

*Primary Examiner*—Jeffery Brier
*Assistant Examiner*—Paul A. Bell
*Attorney, Agent, or Firm*—Townsend and Townsend and Crew

[57]    **ABSTRACT**

Method and apparatus for detecting an operative coupling between one or more fingers or other appropriate objects and a touch pad includes processes for detection of multiple maxima with intermediate minima in appropriate sequences to emulate the operations of cursor control and button actuations in a pointing and control device.

**31 Claims, 17 Drawing Sheets**





*FIG. 1.*



FIG. 2.



*FIG.  3.*

*FIG.  4.*



*FIG. 5.*



FIG. 6-1.



*FIG. 6-2.*



FIG. 7A.



*FIG. 7B.*



FIG. 7C.





FIG. 7D.



*FIG. 7E.*



FIG. 7F-1.



FIG. 7F-2.



FIG. 8-1.



*FIG. 8-2.*





*FIG. 9-1.*



*FIG. 9-2.*

5,825,352

1

# MULTIPLE FINGERS CONTACT SENSING METHOD FOR EMULATING MOUSE BUTTONS AND MOUSE OPERATIONS ON A TOUCH SENSOR PAD

## RELATED APPLICATION

This application is a continuation of U.S. patent application Ser. No. 08/582,768, filed Jan. 4, 1996, abandoned.

## FIELD OF THE INVENTION

The present invention relates generally to touchpad devices, and more particularly relates to touchpad devices which detect at least the presence of one or more objects such as fingers to effectuate preselected control functions.

## BACKGROUND OF THE INVENTION

Touch sensing devices are well known, and take a number of different forms. Perhaps the best known are resistive-membrane position sensors, which have been used in a number of different applications for many years. Such devices have been used as keyboards, position indicators, and so forth. Other types of touch sensing devices include resistive tablets, surface acoustic wave devices, touch sensors based on strain gages or pressure sensors, and optical sensors.

Yet another touch sensing technology is capacitive sensing, in which the location of a finger (or in some instances another object such as a stylus) over a sensing device is determined by virtue of variations in capacitance under and around the location of the finger. Typical of capacitive touch sensing devices are touch screens and capacitive pads which employ a matrix of row and column electrodes and detect, for example, either the transcapacitance between row and column electrodes or the effective capacitance to virtual ground. Other capacitive techniques are also known. Some touch sensitive devices are known to use interpolation for more precisely identifying the location of a finger or stylus.

Typical of each of these prior art devices is that each of them senses any contact as that of only one finger at a time. Cursor movement is straightforward with one finger, and tapping of a finger on the surface of the pad can be detected and acted upon in a manner similar to detecting the actuation of a button on a mouse. Single and double taps can be used as simple equivalents of single and double mouse clicks.

With a single-finger touchpad, the click and drag function is more difficult. With single finger detection, dragging has been implemented with schemes such as uptap (finger lifted and placed down again quickly), tap-and-a-half, and sticky drag (drag lock turns on automatically after the finger is placed in one location without moving for more than a certain time, such as one second). All of these methods take more time and/or more finger motions than it takes to perform the equivalent function with a mouse, and are not intuitive to users familiar with electronic mice. Prior art touch pads are thus less attractive for general use than a mouse.

Another commonly used function in the prior art is that of clicking a box (or icon or displayed "button") or series of boxes (such as "connecting the dots"). With a mouse, the cursor is moved into position by moving the mouse, then the click occurs with a down-up motion of the finger to actuate a button or switch. With a touchpad typical of the prior art, the cursor is moved into position with the finger, then the click occurs with a tap of the finger which moved the cursor.

2

This requires an up-down-up-down finger motion to do the same thing as simply the "down-up" motion of the mouse button. In general, any touchpad equivalent to a mouse button-clicking function requires an extra "up . . . up" motion of the finger, because the finger must be lifted off the pad before and after the tap.

The time and stress associated with the extra motion is significant. Human factors studies have shown that such touchpads yield lower productivity than a mouse in many applications. This somewhat limits touchpads to those applications, such as portable computing, where use of a mouse is inconvenient due to space or other considerations. There is therefore a need for a touchpad capable of yielding the same productivity as a mouse.

## SUMMARY OF THE INVENTION

The present invention provides a novel method and apparatus for sensing the proximity of multiple simultaneous fingers or other appropriate objects to a touch sensor. The present invention may be implemented based on any conventional touch sensing technology, although an exemplary embodiment involves the use of a capacitive touch sensing device similar to that described in U.S. patent application Ser. No. 08/478,290, entitled Touch Sensing Method and Apparatus, filed Jun. 7, 1995, and assigned to the assignee of the present application. The numerous modifications to such a basic device required to implement the present invention are described generally below, and in detail hereinafter. Alternatively, the present invention may be used with the method and apparatus described in the U.S. patent application Ser. No. 08/582,769, entitled Touch Pad Sensing Method and Apparatus, having as inventors Bemi Joss, Bernard Kasser and Stephen Bisset, filed on Jan. 4, 1996, and assigned to the assignee of the present invention, the relevant portions of which are incorporated herein by reference.

Operation of the present invention includes two aspects: detection of multiple objects, typically fingers, and assignment of various functions to particular actions by the movement of one or both fingers. The detection function can be general, but in a simple, exemplary implementation can be limited to a two-finger function such as the combination of the index finger and middle finger. In general, these are the two most dextrous fingers, and they work well together. As a result, for this exemplary embodiment, the touchpad need only distinguish between the two fingers in one dimension since the two fingers are typically side by side. In addition, the touchpad need only detect the second finger in reasonably close proximity to the first finger. In most situations, the distance between finger centers will be less than five centimeters. Additional combinations of fingers, such as three fingers tapping simultaneously or other combinations, may also be implemented in accordance with the methodology of the present invention.

For clarity of explanation, the present invention can be described in most of its applications by establishing one finger as controlling movement of the cursor, and the second finger as controlling functions equivalent to a mouse button or switch. In this context, one finger may be considered the "point" finger, while the other is the "click" finger. Various conventional functions may then be defined accordingly. For example, "drag" may be effected by moving the two fingers in unison, "point and click" may be effected by moving the cursor with the first finger and tapping with the second finger, "point and double click" may be effected by moving the cursor with the first finger and double tapping with the

5,825,352

3

second finger, and so on. "Click and Drag" may be performed simply by moving the cursor to the appropriate position with the first finger, placing both first and second fingers on the pad, and moving both fingers together. The function may be concluded by simply raising one or both fingers. Similarly, connecting the dots may be performed simply by moving the cursor from dot to dot with the first finger, and then clicking on the dot by tapping with the second finger. It will be apparent to those skilled in the art that these functions may be defined differently and still fall within the scope of the present invention. It will also be apparent that many of these operations will be intuitive to experienced mouse users, as soon as the correspondence between mouse functions and the two fingers is demonstrated to the user, and thus their implementation in a touchpad context makes them especially desirable.

In addition to the foregoing functions, which can be performed (albeit awkwardly and less intuitively) with conventional touch pads, there are additional functions that can be performed with two fingers and which can have substantial analogs to the use of a mouse or even go beyond conventional mouse functions. For example, detection and location of two fingers will permit the touchpad to report to a host system the distance between the two fingers. This can be used, for example, in paint or other programs to determine line width or other spacing functions, or any other "variable value" function. Similarly, tapping with both fingers at the same time may be defined as an alternate, shorthand method for a double tap (such as may be defined for the middle button in a Logitech mouse) or may be defined as a special function, similar to the "right button" functions of a mouse. Such special functions may have particular value in operating systems such as Windows 95 where, for example, implementation of the Object Viewer function is an important special function. Such functions can be implemented readily with a triple finger tap, a double tap of two fingers, or other convenient combination.

Another function which may be implemented with two finger detection is "drag lock". This function may be used when a drag function is underway, but at least one of the fingers reaches the edge of the pad before the drag function is complete. Touchpad operation may be controlled to maintain the drag mode if, for example, both fingers are lifted off the pad within a threshold period of one another, and are then placed down on the pad again within a suitable time period. In some implementations, highly extended time periods may be suitable in this context.

A further function which may be readily implemented with the present invention is the ability to operate in relative mode, where a first finger performs a key function, and a second finger controls some attribute of the operation performed by the first finger. For example, a first finger contacting a touch pad may cause a cursor to move across a screen, while contact (and removal) of a second finger with the screen may turn an image, or "ink" on (and off). The resulting image, or "ink," is defined by the motion of the first finger during the period when the second finger is also in contact with the pad; gaps in the "ink" occur when the second finger is lifted away from the pad. The function may, in some ways, be thought of as electronic finger painting, but has the additional advantage of allowing multiple characters to be written on a touch pad. Thus, with the use of two fingers, hand printing of text with gaps between the letters and words becomes feasible and convenient, whereas it is impractical with the prior art "tap and a half" method of turning on the ink.

Yet another function which may be implemented with the present invention is use of the touchpad in absolute mode.

4

Most prior art touchpad devices operate, like mice, in relative mode by indicating the distance travelled relative to the starting point of the motion. Touchpads, on the other hand, can also be operated in absolute mode, where the absolute position of the finger on the pad is detected and reported to the host system or application. In absolute mode, multi-finger detection allows the first finger to point to the desired absolute position, while the second finger performs whatever "click" operation is desired without requiring a removal of the first finger which might lessen accuracy or resolution.

Also included within the present invention is the detection and location of more than two fingers, with accompanying functional definitions permitting such multiple contacts to indicate pointing device or other control operations, such as musical keyboards.

It is therefore one object of the present invention to provide a touchpad system capable of detecting a plurality of contacts such as fingers.

It is a further object of the present invention to provide a touchpad device capable of locating a plurality of contacts such as fingers.

It is a further object of the present invention to provide a method for detecting the presence of more than one finger on a touch pad device.

It is a still further object of the present invention to provide a method for locating each of a plurality of fingers on a touch pad device.

It is yet another object of the present invention to provide a method for effecting the "point and click" function on a touchpad through the use of multiple fingers.

Yet a further object of the present invention is to provide a method for effecting the "click and drag" function on a touchpad through the use of multiple fingers.

A still further object of the present invention is to provide a method for effecting on a touchpad, through the use of multiple finger contacts, a plurality of conventional mouse button functions.

Yet another object of the present invention is to provide a method and apparatus for effecting on a touchpad, through the use of multiple finger contacts, a plurality of enhanced functions.

Yet a further object of the present invention is to provide a method and apparatus for electronic finger painting.

These and other objects of the invention may be better appreciated from the following detailed description of the invention, taken together with the appended figures.

THE FIGURES

FIG. 1 shows a perspective view of a device according to the present invention.

FIG. 2 shows in block diagram form the electronics of the present invention.

FIG. 3 shows a finger profile for two non-overlapping fingers as sensed by the present invention.

FIG. 4 shows a finger profile for two closely-spaced fingers as sensed by the present invention.

FIG. 5 shows in flow diagram form the steps for a high level algorithm for a pointing device according to the present invention.

FIG. 6 shows in flow diagram form the steps for computing motion and "button" states.

FIGS. 7A–7F2 show in diagrammatic form an exemplary sequence of finger contacts and movements across a touch sensor.

5,825,352

| 5 | 6 |

FIG. **8** shows a more generalized case of FIG. **5**.

FIG. **9** shows a more generalized case of FIG. **6**.

## DETAILED DESCRIPTION OF THE INVENTION

Referring first to FIG. **1**, a plurality of a user's fingers **10A** and **10B** are shown positioned over a touchpad **20** in sufficiently close proximity to be operatively connected thereto. Movement of a single finger over the touchpad causes the cursor to move in a now-conventional manner. However, unlike prior art devices, various control functions may be performed by the use of the second finger, typically in combination with the same or a related operation of the first finger. Operations involving more than two fingers may also be performed. In an exemplary embodiment, the touch-pad of the present invention reports to a host either the relative motion of a finger across the touchpad or changes in "button" status.

Referring next to FIG. **2**, the operation of the touchpad **20** may be better appreciated. In particular, FIG. **2** shows in block diagram form the electronics implemented to form an exemplary touchpad **20**. A touchpad matrix **30** is composed of a plurality of rows **35** and columns **40** of wires or traces arranged in a conventional manner; see U.S. patent application Ser. No. 08/321,987, filed 12 Oct. 1994, entitled Touch Pad Sensor with Simultaneous Sensing, commonly assigned with the present application. The rows and columns are connected to an analog multiplexor **45** through a plurality of X (row) direction conductors **50** and a plurality of Y (column) direction conductors **55**, one conductor for each row and each column. Under the control of a microcontroller **60**, the analog multiplexor **45** selects which traces of the matrix **30** will be sampled, and the output of those traces is then provided to a capacitance measuring circuit **70**. One suitable capacitance measuring circuit is described in afore-mentioned U.S. patent application Ser. No. 08/321,987, commonly assigned with the present invention and incor-porated herein by reference; another is described in U.S. patent application Ser. No. 08/478,290, filed 7 Jun. 1995, entitled Touch Sensing Method and Apparatus and also commonly assigned with the present invention and incor-porated herein by reference.

The output of the capacitance measuring circuit is then provided to an analog to digital converter **80**, which operates as described in either of the above-referenced patent appli-cations to convert the capacitance values from the circuit **70** into a digital representation. The analog to digital converter **80** then supplies the signals to the microcontroller **60**, which operates to form, among other things, a finger profile for one or more fingers, X-Y cursor data, and control signals. Depending on the operation being performed at the particu-lar time, the output of microcontroller **60** is then supplied to an interface to a PC or other device, such as a PS/2 interface, an RS-232 interface, or an Apple Desktop Bus (ADB).

A key feature of the present invention is its ability to distinguish the presence of multiple fingers either touching or in operative proximity to the touchpad **30**. In a typical embodiment, the operation of the circuit of FIG. **2** cycles continuously. As noted above, the cycle begins by scanning the traces and measuring the capacitance on each trace. Then the portion of each measured capacitance that is induced by the presence of a finger is extracted, and this finger-induced capacitance is stored in RAM, as X(1) through X(Xcon) and Y(1) through Y(Ycon), as described below. The finger-induced portion of the measured capacitance is determined by subtracting a value, for each trace, representing the capacitance when no finger is present. This "no-finger" capacitance is measured and stored at a time previous to the beginning of the cycle described herein, and is described more fully in U.S. patent application Ser. No. 08/478,290, filed 7 Jun. 1995 and commonly assigned.

It has also been found by applicant that it is not necessary, in all embodiments, to subtract the "no-finger" capacitance if techniques other than calculation of a centroid are used to locate the position of the fingers, and such subtraction is not required even in all instances in which a centroid is calcu-lated. However, in at least some embodiments the sensitivity and hence the resolution of the calculated finger location is enhanced by such subtraction.

Referring again to the exemplary embodiment, the values of finger-induced capacitance are then processed to calculate a position, detect whether one or more fingers is in operative contact with the pad surface, and to detect any changes in the number of fingers operatively coupled to the pad. If the cycle is repeated rapidly enough to update a graphical user inter-face approximately 30 times per second or more, the appear-ance of smooth and instantaneous response is provided to the user. For functions other than pointing, such as hand-writing with the finger, a faster scan rate may be required and may, for example, be on the order of 200 scans per second.

Referring next to FIG. **3**, a finger profile is shown indica-tive of the presence of two fingers, spaced apart from one another. In particular, the circuitry, software or firmware of the touchpad circuitry, such as that shown in FIG. **2**, detects a first maxima **85** indicative of a first finger in operative proximity to the touchpad **30**, followed by a minima **90** indicative of a space between the fingers, and further fol-lowed by another maxima **95** indicative of a second finger operatively coupled to the touchpad **30**. It will be appreci-ated that, for operations involving more than two fingers, more maxima will be detected with an appropriate number of intermediate minima.

Although the finger profile shown in FIG. **3** suggests that the intermediate minima separating the two fingers is a zero value, it is not necessary in all instances that the minima be zero. Thus, for example, FIG. **4** reflects a finger profile with a nonzero local minima **100** intermediate the two maxima **105** and **110** indicative of two fingers operatively coupled to the touchpad. This finger profile simply reflects two fingers placed closely to one another, but still yields a valley for measurement of the minima.

To operate effectively, the present invention must detect and distinguish the presence of a single finger, and the presence of multiple fingers. As noted previously, the second or additional fingers are typically involved to provide "but-ton" or control functions, similar to actuation of the buttons or switches on a mouse. Although the following example describes in detail the use of only two fingers, one for cursor control and a second as a button, the teachings herein are believed sufficient to permit those skilled in the art to construct apparata using multiple fingers for additional buttons.

To avoid artifacts, a threshold may be applied to the both the maximum and minimum distance between the maxima representative of multiple fingers. For example, a threshold requiring the maxima to be within five centimeters of one another may be used to limit the maximum distance between the fingers; other thresholds may be appropriate in some embodiments. A threshold representative of the minimum distance may be configured by establishing a maximum value of the local minima **100**.

5,825,352

7

In an exemplary embodiment, the operation of the system of FIG. 2 is controlled in either firmware, software or hardware. Shown in FIG. 5 is a flow diagram showing the general operation of such software or firmware which is capable of detecting multiple fingers, and which uses the algorithm of FIG. 6, discussed hereinafter. The variables found in the flow diagram of FIG. 5 are defined below:

| Name | Definition |
|---|---|
| Xabsolute | Finger position in X direction, calculated during the current cycle relative to the sensor pad. |
| XabsolutePrevious | The value above stored from the previous cycle. |
| Yabsolute | Similar to Xabsolute. |
| YabsolutePrevious | Similar to XabsolutePrevious. |
| Xbutton | Has value Up or Down (regardless of previous state). |
| XbuttonPrevious | The value above stored from the previous cycle. |
| Ybutton | Similar to Xbutton. |
| YbuttonPrevious | Similar to XbuttonPrevious. |
| Xmotion | Cursor motion in the X direction, relative to the cursor position of the previous cycle (only reported if either or both Xmotion and Ymotion are non-zero). |
| Ymotion | Similar to Xmotion. |
| Button | May be Up or Down (only reported if a change from the previous cycle). |

It will be understood by those skilled in the art that a "report" means transmitting information to an application process executing on a host, such that the cursor is moved or a function is performed. In some instances, driver software executing on the host may ascertain the existence of finger movement, while in other instances including the exemplary embodiment described herein the determination of finger movement occurs in the firmware in the pointing device.

Referring still to FIG. 5, the cyclical process begins at step 400, and continues at step 410 by scanning the conductor sensors. The sensors may be scanned sequentially or concurrently, depending on the hardware implementation. The scan process measures the values of finger-induced capacitance for each of the conductors, and stores the values in RAM at step 420. The cycle process continues by performing the Xcompute loop of FIG. 6 discussed hereinafter, and also the Ycompute loop analogous to FIG. 6, at step 430 and 440, respectively. In general, the function of the Xcompute and Ycompute processes is simply to evaluate the current measurements by calculating the centroid of the finger measurement, and by detecting whether a second finger is touching the pad—which determines the button state.

In the exemplary embodiment, only a change in the button state is reported. As a result, at step 450 the value of Button is set to No Change. In addition, in the exemplary embodiment a tap or double click by only a first finger is not acted upon, although a tap by a second finger or by multiple fingers is acted upon. In the exemplary arrangement, a "button down" condition is only reported if both fingers are in operative contact with the touchpad.

The process continues by comparing the current and previous button states of the X and Y conductors. First, at step 460, the state of Xbutton is checked to see if it is Down and the state of XbuttonPrevious is checked to see if it is Up. If both compares are true, then the variable Button is set to Down at step 465. In addition, at step 470, the state of Ybutton is checked to see if it is Down and the state of YbuttonPrevious is checked to see if it is Up. If both compares are true, the variable Button is also set to Down.

Alternatively, as determined at step 480, if the state of Xbutton is Up and the state of XbuttonPrevious is Down, or,

8

as checked at step 490, the state of Ybutton is up and YbuttonPrevious is Down, then the variable Button is set to Up at step 495.

If the button was set to Down at state 465, or Up at step 495, or if the results at steps 480 and 490 are NO, the process advances to step 510.

At step 510, Xmotion is set to the sum of Xabsolute less XabsolutePrevious, and at step 520, Ymotion is set to the sum of Yabsolute less YabsolutePrevious. Then, at step 530, the state of Button is checked and, if it is changed by being either Up or Down, both Xmotion and Ymotion are set to zero at step 535, indicating that the user has actuated a button and no cursor movement should occur.

In addition, if Button equals Up or Down, the state of Button is reported at step 540. At step 550, Xmotion and Ymotion are compared to zero, and if either is not zero then both Xmotion and Ymotion are reported to the microcontroller. It will be apparent that this indicates a cursor movement, typically reflective of the movement of a single finger over the touchpad, or two fingers in some modes such as Click-and-Drag.

Further, at step 560, whether there is motion reported or not, the variable XabsolutePrevious is set to the value of Xabsolute, and at step 570 the variable YabsolutePrevious is set to the value of Yabsolute. Similarly, at step 580 the value of XbuttonPrevious is set to Xbutton, and at step 590 the value of YabsolutePrevious is set to Yabsolute. The cycle then repeats by returning to step 400. It will be apparent that the foregoing algorithm can be readily extended to include additional fingers beyond two, representative of additional buttons. In such an instance, compare steps for current and previous states of each button would be conducted, and "up," or "down" conditions would be reported for each such button. In some embodiments it may be desired to report "no change" conditions, and the foregoing algorithm could be readily modified to provide such reporting.

Depending on the desired configuration, second and third buttons may be implemented, for example, either by requiring a combination of two or more fingers to indicate operation of a second button, or by the independent movement of additional fingers or other objects. In this latter embodiment, it may be desirable to implement distance thresholding, to ensure that movement of a second or additional button finger is not mistaken for movement of the first or other button finger.

Set forth in FIG. 6 is a flow diagram setting forth the steps for computing motion and "button" states in the X direction, or what may be referred to as "Xcompute." An analogous calculation is performed for the Y direction, or what may be referred to as "Ycompute." The algorithm uses the following variables and constants:

| Name | Definition |
|---|---|
| X(N) | Values, stored in memory, of finger-induced portion of capacitance measured on each conductor. N varies from 1 to Xcon. [When no finger is contacting the pad above a conductor, the value is approximately zero. In addition, X(0) is initialized to a value of 0.] |
| X(N-1) | Value of finger-induced sensor conductor capacitance for the previous conductor. |
| Xcon | The number of sensor conductors in the X direction. |
| Fthresh | The minimum threshold that X must reach before a finger is considered to be present. [Sets the touch sensitivity of the pad.] |
| Xpeak1 | Variable to store the value of the first peak X value. |
| Xvalley | Variable to store the value of a local minimum (if any) between 2 peaks. |

5,825,352

<table>
<tr><td colspan="2" align="center">9</td></tr>
<tr><td colspan="2" align="center">-continued</td></tr>
<tr><td>Name</td><td>Definition</td></tr>
<tr><td>Xpeak2</td><td>Variable to store the value of the second peak X value (if any).</td></tr>
<tr><td>Xsum</td><td>Variable to accumulate the sum of the X values, for centroid calculation.</td></tr>
<tr><td>XweightSum</td><td>Variable to accumulate the sum of the X values, weighted by N (the position of the conductor), for centroid calculation.</td></tr>
<tr><td>Xstate</td><td>A variable which can have values Peak1, Valley, Peak2 or Tail, to indicate which part of the finger profile we are currently searching for. The Tail state is simply the remainder of the scan after a second peak (in the exemplary embodiment) has been identified.</td></tr>
</table>

It will be apparent to those skilled in the art that the "Ycompute" variables and constants differ only in replacing X by Y.

The algorithm for Xcompute starts at step **200**, followed by initialization of variables at step **205**. For Xcompute, the variables initialized are N, which is set to zero, and the value of X(0), which is also set to zero. In addition, Xpeak1, Xvalley, Xpeak2, Xsum and XweightSum, are all set to zero. In addition, the state of Xstate is set to Peak1.

At step **210** a loop, referred to as "Xloop" starts. The purpose of Xloop is to calculate the X centroid, by accumulating the sum and weighted sum of the X values for all the X conductors from one to Xcon. Thus, the loop typically starts with the value of N=0 and increments by one at the beginning of each cycle until the value of N=Xcon. The steps of the loop include step **215**, where N is incremented to N+1 and the value X(N) of the current conductor is added to the prior accumulated value, Xsum, which then becomes the new value of Xsum. The loop then continues at step **220**, where the prior value of XweightSum is added to a weighted value of X(N), where the weighting is done by multiplying X(N) by the number N of the conductor being sampled. The sum of XweightSum and N*X(N) then becomes the new value of XweightSum.

The XLoop continues at step **225**, where one of a series of subloops is selected depending on the value of Xstate. Since Xstate is initially set to Peak1, the first subloop entered is the Peak1 subloop, beginning at step **230**. At step **230** the value of X(N) is compared to the value of X(N−1) and, if X(N) is greater than or equal to the value of X(N−1), the first peak has not yet been reached. As a result, the loop jumps to step **235**, at which points the value of N is compared to the value of Xcon. If the finger-induced capacitance measured at the last conductor has not been evaluated, the result is a NO and the process jumps to step **215** to repeat with an incremented value of N.

At some value of N the value of X(N) is less than the value of X(N−1), at which point the check at step **230** yields a NO. At this point, the peak has been found and at step **232** the value of Xpeak1 is set to X(N−1) and the value of Xstate is set to Valley. The system then jumps to step **235**, where a check is made to see if the last conductor has been measured by comparing N to Xcon. As before, if the capacitance change measured at the last conductor has not been checked, the result is a NO, and the process loops to step **215** and repeats.

When the process begins with the next increment of N, a NO will result at step **225**, so that the process will jump to step **250**, where a check is made to see if Xstate equal Xvalley. Since it now does, a YES results and the process branches to step **255**. At step **255** a X(N) is compared to X(N−1). If X(N−1) is not greater than or equal to X(N), the valley has not yet been found, causing a further jump to step

**235** and a repeat with an incrementally higher N. If a second finger is touching the pad then eventually the value of X(N−1) will be geater than or equal to the value of X(N), such that the valley is detected. At this point, at step **262**, the value of Xvalley is set to X(N−1) and Xstate is set to Peak2. The process then jumps to step **235**, where it repeats from step **215** unless the last conductor in the matrix has been evaluated.

On the next cycle, a NO result is reached at both step **225** and step **250**, causing a jump to step **270**. At step **270** the state of Xstate is compared to Peak2, and a YES result will occur. This results in a compare between X(N) and X(N−1) at step **275**, to look for a second peak, in a manner substantially identical to the process by which the first peak was found. As long as X(N) is greater than or equal to X(N−1), the peak has not been found, so the process jumps to step **235**, and then to step **215** until the change measured at the last conductor has been evaluated.

As before, the value of X(N) will eventually start to decrease, such that X(N) will be less than X(N−1). At this point, at step **278**, the value of Xpeak2 is set to the value of X(N−1) and the state of Xstate is set to Tail. The "tail" is the remaining portion of FIG. 4 following the second peak. While a Tail state is used in the exemplary embodiment, such a state may not be necessary in all embodiments.

The process then cycles through until the last conductor measurement has been considered, at which point N does equal Xcon when the check at step **235** is made. With a YES result, the process branches to a thresholding comparison at step **290**.

In an exemplary embodiment, the Xcompute process then continues by calculating the centroid for the fingers detected, so long as the maxima exceed a threshold value. In accordance with the present invention, two approaches may be used in calculating centroid values. In a first implementation, only a single centroid value is calculated for the combination of one or more fingers. In this arrangement, it will be apparent that, when a second finger contacts the touchpad, the centroid "jumps" laterally approximately to the midpoint of the two fingers. In a second implementation, a centroid value may be calculated for each maxima, yielding multiple centroid values when multiple fingers interact with the pad. For purposes of clarity, the following description will be limited to the first implementation.

Thus, at step **290** the values of Xpeak1 and Xpeak2 are compared to Fthresh, and if either or both are greater then Xabsolute is set to the value of XweightSum/Xsum at step **295**, which causes the X centroid to be calculated. If neither peak exceeds Fthresh, then no finger is deemed present and Xbutton is set to Up at step **315**.

If both Xpeak1 and Xpeak2 were greater than Fthresh, the Xcompute process continues at step **305** by comparing the difference between Xpeak1 and Valley to the value of Xpeak1 divided, for example, by four. If the difference is the greater of the two, then the difference between Xpeak2 and Valley is compared to the value of Xpeak2 divided, for example, by four. If the difference is greater than the dividend, the Xbutton is set to Up at step **310**. Otherwise, the value of Xbutton is set to Up at step **315**. The comparison described above is provided to ensure that a legitimate valley and two legitimate peaks have been detected, to avoid artifacts. It will be appreciated, given the teachings herein, that other comparison methods or divisors other than four may be used for this purpose.

The Xcompute loop then ends at step **320**. It will be appreciated by those skilled in the art that the foregoing is

5,825,352

11

a simplified algorithm and does not include compensation for settling, moisture and noise. Noise thresholding may be provided in at least some embodiments, if noise causes the curve to be non-monotonic; settling and moisture may be dealt with in a similar manner.

The Ycompute loop is performed similarly, as noted above. Depending on the particular arrangement desired, and the associated hardware, the X and Y compute processes may be performed sequentially in either order or concurrently.

While the foregoing example describes identification of minima and maxima in the X and Y directions, it will be apparent that an analysis along a diagonal or some other angular direction may be preferred in some instances, and is still within the scope of the present invention.

It will be appreciated that the foregoing describes a new and useful method and apparatus for detecting a plurality of fingers operatively coupled to a touch pad sensor for enabling a variety of mouse-like operations. A second portion of the invention involves using the previously detection methodology to perform various cursor movement and control functions similar to those well known to users of electronic mice and trackballs.

As previously noted, the first finger is most commonly associated, in the prior art, with cursor movement, while various tapping motions [e.g., tap and tap-and-a half] of that first finger have been implemented to perform various control functions. Unlike such prior art, however, various movements (including sequences of taps) of additional fingers or combinations of the first and additional fingers are provided to enable such control functions in the present invention. Depending on the implementation desired, it is also possible to implement a superset of the prior art control functions together with the more robust control function set available with the present invention.

Note that in the preferred embodiment, the user may arbitrarily choose which finger he or she uses as the "first" or "second" or additional fingers. Thus, for example, one user may choose the index finger as the first finger and the middle finger as the second finger, while another user may prefer the reverse or some different combination. In the preferred embodiment, the only distinction between the first, second and additional fingers is the sequence in which they are placed in contact with the touchpad surface, or removed from it. In any case where a second or additional finger or fingers is placed down after a first finger, or multiple fingers, is already in contact with the pad, the newly placed fingers can be in any relationship to those already in contact with the pad, such as to the left, to the right, above or below. The only requirement is that, in the profile of finger-induced capacitances, the profile of the newly placed finger exhibits a zero value or a local minimum on each side of its peak value, in at least one of the X and Y directions, so that it may be distinguished from the other finger(s) in contact with the touchpad.

In particular, the ability of the previously described methodology to recognize multiple fingers allows the first finger to serve, essentially, as the "point" finger, while additional fingers serve as the "click" finger(s). Combinations of the first, second, and perhaps additional fingers can then enable numerous conventional functions to be performed based on the mapping of a variety of sequences of taps or finger movements to a set of conventional pointing device functions, where the pointing device could be a touchpad, mouse, trackball, joystick, or stylus, for example. It will be apparent to those skilled in the art, given the foregoing description, that the present invention can detect, for

12

example, relative movement of the first finger, together with a tap of the second or more fingers at some point, followed either by removal of both fingers, further movement of the first finger, or further movement of both fingers. Such sequences can, essentially, be viewed as a series of scans in which one or more fingers were found to be either present or absent in any given scan, with motion, or lack thereof, of the finger or fingers across the touch sensor interspersed between changes in the number of fingers in contact with the touchpad. The specific sequence can then be analyzed to determine whether only a cursor movement is involved or whether a control function is intended. If a control function is intended, the specific control function can then be identified.

Referring to FIGS. 7A–7F, there is shown in diagrammatic form an exemplary sequence involving operative coupling of a plurality of fingers with a touch sensor to cause both a cursor movement and a control function. More specifically, FIG. 7A shows a series of movements of one or more fingers across a touch sensor, including various finger taps. FIGS. 7B–7F show, for each of the numeric references in FIG. 7A, an exemplary video display, an exemplary position of one or more fingers on the touchpad, and X and Y finger profiles appropriate to that finger contact. It will be helpful to define certain conventions used in FIGS. 7A–7F before discussing these figures. In FIG. 7A–7F, contact between a finger and the touch pad is indicated by a solid circle within the fingertip; an absence of contact between a fingertip and the touch sensor is indicated by the absence of circle within the finger tip. A tap—i.e., an up and down motion—by a finger is indicated by a dashed circle. Movement of the fingers from a first to a second point while in contact with the touch sensor is indicated by a solid arrow. Movement of the fingers from a first to a second point with the fingers not in contact is indicated by a dashed arrow. With these conventions in mind, FIGS. 7A–7F can be better understood.

In particular, and with reference to FIG. 7A in combination with FIG. 7B, an initial series of scans 700 indicates the presence of a single finger in contact with the touch sensor, with the changing X,Y location between 700 and 705 indicating relative motion by the finger across the touch sensor. At 710, a second finger is detected in contact with the touch sensor, and continues to be operatively coupled to the sensor for several more scans without significant relative motion across the sensor. At 720, the second finger is removed, while the first finger remains. From 720 until 730 (shown in FIG. 7C) the first finger continues its relative motion, while at 740 the second finger is again placed down. The scans of the sensor then detect both the first and second finger being moved together across the sensor until the scan at 750, then both fingers are removed at 755. Thereafter, both fingers are again placed on the sensor at 760 (shown in FIG. 7D), where they remain for a few more scans until 770, at which time they are both removed. Three fingers are placed on the sensor at 780, and removed a few scans later at 790. Thereafter, three fingers are placed on the sensor at 800 (FIG. 7E), moved across the touch sensor for a few scans from 800 to 805, and are then removed at 810. Finally, as shown at 820 (FIGS. 7F1–2), one finger is placed down while the adjacent finger is moved, such as might be desirable for marking text or other functions. When the finger is moved as far as is practicable, the moving finger is picked up at 825 and placed down again at 830 for further movement. The moving finger can be picked up and placed down again as often as desired. Eventually the other, substantially fixed finger is lifted at 835, causing a "button up" condition.

5,825,352

13

While the foregoing sequence can be programmed to define any number of cursor movement and control functions, an exemplary definition of the functions associated with such sequences can be the following: For the period from **700** through **705** the relative motion of a single finger can be defined to mean cursor movement for that period, from the beginning point until the relative ending point. During the period **710** to **720**, a second finger is detected and then removed, which is defined in an exemplary embodiment as a single finger tap which may be a "select" function such as selecting one item from a screen menu. During the period **720** until **730**, the single finger again moves the cursor, while at **740** the second finger reappears to enable a different function. The second finger moves across the sensor, together with the first finger, until at **755** both fingers are removed. Again, such sequences—all of which may be regarded as gestures—can be mapped to control functions in numerous ways, but one reasonable definition is that the presence of two fingers engaged in relative motion is a "drag function," such as where an entity was selected by the first tap and dragged to a new location, where it is dropped by the removal of both fingers at **750**.

Then, at **760**, both fingers reappear and remain for a few additional scans until both are removed at **770**. This gesture, which may be considered a "two finger tap," can enable numerous functions, but an exemplary definition is the classical "double-click" of a standard left mouse button, or the click of a middle button on some three button mice, such as those sold by Logitech, Inc., and could, for example, activate a function or application associated with the item to which the cursor is pointing.

Next, the sequence from **780** to **790**, when the three fingers reappear and are then removed, is a "three finger tap", and can be regarded, for example, as a right mouse button click which may, for example, activate a menu specific to the item to which the cursor is pointing. Finally, the sequence from **800** until **810**, in which three fingers reappear, move across the touch sensor and are then removed, may in an exemplary embodiment be seen as a shortcut to a multi-sequence function. For example, such a movement might be defined as a scroll function, which might otherwise require the user to move the cursor to a scroll bar, drag and drop a scroll box, and return the cursor to the working area of the screen. Finally, the sequence from **820** through **830** can be analogized to holding down a mouse button (for example the left mouse button), rolling a mouse whatever distance is convenient for the user, then picking up the mouse (while continuing to hold down the button) and placing the mouse down again at a position convenient for further movement of the mouse. One example of the use of such a sequence is the marking of text. The algorithm for recognizing movement by one "cursor" finger while the other "button" finger is maintained in position is a generalized case of the algorithm shown in FIGS. 5 and 6, and is described in greater detail in FIGS. 8 and 9. Other functions which can be implemented with such gestures include an "ink" function (mentioned above), entry of variable values, and use of the sensor in absolute mode.

Referring next to FIGS. 8 and 9, the generalized case associated with FIGS. 7F1–2, but also applicable to the remaining functions, may be better appreciated. In the exemplary algorithm shown in FIGS. 8 and 9, a determination is made whether zero, one or two fingers are in contact with the touchpad. Depending on how many fingers are identified, various operations are permitted. It will be appreciated that FIG. 8 is analogous to FIG. 5, while FIG. 9 is analogous to FIG. 6. For convenience, steps unchanged from

14

FIGS. 5 and 6 are in most cases referred to by the reference numerals used in those figures.

In FIG. 8, the process begins in a manner identical to FIG. 5, starting at step **400** and followed by scanning the conductors and storing the results of the scan in memory at step **405**, followed by Xcompute and Ycompute at steps **430** and **440**, respectively. For this embodiment, Xcompute is shown in FIG. 9, and Ycompute is identical to Xcompute. At step **850**, a determination is made whether two fingers are in contact with the touchpad by evaluating both Xcompute and Ycompute. If neither Xcompute nor Ycompute indicate the presence of two fingers, the answer is NO and the process drops to step **855**. However, if either the Xcompute routine or the Ycompute routine indicates the presence of two fingers, the answer at step **850** is YES and the process moves to step **860**, where the value of the variable FINGER is set to 2.

If the answer at step **850** was NO, then a determination has to be made at step **855** whether one or no fingers are in contact with the touch sensor. If variables Xfinger and Yfinger do not both equal 1, then the comparison at step **850** is a NO and it is determined that no fingers are in contact with the touch sensor. In this case, the variable FINGER is set to 0 at step **865**. However, if the variables both yield a 1, then a determination is made that one finger is in contact with the sensor, and the variable FINGER is set to 1 at step **870**.

In either event, the process then moves to step **875**, where Xmotion and Ymotion are calculated in a manner identical with FIG. 5. The process then continues at step **880**, where the variable Finger is compared to the value of FingerPrevious. If the value of Finger differs from the value of FingerPrevious, then a button actuation is assumed to have occurred, and Xmotion and Ymotion are set to zero at step **885**. However, if the value of Finger equals the value of FingerPrevious (i.e., the current number of fingers contacting the pad is the same as in the previous state), then the comparison of step **880** yields a YES, and the process moves to step **890**. At step **890** a comparison is made to determine whether there has been motion in either the X or Y directions. If neither Xmotion nor Ymotion is nonzero, a NO results and the process moves to step **895** where the variable Motion is set to NO. The same results obtains if the process goes through step **885**. However, if either Xmotion or Ymotion is nonzero, a YES results at step **890**, and the process moves to step **900** where the variable Motion is set to YES.

From either step **895** or step **900**, the process moves to step **905**, where a check is made to determine whether ButtonPrevious was up and the number of fingers detected is two. If the answer is NO, the process moves to step **910**. However, if a YES is obtained, the process moves to step **915** where the state of the Button variable is reported to the host as DOWN, and the variable ButtonPrevious is set to Down.

Referring again to step **910**, a check is made to determine whether either of two groups of conditions exist. A YES result may be obtained if ButtonPrevious is DOWN and and the value of the Finger variable is zero; or if ButtonPrevious is Down and the variable Motion is set to YES and the variable Finger is set to one. If none of these conditions exist, a NO result is obtained and the process moves to step **920**. However, if a YES does result, then the process moves to step **925** and reports to the host that Button is Up, while also setting the variable ButtonPrevious to Up.

If a NO resulted at step **910**, at step **920** a comparison is made between variables FingerPrevious and Finger, and the

5,825,352

15

state of the Motion variable. If FingerPrevious is the same value as Finger, and Motion has occurred (i.e., Motion is Yes), the process moves to step **930** and both Xmotion and Ymotion are reported. The process then moves to step **935**. However, if the comparison at step **920** yields a No, the process moves directly to step **935**. At step **935**, the value of XabsolutePrevious is set to the value of Xabsolute, the value of YabsolutePrevious is set to the value of Yabsolute, and the value of FingerPrevious is set to the value of Finger. The process then moves to step **940**, where it recycles by jumping back to start.

Referring next to FIG. **9**, the Xcompute process is shown in detail for the generalized case shown in FIG. **8**. As noted previously, the Ycompute process is identical and is therefore not shown separately. The process of FIG. **9** is identical to that shown in FIG. **6** up through step **290**, and the preceding steps will therefore not be discussed again. However, if a No results from the comparison at step **290**, a determination is made that no fingers are in contact with the pad. This causes the variable Xfinger to be set to zero at step **970**.

Steps **295** and **305** are unchanged from FIG. **6** and will not be discussed further. However, if a No results from the comparison at step **305**, then a determination is made that one finger is in contact with the sensor, and the value of the variable Xfinger is set to one at step **975**. By contrast, if the result at step **305** is a Yes, then a determination is made that two fingers are in contact with the sensor and the variable Xfinger is set to two at step **980**. Regardless of the number of fingers in contact with the sensor, the process moves to step **320** and ends until the next cycle.

Another function achievable with the detection method and apparatus of the present invention may be referred to as edge lock. Because a touch sensor can detect, in absolute terms, where on the sensor the operative coupling occurs, it is possible to detect that one or more fingers have reached the edge of the sensor. In some instances, the user intends to continue the movement he was engaged in when he hit the edge; for example, a drag function involving two fingers, in which the two fingers hit the edge before the object being dragged has reached its destination. In the environment of a mouse, the user simply picks up the mouse while holding the button down, puts it back down and moves again. In the context of a touchpad, however, removal of the two fingers may be perceived as termination of the function even though such termination was not intended. To avoid such problems, the function in which the user was engaged at the time the fingers hit the edge may remain active—i.e., locked in—for a delay period. If the fingers are placed down on the touchpad within the delay period, the user continues with the earlier function. If the user does not place down the fingers within a predefined delay, the function is terminated and a new function begins when the user again places the fingers in operative contact with the sensor.

It will be appreciated from the foregoing that the present invention allows numerous multi-finger gestures to be detected and converted to mouse-related functions for moving a cursor and control of operating environments or applications programs. However, while some exemplary functions and exemplary definitions for particular sequences have been provided above, it is to be understood that the present invention is not limited to the association of a particular function with a particular sequence or to any particular set of functions. Instead this aspect of the invention is directed to the ability to identify and process various sequences in which one or more fingers are either absent or present, interspersed with motion or lack of motion of the

16

finger or fingers across the touch sensor, to evaluate those sequences either locally or via software on the host, and to report appropriate signals to cause cursor movements or control functions to occur in applications programs or operating environments.

Having fully described various embodiments of the present invention, numerous alternatives and equivalents which do not depart from the invention will be apparent to those skilled in the art. It is therefore intended that the invention not be limited by the foregoing description, but only by the appended claims.

What is claimed is:

1. A method for detecting the operative coupling of multiple fingers to a touch sensor involving the steps of

scanning the touch sensor to (a) identify a first maxima in a signal corresponding to a first finger, (b) identify a minima following the first maxima, (c) identify a second maxima in a signal corresponding to a second finger following said minima, and

providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima.

2. The method of claim **1** further including the step of causing a pointing device click function to occur in response to the detection of at least a second maxima.

3. The method of claim **1** further including the step of enabling a "drag" function to occur in response to the detection of at least a second maxima.

4. The method of claim **1** further including the step of enabling a "select" function in response to the detection of at least a second maxima.

5. The method of claim **1** further including the step of enabling an "ink" function in response to the detection of at least a second maxima.

6. The method of claim **1** wherein said touch sensor includes a plurality of lines, said maxima being a largest local variation in a signal value on one of said lines due to capacitive coupling of a finger.

7. The method of claim **6** wherein said maxima are peaks.

8. The method of claim **1** further comprising the step of comparing a distance between said first maxima and said second maxima to a predefined threshold.

9. The method of claim **1** further comprising the steps of:

providing a first control function in response to the detection of the movement of two fingers:

detecting the reaching of an edge of said touch sensor by said two fingers;

detecting a first time corresponding to the removal of said fingers from said touch sensor;

detecting a second time corresponding to the replacement of said two fingers on said touch sensor; and

continuing said first control function if said first and second times are within a predetermined time limit of each other.

10. The method of claim **1** further comprising the step of:

detecting a distance between said first and second maxima.

11. The method of claim **1** further comprising the step of:

providing a drag control function in response to detecting a movement in substantial unison of two said fingers.

12. The method of claim **1** further comprising the step of:

providing a click function in response to the removal and reappearance of said second maxima within a predetermined period of time.

5,825,352

**17**

13. The method of claim **1** further comprising the steps of:

detecting a movement of said first maxima;

detecting a removal and replacement of said maxima within a predetermined time period;

controlling a cursor function in response to said movement of said first maxima; and

providing a control function in response to said removal and replacement of said second maxima.

14. The method of claim **1** further comprising the step of:

selecting an appropriate control function based on a combination of a number of fingers detected, an amount of time said fingers are detected, and any movement of said fingers.

15. The method of claim **1** further comprising the step of determining if said first and second maxima are within 5 centimeters, and only providing said indication of the presence of two fingers if said first and second maxima are within 5 centimeters.

16. The method of claim **1** further comprising the step of calculating first and second centroids corresponding to said first and second fingers.

17. The method of claim **1** wherein said first and second maxima are required to be higher than a first threshold, and said minima is required to be less than a second threshold.

18. A touch sensor for detecting the operative coupling of multiple fingers comprising:

means for scanning the touch sensor to (a) identify a first maxima in a signal corresponding to a first finger, (b) identify a minima following the first maxima, and (c) identify a second maxima in a signal corresponding to a second finger following said minima, and

means for providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima.

19. The touch sensor of claim **18** further comprising:

means for selecting an appropriate control function based on a combination of a number of fingers detected, an amount of time said fingers are detected, and any movement of said fingers.

20. The touch sensor of claim **18** wherein said touch sensor includes a plurality of lines, said maxima being a largest local variation in a signal value on one of said lines due to capacitive coupling of a finger.

21. The touch sensor of claim **18** wherein said maxima are peaks.

22. The touch sensor of claim **18** further comprising means for comparing a distance from said first maxima to said second maxima to a predefined threshold.

**18**

23. The touch sensor of claim **18** further comprising:

means for providing a first control function in response to the detection of the movement of two fingers:

means for detecting the reaching of an edge of said touch sensor by said two fingers;

means for detecting a first time corresponding to the removal of said fingers from said touch sensor;

means for detecting a second time corresponding to the replacement of said two fingers on said touch sensor; and

means for continuing said first control function if said first and second times are within a predetermined time limit of each other.

24. The touch sensor of claim **18** further comprising:

means for detecting a distance between said first and second maxima.

25. The touch sensor of claim **18** further comprising:

means for providing a drag control function in response to detecting a movement in substantial unison of two said fingers.

26. The touch sensor of claim **18** further comprising:

means for providing a click function in response to the removal and reappearance of said second maxima within a predetermined period of time.

27. The touch sensor of claim **18** further comprising:

means for detecting a movement of said first maxima;

means for detecting a removal and replacement of said maxima within a predetermined time period;

means for controlling a cursor function in response to said movement of said first maxima; and

means for providing a control function in response to said removal and replacement of said second maxima.

28. The touch sensor of claim **18** further comprising:

means for selecting an appropriate control function based on a combination of a number of fingers detected, an amount of time said fingers are detected, and any movement of said fingers.

29. The sensor of claim **18** further comprising means for determining if said first and second maxima are within 5 centimeters, and only providing said indication of the presence of two fingers if said first and second maxima are within 5 centimeters.

30. The sensor of claim **18** further comprising means for calculating first and second centroids corresponding to said first and second fingers.

31. The sensor of claim **18** wherein said first and second maxima are required to be higher than a first threshold, and said minima is required to be less than a second threshold.

\* \* \* \* \*

# EXHIBIT 2

# THE
# NEW SHORTER
# OXFORD ENGLISH
# DICTIONARY

## ON HISTORICAL PRINCIPLES

EDITED BY

**LESLEY BROWN**

**VOLUME 1**

A–M

CLARENDON PRESS · OXFORD

SYN 00103315

*Oxford University Press, Great Clarendon Street, Oxford OX2 6DP*

*Oxford New York*

*Athens Auckland Bangkok Bogota Buenos Aires Calcutta
Cape Town Chennai Dar es Salaam Delhi Florence Hong Kong Istanbul
Karachi Kuala Lumpur Madrid Melbourne Mexico City Mumbai
Nairobi Paris São Paulo Singapore Taipei Tokyo Toronto Warsaw
and associated companies in
Berlin Ibadan*

*Oxford is a registered trade mark of Oxford University Press*

*Published in the United States by
Oxford University Press Inc., New York*

© *Oxford University Press 1973, 1993*

*First Edition 1933
Second Edition 1936
Third Edition 1944
Reprinted with revised Etymologies and Enlarged Addenda 1973
This Edition 1993*

*All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted, in any form or by any means,
without the prior permission in writing of Oxford University Press.
Within the UK, exceptions are allowed in respect of any fair dealing for the
purpose of research or private study, or criticism or review, as permitted
under the Copyright, Designs and Patents Act, 1988, or in the case of
reprographic reproduction in accordance with the terms of the licences
issued by the Copyright Licensing Agency. Enquiries concerning
reproduction outside these terms and in other countries should be
sent to the Rights Department, Oxford University Press,
at the address above*

*British Library Cataloguing in Publication Data
Data available*

*Library of Congress Cataloging in Publication Data
Data available*

*ISBN 0-19-861134-X Plain Edition
ISBN 0-19-861271-0 Thumb Index Edition
ISBN 0-19-863142-1 Luxury Edition
ISBN 0-19-195804-2 Leather Bound Edition*

10

*Printed in the United States of America
on acid-free paper*

legal claim; steal. L19. 2 v.i. Stray or wander like a maverick. E20.

**mavis** /ˈmeɪvɪs/ n. Now poet. & dial. LME. [(O)Fr. mauvis.] A song thrush. *red* mavis: see RED a.

**Mavors** /ˈmeɪvɔːz/ n. literary. L16. [L: see MARS.] = MARS 2.

**mavourneen** /məˈvʊəniːn/ n. Anglo-Ir. E19. [Ir. mo mhuirnín, f. mo my + muirnín dim. of muirn affection: see -EEN¹.] My darling.

**mavrodaphne** /mavrəˈdafni/ n. E20. [mod.Gk f. late Gk mauroi dark (Gk amauros) + daphnē laurel.] A dark-red sweet Greek wine; the grape from which this is made

**mavrone** /məˈvrəʊn/ int. Anglo-Ir. L19. [Ir. mo bhrón, f. mo my + brón grief.] Expr. sorrow.

**maw** /mɔː/ n.¹ [OE maga corresp. to OFris. maga, MDu. maghe (Du. maag), OHG mago (G. Magen), ON magi, f. Gmc.] 1 The stomach of an animal or (now joc.) a person; the cavity of the stomach. Formerly spec., the abomasum or fourth stomach of a ruminant. OE. 2 † a Any of various internal organs, as (a) the abdominal cavity as a whole; the belly; (b) the womb; (c) the liver. ME–E16. b The swim-bladder of a fish. LME. 3 The throat, the gullet; esp. the jaws or mouth of a voracious mammal or fish. LME. † 4 Appetite, inclination, liking. L16–E18.

† 1 N. HAWTHORNE Destined to glut the ravenous maw of that detestable sean-beast. 3 *Trout & Salmon* It stuck its head up out of the river ... and it opened its great maw wide. transf. K. KEARY We'll face the terrible maw of a muzzle-loading shotgun. 4 C. CHARKE I have no great Maw to that Business, methinks

**maw** /mɔː/ n.² Long obs. exc. Sc. & north. LME. [Reduced form of MALLOW.] sing. & (usu.) in pl. (treated as sing.) A mallow.

**maw** /mɔː/ n.³ obs. exc. dial. LME. [ON mår = OE mǣw: see MEW n.¹] A gull, esp. the common gull, Larus canus.

**maw** /mɔː/ n.⁴ obs. exc. Hist. M16. [Origin unkn.] A Gaelic card-game from which twenty-five and spoil five developed

**maw** /mɔː/ n.⁵ colloq. & dial. (chiefly US). E20. [Repr. a pronunc. of MA n.: cf. PAW n.²] = MA n.

**mawk** /mɔːk/ n. obs. exc. dial. LMB. [ON maðkr: see MADDOCK.] A maggot.

**mawkin** n. var. of MALKIN.

**mawkish** /ˈmɔːkɪʃ/ a. M17. [f. MAWK + -ISH¹.] 1 Inclined to sickness; without appetite. obs. exc. dial. M17. 2 Having a nauseating, sickly, or insipid taste. L17. 3 Feebly sentimental; imbued with sickly or false sentiment. E18.

2 P. V. WHITE She reached out for the ... barley water. and used to find comfort in ... that mawkish stuff. 3 C. P. SNOW Dickens made a mawkish cult of Mary Hogarth, and idolised her. ... *mawkishly* adv. M18. *mawkishness* n. E18.

**mawky** /ˈmɔːki/ a. obs. exc. dial. L18. [f. MAWK + -Y¹.] 1 Maggoty (lit. & fig.). L18. 2 = MAWKISH 3. M19.

† **mawmish** n. M17–M19. [f. base of MALM n. + -ISH¹.] = MAWKISH 2, 3.

**mawseed** /ˈmɔːsiːd/ n. arch. M18. [Partial tr. G dial. Mahsaat, Mohnsamen, f. Mah, Moh poppy (G Mohn) + Saat, Samen seed.] The seed of the opium poppy, Papaver somniferum.

**mawther** n. var. of MAUTHER.

**mawworm** /ˈmɔːwəːm/ n.¹ Now rare or obs. E17. [f. MAW n.¹ + WORM n.] A parasitic worm, esp. a nematode, infesting the gut of humans and other mammals.

**Mawworm** /ˈmɔːwəːm/ n.² M19. [Mawworm, a character in Isaac Bickerstaffe's play *The Hypocrite*, 1769.] A hypocritical pretender to sanctity.

**max** /maks/ n.¹ & a. N. Amer. colloq. M19. [Abbrev. of MAXIMUM.] 1 n. A maximum. 2 a. Maximum; achievement, etc. M19. 2 A maximum security prison. M20.

1 GROOVY to the max.

B attrib. or as adj. Maximum. M20.

**max** q. *Aeronaut.* the maximum dynamic pressure exerted on an aircraft or spacecraft in the course of its flight; the part of a flight during which the highest aerodynamic pressures are encountered.

**max** /maks/ v. US colloq. L19. [f. prec.] 1 v.i. & i. (usu. foll. by out). Do (a thing) well; perform to the limit of one's capacity, endurance, etc. L19. 2 v.i. Complete a maximum prison sentence. L20.

**max** /maks/ adv. US colloq. L20. [f. as prec.] At the maximum, at the most.

**maxi** /ˈmaksi/ a. colloq. also M20. [f. MAXI-.] A thing that is large or long of its kind; spec. (a) a maxiskirt; (b) *Austral. & NZ* a maxi-taxi.

**maxi-** /ˈmaksɪ/ comb. form. M20. [f. MAXI(MUM: cf. MINI-.] Forming chiefly as. denoting a thing that is large or long of its kind, esp. a garment or (Austral. & NZ) a racing yacht, as maxi-coat, maxi-skirt, etc.

**maxilla** /makˈsɪlə/ n. Pl. -llae /-liː/. LME. [L.] *Anat.* jaw. 1 A jaw; a jawbone; spec. either of a pair of bones forming (part of) the upper jaw in vertebrates. LME. 2 In insects and other arthropods, either of a pair of mouthparts posterior to and accessory to the mandibles. L17. ¶ Cf. MANDIBLE.

*maxillae* n. & (a) maxillary L18–E18. maxillary a. & n. (a) adj. of, pertaining to, or designating a maxilla; forming part of a maxilla; (b) n. a maxillary bone; a maxilla. E17.

**maxilliped** /makˈsɪlɪped/ n. Also -pede /-piːd/. M19. [f. MAXILLA + -i- + L. ped-, pes foot.] Zool. In crustaceans, an appendage modified for feeding and occurring in pairs behind the maxillae.

**maxillo-** /makˈsɪləʊ, makˈsɪləʊ/ comb. form. [f. MAXILLA: see -O-.] Forming adjs. w. the sense 'pertaining to the maxilla and —', as maxillo-facial, maxillo-mandibular, etc., and ns. etc. derived from them.

**maxim** /ˈmaksɪm/ n.¹ LME. [Fr. maxime or its source med.L maxima use as n. (sc. propositio proposition) of fem. of maximus: see MAXIMUM. Cf. MAXIMA n.¹] 1 A self-evident proposition assumed as a premiss in mathematical or dialectical reasoning. LME–L17. 2 A proposition, esp. a pithily-worded one; expressing a general truth drawn from science, law, or experience. Cf. earlier MAXIMUM 1. L16. 3 A rule or principle of conduct; a pithily-expressed precept of morality or prudence. L16.

1 R. BENTLEY It is urged as an universal Maxim, That Nothing can proceed from Nothing. 2 *Weekly News* He considered at length the meaning of the maxim, 'a man's house is his castle.' 3 BERNARD SHAW ... on the psychoanalytic maxim that wishes and fears are often inextricably related. 3 D. M. FRAME The maxim 'Know thyself' was on the temple of Apollo at Delphi.

*maximalist* n. a person who makes or coins maxims M19.

**Maxim** /ˈmaksɪm/ n.² L19. [Sir Hiram S. *Maxim* (1840–1916), US-born Brit. inventor.] In full *Maxim (machine-)gun*. A single-barrelled quick-firing machine-gun with a barrel surrounded by an outer casing filled with water to keep the parts cool.

† **maxima** n.¹ M16. [med.L: see MAXIM n.¹] = MAXIM n.¹ n.¹ 1–L6. 2 *Mus.* = LARGE n. 4. M18–E19.

**maximal** n.¹ pl. of MAXIMUM n.

**maximal** /ˈmaksɪm(ə)l/ a. L19. [f. MAXIMUM + -AL¹.] Consisting of or relating to a maximum; of the greatest possible size, duration, or capacity.

*maximality* n. the property of being maximal M20. *maximally* adv. L19.

**maximalist** /ˈmaksɪm(ə)lɪst/ n. & a. Also Max-. E20. [f. prec. + -IST, after Russ. *maksimalist*. Cf. BOLSHEVIK.] A n. A person who holds out for the maximum of his or her demands and rejects compromises; spec. (*Hist.*) a member of the part of the Russian Social-Democratic Party which favoured extreme methods; a member of (any similar group outside the former USSR. E20. B attrib. or as adj. Of, pertaining to, or characteristic of maximalists or maximalism. M20.

**maximanum** n. the beliefs or practices of maximalists E20.

**maximand** /ˈmaksɪmand/ n. M20. [f. MAXI(MUM or + -AND.] A thing which is to be maximized.

**maximum** /ˈmaksɪməm/ n. & a. M20. [f. MAXI(MUM + MIN(IMUM, after minimax.] *Math.* A n. The largest of a set of minima. M20. B attrib. or as adj. Of, pertaining to, or of the nature of a maximin; spec. in *Game Theory*, designating a strategy that maximizes the smallest gain that can be relied on by a participant in a game or other situation of conflict. Cf. MINIMAX n. & a. M20.

**maximise** /ˈmaksɪmaɪz/ v. Also -ize. E19. [f. L. *maximus* (see MAXIMUM) + -IZE.] 1 v.i. Increase to the highest possible degree; enhance to the utmost. E19. 2 v.t. Chiefly *Theol.* Maintain the most rigorous or comprehensive interpretation possible of a doctrine or an obligation. L19. 3 v.i Reach a maximum value. L20.

1 A. S. DALE He ... went to his father for advice on how to maximize his income. 2 W. S. LILLY I am far from wishing to maximise upon this matter. 3 *Globe & Mail* (*Toronto*) If emissions were curtailed now, the resultant ozone destruction would maximize around 1990.

*maximal'sation* n. E19. *maximiser* n. M19.

**maximum** /ˈmaksɪməm/ n. & a. M16. [(Fr. f.) mod.L. use as n. of neut. sing. of magnus great.] A n. Pl. maximums /maksɪmaz/, maxima /ˈmaksɪmə/. ‖† 1 = MAXIM n.² 2. Only in M16.

2‖ 2 The largest portion in which matter can exist. Only in M17. 3 *Math*. The greatest value which a variable may have; the largest element in a set; a point at which a continuously varying quantity ceases to increase and begins to decrease. M18. 4 gen. The highest possible magnitude or quantity of something attained, attainable, or customary; an upper limit of magnitude or quantity. M18. b The highest amount (esp. of temperature, barometric pressure, etc.) attained or recorded within a particular period. M19. 5 A superior limit imposed by authority; esp. in *Fr. Hist.*, a limit of price for corn. E19.

4 T. M. LINDSAY A strange compound of maximum of fact and minimum of theory. A. EVERS Dependence is at its maximum at birth, when the human infant is most helpless.

*Comb.* maximum thermometer: which records the highest temperature attained since it was last set.

B *attrib.* or as *adj.* Of or pertaining to a maximum, that is a maximum. M19.

Z. TOMIN It was a game requiring maximum concentration. maximum price: that may not by law etc. be exceeded.

**maxixe** /maˈkiːksə/ n. E20. [Origin unkn.] A kind of ballroom dance in common time, first introduced in England in 1917.

**maxwixe** /ˈmaksˈwɪks, ˈmaˈ'ʃiːʃ/ n. E20. [Port.] A dance for couples, of Brazilian origin, resembling the polka and the local tango.

**Maxwell** /ˈmakswel/ n. L19. [James Clerk *Maxwell* (1831–79), Sc. physicist.] *Physics*. 1 Used in *genit.* and *attrib.* to designate concepts originated by Maxwell. L19. 2 (m-.) A unit of magnetic flux in the cgs system, equal to the flux through an area of one square centimetre normal to a uniform induction of one gauss, and equivalent to 10⁻⁸ weber. E20.

1 *Maxwell('s) demons* a device (or imaginary being) conceived as allowing only fast-moving molecules to pass through a hole in one direction and only slow-moving ones in the other direction, so that if the hole is in a partition dividing a gas-filled vessel into two parts, one side becomes warmer and the other cooler, in violation of the second law of thermodynamics. *Maxwell('s) distribution* (a formula describing) the distribution of molecular velocities predicted by Maxwell's law, the number with a velocity between v and v+dv being proportional to exp (−½mv²/kT)² dv (where m is the mass of a molecule, k is Boltzmann's constant, and T is the absolute temperature). *Maxwell('s) equations* each of a set of four linear partial differential equations which summarize the classical properties of the electromagnetic field and relate space and time derivatives of the electric and

SYN 00103321

**minimum** /ˈmɪnɪməm/ *n.* & *a.* M17. [L. use of neut. of *minimus*: see MINIM n. & a.] A n. Pl. **minima** /ˈmɪnəmə/. 1 The smallest portion into which matter is divisible; an atom. Also, the hypothetical smallest possible portion of time or space. M17–M18. 2 The smallest amount or quantity possible, usual, attainable, etc. L17. 3 *Math.* The least value which a variable or a function may have; the smallest element in a set; a point at which a continuously varying quantity ceases to decrease and begins to increase; the value of a quantity at such a point. M18. 4 The lowest amount of a varying quantity (e.g. temperature, pressure, sunspot activity, etc.) attained or recorded within a particular period. E19.

*Comb.*: **minimum thermometer**: which records the lowest temperature attained since it was last set.

B *adj.* That is a minimum; that is the lowest possible, usual, attainable, etc. E19.

*Special collocations*: **minimum pay** from Ling. – MINIMAL *free form*. **minimum lending rate** *Econ.* the minimum percentage at which a central bank will discount bills (abolished in Britain in 1981).

**minimus** /ˈmɪnɪməs/ *n.* & *a.* L16. [L: see MINIM.] A *n.* Pl. -**mi** /-maɪ/. A very small or insignificant creature. L16. B *adj.* Designating the youngest of several pupils with the same surname or the last to enter a school. (Appended to a surname and used esp. in public schools.) Cf. MINOR *a.* 1b. L18.
¶See also GLUTEUS *minimus*.

**mining** /ˈmaɪnɪŋ/ *vbl. n.* E16. [f. MINE v. + -ING¹.] The action of MINE v.; esp. the art or industry of extracting metals, coal, etc., from a mine.
*coal-mining, gold-mining, hydraulic mining, etc.*
*Comb.*: **mining-hole** a hole bored to receive a blasting charge in mining; **mining town**: chiefly inhabited by miners.

**minikin** /ˈmɪnɪkɪn/ *ppl a.* M16. [f. MINE v. + -ING¹.] That mines.

**minion** /ˈmɪnjən/ *n.* & *a.* E16. [Fr. *mignon* rept. OFr. *mignon*: cf. MIGNON.] A *n.* 1 a A lover; (chiefly *derog.*) a mistress. Formerly also as a form of address. Now *rare* or *obs.* E16. b A favourite of a monarch, prince, or other powerful person; *derog.* a servile agent, a slave. Now also, a follower, an attendant, an assistant, etc. E16. c A favourite child, servant, animal, etc. Also as a form of address. Now *derog.* E16. †2 A small kind of ordnance. M16–L19. 3 A size of type between nonpareil and brevier. M17. †4 A kind of peach. Also *more* fully *minion peach*. L17–M18.
B *adj.* 1 Dainty, elegant, fine, pretty, neat. Now *rare*. E16. 2 Dearly loved, favourite, pet. Now *rare*. L18.
*Special collocations*: †**minion peach** = sense A.4 above.

**minion** /ˈmɪnjən/ *n.* = MINIUM. E17. [Fr. f. L. MINIUM.] †1 = MINIUM. E–M17. 2 Calcined iron ore used in cement or mortar. L18.

**miniscule** *n.* & *a.* see MINUSCULE.

**minish** /ˈmɪnɪʃ/ *v.* arch. ME. [OFr. *menu(i)sier*, ult. f. L. MINUTIAL: cf. MINCE v. & n.] 1 *v.t.* 1 = DIMINISH 1, 2. ME. b Break up *into* (parts etc.). *rare* LME. 2 Disparage, belittle. *rare* LME. 3 Take away, remove. L15, 11 *v.i.* 4 = DIMINISH 6. ME. †5 Take something away. LME–E16.

**minister** /ˈmɪnɪstə/ *n.* ME. [(O)Fr. *ministre* f. L. *minister*, f. *minus* less, adv. corresp. to *minor* MINOR *a.*, parallel in formation to correl. *magister* MASTER *n.¹*] 1 a A person having the authority or as an agent of another; *spec.* †(a) a law officer; †(b) a subordinate officer, an underling. Now *rare*. ME. b A person or thing employed or used to achieve a purpose or intention; convey a gift, etc. Foll. *by of*. Now *rare* exc. as passing into sense 1. LME. 2 *Eccl.* a A person, *esp.* an ordained one, with a certain liturgical ministry or function; a member of the

clergy, *esp.* in a Protestant Church, responsible for leading or coordinating preaching, public worship, and pastoral care in a particular church, chapel, community, etc.; a pastor. ME. b A functionary or official of a religion other than Christianity. Long *rare*. LME. c *RC Ch.* (The title of) the superior of certain religious orders. Also *minister general*. LME. 3† n A servant, an attendant. LME–L18. b A person who ministers to the wants of another. *arch.* E19. 4 *Polit.* (Also *Mr-*.) a A person appointed to act for a head of state etc. in a particular government department; a person in charge of a government department; a Secretary of State. E17. b A diplomatic agent officially representing a State or sovereign in a foreign country, *esp.* one ranking below an ambassador. E18. 5 A minister have *post* E16. MORE *n.* & *a.* US. M19.

In B. Joseph The community, of which the magistrate is only the minister. P. P. LINTON The Angels are ministers of the Divine Will. Sir GEO. ELIOT Something between the Catholic priest and the dissenting minister. L. M. MONTGOMERY That's the way the ministers say it in church. R. A. KNOX You will want human ministers to dispense the sacraments. *minister of religion* (esp. in official use) a member of the clergy of any denomination. 6a M. Z. G. DUFF The King... immediately dismissed his Ministers. *Daily Mirror* As a Cabinet meeting some Ministers... complained that the Chancellor had put it all wrong. *Foreign Minister* see FOREIGN. *Minister of State* a minister in the British Government, *esp.* one holding a rank below that of a head of department. *Minister of the Crown* a minister or head of a department in the British Government. *minister without Portfolio* a minister in the British Government, with Cabinet rank but not in charge of a specific department. *minister provident* see PREMIER *a.* 1. *Prime Minister* see PRIME *a.*

**ministership** *n.* the office or position of a minister M16. †**ministerial** *a.* (*rare*) pertaining to a minister or agent E17–M19.

**minister** /ˈmɪnɪstə/ *v.* ME. [(O)Fr. *ministrer* f. L. *ministrare*, f. *minister*: see prec.] 1 *v.i.* *Chr. Ch.* Serve or officiate at a service; act as a minister. ME. 2 *v.i.* Serve, esp. at table; attend to or to the needs of another; assist, be useful, (to a person, cause, etc.); be conducive or contribute *to* something. LME. 3 *v.t.* Provide, supply, impart, (something necessary or helpful). Formerly also, administer (justice, a sacrament, etc.). *arch.* LME.
2 **ministering angel** a kind-hearted person, *esp.* a woman, who nurses or comforts others. S. A. P. STANLEY The story... was able to minister true consolation.

**ministerial** /mɪnɪˈstɪərɪəl/ *a.* & *n.* M16. [Fr. *ministériel* or late L. *ministerialis*, f. L. *ministerium* MINISTRY, but *app.* interpreted as deriv. of *minister*: see -AL.] A *adj.* 1 Pertaining to the office, function, or character of a minister of religion. LME. 2 Pertaining to or entrusted with the execution of the law or the commands of a superior. L16. 3 Subsidiary or instrumental in achieving a purpose etc. E17. 4 Of or pertaining to a Minister of State or a government department; supporting the Government against the Opposition. M17.
3 De QUINCEY My very admit acts of style and ceremonial composition as the ministerial part of rhetoric. 4 H. MARTINEAU Parliament was to be dissolved on the first ministerial reverse.
B *n.* *Hist.* An executive household officer under the feudal system. E19.

**ministerialism** a support for the Government M19. **ministerialist** *n.* a supporter of the Government L18. **ministerially** *adv.* in the manner or capacity of a minister M17.

**ministrable** /ˈmɪnɪstrəb(ə)l/ *a.* & *n.* E20. [Fr., f. *se ministrer* v.: see -ABLE.] *Polit.* (A person who is) likely or expected to become a minister.

**ministrant** /ˈmɪnɪstr(ə)nt/ *a.* & *n.* M16. [L. *ministrant-* pres. ppl stem of *ministrare*: see MINISTER v. & n.] A *adj.* That ministers. M16. B *n.* A person who ministers. E19.

**ministrate** /ˈmɪnɪstreɪt/ *v.t.* Long *rare*. L15. [L. *ministrat-*: see next, -ATE³.] Administer.

**ministration** /mɪnɪˈstreɪʃ(ə)n/ *n.* ME. [OFr. or L. *ministratio*-, f. L. *ministrat-* pa. ppl stem of *ministrare* MINISTER v.: see -ATION.] 1 The action

of an act of serving or ministering, *esp.* in religious matters; *in pl.*, the services of a minister of religion etc. ME. †2 The action of administering a sacrament, justice, an estate, etc.; administration. ME–L16. 3 Agency, instrumentality. LME–M16. 4 The action of supplying, providing, or giving something. Foll. *by of*. L15.

**ministrative** /ˈmɪnɪstrətɪv/ *a.* M19. [App. f. MINISTER v. + -ATIVE.] Pertaining to or of the nature of ministration; affording service or assistance.

**ministrator** /ˈmɪnɪstreɪtə/ *n.* *rare*. LME. [L., f. *ministrare*: see MINISTER v., -ATOR.] A person who ministers or administers. Formerly also, the executor of a will.

**ministress** /ˈmɪnɪstrɪs/ *n.* LME. [f. MINISTER n. + -ESS¹.] A person who ministers or serves.

**ministress** /ˈmɪnɪstrɪs/ *n.* L15. [f. MINISTER n. + -ESS¹.] A female minister. *Chiefly fig.*
M. ARNOLD Beauty sent from heaven, The lovely ministress of truth and good.

**minivet** /ˈmɪnɪvet/ *n.* M19. [Origin uncert.] Any of various brightly coloured cuckoo shrikes of the genus *Pericrocotus*, of tropical Asia.

**mink** /mɪŋk/ *n.* & *a.* LME. [Origin uncertain: rel. to Sw. *menk, mänk*: cf. LG *mink* otter.] A n. 1 The skin or dark brown fur of the mink (see sense 2 below); a garment made of this fur. LME. 2 Either of two semi-aquatic mammals of the genus *Mustela* that resemble stoats, *M. vison*, native to N. America and farmed for its fur, and the European *M. lutreola*. E17. 3 A dark brown colour. M20. B *attrib.* or as *adj.* Made of the fur of the mink. Also, of the colour mink. E20.

**minke** /ˈmɪŋkə, -kiː/ *n.* M20. [Norw., perh. f. *Meincke* a 19th-cent. whaling gunner, who mistook it for the larger blue whale.] In full *minke whale*. A small baleen whale, *Balaenoptera acutorostrata*. Also called *piked whale, lesser rorqual*.

Case 5:06-cv-01839-PVT    Document 72-3    Filed 02/12/2007    Page 5 of 6

SYN 00103322

**operational**

**operationalise** *v.* var. of OPERATIONALIZE.

**operationalism** /ɒpəˈreɪʃ(ə)n(ə)lɪz(ə)m/ *n.* M20. [f. OPERATIONAL + -ISM.] *Philos.* A form of positivism which defines scientific concepts in terms of the operations used to determine or prove them.

**operationalist** *n. & a.* (*a*) *n.* an adherent of operationalism; (*b*) *adj.* of or pertaining to operationalism or operationalists. M20.

**operationalize** /ɒpəˈreɪʃ(ə)n(ə)laɪz/ *v.t.* Also **-ise.** M20. [f. OPERATIONAL + -IZE.] Express in operational terms.

**operationalization** *n.* L20. **operationalization** *n.* M20.

**operationism** /ɒpəˈreɪʃ(ə)nɪz(ə)m/ *n.* M20. [f. OPERATION + -ISM.] *Philos.* = OPERATIONALISM.

**operationist** *n. & a.* var. of OPERATIVE.

**operative** /ˈɒp(ə)rətɪv/ *a. & n.* LME. [Late L. *operativus*, f. as OPERATE: see -IVE.] *A adj.* 1 Being in operation or force; exerting force or

**ophite**

**operculum** /əˈpɜːkjʊləm/ *n.* Pl. -la / -lə/...

**operose** /ˈɒpərəʊs/ *a.* M20...

**ophidian** /əˈfɪdɪən/ *a. & n.* E19...

**ophite** /ˈɒfaɪt/ *n.* M17...

# EXHIBIT 3

# McGraw-Hill
# DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS
## Third Edition

**SYBIL P. PARKER**    Editor in Chief

McGRAW-HILL BOOK COMPANY

New York    St. Louis    San Francisco

Auckland    Bogotá    Guatemala    Hamburg
Johannesburg    Lisbon    London    Madrid    Mexico
Montreal    New Delhi    Panama    Paris    San Juan
São Paulo    Singapore    Sydney    Tokyo    Toronto

SYN 00103308

Included in this Dictionary are definitions which have been published previously in the following works: P. B. Jordain, *Condensed Computer Encyclopedia*, Copyright © 1969 by McGraw-Hill, Inc. All rights reserved. J. Markus, *Electronics and Nucleonics Dictionary*, 4th ed., Copyright © 1960, 1966, 1978 by McGraw-Hill, Inc. All rights reserved. J. Quick, *Artists' and Illustrators' Encyclopedia*, Copyright © 1969 by McGraw-Hill, Inc. All rights reserved. *Blakiston's Gould Medical Dictionary*, 3d ed., Copyright © 1956, 1972 by McGraw-Hill, Inc. All rights reserved. T. Baumeister and L. S. Marks, eds., *Standard Handbook for Mechanical Engineers*, 7th ed., Copyright © 1958, 1967 by McGraw-Hill, Inc. All rights reserved.

In addition, material has been drawn from the following references: R. E. Huschke, *Glossary of Meteorology*, American Meteorological Society, 1959; *U.S. Air Force Glossary of Standardized Terms*, AF Manual 11–1, vol. 1, 1972; *Communications-Electronics Terminology*, AF Manual 11-1, vol. 3, 1970; W. H. Allen, ed., *Dictionary of Technical Terms for Aerospace Use*, 1st ed., National Aeronautics and Space Administration, 1965; J. M. Gilliland, *Solar-Terrestrial Physics: A Glossary of Terms and Abbreviations*, Royal Aircraft Establishment Technical Report 67158, 1967; *Glossary of Air Traffic Control Terms*, Federal Aviation Agency; *A Glossary of Range Terminology*, White Sands Missile Range, New Mexico, National Bureau of Standards, AD 467–424; *A DOD Glossary of Mapping, Charting and Geodetic Terms*, 1st ed., Department of Defense, 1967; P. W. Thrush, comp. and ed., *A Dictionary of Mining, Mineral, and Related Terms*, Bureau of Mines, 1968; *Nuclear Terms: A Glossary*, 2d ed., Atomic Energy Commission; F. Casey, ed., *Compilation of Terms in Information Sciences Technology*, Federal Council for Science and Technology, 1970; *Glossary of Stinfo Terminology*, Office of Aerospace Research, U.S. Air Force, 1963; *Naval Dictionary of Electronic, Technical, and Imperative Terms*, Bureau of Naval Personnel, 1962; *ADP Glossary*, Department of the Navy, NAVSO P-3097.

McGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS,
Third Edition
Copyright © 1984, 1978, 1976, 1974 by McGraw-Hill, Inc. All rights reserved. Printed in the United States of America. Except as permitted under the United States Copyright Act of 1976, no part of this publication may be reproduced or distributed in any form or by any means, or stored in a data base or retrieval system, without the prior written permission of the publisher. Philippines Copyright 1984, 1978, 1976, 1974 by McGraw-Hill, Inc.

34567890    DODO    891098765

ISBN 0-07-045269-5

**Library of Congress Cataloging in Publication Data**

McGraw-Hill dictionary of scientific and technical terms.

1. Science—Dictionaries. 2. Technology—Dictionaries. I. Parker, Sybil P.
[DNLM: 1. Science—Dictionaries. 2. Technology—Dictionaries. Q 123 M147]
Q123.M34        1983        503'.21        83-11502
ISBN 0-07-045269-5

SYN 00103309

**counter/frequency meter** [ENG] An instrument that contains a frequency standard and can be used to measure the number of events or the number of cycles of a periodic quantity that occurs in a specified time, or the time between two events.

**counterpoise** *See gegenschein.*

**counterimmunoelectrophoresis** [IMMUNOL] Immunoelectrophoresis which uses two wells of application, one above the other, along the electrical axis—the anodal well filled with antibody and the cathodal with a negatively charged antigen; electrophoresis results in the antigen and antibody migrating cathodally and anodally, respectively, and a line of precipitation appears where the two meet.

**counterlath** [BUILD] A strip placed between two rafters to support crosswise laths. 2. A lath placed between a timber and a sheet lath. 3. A lath nailed at a more or less random spacing between two precisely spaced laths. 4. A lath put on one side of a partition after the other side has been finished.

**countermeasures** [ORD] Devices and techniques intended to impair the operational effectiveness of enemy activity.

**countermeasures set** [ELECTR] A complete electronic set specifically designed to provide facilities for intercepting and analyzing electromagnetic energy propagated by transmitter and to provide a source of radio-frequency signals which deprive the enemy of effective use of his electronic equipment.

**counterpoise** [ELEC] A system of wires or other conductors that is elevated above and insulated from the ground to form a lower system of conductors for an antenna. Also known as antenna counterpoise. [MECH ENG] *See counterweight.*

**counterpoise gun carriage** [ORD] The mechanism that counterbalances the weight of the breechblock of a large gun.

**counterradiation** [GEOPHYS] The downward flux of atmospheric radiation passing through a given level surface, usually taken as the earth's surface. Also known as back radiation.

**counterrecoil** [ORD] Forward movement of a gun returning to firing position after recoil.

**countershaft** [MECH ENG] A secondary shaft that is driven by a main shaft and from which power is supplied to a machine part.

**countersink** [DES ENG] The tapered and relieved cutting portion in a twist drill, situated between the pilot drill and the body.

**countersinking** [MECH ENG] Drilling operation to form a flaring depression around the rim of a hole.

**counterstain** [BIOL] A second stain applied to a biological specimen to color elements other than those demonstrated by the principal stain.

**counter sun** *See anthelion.*

**countertransference** [PSYCH] The conscious or unconscious emotional reaction of the therapist to the patient, which may interfere with psychotherapy.

**counter tube** [ELECTR] An electron tube having one signal-input electrode and 10 or more output electrodes, with each input pulse serving to transfer conduction sequentially to the next output electrode; beam-switching tubes and cold-cathode counter tubes are examples. [NUCLEO] An electron tube that converts an incident particle or burst of incident radiation into a discrete electric pulse, generally by utilizing the current flow through a gas that is ionized by the radiation; used in radiation counters. Also known as radiation counter tube.

**counterweight** [MECH ENG] 1. A device which counterbalances the original load in elevators and skip and mine hoists, going up when the load goes down, so that the engine must only drive against the unbalanced load and overcome friction. 2. Any weight placed on a mechanism which is out of balance so as to maintain static equilibrium. Also known as counterbalance; counterpoise.

**counting chamber** [MICROBIO] An accurately dimensioned chamber in a microslide which can hold a specific volume of fluid and which is usually ruled into units to facilitate the counting under the microscope of cells, bacteria, or other structures in the fluid.

**counting circuit** [ELECTR] A circuit that counts pulses by frequency-dividing techniques, by charging a capacitor in such a way as to produce a voltage proportional to the pulse count, or by other means. Also known as counter circuit.

**counting-down circuit** *See frequency divider.*

**counting glass** [TEXT] A magnifying glass for counting the number of threads per inch in textile fabrics.

**counting rate** [PHYS] The average rate of occurrence of events as observed by means of a counting system.

**counting rate meter** [NUCLEO] An instrument that indicates the time rate of occurrence of input pulses to a radiation counter, averaged over a time interval. Also known as rate meter.

**counting rate–voltage characteristic** *See plateau characteristic.*

**country rock** [GEOL] 1. Rock that surrounds and is penetrated by mineral veins. 2. Rock that surrounds and is invaded by an igneous intrusion.

**count system** *See numerical system.*

**couplant** [ENG] A substance such as water, oil, grease, or paste used to avoid the retarding of sound transmission by air between the transducer and the test piece during ultrasonic examination.

**couple** [CHEM] Joining of two molecules. [ELEC] To connect two circuits so signals are transferred from one to the other. [ELECTR] Two metals placed in contact, as in a thermocouple. [ENG] To connect with a coupling, such as of two belts or two pipes. [MECH] A system of two parallel forces of equal magnitude and opposite sense.

**coupled antenna** [ELECTROMAG] An antenna electromagnetically coupled to another.

**coupled circuits** [ELEC] Two or more electric circuits so arranged that energy can transfer electrically or magnetically from one to another.

**coupled column** [ARCH] One of two columns used as a grouped pair.

**coupled engine** [MECH ENG] A locomotive engine having the driving wheels connected by a rod.

**coupled field vectors** [ELECTROMAG] The electric- and magnetic-field vectors, which depend upon each other according to Maxwell's field equations.

**coupled harmonic oscillators** [PHYS] Linear oscillators with an interaction, often also linear or weak.

**coupled modes** [ACOUS] Modes of acoustic transmission along a duct having a discontinuity, so that the reflected and transmitted waves contain modes other than the incident ones.

**coupled oscillators** [ELECTROMAG] A set of alternating-current circuits which interact with each other, for example, through mutual inductances or capacitances. [MECH] A set of particles subject to elastic restoring forces and also to elastic interactions with each other.

**coupled reaction** [CHEM] A reaction which involves two oxidants with a single reductant, where one reaction taken alone would be thermodynamically unfavorable.

**coupled systems** [PHYS] Mechanical, electrical, or other systems which are connected in such a way that they interact and exchange energy with each other.

**coupled transistors** [ELECTR] Transistors connected in series by transformers or resistance-capacitance networks, in much the same manner as electron tubes.

**coupled wave** [FL MECH] A surface wave which is being continuously generated by another wave having the same phase velocity. Also known as C wave.

**coupler** [ELEC] A component used to transfer energy from one circuit to another. [ELECTROMAG] 1. A passage which joins two cavities or waveguides, allowing them to exchange energy. 2. A passage which joins the ends of two waveguides, whose cross section changes continuously from that of one to that of the other. [ENG] A device that connects two railroad cars. [NAV] The portion of a navigation system that receives signals of one type from a sensor and transmits signals of a different type to another.

**coupling** [ELEC] 1. A mutual relation between two circuits that permits energy transfer from one to another, through a wire, resistor, transformer, capacitor, or other device. 2. A hardware device used to make a temporary connection between two wires. [ENG] Any device that serves to connect the ends of adjacent parts, as railroad cars. [MECH ENG] The mechanical fastening that connects shafts together for power transmission. Also known as shaft coupling.

**coupling aperture** [ELECTROMAG] An aperture in the wall of a waveguide or cavity resonator, designed to transfer energy to or from an external circuit. Also known as coupling hole; coupling slot.

**coupling capacitor** [ELECTR] A capacitor used to block the flow of direct current while allowing alternating or signal current to pass; widely used for joining two circuits or stages. Also known as blocking capacitor; stopping capacitor.

**coupling coefficient** [ELECTR] The ratio of the maximum change in energy of an electron traversing an interaction space to

# EXHIBIT 4

MODERN
DICTIONARY
of

# ELECTRONICS

Rudolf F. Graf

## SIXTH EDITION



HOWARD W. SAMS & COMPANY
A Division of Macmillan, Inc.
4300 West 62nd Street
Indianapolis, Indiana 46268 USA

SYN 00103311

© 1962, 1963, 1968, 1972, 1977, and 1984
by Rudolf F. Graf

SIXTH EDITION
FOURTH PRINTING—1989

All rights reserved. No part of this book shall be
reproduced, stored in a retrieval system, or transmitted by
any means, electronic, mechanical, photocopying, record-
ing, or otherwise, without written permission from the pub-
lisher. No patent liability is assumed with respect to the use
of the information contained herein. While every precaution
has been taken in the preparation of this book, the pub-
lisher assumes no responsibility for errors or omissions.
Neither is any liability assumed for damages resulting from
the use of the information contained herein.

International Standard Book Number: 0-672-22041-5

Library of Congress Catalog Card Number: 83-51223

Edited by: *Charlie Buffington* and *Jack Davis*
Illustrated by: *T.R. Emrick*

*Printed in the United States of America.*

adjustment of the stylus pressure to the desired value.

**counter circuit**—A circuit which receives uniform pulses representing units to be counted and produces a voltage in proportion to their frequency.

**counterclockwise polarized wave**—*See* Left-Handed Polarized Wave.

**counter-countermeasures**—Use of anti-jamming techniques and circuits designed to decrease the effectiveness of electronic countermeasure activities on electronic equipment.

**counterelectromotive cell**—A cell of practically no ampere-hour capacity used to oppose the line voltage.

**counterelectromotive force**—Abbreviated counter emf. A voltage developed in an inductive circuit by an alternating or pulsating current. The polarity of this voltage is at every instant opposite that of the applied voltage.

**countermeasures**—That part of military science dealing with the employment of devices and/or techniques intended to impair the operational effectiveness of enemy activity.

**counterpoise**—A system of wires or other conductors, elevated above and insulated from ground, forming a lower system of conductors of an antenna. Used to capacitively couple a radio transmitter to the ground when the ground resistance is high.



*Counterpoise.*

**counters (Geiger and scintillation)**—Instruments used to detect ionizing radiations having very short wavelength (about one-thousandth the wavelength of visible light). Natural sources of this radiation are radium, uranium isotopes, cosmic rays and ores in which these elements are present; man-contrived sources are the atomic bomb, nuclear reactors used for generating electric power, high-voltage radar crt's and X-ray machines.

**counter tube**—Also called radiation counter tube. An electron tube that converts an incident particle or burst of incident radiation into a discrete electric pulse. This is generally done by utilizing the current flow through a gas that is ionized by the radiation.

**counting efficiency**—In a scintillation counter, the ratio, under specified conditions, of the average number of photons or particles of ionizing radiation that produce counts to the average number of photons or particles incident on the sensitive area.

**counting-rate meter**—A device for indicating the time rate of occurrence of input pulses averaged over a time interval.

**counting-type frequency meter**—An instrument for measuring frequency. Its operation depends on the use of pulse-counting techniques to indicate the number and/or rate of recurring electrical signals applied to its input circuits.

**counts**—Clicking noises made by a radiation-detecting instrument in the presence of radiation. *See* Scintillation Counter.

**counts per turn**—The total number of code positions per 360° of encoder shaft rotation.

**couple**—Two or more dissimilar metals or alloys in electrical contact with each other that act as the electrodes of an electrolytic cell when they are immersed in an electrolyte.

**coupled circuits**—Any network containing only resistors, inductors (self and mutual), and capacitors, and having more than one independent mesh.

**coupled modes**—In a waveguide, such as an optical fiber, coaxial cable or metal pipe, coexisting propagation modes whose fields are interrelated and whose energies are mutually interchanged.

**coupler**—1. A passive device that divides an antenna signal to feed two or more receivers, or combines two or more antenna signals to feed a single down lead. A coupler provides some internal isolation and maintains an impedance match between the antenna and receiver. 2. A component that interconnects a number of optical waveguides (fibers) and provides an inherently bidirectional system by mixing and splitting all signals within the component.

**coupling**—The association or mutual relationship of two or more circuits or systems in such a way that power may be transferred from one to another.

**coupling angle**—In connection with synchronous motors, the mechanical-degree relationship between the rotor and the rotating field.

**coupling aperture**—Also called coupling hole or coupling slot. An aperture, in the wall of a waveguide or cavity resonator, designed to transfer energy to or from an external circuit.

**coupling capacitor**—1. Any capacitor used to couple two circuits together. Coupling is accomplished by means of the capacitive reactance common to both circuits. 2. Allows alternating currents to pass but blocks direct currents. 3. A capacitor intended for the coupling of two or more ac circuits with different dc levels.

**coupling coefficient**—Also called coeffi-



SYN 00103313

# EXHIBIT 5

# 2nd AMENDED JOINT CLAIM CONSTRUCTION CHART

| Claim Terms | Synaptics Claim Construction Disclosure | Elantech Claim Construction Disclosure |
|---|---|---|
| 1. "tap gesture" ('931/'591) | "a quick tap of the finger on the pad, of short duration and involving little or no X or Y finger motion, that is presented to the host as a brief click of the mouse button" | |
| 2. "X and Y position information" ('931/'591) | "information about the horizontal and vertical positioning of an object on a touch sensor" | "two-dimensional location on a touch-sensor pad" |
| 3. "initiating a first signal to the host indicating the occurrence of said gesture" ('591) | "initiating transmission of a first set of data to a host that indicates that a tap gesture has occurred on the touch-sensor pad" | "outputting to the host a high state of a signal that has a low and a high state, and the high signal state represents that a double tap gesture will potentially occur on the touch-sensor pad" |
| 4. "terminating said first signal" ('591) | "terminating the previous signal" | "changing the state of the signal from the high signal state to the low signal state" |
| 5. "sending a second signal to said host indicating said second gesture" ('591) | "sending a second set of data to a host that indicates that a second tap gesture has occurred on the touch-sensor pad" | "changing the state of the signal from a low signal state to a high signal state for a predetermined period of time, and sending the high signal state to the host which interprets the termination of the first signal and the existence of a second high signal state as being a double tap gesture" This claim construction presumes that "said second gesture" should have read "said gesture" or "said double tap gesture." Absent such a presumption, no claim construction can be made because there is no antecedent basis for "said second gesture." |
| 6. "initiating a drag gesture signal to the host indicating the occurrence of a gesture" ('591) | "initiating transmission of a first set of data to a host that indicates that a gesture has occurred on the touch-sensor pad" | "outputting to a host a high state of a signal that has a low and high state, and the high signal state represents that a drag gesture will potentially occur on the touch-sensor pad" |
| 7. "maintaining said drag gesture signal" ('591) | "to continue, retain, or repeat the drag gesture signal" | "continuously outputting the high signal state" |
| 8. "repeatedly sending X and Y position information to said host for the duration of said second presence" ('591) | "after the second presence is detected, repeatedly sending information about the horizontal and vertical positioning of an object on a touch sensor to a host while the second presence continues" | "continuously sending the current two-dimensional location of the object on the touch-sensor pad to the host as long as the object continues to be in proximity to the touch-sensor pad" |
| 9. "initiating a signal to the host indicating the occurrence of said tap gesture" ('931) | "initiating the transmission of a set of data to a host that indicates that a tap gesture has occurred on the touch-sensor pad" | "outputting to the host a high state of a signal that has a low and a high state, where the high signal state represents that a tap gesture occurred on the touch-sensor pad" |
| 10. "maintaining said signal for a predetermined period of time" ('931) | "to continue, retain, or repeat the signal for a period of time that was determined before" | "continuously outputting the high state of the signal only for a predetermined time period (i.e., changing the signal state from high to low at the end of the predetermined time period)" |
| 11. "detecting in which of at least one corner of the touch-sensor pad said tap gesture occurred" ('931) | "detecting that a tap gesture has occurred in at least one corner, the identity of which is distinguished in some way from other corners of the touch-sensor pad" | "after detecting the occurrence of the tap gesture, separately detecting in which of at least one corner of the touch-sensor pad the tap gesture occurred" |

1

# 2nd AMENDED JOINT CLAIM CONSTRUCTION CHART

| 12. "data packet processor" ('052) | "hardware and/or program code, for example, software executed on a central processing unit, that examines data packets" | "software for processing data packets and sending messages" |
|---|---|---|
| 13. "incrementally move" ('411) | "to move in increments" | movement defined by the second component of Equations 12 and 13 in the '411 patent, namely, $S(X_{cur} - X_{center})$ and $S(Y_{cur} - Y_{center})$ |
| 14. "operative coupling" ('352) | "finger-induced electrical effect" ||
| 15(a) "scanning the touch sensor" | "measuring the traces in the touch sensor and assigning them to a sequence corresponding to their physical order on the touch sensor." | "examining information associated with the touch sensor" |
| 15(b) "means for scanning the touch sensor . . ." ('352) | 112 ¶6 Claimed Function<br>"scanning the touch sensor to (a) identify a first maxima in a signal corresponding to a first finger, (b) identify a minima following the first maxima, and (c) identify a second maxima in a signal corresponding to a second finger following said minima," as those terms are defined below ||
| | 112 ¶6 Corresponding Structures<br>analog multiplexor 45, capacitance measuring circuit 70, analog to digital converter 80, microcontroller 60 ||
| 16. "scanning the touch sensor to . . . identify a first maxima in a signal corresponding to a first finger" ('352) | "measuring the trace values of the touch sensor corresponding to a first finger and determining the point at which the measured values cease to increase and begin to decrease" | "identify a first peak value in a finger profile obtained from scanning the touch sensor" |
| 17. "scanning the touch sensor to . . . identify a minima following the first maxima" ('352t) | "measuring the trace values of the touch sensor following, in scan order, after the first maxima and determining the point at which the measured values cease to decrease and begin to increase" | "identify the lowest value in the finger profile that occurs after the first peak value, and before another peak value is identified" |
| 18. "scanning the touch sensor to . . . identify a second maxima in a signal corresponding to a second finger following said minima" ('352) | "measuring the trace values corresponding to a second finger following, in scan order, said minima and determining the point at which the measured values cease to decrease and begin to increase" | "after identifying the lowest value in the finger profile, identify a second peak value in the finger profile" |
| 19(a) "providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" ('352) | No further construction necessary since ordinary meaning is sufficient. ||
| 19(b) "means for providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" ('352) | 112 ¶6 Claimed Function<br>"providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" ||
| | 112 ¶6 Corresponding Structure<br><br>None | 112 ¶6 Corresponding Structure<br><br>microcontroller 60 |

# 2nd AMENDED JOINT CLAIM CONSTRUCTION CHART

pa-1117140

# EXHIBIT 6

IEEE Std 100-1996

# The IEEE Standard Dictionary of Electrical and Electronics Terms

## Sixth Edition

**Standards Coordinating Committee 10, Terms and Definitions**
**Jane Radatz, Chair**

This standard is one of a number of information technology dictionaries being developed by standards organizations accredited by the American National Standards Institute. This dictionary was developed under the sponsorship of voluntary standards organizations, using a consensus-based process.

LIBRARY

NOV 2 8 2000

MORRISON & FOERSTER LLP
Palo Alto, CA

ISBN 1-55937-833-6



SYN 00103297

**scaler, pulse (pulse techniques)** A device that produces an output signal whenever a prescribed number of input pulses has been received. It frequently includes indicating devices for interpolation. *See also:* pulse. (NPS) 175-1960w

**scale span (instrument)** The algebraic difference between the values of the actuating electrical quantity corresponding to the two ends of the scale. *See also:* instrument.
(EEC/PE) [119]

**scaling (A)** The formation at high temperatures of thick corrosion product layer(s) on a metal surface. **(B)** The deposition of water-insoluble constituents on a metal surface (as on the interior of water boilers). (IA) [59]

**scaling circuit (radiation counters)** A device that produces an output pulse whenever a prescribed number of input pulses has been received. *See also:* anticoincidence. (ED) [45]

**scalloping (navigation aid terms)** The irregularities in the field pattern of the ground facility due to unwanted reflections from obstructions or terrain features, exhibited in flight as cyclical variations in bearing error. *Synonym:* course scalloping.
(AE) 172-1983w

**scan (1) (general)** To examine sequentially part by part.
(C) [20], [85]

(2) **(oscillography)** The process of deflecting the electron beam. *See also:* graticule area; oscillograph; phosphor screen; uniform luminance area. (IM) [40]

(3) **(interrogation) (supervisory control, data acquisition, and automatic control)** The process by which a data acquisition system interrogates remote stations or points for data.
(PE/SWG/SUB) C37.1-1994, C37.100-1992

(4) **(data management)** To examine a set of items sequentially. (C) 610.5-1990

(5) The process by which a data acquisition system interrogates remote terminals or points for data.
(SUB) 999-1992

(6) A sampling process of observing attribute values at a specified point in time. (C/LM) 802.1F-1993

(7) To examine stored information sequentially, part by part.
(C) 610.10-1994

**scan angle** The angle between the direction of the maximum of the major lobe or a directional null and a reference direction. *Notes:* 1. The term beam angle applies to the case of a pencil beam antenna. 2. The reference boresight is usually chosen as the reference direction. *Synonym:* beam angle.
(AP) 145-1993

**scan conversion** The process of redefining an image from one that is composed of lines, points, and areas to one that is expressed in an array of pixels. (C) 610.6-1991

**scan converter** A device on which a display can be written in refresh line-drawing mode and read out in raster scan mode.
(C) 610.10-1994

**scan cycle (supervisory control, data acquisition, and automatic control)** The time in seconds required to obtain a collection of data (for example, all data from one remote, all data from all remotes, and all data of a particular type from all remotes).
(PE/SWG/SUB) C37.1-1994, C37.100-1992

**scan design** A design technique that introduces shift-register paths into digital electronic circuits and thereby improves their testability. (C/TT) 1149.1-1990

**scan function check** Accomplished when control function check has been performed with all remotes. A check of master and remote station equipment by exercising a predefined component or capability. (PE/SUB) C37.1-1994

**scan head** A head within a scanner that sweeps across the item being scanned and transmits the contents of that item to be processed by the scanner. (C) 610.10-1994

**scanner (1) (facsimile)** That part of the facsimile transmitter which systematically translates the densities of the subject copy into signal waveform. *See also:* scanning.
(COM) 168-1956w

(2) **(A)** A multiplexing arrangement that sequentially connects one channel to a number of channels. **(B)** An arrange-

ment that progressively examines a surface for information. *See also:* control system, feedback. (IA) [60], [69]

(3) **(test, measurement, and diagnostic equipment)** A device that sequentially samples a number of data points. *See also:* flying spot scanner; optical scanner; visual scanner.
(MIL) [2]

(4) **(computer graphics)** A graphical input device that examines a spatial pattern and generates analog or digital signals, which can be used as input to a computer system.
(C) 610.6-1991

(5) **(A)** A graphic input device that automatically digitizes images for input to a computer. *See also:* bar code scanner; magnetic ink scanner; optical scanner; scan head. **(B)** Any device that is capable of scanning. (C) 610.10-1994

**scanning (1) (navigation aids)** A programmed motion given to the major lobe of an antenna for the purpose of searching a larger angular region than can be covered with a single direction of the beam, or for measuring angular location of a target; also, the analogous process using range gates or frequency domain filters. *See also:* supervisory control.
(AE) 172-1983w, 686-1990w

(2) **(television)** The process of analyzing or synthesizing successively, according to a predetermined method, the light values of picture elements constituting a picture area.
(BT) 202-1954w

(3) **(facsimile)** The process of analyzing successively the densities of the subject copy according to the elements of a predetermined pattern. *Note:* The normal scanning is from left to right and top to bottom of the subject copy as when reading a page of print. Reverse direction is from right to left and top to bottom of the subject copy.
(COM) 168-1956w

(4) **(telephone switching systems)** The periodic examination of circuit states under common control.
(COM) 312-1977w

(5) **(of an antenna beam)** A repetitive motion given to the major lobe of an antenna. (AP) 145-1993

(6) The process of examining information in a systematic manner. (C) 610.10-1994

**scanning, high-velocity (electron tube)** The scanning of a target with electrons of such velocity that the secondary-emission rate is greater than unity. *See also:* television.
(ED) 161-1971w

**scanning line (television)** A single continuous narrow strip that is determined by the process of scanning. *Note:* In most television systems, the scanning lines that occur during the retrace intervals are blanked. The total number of scanning lines is numerically equal to the ratio of line frequency to frame frequency. (BT) 201-1979w

**scanning linearity (television)** A measure of the uniformity of scanning speed during the unblanked trace interval.
(BT) 201-1979w

**scanning line frequency** *See:* stroke speed.

**scanning line length (facsimile)** The total length of scanning line is equal to the spot speed divided by the scanning line frequency. *Note:* This is generally greater than the length of the available line. *See also:* scanning. (COM) 168-1956w

**scanning loss (1) (radar system employing a scanning antenna)** The reduction in sensitivity, usually expressed in decibels, due to scanning across a target, compared with that obtained when the beam is directed constantly at the target. *See also:* antenna. (AP) 145-1983s

(2) The reduction in sensitivity of a scanning radar due to motion of the beam between transmission and reception of the signal. *See also:* beamshape loss. (AE) 686-1990w

**scanning, low-velocity (electron tube)** The scanning of a target with electrons of velocity less than the minimum velocity to give a secondary-emission ratio of unity. *See also:* television.
(BT/ED) [34], [45], 161-1971w

**scanning speed (television)** The time rate of linear displacement of the scanning spot. (BT) 201-1979w

SYN 00103298

# EXHIBIT 7

# THE
# ILLUSTRATED
# DICTIONARY OF
# MICROCOMPUTERS
## THIRD EDITION

michael f. hordeski



TAB Professional and Reference Books

Division of TAB BOOKS
Blue Ridge Summit, PA



SYN 00103300

THIRD EDITION
SECOND PRINTING

© 1990 by TPR Books, an imprint of TAB BOOKS.
TAB BOOKS is a division of McGraw-Hill, Inc.

The TPR logo, consisting of the letters "TPR" within a large "T," is a registered
trademark of TAB BOOKS.

Printed in the United States of America. All rights reserved. The publisher takes no
responsibility for the use of any of the materials or methods described in this book,
nor for the products thereof.

Library of Congress Cataloging-in-Publication Data

Hordeski, Michael F.
     The illustrated dictionary of microcomputers / by Michael F.
  Hordeski. — 3rd ed.
       p.     cm.
     ISBN 0-8306-7368-7     ISBN 0-8306-3368-5 (pbk.)
     1. Microcomputers—Dictionaries.   I. Title.
TK7885.H67   1990
004.16'03—dc20                                          89-48453
                                                            CIP

TAB BOOKS offers software for sale. For information and a catalog, please contact
TAB Software Department, Blue Ridge Summit, PA 17294-0850.

Questions regarding the content of this book should be addressed to:

Reader Inquiry Branch
TAB BOOKS
Blue Ridge Summit, PA 17294-0850

Vice President & Editorial Director: Larry Hager
Book Editor: Pat Mulholland-McCarty
Production: Katherine G. Brown
Book Design: Jaclyn J. Boone

SYN 00103301

lored to the needs of the individual user and can also be utilized from remote locations by means of computers.

**saturated molecule** One in which each bond of every atom in the backbone of the molecule holds another atom.

**saturating integrator** A digital integrator modified so that the output increment is maximum negative, zero, or maximum positive, according to whether the value of the input is negative, zero, or positive. Same as an incremental integrator.

**saturation** 1. In an amplifier, a condition in which an increase in the input signal no longer produces a significant change in the output. 2. The condition of maximum signal-carrying ability in any medium.

**saturation current** The current that flows between the base and collector of a transistor when an increase in the emitter-to-base voltage causes no further increase in the collector current.

**saturation limiting** Limiting the maximum output of an active device by operating the device in the region of saturation. When the input signal increases, saturation occurs immediately and the output is held at approximately the value of saturation.

**saturation noise** 1. Extra bits or words that can be removed or ignored before the data is used without affecting the data represented. 2. Errors introduced into a system due to disturbances occurring when the signal-carrying medium is at saturation.

**saturation point** The point (in an amplifier) beyond which an increase in input signal magnitude produces no further increases in output signal magnitude. This is in contrast to the *cutoff point*, where usually negative-going signal inputs in excess of the cutoff-point value cause the amplifier to shut off momentarily. Linear amplifiers are operated in the relatively linear region between the two extremes.

**sawtooth** A triangular waveform consisting of a fairly linear voltage or current ramp of ascending value that returns abruptly to the original value.

**sawtooth generator** An oscillator-type circuit used to produce a saw-tooth waveform, usually at some specific frequency or within a specific frequency range.



Sawtooth generator

**sawtooth wave** A signal composed entirely of a recurring sawtooth. Also called *sawtooth waveform*.

**sawtooth waveform** A sawtooth wave such as the type used to establish the timebase in a cathode-ray oscilloscope.

**SBT** Abbreviation for *surface barrier transistor*.

**SC** Abbreviation for *shift control*.

**scalar** Having a value that may be plotted on a graduated scale.

**scalar product** The product of two quantities that itself has magnitude but no direction. In the example:

$$FORCE \times DISTANCE = WORK$$

two vector quantities produce the scalar product, work.

**scalar quantity** A quantity that has magnitude without direction, such as a real number.

**scale** 1. A range of values usually dictated by the computer word length or the routine being processed. 2. To change the units of a variable so that the quantity may be measured by a system whose limits are in a different range. Scaling can bring the values of a variable within the bounds required by register size or other factors. 3. Any value range that permits identification of any incremental value within that range, as a *temperature scale*.

**scale factor** A value used to convert the magnitude of a variable to a usable value in another range or to convert from one notation to another. Scale factors are often used to adjust the radix point so that the significant digits occupy specified positions in a word or register.

**scaler** 1. A unit that produces an output equal to the input multiplied by a constant. 2. A converter used at the input of a device (such as a frequency meter) to bring the quantity being measured to within the range of measurement of the instrument (a *frequency scaler*, for example).

**scale span** The algebraic difference between the values of the actuating electrical quantity that corresponds to the two ends of the scale of an instrument.

**scaling** 1. The changing of a quantity from one notation to another, or from one value range to another, using scale factors. 2. Refers to the uniform reduction of dimensions in integrated circuit fabrication.



The effect of scaling on dynamic MOS RAM speed

**scamp** Loose acronym for a *small cost-effective microprocessor*. Addresses are generated by four 16-bit pointer registers with processor timing generated on the chip.

**scan** 1. To examine sequentially using a part-by-part technique. 2. The successive trace-and-flyback operation required to produce a raster or image on a TV screen.

**scanner** A device that samples or interrogates the state of a process or processes, including files and physical conditions. It also may initiate action or cause another device to initiate action based upon the information obtained. A typical scanner might

SYN 00103305