Yitai Hu (SBN 248085) yhu@akingump.com
Sean DeBruine (SBN 168071) sdebruine@akingump.com
Hsin-Yi Feng (SBN 215152) cfeng@akingump.com
**AKIN GUMP STRAUSS HAUER & FELD LLP**
3000 El Camino Real
Two Palo Alto Square, Suite 400
Palo Alto, CA 94306
Telephone:     650-838-2000
Facsimile:     650-838-2001

Attorneys for Plaintiffs and Counterdefendant
ELANTECH DEVICES CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ELANTECH DEVICES CORPORATION,<br><br>              Plaintiff,<br><br>     v.<br><br>SYNAPTICS, INC.;<br>AVERATEC, INC.,<br><br>              Defendants. | Case No. 3:06-cv-01839 CRB<br><br>**ELANTECH DEVICES CORP.'S OPPOSITION CLAIM CONSTRUCTION BRIEF RE: SYNAPTICS' '052, '411, '591 AND '931 PATENTS** |

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................. 1

II. CONSTRUCTION OF THE ASSERTED SYNAPTICS PATENT CLAIMS .................... 1

    A. "Incrementally Move" ('411 Patent: Joint Claim Term 13) ....................... 1

    B. "Data Packet Processor" ('052 Patent: Joint Claim Term 12) .................. 4

    C. "X and Y position information" ('591/'931 Patents: Joint Claim Terms 2 and 8) ... 8

    D. The "Signaling" Steps ('591/'931 Patents: Joint Claim Terms 3-10) ...... 8

    E. "Double Tap Gesture" ('591 Patent: Joint Claim Term 5) ...................... 12

    F. Corner Tap ('931 Patent: Joint Claim Term 11) ...................................... 12

III. CONCLUSION .................................................................................................. 13

# TABLE OF AUTHORITIES

## CASES

*Autogiro Co. of Am. v. United States*,
    384 F.2d. 391, 396 (Ct. Cl. 1967) ...................................................................................... 13

*Bell Atl. Network Servs., Inc. v. Covad Comm. Group, Inc.*,
    262 F.3d 1258, 1273 (Fed. Cir. 2001) .............................................................................. 6, 10

*Combined Sys., Inc. v. Def. Tech. Corp. of Am. and Fed. Labs.*,
    350 F.3d 1207, 1211 (Fed. Cir. 2003) .................................................................................. 12

*Digital Biometrics Inc. v. Identix, Inc.*
    149 F.3d 1335, 1344 (Fed. Cir. 1998) .................................................................................... 7

*Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*
    93 F.3d 1572, 1582 (Fed. Cir. 1996) ...................................................................................... 2

*Interactive Gift Express, Inc. v. Compuserve Inc.*
    256 F.3d 1323, 1331 (Fed. Cir. 2001) .................................................................................. 12

*Kraft Foods, Inc. v. Int'l. Trading Co.*
    203 F.3d 1362, 1368 (Fed. Cir. 2000) ................................................................................ 3, 4

*Modine Mfg. Co., v. United States Int'l Trade Comm'n*
    75 F.3d 1545, 1551 (Fed. Cir. 1996) ...................................................................................... 6

*Phillips v. AWH Corp.*
    415 F.3d 1303, 1315 (Fed. Cir. 2005) ................................................................................ 1, 6

*Renishaw PLC v. Marposs Societa' Per Azioni*
    158 F.3d 1243, 1248 (Fed Cir. 1998) ................................................................................... 10

*Resonate Inc. v. Alteon Websytems, Inc.*
    338 F.3d 1360, 1365 (Fed. Cir. 2003) .................................................................................. 13

*Vitronics Corp. v. Conceptronic, Inc.*
    90 F.3d. 1576, 1582 (Fed. Cir. 1196) ..................................................................................... 9

*Wang Labs., Inc. v. America Online Inc.*
    197 F.3d 1377, 1383 (Fed. Cir. 1999) .................................................................................... 7

I. **INTRODUCTION**

For the following reasons, Plaintiff Elantech Devices, Inc. ("Elantech") opposes the claim construction positions set out by defendant Synaptics, Inc. ("Synaptics") in its Corrected Opening Claim Construction Brief ("*Syn. Br.*"). In the first place, Synaptics starts from the discredited notion that claim construction "begins and ends" with the "ordinary and customary meaning" of the claim terms alone. *Syn. Br.* at 1. As explained in Elantech's opening brief, the Federal Circuit has emphatically rejected Synaptics' approach. Rather than beginning and ending with the claim terms alone, the claim construction analysis requires a careful analysis of the patent has a whole, including the written description. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1315 (Fed. Cir. 2005) ("The claims, of course, do not stand alone. Rather, they are part of a 'fully integrated written instrument' consisting principally of a specification that concludes with the claims. For that reason, claims 'must be read in view of the specification, of which they are a part.'") (citations omitted). Synaptics then compounds its error by relying almost entirely on the opinion testimony of its hired expert, Dr. Wolfe. *Syn. Br., passim*. However, expert testimony may have a role in the claim construction process, such as explaining the technology at issue or to show that a particular term has a specific meaning to those skilled in the art. *Phillips*, 415 F.3d at 1318. Expert testimony in particular is a type of extrinsic evidence that should be viewed with caution, not least because it may be biased. *Id.* In any case, expert testimony may <u>not</u> be used to support a construction that is at odds with the patent itself. *Id.* As will be shown below, the positions taken by Synaptics and its expert are largely divorced from and not supported by the patents' specifications. Elantech's proposed constructions, on the other hand, are rooted in and consistent with the descriptions of the patents themselves.

II. **CONSTRUCTION OF THE ASSERTED SYNAPTICS PATENT CLAIMS**

A. **"Incrementally Move" ('411 Patent: Joint Claim Term 13)**

This term must be construed to mean "movement defined by the second component of Equations 12 and 13 in the '411 patent, namely, $S(X_{cur} - X_{center})$ and $S(Y_{cur} - Y_{center})$."

Claim 46 of the '411 patent refers to a method of moving a cursor on a display screen in response to two different types of signals generated in response to "motion of an object on a sensing plane" (e.g., finger motion on a touchpad). '411 patent at 63:16-47. In particular, the cursor must

1  simply "move" in response to a first signal, but must "*incrementally* move" in response to the second
2  signal. *Id.* By choosing to use these different terms to describe cursor movement, the patent
3  unmistakably indicates that the second cursor motion signals result in a particular type of movement.
4  It is unclear, however, how "movement" differs from "incremental movement" or how "incremental"
5  modifies "movement," particularly in the context of claim 46.

6        The construction proposed by Synaptics provides no more clarity. Rather, Synaptics' circular
7  definition would deprive the limitation "incrementally" of any meaning whatever. Synaptics proposed
8  that "incrementally move" means "move in increments." *Syn. Br.* at 3. That definition does nothing
9  more than reorder the words at issue; it provides no basis to determine how moving "in increments"
10  differs from simply moving. The dictionary definition of "increment' offered by Synaptics provides no
11  additional help. An increment, according to the dictionary definition chosen by Synaptics, is any
12  "increase in number, size, quantity or extent." *Id.* Thus, according to Synaptics to "incrementally
13  move" is to "move to any extent." In other words, anything that is not stationary is moving in
14  increments. Since anything that is not stationary is also simply moving, Synaptics' construction
15  provides no meaning for "incrementally." Because every claim element is material, and each
16  limitation must be given some meaning, a construction such as Synaptics' that essentially reads a
17  limitation out of the claim is erroneous. *Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*, 93
18  F.3d 1572, 1582 (Fed. Cir. 1996) (Patentee "invites us to read [a] limitation out of the claim. This we
19  cannot do.")

20        Fortunately, the specification of the '411 patent provides a clear path out of the circular maze
21  proposed by Synaptics. The '411 patent provides equations demonstrating how "<u>increments</u>" are
22  added to the $\Delta X$ and $\Delta Y$ events in order to arrive at the claimed incremental motion:

> As discussed above, when a finger is in the outer zone…<u>increments</u> are added to the ($\Delta X$, $\Delta Y$) events pursuant to Eqs. 12 and 13. Because <u>increments</u> corresponding to $S(X_{cur} - X_{center})$ and $S(Y_{cur} - Y_{center})$ are added in the X and Y directions, respectively, for the ($\Delta X$, $\Delta Y$) events…

25  '411 patent at 29:1-7. There is no other reference to an "increment" or any permutation of the word
26  "increment" anywhere else in the lengthy specification of the '411 patent. Thus, the patent supports
27  Elantech's definition as "movement defined by the second component of Equations 12 and 13."
28

1    Notwithstanding the deliberate selection of the "incrementally move" phrase in a claim that
2    also uses the word "move," Synaptics now asks the Court to rewrite the claims so that "incrementally
3    move" effectively takes on the same scope as "move." Synaptics asserts numerous incorrect and
4    misleading arguments in asking for this construction.
5    Synaptics alleges that there are other disclosed embodiments that can be substituted for the
6    increment defined by Equations 12 and 13, and therefore the claims cannot be limited to that
7    increment. *Syn. Br.* at 3-4. One alternative is alleged to be described on column 31, lines 1-38.
8    However, this text portion merely describes in more detail the mathematics associated with Equations
9    12 and 13, and actually confirms Elantech's proposed construction. Another alternative embodiment is
10   alleged to be described on column 32, lines 25-30 of the '411 patent. However, this embodiment
11   merely describes so-called "pure" edge motion wherein object motion does not affect cursor motion
12   and all cursor motion is dictated by the second (edge) cursor motion signals. Stated mathematically,
13   the first portion of Equations 12 and 13 become zero, but the second portion of Equations 12 and 13 is
14   still used. Thus, this allegedly alternate "incremental movement" is exactly the same as Elantech's
15   proposed claim construction.
16   Yet another alternative is alleged to be described on column 32, lines 30-48. In this
17   embodiment, as the finger enters the outer zone, the glide speed starts at <u>zero</u> and increases to some
18   reasonable limit as the finger reaches the edge of the pad. Since the glide speed starts at zero, there is
19   <u>no movement at all</u> as the finger enters the outer zone, and thus <u>no incremental movement</u>. That is,
20   zero cannot be an increment. Accordingly, by definition, this cannot be an alternative embodiment of
21   incremental movement. Also, this embodiment is not described in the '411 patent as being an
22   "incremental" movement.
23   Finally, Synaptics urges that the doctrine of claim differentiation somehow overcomes the
24   express definition in the '411 patent of incrementally move, because there are dependent claims which
25   explicitly recite Equations 12 and 13. The Court should reject this argument. Claim differentiation
26   merely states the presumption that each claim in a patent should have a different scope. *Kraft Foods,*
27   *Inc. v. Int'l. Trading Co.,* 203 F.3d 1362, 1368 (Fed. Cir. 2000). Thus, only if the construction of
28   "incrementally move" would cause claim 46 to be identical to another claim does the presumption

1  even arise. *Id.* Synaptics fails to show any that other claim would be identical to claim 46 if
2  "incrementally move" is properly construed as Elantech suggests.  None of the dependent claims
3  stemming from claim 46 is directed to Equations 12 and 13.  The other claims that Synaptics points to
4  differ in many respects from claim 46 without regard to the meaning of "incrementally move."  For
5  example, Synaptics points to claim 15, yet neither claim 15 nor claim 14 from which it depends even
6  mentions the concept of "incrementally move."  '411 patent at 57:30-58:31.  In fact, these claims do
7  not require any cursor movement at all.  This alone shows that the claims are different without regard
8  to the scope of the "incrementally move" limitation.  The other claims cited by Synaptics are also very
9  different in scope.  As such, Synaptics fails to show that the construction of this term would cause any
10 other claim to be identical to claim 46, and the presumption of claim differentiation does not even arise
11 here.
12      Moreover, the doctrine of claim differentiation is a guide to claim construction, not an absolute
13 rule.  As such, even if it applies, it cannot be used to broaden claims beyond their correct scope. *Kraft*
14 *Foods,* 203 F.3d at 1368.  The doctrine of claim differentiation cannot be used to trump the deliberate
15 wording selection that leads to the unmistakable conclusion that the patent drafter meant to claim
16 Equations 12 and 13 by the phrase, "incrementally move."  For these reasons the Court should adopt
17 the construction of "incrementally move" proposed by Elantech.
18      **B.     "Data Packet Processor" ('052 Patent: Joint Claim Term 12)**
19      The term "data packet processor" means "software for processing data packets and sending
20 messages."
21      The parties dispute the construction of the term "data packet processor" in Claim 14 of the '052
22 patent.  When this term is read in light of the language of the claim and the written description of the
23 '052 patent, there is only be one way to construe that term.  The '052 patent makes it clear that "data
24 packet processor" is software for processing data packets and sending messages.  Elantech's proposed
25 construction is consistent with the language of the claim and the written description, which solely
26 describes and enables the data packet processor of the invention as software code.  Synaptics' proposed
27 construction, on the other hand, is not supported by the patent's specification and would rewrite the
28 claims to cover subject matter not enabled by the specification.

Claim 14 of the '052 patent reads as follows:

> 14. A method of converting user-applied object motion on a cursor-control device into graphical user interface window scrolling messages, said method comprising:
>
> forwarding a plurality of data packets <u>from a cursor-control input device</u> which includes a touchpad having a scrolling zone <u>to a data packet processor</u>, said data packets representing object motion applied by a user to the input device;
>
> generating a plurality of messages in response to the user-applied object motion;
>
> forwarding said messages to an application controlling an active window in said graphical user interface;
>
> scrolling visual display data in response to said messages sent by said data packet processor.

'052 patent at 7:6-19 (emphasis added).

The language of claim 14 itself supports Elantech's construction that the data packet processor performs the function of "processing data packets and sending messages" because the claim recites that the data packet processor both receives data packets from a cursor-control device and sends messages. The specification further supports Elantech's construction. The specification repeatedly explains that the "data packet processor" is software that processes data packets and sends messages. For example, in the "Summary of the Invention," the inventors explain: "The data packet processor generates a plurality of messages in response to the stimuli applied by the user . . . and causes an active window in the graphical user interface to scroll . . . in response to the messages sent by the packet processor." *Id*. at 1:55-60. Also, "the ***processor software*** sends scrolling messages to the operating system or application that owns an active window. The ***packet processing software*** is configured to not scroll on motions that are not substantially parallel to the axis of the scroll zone…." '052 patent at 1:68-2:4. Similarly, in the "Brief Description of the Drawings," the inventors describe Figure 4 as illustrating "a variety of user finger motions recognized as non-scrolling by the <u>processor software apparatus</u> of the present invention." *Id*. at 2:37-39 (emphasis added). Furthermore, when describing the invention in detail, the inventors explain that "Packet processor 20, implemented as a ***program on a central processing unit***, examines data packets generated by touchpad 18." *Id*. at 2:52-54. Thus, throughout the written description the one and only embodiment disclosed is a data packet processor "implemented as a program," *i.e.*, software, and that processes data packets and sends messages.

1    In its opening brief, Synaptics argues that the court should not limit "data packet processor" to software merely because the specification used the word "preferably" when describing the one and only embodiment of a data packet processor. However, just because the word "preferably" is used in the specification does not necessarily mean that a patent claim is entitled to broader scope. *Bell Atl. Network Servs., Inc. v. Covad Comm. Group, Inc.*, 262 F.3d 1258, 1273 (Fed. Cir. 2001) ("We note that 'the usage 'preferred' does not of itself broaden the claims beyond their support in the specification.'") (citations omitted).

Here, the inventors of the '052 patent have described only one enabling embodiment of a data packet processor – that is, software. No other enabling embodiments are found in the specification, and no other embodiments are even suggested. Accordingly, Synaptics should not get more than what it disclosed and the Court should properly limit "data packet processor" to software. *Modine Mfg. Co., v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1551 (Fed. Cir. 1996) ("…when the preferred embodiment is described in the specification as the invention itself, the claims are not necessarily entitled to a scope broader than that embodiment.") Here, the specification refers to the "processor software apparatus *of the present invention"* and refers to no other data packet processor, making clear that the claimed processor is software. '052 patent at 2:37-39

While Elantech's proposed construction is supported by the language of the claim and the patent's specification, Synaptics' proposed construction that data packet processor is "hardware and/or program code, for example software executed on a central processing unit, that processes data packets," is overly broad and not supported by any intrinsic evidence. The only support Synaptics could muster for its construction is testimony from its own hired expert witness. Synaptics' Brief at 4. The Court should give such self-serving testimony very little, if any, weight. *See Phillips* 415 F.3d at 1318 ("However, conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court. Similarly, a court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.'").

Besides not having any reliable support, Synaptics' proposed construction must be rejected because it would give the claim a scope that is neither described nor enabled by the patent. A claim

ELANTECH DEVICES CORP.'S OPPOSITION CLAIM
CONSTRUCTION BRIEF RE: SYNAPTICS' '052, '411,
'591 AND '931 PATENTS

6

3:06-cv-01839 CRB

1  can only cover subject matter if "that subject matter [is] sufficiently described as the applicant's
2  invention to meet the requirements of section 112" *Wang Labs., Inc. v. America Online Inc.,* 197 F.3d
3  1377, 1383 (Fed. Cir. 1999).  As the Federal Circuit explained in *Digital Biometrics Inc. v. Identix,*
4  *Inc.*:

> Because the applicant has the burden to "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention, "35 U.S.C. § 112, ¶ 2 (1994), if the claim is susceptible to a broader and a narrower meaning, and the narrower one is clearly supported by the intrinsic evidence while the broader one raises questions of enablement under § 112, ¶ 1, we will adopt the narrower of the two.

8  *Digital Biometrics Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998).
9       As discussed above, the '052 patent only describes and enables a data packet processor
10 implemented as software.  The patent does not describe nor enable one of ordinary skill to have a data
11 packet processor implemented as hardware as Synaptics would have the Court construe the term.
12 There is no evidence that one of ordinary skill at the time of the invention would even think of
13 implementing the data packet processor of the invention as anything but software.  Yet Synaptics
14 would have the Court construe the term data packet processor to include any combination of "hardware
15 and/or program code."  Perhaps recognizing that no such system is disclosed in the patent, Synaptics
16 provides an "example" of such a system in its claim construction: "software executed on a central
17 processing unit, that processes data packets."  The inclusion of this "example" does nothing to help
18 define or clarify the claim term because it begs the question – what other systems of "hardware and/or
19 program code" could possibly fall within the claim scope?  Synaptics' proposed construction would
20 give the term "data packet processor" an endless and undefined scope, even though only a software
21 implementation is described and enabled by the patent's specification.
22     Synaptics also argues that the Court should define "data packet processor" using only the broad
23 definition of "processor."  *Syn. Br.* at 4-5.  This argument is nothing more than an attempt to re-write
24 the claim because it would effectively remove the term "data packet."  The term "data packet
25 processor" was specifically chosen by the inventors to describe their invention.  It is defined in the
26 claims and specification as software for processing data packets and sending messages.  If the
27 inventors intended to claim simply a "processor," they could have simply used that term.  Thus, even
28

1   assuming the word "processor" has an ordinary meaning as Synaptics proposes, that definition is
2   irrelevant because the inventors specifically recite "data packet processor," and not just "processor."
3        For the reasons above, the Court should adopt Elantech's proposed claim construction for "data
4   packet processor" and reject Synaptics' proposed construction.

      C.      "X and Y position information" ('591/'931 Patents: Joint Claim Terms 2 and 8)

The phrase "X and Y position information" appears in only one limitation of the asserted claims, namely "repeatedly sending X and Y position information" in claim 9 of the '591 patent (Joint Claim Term 8). In all other instances it appears only in the preamble and is thus not a substantive claim limitation. While Elantech does not agree with Synaptics' construction of this phrase, in the interest of focusing attention on more important issues Elantech will no longer contest either joint term 2 or 8.

      D.      The "Signaling" Steps ('591/'931 Patents: Joint Claim Terms 3-10)

The term "signal" as used in numerous limitations in the asserted claims of the '591 and '931 patents should be construed to mean the high state of an output that has a high and low state, as set forth in the Joint Claim Construction chart at terms 3-10. Synaptics incorrectly characterizes the claim construction issue as a dispute over the meaning of the lone word "signal." In fact, it is a disagreement over the meaning of an entire series of phrases, in which "signal" is only one word. The correct claim construction of these terms cannot be decided based solely on the meaning of "signal," devoid of its context.

The disputed phrases in the claims may be summarized as follows:

- "initiating a first signal to the host indicating the occurrence of said gesture" ('591)
- "terminating said first signal" ('591)
- "sending a second signal to said host indicating said second gesture" ('591)
- "initiating a drag gesture signal to the host indicating the occurrence of a gesture" ('591)
- "maintaining said drag gesture signal" ('591)
- "initiating a signal to the host indicating the occurrence of said tap gesture" ('931)
- "maintaining said signal for a predetermined period of time" ('931)

*See* Jt. Cl. Const. Stmt., Ex. A, terms 3–7, 9, 10.

Thus, the first signal must be a signal that is <u>initiated and then terminated</u>. The signals associated with the tap and drag gesture must be signals that are <u>initiated and maintained</u>. If one plugs in the definition of "signal" presented by Synaptics, these phrases become virtually indecipherable. For example the first two phrases would read: "initiating an event or phenomenon that conveys data from one point to another" and "terminating the first event or phenomenon that conveys data from one point to another." It does not make sense that a one-time "event or phenomenon" can be "maintained" or "terminated" as require by the claim. Accordingly, it is entirely appropriate to consider the specification in construing these phrases. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d. 1576, 1582 (Fed. Cir. 1196). Here, Figs. 15A of the '931 patent (tap), Fig. 15B of the '591 patent (drag) and Fig. 15D of the '591 patent (double tap) and their corresponding specification descriptions provide a clear and definite understanding of the claim phrases. See, for example, column 34, lines 25-29 of the '931 patent which reads as follows (underlining added for emphasis):

> In each of FIGS. 15*a* through 15*e*, two <u>signals</u> are shown graphed against time; one is the analog "Z" (finger pressure) signal, the other is the digital <u>"Out" (virtual button press) signal</u>.

Referring to the tap gesture timing diagram in Fig. 15A of the '931 patent, the "OUT" signal precisely matches the signal initiating and maintaining clauses 6 and 7 highlighted above. That is, a signal is initiated by changing from a low state to a high state, and the high state is continually outputted for a predetermined period of time. Referring to the drag gesture timing diagram in Fig. 15B of the '591 patent, the "OUT" signal precisely matches the signal initiating and maintaining clauses 4 and 5 highlighted above. Referring to the double tap gesture timing diagram in Fig. 15D of the '591 patent, the "OUT" signal precisely matches the signal initiating, signal terminating, and sending of a second signal clauses 1-3 highlighted above. The respective descriptions of these figures in the '931/'591 patents consistently refer to the illustrated "OUT" signal that changes from a low (false) to a high (true) state. ('931 patent, 35: 57-59; '591 patent 33: 33-41, 34: 15-19). Furthermore, all of the signals are initiated or sent <u>to a host</u>. More specifically, the virtual button signals in Figs. 1 and 14 of the '931/'591 patents are sent to the host, as clearly described in column 33, lines 32-36 of the '931 patent.

Nowhere else do the '931/'591 patents describe or enable any other schemes of initiating and maintaining a signal, or initiating and terminating a signal, followed by sending a second signal. In

1  fact, every reference to the word "signal" in the '931/'591 patents that relates to gesture recognition
2  refers only to the "OUT" signal.  Accordingly, Synaptics defined the disputed claim phrases by
3  implication, through the consistent use throughout the '931/'591 specifications of the "OUT" signals in
4  the various Fig. 15 timing diagrams when referring to signals that are initiated, maintained and
5  terminated.  *Bell Atl. Network Servs., Inc. v. Covad Comm. Group, Inc.*, 262 F.3d 1258, 1273 (Fed. Cir.
6  2001).

7      Synaptics does not dispute that the various Fig. 15 timing diagrams read on the respective
8  disputed claim terms.  Instead, Synaptics argues that these figures merely illustrate one preferred
9  embodiment of the claimed invention, and thus the claims cannot be limited to those embodiments.
10 Synaptics confuses the impermissible act of reading a limitation into a claim from the written
11 description with the permissible and often required process of looking to the written description to
12 define a term already in a claim limitation so as to read the claim in view of the specification of which
13 it is a part.  *See Renishaw PLC v. Marposs Societa' Per Azioni,* 158 F.3d 1243, 1248 (Fed Cir. 1998).

14     In support of their position, Synaptics presents a broad dictionary definition of the word
15 "signal" and then argues that the broad definition should be used in the claim construction.  However,
16 as discussed above, this is not a dispute about the scope or definition of "signal."  It is a dispute about
17 specific claim phrases that include the word "signal."  Furthermore, Synaptics has not pointed to a
18 single instance wherein the word "signal" is used in any context other than the "OUT" signals shown
19 in the Fig. 15 timing diagrams.  Synaptics' attempt to define a series of interrelated phrases by
20 reference to a definition taken completely out of context of the phrases must be rejected.

21     In further support of their position, Synaptics argues that the '931/'591 specifications describe
22 alternative embodiments to the digital "OUT" signal; and thus, the claims cannot be limited to that
23 embodiment.  Specifically, Synaptics argues that the claimed signals can be initiated, terminated,
24 maintained and sent as "packets."  In fact, no such "packet" embodiments are disclosed or suggested in
25 the '931/'591 patents.  The '931/'591 specifications disclose communicating $\Delta X$ and $\Delta Y$ events that
26 are outputted by the motion unit 18 in Fig. 1 to a host computer in the form of packets.  However, the
27 $\Delta X$ and $\Delta Y$ events have nothing to do with *signals* resulting from gestures on the touchpad.
28

Synaptics highlights column 37, lines 6-9 of the '591 patent as disclosing the packet embodiment. The paragraph that contains this text portion reads as follows:

> Step 326 sets the Suppress flag to TRUE to cause the virtual button signal to go low for one sample. This corresponds to time "t17" of FIG. 15d. In an alternate approach, one or more extra packets indicating a release of the virtual buttons can be inserted into the regular packet stream, rather than using a Suppress flag as shown herein.

'591 patent 37: 3-9. Figs. 1 and 14 of the '931/'591 specifications do not disclose the packet processor that is responsible for packetizing the output signals and delivering them to a host computer, as is well-known in the prior art. This text portion apparently refers to an <u>undisclosed and unclaimed</u> process associated with packetizing the virtual button signals at the output of gesture unit 20 in Fig. 1 for communication to a host computer. In this alternate approach, instead of forcing the "OUT" signal into a low state by using a suppress flag and then packetizing the resulting low state "OUT" signal, one or more extra packets may be inserted into the packet stream for indicating that the "OUT" signal is in a low state. This alternate approach has nothing whatsoever to do with any of the claimed gesture recognition processes. Also, it relates only to the signal terminating process. It provides no instruction to an artisan regarding how packets would be used to initiate signals or maintain signals.

Synaptics' expert also opines that Elantech's proposed construction includes extraneous limitations. *See* Wolfe Decl. at ¶38 ("Elantech's proposed claim construction for both Joint Claim Terms 3 and 6 inserts the limitation that the signal represents that the "gesture will potentially occur on the touch-sensor pad." This interpretation is literally inconsistent with the claim terms themselves. The claims recite that the signals are "indicating the occurrence" of a "gesture.") Synaptics' expert is confusing "double tap gesture" with "a gesture." Claim 6 is directed to recognizing a double tap gesture. The body of claim 6 requires that two separate gestures be recognized. Logically, the occurrence of a double tap gesture cannot be indicated by the first signal alone, so that it is only the potential occurrence of the double tap gesture that may be indicated by the first signal.

For the reasons above, the Court must adopt Elantech's proposed claim construction for the signaling step and must reject Synaptics' proposed construction.

E.  **"Double Tap Gesture" ('591 Patent: Joint Claim Term 5)**

Elantech previously withdrew its invalidity contention regarding the indefiniteness of claim 6 of the '591 patent. Elantech's claim construction chart was inadvertently not updated to reflect this fact. Accordingly, Elantech withdraws the dispute regarding the inability to construe claim term 5. However, the dispute regarding claim construction of Joint Claim Term 5 is not withdrawn and was addressed in the preceding section of this Brief.

F.  **Corner Tap ('931 Patent: Joint Claim Term 11)**

The phrase, "detecting in which of at least one corner of the touch-sensor pad said tap gesture occurred" must be construed to mean "after detecting the occurrence of a tap gesture, separately detecting in which of at least one corner of the touch-sensor pad the tap gesture occurred."

In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is the claim language that the patentee chose to use to particularly point out and distinctly claim the invention. *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). Elantech's claim construction squarely follows this principle. This claim phrase appears in claim 5 of the '931 patent, and reads, in part, as follows (underlining added for emphasis):

> detecting the occurrence of a tap gesture made by a tapping object on the touch-sensor pad;
>
> detecting in which of at least one corner of the touch-sensor pad <u>said tap gesture occurred</u>; and
>
> sending a signal to the host indicating the occurrence of said tap gesture and in which of at least one corner of said touch-sensor pad said tap gesture occurred

As a matter of simple grammar the claim language requires that tap gesture detection occurs prior to the corner analysis. It would be impossible to detect in which of at least one corner of the touch-sensor pad <u>said tap gesture</u> occurred if the tap gesture has not previously been detected. The claim analysis at issue is identical to that faced in *Combined Sys., Inc. v. Def. Tech. Corp. of Am. and Fed. Labs.*, 350 F.3d 1207, 1211 (Fed. Cir. 2003):

> Furthermore, plainly as a matter of grammar, the recitation of "*inserting said formed folds* . . . *into said projectile compartment*" forecloses - at least in the absence of compelling evidence to the contrary in the written description or prosecution history - a construction permitting the "folds" to be formed after or during insertion of the

projectile into the projectile compartment in the shotgun shell. *Cf. Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1343 (Fed. Cir. 2001) (holding that a method claim not reciting an order of steps is not construed to require one, unless the "the method steps implicitly require that they be performed in the order written"). For example, a method claim reciting introducing acetic acid into groundwater and "introducing a turbulent flow of an aqueous solution of ferrous ion into said groundwater region, *for mixing with said acidified groundwater*" requires the acetic acid introduction step to occur before the "turbulent flow" introduction step. *Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1376 (Fed. Cir. 1998) (emphasis added) ("[I]n order for the aqueous solution to mix with the acidified groundwater, the acid must have already mixed with the groundwater to form acidified groundwater."). Similarly, for the "formed folds" to be inserted into said projectile compartment, they must already have been formed. (italics added for emphasis).

Synaptics proposes a construction that imposes no order on the two detecting steps. Here, a particular order is recited and that order cannot be ignored.

Courts may not rewrite claim language. *Resonate Inc. v. Alteon Websytems, Inc.*, 338 F.3d. 1360, 1365 (Fed. Cir. 2003); *Autogiro Co. of Am. v. United States*, 384 F.2d. 391, 396 (Ct. Cl. 1967). Accordingly, Synaptics' construction must be rejected as an attempt to rewrite the claims to remove the explicitly recited order.

## III. CONCLUSION

As the foregoing demonstrates, Elantech proposes constructions for the disputed claim terms that are consistent with, if not mandated by, the disclosure of the patents themselves. Synaptics, on the other hand, relies on the general dichotomy definitions and the unsupported opinions of its expert witnesses in an attempt to broaden its claims beyond the words of the claims and the disclosure of the patents themselves. In such a case it is clear that the words used by the inventors in the patents should control, and Elantech's proposed claim constructions should be adopted.

Dated: February 12, 2007       AKIN GUMP STRAUSS HAUER & FELD LLP




By: _____/s/_____
    Sean P. DeBruine

Attorneys For Plaintiff and Counterdefendant
ELANTECH DEVICES CORPORATION

6038954 v6