Yitai Hu (SBN 248085)(yhu@akingump.com)
Sean P. DeBruine (SBN 168071)(sdebruine@akingump.com)
Ming-Tao Yang (SBN 221295)(myang@akingump.com)
Hsin-Yi Cindy Feng (SBN 215152)(cfeng@akingump.com)
AKIN GUMP STRAUSS HAUER & FELD LLP
3000 El Camino Real
Two Palo Alto Square, Suite 400
Palo Alto, California 94306
Telephone:    650-838-2000
Facsimile:    650-838-2001

Attorneys for Plaintiff and Counterdefendant
ELANTECH DEVICES CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ELANTECH DEVICES CORP., <br><br> Plaintiff, <br><br> vs. <br><br> SYNAPTICS, INC. and AVERATEC, INC. <br><br> Defendants. | Case No. 3:06-CV-01839 CRB <br><br> **ELANTECH DEVICES CORP.'S REPLY CLAIM CONSTRUCTION BRIEF FOR U.S. PATENT NO. 5,825,352** |

**TABLE OF CONTENTS**

I.  INTRODUCTION ..................................................................................................1

II. CLAIM CONSTRUCTION FOR CLAIMS 1 AND 18 OF THE '352 PATENT ................1

    A.  "Scanning the Touch Sensor" Means "Examining Information Associated with the Touch Sensor" ..........................................................................2

        1)  The Intrinsic Evidence Describes "Scanning" as Examining or Processing Touchpad Information to Identify Finger Presence, which the Dictionary Definition also Supports ..........................................................................3

        2)  The Prosecution History of '352 Patent Directly Contradicts Synaptics' Narrow Reading ....................................4

        3)  The Claim Term of "Following" Merely Indicates Relevant Location of the Two Maxima and One Minimum and Connotes No Sequence of Assigning ..........................................5

    B.  "First Maxima," "Minima," and "Second Maxima" Can be Properly and Respectively Construed as "First Peak Value," "Lowest Value," and "Second Peak Value" in Corresponding Finger Profiles .......................................................5

        1)  Synaptics Uses the Terms "Maxima" and "Peaks" Consistently with Elantech's Proposed Construction ................6

        2)  Synaptics Failed to Address Two Main Flaws of Its Proposed Construction: Direct Contradictions by Specification Teachings and Prosecution History ......................8

        3)  The Claim Term of "Following" Merely Indicates Relevant Location of the Two Maxima and One Minimum and Connotes No Particular Scanning Order .................................11

        4)  Synaptics' Reliance on Claim Differentiation Principle is Misplaced .......................................................................11

    C.  The Patent Clearly Discloses Microprocessor 60 as the Structure Corresponding to the "Means for Indicating . . . ." ..............................12

    D.  The Synaptics' Misleading Statements Regarding Its Own Patent's Priority Over '352 Patent and the '352 Patent's Prosecution History Should be Ignored ...................................................................................13

III. CONCLUSION..................................................................................................13

# TABLE OF AUTHORITIES

## CASES

*Markman v. Westview Instruments, Inc.*
    52 F.3d 967, 981 (Fed. Cir. 1995)(*en banc*), aff'd, 517 U.S. 370 (1996) .......................... 3

*Tandon Corp. v. United States International Trade Comm'n*
    831 F.2d 1017, 1023-24 (Fed. Cir. 1987).......................................................................... 11

*Vitronics Corp. v. Conceptronic, Inc.*
    90 F.3d 1576, 1583 (Fed. Cir. 1996) ................................................................................... 3

## OTHER AUTHORITIES

The IEEE Standard Dictionary of Electrical and Electronic Terms, 947 (6th Ed.). ...................... 4

## I. INTRODUCTION

The Court need only resolve two primary claim construction questions for Elantech's United States Patent No. 5,825,352 ("the '352 patent")[1]. They are (1) whether the simple term of "scanning" should, as proposed by Synaptics, be construed as "measuring traces" and "assigning them to a sequence corresponding to their physical order . . ." solely based on expert testimony when no intrinsic record supports such a narrow reading; and (2) whether the easy-to-understand terms of "maxima" and "minima" should, as proposed by Synaptics, be redefined respectively as "the point at which the measured values cease to increase and begin to decrease" and "the point at which the measured values cease to decrease and begin to increase" when the teachings and drawings from the '352 patent directly contradict Synaptics' re-defining of those terms.

Under the Federal Circuit case law, "no" is the only answer to both questions. Synaptics' and its expert's overly complicated reading of the simple term of "scanning," "minima" and "maxima" violates fundamental principles of claim construction. The claim construction process must remain focused on how the patentee used the claim term in the claims, specification, and prosecution history – not how an expert defines the term. Indeed, expert testimony must be viewed as less reliable than the patent and its prosecution history in determining how to read claim terms.

## II. CLAIM CONSTRUCTION FOR CLAIMS 1 AND 18 OF THE '352 PATENT

Synaptics' attempts to alter the claims of the '552 patent using expert testimony should be rejected, and the claim terms should be given their ordinary meaning. The '352 patent relates to touchpad devices that can detect the presence of two or more fingers (or other objects). The invention of claim 1 is simply a method of examining touch sensor information to identify two peak values with one lowest value in between to determine the presence of two fingers, and providing an indication in response to that identification. Claim 18 also contains similar limitations but is directed to an apparatus for detecting two fingers. The claim language as written in both claims, along with the intrinsic record, makes it clear that the claimed method for detecting a multi-finger presence does not require any particular order or manner of scanning, or any particular nature of the

---

[1] The '352 patent is in the record as Exhibit A to the January 29, 2007 Declaration of Sean P. DeBruine ("DeBruine Decl.").

first and second maxima and the minimum between them. Elantech believes that these claims are clear, and could be understood by the jury on their face. To assist the jury and to respond to Synaptics' request for providing claim constructions, Elantech proposed constructions that are based on the intrinsic record, not an expert's selective reading of dictionaries and constantly evolving definitions. In contrast, Synaptics is asking the Court to turn the simple words of "scanning," "maxima," and "minima" into peculiar definitions that are not likely to be decipherable by the jury and are inconsistent with the patent.

### A. "Scanning the Touch Sensor" Means "Examining Information Associated with the Touch Sensor"

As Elantech's Opening Brief explained, its construction of "scanning" is based on the meaning of the term in the context of the '352 patent and should be adopted because (1) the patent specification expressly contradicts Synaptics' initial construction of "sequentially measuring the traces . . . ;" (2) the '352 patent specification describes "scanning" as examining or processing touchpad information to identify finger presence; and (3) the dictionary definitions from Elantech and Synaptics similarly characterize scanning as examining information and contradict Synaptics' initial construction.

Rather than concede that its initial construction was improper, Synaptics now proposes an entirely different construction of this term: "measuring the traces in the touch sensor and assigning them to a sequence corresponding to their physical order on the touch sensor." Synaptics' Opp. at 3, 2/12/2007 Wolfe Decl. at 4. However, this re-ordering of the words does not change the effect. Synaptics is still attempting to impose the additional limitation of a sequence. That reading is still contradicted by the patent which says a scan may be sequential or concurrent. '352 patent at 7:36-40. Thus, Synaptics' new construction unduly imposes a narrow reading of the simple term of "scanning the touch sensors" for the same reasons Elantech has previously discussed. In essence, Synaptics is asking the Court to disregard the broad teaching and multiple embodiments disclosed in the specification and construe the term based solely on Synaptics' expert testimony.

The only specification language cited by Synaptics does not even support its position. It merely says that "[t]he scan process measures the values of finger-induced capacitance for each of

2

Elantech's Reply Claim Construction Brief for
U.S. Patent No. 5,825,352

CASE NO. 3:06-CV-01839 CRB

the conductors, and stores the values in RAM . . . ." Synaptics' Opp. at 4. Synaptics identified no instance where its proposed construction of "assigning [the measured traces] to a sequence corresponding to their physical order on the touch sensor" can be found in the '352 patent specification or prosecution history. The only support for Synaptics' position is the allegedly "uncontested testimony of Dr. Wolfe," the same expert who was forced to re-write his construction of this term after Elantech pointed out that it contradicted the patent disclosure. Synaptics Opp. at 5, 2/12/2007 Wolfe Decl. at 4. Again, the sentence immediately preceding the passage relied on by Synaptics states that touch sensors "may be scanned sequentially *or concurrently*, depending on the hardware implementation." '352 patent at 7:36-37 (emphasis added). In other words, if the scanning as claimed required a separate "assigning" operation as Synaptics suggested, a concurrent scanning would not necessarily result in assigning scanning results to any particular sequence.

Synaptics' attempt to vary the meaning of claim term based solely on expert testimony should be rejected. Indeed, extrinsic evidence, such as expert testimony, "is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 981 (Fed. Cir. 1995)(*en banc*), aff'd, 517 U.S. 370 (1996). Additionally, the Federal Circuit has held that construing a claim to exclude a preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). Synaptics fails to offer any evidentiary support to justify its proposed attention of the claim language.

        1)     **The Intrinsic Evidence Describes "Scanning" as Examining or Processing Touchpad Information to Identify Finger Presence, which the Dictionary Definition also Supports**

As illustrated by the '352 patent specification and Figures 1 and 3 reproduced below, the two-finger presence may be identified by simply identifying two peak values and one lowest value between the two peak values.



FIG. 1.



FIG. 3.

3

Elantech's Reply Claim Construction Brief for
U.S. Patent No. 5,825,352

CASE NO. 3:06-CV-01839 CRB

Sensing the proximity of multiple fingers to a touch sensor, as illustrated in Figure 1, "may be implemented based on any conventional touch sensing technology," such as capacitive, resistive, surface wave, strain, pressure, and optical sensing. '352 patent at 2:18-22, 1:18-32. Accordingly, the specification does not limit the invention to any particular "scanning." For example, scanning a touch sensor to identify the high and low values as illustrated in Figure 3 includes having "the values of finger-induced capacitance . . . processed" to "detect whether one or more fingers is in operative contact" with a touchpad. *Id.* at 6:14-17.

In addition to the specification, an authoritative dictionary cited by both Elantech and Synaptics also defines scanning as "the process of examining information in a systematic manner." DeBruine Decl., Ex. D (The IEEE Standard Dictionary of Electrical and Electronic Terms, 947 (6th Ed.)). However, despite the consistency between the specification and the most relevant dictionary, Synaptics seeks to impose a narrow reading of "measuring the traces" and "assigning them to a sequence corresponding to their physical order . . ." on the easy-to-understand term "scanning." Synaptics' Opp. at 3. Synaptics' only justification for its peculiar definition is its expert's self-serving testimony in combination with two other dictionary definitions not aligned with the intrinsic record. 2/12/2007 Wolfe Decl. at 5. None of those definitions equates scanning with "measuring." *Id.* Thus, Synaptics is left with nothing but unsupported testimony of its expert to support it construction.

**2)    The Prosecution History of '352 Patent Directly Contradicts Synaptics' Narrow Reading**

In addition to the lack of support from the '352 specification and file history, Synaptics' transformation of a single term of "scanning the touch sensor" into two separate and distinct limitations of "measuring the traces in the touch sensor" ***and*** "assigning them to a sequence corresponding to their physical order on the touch sensor" is directly contradicted by the prosecution history. Synaptics' Opp. at 3. Specifically, the file history contradicts the inclusion of "trace values" in Synaptics' proposed construction. The prosecution history states that multiple fingers are detected by "detecting the multiple maxima in the [finger] *profile* on the touchpad," not by measuring the traces as narrowly defined by Synaptics. DeBruine Decl., Ex. C at 3, 4. (Amd. B,

4

April 6, 1998.)  This language clearly supports Elantech's proposed construction that "scanning the touch sensor" means "examining information associated with the touch sensor."  The reference to "trace values" and "assigning them to a sequence corresponding to their physical order . . ." in Synaptics' definition, on the other hand, finds no support in the file history.

        3)       **The Claim Term of "Following" Merely Indicates Relevant Location of the Two Maxima and One Minimum and Connotes No Sequence of Assigning**

The use of the term "following" according to the plain language itself merely explains the relative locations of the maxima and minimum, as having "a minima *following* the first maxima" and "a second maxima . . . *following* said minima."  '352 patent at 16:17-20.  Synaptics nevertheless argues that the claim language of "following" requires there to be "an ordered sequence" associated with the claimed "scanning" and therefore "scanning" requires "assigning the measured trace values from the touch sensor to a sequence corresponding to their physical order on the touch sensor."  Synaptics' Opp at 7.  Synaptics provides no intrinsic evidence to support this position but relies solely on its expert declaration.  *Id.*  In fact, there is no intrinsic evidence to support this argument.  In essence, Synaptics is asking the Court not to follow the claim language itself or the intrinsic record but to rewrite the claim so the term "following" is somehow connected to a remotely located term of "scanning."  Synaptics relied on that attenuated connection to transform the term "scanning" into "measuring the traces" and "assigning them to a sequence corresponding to their physical order . . . ."  The Court should reject Synaptics' attempts to rewrite the claims.

        B.      **"First Maxima," "Minima," and "Second Maxima" Can be Properly and Respectively Construed as "First Peak Value," "Lowest Value," and "Second Peak Value" in Corresponding Finger Profiles**

The three claim phrases relating to the maxima and minima limitations are similar and can be discussed jointly.  Elantech proposed three parallel constructions:  (1) "scanning the touch sensor to . . . identify a first maxima in a signal corresponding to a first finger" means "identify a first peak value in a finger profile obtained from scanning the touch sensor;" (2) "identify a minima following the first maxima" means "identify the lowest value in the finger profile that occurs after the first peak value, and before another peak value is identified;" and (3) "identify a second maxima in a

5

signal corresponding to a second finger following said minima" means "after identifying the lowest value in the finger profile, identify a second peak value in the finger profile."

As Elantech's Opening Brief explained, Elantech's construction given above is based on the meaning of the term in the context of the '352 patent and should be adopted because (1) skilled artisans would understand the "maxima" and "minima" terms as Elantech's proposed construction; (2) the '352 patent specification and prosecution history support Elantech's construction; (3) the '352 patent specification and prosecution history directly contradict Synaptics' proposals. As part of Synaptics' proposals, maxima is defined as "the point at which the measured values cease to increase and begin to decrease" and minima is defined as "the point at which the measured values cease to decrease and begin to increase" solely based on expert testimony and selective reading of dictionary definitions. Those definitions again impose unwarranted restrictions and overcomplicate the claimed "maxima" and "minima" terms that, as written, can be easily understood by the Court and the jury. Again, Synaptics is asking the Court to disregard the intrinsic evidence and construe the term solely based on expert testimony and Synaptics' selective reading of a dictionary.

### 1) Synaptics Uses the Terms "Maxima" and "Peaks" Consistently with Elantech's Proposed Construction

The '352 patent specification and Figures 3 and 4 reproduced below both suggest that the claimed "first maxima" simply means a first peak value, which can be derived by examining a finger profile.

FIG. 3.        FIG. 4.

As illustrated in Figure 3, the "first maxima" as claimed, or more correctly (grammatically speaking) "first maximum," simply means a first peak value 85, which exists in a peak area of the finger profile and may be followed by a minimum or lowest value 90 and another maximum or second peak value 95. '352 patent at Fig. 3, 6:27-38. Figure 4 similarly illustrates a first peak value

1  105, which is followed by a local minimum or lowest value 100 and a second peak value 110. *Id.* at
2  6:39-47. The specification's use of Xpeak1 as a "variable to store the value of the *first peak X*
3  *value*" and Xpeak2 as a "variable to store the value of the *second peak X value*." also suggests the
4  consistent use of a local peak to represent a maximum. *Id.* at 8:64, 9:4.

5  Therefore, Elantech's proposed construction of the claim term "scanning the touch sensor to
6  . . . identify a first maxima in a signal corresponding to a first finger" as "identify a first peak value
7  in a finger profile obtained from scanning the touch sensor" and a similar construction for the claim
8  term of "identify a second maxima in a signal corresponding to a second finger" is fully supported
9  by the intrinsic evidence. Indeed, Synaptics' own statements in its Opposition Brief make it clear
10 that a maximum is generally understood as a peak and the two terms of maximum and peak are used
11 interchangeably. Specifically, Synaptics stated that other than Mount Everest, "every other '*peak*'
12 or 'plateau' around Mount Everest, or anywhere else, *is a 'local' maximum*." Synaptics Opp. at 8
13 (emphasis added) Therefore, Elantech and Synaptics appear to be in agreement that the "first
14 maxima" can be ordinarily and appropriately defined as a "first peak" or a "first peak value."

15 Despite the fact that Synaptics uses the terms "maximum" and "peak" interchangeably, it
16 nevertheless challenged Elantech's position not by taking on Elantech's proposed constructions, but
17 by redefining "first peak value" or "second peak value" as a "global peak" and then arguing that a
18 definition of "maxima" as "global peak" is inconsistent with the plural maxima identified in the
19 '352 patent. *Id.* at 11. Synaptics' self-serving redefinition of Elantech's proposed construction is
20 not acceptable. Nowhere in Elantech's proposed construction does it use the term "global" or
21 characterize the proposed construction of "first peak value" or "second peak value" as a global peak
22 value. Indeed, Elantech's proposed constructions of "first maxima" as "first peak value" and
23 "second maxima" as "second peak value" show that there are at least two peak values as required by
24 the plain language of the claims, and that Elantech's constructions do not require a single, global
25 peak value. DeBruine Decl., Ex. B (Jt. CC Stmt.) at Ex. C, Claim Terms 16 and 18. Therefore,
26 Synaptics' attacks on Elantech's proposed construction are meritless. In fact, the Court need not
27 consider those attacks, because Synaptics' own statements about peaks demonstrate that Synaptics'
28

7

Elantech's Reply Claim Construction Brief for                                CASE NO. 3:06-CV-01839 CRB
U.S. Patent No. 5,825,352

1  own use of the same word does not limit a "peak" to a global peak and allows multiple peaks to
2  coexist.  Synaptics Opp. at 8.  (Other than Mount Everest, "*every other 'peak'* or 'plateau' around
3  Mount Everest, or anywhere else, is a 'local' maximum.") (emphasis added).

        2)       **Synaptics Failed to Address Two Main Flaws of Its Proposed Construction: Direct Contradictions by Specification Teachings and Prosecution History**

6      Elantech, in its Opening Brief, discussed why Synaptics proposed construction of
7  "measuring the trace values of the touch sensor corresponding to a first finger and *determining the*
8  *point at which the measured values cease to increase and begin to decrease*" and Synaptics' similar
9  definition for the second maxima impose unwarranted restrictions and are directly contradicted by
10  the specification, the drawings, and the prosecution history.  Elantech used the following drawings
11  to illustrate two main flaws of Synaptics' proposed construction.



FIG. 3.    Upside-down version of Figure 3

18      First, the first maximum 85 as illustrated in Figure 3 may be the point at which values *begin*
19  *to decrease*, but *not* the point at which values *cease to increase*, which occurs at a separate location,
20  i.e., a point to the left of first maximum 85 and of the same level as first maximum 85.  Similarly,
21  the second maximum 95 may be the point at which values *begin to decrease*, but *not* the point at
22  which values *cease to increase*, which occurs at a separate location, i.e., a point to the left of second
23  maximum 95 and of the same level as second maximum 95.  Synaptics' definition of the claimed
24  "minima" as "the point at which the measured values cease to decrease and begin to increase" is
25  also flawed for the same reason – the minimum 90 as illustrated in Fig. 3 simply does not qualify.
26  Second, the fact that a maximum could be a maximum negative level or a negative peak directly
27  contradicts Synaptics' construction as "the point at which the measured values cease to increase and

8

1  begin to decrease," which only occurs when a finger profile remains positive and does not occur at
2  negative peaks for a finger profile having two negative maxima or peaks.
3       Synaptics failed to provide any response regarding the first flaw, because Synaptics'
4  definition of "first maxima" as a single point "*at which the measured values cease to increase and*
5  *begin to decrease*" is clearly not reconcilable with the teachings in the specification and the
6  drawings.  The very specific "point" as required by Synaptics' proposed construction, which is
7  based not on the intrinsic evidence but on a selected definition from many dictionary definitions,
8  simply does not exist in the embodiments as illustrated by the drawings of the '352 patent.  Indeed,
9  neither point 85 nor point 95 qualifies as a maximum under Synaptics' construction, but they both
10 are maxima according to the specification.  '352 patent at 6:29-35.
11      Synaptics appeared to justify its construction using the algorithm in Fig. 6-1.  Synaptics'
12 Opp. at 9-10.  However, the algorithm in Fig. 6-1, which Synaptics characterized as "exactly
13 correspond[ing]" to Synaptics' definition, does not match or correspond to Synaptics' proposed
14 construction at all.  *Id.*  For example, as the portion of Fig. 6-1 below illustrates, in identifying a
15 first maximum or first peak value Xpeak in the specific embodiment that Synaptics relied upon, the
16 algorithm identifies Xpeak only as *a peak value that occurs before the value stops increasing*, i.e.,
17 where X(N) is no longer larger than X(N-1).  DeBruine Decl., Ex. A, Fig. 6-1 ('352 patent).



Portion of Fig. 6-1 of '352 patent

22      Accordingly, even with the specific and narrowing embodiment Synaptics identified to
23 support its position, the algorithm does not require a point "at which the measured values **cease to**
24 **increase and begin to decrease**."  The algorithm therefore does not, as presented by Synaptics,
25 "exactly correspond" to Synaptics' proposed construction of "measuring the trace values of the
26 touch sensor corresponding to a first finger and *determining the point at which the measured values*

9

1  *cease to increase and begin to decrease*." DeBruine Decl., Ex. B at Ex. C, Claim Term 16 (Jt. CC Stmt.)

As another example, referring to a different portion of Fig. 6-1 reproduced below, in identifying a minimum or lowest value Xvalley, the algorithm identifies Xvalley only as *a lowest value that occurs when the value starts to increase*, i.e. where X(N) is no longer equal to or smaller than X(N-1). '352 patent, Fig. 6-1.



Another Portion of Fig. 6-1 of '352 patent

Again, the algorithm does not require a point "at which the measured values *cease to decrease and begin to increase*." The algorithm does not, as presented by Synaptics, "exactly correspond" to Synaptics' proposed construction of "measuring the trace values of the touch sensor following, in scan order, after the first maxima and *determining the point at which the measured values cease to decrease and begin to increase*." DeBruine Decl., Ex. B at Ex. C, Claim Term 17 (Jt. CC Stmt.)

Regarding the second flaw Elantech identified, Synaptics' response was that "the 'maxima' and 'minima' could be negative 'maxima' and 'minima' and Synaptics' proposed definitions become applicable when a signal is examined using its "absolute value." Synaptics' Opp. at 10, 2/12/2007 Wolf Decl. at 14. However, Synaptics' proposed construction of "maxima" as "the point at which the measured values *cease to increase and begin to decrease,*" with or without Synaptics' further explanation, simply does not apply to a negative maximum as illustrated above. A negative maximum is at best a point where the measured values "cease to decrease and begin to increase." The fact that a maximum could be a maximum negative level or negative peak directly contradicts Synaptics' construction as "the point at which the measured values cease to increase and begin to decrease," which only occurs when a finger profile remains positive. In contrast, Elantech's proposed constructions of "first maxima" as "first peak value" and "second maxima" as "second

10

peak value" are equally applicable to positive or negative peaks without the need for further explanation. Indeed, Synaptics' expert conceded that Elantech's proposed construction is "consistent with the inventors' statement during prosecution." 2/12/2007 Wolf Decl. at 15.

        3)      **The Claim Term of "Following" Merely Indicates Relevant Location of the Two Maxima and One Minimum and Connotes No Particular Scanning Order**

As discussed under Section II-A-(3), the use of the term "following" according to the plain language itself merely explains the relative locations of the maxima and minimum, as having "a minima *following* the first maxima" and "a second maxima . . . *following* said minima." DeBruine Decl., Ex. A at 16: 17-20 ('352 patent). Synaptics again argued that the claim language of "following" requires there to be a "scan order" when the claim language itself has none. Synaptics' Opp. at 12. The Court should reject Synaptics' attempts to rewrite the claims for similar reasons discussed under Section II-A-(3). Furthermore, the '352 specification makes it clear that the touch sensor may be concurrently scanned and the finger-induced capacitance values can then be loaded into a memory. '352 patent at 7:34-40. Then, the maxima and minima can be identified. *Id.* at 6:14-37. Accordingly, the specification descriptions require no particular order and suggest that those values may be obtained concurrently, rather than sequentially. The claim itself and the specification therefore do not require any "scan order" as suggested by Synaptics.

        4)      **Synaptics' Reliance on Claim Differentiation Principle is Misplaced**

Synaptics argues that the doctrine of claim differentiation renders Elantech's claim construction as improper. Synaptics' Opp. at 12. However, the doctrine of claim differentiation is merely a guide, not a rule, and a claim is to be construed based on the intrinsic evidence and not solely by looking at how dependent claims differ from independent ones. Although the doctrine of claim differentiation means that different claims are presumed to be of different scope, describing claim elements or limitations in different words does not invariably change the scope of the claim. *Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1023-24 (Fed. Cir. 1987). Therefore, the fact that dependent claims 7 and 21 of the '352 patent describe maxima as peaks do not preclude the Court from construing maxima as peak values based on the intrinsic evidence.

11

### C. The Patent Clearly Discloses Microprocessor 60 as the Structure Corresponding to the "Means for Indicating . . . ."

While this claim term was not elected by the parties as among the eight terms the Court will initially construe pursuant to its Order of February 12, 2007, Elantech will address Synaptics' erroneous arguments so that the record is complete. Consistent with its tendency to ignore aspects of the patent specification that do not support its litigation positions, Synaptics and its expert claim that there is no teaching in the patent that microcontroller 60 is the structure that performs the function of "providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima." Syn. Opp. Br. at 13. In particular, Synaptics claims that one of ordinary skill would have to "guess" to determine what structure performs this function. *Id.* That is simply not the case.

One of ordinary skill in the art is defined by Synaptics as having a degree in electrical engineering and three years or so of experience in touchpad design. 2/12/2007 Wolfe Decl., ¶ 4. Such a person actually reading the '352 patent would clearly understand that the corresponding structure is microcontroller 60 running appropriate software or firmware. First, the patent explains that microcontroller 60 operates to determine a finger profile for one or more fingers. '352 patent at 5:49-51. The output of microcontroller 60 is supplied to the host computer, such as a PS/2 interface, RS-232 interface or an Apple Desktop Bus interface. *Id.* at 5:53-55; Fig 2 (output of microcontroller 60 is "interface to PC or other device.") The patent also explains that the operation of the touchpad of Fig. 2 is controlled in either firmware, software or hardware. *Id.* 5:32-35 and 7:1-3. The function of detecting the simultaneous presence of two fingers and reporting that presence to the host is described as being carried out with firmware or software generally consistent with the flow diagram in Fig. 5 and algorithm in Fig. 6. *Id.* at 7:3-6. At various points in the flow chart diagram "reports" are made when two fingers are detected. *See, e.g.* Fig. 5, steps 540 and 555. A "report" means information transmitted to the host, *Id.* at 7:27-29, which again is the province of microcontroller 60. *Id.* at 5:52-55. Thus, the patent clearly teaches that microcontroller 60 is programmed to detect the presence of two fingers and provide an indication of that fact to the host

12

Elantech's Reply Claim Construction Brief for U.S. Patent No. 5,825,352

CASE NO. 3:06-CV-01839 CRB

computer. Synaptics uses unsupported expert testimony in an attempt to create a claim construction issue where none exists.

### D. The Synaptics' Misleading Statements Regarding Its Own Patent's Priority Over '352 Patent and the '352 Patent's Prosecution History Should be Ignored

Finally, Elantech will address two extraneous arguments raised by Synaptics which have no bearing whatsoever on the Courts' claim construction analysis. Rather, those arguments appear to have been raised in an attempt to unduly bias the Court. First, Synaptics asserts bragging rights for allegedly being the first to invent multiple finger detection by pointing to its newly issued U.S. Patent No. 7,109,978 ("the '978 patent"). Synaptics alleges that its patent has a priority date earlier than that of the '352 patent. Synaptics Opp. Br. at 2:1-13. The Court should ignore this discussion because it is completely irrelevant to the claim construction issues being briefed. Nowhere does Synaptics offer any discussion of how or why its '978 patent supports Synaptics' claim construction position or refutes Elantech's claim construction position. Furthermore, Synaptics' discussion of its '352 patent raises issues of validity and non-infringement that are completely outside of the scope of a claim construction hearing. As such, this argument should be dismissed for what it is: an attempt to muddy the waters.

Synaptics also suggested, without stating how it is relevant to the Court's construction, that Elantech's predecessor somehow "abandoned its original application." Kramer Decl. at 3. The Court should ignore this statement, not only because it bears no relationship to claim construction, but because Synaptics failed to explain to the Court that such an abandonment is part of practitioner's common practice when applicants continue to prosecute patent applications using a continuation application. *See* Kramer Decl., Ex. C (notice of abandonment from the file history). Indeed, Synaptics' '978 patent originated from an abandoned application. *See* Kramer Decl., Ex. E, ('978 patent cover page).

### III. CONCLUSION

As discussed above, Elantech's proposed constructions for the disputed terms of the '352 patent follow the straightforward language of the claims and are supported by the intrinsic evidence. In contrast, Synaptics' proposed constructions limit the claim language not to any particular

13

Elantech's Reply Claim Construction Brief for
U.S. Patent No. 5,825,352

CASE NO. 3:06-CV-01839 CRB

embodiments in the specification of the '352 patent, but to peculiar meanings sponsored by Synaptics' expert supported only by his selective reading of dictionary definitions, an approach specifically rejected by the Federal Circuit. No explicit or different definitions, or disavowal or disclaimer of claim scope, appear in either the '352 patent itself or in its prosecution history that would warrant the unduly narrow claim constructions proposed by Synaptics. Synaptics' proposed constructions also have several flaws, making them not reconcilable with the intrinsic evidence. Accordingly, Elantech respectfully requests that the Court adopt its constructions and reject those offered by Synaptics.

Dated: February 21, 2007        AKIN GUMP STRAUSS HAUER & FELD LLP


By:_____/s/_____
      SEAN P. DEBRUINE

Attorney For Plaintiff and Counterdefendant
ELANTECH DEVICES CORPORATION

6045046

14

Elantech's Reply Claim Construction Brief for
U.S. Patent No. 5,825,352

CASE NO. 3:06-CV-01839 CRB