1   KARL J. KRAMER (CA SBN 136433)
    ELLEN S. REINSTEIN (CA SBN 227833)
2   ERIKA L. LABIT (CA SBN 234919)
    MORRISON & FOERSTER LLP
3   755 Page Mill Road
    Palo Alto, California  94304-1018
4   Telephone: (650) 813-5600
    Facsimile: (650) 494-0792
5   kkramer@mofo.com

6   Attorneys for Defendant
    SYNAPTICS, INC.
7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11

12  ELANTECH DEVICES CORPORATION, a          Case No.    C06-01839 CRB
    corporation existing under the laws of Taiwan,
13  R.O.C.,                                  **SYNAPTICS, INC.'S REPLY
                                             CLAIM CONSTRUCTION
14                  Plaintiff,               BRIEF CONCERNING THE
                                             SYNAPTICS PATENTS**
15
         v.
16
17  SYNAPTICS, INC., a Delaware corporation;
    AVERATEC, INC., a California corporation;
18  and PROSTAR COMPUTER, INC., a
    California corporation,
19
                    Defendants.
20
21  AND RELATED COUNTERCLAIMS

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.     SUMMARY OF CLAIM CONSTRUCTION ARGUMENT ............................................. 1

II.    LEGAL STANDARDS FOR CLAIM CONSTRUCTION ................................................. 1

III.   CONSTRUCTION OF THE ASSERTED SYNAPTICS PATENT CLAIMS ................. 3

    A.     "Incrementally Move" Does Not Mean "Equations 12 And 13" ............................. 3

    B.     The Signaling Steps Are Not Limited By The Illustrations In The Patents ............ 6

        1.     "Signal" Is Not Limited To One Type Of Signal ........................................ 6

        2.     Elantech Does Not Defend Its Definition Of "Maintaining" ..................... 9

    C.     The "Corner Tap" Claim Steps Do Not Require A Specific Order ...................... 10

    D.     "Data Packet Processor" Is Not Limited To "Software" ..................................... 12

IV.    CONCLUSION ............................................................................................................... 15

# TABLE OF AUTHORITIES

**Page**

*Agfa Corp. v. Creo Prods., Inc.,*
451 F.3d 1366 (Fed. Cir. 2006) ........................................................................... 13

*Altiris v. Symantec Corp.,*
318 F.3d 1363 (Fed. Cir. 2003) ..................................................................... 1, 11

*Bell Atl. Network Serv., Inc. v. Covad Comm'ns Group, Inc.,*
262 F.3d 1258 (Fed. Cir. 2001) ........................................................................... 14

*Combined Sys. v. Def. Tech. Corp. of Am. and Fed. Labs.,*
350 F.3d 1207 (Fed. Cir. 2003) ........................................................................... 11

*Conoco, Inc. v. Energy & Envtl. Int'l,*
460 F.3d 1349 (Fed. Cir. 2006) ............................................................................. 2

*Digital Biometrics, Inc. v. Identix, Inc.,*
149 F.3d 1335 (Fed. Cir. 1998) ........................................................................... 14

*Eolas Tech. Inc. v. Microsoft Corp.,*
399 F.3d 1325 (Fed. Cir. 2005) ........................................................................... 14

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l,*
No. 03-1431 SBA, 2006 U.S. Dist. LEXIS 36788 (N.D. Cal. May 25, 2006) ..................... 2, 5

*Gemstar-TV Guide Int'l, Inc. v. ITC,*
383 F.3d 1352 (Fed. Cir. 2004) ............................................................................. 5

*Home Diagnostics, Inc. v. Lifescan, Inc.,*
381 F.3d 1352 (Fed. Cir. 2004) ............................................................................. 6

*Interactive Gift Express, Inc. v. Compuserve, Inc. et. al.,*
256 F.3d 1323 (Fed. Cir. 2001) ..................................................................... 10, 11

*Interactive Pictures Corp. v. Infinite Pictures, Inc.,*
274 F.3d 1371 (Fed. Cir. 2001) ........................................................................... 14

*Invitrogen Corp. v. Clontech Labs., Inc.,*
429 F.3d 1052 (Fed. Cir. 2005) ........................................................................ 3, 5

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
358 F.3d 898 (Fed. Cir. 2004) ........................................................................... 13

*Modine Mfg. Co. v. United States Int'l Trade Comm'n,*
75 F.3d 1545 (Fed. Cir. 1996) ........................................................................... 14

*Overhead Door Corp. v. Chamberlain Group, Inc.,*
194 F.3d 1261 (Fed. Cir. 1999) ........................................................................... 14

*Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005) ............................................. 2, 13

*SanDisk Corp v. Memorex Prods., Inc.,*
415 F.3d 1278 (Fed. Cir. 2005) ............................................................................. 5

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Teleflex v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002)..............................................................................13

*Transmatic, Inc. v. Gulton Indus., Inc.*,
    53 F.3d 1270 (Fed. Cir. 1995)...........................................................................6, 13

*Varco, L.P. v. Pason Sys. USA Corp.*,
    436 F.3d 1368 (Fed. Cir. 2006)...............................................................................5

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)...............................................................................11

*Wang Labs., Inc. v. Am. Online, Inc.*,
    197 F.3d 1377 (Fed. Cir. 1999)..............................................................................14

1  **I.    SUMMARY OF CLAIM CONSTRUCTION ARGUMENT**

2       In response to the Court's February 14, 2007 Order, Elantech Devices Corporation

3  ("Elantech") chose Joint Claim Terms 9, 10, 11, and 13 as the terms it most wants the Court

4  to construe.  These Joint Claim Terms relate to only two of the four patents – the '411 and

5  '931 Patents – that Synaptics, Inc. ("Synaptics") is asserting in this action.  Synaptics will

6  primarily address Elantech's arguments pertaining to these terms.[1]

7       Elantech openly argues that the disputed claim terms should be narrowly limited to

8  the preferred embodiments disclosed in the patent, or even narrower.  Contrary to Elantech's

9  arguments, simple terms such as "incrementally move" and "signal" should not be limited to

10  very specific types of increments or signals.  Elantech cites nothing from the patent

11  specifications or prosecution histories to support such narrow readings of broad, general

12  terms.  Moreover, Elantech's argument that the steps of the "corner tap" claims (Appendix A,

13  Joint Claim Term 11) should be limited to a particular order, ignores the literal language of

14  the claims and the primary case that Synaptics cited, *Altiris v. Symantec Corp.*, 318 F.3d

15  1363, 1370 (Fed. Cir. 2003).  As the preferred embodiment indisputably shows, and the

16  claims plainly suggest, no such order is required in Joint Claim Term 11.

17  **II.    LEGAL STANDARDS FOR CLAIM CONSTRUCTION**

18       Elantech falsely conflates two distinct sentences from Synaptics' brief to argue that

19  Synaptics incorrectly asserts that "claim construction 'begins and ends' with the 'ordinary

20  and customary meaning' of the claim terms alone."  (Elantech Devices Corp.'s Opposition

21  Claim Construction Brief Re: Synaptics' '052, '411, '591, and '931 Patents ("Elantech Opp.

22  Brief"), at 1:4-6.)  Instead, at pages 1-2 of the Opening Brief, Synaptics set forth a standard

23  litany of the law on claim construction that Elantech simply ignores: (1) the claim

24  construction inquiry begins and ends with the actual words in the claims; (2) claim terms are

25

26      [1]  As set forth in the 3rd Amended Joint Claim Chart (Appendix A hereto), the parties now
agree upon the proper construction of Joint Claim Terms 1, 2, and 8, and Elantech has abandoned

27  its argument that Joint Claim Term 5 is indefinite.  Because these issues are no longer in dispute,
the Court's order should include rulings on these Joint Claim Terms.

28

given their ordinary meaning unless the specification specially defines them; (3) courts look to publicly available information to guide the determination of what the ordinary meaning of a claim term is to one of skill in the art; (4) extrinsic evidence, including expert testimony, is helpful when it is consistent with the patent and claims; and (5) the claims should be construed in light of the specification, but the specification examples should not be read into the ordinary words used in the claims.  (*See* Corrected Synaptics Opening Claim Construction Brief ("Opening Brief").)  Elantech does not dispute any of these legal maxims.

The only substantive issue of law that Elantech raises is that courts should view expert testimony with caution because it might be "biased."  (Elantech Opp. Brief at 1:16-17.)  This generic warning has little weight here because Elantech presents no facts to suggest that Dr. Wolfe's expert explanations are "biased" in the least.  Synaptics presented Dr. Wolfe's testimony because the teachings in the patents relate to electrical engineering concepts concerning the design of touchpads -- something with which the Court and the average juror may not have much familiarity.  *See Conoco, Inc. v. Energy & Envtl. Int'l*, 460 F.3d 1349, 1362 (Fed. Cir. 2006) ("extrinsic evidence in the form of expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology . . .") (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005)).  Dr. Wolfe explained how one of ordinary skill in the art would understand the teachings in the patent specifications to cover a broad range of design techniques, not only isolated illustrations or embodiments in the patents.

Such information can be, and in this case is, important in deciding claim construction.  *See Fresenius Med. Care Holdings, Inc. v. Baxter Int'l*, No. 03-1431 SBA, 2006 U.S. Dist. LEXIS 36788, at *41-42 (N.D. Cal. May 25, 2006).  Without the information necessary to appreciate the full teachings in the patent specification from the perspective of one of skill in the art, the Court may not fully appreciate the proper scope of the claims.

Although the thrust of Elantech's attack on Dr. Wolfe is short on particulars, the few instances in which Elantech actually takes issue with Dr. Wolfe prove that Elantech's complaints are without merit.  (Rebuttal Expert Declaration of Andrew Wolfe Ph.D ("Wolfe

1   Rebuttal Decl."), ¶¶ 3-22.)  Although it had a full and fair opportunity to do so, Elantech has

2   presented no alternative view from the perspective of one of ordinary skill in the art of

3   touchpad design.  Elantech's attorney argument about the views of one of ordinary skill in

4   the art cannot substitute for *evidence*.  *Invitrogen Corp. v. Clontech Labs., Inc*., 429 F.3d

5   1052, 1068 (Fed. Cir. 2005) ("Unsubstantiated attorney argument regarding the meaning of

6   technical evidence is no substitute for competent, substantiated expert testimony.").

7   **III.    CONSTRUCTION OF THE ASSERTED SYNAPTICS PATENT CLAIMS**

8       **A.    "Incrementally Move" Does Not Mean "Equations 12 and 13."**

9       Elantech does not assert that in ordinary usage "incrementally move" means

10  equations 12 and 13 from the '411 Patent.  Elantech also does not assert that "incrementally

11  move" is specially defined in the patent specification.  Instead, Elantech argues that

12  "incrementally move" should be narrowed to equations 12 and 13 because (1) the claim

13  words require these equations to distinguish "incrementally move" from "first cursor motion

14  signals," and (2) those equations are the only embodiment contemplated by the inventors.

15  Both of these arguments are wrong.

16      First, by ignoring the actual context of the claim terms, Elantech creates a false

17  conflict between the "incrementally move" aspect of the "second cursor motion signal" and

18  the movement associated with the "first cursor motion signals."  A careful reading of the

19  actual claim language disproves Elantech's argument.

20      Claim 46 recites a method for using a finger or other object on a touchpad to move a

21  cursor on the display screen.  As noted in Synaptics' Opening Brief, a touchpad may be

22  smaller than the screen so that the user's finger may reach the edge of the touchpad before

23  the cursor reaches the desired place on the screen.  The method in claim 46 permits the user

24  to leave a finger in the edge region of the touchpad and still continue to move the cursor on

25  the screen.  The claim states that in addition to the normal cursor motion signals that are sent

26  when a finger is on the touchpad, when the finger is near an edge of the touchpad, a second

27  cursor motion signal is generated that adds an incremental value in the direction of the

28

1    nearest edge of the touchpad.  (Expert Declaration of Andrew Wolfe Ph.D Concerning Claim

2    Construction of Synaptics' Patents, executed January 26, 2007 ("Wolfe Decl."), ¶ 15.)

3          In exact words, claim 46 states that if an object, for example a finger, is moved on the

4    touchpad, "first cursor motion signals" are generated "for causing said cursor to move in a

5    direction on the display screen representing the difference between a previous position of

6    said object and said present position of said object reported by said present-position signals."

7    This means that when the finger moves on the touchpad, first signals for moving a cursor (for

8    example, data representing the change in the X direction ("$\Delta X$"), and change in the Y

9    direction ("$\Delta Y$")), are generated to move the cursor on the display screen.

10         The claim also states that "second cursor motion signals" are generated if the finger is

11   in an "outer region" of the touch pad.  The claim requires "said second cursor motion signals

12   for causing said cursor *to incrementally move* on the display screen *a selected distance in a*

13   *fixed direction* relative towards said outer edge of said sensing plane to which said object is

14   proximate."  (Emphasis supplied.)  This language specifies that "second cursor motion

15   signals" are "for causing said cursor to incrementally move . . . a selected distance" toward

16   the near edge of the touchpad.  Claim 46 then states that when the finger is in the "outer

17   region" of the touchpad, the method requires "moving said cursor in accordance with said

18   first cursor motion signals *combined with* said second cursor motion signals."

19         In light of the literal language of the claim, Elantech's argument has no merit.  The

20   plain meaning of "incrementally move" in the claims is that the "second cursor motion

21   signals" are "for causing" the cursor to move in increments "a selected distance" toward the

22   near edge.  (Wolfe Decl., ¶ 16 and Exhibit 11.)  Despite Elantech's alleged confusion

23   (Elantech Opp. Brief at 2:9-10), that is "how moving 'in increments' differs from simply

24   moving" with normal "first cursor motion signals."  There is no conflict in the claims

25   between these types of "moving."  The claim phrase "incrementally move . . . a selected

26   distance in a fixed direction," cannot reasonably be narrowed to mean "movement defined by

27   the second component of Equations 12 and 13 in the '411 patent, namely, $S(X_{cur} - X_{center})$ and

28   $S(Y_{cur} - Y_{center})$."  (*See* Elantech's definition in Appendix A attached hereto, Claim Term 13.)

1    Second, no evidence from the patent supports Elantech's improper attempt to narrow

2  the claims to one set of equations described in the '411 Patent specification. *Varco, L.P. v.*

3  *Pason Sys. USA Corp.*, 436 F.3d 1368, 1375 (Fed. Cir. 2006); *SanDisk Corp v. Memorex*

4  *Prods., Inc.*, 415 F.3d 1278, 1286 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 829 (2005)

5  (references to a preferred embodiment are not claim limitations). Elantech presents no

6  evidence to rebut Dr. Wolfe's citation to several alternatives described in the '411 Patent

7  specification for adding an increment to the cursor motion signals. (Wolfe Decl., ¶ 17.)

8  These alternative embodiments demonstrate that the inventors did not intend to limit the

9  claims to one embodiment. *Gemstar-TV Guide Int'l, Inc. v. ITC*, 383 F.3d 1352, 1372 (Fed.

10  Cir. 2004) (an embodiment of a claim term in the written description "does not limit the

11  otherwise broad claim language"); *Fresenius Med. Care Holdings,* 2006 U.S. Dist. LEXIS

12  36788, at *95-96 (preferred embodiment cannot be used to limit a claim). In opposition,

13  Elantech offers only improper attorney argument (*Invitrogen*, 429 F.3d at 1068), which is

14  confused and factually inaccurate. (Wolfe Rebuttal Decl., ¶¶ 4-14.)

15    Moreover, Elantech's response to Synaptics' claim differentiation position (Elantech

16  Opp. Brief at 3-4), ignores claims 30 and 32, which indisputably describe a more detailed

17  embodiment of "incrementally move . . . a selected distance in a fixed direction." Claim 30

18  recites the step of "generating second X and Y cursor motion signals" if the finger is in the

19  "outer region." As in claim 46, these second cursor motion signals in claim 30 are for

20  "*incrementally moving* said cursor on the display screen *a selected distance.*" However,

21  claim 30 further explains that the "selected distance" represents for each of X and Y

22  directions the difference between the current position and a "fixed reference point":

> said second X and Y cursor motion signals incrementally moving
> said cursor on the display screen a selected distance in X direction
> representing the difference between an X location of a fixed
> reference point on said sensing plane and an X component of said
> present position of said object on said sensing plane and a selected
> distance in Y direction representing the difference between a Y
> location of a fixed reference point on said sensing plane and a Y
> component of said present position of said object on said sensing
> plane, said second cursor motion signals being generated so long
> as said object is in said outer region of said sensing plane.

1    (Wolfe Decl., Exhibit 2, '411 Patent, Col. 61, lines 18-33.)  Dependent claim 32 includes the

2    further limitation that the "fixed reference point is *the center* of the sensing plane."  Thus,

3    claim 32, which incorporates claim 30, recites in text the precise formulation of the example

4    increment set forth in equations 12 and 13 of the '411 Patent:  "$S(X_{cur} - X_{center})$" and "$S(Y_{cur} -$

5    $Y_{center})$."  (Wolfe Rebuttal Decl., ¶ 14.)  By contrast, claim 46 contains no such precise

6    limitation to the "selected distance" of the "increment" and, consequently, should not be

7    limited to equations 12 and 13 of the '411 Patent.  *Transmatic, Inc. v. Gulton Indus., Inc.*, 53

8    F.3d 1270, 1277-78 (Fed. Cir. 1995) (limitations from narrow claims cannot be read into

9    broader claims).

10          **B.       The Signaling Steps Are Not Limited By The Illustrations In The Patents.**

11          Elantech has chosen to focus the Court on Joint Claim Terms 9 and 10.  These claim

12   terms include the term "signal" and much of the dispute between the parties centers on

13   Elantech's effort to define the ordinary term "signal" to mean only a certain type of signal.

14                **1.       "Signal" Is Not Limited To One Type Of Signal**

15          Joint Claim Terms 9 and 10 (as well as Joint Claim Terms 3-7), require the use of a

16   "signal."  Elantech's proposed claim construction does not define "signal" with useful

17   alternative words that are helpful in elucidating the ordinary meaning of "signal" to one of

18   ordinary skill in the art.  Instead, Elantech simply restates the word "signal" and adds further

19   words to narrow the normal range of possible meanings for the word "signal."   Elantech

20   asserts that "signal" in Joint Claim Term 9 means "a signal that has a low and a high state."

21   This same narrow meaning is carried over into Joint Claim Term 10.  (Appendix A.)

22   Elantech is not "interpreting" what "signal" means, but rather, Elantech is blatantly and

23   impermissibly narrowing the word "signal" to a certain type of a "signal."  *See Home*

24   *Diagnostics, Inc. v. Lifescan, Inc.*, 381 F.3d 1352, 1357 (Fed. Cir. 2004) ("A patentee may

25   claim an invention broadly and expect enforcement of the full scope of that language absent a

26   clear disavowal or contrary definition in the specification.")  In this case, the claims do not

27   state that the "signal" must be of a particular type.  The claims are silent as to the type of

28   "signal" methodology used.

1    Elantech's claim construction is premised upon narrowly limiting the term "signal" to

2    the timing diagrams shown in Figure 15 of the '591 and '931 Patents. (Elantech Opp. Brief

3    at 9.) Elantech's lead argument in support of its position is that only "a signal that has a low

4    and a high state" can be "terminated" as recited in the claims. This argument is circular since

5    it is only true if "terminate" is narrowly construed to be the change of a "high" state signal to

6    a "low" state signal. The argument completely ignores that other signaling methodologies

7    plainly have ways of "terminating" a signal.[2] The only evidence from one of ordinary skill in

8    the art, Dr. Wolfe, is that each well-known signaling system has a method for "terminating"

9    the signal state, including, for example, sending a data packet signal indicating the

10    termination of the prior signal state. (Wolfe Decl., ¶¶ 34-36, 39.)

11    Contrary to Elantech's new assertions, the patents teach to one of ordinary skill in the

12    art that "signal" is to have a broad ordinary meaning and is not limited to "a signal that has a

13    low and a high state." (Wolfe Rebuttal Decl., ¶¶ 15-20.) First, although Figure 15 is

14    illustrative of the timing relationships between various signals and events in the preferred

15    embodiment, one of ordinary skill in the art would recognize these figures as merely

16    illustrative of the timing of the signaling and not the only means for signaling. (*Id.*, ¶ 17.)

17    Second, contrary to Elantech's unsupported argument, there are numerous express

18    and implicit references in the patent specification to signaling by transmission of packetized

19    data. (Wolfe Decl., ¶¶ 33-36; Wolfe Rebuttal Decl., ¶¶ 18-20.) For example, the patent

20    describes that "the virtual buttons can be inserted into the regular packet stream" (Wolfe

21    Decl., Exhibit 4, '591 Patent, column 37, lines 6-9, and Exhibit 5, '931 Patent, column 43,

22    lines 12-15), recognizing that a gesture signal in the form of a packet stream is an ordinary

23

24    _____

    [2] Elantech mentions "terminating" in its effort to limit the construction of "signal"
25    (Elantech Opp. Brief at 9), but does not provide any further explanation for its proposal to define
    "terminating" as "changing the state of the signal from the high signal state to the low signal
26    state." (Appendix A, Joint Claim Term 4.) Elantech's definition is not consistent with the
    teachings in the patent or the common understanding of those of ordinary skill in the art. (Wolfe
27    Decl., ¶¶ 39, 52, Exhibit 4, '591 Patent, Col. 37, lines 6-9, and Exhibit 5, '931 Patent, Col. 43,
    lines 12-15.)

28

1   method of communicating from an input device.  (*Id*.)  Elantech essentially concedes this

2   point, but argues that there is no disclosure in the patent of a processor for processing such

3   data packets.  (Elantech Opp. Brief at 11:5-9.)  This new argument fails because it is

4   undisputed that using processors to transmit packets of data as a signaling method predates

5   the patents-in-suit by decades and was well known in the art.  (Wolfe Rebuttal Decl., ¶ 18;

6   Wolfe Decl., ¶ 34.)  The patents teach to one of ordinary skill in the art that the claimed

7   gestures can be implemented in any variety of signaling methodologies.  (Wolfe Rebuttal

8   Decl., ¶¶ 17-20; Wolfe Decl., ¶ 35.)

9         To bolster its narrow definition of "signal," Elantech contends, at page 10, lines 22-24

10  of its Opposition Brief, that the patent specification distinguishes between sending packetized

11  "signals" representing motion and sending packetized "events" representing gestures, such as

12  "virtual buttons."  The patent refers to both as "signals": "Referring back to FIG. 1,

13  according to another aspect of the present invention, gesture unit 20 examines the (X,Y,Z)

14  data produced by arithmetic unit 16 to produce one or more 'virtual mouse button' *signal*s to

15  be sent along with the (ΔX, ΔY) *signals* to the host."  (Wolfe Decl., Exhibit 4, '591 Patent,

16  column 30, lines 33-37, and Exhibit 5, '931 Patent, column 33, lines 31-36 (emphasis

17  supplied).)  The patents include packets of "gesture" data, such as "virtual button"

18  information, as a type of "signal."

19        Elantech also never addresses the express teachings in the patents that the inventions

20  can be implemented "as a software program, hardware state machine, or otherwise.  All such

21  implementations are intended to fall within the scope of the present invention."  (Wolfe

22  Decl., ¶ 35, Exhibit 4, '591 Patent, Col. 35, lines 23-32, and Exhibit 5, '931 Patent, Col. 40,

23  lines 47-57.)  It is undisputed that in such embodiments, the "signal" need not be a voltage

24  level on a single wire that has a "high" state and a "low" state.  Indeed, "signals" may simply

25  be "flags" or "messages" residing in memory or registers or communicated over I/O

26  channels, for example.  (Wolfe Decl., ¶ 35.)  Moreover, the patents expressly disclose that

27  the signaling for the inventions may be implemented with packets of data defined by the then

28  well-known computer mouse communication protocols, which are not separate instances of a

"high" or "low" state. (*Id.*)  Each of these signaling types is contemplated within the broad designation "signal." (*Id.*, ¶¶ 34-35, 51-55, 57, 58.)  The claims literally cover all "signals," and nothing in the claims or patent specifications narrows the type of "signal" that the claims cover.

### 2.    Elantech Does Not Defend Its Definition Of "Maintaining"

Elantech's Opposition Brief mentions "maintaining," but nowhere provides any substantive explanation for its definition of "maintaining" as "continuously outputting the high signal state." (Appendix A, Joint Claim Terms 7, 10.)  As taught in the patents and as set forth in the unrebutted testimony of Dr. Wolfe, signals are "maintained" in a touchpad system in variety of ways.  For example, the patents teach that a signal previously sent may be retained until it is, in effect, rescinded. (Wolfe Decl., ¶ 41, Exhibit 4, '591 Patent, Col. 33, lines 1-3, Col. 37, lines 6-9, and Exhibit 5, '931 Patent, Col. 36, lines 6-8, Col. 43, lines 12-15.)  The patent also teaches that a signal previously sent will dictate the operation in question while subsequent signals are suppressed. (*Id.*)  Moreover, the standard mouse protocol at the time included all of the concepts of "to continue, retain, or repeat" in maintaining signals relating to gestures. (*Id.*)  These teachings are also perfectly consistent with the wide variety of ways those of skill in the art would have known to "maintain" a signal in the context of touch-pad technology. (*Id.*)  The Court should reject Elantech's effort to narrow the claims beyond their ordinary meaning.[3]

---

[3]  Elantech still offers no explanation for adding to Joint Claim Term 5 the phrases "for a predetermined period of time," and "which interprets the termination of the first signal and the existence of a second high signal state."  Nothing in the claims or the patent specification requires these additional phrases to be added to this particular claim phrase. (Wolfe Decl., ¶¶ 37, 53.)  Similarly, Joint Claim Terms 3 and 6 do not involve signals that the "gesture *will potentially occur* on the touch-sensor pad." (Appendix A, Terms 3 and 6 (emphasis added).)  Nothing in the claims or the teachings of the patents requires these words in the recited claim phrase. (Wolfe Decl., ¶¶ 38, 51, 54; Wolfe Rebuttal Decl., ¶¶ 21-22.)  Elantech also does not even attempt to defend its contention that "repeatedly sending" requires an unbroken, continuous signal level. (Wolfe Decl., ¶¶ 43, 56 and Exhibit 4, '591 Patent, Col. 39, lines 13-23; Col. 44, lines 23-56.)

1    **C.    The "Corner Tap" Claim Steps Do Not Require A Specific Order.**

2    The parties dispute whether the steps of claim 5 of the '931 Patent (Appendix A, Joint

3    Claim Term 11) must be performed in the order in which they are recited in the claim.

4    Elantech does not dispute the general rule that "[u]nless the steps of a method actually recite

5    an order, the steps are not ordinarily construed to require one." *Interactive Gift Express, Inc.*

6    *v. Compuserve, Inc. et. al.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001). The dispute in this case

7    turns on whether the literal words describing the steps *require* an order of the steps.

8    Claim 5 of the '931 Patent recites "A method for recognizing a tap gesture made on a

9    touch-sensor pad in a touch sensing system providing X and Y position information to a

10    host." The claims make clear that a "tap gesture" is to occur on a touchpad in a "touch

11    sensing system." The two separate steps of the claim in dispute are:

12    detecting the occurrence of a tap gesture made by a tapping object
       on the touch-sensor pad

13

14    detecting in which of at least one corner of the touch-sensor pad
       said tap gesture occurred

15    The first step is "detecting" that a tap gesture has occurred. The first step is not the

16    "tap gesture" itself or the occurrence of the "tap gesture;" rather, it is the action of

17    "detecting" by the "touch sensing system" of a "tap gesture" on the touch pad. The second

18    step is "detecting which of at least one corner of the touch-sensor pad said tap gesture

19    occurred." This is also a "detecting" step. This step does not literally require that the system

20    has already detected contact on the touch-sensor pad as a "tap gesture." In other words, the

21    second step does not require "detecting in which of at least one corner of the touch-sensor

22    pad said *detected* tap gesture occurred." Rather, the second "detecting" step only requires

23    that the "tap gesture" has actually "occurred" on the touchpad. There is no logical

24    requirement that the system perform one detection step before the other.

25    This interpretation is consistent with the teachings in the patent specification. (Wolfe

26    Decl., ¶ 48.) Elantech does not dispute that Figure 17 describes an algorithm for processing

27    information from the touch-sensor pad that executes the two detection steps concurrently,

28    with many overlapping steps. (*Id.*, ¶ 48 and Exhibit 5, '931 Patent, Col. 40, line 66-Col. 41,

1    line 4.)  Thus, in the sole embodiment in the '931 Patent, there is no "separate" process and

2    no required order in the algorithm for detecting a tap gesture and detecting the corner in

3    which the tap gesture occurred.  (*Id.*)  Elantech does not dispute that its proposed

4    construction impermissibly would exclude the embodiment disclosed in the patent.  *Vitronics*

5    *Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (A construction that

6    excludes the preferred embodiment would "rarely, if ever, [be] correct . . . .").

7         Unlike in the case Elantech cites, each step of claim 5 is *not* conditioned on the

8    completion of the preceding step by an explicit reference to the completed result as a

9    component of the next step.  *See Combined Sys. v. Def. Tech. Corp. of Am. and Fed. Labs.*,

10   350 F.3d 1207, 1212 (Fed. Cir. 2003).  The steps construed in *Combined Systems* included

11   "*forming* folds," and then "inserting said *formed* folds."  350 F.3d at 1211-1212 (emphasis

12   supplied).  By contrast, the steps of claim 5 include "*detecting* the occurrence of a tap

13   gesture" and "detecting" where "said tap gesture occurred."  The second "detecting" step in

14   claim 5 of the '931 Patent, does not reference the completed result of the previous step,

15   namely, the *detected* tap gesture, it merely refers to the actual "tap gesture" that occurred on

16   the touchpad.  *See*, *e.g.*, *Interactive Gift Express, Inc.*, 256 F.3d at 1344 (finding no necessary

17   order of the steps where subsequent claims reference actions performed by previous claims,

18   such as "providing a request reproduction code" (step 2), "providing an authorization code"

19   (step 3), and "receiving the request reproduction code and the authorization code" (step 4).)

20        Elantech ignores the Federal Circuit's ruling in *Altiris*, 318 F.3d at 1370, which is

21   directly on point.  In *Altiris*, plaintiff Altiris asserted a method claim that first listed a "testing

22   automatically" step that was followed by other steps that were conditioned upon the result of

23   the "testing" step.  The "automatically testing" step required "reading a boot selection flag,"

24   but a later step recited "setting *said boot selection flag*."  Although the preferred embodiment

25   did follow the sequential order of the recited steps, the Court held that the claim language

26   itself "neither grammatically nor logically indicates that the 'setting' step must occur in a

27   particular order compared to the other steps."  *Id.* at 1370-71.  Similarly, a careful reading of

28   the actual claim terms reveals that there is no necessary order to the claimed method steps of

1   claim 5 of the '931 Patent.  The Court should not limit the claim steps to any particular order.

2   (Wolfe Decl., ¶¶ 47-48, 59.)

3          **D.    "Data Packet Processor" Is Not Limited to "Software."**

4          Although Elantech did not choose Joint Claim Term 12 as one of the top four

5   priorities for claim construction, Synaptics provides below its reply to Elantech's Opposition

6   Brief to complete the record concerning the proper construction of Joint Claim Term 12.

7          Elantech does not dispute with evidence that one of skill in the art would understand

8   the ordinary words "data packet processor" to mean "hardware and/or program code, for

9   example, software executed on a central processing unit, that processes data packets."

10  (Wolfe Decl., ¶ 21 and Exhibit 7.)  Elantech does not argue that the specification expressly

11  defines the term "data packet processor" to have a special meaning.  Instead, Elantech argues

12  for an extraordinary, narrow meaning, because only one embodiment is disclosed.  There is

13  no basis in law or fact for such a narrow reading of the phrase "data packet processor."

14         First, Elantech criticizes Synaptics' definition stating that "Perhaps recognizing that

15  no such system is disclosed in the patent, Synaptics provides an 'example' of such a system

16  in its claim construction: 'software executed on a central processing unit, that processes data

17  packets.'"  (Elantech Opp. Brief at 7:15-17.)  In fact, Synaptics took this allegedly improper

18  "example" from the description of the preferred embodiment in the patent specification:

19  "Packet processor 20, implemented as a program **on a central processing unit** . . . ." (Wolfe

20  Decl., Exhibit 3, '052 Patent, Col. 2, lines 52-54.)  The patent also states, "[p]referrably,

21  packet processor 20 is computer software executed **on a central processing unit**."  (*Id.*, ¶ 22

22  and Exhibit 3, '052 Patent, Col. 3, lines 14-17.)  These statements make clear that the

23  preferred embodiment of the "data packet processor" is not simply "software" alone, but

24  software working with a hardware processing unit.  Elantech's proposed definition is even

25  narrower than the preferred embodiment, since Elantech focuses solely on "software,"

26  without hardware.

27         Second, although Elantech's focus on "software" alone is inappropriate, it is also

28  clear from the claims that "data packet processor" cannot reasonably be limited to the

1    preferred embodiment of a software-based input device driver executed by a central

2    processing unit.  The inventors included the broad claim language "data packet processor" in

3    claim 1 of the '052 Patent.  The inventors narrowed the term "data packet processor" in claim

4    4, which is dependent upon claim 1, by stating the further limitation in claim 4 that "said data

5    packet processor comprises a software-based input device driver executed by a central

6    processing unit on said computer."  (Wolfe Decl., Exhibit 3, '052 Patent, Col. 6, lines 35-37.)

7    Thus, the inventors knew how to craft a narrow claim directed to the preferred embodiment

8    and included that narrower limitation in claim 4.  Under these facts, the Court should not read

9    the narrower description of the preferred embodiment into the broader claim 1.  *Transmatic*,

10    53 F.3d at 1277-78 (limitations from narrow claims cannot be read into broader claims).

11      Third, the descriptions in the patent specification are not sufficient to conclude that

12    the inventors intended to exclude the ordinary meaning of "processor" as a hardware unit.

13    The inventors stated only that the invention was "preferably" software and hardware working

14    together.  The Federal Circuit has "repeatedly rejected the contention that depiction of a

15    single embodiment in a patent necessarily limits the claims to that depicted scope."  *Agfa*

16    *Corp. v. Creo Prods., Inc.*, 451 F.3d 1366, 1376 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at

17    1323); *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 907 (Fed. Cir. 2004);

18    *Teleflex v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1327 (Fed. Cir. 2002).

19      Elantech cites no evidence that the Synaptics inventors expressly abandoned other

20    embodiments in the prosecution correspondence with the examiner, or elsewhere.  Indeed,

21    the '052 Patent inventors made clear in their patent that:

22

23       While the present invention has been described with
   reference to certain preferred embodiments, those skilled in

24       the art will recognize that various modifications and other
   embodiments may be provided…These and other

25       embodiments are intended to fall within the scope of the
   present invention.  These and other variations upon and

26       modifications to the embodiment described herein are
   provided for by the present invention which is limited only

27       by the following claims.

28

(Wolfe Decl., Exhibit 3, '052 Patent, Col. 6, lines 1-12.)   Given these express statements, it would improper to limit the ordinary scope of "data packet processor" to the preferred embodiment.

This is especially true in view of the trivial nature of the distinction Elantech is trying to establish: that somehow those of skill in the art reading the patent would not understand the common availability and interchangeability of hardware and software to perform data packet processing.  The trivial interchangeability of software and hardware is undisputed in the relevant field of computer technology.  (Wolfe Decl., ¶ 21.)  *See also Eolas Tech. Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1339 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 568 (2005) ("process and product – software and hardware – are practically interchangeable in the field of computer technology"); *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1383 (Fed. Cir. 2001) (citing *Overhead Door Corp. v. Chamberlain Group, Inc.*, 194 F.3d 1261, 1269-70 (Fed. Cir. 1999)) (hardware and software implementations found to be interchangeable substitutes in the art).

The cases Elantech cites to support its effort to narrow the claims to one example from the specification are inapposite.  The construction in those cases was supported by statements made during *patent prosecution* and not, as here, on an inference drawn from the inventors' choice to disclose one preferred embodiment of a program running on a processor that indisputably would have enabled those of skill in the art to develop and use a hardware only embodiment.[4]  The '052 Patent inventors did not intended to limit the phrase "data packet processor" to a "software" only embodiment.

_____

[4] *See Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1347 (Fed. Cir. 1998) (prosecution history demonstrates inventors clearly limited scope of claim at issue to distinguish invention from prior art); *Bell Atl. Network Serv., Inc. v. Covad Comm'ns Group, Inc.*, 262 F.3d 1258, 1273 (Fed. Cir. 2001) (prosecution history and claim language support limitation of claim terms); *Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1551-52 (Fed. Cir. 1996), *abrogated on other grounds*, *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 234 F.3d 558 (Fed. Cir. 2000) (en banc) (prosecution history shows "conspicuous and unambiguous" change made by inventors to narrow numerical range relating to claim term "relatively small"); *Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1383-84 (Fed. Cir. 1999) (inventor limited claim term during prosecution of parent application).

1    **IV.    CONCLUSION**

2         The Court should reject Elantech's proposed constructions as impermissibly

3    narrowing the ordinary meaning without legal or factual justification.  Synaptics requests that

4    the Court adopt Synaptics' proposed claim constructions for the four Synaptics patents-in-

5    suit as set forth in the attached 3rd Amended Joint Claim Construction Chart.

6

7    Dated: February 21, 2007                    KARL J. KRAMER
                                                  ELLEN S. REINSTEIN
8                                                 ERIKA L. LABIT
                                                  MORRISON & FOERSTER LLP
9

10

11                                          By:    /s/ Karl J. Kramer
                                                   Karl J. Kramer
12
                                                  Attorneys for Defendant
13                                                SYNAPTICS, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   Pa1131388

# APPENDIX A

# 3rd AMENDED JOINT CLAIM CONSTRUCTION CHART

| Claim Terms | Synaptics Claim Construction | Elantech Claim Construction |
|---|---|---|
| 1. "tap gesture" ('931/'591) | "a quick tap of the finger on the pad, of short duration and involving little or no X or Y finger motion, that is presented to the host as a brief click of the mouse button" ||
| 2. "X and Y position information" ('931/'591) | "information about the horizontal and vertical positioning of an object on a touch sensor" ||
| 3. "initiating a first signal to the host indicating the occurrence of said gesture" ('591) | "initiating transmission of a first set of data to a host that indicates that a tap gesture has occurred on the touch-sensor pad" | "outputting to the host a high state of a signal that has a low and a high state, and the high signal state represents that a double tap gesture will potentially occur on the touch-sensor pad" |
| 4. "terminating said first signal" ('591) | "terminating the previous signal" | "changing the state of the signal from the high signal state to the low signal state" |
| 5. "sending a second signal to said host indicating said second gesture" ('591) | "sending a second set of data to a host that indicates that a second tap gesture has occurred on the touch-sensor pad" | "changing the state of the signal from a low signal state to a high signal state for a predetermined period of time, and sending the high signal state to the host which interprets the termination of the first signal and the existence of a second high signal state as being a double tap gesture" |
| 6. "initiating a drag gesture signal to the host indicating the occurrence of a gesture" ('591) | "initiating transmission of a first set of data to a host that indicates that a gesture has occurred on the touch-sensor pad" | "outputting to a host a high state of a signal that has a low and high state, and the high signal state represents that a drag gesture will potentially occur on the touch-sensor pad" |
| 7. "maintaining said drag gesture signal" ('591) | "to continue, retain, or repeat the drag gesture signal" | "continuously outputting the high signal state" |
| 8. "repeatedly sending X and Y position information to said host for the duration of said second presence" ('591) | "after the second presence is detected, repeatedly sending information about the horizontal and vertical positioning of an object on a touch sensor to a host while the second presence continues" ||
| 9. "initiating a signal to the host indicating the occurrence of said tap gesture" ('931) | "initiating the transmission of a set of data to a host that indicates that a tap gesture has occurred on the touch-sensor pad" | "outputting to the host a high state of a signal that has a low and a high state, where the high signal state represents that a tap gesture occurred on the touch-sensor pad" |
| 10. "maintaining said signal for a predetermined period of time" ('931) | "to continue, retain, or repeat the signal for a period of time that was determined before" | "continuously outputting the high state of the signal only for a predetermined time period (i.e., changing the signal state from high to low at the end of the predetermined time period)" |
| 11. "detecting in which of at least one corner of the touch-sensor pad said tap gesture occurred" ('931) | "detecting that a tap gesture has occurred in at least one corner, the identity of which is distinguished in some way from other corners of the touch-sensor pad" | "after detecting the occurrence of the tap gesture, separately detecting in which of at least one corner of the touch-sensor pad the tap gesture occurred" |
| 12. "data packet processor" ('052) | "hardware and/or program code, for example, software executed on a central processing unit, that examines data packets" | "software for processing data packets and sending messages" |
| 13. "incrementally move" ('411) | "to move in increments" | "movement defined by the second component of Equations 12 and 13 in the '411 patent, namely, $S(X_{cur} - X_{center})$ and $S(Y_{cur} - Y_{center})$" |

# 3rd AMENDED JOINT CLAIM CONSTRUCTION CHART

| Claim Terms | Synaptics Claim Construction | Elantech Claim Construction |
|---|---|---|
| 14. "operative coupling" ('352) | "finger-induced electrical effect" | |
| 15(a) "scanning the touch sensor" ('352) | "measuring the traces in the touch sensor and assigning them to a sequence corresponding to their physical order on the touch sensor" | "examining information associated with the touch sensor" |
| 15(b) "means for scanning the touch sensor . . ." ('352) | 112 ¶6 Claimed Function<br>"scanning the touch sensor to (a) identify a first maxima in a signal corresponding to a first finger, (b) identify a minima following the first maxima, and (c) identify a second maxima in a signal corresponding to a second finger following said minima," as those terms are defined below<br><br>112 ¶6 Corresponding Structures<br>analog multiplexor 45, capacitance measuring circuit 70, analog to digital converter 80, microcontroller 60 | |
| 16. "scanning the touch sensor to . . . identify a first maxima in a signal corresponding to a first finger" ('352) | "measuring the trace values of the touch sensor corresponding to a first finger and determining the point at which the measured values cease to increase and begin to decrease" | "identify a first peak value in a finger profile obtained from scanning the touch sensor" |
| 17. "scanning the touch sensor to . . . identify a minima following the first maxima" ('352) | "measuring the trace values of the touch sensor following, in scan order, after the first maxima and determining the point at which the measured values cease to decrease and begin to increase" | "identify the lowest value in the finger profile that occurs after the first peak value, and before another peak value is identified" |
| 18. "scanning the touch sensor to . . . identify a second maxima in a signal corresponding to a second finger following said minima" ('352) | "measuring the trace values corresponding to a second finger following, in scan order, said minima and determining the point at which the measured values cease to decrease and begin to increase" | "after identifying the lowest value in the finger profile, identify a second peak value in the finger profile" |
| 19(a) "providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" ('352) | No further construction necessary since ordinary meaning is sufficient. | |
| 19(b) "means for providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" ('352) | 112 ¶6 Claimed Function<br>"providing an indication of the simultaneous presence of two fingers in response to identification of said first and second maxima" | |
| | 112 ¶6 Corresponding Structure<br><br>None | 112 ¶6 Corresponding Structure<br><br>microcontroller 60 |