1  KARL J. KRAMER (CA SBN 136433)
   ELLEN S. REINSTEIN (CA SBN 227833)
2  ERIKA L. LABIT (CA SBN 234919)
   MORRISON & FOERSTER LLP
3  755 Page Mill Road
   Palo Alto, California  94304-1018
4  Telephone: (650) 813-5600
   Facsimile: (650) 494-0792
5  kkramer@mofo.com

6  Attorneys for Defendant
   SYNAPTICS, INC.
7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                    SAN FRANCISCO DIVISION

11

12  ELANTECH DEVICES CORPORATION, a          Case No.    C06-01839 CRB
    corporation existing under the laws of Taiwan,
13  R.O.C.,                                   **REBUTTAL EXPERT
                                              DECLARATION OF ANDREW
14                   Plaintiff,               WOLFE Ph.D. CONCERNING
                                              CLAIM CONSTRUCTION OF
15          v.                                SYNAPTICS' PATENTS**

16  SYNAPTICS, INC., a Delaware corporation;
    AVERATEC, INC., a California corporation; and
17  PROSTAR COMPUTER, INC., a California
    corporation,
18
                     Defendants.
19

20  AND RELATED COUNTERCLAIMS.

21

22

23

24

25

26

27

28

I, Andrew Wolfe, hereby declare as follows:

1.      The statements made in this declaration are of my own personal knowledge, and I could and would so testify if called as witness in this matter.

2.      I submit this Rebuttal Declaration in response to new issues raised for the first time in Elantech Devices Corporation's ("Elantech") Opposition Claim Construction Brief Re: Synaptics' '052, '411, '591 and '931 Patents ("Elantech's Opposition Brief"), filed February 12, 2007.  In particular, in Elantech's Opposition Brief, Elantech makes assertions concerning the claim terms "incrementally move" and "signal" that are not consistent with the teachings in the patents at issue as understood by one of ordinary skill in the art.

## I.     "INCREMENTALLY MOVE"

3.      In my prior Declaration, I stated that one of ordinary skill in the art would understand the phrase "incrementally move" as recited in claim 46 of the '411 Patent to mean "to move in increments."  Elantech argues in its Opposition Brief that "Synaptics asserts numerous incorrect and misleading arguments in asking for this construction."  (Elantech's Opposition Brief at page 3, lines 3-4.)  Elantech then makes several new arguments about the disclosure in the '411 Patent that are unsupported by any analysis from the point of view of one of ordinary skill in the art.  (Elantech's Opposition Brief at page 3, lines 5-22.)

4.      The specification of the '411 Patent describes four different alternative strategies for determining an "increment" to be added to normal cursor motion signals representing normal X and Y movement on the touchpad.  (The '411 Patent is attached as Exhibit 2 to my prior Declaration, executed January 26, 2007.)  One of these is the incremental portion of motion vector described by equations 12 and 13, *i.e.*, incremental X motion of $S(Xcur - Xcenter)$ and incremental Y motion of $S(Ycur - Ycenter)$.  Elantech asserts that the claim phrase "incrementally move" in claim 46 of the '411 Patent should be limited to the equations 12 and 13 set forth in the specification.  As I have previously stated in my prior Declaration, this assertion is contrary to the ordinary meaning that one of ordinary skill in the art would apply to the claim phrase "incrementally move."  Elantech's assertion is also inconsistent with the teachings in the '411 Patent specification.

5.      A second alternative is described in the '411 Patent, column 31, lines 8 through 29. In this alternative embodiment, the incremental motion vector may be any of three different values when the finger is in an edge region.  These are:

1)      X motion of $S(Xcur - Xcenter)$ and Y motion of $S(Ycur - Ycenter)$

2)      X motion of 0 and Y motion of $S(Ycur - Ycenter)$

3)      X motion of $S(Xcur - Xcenter)$ and Y motion of 0

This is quite different from the first embodiment and would provide a different experience for the user.

6.      A third variation of the increment computation is described in column 32 lines 25 through 30 of the '411 Patent.  In this case, the non-incremental motion component (dX and dY) is replaced by the incremental motion component (eX and eY).  This would effectively double the amount of incremental motion.  This third description lacks the "first motion signal" of claim 46, yet it still offers an additional alternative for incremental movement.

7.      Yet another alternative is described in column 32, lines 30 through 48 of the '411 Patent. In this fourth embodiment, the incremental motion (called the glide speed in this example), is proportional to the distance from the finger to the border of the outer zone.  This is different than the formulae disclosed in equations 12 and 13 which produce incremental movement at a rate proportional to the distance from the finger to the center of the touch sensor.

8.      In addition to these embodiments, the specification clearly discloses that one of ordinary skill would be aware of other mathematical methods for computing incremental movement.  The specification of the '411 Patent (column 31, lines 29-38), characterizes equations 12 and 13 as monotonic functions and then, in reference to those equations and another embodiment of incremental motion, states that a range of other monotonic functions are within the scope of the invention:

> Those of ordinary skill in the art will recognize that a linear proportionality is described by the above equation. As used herein, "proportionality" means that the signal generated is a monotonic function. Those of ordinary skill in the art will recognize that other monotonic functions, including but not limited to inverse proportionality, and non-linear proportionality such as logarithmic or exponential functions, could be employed in the present invention without departing from the principles disclosed herein.

9.    One of ordinary skill would recognize that the specific word "increment" need not always appear in the same sentence as every disclosure of incremental movement in the patent specification.  For example, one of ordinary skill would recognize that the terms eX and eY discussed in columns 31 and 32 of the '411 Patent always refer to the X and Y components of incremental movement.  The description in column 31, lines 1-8 specifically links these variables with equations 12 and 13 in describing the first preferred embodiment for incremental movement.  Furthermore, one of ordinary skill would recognize that the term "glide speed," used both in column 30 in reference to the first preferred embodiment and in column 32 to refer to the fourth preferred embodiment, also describes the incremental movement of the disclosed invention.  That is because "speed" in terms of these movements merely means the amount of the increment applied in each unit of time or in each periodically scheduled communication packet.  Various alternative embodiments are discussed in this section of the patent disclosure using several related designations for incremental movement.

10.    Elantech's brief asserts that "[i]t is unclear, however, how 'movement' differs from 'incremental movement' or how 'incremental' modifies 'movement,' particularly in the context of claim 46."  (Elantech's Opposition Brief at page 2, lines 4-5.)  This is not the case.  Claim 46 recites:

> first cursor motion signals for moving the cursor, said first cursor motion signals for causing said cursor to move in a direction on the display screen representing the difference between a previous position of said object and said present position of said object reported by said present-position signals

Claim 46 also recites:

> second cursor motion signals different from said first cursor motion signals for moving said cursor if said object has moved into said outer region of said sensing plane, said second cursor motion signals for causing said cursor to incrementally move on the display screen a selected distance in a fixed direction relative towards said outer edge of said sensing plane to which said object is proximate

11.    A "first cursor motion signal" represents cursor movement that is proportional to the movement of the finger on the touch sensor.  The specification refers to this first motion signal as dX and dY in certain disclosed preferred embodiments.  A "second cursor motion

1  signal" represents additional cursor movement, in this case incremental movement, towards the

2  closest outer edge of the sensor pad.  This incremental movement involves adding an increment

3  of motion per unit time to make the cursor appear to "glide" in the direction of the nearest edge of

4  the touch sensor. The specification refers to this second motion signal as eX and eY in certain

5  disclosed preferred embodiments.  The meaning of each claim element and the distinction

6  between them is clear to one of ordinary skill in the art, especially in light of the lengthy

7  discussion of the subject in columns 27-32 of the '411 Patent which includes numerous

8  mathematical examples of both types of motion signals.

9        12.     Elantech's Opposition brief also asserts at page 3, lines 7-9, that "[o]ne alternative

10  is alleged to be described on column 31, lines 1-38.  However, this text portion merely describes

11  in more detail the mathematics associated with Equations 12 and 13, and actually confirms

12  Elantech's proposed construction."  This is not accurate.  Column 31, lines 1-29 describe two

13  different embodiments of the edge motion invention of the '411 Patent.  In the first embodiment,

14  the direction of incremental motion varies continuously depending on the location of the finger in

15  the edge region of the touch sensor.  In the second embodiment, called orthogonal edge motion in

16  the specification, there are two regions defined along the sides of the sensor where only

17  horizontal incremental motion is permitted.  Two additional regions are defined along the top and

18  bottom of the sensor where only vertical incremental motion is permitted.  Finally, there are four

19  regions in the corners where the direction of incremental motion varies continuously depending

20  on the location of the finger as in the first embodiment.  Clearly, the horizontal-only incremental

21  motion in the side regions of the second embodiment is quite different than the variable-direction

22  motion in the corresponding side regions of the first embodiment.  The similarity of a portion of

23  the mathematical computation that produces that motion increment is irrelevant as the increment

24  itself is not the same.

25        13.     Finally, Elantech mischaracterizes the fourth embodiment disclosed in the '411

26  Patent specification.  Elantech asserts at page 3 of Elantech's Opposition Brief, lines 16-20, that

27  "In this embodiment, as the finger enters the outer zone, the glide speed starts at zero and

28  increases to some reasonable limit as the finger reaches the edge of the pad.  Since the glide speed

1  starts at zero, there is no movement at all as the finger enters the outer zone, and thus no

2  incremental movement." In fact, as soon as the finger enters the outer zone in this embodiment,

3  there is incremental movement proportional to the distance from the finger to the edge of the

4  outer zone. Only at the exact border of the outer zone where it still touches the interior zone and

5  before the finger has actually entered into the outer zone is there no incremental movement. In no

6  way does this alter the fact that the patent specification teaches an alternate approach to

7  determining the amount of incremental movement in the outer zone that is unrelated to equations

8  12 and 13.

9        14.    Independent claim 30 of the '411 Patent recites the step of "generating second X

10  and Y cursor motion signals" if the finger is in the "outer region," that are for "*incrementally*

11  *moving* said cursor on the display screen *a selected distance* in X direction *representing the*

12  *difference between an X location of a fixed reference point on said sensing plane and an X*

13  *component of said present position of said object on said sensing plane* and a *selected distance* in

14  Y direction representing the difference between a Y location of a fixed reference point on said

15  sensing plane and a Y component of said present position of said object on said sensing plane."

16  (Emphasis supplied.) Dependent claim 32 includes the further limitation that the "fixed reference

17  point is the center of the sensing plane." These claims recite in text the precise formulation of the

18  example increment set forth in equations 12 and 13 of the '411 Patent: "$S(X_{cur} - X_{center})$ and

19  $S(Y_{cur} - Y_{center})$." This same narrow formulation can also be found in claims 9 and 10. It is true

20  that claims 14 and 15, as well as claims 6 and 7, of the '411 Patent do not literally say

21  "increment." However, the same concept of adding a value to the "second relative position"

22  signals that are generated while the finger is in the "outer region" is recited in those claims.

23        **II.    "SIGNAL"**

24        15.    Elantech raises for the first time several contentions about what is and is not taught

25  in the '591 and '931 Patent specifications concerning the term "signal." (Elantech's Opposition

26  Brief at page 9, line 1 through page 11, line 15.) (The '591 and '931 Patents are attached as

27  Exhibits 4 and 5, respectively, to my prior Declaration, executed January 26, 2007.) Below, I

28  explain why the arguments in Elantech's briefs are factually incorrect.

16.     Absent a teaching to the contrary in the patents, one of ordinary skill in the art would read the word "signal" to mean any of a broad range of methods used for conveying data from one point to another.  This is an extremely common term in electrical engineering and in computer input/output devices such as those described in the patents.  The patents lack any teachings that their usage of the term signal is any different than this ordinary meaning.  On the contrary, the patents disclose a variety of ways to convey data from the touchpad device to the host computer, both through direct teachings and by expressing correspondence between the disclosed embodiments and devices and protocols known to one of ordinary skill.  Furthermore, one of ordinary skill would recognize these descriptions of data conveyance within the patent specifications as the signals of the claims whether or not the specific word "signal" is used in the specifications as each method is disclosed.

17.     Figure 15 is *illustrative* of the timing relationships between various signals and events in the preferred embodiment.  The patents tells us as much in multiple places.  ('591 Patent, column 7, lines 62-64, column 31 lines 25-27; '931 Patent, column 8, lines 13-15, column 34, lines 24-25.)  These types of timing illustrations are commonly used by electrical engineers to describe the timing relationships between signals.  They are a simpler way to diagram these relationships when the underlying signals have complex encodings or protocols that are not material to the idea being illustrated in the diagram.  One of ordinary skill would know to consult a description of the particular signaling protocol or to create one in order to implement an actual embodiment of the illustrated signal.  One of ordinary skill in the art would not limit the claim term "signal" to the illustrative timing diagrams in Figure 15.

18.     Elantech further objects that the '931 and '591 Patents repeatedly discuss the use of packets of information as one possible signaling method without disclosing a packet processor to create these signals.  The use of packets of data as a signaling method predates these patents by decades.  One of ordinary skill would be well versed in how to create hardware or software to place data into packets and output a packetized signal.  In fact, the patents describe "the virtual buttons can be inserted into the regular packet stream" ('591 Patent, column 37, lines 6-9; '931 Patent, column 43, lines 12-15), recognizing that a signal in the form of a packet stream is an

ordinary method of communicating from an input device. The '591 Patent, column 31, lines 8-23 ('931 Patent, column 34, lines 7-23), further teaches that the various touchpad gestures, including tap and double tap gestures can be signaled by a "button control unit" that generates "virtual button" signals:

> In a presently preferred embodiment, the button control unit 286 maps both switches and gestures to the most commonly used virtual buttons, giving maximum flexibility to the user. In an alternate embodiment, switches and gestures can be mapped to different virtual buttons so that a larger number of virtual buttons can be covered without resort to exotic gestures. Or, the user can be offered a choice of mappings.

> It is well known in the art to allow extra button switches to be processed as specialized commands, such as double-clicking, selecting commonly used menu items, etc., instead of their normal role as mouse buttons. Similarly, the button control unit 286 or host software could map some of the gestures described here to software commands instead of simulating mouse buttons. Such processing and mapping is well within the realm of ordinary skill in the art.

19.    This disclosure in the '591 and '931 Patents is important in two respects. First, one of ordinary skill in the art would understand that "signals" for "the most commonly used virtual buttons" would be standard mouse packets, as elsewhere underscored in the teachings of the patents. Second, this portion of the disclosure states that the "button control unit" or "host software" can map gestures "to software commands" instead of "simulating mouse buttons" using standard packetized mouse data. Such "software commands" would not be the "high" level signals recited in Elantech's proposed definitions. The patent teachings plainly to one of ordinary skill in the art that the claimed gestures can be implemented in any variety of signaling methodologies.

20.    I note that Elantech contends, at page 10, lines 25-26 of its Opposition Brief, that the patent specifications merely disclose "communicating ΔX and ΔY events that are outputted by the motion unit 18 in Fig. 1 to a host computer in the form of packets." The patents are clear when they use the term "events" that they are referring to a communication packet that indicates, in this case, measurable X or Y motion. The patents are also clear that such a packet of information is a "signal", *i.e.*, "The X, Y, and Z outputs of arithmetic unit 16 are directed to motion unit 18 which provides the cursor motion direction *signals* to the host computer." ('591 Patent, column 9, lines 9-10; '931 Patent, column 9, lines 31-38 (emphasis supplied).) The

1   patents further make clear that "signal" is used in the same way for ($\Delta$X, $\Delta$Y) motion signals and

2   "virtual button" gesture signals: "Referring back to FIG. 1, according to another aspect of the

3   present invention, gesture unit 20 examines the (X,Y,Z) data produced by arithmetic unit 16 to

4   produce one or more 'virtual mouse button' *signals* to be sent along with the ($\Delta$X, $\Delta$Y) *signals* to

5   the host." ('591 Patent, column 30, lines 33-37; '931 Patent, column 33, lines 31-36 (emphasis

6   supplied).)

7          21.    Elantech asserts that I have misunderstood claim 6 of the '591 Patent. (Elantech's

8   Opposition Brief at page 11.) Elantech asserts that "the occurrence of a double tap gesture cannot

9   be indicated by the first signal alone, so that it is only the potential occurrence of the double tap

10  gesture that may be indicated by the first signal." (*Id.* at page 11, lines 22-24.) This is not the

11  case. The claim language "initiating a first signal to the host indicating the occurrence of said

12  gesture" in claim 6 of the '591 Patent is in no way related to any "potential occurrence." In the

13  preferred embodiment, the first signal is a signal that indicates a "button down" event. The "said

14  gesture" that has occurred is the first of the two "tap gestures" referred to in the preamble

15  recitation of a "double tap" gesture. One of ordinary skill in the art would understand the plain

16  language encompasses this disclosed preferred embodiment. Furthermore, Joint Claim Terms 3

17  and 6 (from claims 6 and 9 of the '591 Patent), are consistent in usage.

18         22.    Joint Claim Term 3 is from claim 6, which is directed to detecting two consecutive

19  taps on a touchpad. The language in Joint Claim Term 3, "initiating a first signal to the host

20  indicating the occurrence of said gesture," simply recites that the system will initiate a signal

21  indicating a first tap has occurred. Joint Claim Term 6 is from claim 9 of the '591 Patent, which

22  is directed to a "drag" operation (placing a cursor on an icon or object on a screen and pulling it

23  to another place on the screen or into a folder, for example). As taught in the patent, the drag

24  gesture is performed by tapping once on the touchpad and then placing the finger quickly on the

25  touchpad and holding it on the touchpad while "dragging" the icon, folder or other object to some

26  other place on the display screen. Joint Claim Term 6 recites "initiating a drag gesture signal to

27  the host indicating the occurrence of a gesture" after the occurrence of a first "tap" event. There

28  is nothing "potential" about these events.

1        I declare under penalty of perjury under the laws of the United States of America that, to

2    the best of my knowledge, the foregoing is true and correct. Executed on February 21, 2007, in

3    Cupertino, California.

4

5                          Andrew Wolfe, Ph.D

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28