1   KARL J. KRAMER (CA SBN 136433)
    ERIKA L. YAWGER (CA SBN 234919)
2   MORRISON & FOERSTER LLP
    755 Page Mill Road
3   Palo Alto, California  94304-1018
    Telephone: 650-813-5600
4   Facsimile: 650-494-0792
    KKramer@mofo.com
5

6   Attorneys for Defendant and Counterclaimant
    SYNAPTICS, INC.
7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10               SAN FRANCISCO DIVISION

11

12  ELANTECH DEVICES CORPORATION, a          Case No.    C06-01839 CRB
    corporation existing under the laws of Taiwan,
13  R.O.C.,                                   SYNAPTICS'S SUBMISSION IN
                                              RESPONSE TO THE COURT'S
14              Plaintiff,                    MARCH 4, 2008 ORDER RE:
                                              PENDING MOTIONS AND
15        v.                                  MARCH 7, 2008 HEARING

16  SYNAPTICS, INC., a Delaware corporation;
    AVERATEC, INC., a California corporation; and
17  PROSTAR COMPUTER, INC., a California
    corporation,
18
                Defendants.
19

20  AND RELATED COUNTERCLAIMS

21

22         Pursuant to the Court's March 4, 2008 Order re: Pending Motions and March 7, 2008

23  Hearing, Synaptics provides the following cases referenced by Synaptics counsel at the oral

24  argument on March 7, 2008, each of which establishes that the plaintiff must present evidence

25  that proves irreparable harm regardless of the likelihood of success on the merits of the defenses

26  in the case:

27

28

1. *Becton Dickinson and Co. v. Syntron Bioresearch, Inc.*, No. 97-CV-1634 K (POR), 1998 U.S. Dist. LEXIS 22082 (S.D. Cal, Sep. 24, 1998).

2. *Cordis Corp. v. Boston Scientific Corp.*, 2003 U.S. Dist. LEXIS 21338 (D. Del. Nov. 21, 2003) *aff'd Cordis Corp. v. Boston Sci. Corp.*, 99 Fed. Appx. 928, 936 (Fed. Cir. 2004).

3. *Reebok Int'l. v. J. Baker, Inc.*, 32 F.3d 1552 (Fed. Cir. 1994).

4. *Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1272 (Fed. Cir. 1985).

5. *Wireless Agents, L.L.C. v. T-Mobile USA, Inc.,* 2006 U.S. Dist. LEXIS 36590 (N.D. Tex. 2006).

Copies of the above-referenced cases are appended hereto as Appendices 1-5.

Dated:   March 7, 2008          KARL J. KRAMER
                                ERIKA L. YAWGER
                                MORRISON & FOERSTER LLP

                                By:    s/Karl J. Kramer
                                       Karl J. Kramer
                                       Email:  KKramer@mofo.com

                                Attorneys for Defendant and
                                Counterclaimant SYNAPTICS, INC.

# Appendix 1

411 of 724 DOCUMENTS



Caution
As of: Mar 07, 2008

**BECTON DICKINSON AND COMPANY, Plaintiff, vs. SYNTRON BIORE-SEARCH, INC., Defendant.**

**CASE NO. 97-CV-1634 K (POR)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

*1998 U.S. Dist. LEXIS 22082; 51 U.S.P.Q.2D (BNA) 1722*

**December 19, 1998, Decided**
**December 21, 1998, Filed**

**SUBSEQUENT HISTORY:**    [*1] Counsel Amended July 8, 1999.

**DISPOSITION:**    Plaintiff's motion for preliminary injunction DENIED. Defendant's Motion to Preclude DENIED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent holder filed a motion for preliminary injunction against defendant manufacturer to enjoin defendant from manufacturing and selling a product that infringed on plaintiff's patent.

**OVERVIEW:** Plaintiff patent holder invented technology that enabled the manufacture of diagnostic test kits. An application of plaintiff's invention was home pregnancy tests. Defendant manufacturer sold a wide variety of products, including home pregnancy tests. Plaintiff attempted to persuade defendant to take a license, but defendant refused. Defendant asserted that it designed a patent of its own. Plaintiff filed a complaint against defendant for patent infringement. Defendant alleged that its patent was unique and plaintiff's patent was unenforceable. Plaintiff filed for a preliminary injunction to enjoin defendant from manufacturing, selling, using, or exporting and importing products, which infringed on its patent. The court denied the preliminary injunction, finding that plaintiff failed to demonstrate that the extraordinary remedy of a preliminary injunction was warranted

at that point. The court opined that although plaintiff demonstrated that it was likely to succeed in its efforts to demonstrate the validity of its patent and infringement of that patent by defendant, it failed to show that irreparable harm existed or that the balance of hardships weighed in its favor.

**OUTCOME:** The court denied plaintiff patent holder's motion for a preliminary injunction preventing defendant manufacturer from infringing on plaintiff's patent where plaintiff failed to demonstrate that the extraordinary remedy of a preliminary injunction was warranted. The court held that plaintiff failed to demonstrate, as a prerequisite to a preliminary injunction, that plaintiff would suffer irreparable harm or hardships weighed in plaintiff's favor.

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN1] Under *35 U.S.C.S. § 283*, the issuance of a preliminary injunction in a patent infringement action is a matter for the discretion of the district court.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*

Case 5:06-cv-01839-PVT    Document 266-2    Filed 03/07/2008    Page 3 of 22

Page 2

1998 U.S. Dist. LEXIS 22082, *; 51 U.S.P.Q.2D (BNA) 1722

*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN2] See *35 U.S.C.S. § 283*.


*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN3] No factor of *35 U.S.C.S. § 283* taken individually is dispositive; the court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested. The Federal Circuit has cautioned that a preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted.


*Patent Law > Claims & Specifications > Description Requirement > General Overview*
*Patent Law > Infringement Actions > Doctrine of Equivalents > Elements > General Overview*
[HN4] Under doctrine of equivalents, a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is equivalence between the elements of the accused product or process and the claimed elements of the patented invention. The doctrine is applied to each element of the patent claim rather than to the invention as a whole, and is not allowed such broad play as to effectively eliminate that element in its entirety. The essential inquiry is does the accused product contain elements identical or equivalent to each claimed element of the patented invention. The doctrine of equivalents, however, does not allow a patentee to claim coverage where that patentee has surrendered coverage in order to avoid overlapping with prior art patents.


*Civil Procedure > Remedies > Injunctions > Elements > Likelihood of Success*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Infringement Actions > Burdens of Proof*
[HN5] Although a patent is presumed to be valid under *35 U.S.C.S. § 282*, at the preliminary injunction stage, the patentee has the burden of showing the likelihood of success on the merits with respect to the patent's validity, enforceability, and infringement.


*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Patent Law > Inequitable Conduct > General Overview*

*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN6] To sustain its burden on this motion for a preliminary injunction, plaintiff must establish a reasonable likelihood that defendant would fail to meet its burden at trial of proving, by clear and convincing evidence, that plaintiff's patents are invalid.


*Patent Law > Anticipation & Novelty > Elements*
*Patent Law > Infringement Actions > Defenses > General Overview*
[HN7] The defense of anticipation is only invoked if the alleged infringer can demonstrate that a single prior art reference discloses each and every element that is expressly or inherently found in the claimed invention.


*Evidence > Procedural Considerations > Burdens of Proof > Clear & Convincing Proof*
*Patent Law > Inequitable Conduct > Burdens of Proof*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Effect of Inequitable Conduct*
[HN8] To prove inequitable conduct and render a patent unenforceable, defendant must establish by clear and convincing evidence that there was a material misrepresentation or omission of information, and must establish a threshold level of intent. To be guilty of inequitable conduct, one must have intended to act inequitably. Materiality and intent must be considered together; the more material the misrepresentation or omission, the less intent is necessary to show inequitable conduct. The courts have warned about charges of inequitable conduct, stating that the habit of charging inequitable conduct in almost every major patent case has become an absolute plague.


*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
[HN9] After a court has construed the claims in a patent case, the rules of the game change, thereby allowing for amendment of the arguments in the case.


*Civil Procedure > Discovery > Disclosures > Mandatory Disclosures*
*Civil Procedure > Discovery > Methods > General Overview*
[HN10] *Fed. R. Civ. P. 26(e)* requires that parties supplement or correct discovery responses in order to make sure that both parties are aware of changes in the case. *Rule 26(e)* requires supplementation of disclosures at appropriate intervals and seasonable amendments of prior discovery responses if the earlier responses are

Case 5:06-cv-01839-PVT    Document 266-2    Filed 03/07/2008    Page 4 of 22

Page 3

1998 U.S. Dist. LEXIS 22082, *; 51 U.S.P.Q.2D (BNA) 1722

found to be inaccurate or incomplete. With regard to expert testimony, such disclosures must be made at appropriate intervals and at least 30 days prior to trial. The Advisory Committee Notes regarding *Rule 26(e)* note that supplementations need not be made as each new item of information is learned but should be made at appropriate intervals during the discovery period, and with special promptness as the trail date approaches.

*Civil Procedure > Discovery > Disclosures > Mandatory Disclosures*
*Civil Procedure > Discovery > Misconduct*
[HN11] The Federal Rules of Civil Procedure are designed to eliminate surprise and to achieve substantial justice. When determining whether preclusion is proper or not, the presence of surprise and prejudice are central to the inquiry. The court, therefore, turns to whether *Fed. R. Civ. P. 26(e)* has been violated, and if so, whether defendant was surprised or suffered prejudice.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel*
[HN12] Under the doctrine of judicial estoppel the court may, at its discretion, preclude a party from taking inconsistent positions in the same litigation. The Ninth Circuit, like the majority of circuits, has recently held that the court may apply judicial estoppel only if the court has relied upon the party's previously inconsistent position.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN13] The district court may find that, even giving movant the benefit of the presumption of irreparable harm, the non-moving party has presented evidence sufficient to rebut the presumption. In such a case, the movant has not established irreparable harm and is not entitled to a preliminary injunction.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Governments > Legislation > Statutory Remedies & Rights*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN14] The patent statute, *35 U.S.C.S. § 283*, provides injunctive relief to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable in money. Because the

principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole. Moreover, the presumption arises because of the finite term of the patent, which is not suspended during patent litigation, and because the passage of time may work irremediable harm.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Patent Law > Ownership > Conveyances > Licenses*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN15] Evidence that the patent holder has offered a license to the alleged infringer indicates that it is clear that the movant is willing to forgo its patent rights for compensation and suggests that any injury suffered by the movant would be compensable in damages assessed as part of the final judgment.

*Civil Procedure > Remedies > Injunctions > Elements > Irreparable Harm*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN16] Delay is one factor that should be considered in determining irreparable harm. A demonstration that plaintiff delayed in bringing this suit does not preclude, as a matter of law, a determination of irreparable harm. In certain circumstances, however, a showing of delay may be so significant as to preclude a determination of irreparable harm. Though other factors are examined, delay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. A plaintiff's delay in bringing suit indicates a lack of urgency and undermines the need for a preliminary injunction. Substantially shorter time periods have demonstrated to courts that the facts favor the denial of a preliminary injunction.

*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN17] A finding of willful infringement is to be made only after consideration of the totality of the circumstances because there are no hard and fast per se rules in respect of willingness.

*Civil Procedure > Judgments > Relief From Judgment > Extraordinary Circumstances*

Case 5:06-cv-01839-PVT    Document 266-2    Filed 03/07/2008    Page 5 of 22

Page 4
1998 U.S. Dist. LEXIS 22082, *; 51 U.S.P.Q.2D (BNA) 1722

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN18] Neither the difficulty in calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial.

**COUNSEL:** For BECTON DICKINSON AND COMPANY, plaintiff: Robert D Rose, Lorenz Alhadeff Cannon and Rose, LLP, San Diego, CA. Edward F. Mullowney, Vicki S. Veenker, Petrina S. Hsi, Brian C. Cannon, Fish & Neave, Palo Alto, CA.

For SYNTRON BIORESEARCH INC, defendant: Raymond J Coughlan, JR, Coughlan Semmer and Lipman, San Diego, CA.

For SYNTRON BIORESEARCH INC, defendant: Bernd W Sandt, Dow Chemical Company, Midland, MI.

For SYNTRON BIORESEARCH INC, defendant: Keith D Nowak, Larissa A Rippa, Arthur M Lieberman, Lieberman and Nowak, New York, NY.

For SYNTRON BIORESEARCH INC, defendant: James P Lynn, Leiberman and Nowak, New York, NY.

For BECTON DICKINSON AND COMPANY, counter-defendant: Robert D Rose, Lorenz Alhadeff Cannon and Rose, LLP, San Diego, CA. Edward F. Mullowney, Vicki S. Veenker, Petrina S. Hsi, Brian C. Cannon, Fish & Neave, Palo Alto, CA.

For SYNTRON BIORESEARCH INC, counter-claimant: Raymond J Coughlan, JR, Coughlan Semmer and Lipman, San Diego, CA.

For SYNTRON BIORESEARCH INC, counter-claimant: James P Lynn, Leiberman and Nowak, New York, NY.

**JUDGES:** Judith N. Keep, District Judge, United States District Court.

**OPINION BY:** Judith N. Keep

**OPINION**

ORDER DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND DENYING DEFENDANT'S MOTION TO PRECLUDE

Plaintiff Becton Dickinson [*2] and Company moves this court for a preliminary injunction. Defendant

Syntron Bioresearch, Inc. opposes. Defendant Syntron moves to preclude one of Becton Dickinson's theories of liability. Both parties are represented by counsel.

**I. BACKGROUND**

Plaintiff invented technology that enables the manufacture of diagnostic test kits. A significant commercial application of plaintiff's invention has been home pregnancy tests in which the user applies a liquid sample to one end of a test strip, then reads the visible test result after the liquid moves across the strip. Plaintiff has obtained two patents on this invention, *United States Patent Nos. 4,703,017* ("the Campbell patent") and 5,591,645 ("the Rosenstein patent"). The Campbell patent describes and claims a process and product for visually determining the presence of an analyte by using a tracer and a binder on a solid support. The Rosenstein patent is not at issue in this motion. Plaintiff states that it currently receives $ 9 million in royalties annually.

Defendant manufactures a wide variety of products, including home pregnancy tests. Plaintiff has attempted to persuade defendant to take a license, but defendant has [*3] not done so. Defendant asserts that it has carefully designed around the patents in suit, and has a patent of its own, *U.S. Patent No. 5,384,264*.

On September 5, 1997, plaintiff filed a Complaint against defendant for patent infringement. The Complaint seeks relief for defendant's alleged infringement of the Campbell and Rosenstein patents. On September 26, 1997, defendant served its Answer with Counterclaims. Among its affirmative defenses, defendant asserted the unenforceability of plaintiff's patents. By order of December 8, 1997, the court granted a motion to strike defendant's affirmative defenses relating to unenforceability for failure to plead with particularity. By that same order, the court also dismissed defendant's declaratory judgment counterclaims relating to unenforceability for failure to plead with particularity. Defendant filed an Amended Answer and Amended Counterclaim on January 2, 1998. On May 7, 1998, the court issued an order denying plaintiff's motion for a preliminary injunction.

On August 6, 7, and 10, 1998, the court presided over an evidentiary hearing pursuant to *Markman v. Westview, 52 F.3d 967 (Fed. Cir. 1995)*, aff'd, *517 U.S. 370, 134 L. Ed.* [*4] *2d 577, 116 S. Ct. 1384, (1996)* ("Markman hearing"), concerning the proper construction of the patent claims asserted in this litigation: claims 1 and 3 of the Campbell patent, *U.S. Patent No. 4,703,017*; and claims 1 and 8 of the Rosenstein patent, *U.S. Patent No. 5,591,645*.

On August 11, 1998, the court construed the elements of these claims in an oral ruling, and on the same

Case 5:06-cv-01839-PVT    Document 266-2    Filed 03/07/2008    Page 6 of 22

Page 5

1998 U.S. Dist. LEXIS 22082, *; 51 U.S.P.Q.2D (BNA) 1722

date, the court issued a written order which incorporated by reference the reasoning announced in the oral ruling.

Plaintiff Becton Dickinson now moves for preliminary injunction, seeking to enjoin Syntron from manufacturing, selling, using, or exporting and importing products which infringe the Campbell patent held by Becton Dickinson. Syntron filed an opposition and Becton Dickinson filed a reply brief.

The matter presently before the court involves assessing whether the requisite showing to support the issuance of a preliminary injunction has been made by Becton Dickinson.

## II. LEGAL STANDARD

[HN1] Under *35 U.S.C. § 283*, the issuance of a preliminary injunction in a patent infringement action is a matter for the discretion of the district court. See *Intel Corp. v. ULSI System Technology,* [*5] *Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993)*, cert. denied, *510 U.S. 1092, 127 L. Ed. 2d 216, 114 S. Ct. 923 (1994).* [1] [HN2] The party seeking a preliminary injunction under *35 U.S.C. § 283* must establish a right to such relief in light of the following factors:

> (1) reasonable likelihood of success on the merits; (2) irreparable harm; (3) the balance of hardships tipping in its favor; and (4) the impact of the injunction on the public interest.

See *Hybritech Inc. v. Abbott Laboratories, 849 F.2d 1446, 1451 (Fed. Cir. 1988).* [HN3] No factor taken individually is dispositive; the court "must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." Id. The Federal Circuit has cautioned that "a preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted." *Intel, 995 F.2d at 1568.*

> 1   Federal Circuit law governs the issuance of injunctions pursuant to *35 U.S.C. § 283*. *Hybritech Inc. v. Abbott Laboratories, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988)* ("Because the issuance of an injunction pursuant to this section enjoins 'the violation of any right secured by a patent, on such terms as the court deems reasonable,' a preliminary injunction of this type, although a procedural matter, involves substantive matters unique to patent law and, therefore, is governed by the law of this court."). Purely procedural questions involving the issuance of such preliminary injunctions are controlled by the law of the Ninth Circuit. See id.

[*6] **III. DISCUSSION**

### A. LIKELIHOOD OF SUCCESS

### 1. INFRINGEMENT OF THE CAMPBELL PATENT

Becton Dickinson avers that it is likely to succeed on the merits because Syntron infringes the Campbell patent. Becton Dickinson provides three theories under which the patent is infringed. A showing of likelihood of success on any one of these three theories is sufficient to support a finding that Becton Dickinson is likely to succeed on the merits in this matter. At the earlier preliminary injunction, Syntron raised three claims of non-infringement of the Campbell patent. In the present motion, Syntron essentially concedes two of those claims and focus extensively on a third claim of non-infringement: Syntron's argument that its pregnancy test assay is not infringing because it contains a visible particulate label (VPL) that is a sac. Becton Dickinson counters that Syntron's assay infringes the Campbell patent because the visible particulate label is not a sac, but instead consists of a solid particle: colloidal gold. Becton Dickinson further contends that if the VPL is construed as a sac, it is a type of sac that infringes the Campbell patent.

As an initial [*7] matter, the court will review the basic coverage of the patent. The Campbell patent covers assays that are comprised of an analyte, a binder, and a tracer. The binder and analyte elements are not disputed presently. The elements of the tracer, however, are at issue. The relevant language in the Campbell patent, contained in Claim 1, reads:

> said tracer being comprised of a ligand labeled with a visible particulate label wherein when said particulate label is a sac including a visible dye, said sac is selected from the group consisting of liposomes and microcapsules...,

See, Campbell Patent, Col. 15-16.

Thus, a tracer consists of a ligand labeled with a visible particulate label. It is undisputed that the ligand in Syntron's assay is the antibody to hCG. A visible particulate label is covered under the Campbell patent if it is a visible particle or it is a sac which contains a dye and is comprised of liposomes or microcapsules. A sac which contains a dye and is not comprised of liposomes or microcapsules is not covered by the patent. This court, in the August 11, 1998 order subsequent to a Markman hearing, construed a "sac including a visible dye" to mean "an enclosure [*8] that contains the visible dye even if the ligand is attached to the dye material so long as the dye material remains enclosed within the sac."

Case 5:06-cv-01839-PVT    Document 266-2    Filed 03/07/2008    Page 7 of 22

Page 6

1998 U.S. Dist. LEXIS 22082, *; 51 U.S.P.Q.2D (BNA) 1722

In examining whether the Syntron assay infringes the Campbell patent the court applies a two step process under the preponderance of the evidence standard. See *Kegel Co. v. AMF Bowling, Inc., 127 F.3d 1420, 1425 (Fed. Cir. 1997)*(citations omitted). The first step, construing the language in the patent claims, was largely completed in the August 11, 1998 decision. See *Hybritech, Inc. v. Abbott Labs., 849 F.2d 1446, 1455 (Fed. Cir. 1988)*. The second step is deciding whether the claims, as construed, indicate that the product at issue infringes the patent. *See Bell & Howell Document Mgt. Co. v. Altek Systems, 132 F.3d 701, 705 (Fed. Cir. 1997)*. Becton Dickinson must "show that, in light of the presumptions and burdens that will inhere at trial, it will likely prove..." that the Campbell patent was infringed. Id.

The court now turns to the arguments advanced by the parties.

**a. The Syntron Assay Contains a Solution of Analyte and a Tracer**

In the August 11, 1998 order, this court construed the claim language of "contacting [*9] a binder...with a solution of analyte and a tracer," to include both "sandwich assays" and "competition assays." Syntron does not dispute that its pregnancy assay is a sandwich assay which contains a solution of analyte and a tracer, and is therefore consistent with the Campbell patent.

**b. The Syntron Assay Condition Is Consistent With the Campbell Patent**

In the August 11, 1998 order, this court construed the language Claim 1 language about "assay conditions" to refer to the environmental conditions under which the assay is performed. The court held that those conditions may vary in different assays, but that the "only condition that must be consistent under this claim is that the binder must be supported in a concentration of at least 1 microgram/cm2." Syntron does not dispute that its assay contains binder concentration of at least 2.9 micrograms/cm<2>, and is therefore consistent with the Campbell patent.

**c. Becton Dickinson is Likely to Succeed in Showing That The Syntron Visible Particulate Label is not a Sac, and Therefore the Syntron VPL Infringes the Campbell Patent**

In the August 11, 1998 order this court construed the claim language regarding a "tracer" [*10] to mean that a "visible particulate labels are either (1) solid particles or (2) a sac including a visible dye." Examples of a the first type of particulate label covered by the patent included "ferritin, phycoerrythrins or phycobili-proteins; precipitated or insoluble metal alloys..." See Campbell Patent, Col. 5, ll. 14-18. In addressing the second type of visible

particulate label, the court noted that the patent covered only sacs "consisting of liposomes and microcapsules." The court further held that a sac is an enclosure. The court continued by stating that "Even if the ligand attaches to the material contained in the sac, rather than to the surface of the sac itself, it is the 'sac including a visible dye' that is the label, so long as the dye material remains within the sac."

Becton Dickinson argues that under this definition, the Syntron tracer element is a ligand, the antibody to hCG, that is attached to a visible particulate label that is a solid particle: colloidal gold. Plaintiff argues that the Syntron tracer is, therefore, not a sac. Accordingly, Becton Dickinson argues, the visible particle label falls under the Campbell patent, as does the tracer.

Syntron argues [*11] that the tracer element is properly understood to include a ligand, the anti-body to hCG, attached to a visible particulate label that is a sac including a visible dye. Syntron argues that the dye, the gold particle, is covered by a sac consisting of bovine serum albumin (BSA) and polyethelene glycol (PEG). This BSA/PEG covering coats approximately 50% of the surface of the much larger gold particle, with the other 50% being covered by the ligand. Alternatively, Syntron argues that the sac consists of the BSA/PEG coating and the ligand, which surrounds the dye, the gold particle. Under either interpretation, Syntron argues, the sac is not a "sac consisting of liposomes or microcapsules" and is therefore not covered under the Campbell patent.

Syntron uses colloidal gold, microscopic particles of gold which are larger than individual gold molecules, but small enough to not settle out of a solution. See McDermott Decl. at P 12. Syntron then attaches the ligand, antibodies, to the surface of each gold particle. Many antibodies attach to each gold particle, as the gold is much larger than the antibody. See C. Decl, Exhibit C. at 45. The antibody coated particle is then coated with [*12] BSA/PEG, which covers the portions of the gold particle not covered by antibodies. The BSA/PEG keeps the many gold particles that will be present in each assay from sticking together. See C. Decl., Exhibit E at 101.

Becton Dickinson's argument that this coating cannot be a sac is two-fold. First, Becton Dickinson argues that the ligand cannot be considered to be a part of the sac according to a clear reading of the claim. The claim states that a tracer consists of a ligand and a visible particulate label. Where the visible particulate label is a sac, the ligand must be a separate element and cannot be viewed as a part of the sac. Becton Dickinson quotes the court's language in the August 11, 1998 order to support this contention. The court noted that "in construing the term "sac" to include any structure that encloses a visible dye, even if the ligand attaches to the material contained

Case 5:06-cv-01839-PVT    Document 266-2    Filed 03/07/2008    Page 8 of 22

Page 7

1998 U.S. Dist. LEXIS 22082, *; 51 U.S.P.Q.2D (BNA) 1722

in the sac rather than to the surface of the sac itself, it is the sac including the visible dye that is the label, so long as the dye material remains within the sac." Becton Dickinson contends that the court's language clearly precludes a reading wherein the ligand is a constituent element of [*13] a sac. Becton Dickinson avers that the ligand, as discussed in the patent, is a discreet portion of a tracer element which also contains a separate sac; therefore the ligand cannot be a part of sac.

Syntron, in contrast, argues that the exact same language "unambiguously" indicates that the court intended that the ligand, i.e. an antibody, may attach to the dye, i.e. the gold, as part of a sac. Thus, Syntron argues, the court "clearly contemplates the ligand being part of the sac as long as it does not cause the release of the sac." Syntron contends that the court adopted a broad definition of "sac" in its August 11, 1998 order, thereby indicating that the coating on the gold in this case should be a sac.

The court is not persuaded by Syntron's argument. Although the court undoubtedly adopted a broader construction of sac than Becton Dickinson urged, the court's finding that a sac was an enclosure cannot be read so broadly as to encompass any coating that covers any dye. To accept Syntron's argument that a sac may be 50% comprised of the ligand would render meaningless the patent's definition of the tracer element. A tracer is defined by its two parts: a ligand and a visible particulate [*14] label. The reading that Syntron urges upon this court would leave the tracer with only a visible particulate label in the form of a sac. That visible particulate label, a sac, would not be not "labeled" with a ligand, but in fact partially constructed out of the ligand. The ligand element of a tracer, therefore, would be rendered superfluous by Syntron's reading. This court finds that the plain meaning of the patent much more strongly supports a construction wherein the ligand, i.e. an antibody, is attached to a distinct visible particulate label that takes the form of a solid particle: colloidal gold.

Becton Dickinson's contention that the BSA/PEG/ligand coating around the colloidal gold is not a sac is further supported by the declaration of an Syntron's expert, Dr. Ehrenkranz, submitted in opposition to Becton Dickinson's previous injunction for preliminary injunction. In that declaration, Dr. Ehrenkranz discussed a tracer, disclosed in the Leuvering patent, that was comprised of colloidal gold partially covered with an antibody. The covering was completed with BSA/PEG. This portion of the tracer is exactly the same as the tracer element used in Syntron's present assay. See [*15] C. Decl., Exhibit K at 240, Col. 4, lines 1-6. Another Syntron expert, Dr. Lee, indicated that the antibody and BSA/PEG coating discussed by Dr. Ehrenkranz is consistent with the current Syntron coating. See C. Decl.,

Exhibit E, at 100 P8. Dr. Ehrenkranz explicitly averred that this tracer, which is identical to Syntron's tracer, is a "ligand labeled with a visible particulate label." In his chart summarizing the claims by Syntron, Dr. Ehrenkranz notes that the "tracer comprises anti-hCG antibody (ligand) labeled with a visible gold sol particulate." See C. Decl., Ex. J at 223. Further, Dr. Ehrenkranz's chart does not include any suggestion that the tracer element depicted, one that is identical to Syntron's, is a sac. See id.

Syntron argues that the declaration by Dr. Ehrenkranz does not involve Syntron products. Syntron does not deny, however, that the tracer element discussed by its experts is exactly the same as the tracer element used by Syntron in its pregnancy assay. Thus, Dr. Ehrenkranz's conclusions regarding an identical tracer element apply with equal force to Syntron's tracer element.

Syntron's own experts support a finding that the tracer element in Syntron's [*16] pregnancy assay does not contain a sac. Indeed, they aver that the tracer element involves a ligand, an antibody, and a solid particle that is the visible particulate label: colloidal gold. Such a finding places the Syntron tracer element squarely within the corners of the Campbell patent.

This court finds that Becton Dickinson is likely to succeed in convincing a factfinder, by a preponderance of the evidence, that the Syntron tracer element does not contain a sac. Becton Dickinson is likely to succeed in proving that the tracer element is comprised of a ligand and antibodies, labeled with a visible particulate label that is a solid particle; in this case colloidal gold. Thus, Becton Dickinson is likely to prove that the Campbell patent has been infringed.

### d. Becton Dickinson is Likely to Succeed in Showing That if the Syntron's Visible Particulate Label is a Sac that Infringes the Campbell Patent

Becton Dickinson avers that even if a jury were to interpret the covering of BSA/PEG to be a sac, the Campbell patent would still have been infringed by Syntron. Moreover, Becton Dickinson avers that if a compound covering of BSA/PEG and the ligand was found to be a sac, the [*17] Campbell patent would still be infringed. Becton Dickinson argues that the BSA/PEG sac, or a BSA/PEG/ligand sac, would infringe the patent because they are sacs "consisting of liposomes or microcapsules" and are therefore consistent with the Campbell patent.

As an initial matter, the court must note that Syntron has moved to preclude Becton Dickinson's argument that if a sac is found to exist in the tracer element, that sac infringes the Campbell patent. As will be discussed at length below, the court is not persuaded that Becton

Case 5:06-cv-01839-PVT    Document 266-2    Filed 03/07/2008    Page 9 of 22

Page 8

1998 U.S. Dist. LEXIS 22082, *; 51 U.S.P.Q.2D (BNA) 1722

Dickinson's argument should be precluded. The court will, therefore, examine the argument.

Becton Dickinson argues that even if the coating of antibodies and BSA/PEG around the colloidal gold is found to be a sac, the sac is comprised of "microcapsules" or the equivalent thereof. Becton Dickinson makes two arguments in support of this construction. First, that the claim directly covers the "sac" here because it is comprised of microcapsules in a manner covered by the text of the patent. Second, Becton Dickinson argues that under the doctrine of equivalents, the sac infringes the patent because the difference between Syntron's "sac" and the sac described [*18] in the patent is insubstantial. Therefore, the sac would fall within the scope of the Campbell patent.

Syntron answers with three arguments: 1) that Becton Dickinson's argument should be precluded, as noted above; 2) that the patent language should read "polymer microcapsules" rather than "microcapsules," and that the Syntron sac is not comprised of polymer microcapsules; 3) that the patent is too broad if the "polymer" language is not present. In sum, Syntron argues that its sac it does not infringe.

### 1. Literal Infringement

Becton Dickinson argues that the language of the patent, specifically a reference to the Vandegaer text, indicates that "microcapsule" sacs may include coatings that do not possess independent structural integrity. See Campbell Patent, Col. 4, ll. 22-24. Becton Dickinson argues that under the court's broad sac definition, wherein a sac is an enclosure, Syntron's coating would be a sac covered by the patent because it consists of microcapsules. See C. Decl., Ex. FF at 745. The Vandegaer text, incorporated into the patent by reference, provides a broad definition of "microcapsule." This definition includes coatings that are formed from compounds, [*19] such as PEG, and various protein structures. See id. Thus, if the Syntron coating is a sac, argues Becton Dickinson, it is a microcapsule sac that directly infringes on the patent. See McDermott Decl. at PP34-36.

Syntron answers by alleging that the patent language should have modified microcapsule with "polymer." Syntron avers that Becton Dickinson misled the patent examiner, resulting in the omission of the language. Syntron seems to argue, therefore, that this court should read the "polymer" language back into the patent text.

Syntron's argument conflates an argument of literal infringement with an argument of patent invalidity. Syntron does provide letters in which Becton Dickinson's counsel and the patent examiner discuss the "polymer" modifier to microcapsules. These letters, however, fall short of providing the clear and convincing evidence of

either material misrepresentation, or intent to mislead on the part of Becton Dickinson, that is required before this court may invalidate the patent because the examiner was misled. Thus, the argument for patent invalidity is not strong. Other than a suggestion that misrepresentations were made to the patent examiner, Syntron [*20] provides no support for a suggestion that the "polymer" language must be read into the patent. The court now looks to the language of the patent to decide if literal infringement has occurred.

The court finds that if a factfinder were to find that the BSA/PEG/antibody compound used by Syntron is a sac, then it would likely find that it is a sac comprised of microcapsules. The microcapsule coating described in the Vandegaer text bonds to a substrate, such as colloidal gold, with compounds that are similar to the compound used by Syntron. See id. Syntron does not dispute that the compound of, BSA/PEG/antibody is a microcapsule; it simply avers that the compound is not a "polymer" compound. At this point, the court refuses to read "polymer" into the patent. Therefore, the court finds that Becton Dickinson is likely to succeed in proving to a factfinder that if the Syntron coating is a sac it is a microcapsule sack that is covered by the Campbell patent.

### 2. Infringement under the Doctrine of Equivalents

Additionally, Becton Dickinson urges that a factfinder is likely to find that the patent is infringed under the doctrine of equivalents. [HN4] Under this doctrine "a product [*21] or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co., 520 U.S. 17, 21, 117 S. Ct. 1040, 1043, 137 L. Ed. 2d 146 (1997)*(citing *Graver Tank v. Linde Air Prod. Co., 339 U.S. 605, 94 L. Ed. 1097, 70 S. Ct. 854 (1950))*. The doctrine is applied to each element of the patent claim rather than to the invention as a whole, and "is not allowed such broad play as to effectively eliminate that element in its entirety." *117 S. Ct. at 1048*. The essential inquiry is "does the accused product contain elements identical or equivalent to each claimed element of the patented invention." *Id. at 1054*.

The doctrine of equivalents, however, does not allow a patentee to claim coverage where that patentee has "surrendered" coverage in order to avoid overlapping with prior art patents. For example, where a patentee has narrowed a definition in order to avoid overlapping with a prior art, the patentee may not use the doctrine of equivalents to make [*22] a claim of infringement re-

Case 5:06-cv-01839-PVT    Document 266-2    Filed 03/07/2008    Page 10 of 22

Page 9

1998 U.S. Dist. LEXIS 22082, *; 51 U.S.P.Q.2D (BNA) 1722

garding the surrendered process. See *id. at 1049.* The patentee may not recapture, by use of the doctrine of equivalents, any subject matter that was expressly surrendered in order to complete a valid patent. See *Litton Systems, Inc. v. Honeywell, Inc., 140 F.3d 1449, 1455 (Fed. Cir. 1998).*

Becton Dickinson avers that the "consisting of liposomes and microcapsules" language was added to modify "sac" because of a concern that the prior language would overlap with the prior art of the Sharon Patent. See C. Decl., Ex. M at 365. The Sharon Patent involved the use of a red blood cell. Thus the modification to the language of the Campbell patent was made in order to avoid overlapping with the red blood cell technology used by the Sharon Patent. As such, Becton Dickinson may not use the doctrine of equivalents to claim that red blood cells, or their equivalents, are covered by the patent. Syntron avers that Becton Dickinson "now attempts to unilaterally impose a construction of the term [microcapsule] which is so broad that it would now include either directly or as equivalents liposomes and erythrocytes." Opposition Memo at 8. Becton Dickinson, however, [*23] does not use the doctrine of equivalents to claim that red blood cells, or any similar structure, are covered under the patent. At issue here is a coating process that is completely unlike a red blood cell.

The doctrine of equivalents, therefore, is properly applied to prove that the product used by Syntron is the equivalent of the "microcapsule" sac discussed in the Campbell Patent. The difference between the Syntron coating product and the coating product in the Campbell patent is insubstantial. The Syntron coating performs substantially the same function as the coating referred to in the patent: providing protection for the enclosed substrate. Additionally, the Syntron coating performs that function in substantially the same way as the patent, by coating the substrate with a compound of antibodies and BSA/PEG. The patent refers to coatings which cover the substrate with a compound of various proteins and polymers, such as PEG. See McDermott Decl. at PP34-36. Finally, the result achieved is substantially the same: coating the substrate with a compound. The court finds that Becton Dickinson is likely to succeed in proving to a factfinder that the patent was infringed if it were [*24] to apply the doctrine of equivalents to the factual scenario presented in this matter.

Becton Dickinson has presented evidence that would likely convince a factfinder that the Campbell patent covers Syntron's Pregnancy Assay. At this stage, it appears that this evidence would likely convince the factfinder under three different theories: 1) that Syntron's tracer element of the assay does not contain a sac, and is there covered by the Campbell patent; 2) that if the tracer element is found to contain a sac, that sac is covered by the Campbell patent as being comprised of microcapsules; 3) that if literal infringement is not found the Campbell patent is still infringed under the doctrine of equivalents. Becton Dickinson need not show that it is likely to succeed on the merits of all three theories in order to have established that it is likely to succeed in showing that the patent is infringed; a showing of likelihood of success on any of the above mentioned theories is sufficient. The fact that it appears that Becton Dickinson is likely to succeed on all three theories merely indicates that its case is very strong.

## 2. INVALIDITY

Plaintiff argues that it is likely to succeed [*25] on the merits of its patent infringement claims because the underlying patents are presumed to be valid and defendant will likely not be able to carry its burden of proving invalidity. [HN5] Although a patent is presumed to be valid under *35 U.S.C. § 282,* at the preliminary injunction stage, the patentee has the burden of showing the likelihood of success on the merits with respect to the patent's validity, enforceability, and infringement. See *Nutrition 21 v. U.S., 930 F.2d 867, 869 (Fed. Cir. 1991).*

Defendant challenges the validity of the Campbell patent on a number of grounds. [HN6] To sustain its burden on this motion for a preliminary injunction, Becton Dickinson must establish a reasonable likelihood that Syntron would fail to meet its burden at trial of proving, by clear and convincing evidence, that Becton Dickinson's patents are invalid. See *H.H. Robertson, Co. v. United Steel Deck, Inc., 820 F.2d 384, 387 (Fed.Cir. 1987).*

### a. Anticipation and Invalidity by the Gribnau Patent

Syntron first argues that the Gribnau Patent, *U.S. Patent No. 4,373,932* discloses an immunoassay technique that is similar to the one disclosed in the Campbell patent. The Gribnau patent involves [*26] an earlier version of the pregnancy test. Unlike the Campbell patent at issue, the Gribnau patent requires the use of solvents. Even with the use of solvents, though, the Gribnau patent cannot detect hCG, the indicator of pregnancy, at the low levels that exist at the early stage of pregnancy and which are visibly apparent by the technique described by the Campbell patent. The ability to visually determine low levels of hCG without the use of other instruments or solvents distinguished the Campbell patent from other assays in the field. See *U.S. Patent 4,703,017* at Cannon Decl., Exhibit F, p.114, col. 1, lines 28-41 (describing other assays).

As noted, a distinction between the Gribnau patent and the Campbell patent because of the Campbell invention's ability to detect significantly lower levels of ana-

Case 5:06-cv-01839-PVT    Document 266-2    Filed 03/07/2008    Page 11 of 22

Page 10

1998 U.S. Dist. LEXIS 22082, *; 51 U.S.P.Q.2D (BNA) 1722

lyte such as hCG compared to the Gribnau patent. The inventors of the Campbell patent discovered that when the binder is supported in a concentration of at least 1 [mu] g/cm<2>, the tracer is visible without further treatment, such as a solution treatment, even when the hCG level is low. This court noted the importance of the Campbell patent's disclosures regarding support of the [*27] binder in a concentration of at least 1 [mu] g/cm<2>. When describing the assay conditions for this patent in the patent construction ruling, this court stated that "the only condition that must be consistent under this claim is that the binder must be supported in a concentration of at least one microgram/cm2." Cannon Decl, Exhibit H at 150.

With the high degree of sensitivity of the Campbell invention, visual detection can occur at hCG levels on the order of 50 mlU/ml. See Cannon Decl., Exhibit O at p. 420, line 7 to p. 421, line 1 (Ehrenkranz Deposition); Cannon Decl., Exhibit N at p. 400, line 5 to p. 401, line 25 (O'Connell Deposition). The Campbell patent therefore permits detection of pregnancy even at its earliest stages; hCG levels are generally on the order of 25-50 mlU/ml on the first day of a missed period. See Cannon Decl., Exhibit N at p. 409-410. The Gribnau invention, in contrast, did not permit visual detection at test concentrations of 65-80 mlU/ml, even with the addition of the color-enhancing solvent step. See Gribnau Patent, Cannon Decl. at Exhibit Q, p. 439. Visual results were obtained with the Gribnau invention only at very high hCG, concentrations [*28] of 4000 mlU/ml. Even at these high concentrations, an additional solvent was required to create a visible signal. The Gribnau invention, then, can only detect pregnancy significantly later in the term, when the hCG levels reach those higher concentrations. The Gribnau assay was unable to achieve visual detection of 50 mlU/ml, and thus was unable to detect pregnancy in its earliest stages, as the Campbell invention is able to do. Therefore, the Gribnau patent does not anticipate and invalidate the Campbell patent.

Syntron argues that Becton Dickinson limits the scope of Gribnau to a single example and ignores all other examples and the "general teachings" of Gribnau. Opposition at 11. Syntron cites to a report of Dr. Eisen, prepared for other litigation. The Eisen report does not indicate that the Gribnau procedure produces results at the levels of hCG discussed above, however. See Exhibit 10 at P 24 (stating merely that the assays produced a visually observable color signal.). And while the Eisen report appears to state that the addition of a solvent is an optional method of intensifying the visual effect, see *id. at P 21*, there is no indication that the extra use of the solvent [*29] is not necessary to allow visual detection at the extremely low levels of hCG at which visual detection is possible with the Campbell patent. The distinc-

tions between the Campbell invention and the prior art discussed herein indicate that Campbell improved on the prior art because hCG is visible at the earliest stages of pregnancy without the use of solvents: these distinctions have not been rebutted by Syntron. Therefore, Becton Dickinson has demonstrated that it is reasonably likely that it will succeed in defeating Syntron's claim that the patent is invalid because it is anticipated by the Gribnau invention.

Moreover, Becton Dickinson points out that Dr. Eisen has not been retained as an expert in this case. The report was prepared for a separate lawsuit that has since settled by an agreement stating that the Campbell patent is valid and enforceable. See Reply at 5. Dr. Eisen has not offered a report in this case. Because the issue has not been briefed and because it is not essential to the court's decision, the court will not issue a holding concerning whether that report is inadmissable hearsay, as Becton Dickinson maintains, or would be admissible because Dr. Ehrenkranz [*30] appears to rely on the report. An expert may testify to an opinion based on information not admissible as evidence, provided that the information is of the type reasonably relied upon by experts in the field. See *American Bearing Co., Inc. v. Litton Indus., Inc., 540 F. Supp. 1163, 1169 (E.D.Pa 1982)*, aff'd *729 F.2d 943 (3rd Cir. 1984)*, cert. denied *469 U.S. 854, 83 L. Ed. 2d 112, 105 S. Ct. 178 (1984)*.

**b. The Leuvering Patent**

Syntron also argues that the Leuvering Patent, *U.S. Patent No. 4,313,734*, anticipates the Campbell patent. Like the Gribnau patent, the Leuvering invention does not use a porous surface that is capable of supporting a binder in a concentration of at least 1 [mu] g/cm<2>. The Leuvering patent, similar to the Gribnau invention, describes an assay in which a binder is coated on the walls of microwells. To detect a bound, gold-labeled tracer, a solvent is added. Also, unlike the Campbell patent, the Leuvering patent then uses an instrument, called a spectrophotometer, to detect color changes. The Leuvering invention does not create a signal visible to the naked eye.

Syntron submits a declaration of Dr. Ehrenkranz, who states that the assay [*31] procedures of Leuvering gave rise to visual color signals in the presence of even low concentrations of analyte. See Ehrenkranz Decl. at P 17, Syntron's Exhibit 11. The experiments relied upon by Dr. Ehrenkranz and Syntron contained significant departures from the process disclosed in the Leuvering patent. The Syntron experiments did not follow the exact procedures detailed in the Leuvering patent; in fact, the scientist conducting the experiments was not even sure as to what antibody/reactants he was using in the experiments. Dr. Ehrenkranz testified that he used three antibodies

Case 5:06-cv-01839-PVT     Document 266-2     Filed 03/07/2008     Page 12 of 22

Page 11

1998 U.S. Dist. LEXIS 22082, *; 51 U.S.P.Q.2D (BNA) 1722

provided to him by Syntron, but did not know what those antibodies were. See Cannon Decl. at Exhibit O, p. 417, line 11 to p. 418, line 23; p.419, line 19 to p. 420, line 1. According to Dr. McDermott, "the use of antibodies rather than receptor proteins is a significant deviation from the Leuvering patent and biases the experiments in Syntron's favor," McDermott Decl. at P 60.

In addition, Dr. Ehrenkranz admitted that two of the three antibodies he used did not yield a visual signal at the 50 mU/ml concentration that is achieved with the Campbell patent. See Cannon Decl. at Exhibit O, p. [*32] 420, line 15 to p. 420, line 1. Dr. Ehrenkranz stated that the two of the Leuvering type tests were not comparable to the Campbell patent. See *id. at p.420,* lines 20-22. The inconsistent results achieved by Syntron, even using the selected antibody binders, overcomes Syntron's claim that the Leuvering test inherently gives visible results and anticipates the Campbell patent. See *Glaxo, Inc. v. Novopharm Ltd., 830 F. Supp. 871, 874 (E.D.N.C. 1993)* ("In order for a claim to be inherent in the prior art it is not sufficient that a person following the disclosure sometimes obtain the result set forth in the claim, it must invariably happen.") (citing *Standard Oil v. Montedison, 664 F.2d 356, 372 (3rd Cir. 1981)),* aff'd, *52 F.3d 1043 (Fed. Cir. 1995),* cert. denied *516 U.S. 988 (1995).*

Syntron also avers that Becton Dickinson has drastically changed its position from the earlier preliminary injunction. At that time, Syntron states that Becton Dickinson described the important part of the Campbell invention as being a discovery that a visible result could be obtained with a particulate label that was attached to a ligand using a solid support. Syntron claims that Becton [*33] Dickinson now alleges that it discovered the use of particular concentrations of analyte requiring a binder concentration of 1 [mu] g/cm<2>. It is not clear how Syntron concludes that this argument will invalidate the patent. On this record, it appears that the use of the 1 [mu] g/cm<2> binder concentration permits the detection of the visible signal at low levels of hCG concentrations and demonstrates that the Campbell patent is not anticipated by either the Gribnau or Leuvering patents.

Syntron also argues that the invention now alleged is not disclosed in the patent and that the new issue becomes not whether 1 [mu] g/cm<2> is claimed, but whether that concentration is capable of detecting low hCG levels. Syntron maintains that the Campbell patent did not disclose that hCG levels at 25-50 mU/ml can be detected by the 1 [mu] g/cm<2> binder concentration, or that those levels can be detected at the first day of a missed period, regardless of the concentration level.

The Campbell patent, however, recites that analyte concentrations that are very low, e.g. 10 MlU/ml, can be

detected without instrumentation or treatment of the label. See McDermott Supp. Decl. at P 7 (citing [*34] col. 8, line 61 and co. 9, lines 13-14 of the Campbell patent). Moreover, the 1 [mu] g/cm<2> concentration level makes the detection of low levels of hCG detectible with the naked eye, and without the additions of solvents or the use of instruments. [HN7] "The defense of anticipation is only invoked if the alleged infringer can demonstrate that a single prior art reference discloses each and every element that is expressly or inherently found in the claimed invention." *Al-Site Corp. v. Opti-Ray, Inc., 841 F. Supp. 1318, 1324 (E.D.N.Y. 1993)* (citing *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc., 976 F.2d 1559, 1565 (Fed.Cir. 1992)).* Syntron provides no authority for the proposition that the earlier patents anticipate the key elements in the Campbell patent.

Becton Dickinson's claim that the Campbell patent is valid, despite Syntron's claims regarding anticipation by the Gribnau and Leuvering patents, is bolstered by other considerations as well. First, Gribnau and Leuvering were both considered by the Patent Examiners, whose decision is afforded deference regarding anticipation. See *American Hoist & Derrick Co. v. Sowa & Sons, 725 F.2d 1350, 1359 (Fed.* [*35] *Cir. 1984),* cert. denied, *469 U.S. 821, 83 L. Ed. 2d 41, 105 S. Ct. 95.* Moreover, as the court discussed in the earlier motion for preliminary injunction, the fact that other companies have taken licenses does constitute some evidence that others in the industry believe the patent to be valid. See *Gillette Co. v. S.C. Johnson & Son, Inc., 919 F.2d 720 (Fed. Cir. 1990)* (discussing commercial success in the nonobviousness context); Studiengesellschaft Kohle mb *H v. Dart Indus., Inc., 549 F. Supp. 716, 736 (D.Del. 1982),* aff'd, *726 F.2d 724 (Fed.Cir. 1984).* Hence, this court finds that Becton Dickinson is likely to succeed in demonstrating that its Campbell patent is not invalidated because of anticipation by the Gribnau and Leuvering patents.

### c. The Hybritech Patent

In a seven-line discussion, Syntron asserts that the Campbell patent are also anticipated by Hybritech's UK application 2 086 041. Syntron argues that, like the Campbell patent, a visible colored signal is obtained. As Becton Dickinson argues, however, the plastic or glass surfaces on which the binder is absorbed in the portion cited by Syntron could not support antibody in a concentration of 1 [*36] [mu] g/cm<2> as required by the Campbell patent. See McDermott Supp. Decl. at P 4. Syntron does not provide the court with any evidence or analysis upon which to base a decision that the requisite concentration is present, or that the Hybritech patent anticipates the Campbell patent despite the binder concentration requirement. Moreover, it is unclear, both in Syntron's papers and in the submitted exhibits, whether the visual determination that occurs in the Hybritech

Case 5:06-cv-01839-PVT    Document 266-2    Filed 03/07/2008    Page 13 of 22

Page 12

1998 U.S. Dist. LEXIS 22082, *; 51 U.S.P.Q.2D (BNA) 1722

invention takes place without, or prior to, treatment or instrumentation. See id. The court holds that both the binder concentration and the Campbell patent's ability to create visual detection at low levels of hCG without the use of a solvent and/or instrumentation demonstrate that the prior art did not anticipate the Campbell invention. Therefore, Syntron's arguments concerning the Hybritech patent also fail. Becton Dickinson has established a reasonable likelihood that Syntron will not succeed in invalidating the Campbell patent on the basis of anticipation.

### d. Misrepresentation of the Prior Art to the Patent Office

Syntron also argues that the patent is unenforceable because Dr. O'Connell and [*37] Becton Dickinson's patent attorney, misrepresented the Gribnau patent and the Leuvering patent to the Patent Office. In the previous preliminary injunction, Syntron supported its argument with the expert report of Dr. Eisen and a declaration from Dr. Ehrenkranz. As explained above, Dr. Eisen's report was submitted as part of a separate challenge to the Campbell patent made by a different defendant. Syntron argues that Becton Dickinson made two misrepresentations: selecting tests to distinguish over the references, and using the tests in such a way as to knowingly present a false result.

[HN8] To prove inequitable conduct and render a patent unenforceable, Syntron must establish by clear and convincing evidence that there was a material misrepresentation or omission of information, and must establish a threshold level of intent. See *Akzo N.V. v. U.S. Intern. Trade Comm'n, 808 F.2d 1471, 1481 (Fed.Cir. 1986)*, cert denied, *482 U.S. 909, 96 L. Ed. 2d 382, 107 S. Ct. 2490 (1987)*. "To be guilty of inequitable conduct, one must have intended to act inequitably." *Kingsdown Medical Consultants v. Hollister, Inc., 863 F.2d 867 (Fed.Cir. 1988)* (quoting *FMC Corp. v. Manitowoc Co., [*38] Inc., 835 F.2d 1411, 1415 (Fed.Cir. 1987)*), cert. denied, *490 U.S. 1067 (1989)*. Materiality and intent must be considered together; the more material the misrepresentation or omission, the less intent is necessary to show inequitable conduct. See *Akzo N.V., 808 F.2d at 1481-1482*. The Federal Circuit has warned courts about charges of inequitable conduct, stating that "the habit of charging inequitable conduct in almost every major patent case has become an absolute plague." *Burlington Industries, Inc. v. Dayco Corp., 849 F.2d 1418, 1422 (Fed.Cir. 1988)*.

Syntron argues that instead of performing an actual assay disclosed in the references, Dr. O'Connell performed a test that did not conform to the Gribnau process, though he was representing that it did, and that he knew would fail. This would allegedly persuade the Pat-

ent Examiners that the Campbell patent was not anticipated by the Gribnau invention. See Opposition at 12. Syntron states that Dr. O'Connell's tests did not contain the presence of a binder on the test tubes, the use of an analyte capable of binding to the binder, and the use of a label conjugated to a ligand capable of reacting with the analyte. [*39] See id. According to Syntron, all of these elements were required for the actual assays. Syntron also cites Dr. Eisen's report for the proposition that a colored signal would have been obtained if the tests had been performed accurately. Syntron charges that Dr. O'Connell presented those tests to the Patent Office for the purpose of distinguishing over the Gribnau and Leuvering references, and that he chose test conditions designed to give misleading results. Syntron also alleges that Dr. O'Connell discussed those tests with the his patent attorney in order to distinguish over the references.

Becton Dickinson argues that Dr. O'Connell performed the test to respond to an assertion made by the Patent Examiners during the Campbell patent prosecution. The Examiners maintained as a "logical deduction" that "[a] label that is visible when taken into solution (in, for example, ethanol as taught by [Gribnau]) must also be visible when bound to the solid surface" of the container or test tube in which the assay is produced. Cannon Decl. at Exhibit M, p. 336, 340 (response to Patent Application) Dr. O'Connell conducted a demonstration at an interview with the Examiners to show that a [*40] dye that is visible in a solution may not necessarily be visible when bound to the surface of a container.

Syntron does not meet its burden of demonstrating intent to mislead. The evidence of intent, one of the two showings that Syntron must meet to demonstrate misrepresentation, indicates that Dr. O'Connell acted in good faith. In fact, the evidence Syntron cites indicates that Dr. O'Connell acted so as to produce the best test that he could to answer the concerns of the Patent Examiners. In his deposition, Dr. O'Connell discussed the difficulty in attempting to reproduce someone else's full assay. See Exhibit 14 at 428. There is no indication that he and his attorney attempted to mislead the examiners. Dr. O'Connell testified that the methods and explanations he was using were a fair representation of what the examiner was citing, see *id. at 429*, and that he provided a "very fair portrayal of what was going on" to the patent examiner. *Id. at 430*. Dr. O'Connell also testified that he believed it was a fair experiment at that time and that his protocol for the experiment did not change based on anything that was said to him by Becton Dickinson's patent attorney. See [*41] *id. at 450-451*. The protocol for the demonstration performed at the Patent Office was also Dr. O'Connell's idea, not that of Becton Dickinson's attorney. See *id. at 427*. The attorney merely confirmed that Dr. O'Connell's portrayal was fair. See *id. at 427-*

Case 5:06-cv-01839-PVT    Document 266-2    Filed 03/07/2008    Page 14 of 22

Page 13

1998 U.S. Dist. LEXIS 22082, *; 51 U.S.P.Q.2D (BNA) 1722

*428*. In short, Syntron has not demonstrated by clear and convincing evidence an intent to deceive, nor has Syntron provided evidence to overcome the sworn statements of Dr. O'Connell indicating that there was an affirmative effort to present accurate portrayals to the Patent Office.

Syntron argues that because of Dr. O'Connell's knowledge of how to dilute a visible dye to an invisible concentration, he "knew that he could make the tests fail if he used a low enough concentration of the label." Opposition at 13. Even assuming that this assertion is correct, this fact does not demonstrate that a material misrepresentation was made or that there was intent to mislead. Moreover, Dr. O'Connell needed to use a dye that was not visible on the container to prove that such a dye could become visible with the addition of a certain substance. His test would have been meaningless if he had began his test with a dye that was already [*42] visible. See McDermott Supp. Dec. P 5-6.

The Patent Examiners were aware that the demonstration was not intended to replicate exactly the Gribnau and Leuvering assays. The "Interview Summary" prepared by the Patent Examiners stated:

> Victoria Blue B (Basic Blue 26) bound to polystyrene is invisible. Added ETOH gives visibly blue solution, showed nc-paper with Victoria Blue-B attached is visible; same amount of dye in 1 ml ETOH is visible. Showed polypropylene & polystyrene tubes with attached with attached gold sol - no color; showed visible gold sol on paper test area. Cannon Decl. at Exhibit M at 342.

The Examiners also explained in a subsequent "Office Action" that:

> The prior are made of record and not relied upon is considered pertinent to applicant's disclosure. Gribnau et al (1982) indicate a sandwich immunoassay for HCG wherein the label consists of dispersed dye particles. On page 423 the last line of Discussion section indicates absorbance of the dye particles increases upon dissolving in an organic solvent. The teaching of Gribnau et al thus is consistent with the demonstration of applicants shown in the interview of 8/22/96. Cannon Decl. at Exhibit [*43] M at 358.

The Examiners understood the Gribnau and Leuvering references and understood the purpose of the demonstration. The statements of the Examiners indicate that the procedure demonstrated by plaintiff did not constitute a material misrepresentation.

Even if Becton Dickinson and Dr. O'Connell attempted to distinguish their process from the prior art, that does not constitute misrepresentation. The Patent Examiners were aware of the Gribnau and Leuvering references. The fact that Becton Dickinson or Dr. O'Connell attempted to distinguish the Campbell patent from the prior art "does not constitute a material omission or misrepresentation." *Akzo N.V. v. U.S. Intern. Trade Comm'n, 808 F.2d 1471, 1482 (Fed.Cir. 1986)*. The examiners in this case were free to reach their own conclusions regarding the Campbell process and the O'Connell demonstration based on the art in front of them. See id. Here, as in Akzo, it appears that the "intent was not to mislead, but rather to distinguish" prior art from the applicant's process, in order to demonstrate validity. See id. This court concludes that Syntron has not demonstrated that it is likely to prove material misrepresentation [*44] nor intent to mislead. Based on the evidence presented, this court concludes that Becton Dickinson has demonstrated that it is likely to succeed on the argument that the Campbell patent is not invalid because of misrepresentations to the Patent Office.

### 3. MOTION TO PRECLUDE BECTON DICKINSON'S ARGUMENT REGARDING MICRO-CAPSULES

The Motion to Preclude was filed by Syntron as a separate motion that was not attached to Becton Dickinson's Motion for Preliminary Injunction. Both parties are represented by counsel and fully briefed the separate preclusion motion. Because the resolution of this separate motion has a direct relation to issues argued in the preliminary injunction, the court will resolve the Motion to Preclude within the Preliminary Injunction ruling.

### a. Introduction

Syntron avers that Becton Dickinson should not be able to argue that Syntron's products contain a visible particulate label that is a sac consisting of microcapsules. Syntron alleges that Becton Dickinson maintained that Syntron's products do not contain a sac throughout the litigation up to and including the Markman hearing. Becton Dickinson now seeks to make a new, contradictory argument. [*45] Essentially, Syntron argues that allowing Becton Dickinson to amend the infringement contentions at this late date constitutes unfair surprise which prejudices Syntron. Syntron avers that such a change in position is prohibited pursuant to *Federal Rule of Civil Procedure 26(e)*. In the alternative, Syntron argues that

Case 5:06-cv-01839-PVT    Document 266-2    Filed 03/07/2008    Page 15 of 22

Page 14

1998 U.S. Dist. LEXIS 22082, *; 51 U.S.P.Q.2D (BNA) 1722

the doctrine of judicial estoppel compels the court to preclude this argument.

Becton Dickinson argues that: 1) amendment of infringement contentions is proper in light of the claim construction ruling by this court subsequent to the Markman hearing; 2) Syntron was not surprised because it had prior notice that such an amendment could take place subsequent to the Markman hearing; 3) Syntron has not been prejudiced by any change; 4) the doctrine of judicial estoppel does not apply to the present case.

This court notes that there is nothing improper in Becton Dickinson's choice to amend the infringement contentions subsequent to the order construing the patent claims, issued on August 11, 1998. Becton Dickinson cites *Johns Hopkins University v. Cellpro, Inc., 152 F.3d 1342, 1357 (Fed. Cir. 1998)* as standing for the proposition that [HN9] after a court has construed the claims [*46] in a patent case, the "rules of the game" change, thereby allowing for amendment of the arguments in the case. In Cellpro, the Federal Circuit held that claims that were not argued, or relevant, prior to claim construction may well become relevant after the patent claims have been construed. See *id. at 1357*. After a jury verdict had been rendered for the defendant in Cellpro, the judge construed the terms of the patent claims and granted a motion for a new trial. The Federal Circuit ruled that the District Court's decision to preclude a new argument at the second trial was error because it did not allow defendant to respond to the changes in the case brought about by the claim construction. See id. Further, the Federal Circuit held that even a pre-trial order did not control what issues could be later argued, or had been waived by the parties, where the claim construction made new arguments relevant. See id.

In the present case, the court's construction of "sac" as "an enclosure" potentially renders previously irrelevant arguments very relevant. Both parties in this matter were aware that there would be changes in the theories of infringement and non-infringement [*47] subsequent to claim construction by this court. This is illustrated by the fact that both parties, in answers to interrogatories, indicated that amendments in various arguments might arise after the court had construed the scope of certain terms. See Syntron's third supplemental response to Interrogatory No. 2; see also Becton Dickinson's first amended interrogatory response, Becton Dickinson's opposition brief, Exhibit E, p. 89. The broad construction of the term "sac" by this court makes arguments regarding the types of sac that infringe the Campbell patent extremely relevant to the resolution of the litigation. Thus, an argument concerning whether Syntron's assay is a sac consisting of microcapsules, which would have been irrelevant under one construction of the term sac, has become relevant. Further, like in Cellpro, the fact that Becton

Dickinson chose not to posit the argument regarding microcapsules prior to the construction hearing does not, by itself, constitute waiver of the right to make the argument later. An amendment in a claim is not impermissible subsequent to a Markman hearing.

### b. *Federal Rule of Civil Procedure 26(e)*

Syntron avers that Becton [*48] Dickinson has violated [HN10] *Federal Rule of Civil Procedure 26(e)*, which requires that parties supplement or correct discovery responses in order to make sure that both parties are aware of changes in the case. *Rule 26(e)* requires supplementation of disclosures "at appropriate intervals" and seasonable amendments of prior discovery responses if the earlier responses are found to be inaccurate or incomplete. With regard to expert testimony, such disclosures must be made at appropriate intervals and at least 30 days prior to trial. See *Fed. R. Civ. P. 26(e)*. The Advisory Committee Notes regarding *Fed. R. Civ. P. 26(e)* note that "supplementations need not be made as each new item of information is learned but should be made at appropriate intervals during the discovery period, and with special promptness as the trail date approaches."

[HN11] The Federal Rules of Civil Procedure are designed to eliminate surprise and to achieve substantial justice. See *Mawby v. United States, 999 F.2d 1252, 1254 (8th Cir. 1993)*(citation omitted). When determining whether preclusion is proper or not, the presence of surprise and prejudice are central to the inquiry. See *Poulin v. Greer, 18 F.3d 979 (1st [*49] Cir. 1994)*. This court, therefore, turns to whether *Rule 26(e)* has been violated, and if so, whether Syntron was surprised or suffered prejudice.

The court is not persuaded that the actions of Becton Dickinson, in amending its infringement claims subsequent to the Markman hearing, constitute a violation of *Rule 26(e)*. The court issued an order construing the claim elements on August 11, 1998. Becton Dickinson filed a request for reconsideration, pertaining only to the presently uncontested Rosenstein patent, on September 11, 1998. On October 16, 1998, the court granted Becton Dickinson's motion, thereby settling all matters relating to claim construction.

Becton Dickinson updated its responses to Syntron's Interrogatories, which applied to both the Rosenstein and Campbell patents, on or about November 2, 1998. Thus, Syntron had notice of the new infringement theory only seventeen days after the October 16, 1998 decision of this court, which settled the claim construction. Waiting until the motion for reconsideration had been decided was reasonable, because the interrogatories involved both the Rosenstein and Campbell patents. See Syntron's Interrogatories 4 and 10. Supplementing [*50] the interrogatories before the motion for reconsideration was

Case 5:06-cv-01839-PVT    Document 266-2    Filed 03/07/2008    Page 16 of 22

Page 15

1998 U.S. Dist. LEXIS 22082, *; 51 U.S.P.Q.2D (BNA) 1722

infeasible, because both the Rosenstein and Campbell patents were addressed in interrogatory questions and the Rosenstein claims were still under consideration. The answers to interrogatories were, therefore, timely.

Additionally, Becton Dickinson updated Dr. McDermott's expert report, initially filed on May 15, 1998, after the claim construction hearing. The supplemental expert report, which addressed the modifications to the infringement claims, was signed on November 14, 1998, and served on Syntron the same day. Syntron filed its Motion to Preclude on November 16, 1998. Thus, the discovery was supplemented before Syntron filed its Motion to Preclude. Syntron's claim that Becton Dickinson has failed to amend the expert report, or to provide any evidence at all, does not comport with the documents provided to Syntron. Additionally, Syntron claims that it was unable to investigate the expert's new claims. Syntron fails to note, however, that Becton Dickinson's cover letter, provided with the supplemental expert report, offered Syntron a chance to depose Dr. McDermott. See Appendix to Becton Dickinson's Memos of Points [*51] and Authorities, Exhibit S.

The disclosures by Becton Dickinson meet the requirements of *Rule 26(e)*. The interrogatories and expert testimony were updated within a reasonable time subsequent to the claim construction. Further, Becton Dickinson offered Syntron a reasonable opportunity to examine Dr. McDermott regarding the new allegations. Thus, Becton Dickinson complied with the requirements of *Rule 26(e)* by providing a seasonable update, within a reasonable interval, once the earlier discovery responses became incomplete.

Even if Becton Dickinson's supplementation of the discovery had not been timely, Syntron is unlikely to have been surprised or prejudiced by the introduction of the "microcapsule" argument. Syntron avers that Becton Dickinson's change in a theory of infringement is unexpected and severely prejudices Syntron. Syntron avers that: 1) the change in theory involves a term that has not been construed by the court subsequent to the Markman hearing; 2) the change comes after discovery has closed, and therefore limits Syntron's ability to respond.

Syntron cites *Loral Fairchild Corp. v. Victor Co. of Japan, Ltd., 911 F. Supp. 76, 80 (E.D.N.Y. 1996)* as standing for the [*52] proposition that post-Markman, post-discovery changes to a theory of liability may require the sanction of preclusion. Loral involved an attempt to change the theory of liability, post-Markman and post-discovery, where the party seeking to change the theory had "not even attempted to update its expert reports or discovery responses in this regard." See id. The court noted that Loral had not, even up to 17 days before trial, attempted to update the discovery, nor had

Loral afforded the opposition any chance to do discovery on the new theory. Given these circumstances, the court found that the sanction of preclusion was appropriate. See id.

The present case is distinguished from Loral in several ways. First, Becton Dickinson did update the expert testimony and interrogatories within a reasonable time after the claim construction order became final. Second, Becton Dickinson offered Syntron the ability to depose the expert witness whose declaration was provided as part of the supplemental discovery. Finally, trial in the present matter have is not imminent, as opposed to the seventeen days remaining until trial in Loral. There has been no Motion for Summary Judgment [*53] decided in this case, nor is a trial date presently set. The equities present in Loral are missing from the present situation.

Syntron also argues that it relied upon the fact that Becton Dickinson chose not to offer a definition of microcapsules at the Markman hearing as an indication that Becton Dickinson did not intend to raise such arguments at trial. Syntron specifically avers that it did not make any argument at the Markman hearing because it did not foresee that the meaning of microcapsules would be at issue.

There is no showing that the lack of argumentation at the Markman hearing is sufficiently prejudicial to warrant the drastic measure of preclusion. First, the term "microcapsule" has been at issue throughout this case due to the non-infringement claims forwarded by Syntron. Syntron has claimed, since the start of litigation, that its product is non-infringing because the visible particulate label is a sac which is not a microcapsule. See Appendix to Becton Dickinson's Opposition, Exhibit I, J; P at p.210. Syntron's claim of non-infringement requires, therefore, that a fact finder assess whether the "sacs" in the product consist of microcapsules. Essentially, Syntron [*54] requests that the court instruct a fact finder that it cannot consider evidence that Syntron's sac is comprised of microcapsules, while simultaneously instructing the fact finder that it may consider evidence that the sac is not comprised of microcapsules. No evidence of infringement could be presented, while evidence of non-infringement would be allowed.

Second, as discussed in the above section regarding Becton Dickinson's alternative theory, there is plenty of evidence regarding the possible meaning of "microcapsules" in the plain meaning of the patent terms, in Vandergaer's text on microencapsulation, and in the record surrounding the application for the patent.

Finally, Syntron has been, and will be, offered many chances to dispute the meaning of the term microcapsule. The arguments forwarded by Syntron in the preliminary injunction papers, as well as in the papers supporting this

Case 5:06-cv-01839-PVT     Document 266-2     Filed 03/07/2008     Page 17 of 22

Page 16

1998 U.S. Dist. LEXIS 22082, *; 51 U.S.P.Q.2D (BNA) 1722

motion for preclusion, suggest significant understanding of the possible meaning of "microcapsule." Further, Syntron will have significant time to formulate arguments, and depose expert witnesses, prior to trial. Syntron has not demonstrated significant prejudice, nor has it demonstrated significant [*55] surprise. Given the facts in this matter, the court finds that the extraordinary measure of precluding Becton Dickinson's argument is not warranted.

### c. Judicial Estoppel

Syntron avers that the court should preclude Becton Dickinson from arguing that the Syntron product contains a sac comprised of microcapsules pursuant to the doctrine of judicial estoppel. [HN12] Under the doctrine of judicial estoppel the court may, at its discretion, preclude a party from taking inconsistent positions in the same litigation. See *Interstate Fire & Cas. Co. v. Underwriters at Lloyd's, London, 139 F.3d 1234, 1239 (9th Cir. 1998)*. The Ninth Circuit, like the majority of circuits, has recently held that the court may apply judicial estoppel only if the court has relied upon the party's previously inconsistent position. See id. (citing *Yanez v. United States, 989 F.2d 323, 326 (9th Cir. 1993)*.

In the present case, there is no reliance by the court upon an inconsistent position taken by Becton Dickinson. The court did not rely on a definition of "microcapsule" forwarded by Becton Dickinson at the Markman. The court did not issue a holding regarding the definition of microcapsule, nor does [*56] Becton Dickinson assert a position regarding the meaning of microcapsule that is fundamentally inconsistent with any construction of a claim by this court. Syntron's argument regarding the inconsistency of the Becton Dickinson's position is similar to its argument regarding *Rule 26(e)*: it is inconsistent to say that the term microcapsule is not at issue and then to offer a definition of the term. Syntron does not offer any meaning that has been asserted previously by Becton Dickinson, nor has this court relied upon or adopted any position advocated by Becton Dickinson regarding the term. Becton Dickinson has not offered contradictory positions regarding the meaning of microcapsule, therefore it is not estopped from asserting a theory of infringement based on the word microcapsule.

Syntron cites *Morris v. State of California, 966 F.2d 448, 453 (9th Cir. 1991)*, cert. denied, *506 U.S. 831, 121 L. Ed. 2d 57, 113 S. Ct. 96 (1991)*, and *Rissetto v. Plumbers and Steamfitters Local 343, 94 F.3d 597, 605 (9th Cir. 1996)* as standing for the proposition that the doctrine of judicial estoppel serves to protect the integrity of the judiciary by stopping litigants from playing fast and [*57] loose with the court. Even though Morris and Rissetto do not apply the Ninth Circuit's recently adopted rule that the court must rely upon a party's in-

consistent position for judicial estoppel to apply, the broad language or regarding judicial integrity is instructive. In the present case, however; there is no indication that Becton Dickinson is playing fast and loose with the court. As noted above, Becton Dickinson made a permissible change in the theory of infringement after the court issued an order on claim construction. The doctrine of judicial estoppel does not justify precluding Becton Dickinson from asserting its amended theory of infringement.

Thus, the court does not find that either *Rule 26(e)* or the doctrine of judicial estoppel justify the preclusion of Becton Dickinson's argument that Syntron's product is a sac comprised of microcapsules, and that as such it infringes the Campbell patent.

### B. IRREPARABLE HARM

Becton Dickinson is entitled to the rebuttable presumption that irreparable harm occurs when a patent is infringed. This conclusion does not end the court's analysis, however. Becton Dickinson still must demonstrate that it is entitled to [*58] a preliminary injunction in light of the other factors. See *Illinois Tool Works, Inc. v. Grip-Pak, Inc., 906 F.2d 679, 682 (Fed.Cir. 1990)* ("Likelihood of success is an important factor, but no court has held it alone determinative and ignored all three of the other factors."). See also *Atlas Powder Co. v. Ireco Chemicals, 773 F.2d 1230, 1233 (Fed.Cir. 1985)* ("When a patentee 'clearly shows' that his patent is valid and infringed, a court may, after a balance of all the competing equities, preliminarily enjoin another from violating the rights secured by the patent."). As the Federal Circuit held, [HN13] "the district court may find that, even giving movant the benefit of the presumption of irreparable harm, the non-moving party has presented evidence sufficient to rebut the presumption. In such a case, the movant has not established irreparable harm and is not entitled to a preliminary injunction." *Reebok International, Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1557 (Fed.Cir. 1994)*.

As this court stated in its May 7, 1998 preliminary injunction decision, a presumption of irreparable harm arises when the patentee makes a strong showing of validity and infringement. See, e.g., *Hybritech,* [*59] *Inc. v. Abbott Laboratories, 849 F.2d 1446, 1456 (Fed.Cir. 1988)* (citing *H.H. Robertson, Co. v. United Steel Deck, Inc., 820 F.2d 384, 390 (Fed. Cir. 1987)*). As the court's discussion above indicates, Becton Dickinson has made a clear showing of the validity of the Campbell patent and infringement of that patent by the Syntron product. Although the presumption of irreparable harm is rebuttable, the presumption awarded to Becton Dickinson "shifts the ultimate production on the question of irreparable harm

Page 17

1998 U.S. Dist. LEXIS 22082, *; 51 U.S.P.Q.2D (BNA) 1722

onto the alleged infringer." *Reebok International, Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1556 (Fed.Cir. 1994).*

The Federal Circuit described the purpose behind the presumption of irreparable harm:

> [HN14] The patent statute provides injunctive relief to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable in money. Because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole. *Id. at 1557* (citing *Hybritech, 849 F.2d at 1456-57*) (internal citation omitted).

Moreover, [*60] the presumption arises because of the finite term of the patent, which is not suspended during patent litigation, and because the passage of time may work irremediable harm. See *H.H. Robertson, Co. v. United Steel Deck, Inc., 820 F.2d 384, 390 (Fed. Cir. 1987).* Various types of evidence have been found sufficient by the Federal Circuit to rebut the presumption. See *Polymer Technologies, Inc. v. Bridwell, 103 F.3d 970, 974 (Fed.Cir. 1996).* As examples of the types of evidence that may rebut the presumption, the Federal Circuit cited demonstrations that (1) the non-movant has or will soon cease the allegedly infringing activities; (2) that the movants have engaged in a pattern of granting licenses; and (3) that the movants unduly delayed in bringing suit, thereby negating the idea of irreparableness. See id. Without a finding that clearly negates irreparable harm, infringement of a valid patent "inherently causes irreparable harm in the absence of the above or similar exceptions." *Id. at 975.*

### 1. Licensing by Becton Dickinson

Syntron argues that Becton Dickinson admits that it "extensively licenses the patents-in-suit," and that Becton Dickinson cites 25 current [*61] licensees. See Opposition at 15. According to Syntron, all but two of Becton Dickinson's licensees were signed after 1993, when Becton Dickinson contacted Syntron. See id. During other litigation, Becton Dickinson continued to license its invention to other companies. See Warfel Dep., Ex. 18 at 72-78. In addition, Becton Dickinson completed license negotiations with three other companies during this litigation. See *id. at 103-104.* Courts have questioned how a company can argue that money damages are unable to compensate a movant if it continues to sell its right to

other companies to make the invention. See *Alliance Research Corp. v. Telular Corp., 859 F. Supp. 400, 405 (C.D. Cal. 1994).* This court finds that the extensive licensing policy undertaken by Becton Dickinson clearly negates the presumption of irreparable harm because it demonstrates that "the patentee was willing to forgo its right to exclude by licensing the patent." *Polymer Technologies, Inc. v. Bridwell, 103 F.3d at 974.* Licensing also indicates that the patent holder does not have the "exclusive market" for its product, and that the court can place a value on the licenses by looking to the licenses [*62] themselves. *Illinois Tool Works, Inc. v. Grip-Pak, Inc., 906 F.2d 679, 683 (Fed.Cir. 1990)* (quoting district court opinion at *725 F. Supp. 951 at 958.*).

Moreover, as the district court noted in deciding the first order for a preliminary injunction, Becton Dickinson offered Syntron a license. Syntron alleges that Becton Dickinson continues attempts to negotiate a license with Syntron. See Opposition at 16. [HN15] Evidence that the patent holder has offered a license to the alleged infringer indicates that "it is clear that [the movant] is willing to forgo its patent rights for compensation. . . [and] suggests that any injury suffered by [the movant] would be compensable in damages assessed as part of the final judgment." *High Tech Med. Instrumentation v. New Image Ind., 49 F.3d 1551, 1557 (Fed.Cir. 1995).* The number of Becton Dickinson licensees in the home pregnancy test market, and Becton Dickinson's efforts to make Syntron another of those licensees, rebuts the presumption of irreparable harm awarded Becton Dickinson. Becton Dickinson asserts that its offering of a license to Syntron does not address the argument of whether Syntron is judgment-proof. See Reply at 8. Becton [*63] Dickinson, however, never address the argument that offering licenses to the alleged infringer demonstrates that irreparable harm may not be present.

### 2. Delay

In addition, Becton Dickinson has failed to rebut, or even address, Syntron's argument concerning the delay in bringing suit, and in bringing motions for preliminary injunctions. This court recognizes that [HN16] delay is one factor that should be considered in determining irreparable harm. A demonstration that Becton Dickinson delayed in bringing this suit does not preclude, as a matter of law, a determination of irreparable harm. See *Hybritech, Inc., 849 F.2d at 1457.* In certain circumstances, however, a showing of delay may be so significant as to preclude a determination of irreparable harm. See id. Though other factors are examined, delay in seeking a remedy is "an important factor bearing on the need for a preliminary injunction." *High Tech Med. Instrumentation v. New Image Industries, Inc., 49 F.3d 1551, 1557 (Fed.Cir. 1995).*

Case 5:06-cv-01839-PVT     Document 266-2     Filed 03/07/2008     Page 19 of 22

Page 18

1998 U.S. Dist. LEXIS 22082, *; 51 U.S.P.Q.2D (BNA) 1722

Syntron has submitted evidence that Becton Dickinson has known about Syntron's allegedly infringing products since 1993. At that time, Becton Dickinson first contacted Syntron with [*64] a letter. See Exhibit 20 (letter dated July 7, 1993). Despite the early discovery of Syntron's products, the present suit was not filed until September 5, 1997, and the first preliminary injunction was not filed until April 6, 1997.

A number of courts have held that a plaintiff's delay in bringing suit indicates a lack of urgency and undermines the need for a preliminary injunction. Substantially shorter time periods have demonstrated to courts that the facts favor the denial of a preliminary injunction. See *High Tech Med. Instrumentation, 49 F.3d at 1557* ("Absent a good explanation, not offered or found here, 17 months is a substantial period of delay that militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief."). A fifteen month delay coupled with evidence that other licenses have been granted suffices to overcome the presumption of irreparable harm. See *T.J. Smith & Nephew Ltd. v. Consolidated Medical Equip., Inc., 821 F.2d 646, 648 (Fed.Cir. 1897).*

Becton Dickinson has not addressed these arguments at all, nor has it provided any reason for the delay in bringing this suit or [*65] any of the preliminary injunction motions. This court understands that patent cases are complicated and require a large amount of discovery, but this court cannot conclude, when no evidence has been provided to it, that any delays in litigating this matter are reasonable. In short, Becton Dickinson has failed to demonstrate that the motion for a preliminary injunction is motivated by a sense of urgency due to the irreparable harm caused by Syntron's continuing infringement.

### 3. Ability to Pay Damage Award

Unlike some cases in which delay and licensing programs were found sufficient to overcome the presumption of irreparable harm, see *High Tech Med. Instrumentation v. New Image Ind., 49 F.3d 1551, 1557 (Fed.Cir. 1995),* the movants in this case contend that the alleged infringer may be unable to pay damages for any infringement. Specifically, Becton Dickinson alleges that Syntron may be judgment-proof. Because of this, Becton Dickinson alleges, money damages will not be able to compensate Becton Dickinson and a preliminary injunction is required.

Becton Dickinson argues that Syntron is depleting its financial resources and would be unable to pay any damage award. The [*66] parties do not dispute that Syntron is a closely held company with three shareholders. See Hammer Decl. at P 6. Dr. James Lee is Syntron's president and majority shareholder with 60% of the shares. See id. Mr. Ted Chen is a Syntron founder and

vice-president who owns 22.5% of the shares. See id. The third shareholder, Mr. Joe Fan, owns 17.5% of Syntron but left Syntron in 1996 and is currently engaged in litigation against the company. See Motion at 18.

Becton Dickinson argues that Syntron's assets are being depleted in two ways. First, Becton Dickinson states that the salaries were increased. Specifically, Becton Dickinson argues that the salary increase and bonus of Dr. Lee, the president of Syntron, demonstrates "extravagance." Dr. Lee's salary was increased from $ 129,032 in 1996 to $ 543,672 in 1997, and was increased to $ 550,000 as of 1/1/98. In addition, Dr. Lee received a 1997 bonus of $ 250,000.

These figures, however, do not provide evidence of depletion of assets. Syntron's 1996 earnings were over double the 1995 earnings and more than the 1995 and 1994 earnings combined. See Hammer Decl. at P 9. The 1997 salary increase is not proof of asset depletion [*67] for the purpose of avoiding paying damages, especially with the evidence of Syntron's strong performance in 1996. See Lee Decl. at P 8. In addition to surviving the loss of several key employees, which required a successful suit by Syntron to enjoin those individuals from using confidential information, Syntron took steps to develop new testing devices during that time. See id. Moreover, Syntron applied for and obtained FDA approval for 16 diagnostic tests involving drugs. In light of these factors, the salary increase does not appear "extravagant" or to be an attempt to escape future damage payments.

Becton Dickinson argues that a second depletion occurred in 1997 when Dr. Lee and Mr. Chen voted $ 2.758 million in cash dividends for themselves and the minority shareholder. Becton Dickinson states that dividends are usually paid out at the tax rate needed for income tax obligations, which approximates about 44%. See Hammer Decl. at P 10. Becton Dickinson maintains that the dividends paid in 1997 exceed income tax obligations by about $ 2 million. See Motion at 19. Dr. Lee argues that the dividend represents only 49% of Syntron's 1996 net income of $ 5.6 million. [*68] See Lee Decl. at P 8. Becton Dickinson counters that Dr. Lee's deposition testimony regarding taxes indicated that dividends were paid quarterly to pay taxes, so that the $ 2 million dividend cannot be justified by examining the 1996 income levels. See Reply at 7 n.1. Thus, Becton Dickinson states that the dividend must be examined in light of the 1997 income levels; in that light, the dividend represents approximately 176% of the 1997 net income.

This alleged evidence does not indicate that Syntron would be unable to pay a damage award, however. Even though Becton Dickinson characterizes Syntron's cash balance as declining, the court has been provided with evidence that demonstrates that Syntron remains profit-

Case 5:06-cv-01839-PVT    Document 266-2    Filed 03/07/2008    Page 20 of 22

Page 19

1998 U.S. Dist. LEXIS 22082, *; 51 U.S.P.Q.2D (BNA) 1722

able. In 1997, Syntron still held ending retained earnings of $ 5.4 million. See Hammer Decl. at P 9. In light of the evidence provided, this court finds that there is no basis for concluding that Syntron will be unable to satisfy an adverse judgment. Becton Dickinson has not demonstrated that Syntron is insolvent or may become insolvent. Instead, Becton Dickinson has pointed to a number of corporate decisions regarding salaries and dividends to suggest the principals [*69] are looting. Becton Dickinson has not, however, presented the court with clear evidence indicating that these decisions are not valid, nor that they will render Syntron unable to perform any future obligations. Becton Dickinson contends, without any supporting arguments, that the damages against Syntron may be enhanced so that the damage amount will total significantly more than damages assessed as lost licensing fees; the court cannot reach that conclusion based only on unsubstantiated assertions and an inference that may be drawn from the lack of an attorney's opinion letter.

Syntron, however, has demonstrated that its retained earnings over the last two years amounts to more than $ 5 million. Syntron is a profitable company that is attempting to create new products. Because the court has been provided with no arguments concerning the amount of damages, there is no basis for concluding that Syntron will be unable to pay Becton Dickinson damages. The TCPI agreement discussed below and the evidence submitted concerning Syntron's finances do not suffice to demonstrate irreparable harm.

To bolster its argument that Syntron may be judgment-proof, Becton Dickinson argues that Syntron's [*70] claims that it is completely indemnified by Technical Chemicals and Products, Inc. ("TCPI") are false. Syntron made the claim that it was totally indemnified by TCPI, a company with greater assets, in the earlier motion for a preliminary injunction. TCPI is a public company with assets that totaled $ 31.5 million in March, 1998. See Hammer Decl. at P 14. Becton Dickinson argues, however, that a majority of the TCPI assets are items such as goodwill, deferred tax assets, and intellectual property. Becton Dickinson estimates that only about $ 700,000 of TCPI assets consists of cash and cash equivalents that can be used to satisfy a judgment. See id.; Ex. E. Becton Dickinson claims that discovery has indicated that Syntron is only indemnified for approximately 15% of the judgment because TCPI has only agreed to indemnify Syntron for products sold to TCPI, not for the entire judgment. See Cannon Decl. at Exhibit T, p. 462 (Aronowitz Deposition). Becton Dickinson concludes that this may leave them without recourse for what could be a damage award over $ 20 million against Syntron.

Syntron acknowledges that there is a dispute regarding the amount of indemnification from TCPI, [*71] but argues that the court should accept its interpretation of the indemnification agreement. Syntron also argues that Becton Dickinson's damage estimates are inflated because it is unclear that damages will be trebled. See *Studiengesellschaft Kohle mb H v. Dart Indus., Inc., 862 F.2d 1564, 1573 (Fed.Cir. 1988).* [HN17] A finding of willful infringement is to be made only after consideration of the totality of the circumstances because there are "no hard and fast per se rules in respect of willingness." Id.

This court holds that Becton Dickinson has failed to demonstrate that enhanced damages are likely to result in this case. See *Read Corp. v. Portec, Inc., 970 F.2d 816, 827 (Fed.Cir. 1992)* (evaluating a wide variety of circumstances, and noting that even a finding of wilful infringement does not mandate enhanced damages). Becton Dickinson notes that Syntron has not waived its privilege, or offered an attorney letter indicating that Syntron believed that its product was not infringing based on legal advice. Though Becton Dickinson is correct that courts allow an inference of knowledge to be made from the lack of such a letter, Becton Dickinson has offered no support for the proposition [*72] that this is the only factor, or even the crucial factor in finding that an infringement is wilful. Aside from its assertion concerning the attorney letter, Becton Dickinson has provided the court with no evidence that the damage award is likely to be enhanced. On the record before it, the court has no basis for concluding that the TCPI agreement is crucial to ensuring that Becton Dickinson's damage award will be satisfied in the event of a favorable verdict.

### 4. Damage to Licensing Program

Without offering any evidence to support its assertion, Becton Dickinson alleges that it is being harmed by the infringement because of damage to, and destabilization of, its licensing program. See Motion at 17, 23. The lack of evidence in the present case distinguishes it from this court's grant of a preliminary injunction in *Wang Laboratories Inc. v. Chip Merchant Inc., 28 U.S.P.Q.2D (BNA) 1677 (S.D.Cal. 1993).* In the court's previous preliminary injunction denial, the court rejected plaintiff's argument that irreparable harm was demonstrated by plaintiff's assertion that it was impaired from negotiating new licenses. In light of Becton Dickinson's success in licensing its invention, [*73] the court sees no reason to reverse its prior decision. [HN18] "Neither the difficulty in calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial." Nutrition 21, *930 F.2d at 871.*

Case 5:06-cv-01839-PVT    Document 266-2    Filed 03/07/2008    Page 21 of 22

Page 20

1998 U.S. Dist. LEXIS 22082, *; 51 U.S.P.Q.2D (BNA) 1722

At other parts of its brief, Becton Dickinson also maintains that Syntron's infringement results in lost royalties. See Motion at 23. Potential lost sales do not manifest irreparable harm because acceptance of that position "would require a finding of irreparable harm to every manufacturer/patentee, regardless of circumstances." *Illinois Tool Works, Inc. v. Grip-Pak, Inc., 906 F.2d 679, 683 (Fed.Cir. 1990).* Though the opportunity to use an invention during the patent litigation may tempt infringers, see *H.H. Robertson, Co. v. United Steel Deck, Inc., 820 F.2d 384, 390 (Fed. Cir. 1987),* no evidence of that has been presented to this court. In fact, the extensive licensing accomplished by Becton Dickinson both before and during this litigation and other suits undermines that notion. If Becton Dickinson's position regarding lost sales, lost royalties, and damage to the [*74] licensing program were accepted, "the presumption of irreparable harm stemming from a finding of likely success could never be rebutted, for every patentee whose motion for a preliminary injunction is denied loses the right to exclude an accused infringer from the market place pending the trial." *Reebok, 32 F.3d at 1558-1559.*

In light of the above discussion regarding the extensive licensing program achieved by Becton Dickinson, and its delay in seeking a remedy, this court holds that Syntron has rebutted the presumption of irreparable harm. In addition, on this record, it appears that money damages will adequately compensate Becton Dickinson for any damages it currently suffers. See *Illinois Tool Works, Inc. v. Grip-Pak, Inc., 906 F.2d 679, 683 (Fed. Cir. 1990)* (though finding no likelihood of success, holding that money damages can sufficiently compensate patent holder who has licensed its product); *Nutrition 21, 930 F.2d at 872* (stating that there is no presumption that money damages are inadequate). Hence, Becton Dickinson has failed to demonstrate that it will be harmed irreparably if the court does not grant the extraordinary remedy of a preliminary injunction.

[*75] **C. BALANCE OF HARDSHIPS**

In addition to demonstrating that Becton Dickinson is not being irreparably harmed by the alleged infringement, Syntron also has shown that the balance of hardships favors the denial of the preliminary injunction motion. This finding alone justifies the court's denial of Becton Dickinson's motion. See *H.H. Robertson, Co. v. United Steel Deck, Inc., 820 F.2d 384, 390 (Fed. Cir. 1987)* ("Even when irreparable injury is presumed and not rebutted, it is still necessary to consider the balance of hardships.").

Becton Dickinson alleges that its hardship consists of lost royalty sales as well as destabilization of its licensing program. Becton Dickinson cites *Bell & Howell Document Management v. Altek Systems, 132 F.3d 701,*

*708 (Fed.Cir. 1997),* as standing for the proposition that Syntron's small size does not insulate it from a preliminary injunction or award it the right to infringe the patent. See Motion at 23. In that case, however, the court acknowledged that the fact that the alleged infringer could be put out of business was a legitimate fact to consider. See id. The Federal Circuit stated that when the other three factors weigh in [*76] favor of granting the preliminary motion, the fact that the infringer is a small company should not insulate it. See id.

The court stated in its May 7, 1998 Order that it will not disregard the hardship facing the defendant. Defendant still maintains that the bulk of its products use the technology alleged to infringe plaintiff's patents, and that a preliminary injunction prohibiting the manufacture and sale of these products may well drive defendant out of business. The Federal Circuit held:

> The hardship on a preliminarily enjoined manufacturer who must withdraw its product from the market before trial can be devastating. . . .Because the court must balance the hardships, at least in part in light of its estimate of what is likely to happen at trial, it must consider movant's likelihood of success. Yet a court must remain free to deny a preliminary injunction, whatever be the showing of likelihood of success, when equity in light of the factors so requires.

*Illinois Tool Works, Inc. v. Grip-Pak, Inc., 906 F.2d 679, 683 (Fed. Cir. 1990).* The risk that Syntron could be financially incapacitated by an adverse ruling weighs in favor of denying the motion. Becton [*77] Dickinson would not be able to recover anything if Syntron is forced into bankruptcy before the merits can be litigated. Even if Syntron could survive by its other inventions, the effect on Syntron must be considered by this court.

The loss of royalties, which is compensable by money damages, and an unquantifiable "destabilizing" effect on a licensing program are not sufficient for this court to conclude that the balance of hardships favor Becton Dickinson. Syntron also experiences destabilization because of this litigation. Becton Dickinson has licensed its invention successfully both before and after this litigation commenced. Other suits have ended in licensing agreements between Becton Dickinson and the adverse party. Becton Dickinson has not provided any evidence that it is being harmed in any way other than its decline in royalties; it will remain a going concern and remain competitive even if the court denies its motion. In contrast, the entire future of the defendant would be sub-

Case 5:06-cv-01839-PVT    Document 266-2    Filed 03/07/2008    Page 22 of 22

Page 21

1998 U.S. Dist. LEXIS 22082, *; 51 U.S.P.Q.2D (BNA) 1722

stantially affected were this court to grant the preliminary injunction. Even considering the court's analysis concerning the likelihood of success, the balance of hardships weighs in favor of Syntron. [*78] "If a preliminary injunction would have a more severe impact on the enjoined party than the moving party would suffer if not granted, that can be a basis for denying the injunction." *Ethicon Endo-Surgery v. U.S. Surgical Corp., 855 F. Supp. 1500, 1517 (S.D.Ohio 1994)* (quoting *American Cyanamid Co. v. U.S. Surgical Corp., 833 F. Supp. 92, 133 (D.Conn. 1992))*.

### D. PUBLIC INTEREST

Neither party has devoted much time to explaining why the public interest favors its position. As it did in the May 7, 1998 Order, this court recognizes that there is a public interest both in protecting patent rights as well as in market competition. Syntron also makes a patent misuse argument in this section. Because the issue was not fully presented to this court, the court will not render a holding on the issue of patent misuse at this time. In conclusion, neither party has demonstrated that the public interest clearly favors its position over that encouraged by the other.

### IV. CONCLUSION

After examining each of the four factors, the court finds that Becton Dickinson has failed to demonstrate that the extraordinary remedy of a preliminary injunction is warranted at this [*79] point. Though Becton Dickinson has demonstrated that it may be likely to succeed in its efforts to demonstrate the validity of its patent and infringement of that patent by Syntron, it has failed to demonstrate that irreparable harm exists or that the balance of hardships weighs in its favor. Hence, plaintiff's motion for a preliminary injunction is **DENIED**. In addition, defendant's Motion to Preclude is **DENIED**.

IT IS SO ORDERED.

DATED: 12/19/98

Judith N. Keep, District Judge

United States District Court

# Appendix 2

LEXSEE



Caution
As of: Mar 07, 2008

**CORDIS CORPORATION, Plaintiff-Appellant, v. BOSTON SCIENTIFIC COR-
PORATION and SCIMED LIFE SYSTEMS, INC., Defendants-Appellees.**

**04-1098**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**99 Fed. Appx. 928; 2004 U.S. App. LEXIS 11557**

**May 28, 2004, Decided**

**NOTICE:**    [**1]  THIS DECISION WAS ISSUED
AS UNPUBLISHED OR NONPRECEDENTIAL AND
MAY NOT BE CITED AS PRECEDENT. PLEASE
REFER TO THE RULES OF THE FEDERAL CIRCUIT
COURT OF APPEALS FOR RULES GOVERNING
CITATION TO UNPUBLISHED OR NONPRECE-
DENTIAL OPINIONS OR ORDERS.

**SUBSEQUENT HISTORY:** Patent interpreted by
Boston Sci. Scimed, Inc. v. Cordis Corp., 2005 U.S. Dist.
LEXIS 10735 (D. Del., June 3, 2005)
Summary judgment denied by Cordis Corp. v. Boston
Sci. Corp., 2005 U.S. Dist. LEXIS 10749 (D. Del., June
3, 2005)

**PRIOR HISTORY:** Cordis Corp. v. Boston Sci. Corp.,
2003 U.S. Dist. LEXIS 21338 (D. Del., Nov. 21, 2003)

**DISPOSITION:**   Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent holder
sued defendant competitor for infringement of a patent
claiming a balloon-expandable coronary stent. The
United States District Court for the District of Delaware
denied the patent holder's motion for a preliminary in-
junction that would have enjoined sales of the competi-
tor's drug-eluting stent. The patent holder appealed the
order.

**OVERVIEW:** The district court properly held that the
patent holder's claim was likely to succeed on the merits

as the claim term "wall surface" did not recite at least on
elongate member and another claim term expressly re-
cited that limitation. With respect to the term "substan-
tially uniform thickness," the competitor's stent likely
had a uniform thickness even on expansion given that the
shape of the cross-section was not important and the pre-
liminary record showed that the competitor's stent used a
stainless steel tube with a uniform thickness, which lent
support to the notion that the endproduct also had a sub-
stantially uniform thickness. With respect to the "thin-
walled" claim term, the testimony that other infringing
stents had greater thicknesses supported the district
court's conclusion. The district court also properly held
that the competitor had rebutted the presumption of ir-
reparable harm given the patent holder's 16-month delay
in seeking injunctive relief and the patent holder's inabil-
ity to prevent its licensees from entering the market for
drug-eluting stents. Finally, the consideration of the pub-
lic interest in having a broad choice of drug-eluting
stents was not error.

**OUTCOME:** The order denying the patent holder's mo-
tion for a preliminary injunction was affirmed.

**CORE TERMS:** stent, thickness, drug-eluting, irrepara-
ble harm, tubular, injunction, preliminary injunction,
surface, public interest, slots, diameter, license, thin-
walled, patent, monetary damages, intralu-
minal, competitor, balancing, elongate, patentee, weigh-
ing, bare, noninfringing, expandable, reversible, technol-
ogy, rebutting, vascular, disposed

**LexisNexis(R) Headnotes**

***Civil Procedure > Remedies > Injunctions > Elements > General Overview***
***Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions***
***Civil Procedure > Appeals > Standards of Review > Abuse of Discretion***

[HN1]The United States Court of Appeals for the Federal Circuit reviews the district court's decision regarding a preliminary injunction for an abuse of discretion, a lapse that occurs when the decision is premised on an error of law, a clearly erroneous finding of fact, or a clear error of judgment in weighing the factors. To the extent the court's decision depends upon an issue of law, the Federal Circuit reviews that issue de novo. But when a preliminary injunction is denied, the movant carries a heavier burden to obtain a reversal. If a preliminary injunction is denied, the absence of an adequate showing with regard to any one of the four factors may be sufficient, given the weight or lack of it discretionarily assigned the other factors by the trial court, to justify the denial.

***Evidence > Inferences & Presumptions > Rebuttal of Presumptions***
***Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > Appeals***
***Patent Law > Remedies > Equitable Relief > Injunctions***

[HN2]Once a patentee shows a likelihood of success on the merits, the United States Court of Appeals for the Federal Circuit's law presumes an irreparable harm. Naturally, however, this presumption is rebuttable.

***Civil Procedure > Remedies > Injunctions > Elements > Irreparable Harm***
***Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions***
***Patent Law > Remedies > Equitable Relief > Injunctions***

[HN3]In the context of reviewing a request for a preliminary injunction in a patent infringement case, delay is a factor in evaluating irreparable harm.

***Patent Law > Infringement Actions > Infringing Acts > General Overview***
***Patent Law > Ownership > Conveyances > General Overview***
***Patent Law > Remedies > Equitable Relief > Injunctions***

[HN4]The United States Court of Appeals for the Federal Circuit permits trial courts to weigh licenses as part of the case rebutting the presumption of irreparable harm in determining whether a preliminary injunction is warranted in a patent infringement action.

***Civil Procedure > Remedies > Damages > Monetary Damages***
***Civil Procedure > Appeals > Standards of Review > Reversible Errors***
***Patent Law > Remedies > Equitable Relief > Injunctions***

[HN5]In the context of evaluation a request for a preliminary injunction in a patent infringement action, the availability of monetary damages cannot alone rebut the presumption of irreparable harm.

***Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions***
***Civil Procedure > Appeals > Standards of Review > Reversible Errors***
***Patent Law > Remedies > Equitable Relief > Injunctions***

[HN6]In the context of evaluating a request for a preliminary injunction in a patent infringement action, relative market effects may factor into balancing the relative hardships.

***Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions***
***Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > Appeals***
***Patent Law > Remedies > Equitable Relief > Injunctions***

[HN7]While crediting the validity of the point that the public's interest lies in upholding the exclusive rights of patents, the United States Court of Appeals for the Federal Circuit also acknowledges that it cannot control in every case without obliterating the public interest component of the preliminary injunction inquiry. Thus, for good reason, courts refuse to permanently enjoin activities that would injure the public health.

**JUDGES:** Before RADER, BRYSON, and GAJARSA, Circuit Judges.

**OPINION BY:** RADER

**OPINION**

 [*930]  RADER, *Circuit Judge.*

99 Fed. Appx. 928, *; 2004 U.S. App. LEXIS 11557, **

The United States District Court for the District of Delaware denied Cordis Corp.'s (Cordis's) motion for a preliminary injunction [*931] that would have enjoined sales of Boston Scientific Corp.'s (BSC's) drug-eluting stent. *Cordis Corp. v. Boston Sci. Corp.,* 2003 U.S. Dist. LEXIS 21338, Civ. No. 03-027-SLR (D. Del. Nov. 21, 2003). Because the district court did not abuse its discretion in denying Cordis's motion, this court *affirms.*

I.

Cordis Corp. owns U.S. Patent No. 4,739,762, which claims a balloon-expandable coronary stent. This court recently considered this patent in *Cordis Corp. v. Medtronic AVE, Inc.,* 339 F.3d 1352 (Fed. Cir. 2003). Three claims of the '762 patent are relevant to this appeal (underlining indicates disputed claim terms):

13. An expandable intraluminal vascular graft, [**2] comprising:

a *thin-walled* tubular member having first and second ends and a *wall surface* disposed between the first and second ends, the wall surface having a *substantially uniform thickness* and a plurality of slots formed therein, the slots being disposed substantially parallel to the longitudinal axis of the tubular member;

the tubular member having a first diameter which permits intraluminal delivery of the tubular member into a body passageway having a lumen; and

the tubular member having a second, expanded and deformed diameter, upon the application from the interior of the tubular member of a radially, outwardly extending force, which second diameter is variable and dependent upon the amount of force applied to the tubular member, whereby the tubular member may be expanded and deformed to expand the lumen of the body passageway.

14. The expandable intraluminal vascular graft of claim 23, wherein the slots are uniformly and circumferentially spaced from adjacent slots and the slots are uniformly spaced from adjacent slots along the longitudinal axis of the tubular member, whereby *at least one elongate member* is formed between adjacent slots.

23. [**3] The expandable intraluminal vascular graft of claim 13, wherein the outside of the wall surface of the tubular member is a smooth surface, when the tubular member has the first diameter.

A stent framework assists with the immediate opening of a narrowed blood vessel, but that blood vessel may subsequently narrow. That adverse reaction, called restenosis, is caused by an inflammatory response, that is, the growth of scar tissue (smooth muscle cells). The claimed stent may include a drug-eluting feature. The drug-eluting feature applies a drug to the vessel wall to facilitate healing without the growth of smooth muscle cells, thus reducing the probability of restenosis in patients. While not explicitly referenced in the claims, this drug-eluting portion may coat the claimed framework.

BSC's accused devices consist of a bare stent, named "Express," and a drug-eluting stent, named "Taxus." The Express stent serves as the framework for the Taxus stent. At the time the motion for a preliminary injunction was pending before the district court, Cordis was the only FDA-approved manufacturer of a drug-eluting coronary stent. Cordis's product is named "Cypher." Cordis sought to preliminarily [**4] enjoin sales of BSC's Taxus stent but not its Express stent. After the district court denied Cordis's motion but before the parties could argue this appeal, the FDA approved Taxus.

[*932] In denying Cordis's motion for a preliminary injunction, the district court weighed the standard four factors: reasonable likelihood of success on the merits; irreparable harm to the patentee in the absence of a preliminary injunction; the balance of the hardships on the patentee and the alleged infringer; and the impact of an injunction on the public interest. At the outset, the district court determined that Cordis would likely succeed on the merits. This court's prior opinion on claim construction in conjunction with expert testimony on infringement suggests that BSC's Taxus stent infringes claim 23 of the '762 patent. Next, the district court de-

99 Fed. Appx. 928, *; 2004 U.S. App. LEXIS 11557, **

termined that a denial would not irreparably harm Cordis. The trial court reasoned that Cordis delayed approximately sixteen months in filing the motion and expressed willingness to accept monetary relief for the Express stent. Moreover, Cordis has licensed the '762 patent to competitors. Finally, Cordis's sales of Cypher would only comprise approximately 5% [**5] of Johnson & Johnson's sales (Johnson & Johnson is Cordis's parent company).

Applying the next step of the test for a preliminary injunction, the district court balanced the hardships in favor of BSC. The trial court noted that the injunction would threaten BSC's most important business and affect the worldwide supply of Taxus stents. Finally, the district court reasoned that grant of the injunction would harm the public interest because Cordis cannot ensure an adequate supply of drug-eluting stents. Thus, balancing the first prong favoring Cordis against the other three favoring BSC, the district court declined to grant a preliminary injunction.

## II.

[HN1]This court "review[s] the district court's decision for an abuse of discretion, a lapse that occurs when the decision is premised on an error of law, a clearly erroneous finding of fact, or a clear error of judgment in weighing the factors. To the extent the court's decision depends upon an issue of law, [this court] review[s] that issue *de novo.*" *Oakley, Inc. v. Sunglass Hut Int'l,* 316 F.3d 1331, 1339 (Fed. Cir. 2003) (citation omitted). But "when a preliminary injunction is denied, the movant carries a heavier [**6] burden to obtain a reversal." *New England Braiding Co. v. A.W. Chesterton Co.,* 970 F.2d 878, 882 (Fed. Cir. 1992). "If a preliminary injunction is denied, the absence of an adequate showing with regard to any one of the four factors may be sufficient, given the weight or lack of it discretionarily assigned the other factors by the trial court, to justify the denial." *Reebok Int'l Ltd. v. J. Baker, Inc.,* 32 F.3d 1552, 1556 (Fed. Cir. 1994).

### A. Likelihood of Success on the Merits

BSC argues that its Express stent does not infringe claim 23 of the '762 patent, focusing on three limitations: "wall surface"; "substantially uniform surface"; and "thin-walled." In separate litigation, the district court construed them as follows:

> (3) **"Thin-walled."** The wall of the tubular member must have little extent from one surface to its opposite at both its first and second diameters.

> (4) **"Wall surface."** The outer surface of the tubular member must be disposed in a common cylindrical plane.

> (5) **"Substantially uniform thickness."** The thickness at all points along the wall surface of the tubular member, both at its first and second diameters, [**7] must be substantially the same. Variances as little as .001 inches fall outside the scope of "substantially uniform."

*Cordis Corp. v. Medtronic AVE, Inc.,* 194 F. Supp. 2d 323, 332 (D. Del. 2002) (emphasis [*933] original). Without discussing the other two claim terms in this appeal, this court revised the construction of "substantially uniform thickness" to mean that "the walls must be of largely or approximately uniform thickness" and that "a wall that varies in thickness by as much as 100 percent cannot be said to be of 'substantially uniform thickness' either literally or by equivalents." *Cordis,* 339 F.3d at 1360, 1362.

With respect to "wall surface," BSC argues that the district court erred because the accused stent does not have at least one elongate member. Claim 23, however, does not recite "at least one elongate member." Moreover, claim differentiation supports not requiring an elongate member; claim 14 expressly recites that limitation. *See Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1187 (Fed. Cir. 1998) (suggesting "a presumption that each claim in a patent has a different scope"). Accordingly, this court [**8] concurs with the district court's conclusion on this preliminary record.

With respect to "substantially uniform thickness," BSC argues that the district court erred because the accused stent has a 100% thickness variation and because Cordis did not show that the accused stent met this limitation. This court, however, concurs with the district court's conclusion on this preliminary record. This court has already rejected the way that BSC would measure the thickness. The shape of the cross-section -- that is, ellipto-rectangular as opposed to circular -- is not important. *See Cordis,* 339 F.3d at 1362 (concluding that "a stent formed from struts with circular or ellipto-rectangular cross-sections can have a wall of substantially uniform thickness"). Moreover, the preliminary record shows that the BSC stent uses a stainless-steel tube having a substantially uniform thickness, which lends support to the notion that the endproduct also has a substantially uniform thickness. In sum, Cordis presented sufficient evidence for the district court to conclude, on a preliminary basis, that BSC's Taxus stent likely has a uniform thickness even upon expansion.

With respect to "thin-walled, [**9] " BSC argues that the previous construction necessarily depends on the context. It further argues that the context is informed by the prosecution history, which supposedly limits "thin-walled" to thicknesses no greater than 0.0045 inches. On this preliminary record, however, this court concurs with the district court's determination. The record includes testimony that other infringing stents had thicknesses greater than 0.0045 inches. Accordingly, none of the district court's conclusions resting on the preliminary construction of claim 23 disclose a reversible error.

This court also considers BSC's validity challenges based on section 112, first paragraph, but agrees with the district court that they are unlikely to succeed.

B. Irreparable Harm

[HN2]Once a patentee shows a likelihood of success on the merits, this court's law presumes an irreparable harm. *See, e.g., Smith Int'l, Inc. v. Hughes Tool Co., 718 F.2d 1573, 1581 (Fed. Cir. 1983).* Naturally, however, this presumption is rebuttable. *See, e.g., Rosemount, Inc. v. United States Int'l Trade Comm'n, 910 F.2d 819, 821-22 (Fed. Cir. 1990).* On appeal, Cordis attacks each part of the district court's [**10] rationale for rebutting the presumption. This court holds that the district court did not err in finding BSC adequately rebutted the presumption of irreparable harm.

1. Delay

The district court determined that Cordis delayed filing its motion for injunction relief approximately sixteen months [*934] after learning about the Taxus stent. Cordis responds that it sought a preliminary injunction as soon as it became likely that FDA would approve the product. [HN3]Delay is a factor in evaluating irreparable harm. *See, e.g., High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc., 49 F.3d 1551, 1557 (Fed. Cir. 1995).* Thus, the district court did not err in weighing the delay in its irreparable harm calculus. The trial court also properly considered Cordis's explanation for the delay.

2. Licenses

Cordis argues that its decision to license the '762 patent to competitors, some of whom could make a non-infringing drug-eluting stent, is not relevant to the irreparable harm decision. Cordis contends that the patent owner alone may decide who may make or use the '762 invention. [HN4]This court, however, has permitted trial courts to weigh licenses as part of the case rebutting the presumption [**11] of irreparable harm. *See T.J. Smith & Nephew, Ltd. v. Consol. Med. Equip., Inc., 821 F.2d 646, 648 (Fed. Cir. 1987).* Indeed, BSC notes that it could transfer its Taxus approval to a licensed competitor, in which case Cordis could not prevent competition.

The '762 patent reads on bare metal stents, a market with many noninfringing alternatives. Even though the '762 patent acts as a blocking patent (because a drug-eluting stent necessarily builds on a bare framework of a stent), Cordis would not likely be able to prevent its licensees from entering the market for drug-eluting stents. [1] Accordingly, the district court did not err in considering licenses in rebutting the presumption of irreparable harm.

    1 Cordis did not show that the licenses contain enforceable field-of-use restrictions that would preclude its licensees from entering the drug-eluting stent market.

3. Monetary Relief

The district court determined that Cordis was willing to seek money damages after trial. Before this court, however, [**12] Cordis denies willingness to accept monetary damages for the Taxus stent. Cordis contends that it was only willing to accept monetary damages for the Express stent. The record shows the reason for Cordis's contention: With noninfringing alternatives in the market for bare metal stents (some with the armor of licenses granted to Cordis's competitors), Cordis cannot prevent sales of the Express stent. In sum, [HN5]the availability of monetary damages cannot alone rebut the presumption of irreparable harm, *see High Tech Med., 49 F.3d at 1557,* but this court detects no reversible error in the district court's consideration of monetary damages in conjunction with other factors that rebutted finding irreparable harm in this case.

4. Percentage of Johnson & Johnson's Sales

Drug-eluting stents constitute a relatively small portion of Johnson & Johnson's overall sales. Cordis correctly notes that this percentage is irrelevant to any irreparable harm Cordis may suffer. Nevertheless, [HN6]relative market effects may factor into balancing the relative hardships. *See, e.g., Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys., 132 F.3d 701, 708 (Fed. Cir. 1997).* Because [**13] this information is part of the overall injunction calculus, this court does not detect reversible error in the district court's consideration of the proportion of Johnson & Johnson's business that comprises sales of drug-eluting stents relative to the effect on Cordis's business. *See Gen. Mills, Inc. v. Hunt-Wesson, Inc., 103 F.3d 978, 981 (Fed. Cir. 1997)* (stating that this court "review[s] judgments, not opinions").

[*935] C. Balance of the Relative Hardships

Cordis argues that the district court required it, in effect, to prove that the injunction would not impose an irreparable harm on BSC. To the contrary, the district court properly considered the effect that an injunction would have on BSC. Indeed, BSC highlights some of the

harms that it would suffer, including the loss of hundreds of jobs, ruination of a core BSC business, and hindrance of development of new medical devices. *See, e.g., Litton Sys., Inc. v. Sundstrand Corp., 750 F.2d 952, 959-61 (Fed. Cir. 1984)* (finding "that entry of the preliminary injunction . . . would be catastrophic" to the defendant). In light of BSC's plant in Ireland that could produce stents for sale outside the [**14] United States, the district court may have erroneously determined that an injunction would damage the extraterritorial supply of Taxus. Nonetheless, the district court did not err overall in considering the harms that an injunction would impose on BSC in balancing the hardships.

D. Public Interest

Cordis argues that the district court factually and legally erred in weighing the public's interest in favor of BSC. Cordis first asserts that it could adequately produce drug-eluting stents to meet market demand, citing testimony that it was taking steps to ensure ability to meet entire market demand. By the same token, the district court was also entitled to credit other testimony that showed Cordis's initial difficulty in meeting demand. Accordingly, the district court did not abuse its discretion in considering whether Cordis could satisfy market demand. *See, e.g., E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co., 835 F.2d 277, 278 (Fed. Cir. 1987).*

Cordis also asserts that the public's interest lies in upholding the exclusive rights of a patentee. *See Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 63, 142 L. Ed. 2d 261, 119 S. Ct. 304 (1998)* ("The patent system represents a carefully [**15] crafted bargain that encourages both the creation and the public disclosure of new and useful advances in technology, in return for an exclusive monopoly for a limited period of time."); *see also Eli Lilly & Co. v. Premo Pharm. Labs., Inc., 630 F.2d 120, 138 (3d Cir. 1980)* ("Congress has determined that it is better for the nation in the long-run to afford the inventors of novel, useful, and nonobvious products short-term monopolies on such products than it is to permit free competition in such goods."). [HN7]While crediting the validity of this point, this court also acknowledges that it cannot control in every case without obliterating the public interest component of the preliminary injunction inquiry. Thus, for good reason, courts have refused to permanently enjoin activities that would injure the public health. *See Vitamin Tech., Inc. v. Wis. Alumni Res. Found., 146 F.2d 941, 944 (9th Cir. 1945); City of Milwaukee v. Activated Sludge, Inc., 69 F.2d 577, 593 (7th Cir. 1934).*

In this case, a strong public interest supports a broad choice of drug-eluting stents, even though no published study proves the superiority of either Cordis's [**16] Cypher or BSC's Taxus stent. Nevertheless, this court notes that Cypher may have, for example, safety or efficacy concerns beyond those shared by Taxus. *See Scripps Clinic & Research Found. v. Genentech, Inc., 666 F. Supp. 1379, 1401 (N.D. Cal. 1987), aff'd, 927 F.2d 1565 (Fed. Cir. 1991)* (stating that the public would be harmed by an injunction because the accused product had the possibility of eliminating safety risks present in other products). Moreover, the record contains evidence that some doctors prefer the Taxus stent over the Cypher stent. *See [*936] Datascope Corp. v. Kontron, Inc., 611 F. Supp. 889, 895 (D. Mass. 1985), aff'd, 786 F.2d 398 (Fed. Cir. 1986)* (stating that the public would be harmed by an injunction because some physicians prefer the defendant's product). Accordingly, this court holds that the district court did not err in considering the public's interest in the issuance of an injunction.

E. Overall Balancing

Cordis argues that the district court erred in finding that "it would be inequitable to grant such drastic relief based on patented old technology when it is new unpatented technology [**17] driving the business decision to file suit." *Cordis, slip op. at 6, 2003 U.S. Dist. LEXIS 21338, at *7.* Even if it erred in requiring a nexus between the likely infringement and the claim for irreparable harm (a question this court need not reach), the district court did not abuse its discretion in weighing all the factors and declining to preliminarily enjoin the sales of Taxus.

III.

Because the district court did not abuse its discretion in denying Cordis's motion for a preliminary injunction, this court affirms.

LEXSEE



Positive
As of: Mar 07, 2008

**CORDIS CORPORATION, Plaintiff, v. BOSTON SCIENTIFIC CORPORATION
and SCIMED LIFE SYSTEMS, INC., Defendants. BOSTON SCIENTIFIC SCI-
MED, INC. and BOSTON SCIENTIFIC CORPORATION, Plaintiffs, v. CORDIS
CORPORATION and JOHNSON & JOHNSON, INC., Defendants.**

**Civil Action No. 03-027-SLR, Civil Action No. 03-283-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2003 U.S. Dist. LEXIS 21338**

**November 21, 2003, Decided**

**SUBSEQUENT HISTORY:** Affirmed by Cordis Corp.
v. Boston Sci. Corp., 2004 U.S. App. LEXIS 11557 (Fed.
Cir., May 28, 2004)

**DISPOSITION:**     [*1]  Motion for preliminary injunc-
tion filed by Cordis Corporation enied. Motion for pre-
liminary injunction filed by Boston Scientific Scimed,
Inc. and Boston Scientific Corporation denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff corporation filed
an action against defendant corporations alleging in-
fringement of one of its patents used in the manufacture
of drug-eluting coronary stents. Defendants also filed a
related action against plaintiff alleging infringement of
its patent. The parties filed cross motions for the prelimi-
nary imposition of injunctive relief.

**OVERVIEW:** Plaintiff contended that it was entitled to
an injunction against defendants based upon literal in-
fringement by the drug-eluting stent manufactured by
defendants. Based upon an earlier claims construction
and expert testimony, the court concluded that plaintiff
had carried its burden of proving that it would likely suc-
ceed on the merits of its infringement claim. However,
the court found that the presumption of irreparable harm
arising from a showing of a likelihood of success on the
merits had been rebutted by the delay in asserting the
claim, plaintiff's willingness to seek money damages, the
fact that other licensees could make the stent without

infringing on the patent, and the fact that the total sales
to one defendant were small. Also there was no showing
that defendants would not suffer irreparable harm if they
were enjoined from marketing their stent and there was a
concern that the public would be harmed by the limited
competition. The court determined that defendants were
not entitled to an injunction because there was a substan-
tial question about the validity of their patent and defen-
dants' likelihood of success on the merits was question-
able.

**OUTCOME:** The court denied the parties' cross-
motions for injunctive relief.

**CORE TERMS:** stent, coat, tubular, drug-eluting, coat-
ing, preliminary injunction, polymer, top, injunction,
patent, non-thrombogenic, injunctive relief, irreparable
harm, sirolimus, topcoat, diameter, comprise, surface,
medical devices, elutable, solvent, public interest, in-
traluminal, infringement, competitors, technology, ex-
pandable, comprising, literally, infringes

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Injunctions > Prelimi-
nary & Temporary Injunctions*
[HN1]A preliminary injunction is a drastic and extraor-
dinary remedy that is not to be routinely granted.

*Civil Procedure > Remedies > Injunctions > Elements > General Overview*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN2]To obtain the extraordinary relief of a preliminary injunction, a movant must prove that: 1) it has a reasonable likelihood of success on the merits; 2) it would suffer irreparable harm if the injunction were not granted; 3) the balance of relative hardships weighs in its favor; and 4) an injunction would not have a negative impact on the public interest.

**COUNSEL:** For Cordis Corporation, PLAINTIFF (1:03cv27): Steven J Balick, Ashby & Geddes, Wilmington, DE USA.

For Boston Scientific Scimed, Inc, Boston Scientific Corporation, PLAINTIFFS (1:03cv283): Andre G Bouchard, Bouchard, Margules & Friedlander, Wilmington, DE USA.

For Boston Scientific Corporation, Scimed Life Systems, Inc, DEFENDANTS (1:03cv27): Josy W Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE USA.

For Cordis Corporation, Johnson & Johnson, Incorporated, DEFENDANTS (1:03cv283): John G Day, Ashby & Geddes, Wilmington, DE USA.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION**

**MEMORANDUM ORDER**

At Wilmington this 21st day of November, 2003, having reviewed the papers submitted in connection with the parties' cross motions for the preliminary imposition of injunctive relief, and having conducted an evidentiary hearing in connection with said motions;

IT IS ORDERED that [*2] both said motions are denied, for the reasons that follow.

1. **Standard of Review.** As the Federal Circuit has recognized, [HN1]a preliminary injunction is "a drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993).* [HN2]To obtain such extraordinary relief, the movant must prove that: 1) it has a reasonable likelihood of success on the merits; 2) it would suffer irreparable harm if the injunction were not granted; 3) the balance of relative hardships weighs in its

favor; and 4) an injunction would not have a negative impact on the public interest. *See New England Braiding Co., Inc. v. A.W. Chesterton Co., 970 F.2d 878, 882 (Fed. Cir. 1992).*

2. **Background.** The parties in this related litigation, competitors in the extremely lucrative field of coronary stents, are well known to the court and to each other. The litigation now pending before the court represents the next chapter in the evolution of the stent market, i.e., drug-eluting stents. The question before the court is whether the patent rights asserted by either party outweigh the other interests which must [*3] be evaluated by the court, including the public's interest in having the best technology available to it through a competitive market.

3. **Cordis Corporation's motion for a preliminary injunction.** Cordis Corporation ("Cordis") urges the court to impose an injunction against Boston Scientific Corporation and Scimed Life Systems, Inc. (collectively "BSC"), alleging that BSC's drug-eluting stent, TAXUS, literally infringes claim 23 of U.S. Patent No. 4,739,762 (the "'762 patent").

a. **Likelihood of success on the merits.** Claim 23 of the '762 patent is an apparatus claim which depends from claim 13. The claims read:

> 13. An expandable intraluminal vascular graft, comprising:
>
> a thin-walled tubular member having first and second ends and a wall surface disposed between the first and second ends, the wall surface having a substantially uniform thickness and a plurality of slots formed therein, the slots being disposed substantially parallel to the longitudinal axis of the tubular member;
>
> the tubular member having a first diameter which permits intraluminal delivery of the tubular member into a body passageway having a lumen; and
>
> the tubular member having a second, expanded [*4] and deformed diameter, upon the application from the interior of the tubular member of a radially, outwardly extending force, which second diameter is variable and dependent upon the amount of force applied to the tubular member, whereby the tubular member may be expanded and deformed to expand the lumen of the body passageway.

23. The expandable intraluminal vascular graft of claim 13, wherein the outside of the wall surface of the tubular member is a smooth surface, when the tubular member has the first diameter.

('762 patent, col. 11, 11. 63 - col. 12, 11. 14; col. 12, 11. 56-59)

Having the benefit of the Federal Circuit's claim construction [1] and the presentation of expert testimony consistent therewith, [2] the court concludes that Cordis has carried its burden of proving that it would likely succeed in proving that BSC's TAXUS stent infringes claim 23 of the '762 patent.

> 1   *See* Cordis Corp. v. Medtronic AVE, Inc., 339 F.3d 1352 (Fed. Cir. 2003).

> 2   *See* the July 21, 2003 hearing transcript at 104-120.

[*5] b. **Irreparable harm to Cordis.** Despite the presumption of irreparable harm that arises from a showing of likely success on the merits, the court finds that the presumption has been rebutted by the following record. First, the court notes that BSC's TAXUS drug-eluting stent incorporates BSC's bare metal EXPRESS stent. [3] Despite the fact that Cordis knew by September 2001 that the EXPRESS stent would serve as the platform for TAXUS, Cordis did not file suit seeking injunctive relief until January 2003. Second, Cordis is willing to seek money damages after trial on the merits for infringement by the EXPRESS stent. Third, Cordis has licensed major competitors under the asserted '762 patent and has admitted that several of these competitors could make a drug-eluting stent without infringing the '762 patent. Finally, the evidence shows that the entire drug-eluting stent market in the United States would comprise only about five percent of Johnson & Johnson's total sales. For all of these reasons, the court concludes that the presumption of irreparable harm has been rebutted.

> 3   The only other components of TAXUS are the paclitaxel drug and a polymer system. Cordis has not asserted a patent covering either of these components.

[*6] c. **Irreparable harm to BSC.** Cordis has failed to prove that BSC will not suffer irreparable harm if it were enjoined from marketing its TAXUS drug-eluting stent. The record demonstrates that an injunction would likely cut BSC's workforce, threaten its most important business, and disrupt BSC's ability to develop new therapeutic devices. In addition, because TAXUS is manufactured in the United States but is being used outside the United States, an injunction would put at risk the ability of patients worldwide to use TAXUS.

d. **Harm to the public.** Aside from the obvious concern of depriving the public of the best and safest medical devices by limiting competition, it is apparent from the evidence that Cordis cannot ensure an adequate supply of drug-eluting stents to meet current market demand.

e. **Conclusion.** For the reasons stated above, the court concludes that Cordis has failed to carry its burden of proof on three of the four prongs of the analysis. The '762 patent, ground-breaking as it was decades ago, contributes nothing to the inventive aspects of drug-eluting stents. Keeping in mind that the entry of injunctive relief is an equitable remedy, the court finds [*7] it would be inequitable to grant such drastic relief based on patented old technology when it is new unpatented technology driving the business decision to file suit. Therefore, Cordis' motion for entry of a preliminary injunction is denied.

4. **BSC's motion for a preliminary injunction.** In its motion for injunctive relief, BSC contends that Cordis' CYPHER stent literally infringes claim 8 of U.S. Patent No. 6,120,536 (the "536 patent").

a. **Likelihood of success on the merits.** Claim 8 depends from claim 6 which, in turn, depends from claim 1. These claims read:

> 1. A medical device having at least a portion which is implantable into the body of a patient, wherein at least a part of the device portion is metallic and at least part of the metallic device portion is covered with a coating for release of at least one biologically active material, wherein said coating comprises an undercoat comprising a hydrophobic elastomeric material incorporating an amount of biologically active material therein for timed release therefrom, and wherein said coating further comprises a topcoat which at least partially covers the undercoat, said topcoat comprising a biostable, non-thrombogenic [*8] material which provides long term non-thrombogenicity to the device portion during and after release of the biologically active material, and wherein said topcoat is substantially free of an elutable material.

> 6. The device of claim 1 wherein the medical device is an expandable stent.

8. The device of claim 6 wherein the stent comprises a tubular body having open ends and an open lattice sidewall structure and wherein the coating conforms to said sidewall structure in a manner that preserves said open lattice.

('536 patent, col. 13, ll. 13-26, ll. 37-38, col. 14., ll. 1-4) At the evidentiary hearing, the parties focused on two limitations.

(1) The first limitation is "non-thrombogenic." BSC argues that non-thrombogenic describes a material that does not promote thrombus formation. Consistent with this claim interpretation, BSC contends that Cordis' CY-PHER stent meets this limitation based on representations made to the FDA by Cordis that CYPHER'S polymer coating is a non-thrombogenic polymer. Cordis denies infringement, arguing that the '536 patent claims not only a coating that is non-thrombogenic, but that such coating must render the stent non-thrombogenic over [*9] the long term. Cordis asserts that its CYPHER stent is as thrombogenic as bare metal stents and, therefore, cannot literally meet this limitation.

(2) The second limitation in dispute is that the top-coat of the device be "substantially free of an elutable material." BSC contends that this limitation should be construed to mean "largely free, but not necessarily completely free of elutable material." Cordis offers no construction, but argues that, "whatever the claim term means, BSC (as the party seeking an injunction) has the burden of presenting the fact-finder with evidence about the amount of elutable material in the top coat so that the Court can determine whether the claim term is, or is not, met. BSC acknowledges that sirolimus [4] is present in the top layer, but it offered no proof whatsoever about how much." (C.A. No. 03-027-SLR, D.I. 88 at 24) BSC counters with representations made by Cordis to the medical community that the CYPHER stent has a "drug free topcoat" consisting of a polymer only.

4 According to Cordis, the CYPHER stent starts with a primer coat. A base coat consisting of two polymers, PBMA and PEVA, together with si-rolimus, is then applied to the stent over the primer coat. These three ingredients are dissolved in a liquid solvent, THF, which is sprayed onto the stent. The solvent then evaporates and leaves behind a coating with the drug and two polymers

mixed together. A top coat consisting of the polymer PBMA is dissoved in the same solvent, THF, which is then sprayed onto the base coat. When the application of the top coat begins, the solvent THF causes some of the base coat to dissolve and causes some sirolimus to move into the outer layer. The dissolution of the base coat and the movement of the sirolimus from the base coat to the top coat occurs before manufacture of the stent is completed. Although the amount of si-rolimus in the top coat can be determined by laboratory testing of the top coat, there is no evidence to this effect in the record.

[*10] (3) For purposes of this proceeding only (i.e., the court will revisit claim construction as the record develops), the court construes the disputed claim limitations consistent with BSC and finds, based on Cordis' promotional materials, that it is likely that BSC could prove infringement at trial. Nevertheless, the court also concludes that there is a substantial question as to the validity of the '536 patent, based on the testimony of Dr. Hanson. [5] Therefore, as to the first prong of the analysis, the court concludes that BSC has not carried its burden of proof [6] and BSC's motion for injunctive relief is denied.

5 See the July 23, 2003 hearing transcript at 728-759.

6 Even if the court found that the first prong of the inquiry were satisfied, the court agrees with BSC that neither BSC nor Cordis should be granted a preliminary injunction on the current record, given the acknowledged public interest in a competitive medical device market and the absence of proof of irreparable harm to either company if their respective drug-eluting stents were introduced into a competitive market.

[*11] 5. Therefore, IT IS ORDERED that:

a. The motion for a preliminary injunction filed by Cordis Corporation in C.A. No. 03-027-SLR (D.I. 8) is denied.

b. The motion for a preliminary injunction filed by Boston Scientific Scimed, Inc. and Boston Scientific Corporation in C.A. No. 03-283-SLR (D.I. 8) is denied.

Sue L. Robinson

United States District Judge

# Appendix 3

LEXSEE



Caution
As of: Mar 07, 2008

**REEBOK INTERNATIONAL LTD., Plaintiff-Appellant, v. J. BAKER, INC., Defendant-Appellee.**

**94-1145**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**32 F.3d 1552; 1994 U.S. App. LEXIS 21580; 31 U.S.P.Q.2D (BNA) 1781; 94 Daily Journal DAR 12005**

**August 15, 1994, Decided**

**PRIOR HISTORY:**     [**1]  Appealed from: U.S. District Court for the District of Massachusetts. Judge Harrington.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff sought review of the decision of the United States District Court for the District of Massachusetts, which denied its motion for a preliminary injunction to enjoin defendant's alleged patent infringement.

**OVERVIEW:** Plaintiff sued defendant, accusing it of patent infringement in the manufacture of athletic shoes. The district court denied plaintiff's motion for a preliminary injunction, finding that plaintiff failed to establish irreparable harm because neither plaintiff nor defendant was still producing the shoes. Because actual damages were calculable with certainty, injunctive relief was inappropriate. On appeal, the court held that the district court erred by placing the burden of establishing irreparable harm on plaintiff without first determining plaintiff's likelihood of success. Nevertheless, the court affirmed. After examining the record, the court concluded the district court's error was harmless because defendant had produced sufficient evidence to rebut the presumption of irreparable harm. Because both parties had stopped making the shoes, plaintiff's reputation was no longer at risk, and the effects on defendant's sale of its remaining stock of shoes was fully compensable by monetary damages.

**OUTCOME:** The court held that plaintiff did not suffer irreparable harm and was not entitled to a preliminary injunction in its patent infringement lawsuit because injury to its reputation was remote and actual damages were monetarily compensable.

**CORE TERMS:** preliminary injunction, irreparable harm, shoe, movant, likelihood of success, patent, infringement, patentee, infringed, selling, sneakers, right to exclude, advertising, infringing, reputation, rebut, burden of establishing, clear error, discontinued, compensable, infringer, athletic, reversal, rebutted, retail, weigh, money damages, harmless, display, balance of hardships

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*
[HN1]A trial court's decision whether to issue a preliminary injunction is discretionary. When a preliminary injunction is denied, to obtain reversal the movant must show not only that one or more of the findings relied on by the district court was clearly erroneous, but also that denial of the injunction amounts to an abuse of the court's discretion upon reversal of erroneous findings.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*

32 F.3d 1552, *; 1994 U.S. App. LEXIS 21580, **;
31 U.S.P.Q.2D (BNA) 1781; 94 Daily Journal DAR 12005

***Patent Law > Remedies > Equitable Relief > Injunctions***

[HN2]An appeal from a denial of a preliminary injunction based on patent infringement involves substantive issues unique to patent law and, therefore, is governed by the law of the appellate court.

***Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions***
***Patent Law > Remedies > Equitable Relief > Injunctions***

[HN3]Injunctive relief in patent cases is authorized by 35 U.S.C.S. § 283 (1988). Whether a preliminary injunction should issue turns upon four factors: (1) the movant's reasonable likelihood of success on the merits; (2) the irreparable harm the movant will suffer if preliminary relief is not granted; (3) the balance of hardships tipping in its favor; and (4) the adverse impact on the public interest. The burden is always on the movant to show entitlement to a preliminary injunction.

***Patent Law > Infringement Actions > Infringing Acts > General Overview***
***Patent Law > Remedies > Equitable Relief > Injunctions***

[HN4]A reasonable likelihood of success requires a showing of validity and infringement.

***Patent Law > Inequitable Conduct > General Overview***
***Patent Law > Infringement Actions > Burdens of Proof***
***Patent Law > Remedies > Equitable Relief > Injunctions***

[HN5]A movant seeking a preliminary injunction must establish a reasonable likelihood of success on the merits both with respect to validity and infringement of its patent. The movant is also required to establish that it will suffer irreparable harm if the preliminary injunction is not granted. Thus, a movant cannot be granted a preliminary injunction without findings by the district court that the movant carried its burden on both factors.

***Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions***
***Patent Law > Remedies > Equitable Relief > Injunctions***

[HN6]If a preliminary injunction is denied, the absence of an adequate showing with regard to any one of the four factors may be sufficient, given the weight or lack of it discretionarily assigned the other factors by the trial court, to justify the denial.

***Civil Procedure > Remedies > Injunctions > Elements > General Overview***
***Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions***
***Patent Law > Remedies > Equitable Relief > Injunctions***

[HN7]Because, irrespective of relative or public harms, a movant must establish both a likelihood of success on the merits and irreparable harm, the district court may deny a preliminary injunction based on the movant's failure to establish either of these two crucial factors without making additional findings respecting the other factors.

***Civil Procedure > Remedies > Injunctions > Elements > General Overview***
***Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions***
***Patent Law > Remedies > Equitable Relief > Injunctions***

[HN8]While a district court must consider all four factors before granting a preliminary injunction to determine whether the moving party has carried its burden of establishing each of the four, a district court is not required to articulate findings on the third and fourth factors when the court denies a preliminary injunction because a party fails to establish either of the two critical factors.

***Evidence > Procedural Considerations > Burdens of Proof > Ultimate Burden of Persuasion***
***Patent Law > Inequitable Conduct > General Overview***
***Patent Law > Infringement Actions > General Overview***

[HN9]A movant who clearly establishes the first factor required for a preliminary injunction receives the benefit of a presumption on the second. A strong showing of likelihood of success on the merits coupled with continuing infringement raises a presumption of irreparable harm to the patentee. However, the presumption does not necessarily or automatically override the evidence of record. It is rebuttable. Like many other factual presumptions, it simply acts as a procedural device which shifts the ultimate burden of production on the question of irreparable harm onto the alleged infringer.

***Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions***
***Patent Law > Remedies > Equitable Relief > Injunctions***

[HN10]If, in adjudicating irreparable harm, the district court has declined to make findings on likelihood of suc-

32 F.3d 1552, *; 1994 U.S. App. LEXIS 21580, **;
31 U.S.P.Q.2D (BNA) 1781; 94 Daily Journal DAR 12005

cess, the court must give the movant the benefit of the presumption before denying a motion requesting a preliminary injunction.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Governments > Legislation > Statutory Remedies & Rights*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN11]The patent statute provides injunctive relief to preserve the legal interests of the parties against future infringement that may have market effects never fully compensable in money. Because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole.

*Civil Procedure > Appeals > Standards of Review > General Overview*
[HN12]A reviewing court may affirm implied findings that are supported by adequate evidence.

*Business & Corporate Law > Distributorships & Franchises > Remedies > General Overview*
*Patent Law > Remedies > Damages > General Overview*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN13]Harm to reputation resulting from confusion between an inferior accused product and a patentee's superior product is a type of harm that is often not fully compensable by money because the damages caused are speculative and difficult to measure. However, such confusion is unlikely to occur or may be de minimis once the patentee stops making and advertising its product embodying the patent and its distributors have nearly ceased selling any.

**COUNSEL:** David K. S. Cornwell, Sterne, Kessler, Goldstein & Fox, of Washington, D.C, argued for plaintiff-appellant. With him on the brief were Tracy-Gene G. Durkin and William C. Allison, V.

David Wolf, Wolf, Greenfield & Sacks, P.C., of Boston, Massachusetts, argued for defendant-appellee. Of counsel was Donald R. Steinberg.

**JUDGES:** Before MICHEL and LOURIE, Circuit Judges, and CARMAN, Judge. *

\* Judge Gregory W. Carman of the United States Court of International Trade, sitting by designation.

**OPINION BY:** MICHEL

**OPINION**

[*1554]  MICHEL, *Circuit Judge*.

Reebok International Ltd. (Reebok) appeals the December 29, 1993 order issued by the United States District Court for the District of Massachusetts denying Reebok's motion for a preliminary injunction. Because the district court did not clearly err in finding that Reebok will not suffer irreparable harm due to the denial and did not abuse its discretion in denying the motion, we affirm. Although the court erred by not making findings on likelihood of success while still denying Reebok the presumption of irreparable harm it may have been entitled to had such findings [**2]  been made, on this record that error was harmless. Defendant's evidence was sufficient to rebut such a presumption.

BACKGROUND

On December 7, 1993, design patent, U.S. Patent No. Des.  341,931 (the '931 patent) for "Shoe Upper" issued to Reebok. The patent protects the design of an athletic shoe, exclusive of the sole, which Reebok's SHAQ I model shoe embodies. On the issue date, Reebok filed a complaint alleging that J. Baker, Inc. (Baker) infringed the '931 patent by making, using or selling its Olympian model athletic shoe. Reebok also filed a motion for a temporary restraining order, which was denied, and a motion for a preliminary injunction requesting that the district court enjoin Baker from making, using or selling the Olympian model shoe. At the preliminary injunction hearing, several facts were established.

Baker began manufacturing and selling the Olympian model shoe in July, 1993, although Reebok did not learn of the Olympian model until November, 1993. By December 7, 1993, the date Reebok filed its complaint, Baker had discontinued production of the Olympian model, but approximately 33,000 pairs of the shoe remained in stock.

Reebok began manufacturing the SHAQ I model [**3]  shoe in November, 1992. To promote the SHAQ I shoe, Reebok undertook an extensive advertising campaign featuring the popular pro basketball player, Shaquille O'Neal. However, by the date the '931 patent had issued and Reebok had filed its complaint, Reebok had discontinued production of the SHAQ I model. Moreover, by December, 1993, Reebok no longer promoted the SHAQ I model shoe because the company had

32 F.3d 1552, *; 1994 U.S. App. LEXIS 21580, **;
31 U.S.P.Q.2D (BNA) 1781; 94 Daily Journal DAR 12005

replaced the SHAQ I with SHAQ II model [1] for reasons unrelated to Baker's alleged infringement.

> 1  The Olympian model shoe is not alleged to infringe any design patents protecting the SHAQ II model shoe.

On December 29, 1993, the district court denied Reebok's motion for a preliminary injunction. The order explained:

> After hearing on Plaintiff Reebok International Ltd.'s Motion for Preliminary Injunction, the Court denies same on the ground that the Plaintiff has failed to establish irreparable harm. In that the alleged infringing sneakers and the alleged infringed sneakers [2] are no longer being produced, in [**4] that the design patent was issued only on December 7, 1993, *after* the alleged infringed sneakers' production was discontinued, and in that only 30,000 pairs [*1555] of the alleged infringing sneakers are available for sale, the actual damages sustained by the Plaintiff can be calculated with exact certainty.

> 2  The district court improperly referred to the "infringed sneakers," meaning the SHAQ I shoes, rather than the infringed patent claim of the design patent and the shoe embodying that claim.

Even though the case remains untried, Reebok appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1)(1988).

## STANDARD OF REVIEW

[HN1]A trial court's decision whether to issue a preliminary injunction is discretionary. When a preliminary injunction is denied, to obtain reversal the movant must show not only that one or more of the findings relied on by the district court was clearly erroneous, but also that denial of the injunction amounts to an abuse of the court's discretion [**5] upon reversal of erroneous findings. *New England Braiding Co., Inc. v. A.W. Chesterton Co.*, 970 F.2d 878, 882, 23 USPQ2d 1622, 1625 (Fed. Cir. 1992). [HN2]An appeal from a denial of a preliminary injunction based on patent infringement involves substantive issues unique to patent law and, therefore, is governed by the law of this court. *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 n.12, 7 USPQ2d 1191, 1195 n.12 (Fed. Cir. 1988).

## ANALYSIS

[HN3]Injunctive relief in patent cases is authorized by 35 U.S.C. § 283 (1988). Whether a preliminary injunction should issue turns upon four factors: (1) the movant's reasonable likelihood of success on the merits; (2) the irreparable harm the movant will suffer if preliminary relief is not granted; (3) the balance of hardships tipping in its favor; and (4) the adverse impact on the public interest. *Hybritech*, 849 F.2d at 1451, 7 USPQ2d at 1195; *New England Braiding*, 970 F.2d at 882, 23 USPQ2d at 1625. The burden is always on the movant [**6] to show entitlement to a preliminary injunction. *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 388, 2 USPQ2d 1926, 1928 (Fed. Cir. 1987).

### A. Likelihood of Success on the Merits

Although the district court made no findings regarding Reebok's likelihood of success on the merits of its infringement claim, Reebok argues for reversal on the ground that it has shown a reasonable likelihood of success. Baker counters that the record would support our independently finding that the '931 patent is invalid and not infringed and, therefore, Reebok has not shown likelihood of success.

[HN4]A reasonable likelihood of success requires a showing of validity and infringement. *Hybritech*, 849 F.2d at 1451, 7 USPQ2d at 1195. Deciding whether Reebok has demonstrated a reasonable likelihood of success would require us to make factual findings and decide a factual issue in the first instance, tasks which we, as an appellate court, may not undertake. See *Oakley, Inc. v. International Tropic-Cal, Inc.*, 923 F.2d 167, 169, 17 USPQ2d 1401, 1403 (Fed. Cir. 1991) [**7] ("We cannot make the necessary factual findings relating to infringement at the appellate level."). Consequently, we must review the district court's denial of a preliminary injunction without the aid of any finding regarding this important factor.

Although it is always preferable that a district court make findings regarding each of the four factors which weigh in the balance concerning whether to deny a preliminary injunction, see *Nutrition 21 v. United States*, 930 F.2d 867, 869, 18 USPQ2d 1347, 1349 (Fed. Cir. 1991) ("Sufficient factual findings on the material issues are necessary to allow this court to have a basis for meaningful review."), the incompleteness of relevant findings here does not necessarily require that we vacate the district court's order and remand for further fact finding. Cf. *Oakley*, 923 F.2d 167, 17 USPQ2d 1401 (vacating preliminary injunction based on conclusion that trial court's findings supporting the grant were so limited that meaningful review was not possible).

32 F.3d 1552, *; 1994 U.S. App. LEXIS 21580, **;
31 U.S.P.Q.2D (BNA) 1781; 94 Daily Journal DAR 12005

[HN5]A movant seeking a preliminary injunction must establish a reasonable likelihood [*1556] of success on the [**8] merits both with respect to validity and infringement of its patent. *Hybritech, 849 F.2d at 1451, 7 USPQ2d at 1196.* The movant is also required to establish that it will suffer irreparable harm if the preliminary injunction is not granted. *Id. at 1456, 7 USPQ2d at 1199.* Thus, a movant cannot be granted a preliminary injunction without findings by the district court that the movant carried its burden on *both* factors.

*(i) Relationship to Other Factors*

[HN6]If a preliminary injunction is denied, the absence of an adequate showing with regard to any one of the four factors may be sufficient, given the weight or lack of it discretionally assigned the other factors by the trial court, to justify the denial. *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc., 908 F.2d 951, 953, 15 USPQ2d 1469, 1471 (Fed. Cir. 1990).* [HN7]Because, irrespective of relative or public harms, a movant must establish both a likelihood of success on the merits *and* irreparable harm (keeping in mind the burden shifting rule discussed below), the district court may deny [**9] a preliminary injunction based on the movant's failure to establish either of these two crucial factors without making additional findings respecting the other factors. Thus, in *New England Braiding* we affirmed the denial of a preliminary injunction even though the district court did not make findings respecting irreparable harm, the balance of hardships and public interest because the district court did not commit clear error in finding that the movant was not likely to succeed on the merits at trial. *970 F.2d at 882, 23 USPQ2d at 1622.*

Arguably, our cases suggest that a district court must always consider all four factors when deciding whether to issue a preliminary injunction. *E.g., Illinois Tool Works, Inc. v. Grip-Pak, Inc., 906 F.2d 679, 681, 15 USPQ2d 1307, 1309 (Fed. Cir. 1990)* ("those factors and circumstances tend to overlap, but none may be ignored"); *Hybritech, 849 F.2d at 1451, 7 USPQ2d at 1195* ("the district court must weigh and measure each factor against the other factors"). In such cases, the district court did consider all [**10] four factors. However, as *New England Braiding* indicates, a closer examination is required.

[HN8]While a district court must consider all four factors before *granting* a preliminary injunction to determine whether the moving party has carried its burden of establishing each of the four, we specifically decline today to require a district court to articulate findings on the third and fourth factors when the court *denies* a preliminary injunction because a party fails to establish *either* of the two critical factors. *See T.J. Smith and Nephew Ltd. v. Consolidated Med. Equip., Inc., 821 F.2d 646, 3 USPQ2d 1316 (Fed. Cir. 1987)* (affirming denial of preliminary injunction based on movant's failure to establish a reasonable likelihood of success *and* irreparable harm, even though district court did not address the other two factors).

*(ii) Relationship to Presumption of Irreparable Harm*

We recognize, of course, that [HN9]a movant who clearly establishes the first factor receives the benefit of a presumption on the second. A strong showing of likelihood of success on the merits coupled with continuing infringement raises a presumption [**11] of irreparable harm to the patentee. *H.H. Robertson, 820 F.2d at 390, 2 USPQ2d at 1929.* However, the presumption does not necessarily or automatically override the evidence of record. It is rebuttable. *Rosemount, Inc. v. United States Int'l Trade Comm'n, 910 F.2d 819, 822, 15 USPQ2d 1569, 1571-72 (Fed. Cir. 1990).* Like many other factual presumptions, it simply acts here as a procedural device which shifts the ultimate burden of production on the question of irreparable harm onto the alleged infringer. *Roper Corp. v. Litton Sys., Inc., 757 F.2d 1266, 1272, 225 USPQ 345, 349 (Fed. Cir. 1985).*

Although a district court may properly deny a motion for preliminary injunction simply based on the movant's failure to establish a reasonable likelihood of success on the merits, a movant's right, upon establishing such a likelihood along with continuing [*1557] infringement, to the benefit of a presumption of irreparable harm, makes the present case problematic. Here, the district court denied Reebok's motion for a preliminary injunction based on Reebok's failure [**12] to establish irreparable harm without addressing the other three factors. This approach improperly places the burden of establishing irreparable harm on the movant without first determining whether the movant is entitled to a presumption of irreparable harm based on a strong likelihood of success on the merits. Thus, the district court committed legal error by placing the burden of establishing irreparable harm on Reebok without first determining Reebok's likelihood of success.

This is not to say, however, that a trial court, before denying a preliminary injunction motion, must always make a finding on a movant's likelihood of success to avoid vacatur, no matter what the evidence regarding irreparable harm. Although such an approach is preferable for reasons of judicial economy and greatly aids appellate review, an alternative analysis is permissible. We hold the district court may find that, even giving movant the benefit of the presumption of irreparable harm, the non-moving party has presented evidence sufficient to rebut the presumption. In such a case, the movant has not established irreparable harm and is not entitled to a preliminary injunction.

32 F.3d 1552, *; 1994 U.S. App. LEXIS 21580, **;
31 U.S.P.Q.2D (BNA) 1781; 94 Daily Journal DAR 12005

District judges are overburdened [**13] and need flexibility to operate efficiently. They deserve tolerance by reviewing courts so they can tailor procedures of adjudication to the case at hand. We do hold, however, that [HN10]if, in adjudicating irreparable harm, the district court has declined to make findings on likelihood of success, the court must give the movant the benefit of the presumption before denying a motion requesting a preliminary injunction.

In this appeal then, the district court's denial of Reebok's motion for a preliminary injunction can be affirmed only if Baker has produced sufficient evidence to rebut the presumption of irreparable harm. On appeal we must afford Reebok the benefit of the presumption since the trial court denied Reebok the opportunity to earn it. We look therefore to evidence of what actual damage was likely due to any continuation of Baker's alleged infringing sales and whether money damages will provide adequate compensation and vindication of Reebok's patent rights.

*B. Irreparable Harm: Proof and Presumption*

[HN11]The patent statute provides injunctive relief to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable [**14] in money. *Hybritech, 849 F.2d at 1457, 7 USPQ2d at 1200*. Because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole. *Id., 7 USPQ2d at 1200*.

*(i) Harm to Reebok's Reputation*

Reebok has not shown, however, that even if it receives the benefit of the presumption of irreparable harm, the district court abused its discretion by denying the preliminary injunction. Reebok submitted the declarations of its in-house patent counsel and its vice-president, each of whom asserted that Baker's sale of infringing footwear will cause irreparable injury to Reebok's reputation because the public might mistakenly believe the inferior quality Olympian shoe to be a Reebok product. To support this assertion, Reebok insisted that the SHAQ I shoe is still being sold in retail outlets, but provided no evidence on the extent of such sales. In fact, at the hearing before the district court, Reebok admitted that it did not have any sense of how many SHAQ I shoes were still available [**15] in the retail market. Therefore, the district court's implied finding that Reebok failed to prove the number was more than de minimis is not clearly erroneous. Although it made no explicit finding, [HN12]we may affirm implied findings that are supported by adequate evidence. [*1558] *ACS Hosp. Sys., Inc. v. Montefiore Hosp., 732 F.2d 1572, 1578, 221 USPQ 929, 933 (Fed. Cir. 1984)* ("We examine the record in order to review the trial court's judgment, and the findings it made or necessarily had to have made to support that judgment . . . .").

In contrast, Baker presented sufficient evidence to rebut a presumption that Reebok would suffer harm that could not be fully compensated by money. Baker established, and the district court properly found, that Reebok no longer produces the SHAQ I shoe. In addition, Baker submitted the December 22, 1993, declaration of Daniel Berkowitz, Manager of Product Development for Baker, stating:

> Over the last month, I have visited numerous stores in the Boston area that sell Reebok athletic shoes. I found that those stores no longer carry the SHAQ I or had very few of the SHAQ I shoes in stock. . . . I also found that [**16] the large promotional displays for the SHAQ I (a life-size stand-up display of Shaquille O'Neal holding the SHAQ I shoe in his size) that used to appear at these stores were no longer being used. . . . I spoke with several sales clerks at these stores, and was told that the SHAQ I was no longer available and that the SHAQ II was the replacement model for the SHAQ I.

Reebok does not contest that very few SHAQ I shoes are available for sale or that Reebok no longer advertises that model.

[HN13]Harm to reputation resulting from confusion between an inferior accused product and a patentee's superior product is a type of harm that is often not fully compensable by money because the damages caused are speculative and difficult to measure. However, such confusion is unlikely to occur or may be de minimis once the patentee stops making and advertising its product embodying the patent and its distributors have nearly ceased selling any. Future purchasers of Baker's Olympian model shoe would not likely confuse that shoe with the SHAQ I model based on advertising or displays of the SHAQ I in retail stores because Reebok and its distributors, some time before the ruling appealed, stopped all advertising [**17] and ceased selling that model to beyond a de minimis extent. Moreover, Reebok has not explained how such confusion could occur. Thus, we conclude Baker has shown that Reebok's reputation will not be materially harmed by the sale of a relatively small number of Olympian shoes and, therefore, effects of Baker's sales of the remaining Olympians would be fully

32 F.3d 1552, *; 1994 U.S. App. LEXIS 21580, **;
31 U.S.P.Q.2D (BNA) 1781; 94 Daily Journal DAR 12005

compensable by money damages. The district court's finding of no irreparable harm is not clearly erroneous. [3]

> 3   For other cases in which we have concluded that even if a movant were entitled to a presumption of irreparable harm, that harm had been rebutted, *see Illinois Tool Works, Inc.*, 906 F.2d at 682, 15 USPQ2d at 1310; *T.J. Smith and Nephew Ltd.*, 821 F.2d at 648, 3 USPQ2d at 1318.

*(ii) Other Arguments*

Reebok also argues that its right to exclude establishes irreparable harm because it will forever lose that right for the current time period if Baker is not excluded [**18] from the marketplace through a preliminary injunction. We reject this argument. "Application of a concept that *every* patentee is *always* irreparably harmed by an alleged infringer's pretrial sales . . . disserve the patent system." *Illinois Tool Works*, 906 F.2d at 683, 15 USPQ2d at 1310 (emphasis in original). In *Illinois Tool* we rejected the patentee's argument that potential lost sales alone could demonstrate "manifest irreparable harm" because acceptance of that position would require a finding of irreparable harm to every patentee, regardless of the circumstances. *Id.*, 15 USPQ2d at 1310. *See also Rosemount*, 910 F.2d at 822, 15 USPQ2d at 1572 (rejecting the argument that the presumption of irreparable harm can be overcome only by evidence that the accused product is no longer being imported, but not by evidence of the actual damage caused). Moreover, if the right to exclude during the litigation period alone estab-

lished irreparable harm, the presumption of irreparable harm stemming from a finding of likely [*1559] success could never [**19] be rebutted, for every patentee whose motion for a preliminary injunction is denied loses the right to exclude an accused infringer from the market place pending the trial.

For these reasons, we conclude the district court properly found that any harm which Reebok suffers due to Baker's selling the remaining 33,000 Olympian shoes can be fully compensated by money damages. Even granting Reebok the presumption of irreparable harm, it has been successfully rebutted.

CONCLUSION

The district court did not commit clear error by finding that Reebok will not suffer irreparable harm from the denial of its motion for a preliminary injunction. This is so even with our presuming irreparable harm since the trial court failed to make findings on likelihood of success, which could have raised such a presumption. Although the district court erred in *neither* finding facts on likelihood of success nor, in the alternative, giving Reebok the benefit of the presumption, on this record the error was harmless. Baker's rebuttal evidence was sufficient to prevent the court's finding from being clear error. Therefore, despite its legal error, the district court did not abuse its discretion in denying [**20] the motion for the error was harmless. Its decision therefore must be and is

*AFFIRMED.*

# Appendix 4

LEXSEE



Caution
As of: Mar 07, 2008

**ROPER CORPORATION, Appellant v. LITTON SYSTEMS, INC., Appellee**

**No. 84-1711**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**757 F.2d 1266; 1985 U.S. App. LEXIS 14750; 225 U.S.P.Q. (BNA) 345**

**March 15, 1985**

**PRIOR HISTORY:**     [**1]   Appealed from U.S. District Court for the Northern District of Illinois, Eastern District.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a case for patent infringement, plaintiff appealed the order of the United States District Court for the Northern District of Illinois, Eastern District, denying its motion for a preliminary injunction.

**OVERVIEW:** Plaintiff sued defendant for infringement of its patent on self-cleaning oven technology. The validity of the patent had been upheld in an earlier infringement case. Defendant challenged neither the validity of the patent nor the claim of infringement, but argued that it no longer practiced the invention, and therefore the absence of irreparable injury was presumed. The court held that validity of the patent, unchallenged, was presumed under 35 U.S.C.S. § 282; and since defendant did not challenge the claim of infringement, it was treated as established. However, even if the court presumed irreparable injury based on the earlier finding of validity and defendant's failure to challenge the infringement, since the infringement was not actually presently occurring, irreparable injury could not be presumed. The apprehension of future infringement could not justify granting equitable relief in the form of an injunction.

**OUTCOME:** The court affirmed, holding plaintiff failed to establish that the preliminary injunction was necessary to avoid irreparable injury.

**CORE TERMS:** infringement, patent, oven, irreparable injury, preliminary injunction, likelihood of success, injunction, irreparable harm, invention, patentee, infringe, presumed, cavity, public interest, contest, criterion, property right, self-cleaning, financially, issuance, cooking, invalid, deposition, infringer, presently, selling, patent infringement, failed to demonstrate, injunctive relief, exclusive right

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Injunctions > Elements > General Overview*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN1]The factors that are considered in granting a preliminary injunction are (1) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue; (2) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant; (3) whether the plaintiff has at least a reasonable likelihood of success on the merits; and (4) whether the granting of a preliminary injunction will disserve the public interest.

*Patent Law > Inequitable Conduct > General Overview*
*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Infringement Actions > Defenses > Patent Invalidity > Validity Presumption*
[HN2]35 U.S.C.S. § 282 provides that a patent shall be presumed valid. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party as-

757 F.2d 1266, *; 1985 U.S. App. LEXIS 14750, **;
225 U.S.P.Q. (BNA) 345

serting such invalidity. A patent is born valid. It remains valid until a challenger proves it was stillborn or had birth defects, or it is no longer viable as an enforceable right.

*Copyright Law > Civil Infringement Actions > General Overview*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN3]Where validity and infringement have been clearly established, immediate irreparable harm is presumed. The rule of irreparable injury was adopted from copyright cases. That rule is that a clear showing of validity and infringement of the copyright will give rise to a presumption of irreparable injury.

*Constitutional Law > Congressional Duties & Powers > Copyright & Patent Clause*
*Copyright Law > Constitutional Protections > Copyright Clause*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN4]Though courts have on occasion been reluctant to presume that irreparable injury arises from patent infringement, no warrant exists in law to distinguish the criteria for presuming irreparable injury to the property right created by letters patent from those available to protect the property right created by copyright. Each of those property rights is granted by the United States under its constitutionally granted power, "to promote the progress of science and the useful arts by securing to authors and inventors the exclusive right to their respective writings and discoveries." U.S. Const. art. I, § 8, cl. 8. Each is personal to the owner, having as the touchstone of their worth the exclusive right.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Patent Law > Infringement Actions > General Overview*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN5]A showing of a "reasonable likelihood of success" on validity and infringement is sufficient, when coupled with separate showings of irreparable injury, favorable balance of injury, and the public interest, to justify the grant of a motion for preliminary injunction against patent infringement. Without the right to obtain an injunction, the right to exclude granted the patentee would have only a fraction of the value it was intended to have, and would no longer be as great an incentive to engage in scientific and technological research.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Patent Law > Inequitable Conduct > General Overview*
*Patent Law > Infringement Actions > General Overview*
[HN6]The grant of the benefit of a presumption of irreparable injury is not dispositive of whether a requested preliminary injunction should issue. The presumption does not change the ultimate equitable showing needed to justify a preliminary injunction. Like most legal presumptions, it is rebuttable by clear evidence that it is overcome in the case at hand. The presumption merely requires that an alleged infringer confronted by a patentee's strong showing of validity and infringement bring forward evidence that irreparable injury would not actually be suffered by the patentee if the motion for preliminary injunction were denied. The presumption rests on a strong showing that a valid patent is being infringed. When that is true, irreparable injury may be presumed. When infringement is neither actually occurring nor is reasonably likely, the basis and need for the presumption crumbles.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN7]Without more, mere apprehension of potential future infringement cannot justify the issuance of preliminary equitable relief. No authority anywhere supports the notion that a preliminary injunction may issue in response to rumors of a threat of infringement.

**COUNSEL:** Frank P. Porcelli, Fish & Richardson, of Boston, Massachusetts, argued for Appellant. With him on the brief were John M. Skenyon and W. R. Hubert, of counsel.

J. Robert Dailey, Morgan, Finnegan, Pine, Foley & Lee, of New York, New York, argued for Appellee. With him on the brief was John Haury Kiewicz, of Minneapolis, Minnesota.

**JUDGES:** Markey, Chief Judge, Davis, Circuit Judge, and Re, Judge. *

* The Honorable Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designation.

**OPINION BY:** MARKEY

757 F.2d 1266, *; 1985 U.S. App. LEXIS 14750, **;
225 U.S.P.Q. (BNA) 345

OPINION

[*1267]  MARKEY, Chief Judge.

Appeal from an order of the United States District Court for the Northern District of Illinois, Eastern Division, denying Roper Corporation's (Roper's) motion for preliminary injunction. 589 F. Supp. 823. We affirm.

BACKGROUND

Roper is the assignee of United States Patent No. 4,028,520, issued June 7, 1977 to Sumner H. Torrey (the Roper patent), relating  [*1268]  to a self-cleaning "common cavity" oven, i.e., an oven capable of operating in three modes: (1) conventional thermal cooking, (2) microwave cooking,  [**2]  and (3) pyrolytic self-cleaning (oven temperature of about 900 degrees F. decomposes soil on cavity surfaces). A more detailed description of the invention and of the claims of the Roper patent appears in *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 955, 220 U.S.P.Q. (BNA) 592, 595 (Fed. Cir. 1983), *cert. denied*, 469 U.S. 835, 105 S. Ct. 127, 83 L. Ed. 2d 69 (1984).

Sears, Roebuck & Co. and Roper entered a joint venture for development and marketing of the oven. Roper filed a patent application on February 26, 1976, which issued as the Roper patent on June 7, 1977. Roper and Sears jointly test-marketed their common cavity oven in 1976.

The Roper oven was a commercially successful product, at least during the early years. See *Raytheon Co. v. Roper Corp.*, 724 F.2d at 954, 220 U.S.P.Q. (BNA) at 594. On September 9, 1980, the Raytheon Company sued for declaratory judgment that the Roper patent was invalid and Roper counterclaimed for infringement. *Id.* at 955, 220 U.S.P.Q. (BNA) at 595.

Sears decided to withdraw from the common cavity oven market in mid-1981, and Roper discontinued producing its ovens in mid-1982, after making and selling over 24,000 patented ovens [**3]  at an average retail price of about $1,100, for a total approximating $25 million.

In *Raytheon*, this court affirmed the district court's judgment that claim 1 was invalid, that claims 2-7 were not invalid, and that the latter claims were infringed by Raytheon's ovens. *Id.* at 962, 220 U.S.P.Q. (BNA) at 601.

*Suit Against Litton*

Soon after this court's mandate issued in *Raytheon*, Roper sued Litton, alleging its 700 series to be an infringement. On May 22, 1984, Roper moved for a preliminary injunction enjoining Litton from manufacturing and selling its 700 series ovens, and from providing to third parties the technology of the ventilation system in the accused ovens.

With its motion, Roper submitted declarations by Sumner Torrey (the inventor), Norman Kirschke (Vice President of Engineering at the Jenn-Air Company, and formerly employed by General Electric on its self-cleaning common cavity oven project), Robert Hilger (Roper's Manager of Product Integrity and Reliability), and Robert Tripplet (Roper's former Vice-President of Engineering and Sales). Litton took the depositions of Kirschke and Torrey, and submitted affidavits of Robert Lowe (Litton Group Patent [**4]  and Licensing Counsel), Gary Pearson and Glenn Spitzer (Operations Controller and Manager of Marketing Administration, respectively, of Litton's Microwave Cooking Products Division), Ronald Lentz (a Litton Staff Engineer), and Russell Hoeker (a Litton Senior Engineer).  Roper took Hoeker's deposition.

At a June 18th hearing, Kirschke, Torrey, Triplett, and Hilger testified and were cross-examined.  Litton called no witnesses, relying on its affidavits, on the depositions of Kirschke, Torrey, and Hoeker, and on cross-examination of Roper's witnesses.

Litton chose not to contest validity of the Roper patent at this stage.  It opposed the motion on the grounds that Roper had not shown: (1) any danger of its suffering immediate irreparable injury; (2) that any harm it would suffer from denial of the injunction would outweigh the harm Litton would suffer from a grant of the injunction; (3) that a preliminary injunction would serve the public interest; and (4) a likelihood of success on the merits. On July 11, 1984, the parties submitted extensive post-hearing briefs and proposed findings and conclusions.

*District Court Proceedings*

On August 10, 1984, the district court denied [**5]  Roper's motion in a published memorandum opinion because "Roper had failed to demonstrate that it would suffer immediate irreparable injury if a preliminary injunction did not issue." 589 F. Supp. 823, 824.

[*1269]  The trial court looked to the four factors set forth in *O'Connor v. Board of Education*, 645 F.2d 578, 580 (7th Cir.), *cert. denied*, 454 U.S. 1084, 70 L. Ed. 2d 619, 102 S. Ct. 641 (1981):

[HN1](1) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue;

(2) whether the threatened injury to the plaintiff outweighs the threatened harm

the injunction may inflict on the defendant;

(3) whether the plaintiff has at least a reasonable likelihood of success on the merits; and

(4) whether the granting of a preliminary injunction will disserve the public interest. [1]

1   This court, as have other courts, considered the same factors on review of appeals from the grant or denial of preliminary injunctions in *Litton Systems, Inc. v. Sundstrand Corp.*, 750 F.2d 952, 224 U.S.P.Q. (BNA) 252 (Fed. Cir. 1984), *Stein Associates, Inc. v. Heat and Control, Inc.*, 748 F.2d 653, 223 U.S.P.Q. (BNA) 1277 (Fed. Cir. 1984), and *Smith International, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 219 U.S.P.Q. (BNA) 686 (Fed. Cir.), *cert. denied*, 464 U.S. 996, 104 S. Ct. 493, 78 L. Ed. 2d 687, 220 U.S.P.Q. (BNA) 385 (1983), noting the need for balancing the relative weight given each.

[**6]   The district court stated that "unless the plaintiff establishes that the defendant is financially irresponsible, a court will not grant a preliminary injunction enjoining infringement of a patent," citing *Signode Corp. v. Weld-Loc Systems, Inc.*, 700 F.2d 1108, 218 U.S.P.Q. (BNA) 293 (7th Cir. 1983), in which the court said, at 1111, "as a general rule, 'a defendant's ability to compensate plaintiff in money damages *precludes* issuance of a preliminary injunction'." (Emphasis added.) [2]

2   Equity requires that no one element be dispositive, that each be weighed and measured against others and against the relief demanded.   We therefore reject the view that an alleged infringer's "ability to compensate" must end a court's inquiry.   To so hold would be to encourage infringement by the rich, to cause frequent devastation of a less affluent patentee's business, and to suggest the ready grant of injunctions against the less affluent among alleged infringers. That result would be unsupported by statute and manifestly inequitable.

[**7]   Because Litton chose not to contest validity, and believing that infringement had been clearly established, Roper said it was entitled to a presumption of irreparable harm, citing *Smith International v. Hughes Tool Company*, 718 F.2d 1573, 1581, 219 U.S.P.Q.

(BNA) 686, 692 (Fed. Cir. 1983). The district court held that *Smith International* was distinguishable and that Roper had failed to present "such a strong showing" of validity and infringement as would warrant a presumption of irreparable harm.

Noting that Litton had not contested validity in response to Roper's motion, the district court stated that "unlike Smith [Litton] has had no opportunity to challenge the validity of the patent in this suit or in a separate action."

Although it entered no finding on infringement, the district court stated that "Litton has not admitted infringement. To the contrary, Litton has made a strong showing that its actions do not infringe the Roper patent." In a footnote, the district court stated, "Because this Court may be called upon to decide the infringement issue at a later date, a detailed discussion of the merits of Litton's defense will be reserved." In viewing Roper's allegations [**8] of irreparable injury, the district court noted that Litton was no longer manufacturing the accused ovens, that Roper had failed to prove Litton "financially irresponsible," and that Litton has more than sufficient assets to satisfy any conceivable judgment.   It therefore concluded that Roper had "clearly failed" to demonstrate that it would suffer irreparable injury if an injunction did not issue.

OPINION

*Introduction*

As it did in the district court, Roper argues here that validity has been overwhelmingly established by the decision in *Raytheon, supra*, and by the absence of challenge by Litton in response to the motion.   [*1270] Roper asserts that the district court's statement on noninfringement, unsupported by findings, was erroneous. Because it has thus prevailed on validity and infringement, says Roper, it is entitled to a presumption of irreparable harm, citing *Smith International*. Roper also says Litton's solvency was not a proper ground for denying injunctive relief.

Litton says the issue is whether the district court abused its discretion in denying the motion, that Roper failed to establish a likelihood of success on infringement, that no accused [**9] range had been made since April, 1984, and that it is financially responsible.   Further, Litton argues that because Roper is not presently practicing the invention, and has not done so for several years, absence of irreparable injury must be presumed.

*Likelihood of Success -- Validity*

Litton says its failure to contest validity before this court or the district court "is a far cry from an admission of validity," that it has "serious reservations" about valid-

757 F.2d 1266, *; 1985 U.S. App. LEXIS 14750, **;
225 U.S.P.Q. (BNA) 345

ity, and that question must wait "for another day". Because it was not a party in *Raytheon*, Litton says, correctly but irrelevantly on this appeal, the decision in that case is not binding on it.

The patent statute, 35 U.S.C. § 282, is unambiguous: [HN2]"A patent shall be presumed valid . . . The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." A patent is born valid. It remains valid until a challenger proves it was stillborn or had birth defects, or it is no longer viable as an enforceable right. [3] Litton's silence leaves untouched at this stage what the statute presumes, namely, that Roper's patent is valid.

> 3　Absent action by the Patent and Trademark Office under the reexamination statutes, 35 U.S.C., Chapter 30.

[**10] The district court mistakenly and irrelevantly stated that Litton "has had no opportunity to challenge the validity of the patent in this suit or in a separate action." Litton had full opportunity to show, in response to the motion, if it could, that Roper had no reasonable likelihood of success on the issue of validity. That was its burden. Its failure to grasp its opportunity means that the district court should have treated, and this court must treat, Roper's likelihood of success on validity as having been established.

*Likelihood of Success -- Infringement*

As above indicated, the district court indicated that "Litton has made a strong showing that its actions do not infringe." Nonetheless, and although the parties submitted extensive post-hearing findings and conclusions, the district court made no findings and did not otherwise point to evidence of record supporting that statement. The question before the court was not whether there was infringement, and not what Litton had shown. The question was whether Roper had shown a reasonable likelihood of success on the infringement issue. The court's statement would, however, appear to have been a backhanded indication [**11] that Roper had not, in the district court's view, made a reasonable showing of likelihood of success in proving infringement. [4] Roper devotes considerable effort to try its infringement claim in this court, asserting infringement of all claims under the doctrine of equivalents and literal infringement of claim 2. [*1271] Roper says the parties agree "as to the basic facts concerning the infringement," and that it "is more than willing to rely on the existing record." Roper then urges this court to decide the issue of infringement, because "all that is really left is a dispute about the interpretation of certain claim language, which is, of course, a matter of law," citing *ACS Hospital Systems, Inc. v. Montefiore Hospital, 732 F.2d 1572, 221 U.S.P.Q.*

*(BNA) 929 (Fed. Cir. 1984)*, and *Fromson v. Advance Offset Plate, Inc., 720 F.2d 1565, 1569, 219 U.S.P.Q. (BNA) 1137, 1140 (Fed. Cir. 1983)*.

> 4　Litton moved for summary judgment of non-infringement on July 25, 1984, saying no genuine issue of material fact existed. That motion was denied on February 14, 1985, the district court correctly pointing out that "equivalence is question of fact."

In view of our disposition, and the lack of explication by the district court, we express no view on whether Litton " made a strong showing that its actions do not infringe." The district court's reference to "actions" in the present tense may have been based on its recognition that Litton is not *currently* making and selling the accused oven.

Nor does this court express here a view on whether the accused ovens infringe any claim of the Roper patent. That question must await an initial determination by the district court.

[**12] Roper's request that this court make the finding of infringement the district court expressly reserved is wholly inappropriate. Roper misconstrues the *appellate* function of this court and the decisional criteria in considering motions for preliminary injunctions. Substantive issues, such as validity and infringement, are not raised for final resolution by such motions. This court reviews final judgments and there has been no judgment entered on those issues in this case.

Roper's reliance on *ACS Hospital* and *Fromson* is misplaced. In those cases, judgment had been entered on the issue of infringement. Here, there has been only an equivocal statement by the district court, a statement related only indirectly, if at all, to the issue before it, i.e., whether Roper had shown a "reasonable likelihood of success" on the infringement issue.

The issue of infringement has not been tried, and Roper may well at trial meet its burden of proof on that issue. Roper, as seeker of a preliminary injunction, bore the burden of showing at this stage a reasonable likelihood of success in proving infringement at trial. It submitted its claims and proved the structure of the accused [**13] oven. There is little more it could have done. We cannot say on this record whether the district court would have erred if it had found that Roper had not met the reasonable likelihood of success criterion for issuance of a preliminary injunction in respect of infringement. That question need not be decided, however, for Roper clearly failed to meet the criterion of showing irreparable injury.

*Presumption of Irreparable Injury*

If Roper had shown a reasonable likelihood of success on validity and infringement, it would have thereby met only one criterion needed for obtaining a preliminary injunction. Three criteria remain, one of which is irreparable injury. Before a showing of likelihood of success may be seen as also meeting that criterion, it must be not merely a reasonable but a strong showing indeed.

In *Smith International*, this court held that [HN3]where validity and infringement have been *clearly* established, "immediate irreparable harm is presumed." 718 F.2d at 1581, 219 U.S.P.Q. (BNA) at 692. As explained in footnote 7, it adopted a "rule of irreparable injury" from copyright cases. *Id.* at 1581 n. 7, 219 U.S.P.Q. (BNA) at 692 n. 7. That rule is that a [**14] "clear showing" of validity and infringement of the copyright will give rise to a presumption of irreparable injury. *See generally Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 620, 214 U.S.P.Q. (BNA) 33, 43-44 (7th Cir.), *cert. denied*, 459 U.S. 880, 74 L. Ed. 2d 145, 103 S. Ct. 176 (1982); *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1187-88, 203 U.S.P.Q. (BNA) 321, 323-24 (5th Cir. 1979)(substantial likelihood of success); *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 94, 194 U.S.P.Q. (BNA) 401, 402 (2d Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S. Ct. 730, 54 L. Ed. 2d 759, 196 U.S.P.Q. (BNA) 864 (1978). The same is generally true of preliminary injunctions granted in protection of a trademark owner's rights. *See Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 649-50, 214 U.S.P.Q. (BNA) 15, 21 (6th Cir. 1982), *cert. denied*, 459 U.S. 916, 103 S. Ct. 231, 74 L. Ed. 2d 182 (1982); *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 189-92, 208 U.S.P.Q. (BNA) 169, 171-74 (2d Cir. 1980); *Miss Universe, Inc. v. Flesher* [**15] , 605 F.2d 1130, 1132-34, 204 U.S.P.Q. (BNA) 354, 356-57 (9th Cir. 1979); *Helene Curtis Industries, Inc. v. Church and Dwight* [*1272] *Co., Inc.*, 560 F.2d 1325, 1330, 195 U.S.P.Q. (BNA) 218, 220 (7th Cir. 1977), *cert. denied*, 434 U.S. 1070, 55 L. Ed. 2d 772, 98 S. Ct. 1252 (1978).

[HN4]Though courts have on occasion been reluctant to presume that irreparable injury arises from patent infringement, no warrant exists in law to distinguish the criteria for presuming irreparable injury to the property right created by letters patent from those available to protect the property right created by copyright. Each of those property rights is granted by the United States under its constitutionally granted power, "to promote the progress of science and the useful arts . . . by securing to authors and inventors the exclusive right to their respective writings and discoveries." U.S. CONST., art. I, § 8, cl. 8. Each is personal to the owner, having as the touchstone of their worth the exclusive right. *See Patlex Corp.*

*v. Mossinghoff*, 758 F.2d 594, slip op. at 8-10 (Fed. Cir. 1985).

Looking to the facts of *Smith International*, the district court noted that an earlier court determination [**16] of patent validity and Smith's failure to contest infringement "removed any question" as to validity and infringement in that case. Distinguishing *Smith International*, the district court refused to apply a presumption here because it thought Roper did not establish validity and infringement by "such a strong showing." [5] *See* 5 D. CHISUM, PATENTS § 20.04[1] [c] [i] (1982). As above indicated, validity was unchallenged. To the extent that the district court thought Roper had made no strong showing of validity, it erred. The district court's statement must (in view of its statement about Litton's showing of non-infringement) be read as indicating that it thought a strong likelihood of success respecting *infringement* was not shown. Again, we need not here decide whether the district court erred in so indicating.

> [5]   [HN5]A showing of a "*reasonable* likelihood of success" on validity and infringement is sufficient, when coupled with separate showings of irreparable injury, favorable balance of injury, and the public interest, to justify the grant of a motion for preliminary injunction against patent infringement. As this court said in *Smith International*, "without the right to obtain an injunction, the right to exclude granted the patentee would have only a fraction of the value it was intended to have, and would no longer be as great an incentive to engage in scientific and technological research." 718 F.2d at 1577-78, 219 U.S.P.Q. (BNA) at 690.

> We do not agree with Roper's assertion that the district court read *Smith International* too narrowly, i.e., in a manner that could improperly limit the availability of a presumption of irreparable injury when a *strong* likelihood of success on the validity and infringement issues has been shown and the accused product is being made, used, or sold.

[**17] If Roper were granted the benefit of a presumption of irreparable injury, [HN6]that grant would not be dispositive of whether its requested preliminary injunction should issue. The presumption does not change the ultimate equitable showing needed to justify a preliminary injunction. Like most legal presumptions, it is rebuttable by clear evidence that it is overcome in the case at hand. The presumption merely requires that an alleged infringer confronted by a patentee's strong showing of validity and infringement bring forward evidence that irreparable injury would not actually be suffered by the patentee if the motion for preliminary injunction

757 F.2d 1266, *; 1985 U.S. App. LEXIS 14750, **;
225 U.S.P.Q. (BNA) 345

were denied. The presumption rests on a strong showing that a valid patent is being infringed. When that is true, irreparable injury may be presumed. When, as here, infringement is neither actually occurring nor is reasonably likely, the basis and need for the presumption crumbles.

### Irreparable Injury

Having reviewed the record and fully considered the parties' contentions, we see no abuse of the district court's discretion. Roper may have made a strong showing that *if* Litton made or sold the accused oven, infringement of a valid [**18] patent would occur. Such a showing would nevertheless be insufficient in this case to establish that Roper would suffer irreparable injury as a result of a denial of its motion. That insufficiency is not here supplanted [*1273] or overweighed by considerations of the balance of equities and the public interest, neither of which were strongly argued.

The record discloses that Litton does not presently make, and has no immediate plans to make, the accused oven. The record also shows that Roper is not presently practicing its invention, and that it does not have immediate plans to do so. We will not, as Litton would have us do, hold that failure to practice the invention means that "absence of irreparable injury must be presumed." A patentee that does not practice, and may never have practiced, his invention may establish irreparable harm, e.g., by showing that an existing infringement precludes his ability to license his patent or to enter the market. Roper, however, has made no clear showing that it would be precluded from either activity by anything Litton is doing or by denial of the extraordinary remedy it seeks.

Roper's argument that past infringement caused its cessation [**19] of manufacture and that its reentrance into the market is prohibited by the possibility of Litton's reentrance, or by the possibility of Litton's sale of its oven business, is conjectural and insufficiently supported to be persuasive.

At best, Roper has demonstrated mere apprehension of potential future infringement, primarily from the possibility of Litton's sale of its oven technology to a company that might infringe. [HN7]Without more, such fears cannot justify the issuance of preliminary equitable relief. This court has stated, "no authority anywhere supports the notion that a preliminary injunction may issue in response to rumors of a threat of infringement." *Chemical Engineering v. Marlo, Inc.*, 754 F.2d 331, 222 U.S.P.Q. (BNA) 738 (Fed. Cir. 1984). Though Roper has cited in its complaint acts which, if proven, might constitute past infringement, there is nothing of record establishing *present* infringement or an *immediate* threat of renewed infringement. [6] Thus, the status quo is maintained without injunctive relief *pendente lite*.

6    Though Litton has an inventory of 175 accused ovens, we cannot say that the district court would have abused its discretion in viewing such potential sales as *de minimus* in considering the motion for preliminary injunction. If Litton does sell those ovens, and Roper prevails at trial, the damages payable as a result of those sales would doubtless be added to the final judgment.

[**20]  AFFIRMED.

# Appendix 5

LEXSEE



Caution
As of: Mar 07, 2008

**WIRELESS AGENTS, L.L.C., Plaintiff-Counterdefendant, vs. T-MOBILE USA, INC., et al., Defendants-Counterplaintiffs.**

**Civil Action No. 3:05-CV-0094-D**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**2006 U.S. Dist. LEXIS 36590; 82 U.S.P.Q.2D (BNA) 1779**

**June 6, 2006, Decided
June 6, 2006, Filed**

**PRIOR HISTORY:** Wireless Agents, L.L.C. v. Sony Ericsson Mobile Communs. AB, 2006 U.S. Dist. LEXIS 28426 (N.D. Tex., May 3, 2006)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a patent infringement action, plaintiff patentee moves for a preliminary injunction.

**OVERVIEW:** The dispositive question was whether the patentee would suffer irreparable harm if an injunction were not granted. The court assumed the patentee had clearly demonstrated a likelihood of success on the merits, thereby creating a presumption that it would be irreparably harmed unless a preliminary injunction issued. However, defendants rebutted the presumption because the patentee could recover through damages what it sought from its licensing efforts -- royalties from a non-exclusive license. The patentee's willingness to license the patent on a non-exclusive basis suggested that it was willing to accept royalties in lieu of exclusion. Further, the patentee's undue delay in filing this action demonstrated that there was no apparent urgency to the request for injunctive relief, and was of itself sufficient to rebut the presumption of irreparable harm; the patentee knew of the accused device as early as January 2004 but did not file this action until one year later. Even if neither the licensing efforts nor the delay in seeking injunctive relief was alone sufficient to rebut the presumption of irrepara-

ble harm, the presumption was rebutted when the circumstances were viewed together.

**OUTCOME:** The motion for preliminary injunction was denied.

**CORE TERMS:** wireless, irreparable harm, preliminary injunction, license, patent, rebutted, manufacturer, licensing, rebut, likelihood of success, infringement, invention's, reseller, manufacture, negotiating, injunction, infringing, royalty, reply brief, injunctive relief, patentee, movant, patent rights, right to exclude, filing suit, citation omitted, good faith, undue delay, non-exclusive, technology

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN1]In a patent infringement case, the decision whether to issue a preliminary injunction is within the court's discretion.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN2]A preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted.

2006 U.S. Dist. LEXIS 36590, *; 82 U.S.P.Q.2D (BNA) 1779

*Civil Procedure > Remedies > Injunctions > Elements > General Overview*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*

[HN3]In deciding whether to grant a motion for a preliminary injunction, a court considers (1) whether the movant has demonstrated a reasonable likelihood of success on the merits, (2) whether the movant will suffer irreparable harm if an injunction is not granted, (3) whether the balance of hardships tips in the movant's favor, and (4) whether and to what extent granting the injunction would have a positive impact on the public interest. No individual factor is dispositive, and the court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested. For the preliminary injunction to issue, however, the movant must establish each of the first two elements.

*Civil Procedure > Remedies > Injunctions > Elements > General Overview*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*

[HN4]For reasons of judicial economy and aid of appellate review, a court generally analyzes all four factors in deciding a preliminary injunction motion. More limited analysis, however, may support the court's denial of a preliminary injunction. For example, the court need not make findings concerning the third and fourth factors if the movant fails to establish either of the first two factors.

*Civil Procedure > Remedies > Injunctions > Elements > Irreparable Harm*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Patent Law > Remedies > Equitable Relief > Injunctions*

[HN5]Because of the very nature of a patent, which provides the right to exclude, infringement of a valid patent inherently causes irreparable harm in the absence of certain exceptions. Thus if the party moving for a preliminary injunction clearly establishes likelihood of success on the merits, it is entitled to a presumption of irreparable harm. The presumption, however, is rebuttable. The presumption of irreparable harm acts as a procedural device which places the ultimate burden of production on the question of irreparable harm onto the alleged infringer. If the court affords the movant the benefit of the presumption and concludes that the non-movants have

rebutted it, the court need not decide whether the movant has demonstrated likelihood of success on the merits.

*Civil Procedure > Remedies > Injunctions > Elements > Irreparable Harm*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Patent Law > Remedies > Equitable Relief > Injunctions*

[HN6]In the context of a motion for a preliminary injunction in a patent infringement action, a presumption of irreparable harm may be rebutted by evidence that (1) the non-movant has or will soon cease the allegedly infringing activities, thus making an injunction unnecessary; (2) movants have engaged in a pattern of granting licenses under the patent, such that it may be reasonable to expect that invasion of the patent right can be recompensed with a royalty rather than with an injunction; or (3) movants unduly delayed in bringing suit, thereby negating the idea of irreparability.

*Civil Procedure > Remedies > Injunctions > Elements > General Overview*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*

[HN7]In the context of a motion for preliminary injunction, a trial court need not make findings concerning the third and fourth factors if the moving party fails to establish either of the first two factors. Similarly, a trial court need not make a finding on a movant's likelihood of success on the merits if it affords the movant the benefit of the presumption of irreparable harm and properly finds that presumption rebutted by the non-movant.

**COUNSEL:** [*1] For Wireless Agents LLC, Plaintiff: Jeff J Horn, Jr, Vance P Freeman, Ohashi & Horn, Dallas, TX; Michael W Shore, Alfonso Garcia Chan, Gerald Bill Hrycyszyn, Joseph F DePumpo, Raj K Krishnan, Shore Chan Bragalone, Dallas, TX; Rick H Rosenblum, Akin Gump Strauss Hauer & Feld -- San Antonio, San Antonio, TX.

For T-Mobile USA Inc, Danger Inc, Sharp Electronics Corp, Defendants: Josh A Krevitt, Orin S Snyder, Gibson Dunn & Crutcher -- New York, New York, NY; Sarah V Toraason, M Sean Royall, Gibson Dunn & Crutcher -- Dallas, Dallas, TX; David J Healey, Weil Gotshal & Manges -- Houston, Houston, TX; Frederick Chung, Stuart Rosenberg, Gibson Dunn & Crutcher -- Palo Alto, Palo Alto, CA; S Ashlie Beringer, Gibson Dunn & Crutcher -- Denver, Denver, CO.

Case 5:06-cv-01839-PVT    Document 266-6    Filed 03/07/2008    Page 4 of 7

2006 U.S. Dist. LEXIS 36590, *; 82 U.S.P.Q.2D (BNA) 1779

**JUDGES:** SIDNEY A. FITZWATER, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** SIDNEY A. FITZWATER

**OPINION**

MEMORANDUM OPINION AND ORDER

In this patent infringement action concerning United States Patent No. 6,665,173 ("the '173 patent") entitled, "Physical Configuration of a Hand-Held Electronic Communication Device," plaintiff-counterdefendant Wireless Agents, L.L.C. ("Wireless") moves for a preliminary injunction, presenting the dispositive question whether [*2] it will suffer irreparable harm if an injunction is not granted. Affording Wireless a presumption of irreparable harm and concluding that defendants-counterplaintiffs have rebutted the presumption, the court holds that Wireless will not suffer irreparable harm and denies the motion. [1]

> 1    Wireless's preliminary injunction motion is before the court under the procedure permitted by Fed. R. Civ. P. 43(e) and is being decided on the papers, without an evidentiary hearing. *See, e.g., Jones v. Bush*, 122 F.Supp.2d 713, 715 (N.D. Tex.) (Fitzwater, J.), *aff'd*, 244 F.3d 134 (5th Cir. 2000) (per curiam) (unpublished table decision). Briefing was completed on May 15, 2006, when Wireless filed its reply brief. As permitted by Rule 52(a), the court sets out its findings of fact and conclusions of law in this memorandum opinion and order.

I

Wireless sues defendants-counterplaintiffs T-Mobile USA, Inc. ("T-Mobile"), Danger, Inc. ("Danger"), and Sharp [*3] Corporation ("Sharp") for infringing the '173 patent based on defendants' manufacture and sale of the Sidekick line of devices, comprising the Sidekick and the Sidekick II. [2] Defendants assert, *inter alia*, the affirmative defense of patent invalidity, and they bring counterclaims for non-infringement and invalidity.

> 2    In its first amended complaint, Wireless identifies the accused devices as the "Sidekick," the "Sidekick II," the "hiptop," and the "hiptop2." 1st Am. Compl. P 12. On the present record, however, it appears that "hiptop" and "hiptop2" are alternative brand names for the Sidekick and Sidekick II devices and that there are thus two accused devices rather than four.

Wireless is the patentee and owner of the '173 patent. Wireless does not itself manufacture or sell the pat-

ented invention. Rather, it has a program of patent licensing and enforcement, whereby it seeks to license rights under the patent to manufacturers and resellers and enforces its patent rights against infringers.

T-Mobile is [*4] a wireless-communications company that sells communications devices and provides wireless voice and data services. Danger is a technology company that designs mobile communications devices and the software platforms that run them. Sharp is a consumer-electronics manufacturer.

The Sidekick was publicly released in October 2002, over one year before the '173 patent issued, and was sold until the Sidekick II was introduced in September 2004. Danger designed the original Sidekick device and had it manufactured by subcontractors. Sharp, under license from Danger, manufactures the Sidekick II and sells it to T-Mobile, who in turn brands the devices with the "Sidekick" name and sells them to consumers for use on T-Mobile's wireless voice and data network. Danger provides device software to Sharp and provides email services to T-Mobile for use on the Sidekick devices.

The '173 patent issued on December 16, 2003. Wireless became aware of the Sidekick device no later than January 2004, at which time Wireless contacted Danger and stated its belief that they had "overlapping intellectual property." Ds. App. 21-22. Wireless did not file suit against defendants until January 15, 2005, and it did [*5] not file the motion for preliminary injunction until February 1, 2006, more than one year after filing suit and more than two years after learning about the accused Sidekick device.

II

[HN1]In a patent infringement case, the decision whether to issue a preliminary injunction is within the court's discretion. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001); *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993). [HN2]"A preliminary injunction is a 'drastic and extraordinary remedy that is not to be routinely granted.'" *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1324 (Fed. Cir. 2004) (quoting *Intel Corp.*, 995 F.2d at 1568). [HN3]In deciding whether to grant Wireless's motion, the court considers (1) whether Wireless has demonstrated a reasonable likelihood of success on the merits, (2) whether Wireless will suffer irreparable harm if an injunction is not granted, (3) whether the balance of hardships tips in Wireless's favor, and (4) whether and to what extent granting the injunction would have a positive impact on the public interest. *See Amazon.com*, 239 F.3d at 1350. [*6] No individual factor is dispositive, and the court "must weigh and measure each factor against the other factors and against the form and magnitude of the relief

Case 5:06-cv-01839-PVT    Document 266-6    Filed 03/07/2008    Page 5 of 7

2006 U.S. Dist. LEXIS 36590, *; 82 U.S.P.Q.2D (BNA) 1779

requested." *Id.* For the preliminary injunction to issue, however, Wireless must establish each of the first two elements. *See id.*

[HN4]For reasons of judicial economy and aid of appellate review, the court generally analyzes all four factors in deciding a preliminary injunction motion. *Polymer Techs., Inc. v. Bridwell,* 103 F.3d 970, 973 (Fed. Cir. 1996) (quoting *Reebok Int'l Ltd. v. Baker, Inc.,* 32 F.3d 1552, 1557 (Fed. Cir. 1994)). More limited analysis, however, may support the court's denial of a preliminary injunction. *Id.* For example, the "court need not make findings concerning the third and fourth factors if [Wireless] fails to establish either of the first two factors." *Id.* at 973-74 (citing *Reebok Int'l,* 32 F.3d at 1556).

[HN5]"Because of the very nature of a patent, which provides the right to exclude, infringement of a valid patent inherently causes irreparable harm in the absence of [certain] exceptions." *Id.* at 975 (internal citation omitted). [*7] Thus if Wireless clearly establishes likelihood of success on the merits, it is entitled to a presumption of irreparable harm. *See Pfizer, Inc. v. Teva Pharms. USA, Inc.,* 429 F.3d 1364, 1381 (Fed. Cir. 2005); *Reebok Int'l,* 32 F.3d at 1556. The presumption, however, is rebuttable. *See, e.g., Reebok Int'l,* 32 F.3d at 1556. "The presumption of irreparable harm acts 'as a procedural device which places the ultimate burden of production on the question of irreparable harm onto the alleged infringer.'" *Polymer Techs.,* 103 F.3d at 974 (quoting *id.* at 1556). If the court affords Wireless the benefit of the presumption and concludes that defendants have rebutted it, the court need not decide whether Wireless has demonstrated likelihood of success on the merits. *Id.* at 974 (citing *Reebok Int'l,* 32 F.3d at 1557).

III

A

The court assumes *arguendo* that Wireless has clearly demonstrated a likelihood of success on the merits, thereby creating a presumption that it will be irreparably harmed unless a preliminary injunction issues. The presumption of irreparable harm places the burden on [*8] defendants to adduce sufficient evidence to rebut the presumption. *Id.*

> Various types of evidence have been found sufficient for this purpose. For example, [HN6]the presumption may be rebutted by evidence that (1) the non-movant has or will soon cease the allegedly infringing activities, thus making an injunction unnecessary; (2) movants have engaged in a pattern of granting licenses under the patent, such that it may be reasonable to expect that invasion of the pat-

ent right can be recompensed with a royalty rather than with an injunction; or (3) movants unduly delayed in bringing suit, thereby negating the idea of irreparability.

*Id.* (internal citations omitted).

In its brief in support of its preliminary injunction motion, Wireless relies principally on the presumption of irreparable harm, but it also maintains that it is suffering actual irreparable harm to its negotiating position in its discussions with other manufacturers over potential licenses. Wireless avers that it is currently negotiating licenses of the '173 patent with several device manufacturers and resellers and that its negotiating position is harmed by defendants' continued infringement accompanied [*9] by a refusal to negotiate in good faith, "because it demonstrates to other potential licensees that a competitor can refuse a license but still continue violating the '173 patent with impunity." P. Br. 30.

Defendants contend the presumption of irreparable harm is rebutted because Wireless's alleged harm to its licensing efforts does not constitute irreparable harm as a matter of law, since the presumption does not arise until the plaintiff has made a clear showing of validity and infringement; and, even if Wireless is entitled to the presumption of irreparable harm, the presumption has been conclusively rebutted because harm to licensing efforts does not constitute irreparable harm as a matter of law, Wireless has not demonstrated any such harm, and Wireless's extraordinary delay in seeking a preliminary injunction precludes a finding of irreparable harm.

B

The court first considers the effect of Wireless's licensing efforts on the presumption of irreparable harm. A patentee's granting of a non-exclusive license is "incompatible with the emphasis on the right to exclude that is the basis for the presumption in a proper case." *T.J. Smith & Nephew Ltd. v. Consol. Med. Equip., Inc.,* 821 F.2d 646, 648 (Fed. Cir. 1987). [*10] The offer of a license demonstrates that the patentee "is willing to forgo its patent rights for compensation" and "suggests that any injury suffered by [the patentee] would be compensable in damages assessed as part of the final judgment in the case." *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.,* 49 F.3d 1551, 1557 (Fed. Cir. 1995). It is the type of evidence that has been found sufficient to rebut the presumption of irreparable harm. *Polymer Techs.,* 103 F.3d at 974.

Wireless does not itself manufacture the patented invention; indeed, it lacks the capacity to do so. P. Reply Br. 22. Rather, Wireless's business includes "a program of patent licensing and enforcement." P. Br. 30. Wireless

Case 5:06-cv-01839-PVT    Document 266-6    Filed 03/07/2008    Page 6 of 7

2006 U.S. Dist. LEXIS 36590, *; 82 U.S.P.Q.2D (BNA) 1779

avers in its initial brief that it "is currently negotiating such licenses with several device manufacturers and resellers." *Id.* Wireless's willingness to license the '173 patent on a non-exclusive basis suggests that it is willing to accept royalties in lieu of exclusion.

Wireless asserts in its reply brief that the right to exclude is more critical in the early stages of a new product category because a "first-mover" is often able to entrench [*11] itself when early customers have no choice but the first-mover's products. Wireless alleges that it was on the leading edge of designing new handheld mobile computing devices that overcame the data entry and output problems associated with previous devices. It avers that it has pending patent applications for a system to deliver content to these devices and maintains that it must be able to license its patents to first-movers and provide them with exclusive rights to manufacture and sell the invention. Wireless argues that if defendants are permitted to continue manufacturing and selling infringing devices during the course of the litigation, the infringing devices will become entrenched, and Wireless will lose its ability to guide the market for its invention, license its new technology related to content delivery, or leverage its relationships with its licensees to expand the uses of its invention. Wireless posits that this cannot be remedied by damages.

Wireless's argument might have more bearing to this case if the invention's product category were actually in its early stages. But defendants began selling one of the accused devices in October 2002, and several other devices that [*12] Wireless contends infringe the '173 patent have been and continue to be manufactured and sold, as evidenced by Wireless's other pending lawsuits in this court. *See Wireless Agents, L.L.C. v. Sony Ericsson Mobile Commc'ns AB, No. 390 F. Supp. 2d 532 (N.D. Tex.); Wireless Agents, L.L.C. v. Kyocera Wireless Corp.,* No. 3:05-CV-0290-D (N.D. Tex.). Moreover, if defendants' devices have become or are becoming entrenched, it is due in part to Wireless's own undue delay in bringing this suit and in seeking a preliminary injunction, as the court explains below.

Wireless admits that at this point it is not seeking to license the '173 patent on an exclusive basis; rather, since the patent issued in December 2003 Wireless has "sought to . . . license rights under the '173 patent to *several* computing device manufacturers and resellers, P. Br. 2 (emphasis added), it is "currently negotiating . . . licenses with *several* device manufacturers and resellers," *id.* at 30 (emphasis added), and it desires to "leverage its relationships with its licensees," P. Reply Br. 23. The intended result of a "program of patent licensing," P. Br. 30, would be royalties. If an infringing manufacturer or reseller [*13] refuses to pay Wireless for a license, Wireless may be recompensed for its loss of royalties

through damages in a successful infringement action. Because Wireless can recover through damages what it seeks from its licensing efforts -- royalties from a non-exclusive license -- the court holds that defendants have rebutted the presumption of irreparable harm. *See Polymer Techs., 103 F.3d at 974.*

C

Defendants additionally maintain that Wireless's delay in seeking a preliminary injunction rebuts the presumption of irreparable harm. "Delay in seeking a remedy is an important factor bearing on the need for a preliminary injunction." *High Tech Med. Instrumentation, 49 F.3d at 1557.* "Absent a good explanation, . . . a substantial period of delay . . . militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *Id.* Evidence of an undue delay in bringing suit may be sufficient to rebut the presumption of irreparable harm. *See Polymer Techs., 103 F.3d at 974.*

Defendants submit evidence demonstrating that Wireless became aware of the accused devices [*14] no later than January 2004. Robert Kay ("Kay"), one of the inventors listed on the '173 patent, sent Danger an email on January 11, 2004 stating that he was aware of Danger's Sidekick device and indicating that Danger and Wireless had "overlapping intellectual property." D. App. 21-22. Kay was so surprised by the similarity between Danger's patent and his own that he stated in the email: "I don't know how both patents issued." *Id.* at 22. Wireless's counsel also sent Danger a January 15, 2004 letter discussing the '173 patent and asking to "meet and discuss a business arrangement regarding [their] technology." *Id.* at 45-46.

Although Wireless knew of the Sidekick device as early as January 2004, it nonetheless did not file this action until January 15, 2005, one year later. Wireless did not file the present motion until February 1, 2006, over one year after filing suit and over two years after first learning about the Sidekick device.

Wireless contends in its reply brief that it has a good explanation for the delay: it was caused by defendants' counsel. Wireless avers that it repeatedly contacted Danger and its counsel to meet and confer, Danger's counsel continuously promised [*15] meaningful talks and then came up with excuses why they could not occur, moving for a preliminary injunction in light of Danger's counsel's promises to negotiate in good faith would not have been a wise business decision, and Wireless did not move for preliminary injunctive relief "as a token of its own good faith." P. Reply Br. 24. Beyond these statements in its brief, however, Wireless does not direct the court to *evidence* that defendants are responsible for the delay, nor does it seek leave to file with its reply brief a supplemen-

2006 U.S. Dist. LEXIS 36590, *; 82 U.S.P.Q.2D (BNA) 1779

tal appendix containing such evidence. Even if Wireless did proffer evidence that defendants repeatedly promised and postponed substantive negotiations, and even if this evidence would justify some delay in seeking injunctive relief, it would certainly not support Wireless's delay of over one year from the time of filing suit until seeking a preliminary injunction. Wireless's undue delay "demonstrates that there is no apparent urgency to the request for injunctive relief," *High Tech Med. Instrumentation, 49 F.3d at 1557*, and is of itself sufficient to rebut the presumption of irreparable harm, *see Polymer Techs., 103 F.3d at 974.* [*16]

### D

Even if neither Wireless's licensing efforts nor its delay in seeking injunctive relief is alone sufficient to rebut the presumption of irreparable harm, the court holds that the presumption is rebutted when these circumstances are viewed together. *Cf. T.J. Smith, 821 F.2d at 648* (stating presumption of irreparable harm rebutted by 15-month delay in seeking preliminary injunction and grant of licenses).

Affording Wireless the benefit of the presumption of irreparable harm, the court concludes that defendants have rebutted the presumption and that Wireless will not suffer irreparable harm from the denial of a preliminary injunction. Because this conclusion is sufficient to deny Wireless's motion, the court does not reach the remaining factors. *Polymer Techs., 103 F.3d at 973-74* [HN7]("[A] trial court need not make findings concerning the third and fourth factors if the moving party fails to establish either of the first two factors. Similarly, a trial court need not make a finding on a movant's likelihood of success on the merits if it affords the movant the benefit of the presumption of irreparable harm and properly finds that presumption rebutted [*17] by the non-movant." (internal citations omitted)).

### IV

Wireless filed on May 26, 2006 a motion for leave to submit rebuttal expert report. Wireless seeks leave to submit the report of Gerhard Deffner, Ph.D. ("Dr. Deffner"), in order to rebut the expert report defendants submitted with their response to the preliminary injunction motion. Dr. Deffner's report relates only to issues associated with Wireless's likelihood of success on the merits. Because the court does not reach this factor in denying Wireless's motion for preliminary injunction, the court denies as moot Wireless's motion for leave to submit Dr. Deffner's report.

Wireless filed on June 1, 2006 a motion for evidentiary hearing on its motion for preliminary injunction and on claim construction. For similar reasons as make it unnecessary to consider Dr. Deffner's report, and because a hearing is unnecessary under the provisions of the court's February 2, 2006 order, the motion is denied.

* * *

Wireless's February 1, 2006 motion for preliminary injunction is denied.

**SO ORDERED.**

June 6, 2006.

SIDNEY A. FITZWATER

UNITED STATES DISTRICT JUDGE