Yitai Hu (SBN 248085) (yhu@akingump.com)
Sean P. DeBruine (SBN 168071) (sdebruine@akingump.com)
S.H. Michael Kim (SBN 203491) (mkim@akingump.com)
AKIN GUMP STRAUSS HAUER & FELD LLP
3000 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone:      650-838-2000
Facsimile:      650-838-2001

Attorneys for Plaintiff and Counterdefendant
ELANTECH DEVICES CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ELANTECH DEVICES CORP., <br><br> Plaintiff, <br><br> vs. <br><br> SYNAPTICS, INC and AVERATEC, INC., <br><br> Defendants. | Case No. 5:06-CV-01839 PVT <br><br> **DEBRUINE DECLARATION IN SUPPORT OF ELANTECH'S OPPOSITION TO SYNAPTICS MOTION FOR A PRELIMINARY INJUNCTION** <br><br> **Date:** June 24, 2008 <br> **Time:** 2:00 p.m. <br> **Judge:** Patricia V. Trumbull <br> **Court:** 5, 4th Floor |

I, Sean P. DeBruine, declare as follows:

1.      I am a partner at the law firm of Akin Gump Strauss Hauer and Feld, LLP, counsel to plaintiff Elantech Devices Corp. ("Elantech"). I have personal knowledge of the following facts and if called to testify I could and would testify competently to the matters stated herein.

2.      I recently visited the website of defendant Averatec, Inc. I was automatically redirected to another website, www.trigem.com. That website stated that TriGem is Averatec's global brand. The website listed one Averatec branded laptop computer, the model 2500. The specifications for that product showed that it includes a Synaptics touchpad. There is no indication on that website that Averatec offers any products including Elantech touchpad devices.

1      3.     Exhibit 2-6 to the May 9, 2008 declaration of Karl J. Kramer ("Kramer Decl.") in

2 this matter consists of documents produced in this matter by Synaptics in the fall of 2006.

3      4.     Exhibit 3 to the Kramer Decl. appears to be a printout of a web page from

4 www.addictpc.com. That printout is dated Friday, August 26, 2006 and refers to the Avenger

5 7600 model notebook. I recently visited the addictpc.com website and was unable to locate that

6 model offered for sale. I was also unable to locate any mention of Elantech touchpads including

7 in any of AddictPC's current products. Exhibit 5 to the Kramer Decl. refers to the Megabook

8 L725 model laptop from Micro-Star International. During a recent search of the referenced

9 Taiwanese web site at www.msi.com.tw I was unable to locate that model computer and found

10 no mention of Elantech touchpads. Exhibit 6 to the Kramer Decl. purports to be a web page

11 referring to the Sager NP3880 laptop computer at www.discountlaptops.com. Ex. 7 also includes

12 pages referencing the Sager NP-5950 laptop from www.bsicomputer.com. As with the other

13 sites, I was unable to locate either of these Sager laptop models, nor could I find any mention of

14 Elantech touchpads, on either of those sites. In fact, I was unable to locate any of the notebook

15 models listed in exhibits 4-6 on any current web page.

16      5.     Exhibits 7 and 8 to the Kramer Decl. were not previously produced in this matter,

17 but also are inconsistent with the current information provided on the referenced websites. I

18 recently visited the website for AVA Direct mentioned in Ex. 7 and www.overam.com as

19 mentioned in Ex. 8. I was unable to find any mention of Elantech touchpads on those web sites.

20      6.     Attached hereto as Exhibit 1 is a true and correct copy of Synaptics' Responses to

21 Elantech's First Set of Interrogatories in this matter.

22      7.     Attached hereto as Exhibit 2 is a true and correct copy of the relevant pages from

23 Synaptics' latest Form 10-K Annual Report, retrieved from Synaptics' web site. On page 12

24 Synaptics discloses Alps Electric, among others, as its main competitor. Elantech is not

25 mentioned.

26      8.     Attached hereto as Exhibit 3 is information regarding the Glide Point touchpad

27 products taken from Alps Electric's U.S. website, indicating that the Glide Point touchpads offer

28 scroll zones, corner taps and surface tapping features.

1    9.    Attached hereto as Exhibit 4 is a true and correct copy of Synaptics' Amended

2  Initial Disclosure of Asserted Claims in this matter.

3    10.    Attached hereto as Exhibit 5 is a true and correct copy of a Declaration filed

4  under 37 C.F.R. § 1.13(a) for the '052 patent on February 8, 1999.

5    11.    Attached hereto as Exhibit 6 is a true and correct copy of an Information

6  Disclosure Statement filed on December 5, 1996 for the '411 patent.

7    I swear under penalty of perjury under the laws of the United States of America that the

8  foregoing is true and correct.  Executed on June 13, 2008 at Palo Alto, California.

9

10

11    _____/s/_____
      Sean P. DeBruine

12

13  6252716

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 1**

1  KARL J. KRAMER (CA SBN 136433)
   ROBERT L. McKAGUE (CA SBN 187461)
2  ERIKA L. LABIT (CA SBN 234919)
   MORRISON & FOERSTER LLP
3  755 Page Mill Road
   Palo Alto, California 94304-1018
4  Telephone: (650) 813-5600
   Facsimile: (650) 494-0792
5  kkramer@mofo.com

6  Attorneys for Defendant
   SYNAPTICS, INC.

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11

12
   ELANTECH DEVICES CORPORATION, a          Case No.   C06-01839 CRB
13 corporation existing under the laws of Taiwan,
   R.O.C.,                                  SYNAPTICS, INC.'S RESPONSES
14                                          AND OBJECTIONS TO
                    Plaintiff,              ELANTECH DEVICES
15                                          CORPORATION'S FIRST SET
        v.                                  OF INTERROGATORIES TO
16                                          SYNAPTICS [NOS. 1-11]
   SYNAPTICS, INC., a Delaware corporation;
17 AVERATEC, INC., a California corporation; and
   PROSTAR COMPUTER, INC., a California
18 corporation,

19                  Defendants.

20
   AND RELATED COUNTERCLAIMS
21

22

23 PROPOUNDING PARTY:    PLAINTIFF ELANTECH DEVICES CORP.

24 RESPONDING PARTY:     SYNAPTICS, INC.

25 SET NUMBER:           ONE

26

27

28

1    Pursuant to Rule 33 of the Federal Rules of Civil Procedure, defendant Synaptics, Inc.

2   ("Synaptics") hereby submits the following objections and responses to the First Set of

3   Interrogatories served by plaintiff Elantech Devices Corporation's ("Elantech").

### PRELIMINARY STATEMENT

5    This case is in its initial stages and discovery is on-going.  Synaptics has not completed its

6   investigation of the facts related to this case and has not completed its preparations for trial.

7   Additional investigation, research and analysis may require amendment or revision of these

8   responses.  Synaptics responses to the interrogatories are based only on information presently

9   known to Synaptics, and are given without prejudice to Synaptics' right to supplement, add to,

10   amend, or modify its responses and to Synaptics' right to provide or introduce at trial evidence of

11   any subsequently discovered information.

12    Each of the following interrogatory responses is made subject to this preliminary

13   statement, which applies to each and every response and is hereby incorporated into each and

14   every response as if set forth in full therein.

### GENERAL OBJECTIONS

16    Synaptics makes the following general objections to Elantech's interrogatories, and these

17   objections shall be deemed incorporated into each of Synaptics' responses as if set forth fully

18   therein:

19    1.    Synaptics objects to the interrogatories to the extent that they call for information

20   that is not relevant to a claim or defense of any party to this action and/or that is not reasonably

21   calculated to lead to the discovery of admissible evidence.  In responding to these interrogatories,

22   Synaptics does not concede the relevancy, materiality or admissibility of any of the information

23   sought.  Synaptics' responses are made subject to and without waiver of objections as to the

24   competency, relevancy, materiality, or admissibility as evidence of any of the information

25   requested or referred to in the responses given here.  Synaptics reserves the right to object to any

26   further discovery on the topics of the interrogatories, and to object to the admissibility of any

27   interrogatory, any response thereto or any document identified in a response, in any filing or

28   proceeding including, but not limited to, trial.

1      2.     Synaptics objects to the interrogatories to the extent that they seek information

2 protected from disclosure by the attorney-client privilege, the work-product doctrine, the joint

3 defense privilege, the right of privacy, or any other applicable rule of privilege or confidentiality

4 provided by law. All such information will be withheld. Synaptics objects to Instruction C to the

5 extent that it imposes on Synaptics an obligation to furnish Elantech with a privilege log that

6 contains more information than required by applicable law. Synaptics does not waive any claim

7 of privilege, whether expressly asserted or not, by providing any information or identifying any

8 document or thing in response to the interrogatories. The inadvertent disclosure of such

9 information or the inadvertent identification of any document shall not constitute a waiver of any

10 applicable privilege as to that information or that document or any other information or document

11 identified or produced by Synaptics. Synaptics reserves the right to object to the introduction into

12 evidence before the Court at any time before or at trial of information that is privileged under law

13 and that has been revealed or produced inadvertently.

14      3.     Synaptics objects to the interrogatories to the extent that they seek information that

15 is in Elantech's possession, custody or control. Synaptics further objects to these interrogatories

16 to the extent they seek information which is a matter of public record or readily available through

17 public sources and is thus equally available to Elantech as to Synaptics.

18      4.     Synaptics objects to the interrogatories to the extent that they purport to impose on

19 Synaptics an obligation to provide information or to identify documents that are not in Synaptics'

20 possession, custody or control, or to require Synaptics to search for or identify information or

21 documents that are in the possession, custody and control of any person, business, or entity other

22 than Synaptics.

23      5.     Synaptics objects to the interrogatories to the extent that they call for Synaptics to

24 provide a legal opinion or contention that is unrelated to any fact. Such questions are not

25 authorized by Rule 33 of the Federal Rules of Civil Procedure.

26      6.     Synaptics objects to the interrogatories to the extent they attempt to impose on

27 Synaptics obligations that conflict with or exceed those imposed by the Federal Rules of Civil

28

1 | Procedure, the Civil Local Rules, the Patent Local Rules, or any case management schedule

2 | adopted by the Court.

3 |     7.    Synaptics objects to the interrogatories as premature on the grounds and to the

4 | extent that they call for expert testimony.

5 |     8.    Synaptics objects to the "Definitions" that accompany the interrogatories to the

6 | extent that they are overbroad and cover information that is not relevant to any claim or defense

7 | involved in this action and/or that is not reasonably calculated to lead to the discovery of

8 | admissible evidence. Synaptics objects to all definitions to the extent that they place a greater

9 | burden on Synaptics than imposed by the Federal Rules of Civil Procedure. To the extent

10 | Synaptics adopts the terms defined by plaintiffs, they are adopted solely for convenience in

11 | responding to these interrogatories. Synaptics does not accept or concede that any of the terms or

12 | definitions is appropriate, descriptive or accurate.

13 |     9.    Synaptics objects to Elantech's definitions of the terms "prosecution" and "prior

14 | art" to the extent that the definitions are inconsistent with the commonly accepted understanding

15 | of those terms, are overbroad, and cover information that is not relevant to any claim or defense

16 | involved in this action and/or that is not reasonably calculated to lead to the discovery of

17 | admissible evidence.

18 |     10.    Synaptics objects to Elantech's definitions of "identify" with respect to natural

19 | persons, legal entities, oral statements, and written documents or statements to the extent that they

20 | seek to impose obligations on Synaptics that exceed those imposed by the Federal Rules of Civil

21 | Procedure and applicable case law. Synaptics further objects to these definitions on the grounds

22 | that they are overbroad and cover information that is not relevant to any claim or defense

23 | involved in this action and/or that is not reasonably calculated to lead to the discovery of

24 | admissible evidence.

25 |     11.    Synaptics objects to Elantech's definitions of the term "communication" as

26 | overbroad, vague, and ambiguous.

27 |     12.    Synaptics objects to Elantech's definition of the term "document" as vague and

28 | ambiguous. Synaptics further objects to the definition to the extent that it purports to impose

1    obligations on Synaptics that differ from those imposed by the Federal Rules of Civil Procedure

2    and applicable law.  Synaptics further objects to the definition as overbroad and unduly

3    burdensome to the extent that it purports to impose on Synaptics an obligation to provide:

4         a.    all purportedly responsive information that may be contained on digital or

5    analog electronic files;

6         b.    all purportedly responsive e-mail, electronic calendars, handheld personal

7    organizer device entries, and computer logs;

8         c.    all purportedly responsive voicemail in electronic form, which may include

9    modular messaging and Voice over Internet Protocol, and all other purportedly relevant

10   telecommunications files;

11        d.    all purportedly responsive data that may be contained on hard disks,

12   diskettes/floppy disks, magnetic tapes, CD-ROMs, DVDs, magneto-optical diskettes, tape drives,

13   and/or zip drives;

14        e.    all purportedly responsive data that may be contained on network e-mail

15   servers and other network data storage media; and

16        f.    all purportedly responsive on-line data storage that may be contained on

17   mainframes and minicomputers.

18        In addition, Synaptics also specifically objects to the definition of "document" as

19   overbroad and unduly burdensome to the extent that it purports to impose on Synaptics an

20   obligation to provide materials not readily accessible, including:

21        g.    data from computers that were used during the relevant time period that are

22   no longer in use, but the drives of which were not erased prior to this litigation;

23        h.    archived backup tapes;

24        i.    all archival and backup information of purportedly relevant information;

25   and

26        j.    documents outside Synaptics's possession, custody, or control.

27        13.    Synaptics objects to Elantech's definitions of "Elantech Product(s)," "Plaintiff's

28   Product(s)," "Synaptics Product(s)," and "Defendant's Product(s)" to the extent that they are

SYNAPTICS' RESP. & OBJS. TO ELANTECH'S FIRST INTERROGATORIES
CASE NO. C06-01839 CRB
pa-1072797

4

1   overbroad and cover information that is not relevant to any claim or defense involved in this

2   action and/or that is not reasonably calculated to lead to the discovery of admissible evidence.

3           14.     Synaptics objects to Elantech's definition of "related fields" on the ground that the

4   definition is overbroad, vague, and ambiguous.

5           15.     Synaptics objects to the "Instructions" that accompany the interrogatories to the

6   extent that they seek to impose a greater burden on Synaptics than imposed by the Federal Rules

7   of Civil Procedure or applicable law.

8           16.     Synaptics objects to the time period covered by the interrogatories to the extent

9   that it calls for information that is not relevant to the claims or defenses involved in this action

10  and/or that is not reasonably calculated to lead to the discovery of admissible evidence.

11          Notwithstanding its specific response to any particular interrogatory, Synaptics does not

12  waive any of the general objections made here, each of which is incorporated by reference into

13  each and every specific response as if set forth in full therein.

14                          **SPECIFIC RESPONSES AND OBJECTIONS**

15  INTERROGATORY NO. 1:

16          Describe in detail your first awareness of each of Elantech Product(s) or any prototype

17  thereof, including without limitation the date on which you first became aware of such product or

18  prototype, the circumstances surrounding your first awareness, how you gained such awareness,

19  and the identity of the persons who gained such awareness and all documents that concern such

20  awareness.

21  RESPONSE TO INTERROGATORY NO. 1:

22          Synaptics incorporates its General Objections as if set forth fully herein.  Synaptics also

23  objects to this interrogatory to the extent it is overbroad, vague, and ambiguous.  Synaptics

24  further objects to this interrogatory to the extent that it seeks information that is not relevant to a

25  claim or defense in this action and/or that is not reasonably calculated to lead to the discovery of

26  relevant or admissible evidence.  Synaptics further objects to this interrogatory as premature, to

27  the extent that it seeks information required to be disclosed by the Patent Local Rules.  Synaptics

28  further objects to this Interrogatory on the grounds that it is compound and contains multiple

1  subparts, and thus represents an improper attempt to circumvent the limits on interrogatories

2  imposed by the parties' agreement and the Federal Rules of Civil Procedure. Synaptics further

3  objects to this interrogatory to the extent that it calls for material protected by the attorney-client

4  privilege and work product doctrine.

5        Subject to and without waiver of its General and Specific Objections, Synaptics responds

6  as follows: Synaptics became aware of Elantech's products at some point after Elantech was

7  formed on September 18, 2003, and before December 18, 2003. The Elantech products were

8  identified by Synaptics, in the regular course of its business, in connection with Synaptics'

9  monitoring of the products offered in the United States by Synaptics' customers and competitors'

10  customers. The exact identity of the first Synaptics employee to see an Elantech product is not

11  currently known. If and when the identity of the employee(s) is determined, Synaptics agrees to

12  supplement this response to provide that information.

13  INTERROGATORY NO. 2:

14        Describe in detail your first awareness of the Elantech Patent, including without limitation

15  the date on which you first became aware of the patent, the circumstances surrounding your first

16  awareness, how you gained such awareness, and the identity of the persons who gained such

17  awareness and all documents that concern such awareness.

18  RESPONSE TO INTERROGATORY NO. 2:

19        Synaptics incorporates its General Objections as if set forth fully herein. Synaptics also

20  objects to this interrogatory to the extent it is overbroad, vague, and ambiguous. Synaptics

21  further objects to this Interrogatory on the grounds that it is compound and contains multiple

22  subparts, and thus represents an improper attempt to circumvent the limits on interrogatories

23  imposed by the parties' agreement and the Federal Rules of Civil Procedure. Synaptics further

24  objects to this interrogatory to the extent that it calls for material protected by the attorney-client

25  privilege and work product doctrine.

26        Subject to and without waiver of its General and Specific Objections, Synaptics responds

27  as follows: Synaptics first became aware of U.S. Patent number 5,825,352 (the '352 Patent) at

28  some point after it issued on October 20, 1998. Synaptics has conducted a reasonable search of

1    available company documents and, at the present time, has determined that at least one employee,

2    David Gillespie, of Synaptics was aware of the '352 Patent in or around September, 1999. It is

3    believed that Mr. Gillespie became aware of the '352 Patent in connection with an analysis of art

4    that might relate to Synaptics' 5,943,052 patent related to scrolling. It is possible that Synaptics

5    was aware of the '352 Patent prior to this date, but no documentary record or recollection of that

6    knowledge has yet been found. As noted in the Preliminary Statement above, Synaptics'

7    investigation of the facts is on-going and Synaptics therefore reserves the right to supplement its

8    response to this interrogatory. Documents relating to the above-described first awareness, other

9    than the '352 Patent itself, are privileged, and Synaptics objects to this interrogatory on that basis.

10   INTERROGATORY NO. 3:

11       Separately for each Synaptics Patent, describe in detail the conception and first reduction

12   to practice of the claimed invention in the patent-in-suit, including without limitation, the date

13   each alleged invention thereof was conceived and first reduced to practice, the circumstances

14   surrounding each such conception and reduction to practice, the names of all persons who

15   participated therein and the contribution made by each person, the internal name, project

16   designation, or other designation for the work or research project that led to the alleged invention

17   or resulted from such work or research project, and the identity of all documents and things that

18   concern or evince such alleged conception, first reduction to practice, or such work or research

19   project.

20   RESPONSE TO INTERROGATORY NO. 3:

21       Synaptics incorporates its General Objections as if set forth fully herein. Synaptics also

22   objects to this interrogatory to the extent it is overbroad, vague, and ambiguous. Synaptics

23   further objects to this Interrogatory on the grounds that it is compound and contains multiple

24   subparts, and thus represents an improper attempt to circumvent the limits on interrogatories

25   imposed by the parties' agreement and the Federal Rules of Civil Procedure. Synaptics further

26   objects to this interrogatory as premature, to the extent that it seeks information required to be

27   disclosed by the Patent Local Rules. Synaptics further objects to this interrogatory to the extent

28   that it calls for material protected by the attorney-client privilege and work product doctrine.

1         Subject to and without waiver of its General and Specific Objections, Synaptics responds

2   as follows:

3         The asserted inventions claimed in U.S. Patent No. 5,543,591 (the '591 Patent), were

4   constructively conceived and reduced to practice no later than October 7, 1994, when an

5   application was submitted to the U.S. Patent & Trademark Office.  Although Synaptics'

6   investigation has only recently begun, Synaptics believes that the specific inventions of the

7   asserted claims of the '591 Patent were actually conceived in November and December, 1993 and

8   reduced to practice by January 7, 1994.  Persons who participated in or have knowledge of the

9   conception and reduction to practice of the '591 Patent include but are not limited to David

10  Gillespie, Timothy P. Allen, Ralph Wolf, Ken D'Alessandro, and the law firm of D'Alessandro &

11  Ritchie.  To the extent documents exist which memorialize the conception and reduction to

12  practice of the '591 invention, such documents will be produced.  There was no formal project

13  designation for the work or research project that led to the invention covered by the '591 Patent.

14        The asserted inventions claimed in U.S. Patent No. 5,880,411 (the '411 Patent), were

15  constructively conceived and reduced to practice no later than March 28, 1996, when an

16  application was submitted to the U.S. Patent & Trademark Office.  Although Synaptics'

17  investigation has only recently begun, Synaptics believes that the specific inventions of the

18  asserted claims of the '411 Patent were actually conceived in December 1995 and reduced to

19  practice by January 3, 1996.  Persons who participated in or have knowledge of the conception

20  and reduction to practice of the '411 Patent include but are not limited to David Gillespie,

21  Timothy P. Allen, Ralph C. Wolf, Shawn P. Day, Ken D'Alessandro, and the law firm of

22  D'Alessandro & Ritchie.  To the extent documents exist which memorialize the conception and

23  reduction to practice of the '411 invention, such documents will be produced.  There was no

24  formal project designation for the work or research project that led to the invention covered by

25  the '411 Patent.

26        The asserted inventions claimed in U.S. Patent No. 5,943,052 (the '052 Patent), were

27  constructively conceived and reduced to practice no later than August 12, 1997, when the

28  application was submitted to the U.S. Patent & Trademark Office.  Although Synaptics'

1   investigation has only recently begun, Synaptics believes that the specific inventions of the

2   asserted claims of the '052 Patent were actually conceived before the end of May 1996 and

3   reduced to practice before July 3, 1996.  Persons who participated in or have knowledge of the

4   conception and reduction to practice of the '052 Patent include but are not limited to Timothy

5   Allen, Shawn Day, Aaron T. Ferrucci, and Malcolm B. Wittenberg.  To the extent documents

6   exist which memorialize the conception and reduction to practice of the '052 invention, such

7   documents will be produced.  There was no formal project designation for the work or research

8   project that led to the invention covered by the '052 Patent.

9        The asserted inventions claimed in U.S. Patent No. 6,380,931 (the '931 Patent) were

10   constructively conceived and reduced to practice no later than October 7, 1994, when an

11   application was submitted to the U.S. Patent & Trademark Office.  Although Synaptics'

12   investigation has only recently begun, Synaptics believes that the specific inventions of claim 1 of

13   the '931 Patent was actually conceived in November and December, 1993 and reduced to practice

14   by January 7, 1994.  Synaptics also believes that the specific inventions of claims 5 and 6 of the

15   '931 Patent were conceived in September 1994 and reduced to practice by September 19, 1994.

16   Persons who participated in or have knowledge of the conception and reduction to practice of the

17   '931 Patent include but are not limited to David Gillespie, Timothy P. Allen, Ralph Wolf, Shawn

18   Day, Ken D'Alessandro, and the Sierra Patent Group, Ltd.  To the extent documents exist which

19   memorialize the conception and reduction to practice of the '931 invention, such documents will

20   be produced.  There was no formal project designation for the work or research project that led to

21   the invention covered by the '931 Patent.

22        To the extent any of the people listed above is currently an employee of Synaptics, they

23   should be contacted through Morrison & Foerster LLP, counsel of record for Synaptics in this

24   matter.  To the extent that the contact information for the remaining individuals is ascertainable, it

25   will be provided in Synaptics' Initial Disclosures, due September 1, 2006.

26   INTERROGATORY NO. 4:

27        Describe in detail any testing, examination, or analysis performed by you or on your

28   behalf, including any patent infringement analysis, of any Elantech Product(s), done by you or at

SYNAPTICS' RESP. & OBJS. TO ELANTECH'S FIRST INTERROGATORIES

CASE NO. C06-01839 CRB

pa-1072797

9

1 | your direction, including without limitation the dates of such testing, examination, or analysis, the

2 | identity of documents relating to such testing, examination, or analysis, and the identity of

3 | persons involved in such testing, examination, or analysis.

4 | RESPONSE TO INTERROGATORY NO. 4:

5 | Synaptics incorporates its General Objections as if set forth fully herein. Synaptics also

6 | objects to this interrogatory to the extent it is overbroad, vague, and ambiguous. Synaptics

7 | further objects to this Interrogatory on the grounds that it is compound and contains multiple

8 | subparts, and thus represents an improper attempt to circumvent the limits on interrogatories

9 | imposed by the parties' agreement and the Federal Rules of Civil Procedure. Synaptics further

10 | objects to this interrogatory to the extent that it asks for Synaptics to provide a legal opinions or

11 | conclusions. Synaptics further objects to this interrogatory to the extent that it calls for material

12 | protected by the attorney-client privilege and work product doctrine.

13 | Subject to and without waiver of its General and Specific Objections, Synaptics responds

14 | as follows: On occasion, Synaptics has conducted a variety of tests on competitive products to

15 | determine the quality and feature sets of such products. Synaptics has performed tests on

16 | Elantech products, including Elantech products sold by Averatec, Inc. and Prostar Computer, Inc.

17 | Persons involved in or with knowledge of Synaptics' testing, examination, and analysis of

18 | Elantech's infringing products include but are not limited to Greg DeWolfe, Wendy Cheng, Ken

19 | Geisler, Alfred Woo, David Gillespie, and Kirk Hargreaves. Pursuant to Federal Rule of Civil

20 | Procedure 33(d), information responsive to this request may also be found in non-privileged

21 | documents that will be produced shortly and identified by Bates numbers in subsequent

22 | correspondence.

23 | INTERROGATORY NO. 5:

24 | With respect to your allegations of indirect infringement by Elantech, identify the direct

25 | infringer, and describe in detail the facts based on which you allege that Elantech actively

26 | induced the alleged infringement.

27 |

28 |

1  RESPONSE TO INTERROGATORY NO. 5:

2        Synaptics incorporates its General Objections as if set forth fully herein.  Synaptics also

3  objects to this interrogatory on the ground that it is premature.  Synaptics has not completed its

4  investigation of the facts related to this case and has not completed its preparations for trial.

5  Synaptics therefore reserves the right to supplement this response at a later date.  Synaptics

6  further objects to this interrogatory to the extent that it calls for material protected by the

7  attorney-client privilege and work product doctrine.

8        Subject to and without waiver of its General and Specific Objections, Synaptics responds

9  as follows:  Elantech has been on notice of the Synaptics Patents since at least December 18,

10  2003, when Synaptics sent Elantech a letter concerning those patents.  Elantech has also

11  participated in numerous meetings and correspondence with Synaptics concerning Elantech's

12  infringement of the Synaptics Patents.  Elantech was on notice of Synaptics' allegation of

13  infringement of the Synaptics patents.  Elantech conducts activities with respect to electronic

14  products including touchpads, with knowledge and intending that third parties use their respective

15  United States contacts and distribution channels to import into, sell, offer for sale, and/or use

16  these products in California and/or elsewhere in the United States.  Synaptics has identified at

17  least three companies, Averatec, Inc., Prostar Computer, Inc., and Sager, Inc. which have sold

18  computer products in the United States containing infringing Elantech products.  Elantech's sales

19  of the infringing products were made without Synaptics' permission.  Through direct instruction

20  and presentation of operable feature sets, Elantech induces users of those computer products to

21  practice the methods claimed in the asserted claims of the patents-in-suit without Synaptics'

22  permission.

23  INTERROGATORY NO. 6:

24        For each Synaptics Patent, state the factual basis of Synaptics's contentions that Elantech

25  has willfully infringed the patent; identify the three persons most knowledgeable concerning such

26  facts and all documents that Synaptics contends substantiate such facts.

27

28

1   RESPONSE TO INTERROGATORY NO. 6:

2          Synaptics incorporates its General Objections as if set forth fully herein.  Synaptics

3   objects to this interrogatory on the ground that it is premature.  Pursuant to an agreement between

4   the parties, the Court has bifurcated this case into liability and damages phases.  This

5   interrogatory seeks information that is only relevant to the damages phase of this case and, on that

6   basis, Synaptics declines to answer this question at this time.  Moreover, the interrogatory is

7   premature for the independent reason that the question calls for expert opinion, discovery of

8   which is to be determined in accordance with the case management schedule adopted by the

9   Court.  In addition, Synaptics has not completed its investigation of the facts related to this case

10  and has not completed its preparations for trial.  Synaptics further objects to this Interrogatory on

11  the grounds that it is compound and contains multiple subparts, and thus represents an improper

12  attempt to circumvent the limits on interrogatories imposed by the parties' agreement and the

13  Federal Rules of Civil Procedure.  Synaptics further objects to this interrogatory to the extent that

14  it calls for material protected by the attorney-client privilege and work product doctrine.

15         Subject to and without waiver of its General and Specific Objections, Synaptics responds

16  as follows:  Elantech's infringement has been willful because Elantech proceeded to induce

17  infringement of the asserted claims of Synaptics' Patents while on notice of Synaptics' patent

18  rights and with no reasonable basis for believing that Elantech's devices do not infringe

19  Synaptics' Patents.  Although Synaptics met and corresponded with Elantech representatives on

20  many occasions, Elantech never once articulated a good-faith defense to Synaptics' assertions of

21  infringement.  Persons knowledgeable of these facts include those persons involved in such

22  meetings and correspondence, including Dan Kirby, Russ Knittel, Shawn Day, Tom Tiernan,

23  Greg DeWolfe, Mariel Van Tatenhove, Tom Spade, Daisuke Shudo, I-Hau Yeh, and Kozo

24  Yamamoto.  Other representatives of Elantech whose identities are unknown at this time were

25  also aware of Elantech's willful infringement.  Documents relating to the correspondence and

26  meetings between Synaptics and Elantech are in Elantech's possession.  Synaptics will produce

27  any other non-privileged responsive documents that it identifies supporting its claims of willful

28  infringement.

SYNAPTICS' RESP. & OBJS. TO ELANTECH'S FIRST INTERROGATORIES                                    12
CASE NO. C06-01839 CRB
pa-1072797

1  INTERROGATORY NO. 7:

2      For each Synaptics Patent, describe in detail all monetary damages you contend you have

3  suffered as a result of Elantech's alleged infringement, including all theories and methods of

4  calculating those damages and all facts which you believe support your contentions.

5  RESPONSE TO INTERROGATORY NO. 7:

6      Synaptics incorporates its General Objections as if set forth fully herein. Synaptics

7  objects to this interrogatory on the ground that it is premature. Pursuant to an agreement, the

8  parties have agreed to bifurcate this case into liability and damages phases. This interrogatory

9  seeks information that is only relevant to the damages phase of this case and, on that base,

10  Synaptics will answer this question at a later phase in this litigation. Moreover, the interrogatory

11  is premature for the independent reason that the question calls for expert opinion, discovery of

12  which is to be determined in accordance with the case management schedule adopted by the

13  Court. In addition, Synaptics has not completed its investigation of the facts related to this case

14  and has not completed its preparations for trial. Synaptics further objects to this interrogatory to

15  the extent that it calls for material protected by the attorney-client privilege and work product

16  doctrine.

17  INTERROGATORY NO. 8:

18      With respect to each Synaptics Patent, identify where, when, how, and by whom the

19  subject matter described in the patent was first known or used by others in the United States, first

20  offered for sale in the United States, and/or first disclosed to any person not employed by

21  Synaptics.

22  RESPONSE TO INTERROGATORY NO. 8:

23      Synaptics incorporates its General Objections as if set forth fully herein. Synaptics further

24  objects to this Interrogatory on the grounds that it is compound and contains multiple subparts,

25  and thus represents an improper attempt to circumvent the limits on interrogatories imposed by

26  the parties' agreement and the Federal Rules of Civil Procedure. Subject to and without waiver of

27  its General and Specific Objections, Synaptics responds as follows:

28

1    Synaptics currently believes that the inventions covered by the asserted claims of the '591

2    Patent were first disclosed to any person not employed by Synaptics in late March 1994 pursuant

3    to a confidentiality agreement for beta testing and analysis. Although Synaptics' records are

4    incomplete and its investigation is still on going, it is believed that the third party involved was

5    Hewlett-Packard. Synaptics does not appear to have complete sales records from the relevant

6    time frame, but currently believes that no product embodying the inventions of the asserted

7    claims of the '591 Patent were offered for sale or sold any earlier than September, 1994.

8    Synaptics will continue to investigate the facts and provide supplemental information when it is

9    available.

10    Synaptics currently believes that the inventions covered by the asserted claims of the '411

11    Patent were first disclosed to any person not employed by Synaptics in February 1996 pursuant

12    to a confidentiality agreement for beta testing and analysis. Synaptics' records are incomplete and

13    its investigation is still on going, but it is not currently known which third-party may have been

14    involved in that beta testing. Synaptics does not appear to have complete sales records from the

15    relevant time frame, but currently believes that no product embodying the inventions of the

16    asserted claims of the '411 Patent were offered for sale or sold any earlier than March, 1996.

17    Synaptics will continue to investigate the facts and provide supplemental information when it is

18    available.

19    Synaptics currently believes that the inventions covered by the asserted claims of the '052

20    Patent were first disclosed to any person not employed by Synaptics in July or August 1996

21    pursuant to a confidentiality agreement for beta testing and analysis. Synaptics' records are

22    incomplete and its investigation is still on going, but it is not currently known which third-party

23    may have been involved in that beta testing. Synaptics does not appear to have complete sales

24    records from the relevant time frame, but currently believes that no product embodying the

25    inventions of the asserted claims of the '052 Patent were offered for sale or sold any earlier than

26    September, 1996. Synaptics will continue to investigate the facts and provide supplemental

27    information when it is available.

28

1    Synaptics currently believes that the invention covered by claim 1 of the '931 Patent was

2  first disclosed to any person not employed by Synaptics in late March 1994 pursuant to a

3  confidentiality agreement for beta testing and analysis. Although Synaptics' records are

4  incomplete and its investigation is still on going, it is believed that the third party involved was

5  Hewlett-Packard. Synaptics currently believes that the inventions covered by claims 5 and 6 of

6  the '931 Patent were first disclosed to any person not employed by Synaptics in September 1994.

7  Synaptics does not appear to have complete sales records from the relevant time frame, but

8  currently believes that no product embodying the inventions of the asserted claims of the '931

9  Patent were offered for sale or sold any earlier than September, 1994. Synaptics will continue to

10  investigate the facts and provide supplemental information when it is available.

11  INTERROGATORY NO. 9:

12    Describe all efforts by Synaptics in complying with the notice requirements of 35 U.S.C.

13  § 287, including identifying each and every product or device marked with the number(s) of the

14  Synaptics Patents and all of the designations (including model, names, and/or numbers) of the

15  marked product(s) or device(s).

16  RESPONSE TO INTERROGATORY NO. 9:

17    Synaptics incorporates its General Objections as if set forth fully herein. Synaptics also

18  objects to this interrogatory on the ground that it is premature. Pursuant to an agreement, the

19  Court has bifurcated this case into liability and damages phases. This interrogatory seeks

20  information that is only relevant to the damages phase of this case and, on that basis, Synaptics

21  will answer this question at a later phase in this litigation. Synaptics further objects to this

22  interrogatory as premature because Synaptics has not completed its investigation of the facts

23  related to this case and has not completed its preparations for trial. Synaptics further objects to

24  this interrogatory to the extent that it calls for material protected by the attorney-client privilege

25  and work product doctrine.

26

27

28

1 | INTERROGATORY NO. 10:

2 |       For each Synaptics Patent, describe in detail all facts that Synaptics contends constitute or

3 | evince any secondary considerations of non-obviousness with respect to any invention claimed by

4 | the patent, and identify all documents that Synaptics contends substantiate such facts.

5 | RESPONSE TO INTERROGATORY NO. 10:

6 |       Synaptics incorporates its General Objections as if set forth fully herein.  Synaptics also

7 | objects to this interrogatory as vague and ambiguous in its use of the phrase "secondary

8 | considerations of non-obviousness."  Synaptics further objects to this Interrogatory on the

9 | grounds that it is compound and contains multiple subparts, and thus represents an improper

10 | attempt to circumvent the limits on interrogatories imposed by the parties' agreement and the

11 | Federal Rules of Civil Procedure.

12 |       Subject to and without waiver of its General and Specific Objections, Synaptics responds

13 | as follows:  After the inventions of the asserted claims of the Synaptics' patents were developed,

14 | they were embedded in Synaptics' touchpad products.  Those products have been commercially

15 | successful.  In fact, Synaptics' touchpad products embodying the inventions of the Synaptics'

16 | Patents have garnered the majority share of the market for touchpad devices.  The set of features

17 | recited in the asserted claims of Synaptics' patents are now demanded by most customers in the

18 | industry and no company can effectively compete in the marketplace without offering them.

19 | Synaptics' touchpads, including the feature set claimed in the Synaptics' Patents, have won

20 | numerous awards and continuous praise in the industry since their introduction.  Others in the

21 | industry, including Elantech, have copied those patented features.  The patents-in-suit have been

22 | recognized through license.  Moreover, others have tried and failed to make touchpads that can

23 | compete with the feature set that Synaptics offers.  In addition, pursuant to Federal Rule of Civil

24 | Procedure 33(d), Synaptics agrees to produce non-privileged documents concerning these facts.

25 | INTERROGATORY NO. 11:

26 |       Describe in detail and identify all documents concerning Synaptics's practices, policies,

27 | and procedures for retention and destruction of documents, including electronic documents.

28 |

1    RESPONSE TO INTERROGATORY NO. 11:

2          Synaptics objects to this interrogatory on the ground that it is unduly burdensome and

3    overbroad.  Synaptics further objects to this interrogatory on the grounds that it is vague and

4    ambiguous as to timeframe.  Synaptics further objects to this interrogatory to the extent that it

5    seeks information that is not relevant to a claim or defense in this action and/or that is not

6    reasonably calculated to lead to the discovery of relevant or admissible evidence.  Synaptics

7    objects further to this interrogatory to the extent that it seeks information that is protected by

8    attorney-client privilege or the attorney work-product doctrine.

9          Subject to and without waiver of its General and Specific Objections, Synaptics responds

10   as follows:  Synaptics' policy on record-keeping may be found on the company's website,

11   www.synaptics.com, under the "Corporate Governance" tab.  In addition, pursuant to Federal

12   Rule of Civil Procedure 33(d), Synaptics agrees to produce non-privileged documents concerning

13   its document retention and destruction policies, to the extent such documents exist.

14

Dated:        August 24, 2006              KARL J. KRAMER
15                                         ROBERT L. McKAGUE
                                           ERIKA L. LABIT
16                                         MORRISON & FOERSTER LLP

17

18                                         By: _____
                                               Karl J. Kramer
19
                                           Attorneys for Defendant
20                                         SYNAPTICS, INC.

21

22

23

24

25

26

27

28

**EXHIBIT 2**

## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

**For the Fiscal Year Ended June 30, 2007**

**Commission File Number 000-49602**

# SYNAPTICS INCORPORATED
### (Exact name of registrant as specified in its charter)

| Delaware | 77-0118518 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 3120 Scott Blvd., Ste 130 Santa Clara, California | 95054 |
| (Address of principal executive offices) | (Zip Code) |

(408) 454-5100

Registrant's telephone number, including area code

### Securities registered pursuant to section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, par value $.001 per share | The Nasdaq Global Select Market |
| Preferred Stock Purchase Rights | The Nasdaq Global Select Market |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filed, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑        Accelerated Filer ☐        Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐   No ☑

The aggregate market value of Common Stock held by nonaffiliates of the registrant (24,894,527 shares) based on the closing price of the registrant's Common Stock as reported on the Nasdaq Global Select Market on December 29, 2006 of $29.69, was $739,118,507. For purposes of this computation, all officers, directors, and 10% beneficial owners of the registrant are deemed to be affiliates. Such determination should not be deemed to be an admission that such officers, directors, or 10% beneficial owners are, in fact, affiliates of the registrant.

As of August 1, 2007, there were outstanding 26,238,166 shares of the registrant's Common Stock, par value $.001 per share.

### Documents Incorporated by Reference

Portions of the registrant's definitive Proxy Statement for the 2007 Annual Meeting of Stockholders are incorporated by reference into Part III of this Form 10-K.

**SYNAPTICS INCORPORATED**
**ANNUAL REPORT ON FORM 10-K**
**FISCAL YEAR ENDED JUNE 30, 2007**

## TABLE OF CONTENTS

PART I

| | | |
|---|---|---|
| ITEM 1. | BUSINESS | 1 |
| ITEM 1A. | RISK FACTORS | 15 |
| ITEM 1B. | UNRESOLVED STAFF COMMENTS | 30 |
| ITEM 2. | PROPERTIES | 30 |
| ITEM 3. | LEGAL PROCEEDINGS | 30 |
| ITEM 4. | SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS | 30 |

PART II

| | | |
|---|---|---|
| ITEM 5. | MARKET FOR THE REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 31 |
| ITEM 6. | SELECTED FINANCIAL DATA | 34 |
| ITEM 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 35 |
| ITEM 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 51 |
| ITEM 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 52 |
| ITEM 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 52 |
| ITEM 9A. | CONTROLS AND PROCEDURES | 52 |
| ITEM 9B. | OTHER INFORMATION | 53 |

PART III

| | | |
|---|---|---|
| ITEM 10. | DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 54 |
| ITEM 11. | EXECUTIVE COMPENSATION | 54 |
| ITEM 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 54 |
| ITEM 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 54 |
| ITEM 14. | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 54 |

PART IV

| | | |
|---|---|---|
| ITEM 15. | EXHIBITS AND FINANCIAL STATEMENT SCHEDULES | 55 |
| SIGNATURES | | 57 |
| INDEX TO CONSOLIDATED FINANCIAL STATEMENTS | | F-1 |

EX-12.1
EX-21
EX-23.1
EX-31.1
EX-31.2
EX-32.1
EX-32.2

### Statement Regarding Forward-Looking Statements

*The statements contained in this report on Form 10-K that are not purely historical are forward-looking statements within the meaning of applicable securities laws. Forward-looking statements include statements regarding our "expectations," "anticipation," "intentions," "beliefs," or "strategies" regarding the future, whether or not those words are used. Forward-looking statements also include statements regarding revenue, margins, expenses, and earnings analysis for fiscal 2008 and thereafter; technological innovations; products or product development, including their performance, market position, and potential; our product development strategies; potential acquisitions or strategic alliances; the success of particular product or marketing programs; the amounts of revenue generated as a result of sales to significant customers; and liquidity and anticipated cash needs and availability. All forward-looking statements included in this report are based on information available to us as of the filing date of this report, and we assume no obligation to update any such forward-looking statements. Our actual results could differ materially from the forward-looking statements. Among the factors that could cause actual results to differ materially are the factors discussed in Item 1A. Risk Factors.*

Table of Contents

**PART I**

## ITEM 1. BUSINESS

### Overview

We are a leading worldwide developer and supplier of custom-designed user interface solutions that enable people to interact more easily and intuitively with a wide variety of mobile computing, communications, entertainment, and other electronic devices. We currently target the personal computer, or PC, market and the market for digital lifestyle products, including portable digital music and video players, mobile phones, and other select electronic device markets with our customized user interface solutions.

We are the global market leader in providing user interface solutions for notebook computers. Our original equipment manufacturer, or OEM, customers include tier one PC OEMs. We generally supply custom designed user interface solutions to our OEM customers through their contract manufacturers, which take delivery of our products and pay us directly for them. Through our new OneTouch offering, we now offer not only our custom module solutions but also access to our technologies to enable customers to develop their own user interface designs for capacitive buttons and scrolling applications for products such as mobile phones, portable digital music and video players, and notebook peripherals.

Our website is www.synaptics.com . Through our website, we make available free of charge all of our Securities and Exchange Commission filings, including our annual reports on Form 10-K, our proxy statements, our quarterly reports on Form 10-Q, and our current reports on Form 8-K as well as Form 3, Form 4, and Form 5 Reports for our directors, officers, and principal stockholders, together with amendments to those reports filed or furnished pursuant to Section 13(a), 15(d), or 16 under the Securities Exchange Act. These reports are available immediately after their electronic filing with the Securities and Exchange Commission. The website also includes corporate governance information, including our Code of Conduct, our Code of Ethics for the CEO and Senior Financial Officers, and our Board Committee Charters.

*PC Market*

We provide custom user interface solutions for navigation, cursor control, and multimedia controls for many of the world's premier PC OEMs. In addition to notebooks, other PC applications for our technology include peripherals, such as keyboards, mice, and monitors, as well as desktop and PC remote control applications. Our solutions for the PC market include the TouchPad™, a touch-sensitive pad that senses the position and movement of a person's finger on its surface; the TouchStyk™, a self contained, easily integrated pointing stick module; and dual pointing solutions, which combine both a TouchPad and a pointing stick into a single notebook computer, enabling users to use the interface of their choice. Additional products offered for the PC markets include LuxPad™, Dual Mode TouchPad, QuickStroke ®, RoundPad™, TouchRing™, ScrollStrip™, LightTouch™, SmartTouch, MobileTouch™, ClearPad™, NavPoint™, and OneTouch .

The latest industry projections for notebook unit growth for the period 2007-2011 show a compound annual growth rate of 15% compared with 3% for desktop computers, reflecting the continued migration of desktops to notebooks fueled by users' desire for mobile computing and on-the-go access to applications, information, and digital content, which is expanding on a daily basis. Based on the strength of our technology and engineering know-how, we believe we are well positioned to take advantage of the growth opportunity in the notebook market and to provide innovative, value-added user interface solutions for each of the key end-user preferences. We estimate that in our fiscal 2007 approximately 83% of all notebook computers sold used solely a touch pad interface; 2% used solely a pointing stick interface; and 15% used a dual pointing interface, which consists of both a touch pad and a pointing stick. Our notebook product lines of touch pads and pointing sticks allow us to address 100% of the notebook market.

*Digital Lifestyle Product Markets*

We believe our extensive intellectual property portfolio, our experience in providing user interface solutions to major OEMs of electronic devices, and our proven track record of growth in our expanding core notebook computer interface business position us to be a key technological enabler for multiple consumer electronic devices targeted to meet the growing digital lifestyle trend. Based on these strengths, we are addressing the

1

Table of Contents

opportunities created by the growth of mobile computing, communications, and entertainment devices within the digital lifestyle products markets. Digital lifestyle products include portable digital music and video players, mobile phones, remote controls, GPS devices, as well as a variety of mobile, handheld, wireless, and entertainment devices. We believe our existing technologies, our range of product solutions, and our emphasis on ease of use, small size, low power consumption, advanced functionality, durability, and reliability will enable us to serve multiple aspects of the markets for digital lifestyle products and other electronic devices.

Our array of user interface solutions for digital lifestyle products includes the ScrollStrip and TouchRing, which are scrolling solutions allowing users to navigate efficiently through menus and content; LightTouch capacitive buttons, which provide illuminated button functionality; and MobileTouch, NavPoint, and our ClearPad.

Industry projections for the portable digital music player market for the period 2007-2010 suggest a compound annual growth rate of 8% for the overall market and a compound annual growth rate of 32% for video capable MP3 players, reflecting the trend towards portable digital entertainment devices with advanced capabilities, such as built-in video playback capabilities. These products require a simple, durable, and intuitive user interface solution to enable the user to navigate efficiently through menus and scroll through extensive play lists, songs, and videos contained in the host device. We believe we are well positioned to take advantage of this growing market based on our technology, engineering know-how, and the acceptance of our user interface solutions by OEMs in this market.

Industry projections for the mobile phone market for the period 2007-2010 show a compound annual growth rate of 6% for the overall market and a compound annual growth rate of 55% for the smartphone market, reflecting the trend towards increased interest among non-business consumers and the trend towards greater functionality in smartphone products to meet and address the expanded needs and expectations of the consumer oriented market.

## Our Strategy

Our objective is to continue to enhance our position as a leading supplier of user interface solutions for the notebook computer market and to become a leading supplier of user interface solutions for digital lifestyle products. Key aspects of our strategy to achieve this objective include those set forth below.

### Extend Our Technological Leadership

We plan to utilize our extensive intellectual property portfolio and technological expertise to extend the functionality of our product solutions and offer innovative product solutions to customers across multiple markets. We intend to continue utilizing our technological expertise to reduce the overall size, weight, cost, and power consumption of our user interface solutions while increasing their applications, capabilities, and performance. We plan to continue enhancing the ease of use and functionality of our solutions. We also plan to expand our research and development efforts through increased investment in our engineering activities, the hiring of additional engineering personnel, and strategic acquisitions and alliances. We believe that these efforts will enable us to meet customer expectations and to achieve our goal of supplying on a timely and cost-effective basis the most advanced, easy-to-use, functional user interface solutions to our target markets.

### Enhance Our Position in the Notebook Computer and Portable Digital Music Player Markets

We intend to continue introducing market-leading user interface solutions in terms of performance, functionality, size, and ease of use. We plan to continue enhancing our customer's industrial design alternatives and device functionality through innovative product development based on our existing capabilities and technological advances.

### Capitalize on Growth of New Markets

We intend to capitalize on the growth of new markets, including the digital lifestyle products markets, brought about by the convergence of computing, communications, and entertainment devices. We plan to offer innovative, intuitive user interface solutions that address the evolving portability, connectivity, and functionality requirements of these new markets. We plan to offer these solutions to existing and potential OEM customers to enable increased functionality, reduced size, lower cost, and enhanced industrial design features and to enhance the

2

**Table of Contents**

user experience of their products. We plan to utilize our existing technologies as well as aggressively pursue new technologies as new markets evolve that demand new solutions.

*Emphasize and Expand Customer Relationships*

We plan to emphasize and expand our strong and long-lasting customer relationships and to establish successful relationships with new customers. In each market we serve, we plan to provide the most advanced user interface solutions for our customers' products. We believe that our user interface solutions enable our customers to deliver a positive user experience and to differentiate their products from those of their competitors. We continually attempt to enhance the competitive position of our customers by providing them with innovative, distinctive, and high-quality user interface solutions on a timely and cost-effective basis. To do so, we work continually to improve our productivity, to reduce costs, and to speed the delivery of our user interface solutions. We endeavor to streamline the entire design and delivery process through our ongoing design, engineering, and production improvement efforts. We also focus on providing timely support to our customers after the purchase of our user interface solutions.

We plan to increase our business with existing customers and attract new customers by offering design tools, documentation, a family of capacitive sensing ASICs, and technical support to enable them to develop their own user interface designs for capacitive buttons and scrolling applications in products such as mobile phones, portable digital music and video players, and notebook peripherals. As a result, customers will have a choice of determining the most optimal way to meet their emerging and growing needs: our traditional custom module solutions or OneTouch, which offers a flexible alternative when design integration or quick turns are important.

*Pursue Strategic Relationships and Acquisitions*

We intend to develop and expand strategic relationships to enhance our ability to offer value-added user interface solutions to our customers, penetrate new markets, and strengthen the technological leadership of our product solutions. We also consider the potential acquisition of companies in order to expand our technological expertise and to establish or strengthen our presence in selected target markets.

*Continue Virtual Manufacturing*

We plan to expand and diversify our production capacity through third-party relationships, thereby strengthening our virtual manufacturing platform. This strategy results in a scalable business model; enables us to concentrate on our core competencies of research and development, technological advances, and product design; and reduces our capital expenditures. Our virtual manufacturing strategy allows us to maintain a variable cost model, in which we do not incur most of our manufacturing costs until our product solutions have been shipped and billed to our customers.

**Product Solutions**

We develop and enhance interface technologies that enrich the user's experience in interacting with the user's mobile computing, communications, and entertainment devices. Our innovative and intuitive user interfaces can be engineered to accommodate many diverse platforms, and our expertise in human factors and usability can be utilized to improve the features and functionality of our solutions. Our extensive array of technologies includes ASICs, firmware, software, mechanical and electrical designs, and pattern recognition and touch sensing technologies.

Our custom-designed user interface solutions are custom engineered, total solutions for our customers and include sensor design, module layout, ASICs, firmware, and software features for which we provide manufacturing and design support and device testing. This allows us to be a one-stop supplier for complete user interface design from the early design stage, to manufacturing, to testing and support. Our OneTouch offering includes design tools, documentation, a family of capacitive sensing ASICs, and technical support to enable customers to develop their own user interface designs for capacitive buttons and scrolling applications. Through our technologies and expertise, we seek to provide our customers with solutions that address their individual design issues and result in high-performance, feature-rich, and reliable interface solutions. We believe our interface solutions offer the following characteristics:

Table of Contents

- *Ease of Use* . Our interface solutions offer the ease of use and intuitive interaction that users demand.

- *Small Size.* The small, thin size of our interface solutions enables our customers to reduce the overall size and weight of their products in order to satisfy consumer demand for portability.

- *Low Power Consumption* . The low power consumption of our interface solutions enables our customers to offer products with longer battery life or smaller battery size.

- *Advanced Functionality* . Our interface solutions offer advanced features, such as virtual scrolling, customizable tap zones, edge motion, and tapping and dragging icons, to enhance user experience.

- *Reliability* . The reliability of our interface solutions satisfies consumer requirements for dependability, which is a major component of consumer satisfaction.

- *Durability* . Our interface solutions withstand repeated use, harsh physical treatment, and temperature fluctuations while providing a superior level of performance.

We believe these characteristics will enable us to maintain our leadership position in the notebook computer market and to enhance our position as a technological enabler within the markets for digital lifestyle products and other electronic devices.

Our user interface solutions are intended to satisfy our customer's specification needs, including features and functionality, industrial design, mechanical, and electrical requirements. Our products also offer unique integration options, including allowing our capacitive sensors to be placed underneath the plastic of the device, which allows for streamlined and stylized designs, incorporating LEDs to indicate status or enhance industrial design, and incorporating tactile indicators, including ridges, Braille bumps, and textures designed to provide the user with additional feedback.

Our emphasis on technological leadership and design capabilities positions us to provide unique user interface solutions that address specific customer requirements. Our long-term working relationships with large, global OEMs provide us with experience in satisfying their demanding design specifications and other requirements. Our custom product solutions provide OEMs with numerous benefits, including the following:

- modular integration;

- reduced product development costs;

- shorter product time to market;

- compact and efficient platforms;

- improved product functionality and utility; and

- product differentiation.

We work with our customers in order to meet their technical and functional specifications, their industrial design requirements, and their desire to differentiate their products from those of their competitors. This collaborative effort reduces the duplication and overlap of investment and resources, enabling our OEM customers to devote more time and resources to the market development of their products.

We utilize capacitive technology rather than resistive or mechanical technology in our product solutions. Unlike resistive and mechanical technology, our solid state capacitive technology have no moving parts or activation force, thereby offering a durable, more reliable solution that can be integrated into both curved and flat surfaces. Capacitive technologies also allow for much thinner sensors than resistive or mechanical technology, providing for slimmer, more compact and unique industrial designs.

4

Table of Contents

## Products

Our family of product solutions allows our customers to solve their interface needs and differentiate their products from those of their competitors.

### TouchPad

Our TouchPad, which takes the place and exceeds the functionality of a mouse, is a small, touch-sensitive pad that senses the position of a person's finger on its surface through the measurement of capacitance. Our TouchPad provides an accurate, comfortable, and reliable method for screen navigation and cursor movement and provides a platform for interactive input. Our TouchPad solutions allow our customers to provide stylish, simple, user-friendly, and intuitive user interface solutions for both the consumer and corporate markets. Our TouchPad solutions offer various advanced features, including the following:

- *Virtual scrolling.* This feature enables the user to scroll through any document by swiping a finger along the side or bottom of the TouchPad.

- *Customizable tap zones.* These zones permit designated portions of the TouchPad to be used to simulate mouse clicks, launch applications, and perform other selected functions.

- *PalmCheck* ™. PalmCheck eliminates false activation when a person's palm accidentally rests on the TouchPad.

- *EdgeMotion* ™. This feature permits cursor movement to continue when a user's finger reaches the edge of the TouchPad.

- *Tapping and dragging of icons.* This feature allows the user to simply tap and hold on an icon in order to drag it, rather than being forced to hold a button down in order to drag an icon.

- *Multi-finger gestures.* This feature allows the user to designate specific actions when more than one finger is used on the TouchPad.

Our TouchPad solutions are available in a variety of sizes, electrical interfaces, and thicknesses. Our TouchPad solutions are designed to meet the electrical and mechanical specifications of our customers. Customized firmware and driver software ensure the availability of specialized features. As a result of their solid state characteristics, our TouchPad solutions have no moving parts that wear out, resulting in a robust and reliable input solution that also allows for unique industrial designs.

### TouchStyk

Our TouchStyk is a proprietary pointing stick interface solution. TouchStyk is a self-contained, easily integrated module that uses capacitive technology similar to that of our TouchPad. TouchStyk is enabled with press-to-select and tap-to-click capabilities and can be easily integrated into multiple computing and communications devices. In addition, our design greatly reduces susceptibility to electromagnetic interference, thereby providing greater pointing accuracy and preventing the pointer from drifting when not in use.

We are currently shipping our TouchStyk in notebooks, portable multimedia players, and ultra mobile personal computers. Our modular approach allows OEMs to include our TouchPad, our TouchStyk, or a combination of both interfaces in their products.

### Dual Pointing Solutions

Our dual pointing solutions offer a TouchPad with a pointing stick in a single notebook computer, enabling users to select their interface of choice. Our dual pointing solution also provides the end user the ability to use both interfaces interchangeably. Our dual pointing solution provides the following advantages:

- cost-effective and simplified OEM integration;

5

Table of Contents

- simplified OEM product line because one device contains both solutions;
- single-source supplier, which eliminates compatibility issues; and
- end user flexibility because one notebook can address both user preferences.

We have developed two solutions for use in the dual pointing market. Our first solution integrates all the electronics for controlling a third-party resistive strain gauge pointing stick onto our TouchPad PCB. This solution simplifies OEM integration by eliminating the need to procure the pointing stick electronics from another party and physically integrate them into the notebook. Our second dual pointing solution uses our TouchStyk rather than a third-party pointing stick and offers the same simplified OEM integration. The second solution is a completely modular design, allowing OEMs to offer TouchPad-only, TouchStyk-only, or dual pointing solutions on a build-to-order basis.

*LuxPad*

LuxPad is an innovative illuminated TouchPad. The LuxPad is designed to allow our customers to differentiate their products. The LuxPad can either light up the entire touchpad, light up a logo in the center of the TouchPad, or light up designated "virtual buttons" on the TouchPad, depending on the preference of the notebook designer.

*Dual Mode TouchPad*

Dual Mode TouchPad is designed to transform the TouchPad from a cursor control device to a launch and control center with the touch of a button. In default mode, the Dual Mode provides the same cursor control for on screen navigation as a standard TouchPad. When the user taps on a launch icon located on the TouchPad surface, icons illuminate on the TouchPad surface.

The Dual Mode offers a variety of customization options to the OEM, including tap zones for launching applications and multimedia controls, scrolling zones to adjust volume, and programmable buttons so end users can choose which application they would like to launch through our Dual Mode driver. To regain cursor control, the user simply taps the mode switch button and the illuminated icons disappear, allowing the user to control the cursor for on-screen navigation.

*QuickStroke*

QuickStroke provides a fast, easy, and accurate way to input Chinese characters. Using our recognition technology that combines our patented software with our TouchPad, QuickStroke can recognize handwritten, partially finished Chinese characters, thereby saving considerable time and effort. Our QuickStroke, which operates with our touch pad products, can be integrated into notebook computers, keyboards, and a host of stand-alone interface devices that use either a pen or a finger.

Our patented Incremental Recognition Technology allows users to simply enter the first few strokes of a Chinese character, and QuickStroke accurately interprets the intended character. Since the typical Chinese character consists of an average of 13 strokes, QuickStroke technology saves considerable time and effort. We can port different alphabets or characters to our underlying pattern recognition engine, allowing us to offer support for different languages.

*TouchRing*

Our TouchRing is an integrated, solid state scrolling wheel utilizing our capacitive touch sensing technology that enables the user to navigate through menus and scroll through lists. Our TouchRing is utilized in MP3 players, personal media players, and remote controls, enabling the user to navigate efficiently through menus and scroll through extensive play lists and songs.

6

**Table of Contents**

*ScrollStrip*

ScrollStrip is a one-dimensional TouchPad that provides a simple and intuitive way for users to scroll through menus, navigate through content, and adjust controls. A ScrollStrip can be used in a wide variety of applications that require a thin, robust, accurate, and easy-to-use input and navigation device, including PC peripherals, such as keyboards and mice, and digital lifestyle products. ScrollStrip is thin, lightweight, and flexible and can be mounted on curved surfaces to meet the industrial design needs of our OEM customers. Currently, the ScrollStrip is incorporated into a number of devices, including MP3 players, PC keyboards, and computer mice.

*LightTouch*

LightTouch is a simple, easy to use, stylish interface solution that replaces mechanical buttons with an illuminated sensor programmed to perform functions, such as multimedia controls, including pause, play, fast-forward, and rewind. LightTouch is designed for integration under the plastic face of a device, allowing for a sealed, thin design that is both stylish and durable. Currently, a number of custom LightTouch solutions are available in the market, including multimedia controls for notebook PCs, a multimedia keyboard, and as button controls for MP3 players.

*MobileTouch*

MobileTouch is a new product solution specifically designed for the mobile phone environment that combines our expertise in ease of use with our technology capabilities. The result is custom-designed modules that can combine our scrolling, selection, and navigation capabilities into a simple, easy to use interface solution that improves access to mobile phone content and applications. MobileTouch can be mounted beneath the plastic of the phone, making it well suited to the mobile phone environment where slim design and durability are essential.

*SmartTouch*

SmartTouch is a software-configurable auxiliary interface for notebook computers that enables notebook computer OEMs to offer their customers the advanced functionality and customizability of our software-configured LightTouch control bar with on-screen display. Our SmartTouch solution replaces conventional multimedia buttons with virtual contextual controls that automatically adapt to the software application that is being used at the time to present customized browser, media player, DVD player, or systems controls and enables users to personalize touch control behavior, including audio feedback, touch sensibility, illumination, control functions, and control placement.

*ClearPad*

ClearPad consists of a clear, thin capacitive sensor that can be placed over any viewable surface, including display devices, such as LCDs. Similar to our traditional TouchPad, our ClearPad has various distinct advantages, including light weight; low profile form factor; high reliability, durability, and accuracy; and low power consumption. ClearPad, can be mounted on or under curved surfaces, providing for unique and sleek industrial designs.

*NavPoint*

The NavPoint solution offers users improved functionality and versatility in accessing and managing content in handheld devices through unique navigation controls, including short- and long-distance scrolling features, tapping, and mouse-like cursor navigation.

*OneTouch*

OneTouch is a configurable solution based on our capacitive sensing technology, which includes a capacitive sensing ASIC, easy-to-use design tools, documentation, and technical support, that enables customers to develop their own custom interface designs in-house for capacitive buttons and scrolling applications in various products, including mobile phones, portable digital media players, and PC peripherals, such as monitors, keyboards, mice, and remote controls. OneTouch increases our reach from a customer standpoint by offering them an alternative and flexible way to leverage our technology and know-how whether through our traditional custom

7

**Table of Contents**

module solution or through the new OneTouch capability that allows them to implement capacitive sensing in-house when design integration or quick design turns are important.

**Technologies**

We have developed and own an extensive array of technologies, encompassing ASICs, firmware, software, pattern recognition, and touch sensing technologies. With 89 U.S. patents in force and 55 U.S. patents pending, as well as many non-U.S. counterparts, we continue to develop technology in these areas. We believe these technologies and the related intellectual property create barriers for competitors and allow us to provide user interface solutions in a variety of high-growth market segments.

Our broad line of user interface solutions currently is based upon the following key technologies:

* capacitive position sensing technology;

* capacitive force sensing technology;

* transparent capacitive position sensing technology;

* pattern recognition technology;

* mixed signal, very large scale integrated circuit, or VLSI, technology; and

* proprietary microcontroller technology.

In addition to these technologies, we develop firmware and driver software that we incorporate into our products, which provide unique features, such as virtual scrolling, customizable tap zones, PalmCheck, EdgeMotion, and tapping and dragging of icons. In addition, our ability to integrate all of our products to interface with major operating systems, including Windows 98, Windows 2000, Windows NT, Windows CE, Windows XP, Windows ME, Windows Vista, Mac OS, Pocket PC, Palm OS, Symbian, UNIX, and LINUX, provides us with a competitive advantage.

*Capacitive Position Sensing Technology.* This technology provides a method for sensing the presence, position, and contact area of one or more fingers or a conductive stylus on a flat or curved surface, such as our TouchPad, TouchRing, and ScrollStrip. Our technology works with very light touch and provides highly responsive cursor navigation, scrolling, and selection. It uses no moving parts, can be implemented under plastic, and is extremely durable.

*Capacitive Force Sensing Technology.* This technology senses the direction and magnitude of a force applied to an object. The object can either move when force is applied, like a typical joystick used for gaming applications, or it can be isometric, with no perceptible motion during use, like our TouchStyk. The primary competition for this technology is resistive strain gauge technology. Resistive strain gauge technology requires electronics that can sense very small changes in resistance, presenting challenges to the design of that circuitry, including sensitivity to electrical noise and interference. Our electronic circuitry determines the magnitude and direction of an applied force, permits very accurate sensing of tiny changes in capacitance, and minimizes electrical interference from other sources.

*Transparent Capacitive Position Sensing Technology.* This technology allows us to build transparent sensors for use with our capacitive position sensing technology, such as in our ClearPad. It has all the advantages of our capacitive position sensing technology and allows for visual feedback when incorporated with a display device, such as an LCD. Our technology does not require calibration, does not produce undesirable internal reflections, and has reduced power requirements, allowing for longer battery life.

*Pattern Recognition Technology.* This technology is a set of software algorithms and techniques for converting real-world data, such as handwriting, into a digital form that can be recognized and manipulated within a computer, such as our QuickStroke product and gesture decoding for our TouchPad products. Our technology provides reliable handwriting recognition and can be used in other applications such as signature verification.

8

Table of Contents

*Mixed Signal VLSI Technology.* This hybrid analog-digital integrated circuit technology combines the power of digital computation with the ability to interface with non-digital, real-world signals, such as the position of a finger or stylus on a surface. Our patented design techniques permit us to utilize this technology to optimize our core ASIC engine for all our products.

*Proprietary Microcontroller Technology.* This technology consists of a proprietary 16-bit microcontroller core embedded in the digital portion of our mixed signal ASIC, which allows us to optimize our ASIC for position sensing tasks. Our embedded microcontroller provides great flexibility in customizing our product solutions utilizing firmware, which eliminates the need to design new circuitry for each new application.

## Competing Technology

Many user interface solutions currently utilize resistive sensing technology. Resistive sensing technology consists of a flexible membrane above a flat, rigid, electrically conductive surface. When finger or stylus pressure is applied to the membrane, it deforms until it makes contact with the rigid layer below, at which point attached electronics can determine the position of the finger or stylus. Since the flexible membrane is a moving part, it is susceptible to mechanical wear and will eventually suffer degraded performance. Due to the way that resistive position sensors work, it is not possible for them to detect more than a single finger or stylus at any given time. The positional accuracy of a resistive sensor is limited by the uniformity of the resistive coating as well as by the mechanics of the flexible membrane. Finally, implementations of resistive technology over display devices, such as an LCD, result in reduced transmissivity, or the amount of light that can pass through the display, requiring the use of backlighting and thereby reducing the battery life of the device.

## Research and Development

We conduct ongoing research and development programs that focus on advancing our technologies, developing new products, improving design and manufacturing processes, and enhancing the quality and performance of our product solutions. Our goal is to provide our customers with innovative solutions that address their needs and improve their competitive positions. Our research and development is focused on advancing our existing interface technologies, improving our current product solutions, and expanding our technologies to serve new markets. Our vision is to offer user interface solutions, such as touch, handwriting, vision, and voice capabilities, that can be readily incorporated into varied electronic devices.

Our research and development programs focus on the development of accurate, easy to use, reliable, and intuitive user interfaces for electronic devices. We believe our innovative interface technologies can be applied to many diverse products. We believe the interface is a key factor in the differentiation of these products. We believe that our interface technologies enable us to provide customers with product solutions that have significant advantages over alternative technologies in terms of functionality, size, power consumption, durability, and reliability. We also intend to pursue strategic relationships and acquisitions to enhance our research and development capabilities, leverage our technology, and shorten our time to market with new technological applications.

Our research, design, and engineering teams frequently work directly with our customers to design custom solutions for specific applications. We focus on enabling our customers to overcome technical barriers and enhance the performance of their products. We believe our engineering know-how and electronic systems expertise provide significant benefits to our customers by enabling them to concentrate on their core competencies of production and marketing.

As of June 30, 2007, we employed 161 people in our technology, engineering, and product design functions in the United States, Hong Kong, and Taiwan. Our research and development expenses were approximately $25.0 million, $35.4 million, and $39.4 million in fiscal 2005, 2006, and 2007, respectively.

## Intellectual Property Rights

Our success and ability to compete depend in part on our ability to maintain the proprietary aspects of our technologies and products. We rely on a combination of patents, copyrights, trade secrets, trademarks, confidentiality agreements, and other contractual provisions to protect our intellectual property, but these measures

9

**Table of Contents**

may provide only limited protection. Our research, design, and engineering teams frequently work directly with our OEM customers to design custom solutions for specific applications.

We hold 89 U.S. patents in force and have 55 U.S. patents pending, as well as many non-U.S. counterparts to the U.S. patents and U.S. patents pending. Collectively, these patents and patents pending cover various aspects of our key technologies, including touch sensing, pen sensing, handwriting recognition, customizable tap zones, edge motion, and virtual scrolling technologies. Our proprietary software is protected by copyright laws. The source code for our proprietary software is also protected under applicable trade secret laws.

Our extensive array of technologies includes ASICs, firmware, software, and pattern recognition and position sensing technologies. Our products rely on a combination of these technologies, making it difficult to use any single technology as the basis for replicating our products. Furthermore, the length and customization of the customer design cycle serve to protect our intellectual property rights.

Patent applications that we have filed or may file in the future may not result in a patent being issued. Our issued patents may be challenged, invalidated, or circumvented, and claims of our patents may not be of sufficient scope or strength, or issued in the proper geographic regions, to provide meaningful protection or any commercial advantage. We have not applied for, and do not have, any copyright registration on our technologies or products. We have applied to register certain of our trademarks in the United States and other countries. There can be no assurance that we will obtain registrations of trademarks in key markets. Failure to obtain registrations could compromise our ability to protect fully our trademarks and brands and could increase the risk of challenge from third parties to our use of our trademarks and brands. In addition, our failure to enforce and protect our intellectual property rights or obtain from third parties the right to use necessary technology could have a material adverse effect on our business, financial condition, and results of operations.

We do not consistently rely on written agreements with our customers, suppliers, manufacturers, and other recipients of our technologies and products, and therefore some trade secret protection may be lost and our ability to enforce our intellectual property rights may be limited. Furthermore, our customers, suppliers, manufacturers, and other recipients of our technologies and products may seek to use our technologies and products without appropriate limitations. In the past, we did not consistently require our employees and consultants to enter into confidentiality agreements, employment agreements, or proprietary information and invention agreements. Therefore, our former employees and consultants may try to claim some ownership interest in our technologies and products and may use our technologies and products competitively and without appropriate limitations.

Other companies, including our competitors, may develop technologies that are similar or superior to our technologies, duplicate our technologies, or design around our patents and may have or obtain patents or other proprietary rights that would prevent, limit, or interfere with our ability to make, use, or sell our products. Effective intellectual property protection may be unavailable or limited in some foreign countries in which we operate, such as China and Taiwan. Unauthorized parties may attempt to copy or otherwise use aspects of our technologies and products that we regard as proprietary. There can be no assurance that our means of protecting our proprietary rights in the United States or abroad will be adequate or that competitors will not independently develop similar technologies. If our intellectual property protection is insufficient to protect our intellectual property rights, we could face increased competition in the market for our technologies and products.

We may receive notices from third parties that claim our products infringe their rights. From time to time, we receive notice from third parties of the intellectual property rights such parties have obtained. We cannot be certain that our technologies and products do not and will not infringe issued patents or other proprietary rights of third parties. Any infringement claims, with or without merit, could result in significant litigation costs and diversion of resources, including the payment of damages, which could have a material adverse effect on our business, financial condition, and results of operations.

**Customers**

Our customers include many of the world's largest PC OEMs, based on unit shipments, as well as a variety of consumer electronics manufacturers. Our demonstrated track record of technological leadership, design innovation, product performance, cost effectiveness, and on-time delivery have resulted in our leadership position in providing user interface solutions to the notebook market. We believe our strong relationship with our OEM

Table of Contents

customers, many of which are currently developing digital lifestyle products, will position us as a source of supply for their product offerings.

Our industry leading OEM customers in fiscal 2007 included the following:

- Acer
- Asustek
- Dell
- Fujitsu
- Gateway
- Hewlett-Packard
- IBM
- Lenovo
- LG Electronics
- NEC
- Samsung
- Toshiba

We generally supply custom-designed products to our OEM customers through their contract manufacturers. We sell our custom-designed products directly to these contract manufacturers, which include Compal, Hon Hai, Inventec, Kangzhun Electronical, Lenovo, Shanghai Yi Hsin, Wistron, and Zhan Yun Shanghai Electronics. Sales to Compal and Wistron in the aggregate accounted for approximately 26% of our net revenue for fiscal 2007, and sales to Inventec and Wistron in the aggregate accounted for approximately 24% of our net revenue for fiscal 2006. No other customer accounted for more than 10% of our net revenue for either fiscal 2006 or 2007. We supply our OneTouch solution directly to our OEM customers.

We consider both the OEMs and their contract manufacturers to be our customers. Both the OEMs and their contract manufacturers may determine the design and pricing requirements and make the overall decision regarding the use of our user interface solutions in their products. The contract manufacturers place orders with us for the purchase of our products, take title to the products purchased upon shipment by us, and pay us directly for those purchases. These customers have no return privileges except for warranty provisions.

## Strategic Relationships

We have used strategic relationships to enhance our ability to offer value-added customer solutions in the past and we intend to enter into additional strategic relationships with companies that may help us serve our target markets.

## Sales and Marketing

We sell our product solutions for incorporation into the products of our OEM customers. We generate sales through direct sales employees as well as outside sales representatives and distributors. Our sales personnel receive substantial technical assistance and support from our internal engineering resources because of the highly technical nature of our product solutions. Sales frequently result from multi-level sales efforts that involve senior management, design engineers, and our sales personnel interacting with our customers' decision makers throughout the product development and order process.

We currently employ 79 sales and marketing professionals. We maintain eight customer support offices domestically and internationally, which are located in the United States, Taiwan, China, Korea, Japan, Hong Kong, and Switzerland. In addition, we utilize sales representatives in Korea, Singapore, and Malaysia and sales distributors in Japan and Taiwan.

International sales constituted approximately 98%, 98%, and 99% of our revenue for fiscal 2005, 2006, and 2007, respectively. Over 90% of our sales were made to companies located in China and Taiwan that provide design and manufacturing services for major notebook computer and digital lifestyle product OEMs. All of our sales were denominated in U.S. dollars.

## Manufacturing

We employ a virtual manufacturing platform through third-party relationships. We currently utilize two semiconductor wafer manufacturers to supply us with silicon wafers integrating our proprietary design specifications. The completed silicon wafers are forwarded to third-party package and test processors for further processing into die and packaged ASICs, as applicable, which are then utilized in our custom interface products.

**Table of Contents**

After processing and testing, the die and ASICs are consigned to various contract manufacturers for assembly or, in the case of OneTouch ASICs are shipped directly to our customers. During the assembly process, our die or ASIC is combined with other components to complete the module for our custom user interface solution. The finished assembled product is subsequently shipped by our contract manufacturers directly to our customers for integration into their products.

We believe our virtual manufacturing strategy provides a scalable business model; enables us to concentrate on our core competencies of research and development, technological advances, and product design; and reduces our capital expenditures. In addition, this strategy significantly reduces our working capital requirements for inventory because we do not incur most of our manufacturing costs until we have actually shipped our interface products to our customers and billed those customers for those products.

Our third-party contract manufacturers are Asian-based organizations. We provide our contract manufacturers with six-month rolling forecasts of our production requirements. We do not, however, have long-term agreements with any of our contract manufacturers that guarantee production capacity, prices, lead times, or delivery schedules. The strategy of relying on those parties exposes us to vulnerability owing to our dependence on few sources of supply. We believe, however, that other sources of supply are available. In addition, we may establish relationships with other contract manufacturers in order to reduce our dependence on any one source of supply.

Periodically, we purchase inventory from our contract manufacturers when a customer's delivery schedule is delayed or a customer's order is cancelled. In those circumstances in which our customer has cancelled its order and we purchase inventory from our contract manufacturers, we consider a write-down to reduce the carrying value of the inventory purchased to its net realizable value. Write-downs to reduce the carrying value of obsolete, slow moving, and non-usable inventory to net realizable value are charged to cost of revenue.

**Backlog**

As of June 30, 2007, we had a backlog of orders of approximately $46.9 million, an increase of $18.2 million compared with our backlog of orders as of June 30, 2006 of approximately $28.7 million. The increase in backlog is primarily related to the increase in demand for our products. Our backlog consists of product orders for which purchase orders have been received and which are generally scheduled for shipment within three months. Most orders are subject to rescheduling or cancellation with limited penalties. Because of the possibility of customer changes in product shipments, our backlog as of a particular date may not be indicative of net sales for any succeeding period.

**Competition**

Our principal competitor in the sale of notebook touch pads is Alps Electric, a Japanese conglomerate. Our principal competitors in the sale of notebook pointing sticks are Alps Electric, NMB, and CTS. In the markets for digital lifestyle products and other electronic devices, our competitors include Alps Electric, Cypress, Quantum Technology Management, and various other companies involved in user interface solutions. In certain cases, large OEMs may develop alternative user interface solutions for their own products or provide key components for use in designing user interface solutions.

In the notebook user interface market, we plan to continue to compete primarily on the basis of our technological expertise, design innovation, customer service, and the long track record of performance of our user interface solutions, including their ease of use, reliability, and cost-effectiveness as well as their timely design, production, and delivery schedules. Our pointing stick solutions, including our proprietary TouchStyk, enable us to address the approximate 2% of the notebook computer market that uses solely a pointing stick rather than a touch pad as the user interface as well as the approximate 15% of the notebook market that uses dual pointing interfaces. Our ability to supply OEMs with TouchPads, TouchStyks, and dual pointing alternatives enhances our market position as we can provide OEMs with the following advantages:

- single source supplier to eliminate compatibility issues;

- cost-effective and simplified integration;

12

Table of Contents

- simplified product line to address both interface preferences;
- end user flexibility because one notebook can address both user preferences; and
- modular approach allowing OEMs to utilize our TouchPad, our TouchStyk, or a combination of both interfaces.

In the user interface markets for digital lifestyle products and other electronic devices, we compete primarily based on the advantages of our systems knowledge of capacitive sensing and neural pattern recognition technologies. We believe our solutions based engineering expertise coupled with our technologies offer benefits in terms of size, power consumption, durability, light transmissivity, resolution, ease of use, and reliability when compared to our competitors and other technologies. While these markets continue to evolve and we do not know what the competitive factors will ultimately be, we believe we are positioned to compete aggressively for this business based on our proven track record, our marquee global customer base, and our reputation for design innovation. However, some of our competitors have greater market recognition, larger customer bases, and substantially greater financial, technical, marketing, distribution, and other resources than we possess that afford them potential competitive advantages. As a result, they may be able to introduce new product solutions and respond to customer requirements more quickly than we can. In addition, new competitors, alliances among competitors, or alliances among competitors and OEMs may emerge and allow competitors to rapidly acquire significant market share.

Furthermore, our competitors or our customers may develop technologies in the future that more effectively address the user interface needs of the notebook market and other markets. Our sales, profitability, and success depend on our ability to compete with other suppliers of user interface solutions and components used in user interface solutions. Our competitive position could be adversely affected if one or more of our current OEMs reduce their orders or if we are unable to develop new customers for our user interface solutions.

## Employees

As of June 30, 2007, we employed a total of 312 persons, including 72 in finance, administration, and operations; 79 in sales and marketing; and 161 in research and development. Of these employees, 205 were located in North America, 106 in Asia/Pacific, and one in Europe. We consider our relationship with our employees to be good, and none of our employees are represented by a union in collective bargaining with us.

Competition for qualified personnel in our industry is extremely intense, particularly for engineering and other technical personnel. Our success depends on our continued ability to attract, hire, and retain qualified personnel.

## Executive Officers

The following table sets forth certain information regarding our executive officers:

| Name | Age | Position |
| --- | --- | --- |
| Francis F. Lee | 55 | President, Chief Executive Officer, and Director |
| Thomas J. Tiernan | 44 | Executive Vice President and General Manager |
| Russell J. Knittel | 57 | Executive Vice President, Chief Financial Officer, Chief Administrative Officer, Secretary, and Treasurer |
| Shawn P. Day, Ph.D. | 41 | Vice President and Chief Technical Officer |
| Alex Wong | 51 | Vice President of World Wide Operations |

13

Table of Contents

*Francis F. Lee* has served as a director and the President and Chief Executive Officer of our company since January 1999. He was a consultant from August 1998 to November 1998. From May 1995 until July 1998, Mr. Lee served as General Manager of NSM, a Hong Kong-based joint venture between National Semiconductor Corporation and S. Megga. Mr. Lee held a variety of executive positions for National Semiconductor from 1988 until August 1995. These positions included Vice President of Communication and Computing Group, Vice President of Quality and Reliability, Director of Standard Logic Business Unit, and various other operations and engineering management positions. Mr. Lee is a director of Foveon, Inc., a privately held company in which we have an ownership interest. Mr. Lee holds a Bachelor of Science degree, with honors, in electrical engineering from the University of California at Davis.

*Thomas J. Tiernan* has been Executive Vice President and General Manager of our company since July 2007. Mr. Tiernan served as Senior Vice President of our company from March 2006 until July 2007. Prior to joining our company, Mr. Tiernan served as Vice President and General Manager of Symbol Technologies' Mobile Computing Division. From 1985 to 2004, Mr. Tiernan held various management and executive positions at Hewlett-Packard, including running the Network Storage business in the Americas, the Enterprise Systems business in Asia Pacific, and the PC business in Japan. Mr. Tiernan holds a Bachelor's Degree in Electrical Engineering from California State Polytechnic University and a Masters of Science in Computer Engineering from Santa Clara University.

*Russell J. Knittel* has been Executive Vice President, Chief Financial Officer, of our company since July 2007 and Chief Financial Officer, Chief Administrative Officer, Secretary, and Treasurer of our company since November 2001. Mr. Knittel served as Senior Vice President of our company from April 2000 until July 2007. He served as the Vice President of Administration and Finance, Chief Financial Officer, and Secretary of our company from April 2000 through October 2001. Mr. Knittel served as Vice President and Chief Financial Officer of Probe Technology Corporation from May 1999 to March 2000. He was a consultant from January 1999 until April 1999. Mr. Knittel was Vice President and Chief Financial Officer at Starlight Networks from November 1994 to December 1998. Mr. Knittel holds a Bachelor of Arts degree in accounting from California State University at Fullerton and a Masters of Business Administration from San Jose State University.

*Shawn P. Day, Ph.D.* has been Vice President and Chief Technical Officer of our company since July 2007. He served as our Vice President of Research and Development of our company from June 1998 through July 2007; as the Director of Software Development of our company from November 1996 until May 1998; and as principal software engineer of our company from August 1995 until October 1996. Mr. Day holds a Bachelor of Science degree and a Doctorate, both in electrical engineering, from the University of British Columbia in Vancouver, Canada.

*Alex Wong* has been the Vice President of World Wide Operations of our company since September 2006. From 2003 to 2006, Mr. Wong served our company as Managing Director of Hong Kong and Director of Operations. Prior to joining Synaptics, Mr. Wong held various management positions with National Semiconductor, including General Manager for National Joint Ventures in China and Hong Kong as well as the Director of Corporate Business Development. Mr. Wong holds a Bachelor of Science degree in Computer Science from California State University at Northridge and a Masters in Business Administration from the University of East Asia, Macau.

14

Table of Contents

## ITEM 1A. RISK FACTORS

You should carefully consider the following factors, together with all the other information included in this report, in evaluating our company and our business.

**We currently depend on our TouchPad and TouchStyk products, and the notebook computer market, for a significant portion of our revenue, and a downturn in these products or market could have a disproportionate impact on our revenue.**

Historically, we have derived a substantial portion of our revenue from the sale of our TouchPad and TouchStyk products for notebook computers. While our long-term objective is to derive revenue from multiple user interface solutions for both the notebook computer market and the markets for digital lifestyle products and other electronic devices, we anticipate that sales of our TouchPads and TouchStyks for notebooks will continue to represent a significant portion of our revenue. The PC market as a whole has experienced a slowdown in the rate of growth. A continued or accelerated softening in the demand in the notebook portion of the PC market or the level of our participation in that market would cause our business, financial condition, and results of operations to suffer more than they would have if we offered a more diversified line of products.

**Net revenue from our user interface solutions for digital lifestyle products have been volatile in the past, and our net revenue from our user interface solutions for digital lifestyle products may not increase or be less volatile in the future.**

Net revenue from our user interface solutions for digital lifestyle products, particularly portable digital music players, have been volatile in the past, and sales for other digital lifestyle products, such as mobile phones, have not been significant to date. Our net revenue from our user interface solutions for digital lifestyle products may not increase or be less volatile in the future. Net revenue from our user interface solutions for digital lifestyle products were $27.0 million, or 15% of our net revenue, in fiscal 2006 and $40.6 million, or 15% of our net revenue, in fiscal 2007. Further, our interface business for digital lifestyle products faces many uncertainties, particularly portable digital music players, including our success in penetrating new markets dominated by a limited number of OEMs. Our inability to address these uncertainties successfully and to become a leading supplier of user interfaces for digital lifestyle products would result in a slower growth rate than we currently anticipate. We do not know whether our user interface solutions for the digital lifestyle product market will gain market acceptance or will ever result in a substantial portion of our revenue on a consistent basis. The failure to succeed in these other markets would result in no return on the substantial investments we have made to date and plan to make in the future to penetrate these markets.

**We cannot assure you that our user interface business for digital lifestyle products will be successful or that we will be able to generate significant revenue from the markets for digital lifestyle products.**

Various target markets for our interfaces, such as those for smart phones, GPS devices, smart handheld devices, and interactive games and toys, are uncertain, may develop slower than anticipated, or could utilize competing technologies. The market for certain of these products depends in part upon the development and deployment of wireless and other technologies, which may or may not address the needs of users of these new products.

Our ability to generate significant revenue from the markets for certain digital lifestyle products and other electronic devices will depend on various factors, including the following:

- the development and growth of these markets;

- the ability of our technologies and product solutions to address the needs of these markets, the requirements of OEMs, and the preferences of end users; and

- our ability to provide OEMs with user interface solutions that provide advantages in terms of size, power consumption, reliability, durability, performance, and value-added features compared with alternative solutions.

15

Table of Contents

Many manufacturers of these products have well-established relationships with competitive suppliers. Penetrating these markets will require us to offer better performance alternatives to existing solutions at competitive costs. We generally do not have a significant backlog of orders for our user interface solutions to be incorporated in products in these markets. The failure of any of these target markets to develop as we expect, or our failure to penetrate these markets to a significant extent, will impede our anticipated sales growth and could result in substantially reduced earnings from those we anticipate. We cannot predict the size or growth rate of these markets or the market share we will achieve in these markets in the future.

**Our historical financial performance is based primarily on net revenue generated from our user interface solutions to the notebook computer market and may not be indicative of our future performance in other markets.**

Our historical financial performance primarily reflects net revenue generated from our user interface solutions for notebook computers. While we expect sales of our user interface solutions for notebook computers to continue to generate a substantial percentage of our revenue, we expect to derive an increasing portion of our revenue from sales of our product solutions for digital lifestyle products, including portable digital music players, mobile phones, and other electronic devices. We have a limited operating history in these markets, especially for mobile phones, upon which you can evaluate our prospects, which may make it difficult to predict our actual results in future periods. Actual results of our future operations may differ materially from our anticipated results.

**Market acceptance of our customers' existing or new products that utilize our user interface solution may decline or may not develop and, as a result, our sales may decline or may not increase.**

We do not sell any products to end users. Instead, we design various user interface solutions that our OEM customers incorporate into their products. As a result, our success depends almost entirely upon the widespread market acceptance of our OEM customers' products. We do not control or influence the manufacture, promotion, distribution, or pricing of the products that incorporate our user interface solutions. Instead, we depend on our customers to manufacture and distribute products incorporating our user interface solutions and to generate consumer demand through marketing and promotional activities. Even if our technologies successfully meet our customers' price and performance goals, our sales would decline or fail to develop if our customers do not achieve commercial success in selling their products that incorporate our user interface solutions.

Competitive advances by OEMs in the PC or digital lifestyle product markets, which do not utilize our user interface solutions broadly in their product offerings, at the expense of our other OEM customers could result in lost sales opportunities. Within the digital lifestyle product market, the portable digital music player market also has become an important factor in our operating results. Any significant slowdown in the use of our user interface solutions by our customers in this market, the reduced demand for our customers' products, or a slowdown in this market would adversely affect our sales.

**If we fail to maintain and build relationships with our customers and do not continue to satisfy our customers, we may lose future sales and our revenue may stagnate or decline.**

Because our success depends on the widespread market acceptance of our customers' products, we must continue to maintain our relationships with the leading notebook computer and portable digital music player OEMs and expand our relationships with mobile phone OEMs. In addition, we must identify areas of significant growth potential in other markets, establish relationships with OEMs in those markets, and assist those OEMs in developing products that use our interface technologies. Our failure to identify potential growth opportunities, particularly in new markets, or establish and maintain relationships with OEMs in those markets, would prevent our business from growing in those markets.

Our ability to meet the expectations of our customers requires us to provide innovative user interface solutions for customers on a timely and cost-effective basis and to maintain customer satisfaction with our user interface solutions. We must match our design and production capacity with customer demand, maintain satisfactory delivery schedules, and meet performance goals. If we are unable to achieve these goals for any reason, our customers could reduce their purchases from us and our sales would decline or fail to develop.

Our customer relationships also can be affected by factors affecting our customers that are unrelated to our performance. These factors can include a myriad of situations, including business reversals of customers,

16

Table of Contents

determinations by customers to change their product mix or abandon business segments, or mergers, consolidations, or acquisitions involving our customers, such as the combination of Compaq and Hewlett-Packard or the acquisition of IBM's PC business unit by Lenovo.

**Two customers accounted for an aggregate of 26% of our net revenue in fiscal 2007, and the loss of revenue from these customers could harm our business, financial condition, and results of operations.**

Sales to two customers that provide contract manufacturing services to major OEMs accounted for an aggregate of 26% of our net revenue for the fiscal ended June 30, 2007, and two customers accounted for an aggregate of 24% of our net revenue for the fiscal ended June 30, 2006. These customers were Compal and Wistron in fiscal 2007 and Inventec and Wistron in fiscal 2006. Additionally, receivables from each of Compal and Zhan Yun Shanghai Electronics exceeded 10% of accounts receivable and in the aggregate represented 29% of accounts receivable at June 30, 2007.

Compal, Inventec, Wistron, and Zhan Yun Shanghai Electronics are contract manufacturers that serve our OEM customers. Any material delay, cancellation, or reduction of orders from any one or more of these contract manufacturers or the OEMs they serve could harm our business, financial condition, and results of operations. The adverse effect would be more substantial if our other customers in the notebook computer industry do not increase their orders or if we are unsuccessful in generating orders for user interface solutions in the markets for digital lifestyle products and other electronic devices, from existing or new customers. Many of these contract manufacturers sell to the same OEMs, and therefore our concentration with certain OEMs may be higher than with any individual contract manufacturer. Concentration in our customer base may make fluctuations in revenue and earnings more severe and make business planning more difficult.

**We rely on others for our production and any interruptions of these arrangements could disrupt our ability to fill our customers' orders.**

We utilize contract manufacturers for all of our production requirements. The majority of our manufacturing is conducted in China, Hong Kong, Singapore, Taiwan, and Thailand by contract manufacturers that also perform services for numerous other companies. We do not have a guaranteed level of production capacity with any of our contract manufacturers. Qualifying new contract manufacturers, and specifically semiconductor foundries, is time consuming and might result in unforeseen manufacturing and operations problems. The loss of our relationships with our contract manufacturers or assemblers or their inability to conduct their manufacturing and assembly services for us as anticipated in terms of cost, quality, and timeliness could adversely affect our ability to fill customer orders in accordance with required delivery, quality, and performance requirements. If this were to occur, the resulting decline in revenue would harm our business.

**We depend on third parties to maintain satisfactory manufacturing yields and delivery schedules, and their inability to do so could increase our costs, disrupt our supply chain, and result in our inability to deliver our products, which would adversely affect our results of operations.**

We depend on our contract manufacturers to maintain high levels of productivity and satisfactory delivery schedules at manufacturing and assembly facilities located primarily in China, Hong Kong, Singapore, Taiwan, and Thailand. We provide our contract manufacturers with six-month rolling forecasts of our production requirements. We do not, however, have long-term agreements with any of our contract manufacturers that guarantee production capacity, prices, lead times, or delivery schedules. Our contract manufacturers serve other customers, a number of which have greater production requirements than we do. As a result, our contract manufacturers could determine to prioritize production capacity for other customers or reduce or eliminate deliveries to us on short notice. At times, we have experienced lower than anticipated manufacturing yields and lengthening of delivery schedules. Lower than expected manufacturing yields could increase our costs or disrupt our supplies. We may encounter lower manufacturing yields and longer delivery schedules in commencing volume production of our new products. Any of these problems could result in our inability to deliver our product solutions in a timely manner and adversely affect our operating results.

17

Table of Contents

**Shortages of components and materials may delay or reduce our sales and increase our costs, thereby harming our results of operations.**

The inability to obtain sufficient quantities of components and other materials necessary for the production of our products could result in reduced or delayed sales or lost orders. Any delay in or loss of sales could adversely impact our operating results. Many of the materials used in the production of our products are available only from a limited number of foreign suppliers, particularly suppliers located in Asia. In most cases, neither we nor our contract manufacturers have long-term supply contracts with these suppliers. As a result, we are subject to economic instability in these Asian countries as well as to increased costs, supply interruptions, and difficulties in obtaining materials. Our customers also may encounter difficulties or increased costs in obtaining the materials necessary to produce their products into which our product solutions are incorporated.

From time to time, materials and components used in our product solutions or in other aspects of our customers' products have been subject to allocation because of shortages of these materials and components. Shortages in the future could cause delayed shipments, customer dissatisfaction, and lower revenue.

**We are subject to lengthy development periods and product acceptance cycles, which can result in development and engineering costs without any future revenue.**

We provide user interface solutions that are incorporated by OEMs into the products they sell. OEMs make the determination during their product development programs whether to incorporate our user interface solutions or pursue other alternatives. This process requires us to make significant investments of time and resources in the design of user interface solutions well before our customers introduce their products incorporating these interfaces and before we can be sure that we will generate any significant sales to our customers or even recover our investment. During a customer's entire product development process, we face the risk that our interfaces will fail to meet our customer's technical, performance, or cost requirements or that our products will be replaced by competitive products or alternative technological solutions. Even if we complete our design process in a manner satisfactory to our customer, the customer may delay or terminate its product development efforts. The occurrence of any of these events could cause sales to not materialize, to be deferred, or to be cancelled, which would adversely affect our operating results.

**We do not have long-term purchase commitments from our customers, and their ability to cancel, reduce, or delay orders could reduce our revenue and increase our costs.**

Our customers do not provide us with firm, long-term volume purchase commitments, but instead issue purchase orders. As a result, customers can cancel purchase orders or reduce or delay orders at any time. The cancellation, delay, or reduction of customer purchase orders could result in reduced revenue, excess inventory, and unabsorbed overhead. We have an established presence in the notebook computer market and have only recently established a presence in the digital lifestyle products markets. Our success in the digital lifestyle product market will require us to establish the value added by our products to OEMs that have traditionally used other solutions. All of the markets we serve are subject to severe competitive pressures, rapid technological change, and product obsolescence, which increase our inventory and overhead risks, resulting in increased costs.

**We face intense competition that could result in our losing or failing to gain market share and suffering reduced revenue.**

We serve intensely competitive markets that are characterized by price erosion, rapid technological change, and competition from major domestic and international companies. This intense competition could result in pricing pressures, lower sales, reduced margins, and lower market share. Any movement away from high-quality, custom designed, feature-rich user interface solutions to lower priced alternatives would adversely affect our business. Some of our competitors, particularly in the markets for digital lifestyle products and other electronic devices, have greater market recognition, larger customer bases, and substantially greater financial, technical, marketing, distribution, and other resources than we possess and that afford them competitive advantages. As a result, they may be able to devote greater resources to the promotion and sale of products, to negotiate lower prices for raw materials and components, to deliver competitive products at lower prices, and to introduce new product solutions and respond to customer requirements more quickly than we can. Our competitive position could suffer if one or more of our customers determine not to utilize our custom engineered, total solutions approach and instead decide to design and manufacture their own interfaces, to contract with our competitors, or to use alternative technologies.

18

Table of Contents

Our ability to compete successfully depends on a number of factors, both within and outside our control. These factors include the following:

- our success in designing and introducing new user interface solutions, including those implementing new technologies;

- our ability to predict the evolving needs of our customers and to assist them in incorporating our technologies into their new products;

- our ability to meet our customer's requirements for low power consumption, ease of use, reliability, durability, and small form factor;

- the quality of our customer services;

- the rate at which customers incorporate our user interface solutions into their own products;

- product or technology introductions by our competitors; and

- foreign currency fluctuations, which may cause a foreign competitor's products to be priced significantly lower than our product solutions.

**If we do not keep pace with technological innovations, our products may not be competitive and our revenue and operating results may suffer.**

We operate in rapidly changing markets. Technological advances, the introduction of new products, and new design techniques could adversely affect our business unless we are able to adapt to the changing conditions. Technological advances could render our solutions obsolete, and we may not be able to respond effectively to the technological requirements of evolving markets. As a result, we will be required to expend substantial funds for and commit significant resources to

- continue research and development activities on existing and potential user interface solutions,

- hire additional engineering and other technical personnel, and

- purchase advanced design tools and test equipment.

Our business could be harmed if we are unable to develop and utilize new technologies that address the needs of our customers, or our competitors or customers do so more effectively than we do.

**Our efforts to develop new technologies may not result in commercial success, which could cause a decline in our revenue and could harm our business.**

Our research and development efforts with respect to new technologies may not result in customer or market acceptance. Some or all of those technologies may not successfully make the transition from the research and development lab to cost-effective production as a result of technology problems, competitive cost issues, yield problems, and other factors. Even when we successfully complete a research and development effort with respect to a particular technology, our customers may decide not to introduce or may terminate products utilizing the technology for a variety of reasons, including the following:

- difficulties with other suppliers of components for the products,

- superior technologies developed by our competitors and unfavorable comparisons of our solutions with these technologies,

- price considerations, and

- lack of anticipated or actual market demand for the products.

19

Table of Contents

The nature of our business requires us to make continuing investments for new technologies. Significant expenses relating to one or more new technologies that ultimately prove to be unsuccessful for any reason could have a material adverse effect on us. In addition, any investments or acquisitions made to enhance our technologies may prove to be unsuccessful. If our efforts are unsuccessful, our business could be harmed.

**We may not be able to enhance our existing product solutions and develop new product solutions in a timely manner.**

Our future operating results will depend to a significant extent on our ability to continue to provide new user interface solutions that compare favorably with alternative solutions on the basis of time to introduction, cost, performance, and end user preferences. Our success in maintaining existing and attracting new customers and developing new business depends on various factors, including the following:

- innovative development of new solutions for customer products,

- utilization of advances in technology,

- maintenance of quality standards,

- efficient and cost-effective solutions, and

- timely completion of the design and introduction of new user interface solutions.

We recently introduced our OneTouch product offering to enable our customers to access our technologies to develop their own user interface designs for capacitive buttons and scrolling applications for products such as mobile phones, portable digital music and video players, and notebook peripherals. OneTouch may not enable us to achieve our goal of increasing our business with existing customers or attracting new customers. In addition, OneTouch could reduce demand for our custom-designed user interface solutions.

Our inability to enhance our existing product solutions and develop new product solutions on a timely basis could harm our operating results and impede our growth.

**A technologically new user interface solution that achieves significant market share could harm our business.**

Our user interface solutions are designed to integrate touch, handwriting, and vision capabilities. New computing and communications devices could be developed that call for a different interface solution. Existing devices also could be modified to allow for a different interface solution. Our business could be harmed if our products become noncompetitive as a result of a technological breakthrough that allows a new interface solution to displace our solutions and achieve significant market acceptance.

**International sales and manufacturing risks could adversely affect our operating results.**

Our manufacturing and assembly operations are primarily conducted in China, Hong Kong, Singapore, Taiwan, and Thailand by manufacturing contractors. We have sales and logistics operations in Hong Kong, and sales support operations in China, Japan, Korea, Switzerland, and Taiwan. These international operations expose us to various economic, political, and other risks that could adversely affect our operations and operating results, including the following:

- difficulties and costs of staffing and managing a multi-national organization,

- unexpected changes in regulatory requirements,

- differing labor regulations,

- potentially adverse tax consequences,

- tariffs and duties and other trade barrier restrictions,

20

Table of Contents

- possible employee turnover or labor unrest,
- greater difficulty in collecting accounts receivable,
- the burdens and costs of compliance with a variety of foreign laws,
- potentially reduced protection for intellectual property rights, and
- political or economic instability in certain parts of the world.

The risks associated with international operations could negatively affect our operating results.

**Our business may suffer if international trade is hindered, disrupted, or economically disadvantaged.**

Political and economic conditions abroad may adversely affect the foreign production and sale of our products. Protectionist trade legislation in either the United States or foreign countries, such as a change in the current tariff structures, export or import compliance laws, or other trade policies, could adversely affect our ability to sell user interface solutions in foreign markets and to obtain materials or equipment from foreign suppliers.

Changes in policies by the U.S. or foreign governments resulting in, among other things, higher taxation, currency conversion limitations, restrictions on the transfer of funds, or the expropriation of private enterprises also could have a material adverse effect on us. Any actions by countries in which we conduct business to reverse policies that encourage foreign investment or foreign trade also could adversely affect our operating results. In addition, U.S. trade policies, such as "most favored nation" status and trade preferences for certain Asian nations, could affect the attractiveness of our services to our U.S. customers and adversely impact our operating results.

**Our operating results could be adversely affected by fluctuations in the value of the U.S. dollar against foreign currencies.**

We transact business predominantly in U.S. dollars and bill and collect our sales in U.S. dollars. A weakening of the dollar could cause our overseas vendors to require renegotiation of either the prices or currency we pay for their goods and services. In the future, customers may negotiate pricing and make payments in non-U.S. currencies. For fiscal 2007, approximately 5% of our costs were denominated in non-U.S. currencies, including Hong Kong dollars, British pounds, Taiwan dollars, Japanese yen, Korean won, Chinese yuan, and Swiss francs.

If our overseas vendors or customers require us to transact business in non-U.S. currencies, fluctuations in foreign currency exchange rates could affect our cost of goods, operating expenses, and operating margins and could result in exchange losses. In addition, currency devaluation can result in a loss to us if we hold deposits of that currency. Hedging foreign currencies can be difficult, especially if the currency is not freely traded. We cannot predict the impact of future exchange rate fluctuations on our operating results. We currently do not hedge any foreign currencies, accordingly, we have no foreign currency hedge contracts outstanding as of the end of our fiscal year.

**A majority of our contract manufacturers are located in China, Hong Kong, Singapore, Taiwan, and Thailand increasing the risk that a natural disaster, labor strike, war, or political unrest in those countries would disrupt our operations.**

A majority of our contract manufacturers are located in China, Hong Kong, Singapore, Taiwan, and Thailand. Events out of our control, such as earthquakes, fires, floods, or other natural disasters, or political unrest, war, labor strikes, or work stoppages in these countries would disrupt their operations, which would impact our operations. The risk of earthquakes in Taiwan is significant because of its proximity to major earthquake fault lines. An earthquake, such as the one that occurred in Taiwan in September 1999, could cause significant delays in shipments of our product solutions until we are able to shift our outsourced operations. In addition, there is political tension between China and Taiwan that could lead to hostilities. If any of these events occur, we may not be able to obtain alternative capacity. Failure to secure alternative capacity could cause a delay in the shipment of our product solutions, which would cause our revenue to fluctuate or decline.

21

Table of Contents

**Variability of customer requirements resulting in cancellations, reductions, or delays may adversely affect our operating results.**

We must provide increasingly rapid product turnaround and respond to ever-shorter lead times. A variety of conditions, both specific to individual customers and generally affecting the demand for OEMs' products, may cause customers to cancel, reduce, or delay orders. Cancellations, reductions, or delays by a significant customer or by a group of customers may adversely affect our revenue; and could require us to repurchase inventory from our contract manufacturers, which could adversely affect our costs. On occasion, customers require rapid increases in production, which can strain our resources and reduce our margins. Although we have been able to obtain increased production capacity from our third-party manufacturers, we may be unable to do so at any given time to meet our customers' demands if their demands exceed anticipated levels.

**Our operating results may experience significant fluctuations that could result in a decline in the price of our stock.**

In addition to the variability resulting from the short-term nature of our customers' commitments, other factors contribute to significant periodic and seasonal quarterly fluctuations in our results of operations. These factors include the following:

- the cyclicality of the markets we serve;

- the timing and size of orders;

- the volume of orders relative to our capacity;

- product introductions and market acceptance of new products or new generations of products;

- evolution in the life cycles of our customers' products;

- timing of expenses in anticipation of future orders;

- changes in product mix, including the percentage of dual pointing and single pointing products shipped;

- availability of manufacturing and assembly services;

- changes in cost and availability of labor and components;

- the expanded use of high-cost third-party components in the products we sell;

- timely delivery of product solutions to customers;

- pricing and availability of competitive products;

- introduction of new technologies into the markets we serve;

- emergence of new competitors;

- pressures on reducing selling prices;

- the absolute and relative levels of corporate enterprise and consumer notebook purchases;

- our success in serving new markets, and

- changes in economic conditions.

Accordingly, you should not rely on period-to-period comparisons as an indicator of our future performance. Negative or unanticipated fluctuations in our operating results may result in a decline in the price of our stock.

22

Table of Contents

**If we fail to manage our growth effectively, our infrastructure, management, and resources could be strained, our ability to effectively manage our business could be diminished, and our operating results could suffer.**

The failure to manage our growth effectively could strain our resources, which would impede our ability to increase revenue. We have increased the number of our user interface solutions and plan to expand further the number and diversity of our solutions and their use in the future. Our ability to manage our planned diversification and growth effectively will require us to

- successfully hire, train, retain, and motivate additional employees, including employees outside the United States;

- enhance our global operational, financial, and management systems; and

- expand our production capacity.

In connection with the expansion and diversification of our product and customer base, we are increasing our personnel and making other expenditures to meet the increased demand we anticipate for our expanding product offerings, including offerings in the notebook computer and digital lifestyle markets. Increases in the demand for our products will require further expansion of our traditional notebook computer business as well as an increasing presence in the digital lifestyle product market, including portable digital music and video players and mobile phones. To date, our sales in the portable digital music and video player market has varied significantly from quarter to quarter and our mobile phone business is in its formative stage. Risks are further increased because customers do not commit to firm production schedules for more than a short time in advance. Any increase in expenses in anticipation of future orders that do not materialize would adversely affect our profitability. Our customers also may require rapid increases in design and production services that place an excessive short-term burden on our resources and the resources of our third-party manufacturers. If we cannot manage our growth effectively, our business and results of operations could suffer.

**We depend on key personnel who would be difficult to replace, and our business will likely be harmed if we lose their services or cannot hire additional qualified personnel.**

Our success depends substantially on the efforts and abilities of our senior management and other key personnel. The competition for qualified management and key personnel, especially engineers, is intense. Although we maintain noncompetition and nondisclosure covenants with most of our key personnel, we do not have employment agreements with most of them. The loss of services of one or more of our key employees or the inability to hire, train, and retain key personnel, especially engineers and technical support personnel, and capable sales and customer-support employees outside the United States, could delay the development and sale of our products, disrupt our business, and interfere with our ability to execute our business plan.

**Our inability to protect our intellectual property could impair our competitive advantage, reduce our revenue, and increase our costs.**

Our success and ability to compete depend in part on our ability to maintain the proprietary aspects of our technologies and products. We rely on a combination of patents, copyrights, trade secrets, trademarks, confidentiality agreements, and other contractual provisions to protect our intellectual property, but these measures may provide only limited protection. We license from third parties certain technology used in and for our products. These third-party licenses are granted with restrictions, and there can be no assurances that such third-party technology will remain available to us on terms beneficial to us. Our failure to enforce and protect our intellectual property rights or obtain from third parties the right to use necessary technology could have a material adverse effect on our business, financial condition, and results of operations. In addition, the laws of some foreign countries do not protect proprietary rights as fully as do the laws of the United States.

Patents may not issue from the patent applications that we have filed or may file in the future. Our issued patents may be challenged, invalidated, or circumvented, and claims of our patents may not be of sufficient scope or strength, or issued in the proper geographic regions, to provide meaningful protection or any commercial advantage. We have not applied for, and do not have, any copyright registration on our technologies or products. We have applied to register certain of our trademarks in the United States and other countries. There can be no assurance that we will obtain registrations of principle or other trademarks in key markets. Failure to obtain registrations could

23

Table of Contents

compromise our ability to protect fully our trademarks and brands and could increase the risk of challenge from third parties to our use of our trademarks and brands.

We do not consistently rely on written agreements with our customers, suppliers, manufacturers, and other recipients of our technologies and products, and therefore some trade secret protection may be lost and our ability to enforce our intellectual property rights may be limited. Additionally, our customers, suppliers, manufacturers, and other recipients of our technologies and products may seek to use our technologies and products without appropriate limitations. In the past, we did not consistently require our employees and consultants to enter into confidentiality agreements, employment agreements, or proprietary information and invention assignment agreements. Therefore, our former employees and consultants may try to claim some ownership interest in our technologies and products and may use our technologies and products competitively and without appropriate limitations.

**We may be required to incur substantial expenses and divert management attention and resources in defending intellectual property litigation against us.**

We may receive notices from third parties that claim our products infringe their rights. From time to time, we receive notice from third parties of the intellectual property rights such parties have obtained. We cannot be certain that our technologies and products do not and will not infringe issued patents or other proprietary rights of others. While we are not currently subject to any infringement claim, any future claim, with or without merit, could result in significant litigation costs and diversion of resources, including the attention of management, and could require us to enter into royalty and licensing agreements, any of which could have a material adverse effect on our business. There can be no assurance that such licenses could be obtained on commercially reasonable terms, if at all, or that the terms of any offered licenses would be acceptable to us. If forced to cease using such technology, there can be no assurance that we would be able to develop or obtain alternate technology. Accordingly, an adverse determination in a judicial or administrative proceeding or failure to obtain necessary licenses could prevent us from manufacturing, using, or selling certain of our products, which could have a material adverse effect on our business, financial condition, and results of operations.

Furthermore, parties making such claims could secure a judgment awarding substantial damages, as well as injunctive or other equitable relief that could effectively block our ability to make, use, or sell our products in the United States or abroad. Such a judgment could have a material adverse effect on our business, financial condition, and results of operations. In addition, we are obligated under certain agreements to indemnify the other party in connection with infringement by us of the proprietary rights of third parties. In the event we are required to indemnify parties under these agreements, it could have a material adverse effect on our business, financial condition, and results of operations.

**We may incur substantial expenses and divert management resources in prosecuting others for their unauthorized use of our intellectual property rights.**

The markets in which we compete are characterized by frequent litigation regarding patents and other intellectual property rights. Other companies, including our competitors, may develop technologies that are similar or superior to our technologies, duplicate our technologies, or design around our patents and may have or obtain patents or other proprietary rights that would prevent, limit, or interfere with our ability to make, use, or sell our products. Effective intellectual property protection may be unavailable or limited in some foreign countries in which we operate, such as China and Taiwan. Unauthorized parties may attempt to copy or otherwise use aspects of our technologies and products that we regard as proprietary. There can be no assurance that our means of protecting our proprietary rights in the United States or abroad will be adequate or that competitors will not independently develop similar technologies. If our intellectual property protection is insufficient to protect our intellectual property rights, we could face increased competition in the market for our technologies and products.

Should any of our competitors file patent applications or obtain patents that claim inventions also claimed by us, we may choose to participate in an interference proceeding to determine the right to a patent for these inventions because our business would be harmed if we fail to enforce and protect our intellectual property rights. Even if the outcome is favorable, this proceeding could result in substantial cost to us and disrupt our business.

In the future, we also may need to file lawsuits to enforce our intellectual property rights, to protect our trade secrets, or to determine the validity and scope of the proprietary rights of others. This litigation, whether

24

Table of Contents

successful or unsuccessful, could result in substantial costs and diversion of resources, which could have a material adverse effect on our business, financial condition, and results of operations.

**If we become subject to product returns and product liability claims resulting from defects in our products, we may fail to achieve market acceptance of our products and our business could be harmed.**

We develop complex products in an evolving marketplace and generally warrant our products for a period of 12 months or more from the date of sale. Despite testing by us and our customers, defects may be found in existing or new products. In fiscal 2001, a manufacturing error of one of our contract manufacturers was discovered. Although the error was promptly discovered without significant interruption of supply and the contract manufacturer rectified the problem at its own cost, any such manufacturing errors or product defects could result in a delay in recognition or loss of revenue, loss of market share, or failure to achieve market acceptance. Additionally, these defects could result in financial or other damages to our customers; cause us to incur significant warranty, support, and repair costs; and divert the attention of our engineering personnel from our product development efforts. In such circumstances, our customers could also seek and obtain damages from us for their losses. A product liability claim brought against us, even if unsuccessful, would likely be time-consuming and costly to defend. The occurrence of these problems would likely harm our business.

**Potential strategic alliances may not achieve their objectives, and the failure to do so could impede our growth.**

We anticipate that we will enter into strategic alliances. Among other matters, we continually explore strategic alliances designed to enhance or complement our technology or to work in conjunction with our technology; to provide necessary know-how, components, or supplies; and to develop, introduce, and distribute products utilizing our technology. Any strategic alliances may not achieve their intended objectives, and parties to our strategic alliances may not perform as contemplated. The failure of these alliances may impede our ability to introduce new products and enter new markets.

**Any acquisitions that we undertake could be difficult to integrate, disrupt our business, dilute stockholder value, and harm our operating results.**

We expect to pursue opportunities to acquire other businesses and technologies in order to complement our current user interface solutions, expand the breadth of our markets, enhance our technical capabilities, or otherwise offer growth opportunities. While we have no current definitive agreements underway, we may acquire businesses, products, or technologies in the future. If we make any future acquisitions, we could issue stock that would dilute existing stockholders' percentage ownership, incur substantial debt, assume contingent liabilities, or experience higher operating expenses. Our experience in acquiring other businesses and technologies is limited. Potential acquisitions also involve numerous risks, including the following:

- problems assimilating the purchased operations, technologies, or products;
- unanticipated costs associated with the acquisition;
- diversion of management's attention from our core businesses;
- adverse effects on existing business relationships with suppliers and customers;
- risks associated with entering markets in which we have little or no prior experience; and
- potential loss of key employees of purchased organizations.

We cannot assure you that we would be successful in overcoming problems encountered in connection with any acquisitions, and our inability to do so could disrupt our operations and adversely affect our business.

**The PC and electronics industries are cyclical and may result in fluctuations in our operating results.**

The PC and electronics industries have experienced significant economic downturns at various times. These downturns are characterized by diminished product demand, accelerated erosion of average selling prices, and

25

production overcapacity. In addition, the PC and electronics industries are cyclical in nature. We seek to reduce our exposure to industry downturns and cyclicality by providing design and production services for leading companies in rapidly expanding industry segments. We may, however, experience substantial period-to-period fluctuations in future operating results because of general industry conditions or events occurring in the general economy.

**The valuation of our technology conducted in connection with our international operating structure may be challenged, which could result in additional taxes, interest, and penalties.**

In fiscal 2005, we implemented an international operating structure. Under this structure, generally, one of our affiliates licensed from us certain rights to the pre-existing and in-process technology associated with our products for exploitation in all geographic markets except the U.S., Japanese, and Korean markets, which we refer to as "ROW markets." Our affiliate also acquired ownership of all future economic rights to product sales in ROW markets by entering into an agreement to license certain intangibles and a cost-sharing agreement under which we and our affiliate will share research and development costs in accordance with certain tax rules and regulations. We believe this structure appropriately reflects where our profits are generated and may result in future tax advantages to us, but there can be no assurances that this will be the case.

**We expect to incur additional expenses in complying with corporate governance and public disclosure requirements.**

Changing laws, regulations, and standards relating to corporate governance and public disclosure, including the Sarbanes-Oxley Act of 2002, new SEC regulations, and Nasdaq Global Select Market rules, are creating uncertainty and increased expenses for companies such as ours. These new or changed laws, regulations, and standards are subject to varying interpretations in many cases due to their lack of specificity and, as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies, which could result in continuing uncertainty regarding compliance matters and higher costs necessitated by ongoing revisions to disclosure and governance practices. We are committed to maintaining high standards of corporate governance and public disclosure. As a result, our efforts to comply with evolving laws, regulations, and standards have resulted in, and are likely to continue to result in, increased general and administrative expenses and a diversion of management time and attention from revenue-generating activities to compliance activities. In particular, our efforts to comply with Section 404 of the Sarbanes-Oxley Act of 2002 and the related regulations regarding our required assessment of our internal control over financial reporting and our external auditors' audit of our internal controls over financial reporting has required the commitment of significant financial and managerial resources. We expect these efforts to require the continued commitment of significant resources. In addition, it has become more difficult and more expensive for us to obtain director and officer liability insurance. As a result, we may have difficulty attracting and retaining qualified board members, which could harm our business. If our efforts to comply with new or changed laws, regulations, and standards differ from the activities intended by regulatory or governing bodies due to ambiguities related to practice, our reputation may be harmed.

**The accounting requirements for income taxes on certain of our share-based awards will subject our future quarterly and annual effective tax rates to greater volatility and, consequently, our ability to estimate reasonably our future quarterly and annual effective tax rates is greatly diminished.**

In accordance with Statement of Financial Accounting Standards ("SFAS") No. 123R, "Share-Based Payment" ("SFAS 123R"), we recognize tax benefit upon expensing certain share-based awards associated with our share-based compensation plans, including nonqualified stock options and deferred stock unit awards, but under current accounting standards we cannot recognize tax benefit currently for those share-based compensation expenses associated with incentive stock options and employee stock purchase plan shares (qualified stock options). For qualified stock options that vested after our adoption of SFAS 123R, we recognize tax benefit only in the period when disqualifying dispositions of the underlying stock occur and, for qualified stock options that vested prior to our adoption of SFAS 123R, the tax benefit is recorded directly to additional paid-in capital. Accordingly, because we cannot recognize the tax benefit for share-based compensation expense associated with qualified stock options until the occurrence of future disqualifying dispositions of the underlying stock and such disqualified dispositions may happen in periods when our stock price substantially increases, and because a portion of that tax benefit may be directly recorded to additional paid-in capital, our future quarterly and annual effective tax rates will be subject to greater volatility and, consequently, our ability to estimate reasonably our future quarterly and annual effective tax rates is greatly diminished.

Table of Contents

**Future changes in financial accounting standards or practices may cause adverse unexpected fluctuations and affect our reported results of operations.**

A change in accounting standards or practices could have a significant effect on our reported results of operations. New accounting pronouncements and varying interpretations of accounting pronouncements have occurred in the past and may occur in the future. Changes to existing rules or the questioning of current practices may adversely affect our reported financial results or the way we conduct our business. For example, the Financial Accounting Standards Board issued SFAS 123R requiring us to recognize all share-based payments to employees, including grants of stock options, in the financial statements based on their grant date fair value eliminating the pro forma footnote disclosures that were allowed as an alternative to financial statement recognition. This requirement, while not affecting our cash flow, adversely affected our reported financial results and impaired our ability to provide guidance on our future reported financial results as a result of the variability of the factors used to establish the grant date fair value of stock options and the accounting for income taxes thereon.

**We increased our leverage as a result of the sale of our 0.75% convertible senior subordinated notes.**

As a result of the sale of our 0.75% convertible senior subordinated notes in fiscal 2005, we incurred $125 million of indebtedness. As a result of this indebtedness, our interest payment obligations have increased. Our interest payment obligations on the notes is approximately $938,000 annually. The degree to which we are now leveraged could have adverse consequences, including the following:

- a limitation on our ability to obtain future financing for working capital, acquisitions, or other purposes;

- an increase in our vulnerability to industry downturns and competitive pressures; and

- a possible competitive disadvantage with less leveraged competitors and competitors that may have better access to capital resources.

Our ability to meet our debt service obligations will depend upon our future performance, which will be subject to the financial, business, and other factors affecting our operations, many of which are beyond our control.

**We made an irrevocable election to cash settle the $125 million principal amount of our convertible senior subordinated notes in April 2007. If we do not have sufficient cash resources when settlement occurs we may be in breach of our obligation or we may be required to borrow cash to meet our obligation.**

We made an irrevocable election to cash settle the $125 million principal amount of our convertible senior subordinated notes in April 2007. If we do not have sufficient cash resources when settlement occurs, we may be in breach of our obligation or we may be required to borrow cash to meet our obligation, which may not be available on favorable terms or at all.

**A substantial portion of our short-term investment portfolio is invested in auction rate securities and if an auction fails for amounts we have invested, our investment will not be liquid. If the issuer is unable to successfully close future auctions and their credit rating deteriorates, we may be required to adjust the carrying value of our investment through an impairment charge.**

A substantial portion of our investment portfolio is invested in auction rate securities and if an auction fails for amounts we have invested, our investment will not be liquid. In the event we need to access these funds, we will not be able to until a future auction on these investments is successful. If the issuer is unable to successfully close future auctions and their credit rating deteriorates, we may be required to adjust the carrying value of the investment through an impairment charge.

**Legislation affecting the markets in which we compete could adversely affect our ability to implement our growth strategies.**

Our ability to expand our business may be adversely impacted by future laws or regulations. Our customers' products may be subject to laws relating to environmental regulations, communications, encryption

27

Table of Contents

technology, electronic commerce, e-signatures, and privacy. Any of these laws could be expensive to comply with, and the marketability of our products could be adversely affected.

**We must finance the growth of our business and the development of new products, which could have an adverse effect on our operating results.**

To remain competitive, we must continue to make significant investments in research and development, marketing, and business development. Our failure to increase sufficiently our net revenue to offset these increased costs would adversely affect our operating results.

From time to time, we may seek additional equity or debt financing to provide for funds required to expand our business. We cannot predict the timing or amount of any such requirements at this time. If such financing is not available on satisfactory terms, we may be unable to expand our business or to develop new business at the rate desired and our operating results may suffer. Debt financing increases expenses and must be repaid regardless of operating results. Equity financing could result in additional dilution to existing stockholders.

**Continuing uncertainty of the U.S. and global economy may have serious implications for the growth and stability of our business and may negatively affect our stock price.**

The revenue growth and profitability of our business depends significantly on the overall demand in the notebook computer market and in the markets for digital lifestyle products and other electronic devices. Softening demand in these markets caused by ongoing economic uncertainty may result in decreased revenue or earnings levels or growth rates. The U.S. and global economy has been historically cyclical, and market conditions continue to be challenging, which has resulted in individuals and companies delaying or reducing expenditures. Further delays or reductions in spending could have a material adverse effect on demand for our products, and consequently on our business, financial condition, results of operations, prospects, and stock price.

**The market price of our common stock has been and may continue to be volatile.**

The trading price of our common stock has been and may continue to be subject to wide fluctuations in response to various factors, including the following:

- variations in our quarterly results;

- the financial guidance we may provide to the public, any changes in such guidance, or our failure to meet such guidance;

- changes in financial estimates by industry or securities analysts or our failure to meet such estimates;

- various market factors or perceived market factors, including rumors, whether or not correct, involving us, our customers, our suppliers, or our competitors;

- announcements of technological innovations by us or by our competitors;

- introductions of new products or new pricing policies by us or by our competitors;

- acquisitions or strategic alliances by us or by our competitors;

- recruitment or departure of key personnel;

- the gain or loss of significant orders;

- the gain or loss of significant customers;

- market conditions in our industry, the industries of our customers, and the economy as a whole;

- hedging activities by investors holding positions in our convertible senior subordinated notes; and

28

Table of Contents

- general financial market conditions or occurrences.

In addition, stocks of technology companies have experienced extreme price and volume fluctuations that often have been unrelated or disproportionate to these companies' operating performance. Public announcements by technology companies concerning, among other things, their performance, accounting practices, or legal problems could cause the market price of our common stock to decline regardless of our actual operating performance.

**Our charter documents and Delaware law could make it more difficult for a third party to acquire us, and discourage a takeover.**

Our certificate of incorporation and the Delaware General Corporation Law contain provisions that may have the effect of making more difficult or delaying attempts by others to obtain control of our company, even when these attempts may be in the best interests of our stockholders. Our certificate of incorporation also authorizes our board of directors, without stockholder approval, to issue one or more series of preferred stock, which could have voting and conversion rights that adversely affect or dilute the voting power of the holders of common stock. Delaware law also imposes conditions on certain business combination transactions with "interested stockholders." Our certificate of incorporation divides our Board of Directors into three classes, with one class to stand for election each year for a three-year term after the initial election. The classification of directors tends to discourage a third party from initiating a proxy solicitation or otherwise attempting to obtain control of our company and may maintain the incumbency of our Board of Directors, as this structure generally increases the difficulty of, or may delay, replacing a majority of directors. Our certificate of incorporation authorizes our Board of Directors to fill vacancies or newly created directorships. A majority of the directors then in office may elect a successor to fill any vacancies or newly created directorships.

**Our stockholders' rights plan may adversely affect existing stockholders.**

Our stockholders' rights plan may have the effect of deterring, delaying, or preventing a change in control that might otherwise be in the best interests of our stockholders. In general, stock purchase rights issued under the rights plan become exercisable when a person or group acquires 15% or more of our common stock or a tender offer or exchange offer of 15% or more of our common stock is announced or commenced. After any such event, our other stockholders may purchase additional shares of our common stock at 50% of the then-current market price. The rights will cause substantial dilution to a person or group that attempts to acquire us on terms not approved by our board of directors. The rights should not interfere with any merger or other business combination approved by our board of directors as the rights may be redeemed by us at $0.01 per stock purchase right at any time before any person or group acquires 15% or more of our outstanding common stock. The rights expire in August 2012.

**Sales of large numbers of shares could adversely affect the price of our common stock.**

All of the 26,238,166 shares of our common stock outstanding as of August 1, 2007 are eligible for resale in the public markets. Of these shares, 1,343,639 shares held by affiliates are eligible for resale in the public markets subject to compliance with the volume and manner of sale rules of Rule 144 or 701 under the Securities Act of 1933, as amended, and the balance of the shares are eligible for resale in the public markets either as unrestricted shares or pursuant to Rule 144(k). In general, under Rule 144 as currently in effect, any person (or persons whose shares are aggregated for purposes of Rule 144) who beneficially owns restricted securities with respect to which at least one year has elapsed since the later of the date the shares were acquired from us, or from an affiliate of ours, is entitled to sell within any three-month period a number of shares that does not exceed the greater of 1% of the then outstanding shares of our common stock and the average weekly trading volume in common stock during the four calendar weeks preceding such sale. Sales under Rule 144 also are subject to certain manner-of-sale provisions and notice requirements and to the availability of current public information about us.

Rule 701, as currently in effect, permits our employees, officers, directors, and consultants who purchase shares pursuant to a written compensatory plan or contract to resell these shares in reliance upon Rule 144, but without compliance with specific restrictions. Rule 701 provides that affiliates may sell their Rule 701 shares under Rule 144 without complying with the holding period requirement and that non-affiliates may sell their shares in reliance on Rule 144 without complying with the holding period, public information, volume limitation, or notice provisions of Rule 144. A person who is not an affiliate, who has not been an affiliate within three months prior to sale, and who beneficially owns restricted securities with respect to which at least two years have elapsed since the later of the date the shares were acquired from us, or from an affiliate of ours, is entitled to sell such shares under

29

Rule 144(k) without regard to any of the volume limitations or other requirements described above. Sales of substantial amounts of common stock in the public market could adversely affect prevailing market prices.

We have registered an aggregate of $100 million of common stock and preferred stock for issuance in connection with acquisitions, which shares generally will be freely tradeable after their issuance under Rule 145 of the Securities Act, unless held by an affiliate of the acquired company, in which case such shares will be subject to the volume and manner of sale restrictions of Rule 144 discussed above. The issuance or subsequent sale of these shares in the public market could adversely affect prevailing market prices.

We have registered an aggregate of $125 million of our 0.75% Convertible Senior Subordinated Notes due 2024 and the common stock issuable upon conversion of the notes. The shares issued upon conversion generally will be freely tradeable after their issuance, unless held by an affiliate, in which case such shares will be subject to the volume and manner of sale restrictions of Rule 144 discussed above. The issuance or subsequent sale of these shares in the public market could negatively affect the market price of our common stock.

We have registered for offer and sale the shares of common stock that are reserved for issuance pursuant to our outstanding share-based compensation plans. Shares issued after the effective date of such registration statements in connection with our share-based compensation plans generally will be eligible for sale in the public market, except that affiliates will continue to be subject to volume limitations and other requirements of Rule 144. The issuance or subsequent sale of such shares could depress the market price of our common stock.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

Not applicable.

## ITEM 2. PROPERTIES

Our principal executive offices as well as our principal research, development, sales, marketing, and administrative functions are located in our 70,000 square foot facility in Santa Clara, California. We believe this facility will be adequate to meet our needs for the foreseeable future. Our Asia/Pacific headquarters are located in Hong Kong where we lease approximately 13,300 square feet. We also maintain approximately 10,000 square feet of office space in Taiwan, approximately 4,600 square feet of office space in China, approximately 2,500 square feet of office space in Korea, and less than 1,000 square feet of office space in both Japan and Switzerland. We have satellite sales support offices in Thailand and Texas.

## ITEM 3. LEGAL PROCEEDINGS

In March 2006, Elantech Devices Corporation ("Elantech") filed a Complaint for Patent Infringement against us claiming that we infringed one of its patents and seeking damages, attorneys' fees, and a permanent injunction against us infringing or inducing others to infringe the patent. In April 2006, we filed our Answer to the Complaint and Counterclaims against Elantech claiming that Elantech has infringed and induced infringement of four of our patents and seeking damages, attorneys' fees, and a permanent injunction against infringing or inducing others to infringe.

Elantech responded to our counterclaim denying liability and counterclaimed seeking an injunction and damages for alleged violations of California law. We subsequently filed a motion to dismiss the Elantech counterclaims that was granted in July 2006 with leave to amend the counterclaims after the adjudication of the patent infringement claims. We intend to vigorously defend our patents and pursue our counterclaims. We have not recorded any liability associated with Elantech's claims and have expensed as incurred all legal fees associated with the legal proceedings.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

Not applicable.

**EXHIBIT 3**

**Software technology**                                                                                              **GlidePoint™**

The drivers are manufactured in ALPS to respond to customized specifications.

The IC design technology and software technology of ALPS support GlidePoint™ development in response to a variety of needs. The company develops digital/analog-combined ASICs that achieve both low power consumption and high reliability, as well as developing the drivers completely within ALPS to respond to customization in terms of language and functions.
Arranging virtual scroll bars and buttons on the surface of the touch pad results in a comfortable one-finger operation.



■ Touch Pad Driver



http://www3.alps.com/WebObjects/catalog.woa/E/HTML/InputDevice/index.html

**EXHIBIT 4**

1    KARL J. KRAMER (CA SBN 136433)
     ROBERT L. McKAGUE (CA SBN 187461)
2    ERIKA L. LABIT (CA SBN 234919)
     MORRISON & FOERSTER LLP
3    755 Page Mill Road
     Palo Alto, California  94304-1018
4    Telephone: (650) 813-5600
     Facsimile: (650) 494-0792
5    kkramer@mofo.com

6    Attorneys for Defendant
     SYNAPTICS, INC.
7

8                 UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10                SAN FRANCISCO DIVISION

11

| | |
|---|---|
| 12   ELANTECH DEVICES CORPORATION, a corporation existing under the laws of Taiwan, 13   R.O.C., | Case No.    3:06-CV-01839 CRB |
| | **SYNAPTICS' AMENDED PATENT LOCAL RULE 3-1, 3-2 DISCLOSURES** |
| 14            Plaintiff, | |
| 15       v. | |
| 16   SYNAPTICS, INC., a Delaware corporation; AVERATEC, INC., a California corporation; and 17   PROSTAR COMPUTER, INC., a California corporation, | |
| 18            Defendants. | |
| 19 | |
| 20   AND RELATED COUNTERCLAIMS | |

21

22

23

24

25

26

27

28

1    Pursuant to Patent L.R. 3-1 and 3-2, Counterclaimant Synaptics, Inc. ("Synaptics")

2    hereby submits the following Disclosure of Asserted Claims and Preliminary Infringement

3    Contentions regarding infringement of U.S. Patent Nos. 5,543,591 ("the '591 patent"),

4    5,880,411 ("the '411 patent"), 5,943,052 ("the '052 patent"), and 6,380,931 ("the '931 patent")

5    (collectively the "Synaptics Patents") to Counterclaim Defendant Elantech Devices

6    Corporation ("Elantech").

7         **(a)     The Claims Asserted To Be Infringed**

8    Synaptics presently asserts that Elantech is liable under Title 35 United States Code

9    Section 271 for infringement of Claims 14-15 and 18-19 of the '052 Patent, claims 46 and 48-

10   52 of the '411 Patent, claims 1, 5, and 6 of the '931 Patent, and claims 6 and 9 of the '591

11   Patent.  Synaptics has yet to receive a full production or disclosure of documents or

12   information from Elantech.  Elantech has not fully stated its interpretation of the claims of the

13   Synaptics Patents and has not explained its contention that it allegedly does not infringe the

14   asserted claims of the Synaptics Patents.  Synaptics reserves the right to amend or otherwise

15   modify its identification if further relevant information is revealed or circumstances change.

16   Although Synaptics has set forth disclosure with respect to all terms of the asserted claims,

17   some of the terms in the claims may not be properly construed as limitations of the claims.

18   That issue will be resolved in connection with the claim construction proceedings and nothing

19   herein shall be deemed an admission concerning which claim terms are or are not limitations of

20   the claims.

21        **(b)     The Accused Instrumentalities**

22   Elantech develops, markets, sells and distributes Elantech TouchPad devices, including,

23   but not limited to, those devices identified in Elantech's Response to Interrogatory No. 1,

24   served on August 18, 2006 (the "Elantech TouchPads").  At present, Synaptics believes that

25   Elantech's  TP3, KTP3, and KTP5 TouchPad devices practice the inventions claimed in the

26   Synaptics Patents.  In addition, it is currently believed that Elantech's KTP6 TouchPad devices

27   also practice the inventions claimed in the Synaptics Patents, although Synaptics has not had an

28   opportunity to test the KTP6 TouchPad.  The Elantech TouchPads are incorporated into and

1    work in conjunction with other hardware and software for sale to and use by end-users ("end-

2    products").  Such end products include the ProStar M55G and Averatec 3700.  These end

3    products have already been adjudged and enjoined in the United States as infringing devices.

4    Other end products including Elantech's infringing TouchPad devices are currently believed to

5    include:  Addict Avenger, ASI EL80, MSI L725, Nogware Savage 150, Overam Mirage 5500,

6    Quandra CNT 1016, Sager NP3880, 4880, 5950, and 6630, and ProStar M38AW, M400A,

7    M4A, M55N, M56A, M57A, M57U, M59K and M66N.  Synaptics has reason to believe, but

8    has not been able to confirm with certainty, that the following end products also include

9    Elantech TouchPad devices:  Clevo M400A, M560A, M570A, MSI 1035, Compal EL 80 and

10   FL 30, Acer 3004, Acer Travel Mate C300, and Acer Aspire 5504.  Further end products will

11   be identified in discovery as Elantech discloses further end products into which its infringing

12   TouchPads have been incorporated.  The Elantech TouchPad devices, as incorporated into end

13   products and used by end users, are the Accused Instrumentalities.

14        Elantech conducts its commercial activities regarding its TouchPad devices with

15   knowledge and intent that they are incorporated into end products and imported into, sold,

16   offered for sale, and/or used in the United States.  Elantech designs its TouchPad devices to be

17   used in a manner that infringes the asserted claims of the Synaptics Patents and Elantech

18   instructs end-users of end products to use the Elantech TouchPads in a manner that infringes

19   the asserted claims of the Synaptics' Patents.  Elantech has had knowledge of the Synaptics

20   Patents, and its infringement of the asserted claims of the Synaptics Patents since at least

21   December 18, 2003.

22        Synaptics has yet to receive a full production or disclosure of documents and other

23   information relating to the Elantech TouchPad devices.  Elantech has not fully stated its

24   interpretation of the claims of the Synaptics Patents and has not explained its contention that it

25   allegedly does not infringe the asserted claims of the Synaptics Patents.  Synaptics reserves the

26   right to amend or otherwise modify its identification if further relevant information is revealed

27   or circumstances change.

28

SYNAPTICS' PATENT LOCAL RULE 3-1, 3-2 DISCLOSURES
CASE NO. 3:06-CV-01839 CRB                                              2

1

**(c)     The Preliminary Infringement Contentions Chart**

2      The Preliminary Infringement Contentions Charts attached hereto identify specifically

3  where each element of each asserted claim is found within each Accused Instrumentality.

4  Synaptics has yet to receive a full production or disclosure of documents or information from

5  Elantech relating to the Accused Instrumentalities.  Elantech has not fully stated its

6  interpretation of the claims of the Synaptics Patents and has not explained its contention that it

7  allegedly does not infringe the asserted claims of the Synaptics Patents.  Synaptics reserves the

8  right to amend or otherwise modify its identification if further relevant information is revealed

9  or circumstances change.

10

**(d)     Identification of Type of Infringement**

11      The attached Preliminary Infringement Contentions Chart identifies how each element

12  of each asserted claim is literally present in the Accused Instrumentalities.  Synaptics has yet to

13  receive a full production or disclosure of documents or information from Elantech.  Elantech

14  has not stated fully its interpretation of the claims of the Synaptics Patents and has not

15  explained its contention that it allegedly does not infringe the asserted claims of the Synaptics

16  Patents.  However, Synaptics states on information and belief that under the claim

17  interpretation that Defendant has suggested it will advance, the Accused Instrumentalities meet

18  each and every asserted claim term at a minimum under the doctrine of equivalents.  Synaptics

19  reserves the right to amend or otherwise modify its identification if further relevant information

20  is revealed or circumstances change.

21

**(e)     Application Priority Dates of Claims**

22      The asserted inventions claimed in U.S. Patent No. 5,543,591 (the '591 Patent), are

23  entitled to a priority date of at least October 7, 1994, when application Ser. No. 320,158 was

24  submitted to the U.S. Patent & Trademark Office.  The inventions claimed in U.S. Patent No.

25  6,380,931 (the '931 Patent) are entitled to a priority date of at least October 7, 1994, when

26  application Ser. No. 320,158 was submitted to the U.S. Patent & Trademark Office.  The

27  asserted inventions claimed in U.S. Patent No. 5,880,411 (the '411 Patent), are entitled to a

28  priority date of at least March 28, 1996, when application Ser. No. 623,483 was submitted to

1   the U.S. Patent & Trademark Office.  The asserted inventions claimed in U.S. Patent No.

2   5,943,052 (the '052 Patent), are entitled to a priority date of at least August 12, 1997, when

3   application Ser. No. 909,696 was submitted to the U.S. Patent & Trademark Office.

4           **(f)      Patentee's Asserted Practice Of The Claimed Inventions**

5           As of this date, Synaptics states that it does intend to rely upon its own practice of the

6   claimed invention for any purpose in this case.  The devices that are believed to practice the

7   asserted claims are listed in a letter served with the original Patent Local Rule 3-1 and 3-2

8   Disclosure.  Synaptics does intend to rely upon evidence that it has licensed the inventions

9   claimed in the Synaptics Patents to other parties and that those parties are or may be practicing

10  the inventions claimed in the Synaptics Patents.  Synaptics also notes that its statements herein

11  do not waive any right Synaptics may have to assert evidence of inventorship under 35 U.S.C.

12  Sections 102, 256 or other applicable provision.

13          **Statement of Compliance with Rule 3-2**

14          Synaptics states that it has already produced or produces herewith the materials in its

15  possession, custody or control that are specified under Local Patent Rule 3-2.  In particular,

16  with respect to Rule 3-2(a), Synaptics states that it has produced responsive documents of

17  which it is currently aware that are in its possession, custody or control.  Synaptics also states

18  that it has produced materials in its possession, custody or control that may contain information

19  or reference information responsive to Local Patent Rule 3-2(b).   Finally, with respect to Local

20  Patent Rule 3-2(c), responsive materials have been produced in the most complete form

21  possible at this time.

22          Synaptics is continuing its search for additional responsive documents within its

23  possession, custody, and control, and will produce them (if any) to the extent such documents

24  are located.

25

26

27

28

1    **<u>Certification of Compliance with Rule 2-3</u>**

2          Pursuant to Patent L.R. 2-3, counsel attests that to the best of his or her knowledge,

3    information, and belief, formed after an inquiry that is reasonable under the circumstances, the

4    information contained in this statement, charts and disclosure is complete and correct at the

5    time it is made.

6

7    Dated: December 29, 2006         KARL J. KRAMER
                                                                 ROBERT L. McKAGUE
8                                                                ERIKA L. LABIT
                                                                 MORRISON & FOERSTER LLP
9

10

11

12                                     By: _____

13                                                               Karl J. Kramer

14                                                               Attorneys for Defendant
                                                                 SYNAPTICS, INC.

15   pa-1121391

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 5**

# SYNAPTICS INC

## FORM 10-K
(Annual Report)

## Filed 9/6/2007 For Period Ending 6/30/2007

| | |
|---|---|
| Address | 3120 SCOTT BLVD. SUITE 130 |
| | SANTA CLARA, California 95054 |
| Telephone | 408-454-5100 |
| CIK | 0000817720 |
| Industry | Software & Programming |
| Sector | Technology |
| Fiscal Year | 06/24 |

Powered By EDGAR Online

http://www.edgar-online.com/
© Copyright 2006. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Onlines Terms of Use.

## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

**For the Fiscal Year Ended June 30, 2007**

**Commission File Number 000-49602**

# SYNAPTICS INCORPORATED

(Exact name of registrant as specified in its charter)

| Delaware | 77-0118518 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 3120 Scott Blvd., Ste 130 Santa Clara, California | 95054 |
| (Address of principal executive offices) | (Zip Code) |

(408) 454-5100

Registrant's telephone number, including area code

**Securities registered pursuant to section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, par value $.001 per share | The Nasdaq Global Select Market |
| Preferred Stock Purchase Rights | The Nasdaq Global Select Market |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filed, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑      Accelerated Filer ☐      Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐   No ☑

The aggregate market value of Common Stock held by nonaffiliates of the registrant (24,894,527 shares) based on the closing price of the registrant's Common Stock as reported on the Nasdaq Global Select Market on December 29, 2006 of $29.69, was $739,118,507. For purposes of this computation, all officers, directors, and 10% beneficial owners of the registrant are deemed to be affiliates. Such determination should not be deemed to be an admission that such officers, directors, or 10% beneficial owners are, in fact, affiliates of the registrant.

As of August 1, 2007, there were outstanding 26,238,166 shares of the registrant's Common Stock, par value $.001 per share.

**Documents Incorporated by Reference**

Portions of the registrant's definitive Proxy Statement for the 2007 Annual Meeting of Stockholders are incorporated by reference into Part III of this Form 10-K.

SYNAPTICS INCORPORATED
ANNUAL REPORT ON FORM 10-K
FISCAL YEAR ENDED JUNE 30, 2007

## TABLE OF CONTENTS

PART I

| | | |
|---|---|---|
| ITEM 1. | BUSINESS | 1 |
| ITEM 1A. | RISK FACTORS | 15 |
| ITEM 1B. | UNRESOLVED STAFF COMMENTS | 30 |
| ITEM 2. | PROPERTIES | 30 |
| ITEM 3. | LEGAL PROCEEDINGS | 30 |
| ITEM 4. | SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS | 30 |

PART II

| | | |
|---|---|---|
| ITEM 5. | MARKET FOR THE REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 31 |
| ITEM 6. | SELECTED FINANCIAL DATA | 34 |
| ITEM 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 35 |
| ITEM 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 51 |
| ITEM 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 52 |
| ITEM 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 52 |
| ITEM 9A. | CONTROLS AND PROCEDURES | 52 |
| ITEM 9B. | OTHER INFORMATION | 53 |

PART III

| | | |
|---|---|---|
| ITEM 10. | DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 54 |
| ITEM 11. | EXECUTIVE COMPENSATION | 54 |
| ITEM 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 54 |
| ITEM 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 54 |
| ITEM 14. | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 54 |

PART IV

| | | |
|---|---|---|
| ITEM 15. | EXHIBITS AND FINANCIAL STATEMENT SCHEDULES | 55 |
| SIGNATURES | | 57 |
| INDEX TO CONSOLIDATED FINANCIAL STATEMENTS | | F-1 |

EX-12.1
EX-21
EX-23.1
EX-31.1
EX-31.2
EX-32.1
EX-32.2

### Statement Regarding Forward-Looking Statements

*The statements contained in this report on Form 10-K that are not purely historical are forward-looking statements within the meaning of applicable securities laws. Forward-looking statements include statements regarding our "expectations," "anticipation," "intentions," "beliefs," or "strategies" regarding the future, whether or not those words are used. Forward-looking statements also include statements regarding revenue, margins, expenses, and earnings analysis for fiscal 2008 and thereafter; technological innovations; products or product development, including their performance, market position, and potential; our product development strategies; potential acquisitions or strategic alliances; the success of particular product or marketing programs; the amounts of revenue generated as a result of sales to significant customers; and liquidity and anticipated cash needs and availability. All forward-looking statements included in this report are based on information available to us as of the filing date of this report, and we assume no obligation to update any such forward-looking statements. Our actual results could differ materially from the forward-looking statements. Among the factors that could cause actual results to differ materially are the factors discussed in Item 1A. Risk Factors.*

Table of Contents

## PART I

## ITEM 1. BUSINESS

### Overview

We are a leading worldwide developer and supplier of custom-designed user interface solutions that enable people to interact more easily and intuitively with a wide variety of mobile computing, communications, entertainment, and other electronic devices. We currently target the personal computer, or PC, market and the market for digital lifestyle products, including portable digital music and video players, mobile phones, and other select electronic device markets with our customized user interface solutions.

We are the global market leader in providing user interface solutions for notebook computers. Our original equipment manufacturer, or OEM, customers include tier one PC OEMs. We generally supply custom designed user interface solutions to our OEM customers through their contract manufacturers, which take delivery of our products and pay us directly for them. Through our new OneTouch offering, we now offer not only our custom module solutions but also access to our technologies to enable customers to develop their own user interface designs for capacitive buttons and scrolling applications for products such as mobile phones, portable digital music and video players, and notebook peripherals.

Our website is www.synaptics.com . Through our website, we make available free of charge all of our Securities and Exchange Commission filings, including our annual reports on Form 10-K, our proxy statements, our quarterly reports on Form 10-Q, and our current reports on Form 8-K as well as Form 3, Form 4, and Form 5 Reports for our directors, officers, and principal stockholders, together with amendments to those reports filed or furnished pursuant to Section 13(a), 15(d), or 16 under the Securities Exchange Act. These reports are available immediately after their electronic filing with the Securities and Exchange Commission. The website also includes corporate governance information, including our Code of Conduct, our Code of Ethics for the CEO and Senior Financial Officers, and our Board Committee Charters.

### PC Market

We provide custom user interface solutions for navigation, cursor control, and multimedia controls for many of the world's premier PC OEMs. In addition to notebooks, other PC applications for our technology include peripherals, such as keyboards, mice, and monitors, as well as desktop and PC remote control applications. Our solutions for the PC market include the TouchPad™, a touch-sensitive pad that senses the position and movement of a person's finger on its surface; the TouchStyk™, a self contained, easily integrated pointing stick module; and dual pointing solutions, which combine both a TouchPad and a pointing stick into a single notebook computer, enabling users to use the interface of their choice. Additional products offered for the PC markets include LuxPad™, Dual Mode TouchPad, QuickStroke ®, RoundPad™, TouchRing™, ScrollStrip™, LightTouch™, SmartTouch, MobileTouch™, ClearPad™, NavPoint™, and OneTouch .

The latest industry projections for notebook unit growth for the period 2007-2011 show a compound annual growth rate of 15% compared with 3% for desktop computers, reflecting the continued migration of desktops to notebooks fueled by users' desire for mobile computing and on-the-go access to applications, information, and digital content, which is expanding on a daily basis. Based on the strength of our technology and engineering know-how, we believe we are well positioned to take advantage of the growth opportunity in the notebook market and to provide innovative, value-added user interface solutions for each of the key end-user preferences. We estimate that in our fiscal 2007 approximately 83% of all notebook computers sold used solely a touch pad interface; 2% used solely a pointing stick interface; and 15% used a dual pointing interface, which consists of both a touch pad and a pointing stick. Our notebook product lines of touch pads and pointing sticks allow us to address 100% of the notebook market.

### Digital Lifestyle Product Markets

We believe our extensive intellectual property portfolio, our experience in providing user interface solutions to major OEMs of electronic devices, and our proven track record of growth in our expanding core notebook computer interface business position us to be a key technological enabler for multiple consumer electronic devices targeted to meet the growing digital lifestyle trend. Based on these strengths, we are addressing the

1

Table of Contents

opportunities created by the growth of mobile computing, communications, and entertainment devices within the digital lifestyle products markets. Digital lifestyle products include portable digital music and video players, mobile phones, remote controls, GPS devices, as well as a variety of mobile, handheld, wireless, and entertainment devices. We believe our existing technologies, our range of product solutions, and our emphasis on ease of use, small size, low power consumption, advanced functionality, durability, and reliability will enable us to serve multiple aspects of the markets for digital lifestyle products and other electronic devices.

Our array of user interface solutions for digital lifestyle products includes the ScrollStrip and TouchRing, which are scrolling solutions allowing users to navigate efficiently through menus and content; LightTouch capacitive buttons, which provide illuminated button functionality; and MobileTouch, NavPoint, and our ClearPad.

Industry projections for the portable digital music player market for the period 2007-2010 suggest a compound annual growth rate of 8% for the overall market and a compound annual growth rate of 32% for video capable MP3 players, reflecting the trend towards portable digital entertainment devices with advanced capabilities, such as built-in video playback capabilities. These products require a simple, durable, and intuitive user interface solution to enable the user to navigate efficiently through menus and scroll through extensive play lists, songs, and videos contained in the host device. We believe we are well positioned to take advantage of this growing market based on our technology, engineering know-how, and the acceptance of our user interface solutions by OEMs in this market.

Industry projections for the mobile phone market for the period 2007-2010 show a compound annual growth rate of 6% for the overall market and a compound annual growth rate of 55% for the smartphone market, reflecting the trend towards increased interest among non-business consumers and the trend towards greater functionality in smartphone products to meet and address the expanded needs and expectations of the consumer oriented market.

## Our Strategy

Our objective is to continue to enhance our position as a leading supplier of user interface solutions for the notebook computer market and to become a leading supplier of user interface solutions for digital lifestyle products. Key aspects of our strategy to achieve this objective include those set forth below.

### Extend Our Technological Leadership

We plan to utilize our extensive intellectual property portfolio and technological expertise to extend the functionality of our product solutions and offer innovative product solutions to customers across multiple markets. We intend to continue utilizing our technological expertise to reduce the overall size, weight, cost, and power consumption of our user interface solutions while increasing their applications, capabilities, and performance. We plan to continue enhancing the ease of use and functionality of our solutions. We also plan to expand our research and development efforts through increased investment in our engineering activities, the hiring of additional engineering personnel, and strategic acquisitions and alliances. We believe that these efforts will enable us to meet customer expectations and to achieve our goal of supplying on a timely and cost-effective basis the most advanced, easy-to-use, functional user interface solutions to our target markets.

### Enhance Our Position in the Notebook Computer and Portable Digital Music Player Markets

We intend to continue introducing market-leading user interface solutions in terms of performance, functionality, size, and ease of use. We plan to continue enhancing our customer's industrial design alternatives and device functionality through innovative product development based on our existing capabilities and technological advances.

### Capitalize on Growth of New Markets

We intend to capitalize on the growth of new markets, including the digital lifestyle products markets, brought about by the convergence of computing, communications, and entertainment devices. We plan to offer innovative, intuitive user interface solutions that address the evolving portability, connectivity, and functionality requirements of these new markets. We plan to offer these solutions to existing and potential OEM customers to enable increased functionality, reduced size, lower cost, and enhanced industrial design features and to enhance the

2

Table of Contents

user experience of their products. We plan to utilize our existing technologies as well as aggressively pursue new technologies as new markets evolve that demand new solutions.

*Emphasize and Expand Customer Relationships*

We plan to emphasize and expand our strong and long-lasting customer relationships and to establish successful relationships with new customers. In each market we serve, we plan to provide the most advanced user interface solutions for our customers' products. We believe that our user interface solutions enable our customers to deliver a positive user experience and to differentiate their products from those of their competitors. We continually attempt to enhance the competitive position of our customers by providing them with innovative, distinctive, and high-quality user interface solutions on a timely and cost-effective basis. To do so, we work continually to improve our productivity, to reduce costs, and to speed the delivery of our user interface solutions. We endeavor to streamline the entire design and delivery process through our ongoing design, engineering, and production improvement efforts. We also focus on providing timely support to our customers after the purchase of our user interface solutions.

We plan to increase our business with existing customers and attract new customers by offering design tools, documentation, a family of capacitive sensing ASICs, and technical support to enable them to develop their own user interface designs for capacitive buttons and scrolling applications in products such as mobile phones, portable digital music and video players, and notebook peripherals. As a result, customers will have a choice of determining the most optimal way to meet their emerging and growing needs: our traditional custom module solutions or OneTouch, which offers a flexible alternative when design integration or quick turns are important.

*Pursue Strategic Relationships and Acquisitions*

We intend to develop and expand strategic relationships to enhance our ability to offer value-added user interface solutions to our customers, penetrate new markets, and strengthen the technological leadership of our product solutions. We also consider the potential acquisition of companies in order to expand our technological expertise and to establish or strengthen our presence in selected target markets.

*Continue Virtual Manufacturing*

We plan to expand and diversify our production capacity through third-party relationships, thereby strengthening our virtual manufacturing platform. This strategy results in a scalable business model; enables us to concentrate on our core competencies of research and development, technological advances, and product design; and reduces our capital expenditures. Our virtual manufacturing strategy allows us to maintain a variable cost model, in which we do not incur most of our manufacturing costs until our product solutions have been shipped and billed to our customers.

**Product Solutions**

We develop and enhance interface technologies that enrich the user's experience in interacting with the user's mobile computing, communications, and entertainment devices. Our innovative and intuitive user interfaces can be engineered to accommodate many diverse platforms, and our expertise in human factors and usability can be utilized to improve the features and functionality of our solutions. Our extensive array of technologies includes ASICs, firmware, software, mechanical and electrical designs, and pattern recognition and touch sensing technologies.

Our custom-designed user interface solutions are custom engineered, total solutions for our customers and include sensor design, module layout, ASICs, firmware, and software features for which we provide manufacturing and design support and device testing. This allows us to be a one-stop supplier for complete user interface design from the early design stage, to manufacturing, to testing and support. Our OneTouch offering includes design tools, documentation, a family of capacitive sensing ASICs, and technical support to enable customers to develop their own user interface designs for capacitive buttons and scrolling applications. Through our technologies and expertise, we seek to provide our customers with solutions that address their individual design issues and result in high-performance, feature-rich, and reliable interface solutions. We believe our interface solutions offer the following characteristics:

3

Table of Contents

- *Ease of Use* . Our interface solutions offer the ease of use and intuitive interaction that users demand.

- *Small Size.* The small, thin size of our interface solutions enables our customers to reduce the overall size and weight of their products in order to satisfy consumer demand for portability.

- *Low Power Consumption* . The low power consumption of our interface solutions enables our customers to offer products with longer battery life or smaller battery size.

- *Advanced Functionality* . Our interface solutions offer advanced features, such as virtual scrolling, customizable tap zones, edge motion, and tapping and dragging icons, to enhance user experience.

- *Reliability* . The reliability of our interface solutions satisfies consumer requirements for dependability, which is a major component of consumer satisfaction.

- *Durability* . Our interface solutions withstand repeated use, harsh physical treatment, and temperature fluctuations while providing a superior level of performance.

We believe these characteristics will enable us to maintain our leadership position in the notebook computer market and to enhance our position as a technological enabler within the markets for digital lifestyle products and other electronic devices.

Our user interface solutions are intended to satisfy our customer's specification needs, including features and functionality, industrial design, mechanical, and electrical requirements. Our products also offer unique integration options, including allowing our capacitive sensors to be placed underneath the plastic of the device, which allows for streamlined and stylized designs, incorporating LEDs to indicate status or enhance industrial design, and incorporating tactile indicators, including ridges, Braille bumps, and textures designed to provide the user with additional feedback.

Our emphasis on technological leadership and design capabilities positions us to provide unique user interface solutions that address specific customer requirements. Our long-term working relationships with large, global OEMs provide us with experience in satisfying their demanding design specifications and other requirements. Our custom product solutions provide OEMs with numerous benefits, including the following:

- modular integration;

- reduced product development costs;

- shorter product time to market;

- compact and efficient platforms;

- improved product functionality and utility; and

- product differentiation.

We work with our customers in order to meet their technical and functional specifications, their industrial design requirements, and their desire to differentiate their products from those of their competitors. This collaborative effort reduces the duplication and overlap of investment and resources, enabling our OEM customers to devote more time and resources to the market development of their products.

We utilize capacitive technology rather than resistive or mechanical technology in our product solutions. Unlike resistive and mechanical technology, our solid state capacitive technology have no moving parts or activation force, thereby offering a durable, more reliable solution that can be integrated into both curved and flat surfaces. Capacitive technologies also allow for much thinner sensors than resistive or mechanical technology, providing for slimmer, more compact and unique industrial designs.

4

Table of Contents

## Products

Our family of product solutions allows our customers to solve their interface needs and differentiate their products from those of their competitors.

### TouchPad

Our TouchPad, which takes the place and exceeds the functionality of a mouse, is a small, touch-sensitive pad that senses the position of a person's finger on its surface through the measurement of capacitance. Our TouchPad provides an accurate, comfortable, and reliable method for screen navigation and cursor movement and provides a platform for interactive input. Our TouchPad solutions allow our customers to provide stylish, simple, user-friendly, and intuitive user interface solutions for both the consumer and corporate markets. Our TouchPad solutions offer various advanced features, including the following:

- *Virtual scrolling.* This feature enables the user to scroll through any document by swiping a finger along the side or bottom of the TouchPad.

- *Customizable tap zones.* These zones permit designated portions of the TouchPad to be used to simulate mouse clicks, launch applications, and perform other selected functions.

- *PalmCheck* ™. PalmCheck eliminates false activation when a person's palm accidentally rests on the TouchPad.

- *EdgeMotion* ™. This feature permits cursor movement to continue when a user's finger reaches the edge of the TouchPad.

- *Tapping and dragging of icons.* This feature allows the user to simply tap and hold on an icon in order to drag it, rather than being forced to hold a button down in order to drag an icon.

- *Multi-finger gestures.* This feature allows the user to designate specific actions when more than one finger is used on the TouchPad.

Our TouchPad solutions are available in a variety of sizes, electrical interfaces, and thicknesses. Our TouchPad solutions are designed to meet the electrical and mechanical specifications of our customers. Customized firmware and driver software ensure the availability of specialized features. As a result of their solid state characteristics, our TouchPad solutions have no moving parts that wear out, resulting in a robust and reliable input solution that also allows for unique industrial designs.

### TouchStyk

Our TouchStyk is a proprietary pointing stick interface solution. TouchStyk is a self-contained, easily integrated module that uses capacitive technology similar to that of our TouchPad. TouchStyk is enabled with press-to-select and tap-to-click capabilities and can be easily integrated into multiple computing and communications devices. In addition, our design greatly reduces susceptibility to electromagnetic interference, thereby providing greater pointing accuracy and preventing the pointer from drifting when not in use.

We are currently shipping our TouchStyk in notebooks, portable multimedia players, and ultra mobile personal computers. Our modular approach allows OEMs to include our TouchPad, our TouchStyk, or a combination of both interfaces in their products.

### Dual Pointing Solutions

Our dual pointing solutions offer a TouchPad with a pointing stick in a single notebook computer, enabling users to select their interface of choice. Our dual pointing solution also provides the end user the ability to use both interfaces interchangeably. Our dual pointing solution provides the following advantages:

- cost-effective and simplified OEM integration;

Table of Contents

- simplified OEM product line because one device contains both solutions;
- single-source supplier, which eliminates compatibility issues; and
- end user flexibility because one notebook can address both user preferences.

     We have developed two solutions for use in the dual pointing market. Our first solution integrates all the electronics for controlling a third-party resistive strain gauge pointing stick onto our TouchPad PCB. This solution simplifies OEM integration by eliminating the need to procure the pointing stick electronics from another party and physically integrate them into the notebook. Our second dual pointing solution uses our TouchStyk rather than a third-party pointing stick and offers the same simplified OEM integration. The second solution is a completely modular design, allowing OEMs to offer TouchPad-only, TouchStyk-only, or dual pointing solutions on a build-to-order basis.

*LuxPad*

     LuxPad is an innovative illuminated TouchPad. The LuxPad is designed to allow our customers to differentiate their products. The LuxPad can either light up the entire touchpad, light up a logo in the center of the TouchPad, or light up designated "virtual buttons" on the TouchPad, depending on the preference of the notebook designer.

*Dual Mode TouchPad*

     Dual Mode TouchPad is designed to transform the TouchPad from a cursor control device to a launch and control center with the touch of a button. In default mode, the Dual Mode provides the same cursor control for on screen navigation as a standard TouchPad. When the user taps on a launch icon located on the TouchPad surface, icons illuminate on the TouchPad surface.

     The Dual Mode offers a variety of customization options to the OEM, including tap zones for launching applications and multimedia controls, scrolling zones to adjust volume, and programmable buttons so end users can choose which application they would like to launch through our Dual Mode driver. To regain cursor control, the user simply taps the mode switch button and the illuminated icons disappear, allowing the user to control the cursor for on-screen navigation.

*QuickStroke*

     QuickStroke provides a fast, easy, and accurate way to input Chinese characters. Using our recognition technology that combines our patented software with our TouchPad, QuickStroke can recognize handwritten, partially finished Chinese characters, thereby saving considerable time and effort. Our QuickStroke, which operates with our touch pad products, can be integrated into notebook computers, keyboards, and a host of stand-alone interface devices that use either a pen or a finger.

     Our patented Incremental Recognition Technology allows users to simply enter the first few strokes of a Chinese character, and QuickStroke accurately interprets the intended character. Since the typical Chinese character consists of an average of 13 strokes, QuickStroke technology saves considerable time and effort. We can port different alphabets or characters to our underlying pattern recognition engine, allowing us to offer support for different languages.

*TouchRing*

     Our TouchRing is an integrated, solid state scrolling wheel utilizing our capacitive touch sensing technology that enables the user to navigate through menus and scroll through lists. Our TouchRing is utilized in MP3 players, personal media players, and remote controls, enabling the user to navigate efficiently through menus and scroll through extensive play lists and songs.

6

Table of Contents

*ScrollStrip*

ScrollStrip is a one-dimensional TouchPad that provides a simple and intuitive way for users to scroll through menus, navigate through content, and adjust controls. A ScrollStrip can be used in a wide variety of applications that require a thin, robust, accurate, and easy-to-use input and navigation device, including PC peripherals, such as keyboards and mice, and digital lifestyle products. ScrollStrip is thin, lightweight, and flexible and can be mounted on curved surfaces to meet the industrial design needs of our OEM customers. Currently, the ScrollStrip is incorporated into a number of devices, including MP3 players, PC keyboards, and computer mice.

*LightTouch*

LightTouch is a simple, easy to use, stylish interface solution that replaces mechanical buttons with an illuminated sensor programmed to perform functions, such as multimedia controls, including pause, play, fast-forward, and rewind. LightTouch is designed for integration under the plastic face of a device, allowing for a sealed, thin design that is both stylish and durable. Currently, a number of custom LightTouch solutions are available in the market, including multimedia controls for notebook PCs, a multimedia keyboard, and as button controls for MP3 players.

*MobileTouch*

MobileTouch is a new product solution specifically designed for the mobile phone environment that combines our expertise in ease of use with our technology capabilities. The result is custom-designed modules that can combine our scrolling, selection, and navigation capabilities into a simple, easy to use interface solution that improves access to mobile phone content and applications. MobileTouch can be mounted beneath the plastic of the phone, making it well suited to the mobile phone environment where slim design and durability are essential.

*SmartTouch*

SmartTouch is a software-configurable auxiliary interface for notebook computers that enables notebook computer OEMs to offer their customers the advanced functionality and customizability of our software-configured LightTouch control bar with on-screen display. Our SmartTouch solution replaces conventional multimedia buttons with virtual contextual controls that automatically adapt to the software application that is being used at the time to present customized browser, media player, DVD player, or systems controls and enables users to personalize touch control behavior, including audio feedback, touch sensibility, illumination, control functions, and control placement.

*ClearPad*

ClearPad consists of a clear, thin capacitive sensor that can be placed over any viewable surface, including display devices, such as LCDs. Similar to our traditional TouchPad, our ClearPad has various distinct advantages, including light weight; low profile form factor; high reliability, durability, and accuracy; and low power consumption. ClearPad, can be mounted on or under curved surfaces, providing for unique and sleek industrial designs.

*NavPoint*

The NavPoint solution offers users improved functionality and versatility in accessing and managing content in handheld devices through unique navigation controls, including short- and long-distance scrolling features, tapping, and mouse-like cursor navigation.

*OneTouch*

OneTouch is a configurable solution based on our capacitive sensing technology, which includes a capacitive sensing ASIC, easy-to-use design tools, documentation, and technical support, that enables customers to develop their own custom interface designs in-house for capacitive buttons and scrolling applications in various products, including mobile phones, portable digital media players, and PC peripherals, such as monitors, keyboards, mice, and remote controls. OneTouch increases our reach from a customer standpoint by offering them an alternative and flexible way to leverage our technology and know-how whether through our traditional custom

Table of Contents

module solution or through the new OneTouch capability that allows them to implement capacitive sensing in-house when design integration or quick design turns are important.

**Technologies**

We have developed and own an extensive array of technologies, encompassing ASICs, firmware, software, pattern recognition, and touch sensing technologies. With 89 U.S. patents in force and 55 U.S. patents pending, as well as many non-U.S. counterparts, we continue to develop technology in these areas. We believe these technologies and the related intellectual property create barriers for competitors and allow us to provide user interface solutions in a variety of high-growth market segments.

Our broad line of user interface solutions currently is based upon the following key technologies:

- capacitive position sensing technology;

- capacitive force sensing technology;

- transparent capacitive position sensing technology;

- pattern recognition technology;

- mixed signal, very large scale integrated circuit, or VLSI, technology; and

- proprietary microcontroller technology.

In addition to these technologies, we develop firmware and driver software that we incorporate into our products, which provide unique features, such as virtual scrolling, customizable tap zones, PalmCheck, EdgeMotion, and tapping and dragging of icons. In addition, our ability to integrate all of our products to interface with major operating systems, including Windows 98, Windows 2000, Windows NT, Windows CE, Windows XP, Windows ME, Windows Vista, Mac OS, Pocket PC, Palm OS, Symbian, UNIX, and LINUX, provides us with a competitive advantage.

*Capacitive Position Sensing Technology.* This technology provides a method for sensing the presence, position, and contact area of one or more fingers or a conductive stylus on a flat or curved surface, such as our TouchPad, TouchRing, and ScrollStrip. Our technology works with very light touch and provides highly responsive cursor navigation, scrolling, and selection. It uses no moving parts, can be implemented under plastic, and is extremely durable.

*Capacitive Force Sensing Technology.* This technology senses the direction and magnitude of a force applied to an object. The object can either move when force is applied, like a typical joystick used for gaming applications, or it can be isometric, with no perceptible motion during use, like our TouchStyk. The primary competition for this technology is resistive strain gauge technology. Resistive strain gauge technology requires electronics that can sense very small changes in resistance, presenting challenges to the design of that circuitry, including sensitivity to electrical noise and interference. Our electronic circuitry determines the magnitude and direction of an applied force, permits very accurate sensing of tiny changes in capacitance, and minimizes electrical interference from other sources.

*Transparent Capacitive Position Sensing Technology.* This technology allows us to build transparent sensors for use with our capacitive position sensing technology, such as in our ClearPad. It has all the advantages of our capacitive position sensing technology and allows for visual feedback when incorporated with a display device, such as an LCD. Our technology does not require calibration, does not produce undesirable internal reflections, and has reduced power requirements, allowing for longer battery life.

*Pattern Recognition Technology.* This technology is a set of software algorithms and techniques for converting real-world data, such as handwriting, into a digital form that can be recognized and manipulated within a computer, such as our QuickStroke product and gesture decoding for our TouchPad products. Our technology provides reliable handwriting recognition and can be used in other applications such as signature verification.

8

Table of Contents

*Mixed Signal VLSI Technology.* This hybrid analog-digital integrated circuit technology combines the power of digital computation with the ability to interface with non-digital, real-world signals, such as the position of a finger or stylus on a surface. Our patented design techniques permit us to utilize this technology to optimize our core ASIC engine for all our products.

*Proprietary Microcontroller Technology.* This technology consists of a proprietary 16-bit microcontroller core embedded in the digital portion of our mixed signal ASIC, which allows us to optimize our ASIC for position sensing tasks. Our embedded microcontroller provides great flexibility in customizing our product solutions utilizing firmware, which eliminates the need to design new circuitry for each new application.

## Competing Technology

Many user interface solutions currently utilize resistive sensing technology. Resistive sensing technology consists of a flexible membrane above a flat, rigid, electrically conductive surface. When finger or stylus pressure is applied to the membrane, it deforms until it makes contact with the rigid layer below, at which point attached electronics can determine the position of the finger or stylus. Since the flexible membrane is a moving part, it is susceptible to mechanical wear and will eventually suffer degraded performance. Due to the way that resistive position sensors work, it is not possible for them to detect more than a single finger or stylus at any given time. The positional accuracy of a resistive sensor is limited by the uniformity of the resistive coating as well as by the mechanics of the flexible membrane. Finally, implementations of resistive technology over display devices, such as an LCD, result in reduced transmissivity, or the amount of light that can pass through the display, requiring the use of backlighting and thereby reducing the battery life of the device.

## Research and Development

We conduct ongoing research and development programs that focus on advancing our technologies, developing new products, improving design and manufacturing processes, and enhancing the quality and performance of our product solutions. Our goal is to provide our customers with innovative solutions that address their needs and improve their competitive positions. Our research and development is focused on advancing our existing interface technologies, improving our current product solutions, and expanding our technologies to serve new markets. Our vision is to offer user interface solutions, such as touch, handwriting, vision, and voice capabilities, that can be readily incorporated into varied electronic devices.

Our research and development programs focus on the development of accurate, easy to use, reliable, and intuitive user interfaces for electronic devices. We believe our innovative interface technologies can be applied to many diverse products. We believe the interface is a key factor in the differentiation of these products. We believe that our interface technologies enable us to provide customers with product solutions that have significant advantages over alternative technologies in terms of functionality, size, power consumption, durability, and reliability. We also intend to pursue strategic relationships and acquisitions to enhance our research and development capabilities, leverage our technology, and shorten our time to market with new technological applications.

Our research, design, and engineering teams frequently work directly with our customers to design custom solutions for specific applications. We focus on enabling our customers to overcome technical barriers and enhance the performance of their products. We believe our engineering know-how and electronic systems expertise provide significant benefits to our customers by enabling them to concentrate on their core competencies of production and marketing.

As of June 30, 2007, we employed 161 people in our technology, engineering, and product design functions in the United States, Hong Kong, and Taiwan. Our research and development expenses were approximately $25.0 million, $35.4 million, and $39.4 million in fiscal 2005, 2006, and 2007, respectively.

## Intellectual Property Rights

Our success and ability to compete depend in part on our ability to maintain the proprietary aspects of our technologies and products. We rely on a combination of patents, copyrights, trade secrets, trademarks, confidentiality agreements, and other contractual provisions to protect our intellectual property, but these measures

9

Table of Contents

may provide only limited protection. Our research, design, and engineering teams frequently work directly with our OEM customers to design custom solutions for specific applications.

We hold 89 U.S. patents in force and have 55 U.S. patents pending, as well as many non-U.S. counterparts to the U.S. patents and U.S. patents pending. Collectively, these patents and patents pending cover various aspects of our key technologies, including touch sensing, pen sensing, handwriting recognition, customizable tap zones, edge motion, and virtual scrolling technologies. Our proprietary software is protected by copyright laws. The source code for our proprietary software is also protected under applicable trade secret laws.

Our extensive array of technologies includes ASICs, firmware, software, and pattern recognition and position sensing technologies. Our products rely on a combination of these technologies, making it difficult to use any single technology as the basis for replicating our products. Furthermore, the length and customization of the customer design cycle serve to protect our intellectual property rights.

Patent applications that we have filed or may file in the future may not result in a patent being issued. Our issued patents may be challenged, invalidated, or circumvented, and claims of our patents may not be of sufficient scope or strength, or issued in the proper geographic regions, to provide meaningful protection or any commercial advantage. We have not applied for, and do not have, any copyright registration on our technologies or products. We have applied to register certain of our trademarks in the United States and other countries. There can be no assurance that we will obtain registrations of trademarks in key markets. Failure to obtain registrations could compromise our ability to protect fully our trademarks and brands and could increase the risk of challenge from third parties to our use of our trademarks and brands. In addition, our failure to enforce and protect our intellectual property rights or obtain from third parties the right to use necessary technology could have a material adverse effect on our business, financial condition, and results of operations.

We do not consistently rely on written agreements with our customers, suppliers, manufacturers, and other recipients of our technologies and products, and therefore some trade secret protection may be lost and our ability to enforce our intellectual property rights may be limited. Furthermore, our customers, suppliers, manufacturers, and other recipients of our technologies and products may seek to use our technologies and products without appropriate limitations. In the past, we did not consistently require our employees and consultants to enter into confidentiality agreements, employment agreements, or proprietary information and invention agreements. Therefore, our former employees and consultants may try to claim some ownership interest in our technologies and products and may use our technologies and products competitively and without appropriate limitations.

Other companies, including our competitors, may develop technologies that are similar or superior to our technologies, duplicate our technologies, or design around our patents and may have or obtain patents or other proprietary rights that would prevent, limit, or interfere with our ability to make, use, or sell our products. Effective intellectual property protection may be unavailable or limited in some foreign countries in which we operate, such as China and Taiwan. Unauthorized parties may attempt to copy or otherwise use aspects of our technologies and products that we regard as proprietary. There can be no assurance that our means of protecting our proprietary rights in the United States or abroad will be adequate or that competitors will not independently develop similar technologies. If our intellectual property protection is insufficient to protect our intellectual property rights, we could face increased competition in the market for our technologies and products.

We may receive notices from third parties that claim our products infringe their rights. From time to time, we receive notice from third parties of the intellectual property rights such parties have obtained. We cannot be certain that our technologies and products do not and will not infringe issued patents or other proprietary rights of third parties. Any infringement claims, with or without merit, could result in significant litigation costs and diversion of resources, including the payment of damages, which could have a material adverse effect on our business, financial condition, and results of operations.

## Customers

Our customers include many of the world's largest PC OEMs, based on unit shipments, as well as a variety of consumer electronics manufacturers. Our demonstrated track record of technological leadership, design innovation, product performance, cost effectiveness, and on-time delivery have resulted in our leadership position in providing user interface solutions to the notebook market. We believe our strong relationship with our OEM

Table of Contents

customers, many of which are currently developing digital lifestyle products, will position us as a source of supply for their product offerings.

Our industry leading OEM customers in fiscal 2007 included the following:

- Acer
- Asustek
- Dell
- Fujitsu
- Gateway
- Hewlett-Packard
- IBM
- Lenovo
- LG Electronics
- NEC
- Samsung
- Toshiba

We generally supply custom-designed products to our OEM customers through their contract manufacturers. We sell our custom-designed products directly to these contract manufacturers, which include Compal, Hon Hai, Inventec, Kangzhun Electronical, Lenovo, Shanghai Yi Hsin, Wistron, and Zhan Yun Shanghai Electronics. Sales to Compal and Wistron in the aggregate accounted for approximately 26% of our net revenue for fiscal 2007, and sales to Inventec and Wistron in the aggregate accounted for approximately 24% of our net revenue for fiscal 2006. No other customer accounted for more than 10% of our net revenue for either fiscal 2006 or 2007. We supply our OneTouch solution directly to our OEM customers.

We consider both the OEMs and their contract manufacturers to be our customers. Both the OEMs and their contract manufacturers may determine the design and pricing requirements and make the overall decision regarding the use of our user interface solutions in their products. The contract manufacturers place orders with us for the purchase of our products, take title to the products purchased upon shipment by us, and pay us directly for those purchases. These customers have no return privileges except for warranty provisions.

### Strategic Relationships

We have used strategic relationships to enhance our ability to offer value-added customer solutions in the past and we intend to enter into additional strategic relationships with companies that may help us serve our target markets.

### Sales and Marketing

We sell our product solutions for incorporation into the products of our OEM customers. We generate sales through direct sales employees as well as outside sales representatives and distributors. Our sales personnel receive substantial technical assistance and support from our internal engineering resources because of the highly technical nature of our product solutions. Sales frequently result from multi-level sales efforts that involve senior management, design engineers, and our sales personnel interacting with our customers' decision makers throughout the product development and order process.

We currently employ 79 sales and marketing professionals. We maintain eight customer support offices domestically and internationally, which are located in the United States, Taiwan, China, Korea, Japan, Hong Kong, and Switzerland. In addition, we utilize sales representatives in Korea, Singapore, and Malaysia and sales distributors in Japan and Taiwan.

International sales constituted approximately 98%, 98%, and 99% of our revenue for fiscal 2005, 2006, and 2007, respectively. Over 90% of our sales were made to companies located in China and Taiwan that provide design and manufacturing services for major notebook computer and digital lifestyle product OEMs. All of our sales were denominated in U.S. dollars.

### Manufacturing

We employ a virtual manufacturing platform through third-party relationships. We currently utilize two semiconductor wafer manufacturers to supply us with silicon wafers integrating our proprietary design specifications. The completed silicon wafers are forwarded to third-party package and test processors for further processing into die and packaged ASICs, as applicable, which are then utilized in our custom interface products.

Table of Contents

After processing and testing, the die and ASICs are consigned to various contract manufacturers for assembly or, in the case of OneTouch ASICs are shipped directly to our customers. During the assembly process, our die or ASIC is combined with other components to complete the module for our custom user interface solution. The finished assembled product is subsequently shipped by our contract manufacturers directly to our customers for integration into their products.

We believe our virtual manufacturing strategy provides a scalable business model; enables us to concentrate on our core competencies of research and development, technological advances, and product design; and reduces our capital expenditures. In addition, this strategy significantly reduces our working capital requirements for inventory because we do not incur most of our manufacturing costs until we have actually shipped our interface products to our customers and billed those customers for those products.

Our third-party contract manufacturers are Asian-based organizations. We provide our contract manufacturers with six-month rolling forecasts of our production requirements. We do not, however, have long-term agreements with any of our contract manufacturers that guarantee production capacity, prices, lead times, or delivery schedules. The strategy of relying on those parties exposes us to vulnerability owing to our dependence on few sources of supply. We believe, however, that other sources of supply are available. In addition, we may establish relationships with other contract manufacturers in order to reduce our dependence on any one source of supply.

Periodically, we purchase inventory from our contract manufacturers when a customer's delivery schedule is delayed or a customer's order is cancelled. In those circumstances in which our customer has cancelled its order and we purchase inventory from our contract manufacturers, we consider a write-down to reduce the carrying value of the inventory purchased to its net realizable value. Write-downs to reduce the carrying value of obsolete, slow moving, and non-usable inventory to net realizable value are charged to cost of revenue.

### Backlog

As of June 30, 2007, we had a backlog of orders of approximately $46.9 million, an increase of $18.2 million compared with our backlog of orders as of June 30, 2006 of approximately $28.7 million. The increase in backlog is primarily related to the increase in demand for our products. Our backlog consists of product orders for which purchase orders have been received and which are generally scheduled for shipment within three months. Most orders are subject to rescheduling or cancellation with limited penalties. Because of the possibility of customer changes in product shipments, our backlog as of a particular date may not be indicative of net sales for any succeeding period.

### Competition

Our principal competitor in the sale of notebook touch pads is Alps Electric, a Japanese conglomerate. Our principal competitors in the sale of notebook pointing sticks are Alps Electric, NMB, and CTS. In the markets for digital lifestyle products and other electronic devices, our competitors include Alps Electric, Cypress, Quantum Technology Management, and various other companies involved in user interface solutions. In certain cases, large OEMs may develop alternative user interface solutions for their own products or provide key components for use in designing user interface solutions.

In the notebook user interface market, we plan to continue to compete primarily on the basis of our technological expertise, design innovation, customer service, and the long track record of performance of our user interface solutions, including their ease of use, reliability, and cost-effectiveness as well as their timely design, production, and delivery schedules. Our pointing stick solutions, including our proprietary TouchStyk, enable us to address the approximate 2% of the notebook computer market that uses solely a pointing stick rather than a touch pad as the user interface as well as the approximate 15% of the notebook market that uses dual pointing interfaces. Our ability to supply OEMs with TouchPads, TouchStyks, and dual pointing alternatives enhances our market position as we can provide OEMs with the following advantages:

- single source supplier to eliminate compatibility issues;

- cost-effective and simplified integration;

12

Table of Contents

- simplified product line to address both interface preferences;
- end user flexibility because one notebook can address both user preferences; and
- modular approach allowing OEMs to utilize our TouchPad, our TouchStyk, or a combination of both interfaces.

In the user interface markets for digital lifestyle products and other electronic devices, we compete primarily based on the advantages of our systems knowledge of capacitive sensing and neural pattern recognition technologies. We believe our solutions based engineering expertise coupled with our technologies offer benefits in terms of size, power consumption, durability, light transmissivity, resolution, ease of use, and reliability when compared to our competitors and other technologies. While these markets continue to evolve and we do not know what the competitive factors will ultimately be, we believe we are positioned to compete aggressively for this business based on our proven track record, our marquee global customer base, and our reputation for design innovation. However, some of our competitors have greater market recognition, larger customer bases, and substantially greater financial, technical, marketing, distribution, and other resources than we possess that afford them potential competitive advantages. As a result, they may be able to introduce new product solutions and respond to customer requirements more quickly than we can. In addition, new competitors, alliances among competitors, or alliances among competitors and OEMs may emerge and allow competitors to rapidly acquire significant market share.

Furthermore, our competitors or our customers may develop technologies in the future that more effectively address the user interface needs of the notebook market and other markets. Our sales, profitability, and success depend on our ability to compete with other suppliers of user interface solutions and components used in user interface solutions. Our competitive position could be adversely affected if one or more of our current OEMs reduce their orders or if we are unable to develop new customers for our user interface solutions.

## Employees

As of June 30, 2007, we employed a total of 312 persons, including 72 in finance, administration, and operations; 79 in sales and marketing; and 161 in research and development. Of these employees, 205 were located in North America, 106 in Asia/Pacific, and one in Europe. We consider our relationship with our employees to be good, and none of our employees are represented by a union in collective bargaining with us.

Competition for qualified personnel in our industry is extremely intense, particularly for engineering and other technical personnel. Our success depends on our continued ability to attract, hire, and retain qualified personnel.

## Executive Officers

The following table sets forth certain information regarding our executive officers:

| Name | Age | Position |
| --- | --- | --- |
| Francis F. Lee | 55 | President, Chief Executive Officer, and Director |
| Thomas J. Tiernan | 44 | Executive Vice President and General Manager |
| Russell J. Knittel | 57 | Executive Vice President, Chief Financial Officer, Chief Administrative Officer, Secretary, and Treasurer |
| Shawn P. Day, Ph.D. | 41 | Vice President and Chief Technical Officer |
| Alex Wong | 51 | Vice President of World Wide Operations |

13

Table of Contents

*Francis F. Lee* has served as a director and the President and Chief Executive Officer of our company since January 1999. He was a consultant from August 1998 to November 1998. From May 1995 until July 1998, Mr. Lee served as General Manager of NSM, a Hong Kong-based joint venture between National Semiconductor Corporation and S. Megga. Mr. Lee held a variety of executive positions for National Semiconductor from 1988 until August 1995. These positions included Vice President of Communication and Computing Group, Vice President of Quality and Reliability, Director of Standard Logic Business Unit, and various other operations and engineering management positions. Mr. Lee is a director of Foveon, Inc., a privately held company in which we have an ownership interest. Mr. Lee holds a Bachelor of Science degree, with honors, in electrical engineering from the University of California at Davis.

*Thomas J. Tiernan* has been Executive Vice President and General Manager of our company since July 2007. Mr. Tiernan served as Senior Vice President of our company from March 2006 until July 2007. Prior to joining our company, Mr. Tiernan served as Vice President and General Manager of Symbol Technologies' Mobile Computing Division. From 1985 to 2004, Mr. Tiernan held various management and executive positions at Hewlett-Packard, including running the Network Storage business in the Americas, the Enterprise Systems business in Asia Pacific, and the PC business in Japan. Mr. Tiernan holds a Bachelor's Degree in Electrical Engineering from California State Polytechnic University and a Masters of Science in Computer Engineering from Santa Clara University.

*Russell J. Knittel* has been Executive Vice President, Chief Financial Officer, of our company since July 2007 and Chief Financial Officer, Chief Administrative Officer, Secretary, and Treasurer of our company since November 2001. Mr. Knittel served as Senior Vice President of our company from April 2000 until July 2007. He served as the Vice President of Administration and Finance, Chief Financial Officer, and Secretary of our company from April 2000 through October 2001. Mr. Knittel served as Vice President and Chief Financial Officer of Probe Technology Corporation from May 1999 to March 2000. He was a consultant from January 1999 until April 1999. Mr. Knittel was Vice President and Chief Financial Officer at Starlight Networks from November 1994 to December 1998. Mr. Knittel holds a Bachelor of Arts degree in accounting from California State University at Fullerton and a Masters of Business Administration from San Jose State University.

*Shawn P. Day, Ph.D.* has been Vice President and Chief Technical Officer of our company since July 2007. He served as our Vice President of Research and Development of our company from June 1998 through July 2007; as the Director of Software Development of our company from November 1996 until May 1998; and as principal software engineer of our company from August 1995 until October 1996. Mr. Day holds a Bachelor of Science degree and a Doctorate, both in electrical engineering, from the University of British Columbia in Vancouver, Canada.

*Alex Wong* has been the Vice President of World Wide Operations of our company since September 2006. From 2003 to 2006, Mr. Wong served our company as Managing Director of Hong Kong and Director of Operations. Prior to joining Synaptics, Mr. Wong held various management positions with National Semiconductor, including General Manager for National Joint Ventures in China and Hong Kong as well as the Director of Corporate Business Development. Mr. Wong holds a Bachelor of Science degree in Computer Science from California State University at Northridge and a Masters in Business Administration from the University of East Asia, Macau.

14

Table of Contents

## ITEM 1A. RISK FACTORS

You should carefully consider the following factors, together with all the other information included in this report, in evaluating our company and our business.

**We currently depend on our TouchPad and TouchStyk products, and the notebook computer market, for a significant portion of our revenue, and a downturn in these products or market could have a disproportionate impact on our revenue.**

Historically, we have derived a substantial portion of our revenue from the sale of our TouchPad and TouchStyk products for notebook computers. While our long-term objective is to derive revenue from multiple user interface solutions for both the notebook computer market and the markets for digital lifestyle products and other electronic devices, we anticipate that sales of our TouchPads and TouchStyks for notebooks will continue to represent a significant portion of our revenue. The PC market as a whole has experienced a slowdown in the rate of growth. A continued or accelerated softening in the demand in the notebook portion of the PC market or the level of our participation in that market would cause our business, financial condition, and results of operations to suffer more than they would have if we offered a more diversified line of products.

**Net revenue from our user interface solutions for digital lifestyle products have been volatile in the past, and our net revenue from our user interface solutions for digital lifestyle products may not increase or be less volatile in the future.**

Net revenue from our user interface solutions for digital lifestyle products, particularly portable digital music players, have been volatile in the past, and sales for other digital lifestyle products, such as mobile phones, have not been significant to date. Our net revenue from our user interface solutions for digital lifestyle products may not increase or be less volatile in the future. Net revenue from our user interface solutions for digital lifestyle products were $27.0 million, or 15% of our net revenue, in fiscal 2006 and $40.6 million, or 15% of our net revenue, in fiscal 2007. Further, our interface business for digital lifestyle products faces many uncertainties, particularly portable digital music players, including our success in penetrating new markets dominated by a limited number of OEMs. Our inability to address these uncertainties successfully and to become a leading supplier of user interfaces for digital lifestyle products would result in a slower growth rate than we currently anticipate. We do not know whether our user interface solutions for the digital lifestyle product market will gain market acceptance or will ever result in a substantial portion of our revenue on a consistent basis. The failure to succeed in these other markets would result in no return on the substantial investments we have made to date and plan to make in the future to penetrate these markets.

**We cannot assure you that our user interface business for digital lifestyle products will be successful or that we will be able to generate significant revenue from the markets for digital lifestyle products.**

Various target markets for our interfaces, such as those for smart phones, GPS devices, smart handheld devices, and interactive games and toys, are uncertain, may develop slower than anticipated, or could utilize competing technologies. The market for certain of these products depends in part upon the development and deployment of wireless and other technologies, which may or may not address the needs of users of these new products.

Our ability to generate significant revenue from the markets for certain digital lifestyle products and other electronic devices will depend on various factors, including the following:

- the development and growth of these markets;

- the ability of our technologies and product solutions to address the needs of these markets, the requirements of OEMs, and the preferences of end users; and

- our ability to provide OEMs with user interface solutions that provide advantages in terms of size, power consumption, reliability, durability, performance, and value-added features compared with alternative solutions.

15

Table of Contents

Many manufacturers of these products have well-established relationships with competitive suppliers. Penetrating these markets will require us to offer better performance alternatives to existing solutions at competitive costs. We generally do not have a significant backlog of orders for our user interface solutions to be incorporated in products in these markets. The failure of any of these target markets to develop as we expect, or our failure to penetrate these markets to a significant extent, will impede our anticipated sales growth and could result in substantially reduced earnings from those we anticipate. We cannot predict the size or growth rate of these markets or the market share we will achieve in these markets in the future.

**Our historical financial performance is based primarily on net revenue generated from our user interface solutions to the notebook computer market and may not be indicative of our future performance in other markets.**

Our historical financial performance primarily reflects net revenue generated from our user interface solutions for notebook computers. While we expect sales of our user interface solutions for notebook computers to continue to generate a substantial percentage of our revenue, we expect to derive an increasing portion of our revenue from sales of our product solutions for digital lifestyle products, including portable digital music players, mobile phones, and other electronic devices. We have a limited operating history in these markets, especially for mobile phones, upon which you can evaluate our prospects, which may make it difficult to predict our actual results in future periods. Actual results of our future operations may differ materially from our anticipated results.

**Market acceptance of our customers' existing or new products that utilize our user interface solution may decline or may not develop and, as a result, our sales may decline or may not increase.**

We do not sell any products to end users. Instead, we design various user interface solutions that our OEM customers incorporate into their products. As a result, our success depends almost entirely upon the widespread market acceptance of our OEM customers' products. We do not control or influence the manufacture, promotion, distribution, or pricing of the products that incorporate our user interface solutions. Instead, we depend on our customers to manufacture and distribute products incorporating our user interface solutions and to generate consumer demand through marketing and promotional activities. Even if our technologies successfully meet our customers' price and performance goals, our sales would decline or fail to develop if our customers do not achieve commercial success in selling their products that incorporate our user interface solutions.

Competitive advances by OEMs in the PC or digital lifestyle product markets, which do not utilize our user interface solutions broadly in their product offerings, at the expense of our other OEM customers could result in lost sales opportunities. Within the digital lifestyle product market, the portable digital music player market also has become an important factor in our operating results. Any significant slowdown in the use of our user interface solutions by our customers in this market, the reduced demand for our customers' products, or a slowdown in this market would adversely affect our sales.

**If we fail to maintain and build relationships with our customers and do not continue to satisfy our customers, we may lose future sales and our revenue may stagnate or decline.**

Because our success depends on the widespread market acceptance of our customers' products, we must continue to maintain our relationships with the leading notebook computer and portable digital music player OEMs and expand our relationships with mobile phone OEMs. In addition, we must identify areas of significant growth potential in other markets, establish relationships with OEMs in those markets, and assist those OEMs in developing products that use our interface technologies. Our failure to identify potential growth opportunities, particularly in new markets, or establish and maintain relationships with OEMs in those markets, would prevent our business from growing in those markets.

Our ability to meet the expectations of our customers requires us to provide innovative user interface solutions for customers on a timely and cost-effective basis and to maintain customer satisfaction with our user interface solutions. We must match our design and production capacity with customer demand, maintain satisfactory delivery schedules, and meet performance goals. If we are unable to achieve these goals for any reason, our customers could reduce their purchases from us and our sales would decline or fail to develop.

Our customer relationships also can be affected by factors affecting our customers that are unrelated to our performance. These factors can include a myriad of situations, including business reversals of customers,

16

Table of Contents

determinations by customers to change their product mix or abandon business segments, or mergers, consolidations, or acquisitions involving our customers, such as the combination of Compaq and Hewlett-Packard or the acquisition of IBM's PC business unit by Lenovo.

**Two customers accounted for an aggregate of 26% of our net revenue in fiscal 2007, and the loss of revenue from these customers could harm our business, financial condition, and results of operations.**

Sales to two customers that provide contract manufacturing services to major OEMs accounted for an aggregate of 26% of our net revenue for the fiscal ended June 30, 2007, and two customers accounted for an aggregate of 24% of our net revenue for the fiscal ended June 30, 2006. These customers were Compal and Wistron in fiscal 2007 and Inventec and Wistron in fiscal 2006. Additionally, receivables from each of Compal and Zhan Yun Shanghai Electronics exceeded 10% of accounts receivable and in the aggregate represented 29% of accounts receivable at June 30, 2007.

Compal, Inventec, Wistron, and Zhan Yun Shanghai Electronics are contract manufacturers that serve our OEM customers. Any material delay, cancellation, or reduction of orders from any one or more of these contract manufacturers or the OEMs they serve could harm our business, financial condition, and results of operations. The adverse effect would be more substantial if our other customers in the notebook computer industry do not increase their orders or if we are unsuccessful in generating orders for user interface solutions in the markets for digital lifestyle products and other electronic devices, from existing or new customers. Many of these contract manufacturers sell to the same OEMs, and therefore our concentration with certain OEMs may be higher than with any individual contract manufacturer. Concentration in our customer base may make fluctuations in revenue and earnings more severe and make business planning more difficult.

**We rely on others for our production and any interruptions of these arrangements could disrupt our ability to fill our customers' orders.**

We utilize contract manufacturers for all of our production requirements. The majority of our manufacturing is conducted in China, Hong Kong, Singapore, Taiwan, and Thailand by contract manufacturers that also perform services for numerous other companies. We do not have a guaranteed level of production capacity with any of our contract manufacturers. Qualifying new contract manufacturers, and specifically semiconductor foundries, is time consuming and might result in unforeseen manufacturing and operations problems. The loss of our relationships with our contract manufacturers or assemblers or their inability to conduct their manufacturing and assembly services for us as anticipated in terms of cost, quality, and timeliness could adversely affect our ability to fill customer orders in accordance with required delivery, quality, and performance requirements. If this were to occur, the resulting decline in revenue would harm our business.

**We depend on third parties to maintain satisfactory manufacturing yields and delivery schedules, and their inability to do so could increase our costs, disrupt our supply chain, and result in our inability to deliver our products, which would adversely affect our results of operations.**

We depend on our contract manufacturers to maintain high levels of productivity and satisfactory delivery schedules at manufacturing and assembly facilities located primarily in China, Hong Kong, Singapore, Taiwan, and Thailand. We provide our contract manufacturers with six-month rolling forecasts of our production requirements. We do not, however, have long-term agreements with any of our contract manufacturers that guarantee production capacity, prices, lead times, or delivery schedules. Our contract manufacturers serve other customers, a number of which have greater production requirements than we do. As a result, our contract manufacturers could determine to prioritize production capacity for other customers or reduce or eliminate deliveries to us on short notice. At times, we have experienced lower than anticipated manufacturing yields and lengthening of delivery schedules. Lower than expected manufacturing yields could increase our costs or disrupt our supplies. We may encounter lower manufacturing yields and longer delivery schedules in commencing volume production of our new products. Any of these problems could result in our inability to deliver our product solutions in a timely manner and adversely affect our operating results.

17

Table of Contents

**Shortages of components and materials may delay or reduce our sales and increase our costs, thereby harming our results of operations.**

The inability to obtain sufficient quantities of components and other materials necessary for the production of our products could result in reduced or delayed sales or lost orders. Any delay in or loss of sales could adversely impact our operating results. Many of the materials used in the production of our products are available only from a limited number of foreign suppliers, particularly suppliers located in Asia. In most cases, neither we nor our contract manufacturers have long-term supply contracts with these suppliers. As a result, we are subject to economic instability in these Asian countries as well as to increased costs, supply interruptions, and difficulties in obtaining materials. Our customers also may encounter difficulties or increased costs in obtaining the materials necessary to produce their products into which our product solutions are incorporated.

From time to time, materials and components used in our product solutions or in other aspects of our customers' products have been subject to allocation because of shortages of these materials and components. Shortages in the future could cause delayed shipments, customer dissatisfaction, and lower revenue.

**We are subject to lengthy development periods and product acceptance cycles, which can result in development and engineering costs without any future revenue.**

We provide user interface solutions that are incorporated by OEMs into the products they sell. OEMs make the determination during their product development programs whether to incorporate our user interface solutions or pursue other alternatives. This process requires us to make significant investments of time and resources in the design of user interface solutions well before our customers introduce their products incorporating these interfaces and before we can be sure that we will generate any significant sales to our customers or even recover our investment. During a customer's entire product development process, we face the risk that our interfaces will fail to meet our customer's technical, performance, or cost requirements or that our products will be replaced by competitive products or alternative technological solutions. Even if we complete our design process in a manner satisfactory to our customer, the customer may delay or terminate its product development efforts. The occurrence of any of these events could cause sales to not materialize, to be deferred, or to be cancelled, which would adversely affect our operating results.

**We do not have long-term purchase commitments from our customers, and their ability to cancel, reduce, or delay orders could reduce our revenue and increase our costs.**

Our customers do not provide us with firm, long-term volume purchase commitments, but instead issue purchase orders. As a result, customers can cancel purchase orders or reduce or delay orders at any time. The cancellation, delay, or reduction of customer purchase orders could result in reduced revenue, excess inventory, and unabsorbed overhead. We have an established presence in the notebook computer market and have only recently established a presence in the digital lifestyle products markets. Our success in the digital lifestyle product market will require us to establish the value added by our products to OEMs that have traditionally used other solutions. All of the markets we serve are subject to severe competitive pressures, rapid technological change, and product obsolescence, which increase our inventory and overhead risks, resulting in increased costs.

**We face intense competition that could result in our losing or failing to gain market share and suffering reduced revenue.**

We serve intensely competitive markets that are characterized by price erosion, rapid technological change, and competition from major domestic and international companies. This intense competition could result in pricing pressures, lower sales, reduced margins, and lower market share. Any movement away from high-quality, custom designed, feature-rich user interface solutions to lower priced alternatives would adversely affect our business. Some of our competitors, particularly in the markets for digital lifestyle products and other electronic devices, have greater market recognition, larger customer bases, and substantially greater financial, technical, marketing, distribution, and other resources than we possess and that afford them competitive advantages. As a result, they may be able to devote greater resources to the promotion and sale of products, to negotiate lower prices for raw materials and components, to deliver competitive products at lower prices, and to introduce new product solutions and respond to customer requirements more quickly than we can. Our competitive position could suffer if one or more of our customers determine not to utilize our custom engineered, total solutions approach and instead decide to design and manufacture their own interfaces, to contract with our competitors, or to use alternative technologies.

18

Table of Contents

Our ability to compete successfully depends on a number of factors, both within and outside our control. These factors include the following:

- our success in designing and introducing new user interface solutions, including those implementing new technologies;

- our ability to predict the evolving needs of our customers and to assist them in incorporating our technologies into their new products;

- our ability to meet our customer's requirements for low power consumption, ease of use, reliability, durability, and small form factor;

- the quality of our customer services;

- the rate at which customers incorporate our user interface solutions into their own products;

- product or technology introductions by our competitors; and

- foreign currency fluctuations, which may cause a foreign competitor's products to be priced significantly lower than our product solutions.

**If we do not keep pace with technological innovations, our products may not be competitive and our revenue and operating results may suffer.**

We operate in rapidly changing markets. Technological advances, the introduction of new products, and new design techniques could adversely affect our business unless we are able to adapt to the changing conditions. Technological advances could render our solutions obsolete, and we may not be able to respond effectively to the technological requirements of evolving markets. As a result, we will be required to expend substantial funds for and commit significant resources to

- continue research and development activities on existing and potential user interface solutions,

- hire additional engineering and other technical personnel, and

- purchase advanced design tools and test equipment.

Our business could be harmed if we are unable to develop and utilize new technologies that address the needs of our customers, or our competitors or customers do so more effectively than we do.

**Our efforts to develop new technologies may not result in commercial success, which could cause a decline in our revenue and could harm our business.**

Our research and development efforts with respect to new technologies may not result in customer or market acceptance. Some or all of those technologies may not successfully make the transition from the research and development lab to cost-effective production as a result of technology problems, competitive cost issues, yield problems, and other factors. Even when we successfully complete a research and development effort with respect to a particular technology, our customers may decide not to introduce or may terminate products utilizing the technology for a variety of reasons, including the following:

- difficulties with other suppliers of components for the products,

- superior technologies developed by our competitors and unfavorable comparisons of our solutions with these technologies,

- price considerations, and

- lack of anticipated or actual market demand for the products.

19

**Table of Contents**

The nature of our business requires us to make continuing investments for new technologies. Significant expenses relating to one or more new technologies that ultimately prove to be unsuccessful for any reason could have a material adverse effect on us. In addition, any investments or acquisitions made to enhance our technologies may prove to be unsuccessful. If our efforts are unsuccessful, our business could be harmed.

**We may not be able to enhance our existing product solutions and develop new product solutions in a timely manner.**

Our future operating results will depend to a significant extent on our ability to continue to provide new user interface solutions that compare favorably with alternative solutions on the basis of time to introduction, cost, performance, and end user preferences. Our success in maintaining existing and attracting new customers and developing new business depends on various factors, including the following:

- innovative development of new solutions for customer products,

- utilization of advances in technology,

- maintenance of quality standards,

- efficient and cost-effective solutions, and

- timely completion of the design and introduction of new user interface solutions.

We recently introduced our OneTouch product offering to enable our customers to access our technologies to develop their own user interface designs for capacitive buttons and scrolling applications for products such as mobile phones, portable digital music and video players, and notebook peripherals. OneTouch may not enable us to achieve our goal of increasing our business with existing customers or attracting new customers. In addition, OneTouch could reduce demand for our custom-designed user interface solutions.

Our inability to enhance our existing product solutions and develop new product solutions on a timely basis could harm our operating results and impede our growth.

**A technologically new user interface solution that achieves significant market share could harm our business.**

Our user interface solutions are designed to integrate touch, handwriting, and vision capabilities. New computing and communications devices could be developed that call for a different interface solution. Existing devices also could be modified to allow for a different interface solution. Our business could be harmed if our products become noncompetitive as a result of a technological breakthrough that allows a new interface solution to displace our solutions and achieve significant market acceptance.

**International sales and manufacturing risks could adversely affect our operating results.**

Our manufacturing and assembly operations are primarily conducted in China, Hong Kong, Singapore, Taiwan, and Thailand by manufacturing contractors. We have sales and logistics operations in Hong Kong, and sales support operations in China, Japan, Korea, Switzerland, and Taiwan. These international operations expose us to various economic, political, and other risks that could adversely affect our operations and operating results, including the following:

- difficulties and costs of staffing and managing a multi-national organization,

- unexpected changes in regulatory requirements,

- differing labor regulations,

- potentially adverse tax consequences,

- tariffs and duties and other trade barrier restrictions,

20

Table of Contents

- possible employee turnover or labor unrest,
- greater difficulty in collecting accounts receivable,
- the burdens and costs of compliance with a variety of foreign laws,
- potentially reduced protection for intellectual property rights, and
- political or economic instability in certain parts of the world.

The risks associated with international operations could negatively affect our operating results.

**Our business may suffer if international trade is hindered, disrupted, or economically disadvantaged.**

Political and economic conditions abroad may adversely affect the foreign production and sale of our products. Protectionist trade legislation in either the United States or foreign countries, such as a change in the current tariff structures, export or import compliance laws, or other trade policies, could adversely affect our ability to sell user interface solutions in foreign markets and to obtain materials or equipment from foreign suppliers.

Changes in policies by the U.S. or foreign governments resulting in, among other things, higher taxation, currency conversion limitations, restrictions on the transfer of funds, or the expropriation of private enterprises also could have a material adverse effect on us. Any actions by countries in which we conduct business to reverse policies that encourage foreign investment or foreign trade also could adversely affect our operating results. In addition, U.S. trade policies, such as "most favored nation" status and trade preferences for certain Asian nations, could affect the attractiveness of our services to our U.S. customers and adversely impact our operating results.

**Our operating results could be adversely affected by fluctuations in the value of the U.S. dollar against foreign currencies.**

We transact business predominantly in U.S. dollars and bill and collect our sales in U.S. dollars. A weakening of the dollar could cause our overseas vendors to require renegotiation of either the prices or currency we pay for their goods and services. In the future, customers may negotiate pricing and make payments in non-U.S. currencies. For fiscal 2007, approximately 5% of our costs were denominated in non-U.S. currencies, including Hong Kong dollars, British pounds, Taiwan dollars, Japanese yen, Korean won, Chinese yuan, and Swiss francs.

If our overseas vendors or customers require us to transact business in non-U.S. currencies, fluctuations in foreign currency exchange rates could affect our cost of goods, operating expenses, and operating margins and could result in exchange losses. In addition, currency devaluation can result in a loss to us if we hold deposits of that currency. Hedging foreign currencies can be difficult, especially if the currency is not freely traded. We cannot predict the impact of future exchange rate fluctuations on our operating results. We currently do not hedge any foreign currencies, accordingly, we have no foreign currency hedge contracts outstanding as of the end of our fiscal year.

**A majority of our contract manufacturers are located in China, Hong Kong, Singapore, Taiwan, and Thailand increasing the risk that a natural disaster, labor strike, war, or political unrest in those countries would disrupt our operations.**

A majority of our contract manufacturers are located in China, Hong Kong, Singapore, Taiwan, and Thailand. Events out of our control, such as earthquakes, fires, floods, or other natural disasters, or political unrest, war, labor strikes, or work stoppages in these countries would disrupt their operations, which would impact our operations. The risk of earthquakes in Taiwan is significant because of its proximity to major earthquake fault lines. An earthquake, such as the one that occurred in Taiwan in September 1999, could cause significant delays in shipments of our product solutions until we are able to shift our outsourced operations. In addition, there is political tension between China and Taiwan that could lead to hostilities. If any of these events occur, we may not be able to obtain alternative capacity. Failure to secure alternative capacity could cause a delay in the shipment of our product solutions, which would cause our revenue to fluctuate or decline.

21

Table of Contents

**Variability of customer requirements resulting in cancellations, reductions, or delays may adversely affect our operating results.**

We must provide increasingly rapid product turnaround and respond to ever-shorter lead times. A variety of conditions, both specific to individual customers and generally affecting the demand for OEMs' products, may cause customers to cancel, reduce, or delay orders. Cancellations, reductions, or delays by a significant customer or by a group of customers may adversely affect our revenue; and could require us to repurchase inventory from our contract manufacturers, which could adversely affect our costs. On occasion, customers require rapid increases in production, which can strain our resources and reduce our margins. Although we have been able to obtain increased production capacity from our third-party manufacturers, we may be unable to do so at any given time to meet our customers' demands if their demands exceed anticipated levels.

**Our operating results may experience significant fluctuations that could result in a decline in the price of our stock.**

In addition to the variability resulting from the short-term nature of our customers' commitments, other factors contribute to significant periodic and seasonal quarterly fluctuations in our results of operations. These factors include the following:

- the cyclicality of the markets we serve;
- the timing and size of orders;
- the volume of orders relative to our capacity;
- product introductions and market acceptance of new products or new generations of products;
- evolution in the life cycles of our customers' products;
- timing of expenses in anticipation of future orders;
- changes in product mix, including the percentage of dual pointing and single pointing products shipped;
- availability of manufacturing and assembly services;
- changes in cost and availability of labor and components;
- the expanded use of high-cost third-party components in the products we sell;
- timely delivery of product solutions to customers;
- pricing and availability of competitive products;
- introduction of new technologies into the markets we serve;
- emergence of new competitors;
- pressures on reducing selling prices;
- the absolute and relative levels of corporate enterprise and consumer notebook purchases;
- our success in serving new markets, and
- changes in economic conditions.

Accordingly, you should not rely on period-to-period comparisons as an indicator of our future performance. Negative or unanticipated fluctuations in our operating results may result in a decline in the price of our stock.

22

Table of Contents

**If we fail to manage our growth effectively, our infrastructure, management, and resources could be strained, our ability to effectively manage our business could be diminished, and our operating results could suffer.**

The failure to manage our growth effectively could strain our resources, which would impede our ability to increase revenue. We have increased the number of our user interface solutions and plan to expand further the number and diversity of our solutions and their use in the future. Our ability to manage our planned diversification and growth effectively will require us to

- successfully hire, train, retain, and motivate additional employees, including employees outside the United States;
- enhance our global operational, financial, and management systems; and
- expand our production capacity.

In connection with the expansion and diversification of our product and customer base, we are increasing our personnel and making other expenditures to meet the increased demand we anticipate for our expanding product offerings, including offerings in the notebook computer and digital lifestyle markets. Increases in the demand for our products will require further expansion of our traditional notebook computer business as well as an increasing presence in the digital lifestyle product market, including portable digital music and video players and mobile phones. To date, our sales in the portable digital music and video player market has varied significantly from quarter to quarter and our mobile phone business is in its formative stage. Risks are further increased because customers do not commit to firm production schedules for more than a short time in advance. Any increase in expenses in anticipation of future orders that do not materialize would adversely affect our profitability. Our customers also may require rapid increases in design and production services that place an excessive short-term burden on our resources and the resources of our third-party manufacturers. If we cannot manage our growth effectively, our business and results of operations could suffer.

**We depend on key personnel who would be difficult to replace, and our business will likely be harmed if we lose their services or cannot hire additional qualified personnel.**

Our success depends substantially on the efforts and abilities of our senior management and other key personnel. The competition for qualified management and key personnel, especially engineers, is intense. Although we maintain noncompetition and nondisclosure covenants with most of our key personnel, we do not have employment agreements with most of them. The loss of services of one or more of our key employees or the inability to hire, train, and retain key personnel, especially engineers and technical support personnel, and capable sales and customer-support employees outside the United States, could delay the development and sale of our products, disrupt our business, and interfere with our ability to execute our business plan.

**Our inability to protect our intellectual property could impair our competitive advantage, reduce our revenue, and increase our costs.**

Our success and ability to compete depend in part on our ability to maintain the proprietary aspects of our technologies and products. We rely on a combination of patents, copyrights, trade secrets, trademarks, confidentiality agreements, and other contractual provisions to protect our intellectual property, but these measures may provide only limited protection. We license from third parties certain technology used in and for our products. These third-party licenses are granted with restrictions, and there can be no assurances that such third-party technology will remain available to us on terms beneficial to us. Our failure to enforce and protect our intellectual property rights or obtain from third parties the right to use necessary technology could have a material adverse effect on our business, financial condition, and results of operations. In addition, the laws of some foreign countries do not protect proprietary rights as fully as do the laws of the United States.

Patents may not issue from the patent applications that we have filed or may file in the future. Our issued patents may be challenged, invalidated, or circumvented, and claims of our patents may not be of sufficient scope or strength, or issued in the proper geographic regions, to provide meaningful protection or any commercial advantage. We have not applied for, and do not have, any copyright registration on our technologies or products. We have applied to register certain of our trademarks in the United States and other countries. There can be no assurance that we will obtain registrations of principle or other trademarks in key markets. Failure to obtain registrations could

23

compromise our ability to protect fully our trademarks and brands and could increase the risk of challenge from third parties to our use of our trademarks and brands.

We do not consistently rely on written agreements with our customers, suppliers, manufacturers, and other recipients of our technologies and products, and therefore some trade secret protection may be lost and our ability to enforce our intellectual property rights may be limited. Additionally, our customers, suppliers, manufacturers, and other recipients of our technologies and products may seek to use our technologies and products without appropriate limitations. In the past, we did not consistently require our employees and consultants to enter into confidentiality agreements, employment agreements, or proprietary information and invention assignment agreements. Therefore, our former employees and consultants may try to claim some ownership interest in our technologies and products and may use our technologies and products competitively and without appropriate limitations.

**We may be required to incur substantial expenses and divert management attention and resources in defending intellectual property litigation against us.**

We may receive notices from third parties that claim our products infringe their rights. From time to time, we receive notice from third parties of the intellectual property rights such parties have obtained. We cannot be certain that our technologies and products do not and will not infringe issued patents or other proprietary rights of others. While we are not currently subject to any infringement claim, any future claim, with or without merit, could result in significant litigation costs and diversion of resources, including the attention of management, and could require us to enter into royalty and licensing agreements, any of which could have a material adverse effect on our business. There can be no assurance that such licenses could be obtained on commercially reasonable terms, if at all, or that the terms of any offered licenses would be acceptable to us. If forced to cease using such technology, there can be no assurance that we would be able to develop or obtain alternate technology. Accordingly, an adverse determination in a judicial or administrative proceeding or failure to obtain necessary licenses could prevent us from manufacturing, using, or selling certain of our products, which could have a material adverse effect on our business, financial condition, and results of operations.

Furthermore, parties making such claims could secure a judgment awarding substantial damages, as well as injunctive or other equitable relief that could effectively block our ability to make, use, or sell our products in the United States or abroad. Such a judgment could have a material adverse effect on our business, financial condition, and results of operations. In addition, we are obligated under certain agreements to indemnify the other party in connection with infringement by us of the proprietary rights of third parties. In the event we are required to indemnify parties under these agreements, it could have a material adverse effect on our business, financial condition, and results of operations.

**We may incur substantial expenses and divert management resources in prosecuting others for their unauthorized use of our intellectual property rights.**

The markets in which we compete are characterized by frequent litigation regarding patents and other intellectual property rights. Other companies, including our competitors, may develop technologies that are similar or superior to our technologies, duplicate our technologies, or design around our patents and may have or obtain patents or other proprietary rights that would prevent, limit, or interfere with our ability to make, use, or sell our products. Effective intellectual property protection may be unavailable or limited in some foreign countries in which we operate, such as China and Taiwan. Unauthorized parties may attempt to copy or otherwise use aspects of our technologies and products that we regard as proprietary. There can be no assurance that our means of protecting our proprietary rights in the United States or abroad will be adequate or that competitors will not independently develop similar technologies. If our intellectual property protection is insufficient to protect our intellectual property rights, we could face increased competition in the market for our technologies and products.

Should any of our competitors file patent applications or obtain patents that claim inventions also claimed by us, we may choose to participate in an interference proceeding to determine the right to a patent for these inventions because our business would be harmed if we fail to enforce and protect our intellectual property rights. Even if the outcome is favorable, this proceeding could result in substantial cost to us and disrupt our business.

In the future, we also may need to file lawsuits to enforce our intellectual property rights, to protect our trade secrets, or to determine the validity and scope of the proprietary rights of others. This litigation, whether

24

Table of Contents

successful or unsuccessful, could result in substantial costs and diversion of resources, which could have a material adverse effect on our business, financial condition, and results of operations.

**If we become subject to product returns and product liability claims resulting from defects in our products, we may fail to achieve market acceptance of our products and our business could be harmed.**

We develop complex products in an evolving marketplace and generally warrant our products for a period of 12 months or more from the date of sale. Despite testing by us and our customers, defects may be found in existing or new products. In fiscal 2001, a manufacturing error of one of our contract manufacturers was discovered. Although the error was promptly discovered without significant interruption of supply and the contract manufacturer rectified the problem at its own cost, any such manufacturing errors or product defects could result in a delay in recognition or loss of revenue, loss of market share, or failure to achieve market acceptance. Additionally, these defects could result in financial or other damages to our customers; cause us to incur significant warranty, support, and repair costs; and divert the attention of our engineering personnel from our product development efforts. In such circumstances, our customers could also seek and obtain damages from us for their losses. A product liability claim brought against us, even if unsuccessful, would likely be time-consuming and costly to defend. The occurrence of these problems would likely harm our business.

**Potential strategic alliances may not achieve their objectives, and the failure to do so could impede our growth.**

We anticipate that we will enter into strategic alliances. Among other matters, we continually explore strategic alliances designed to enhance or complement our technology or to work in conjunction with our technology; to provide necessary know-how, components, or supplies; and to develop, introduce, and distribute products utilizing our technology. Any strategic alliances may not achieve their intended objectives, and parties to our strategic alliances may not perform as contemplated. The failure of these alliances may impede our ability to introduce new products and enter new markets.

**Any acquisitions that we undertake could be difficult to integrate, disrupt our business, dilute stockholder value, and harm our operating results.**

We expect to pursue opportunities to acquire other businesses and technologies in order to complement our current user interface solutions, expand the breadth of our markets, enhance our technical capabilities, or otherwise offer growth opportunities. While we have no current definitive agreements underway, we may acquire businesses, products, or technologies in the future. If we make any future acquisitions, we could issue stock that would dilute existing stockholders' percentage ownership, incur substantial debt, assume contingent liabilities, or experience higher operating expenses. Our experience in acquiring other businesses and technologies is limited. Potential acquisitions also involve numerous risks, including the following:

- problems assimilating the purchased operations, technologies, or products;
- unanticipated costs associated with the acquisition;
- diversion of management's attention from our core businesses;
- adverse effects on existing business relationships with suppliers and customers;
- risks associated with entering markets in which we have little or no prior experience; and
- potential loss of key employees of purchased organizations.

We cannot assure you that we would be successful in overcoming problems encountered in connection with any acquisitions, and our inability to do so could disrupt our operations and adversely affect our business.

**The PC and electronics industries are cyclical and may result in fluctuations in our operating results.**

The PC and electronics industries have experienced significant economic downturns at various times. These downturns are characterized by diminished product demand, accelerated erosion of average selling prices, and

25

Table of Contents

production overcapacity. In addition, the PC and electronics industries are cyclical in nature. We seek to reduce our exposure to industry downturns and cyclicality by providing design and production services for leading companies in rapidly expanding industry segments. We may, however, experience substantial period-to-period fluctuations in future operating results because of general industry conditions or events occurring in the general economy.

**The valuation of our technology conducted in connection with our international operating structure may be challenged, which could result in additional taxes, interest, and penalties.**

In fiscal 2005, we implemented an international operating structure. Under this structure, generally, one of our affiliates licensed from us certain rights to the pre-existing and in-process technology associated with our products for exploitation in all geographic markets except the U.S., Japanese, and Korean markets, which we refer to as "ROW markets." Our affiliate also acquired ownership of all future economic rights to product sales in ROW markets by entering into an agreement to license certain intangibles and a cost-sharing agreement under which we and our affiliate will share research and development costs in accordance with certain tax rules and regulations. We believe this structure appropriately reflects where our profits are generated and may result in future tax advantages to us, but there can be no assurances that this will be the case.

**We expect to incur additional expenses in complying with corporate governance and public disclosure requirements.**

Changing laws, regulations, and standards relating to corporate governance and public disclosure, including the Sarbanes-Oxley Act of 2002, new SEC regulations, and Nasdaq Global Select Market rules, are creating uncertainty and increased expenses for companies such as ours. These new or changed laws, regulations, and standards are subject to varying interpretations in many cases due to their lack of specificity and, as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies, which could result in continuing uncertainty regarding compliance matters and higher costs necessitated by ongoing revisions to disclosure and governance practices. We are committed to maintaining high standards of corporate governance and public disclosure. As a result, our efforts to comply with evolving laws, regulations, and standards have resulted in, and are likely to continue to result in, increased general and administrative expenses and a diversion of management time and attention from revenue-generating activities to compliance activities. In particular, our efforts to comply with Section 404 of the Sarbanes-Oxley Act of 2002 and the related regulations regarding our required assessment of our internal control over financial reporting and our external auditors' audit of our internal controls over financial reporting has required the commitment of significant financial and managerial resources. We expect these efforts to require the continued commitment of significant resources. In addition, it has become more difficult and more expensive for us to obtain director and officer liability insurance. As a result, we may have difficulty attracting and retaining qualified board members, which could harm our business. If our efforts to comply with new or changed laws, regulations, and standards differ from the activities intended by regulatory or governing bodies due to ambiguities related to practice, our reputation may be harmed.

**The accounting requirements for income taxes on certain of our share-based awards will subject our future quarterly and annual effective tax rates to greater volatility and, consequently, our ability to estimate reasonably our future quarterly and annual effective tax rates is greatly diminished.**

In accordance with Statement of Financial Accounting Standards ("SFAS") No. 123R, "Share-Based Payment" ("SFAS 123R"), we recognize tax benefit upon expensing certain share-based awards associated with our share-based compensation plans, including nonqualified stock options and deferred stock unit awards, but under current accounting standards we cannot recognize tax benefit currently for those share-based compensation expenses associated with incentive stock options and employee stock purchase plan shares (qualified stock options). For qualified stock options that vested after our adoption of SFAS 123R, we recognize tax benefit only in the period when disqualifying dispositions of the underlying stock occur and, for qualified stock options that vested prior to our adoption of SFAS 123R, the tax benefit is recorded directly to additional paid-in capital. Accordingly, because we cannot recognize the tax benefit for share-based compensation expense associated with qualified stock options until the occurrence of future disqualifying dispositions of the underlying stock and such disqualified dispositions may happen in periods when our stock price substantially increases, and because a portion of that tax benefit may be directly recorded to additional paid-in capital, our future quarterly and annual effective tax rates will be subject to greater volatility and, consequently, our ability to estimate reasonably our future quarterly and annual effective tax rates is greatly diminished.

26

Table of Contents

**Future changes in financial accounting standards or practices may cause adverse unexpected fluctuations and affect our reported results of operations.**

A change in accounting standards or practices could have a significant effect on our reported results of operations. New accounting pronouncements and varying interpretations of accounting pronouncements have occurred in the past and may occur in the future. Changes to existing rules or the questioning of current practices may adversely affect our reported financial results or the way we conduct our business. For example, the Financial Accounting Standards Board issued SFAS 123R requiring us to recognize all share-based payments to employees, including grants of stock options, in the financial statements based on their grant date fair value eliminating the pro forma footnote disclosures that were allowed as an alternative to financial statement recognition. This requirement, while not affecting our cash flow, adversely affected our reported financial results and impaired our ability to provide guidance on our future reported financial results as a result of the variability of the factors used to establish the grant date fair value of stock options and the accounting for income taxes thereon.

**We increased our leverage as a result of the sale of our 0.75% convertible senior subordinated notes.**

As a result of the sale of our 0.75% convertible senior subordinated notes in fiscal 2005, we incurred $125 million of indebtedness. As a result of this indebtedness, our interest payment obligations have increased. Our interest payment obligations on the notes is approximately $938,000 annually. The degree to which we are now leveraged could have adverse consequences, including the following:

- a limitation on our ability to obtain future financing for working capital, acquisitions, or other purposes;
- an increase in our vulnerability to industry downturns and competitive pressures; and
- a possible competitive disadvantage with less leveraged competitors and competitors that may have better access to capital resources.

Our ability to meet our debt service obligations will depend upon our future performance, which will be subject to the financial, business, and other factors affecting our operations, many of which are beyond our control.

**We made an irrevocable election to cash settle the $125 million principal amount of our convertible senior subordinated notes in April 2007. If we do not have sufficient cash resources when settlement occurs we may be in breach of our obligation or we may be required to borrow cash to meet our obligation.**

We made an irrevocable election to cash settle the $125 million principal amount of our convertible senior subordinated notes in April 2007. If we do not have sufficient cash resources when settlement occurs, we may be in breach of our obligation or we may be required to borrow cash to meet our obligation, which may not be available on favorable terms or at all.

**A substantial portion of our short-term investment portfolio is invested in auction rate securities and if an auction fails for amounts we have invested, our investment will not be liquid. If the issuer is unable to successfully close future auctions and their credit rating deteriorates, we may be required to adjust the carrying value of our investment through an impairment charge.**

A substantial portion of our investment portfolio is invested in auction rate securities and if an auction fails for amounts we have invested, our investment will not be liquid. In the event we need to access these funds, we will not be able to until a future auction on these investments is successful. If the issuer is unable to successfully close future auctions and their credit rating deteriorates, we may be required to adjust the carrying value of the investment through an impairment charge.

**Legislation affecting the markets in which we compete could adversely affect our ability to implement our growth strategies.**

Our ability to expand our business may be adversely impacted by future laws or regulations. Our customers' products may be subject to laws relating to environmental regulations, communications, encryption

27

technology, electronic commerce, e-signatures, and privacy. Any of these laws could be expensive to comply with, and the marketability of our products could be adversely affected.

**We must finance the growth of our business and the development of new products, which could have an adverse effect on our operating results.**

To remain competitive, we must continue to make significant investments in research and development, marketing, and business development. Our failure to increase sufficiently our net revenue to offset these increased costs would adversely affect our operating results.

From time to time, we may seek additional equity or debt financing to provide for funds required to expand our business. We cannot predict the timing or amount of any such requirements at this time. If such financing is not available on satisfactory terms, we may be unable to expand our business or to develop new business at the rate desired and our operating results may suffer. Debt financing increases expenses and must be repaid regardless of operating results. Equity financing could result in additional dilution to existing stockholders.

**Continuing uncertainty of the U.S. and global economy may have serious implications for the growth and stability of our business and may negatively affect our stock price.**

The revenue growth and profitability of our business depends significantly on the overall demand in the notebook computer market and in the markets for digital lifestyle products and other electronic devices. Softening demand in these markets caused by ongoing economic uncertainty may result in decreased revenue or earnings levels or growth rates. The U.S. and global economy has been historically cyclical, and market conditions continue to be challenging, which has resulted in individuals and companies delaying or reducing expenditures. Further delays or reductions in spending could have a material adverse effect on demand for our products, and consequently on our business, financial condition, results of operations, prospects, and stock price.

**The market price of our common stock has been and may continue to be volatile.**

The trading price of our common stock has been and may continue to be subject to wide fluctuations in response to various factors, including the following:

- variations in our quarterly results;

- the financial guidance we may provide to the public, any changes in such guidance, or our failure to meet such guidance;

- changes in financial estimates by industry or securities analysts or our failure to meet such estimates;

- various market factors or perceived market factors, including rumors, whether or not correct, involving us, our customers, our suppliers, or our competitors;

- announcements of technological innovations by us or by our competitors;

- introductions of new products or new pricing policies by us or by our competitors;

- acquisitions or strategic alliances by us or by our competitors;

- recruitment or departure of key personnel;

- the gain or loss of significant orders;

- the gain or loss of significant customers;

- market conditions in our industry, the industries of our customers, and the economy as a whole;

- hedging activities by investors holding positions in our convertible senior subordinated notes; and

Table of Contents

- general financial market conditions or occurrences.

In addition, stocks of technology companies have experienced extreme price and volume fluctuations that often have been unrelated or disproportionate to these companies' operating performance. Public announcements by technology companies concerning, among other things, their performance, accounting practices, or legal problems could cause the market price of our common stock to decline regardless of our actual operating performance.

### Our charter documents and Delaware law could make it more difficult for a third party to acquire us, and discourage a takeover.

Our certificate of incorporation and the Delaware General Corporation Law contain provisions that may have the effect of making more difficult or delaying attempts by others to obtain control of our company, even when these attempts may be in the best interests of our stockholders. Our certificate of incorporation also authorizes our board of directors, without stockholder approval, to issue one or more series of preferred stock, which could have voting and conversion rights that adversely affect or dilute the voting power of the holders of common stock. Delaware law also imposes conditions on certain business combination transactions with "interested stockholders." Our certificate of incorporation divides our Board of Directors into three classes, with one class to stand for election each year for a three-year term after the initial election. The classification of directors tends to discourage a third party from initiating a proxy solicitation or otherwise attempting to obtain control of our company and may maintain the incumbency of our Board of Directors, as this structure generally increases the difficulty of, or may delay, replacing a majority of directors. Our certificate of incorporation authorizes our Board of Directors to fill vacancies or newly created directorships. A majority of the directors then in office may elect a successor to fill any vacancies or newly created directorships.

### Our stockholders' rights plan may adversely affect existing stockholders.

Our stockholders' rights plan may have the effect of deterring, delaying, or preventing a change in control that might otherwise be in the best interests of our stockholders. In general, stock purchase rights issued under the rights plan become exercisable when a person or group acquires 15% or more of our common stock or a tender offer or exchange offer of 15% or more of our common stock is announced or commenced. After any such event, our other stockholders may purchase additional shares of our common stock at 50% of the then-current market price. The rights will cause substantial dilution to a person or group that attempts to acquire us on terms not approved by our board of directors. The rights should not interfere with any merger or other business combination approved by our board of directors as the rights may be redeemed by us at $0.01 per stock purchase right at any time before any person or group acquires 15% or more of our outstanding common stock. The rights expire in August 2012.

### Sales of large numbers of shares could adversely affect the price of our common stock.

All of the 26,238,166 shares of our common stock outstanding as of August 1, 2007 are eligible for resale in the public markets. Of these shares, 1,343,639 shares held by affiliates are eligible for resale in the public markets subject to compliance with the volume and manner of sale rules of Rule 144 or 701 under the Securities Act of 1933, as amended, and the balance of the shares are eligible for resale in the public markets either as unrestricted shares or pursuant to Rule 144(k). In general, under Rule 144 as currently in effect, any person (or persons whose shares are aggregated for purposes of Rule 144) who beneficially owns restricted securities with respect to which at least one year has elapsed since the later of the date the shares were acquired from us, or from an affiliate of ours, is entitled to sell within any three-month period a number of shares that does not exceed the greater of 1% of the then outstanding shares of our common stock and the average weekly trading volume in common stock during the four calendar weeks preceding such sale. Sales under Rule 144 also are subject to certain manner-of-sale provisions and notice requirements and to the availability of current public information about us.

Rule 701, as currently in effect, permits our employees, officers, directors, and consultants who purchase shares pursuant to a written compensatory plan or contract to resell these shares in reliance upon Rule 144, but without compliance with specific restrictions. Rule 701 provides that affiliates may sell their Rule 701 shares under Rule 144 without complying with the holding period requirement and that non-affiliates may sell their shares in reliance on Rule 144 without complying with the holding period, public information, volume limitation, or notice provisions of Rule 144. A person who is not an affiliate, who has not been an affiliate within three months prior to sale, and who beneficially owns restricted securities with respect to which at least two years have elapsed since the later of the date the shares were acquired from us, or from an affiliate of ours, is entitled to sell such shares under

29

Table of Contents

Rule 144(k) without regard to any of the volume limitations or other requirements described above. Sales of substantial amounts of common stock in the public market could adversely affect prevailing market prices.

We have registered an aggregate of $100 million of common stock and preferred stock for issuance in connection with acquisitions, which shares generally will be freely tradeable after their issuance under Rule 145 of the Securities Act, unless held by an affiliate of the acquired company, in which case such shares will be subject to the volume and manner of sale restrictions of Rule 144 discussed above. The issuance or subsequent sale of these shares in the public market could adversely affect prevailing market prices.

We have registered an aggregate of $125 million of our 0.75% Convertible Senior Subordinated Notes due 2024 and the common stock issuable upon conversion of the notes. The shares issued upon conversion generally will be freely tradeable after their issuance, unless held by an affiliate, in which case such shares will be subject to the volume and manner of sale restrictions of Rule 144 discussed above. The issuance or subsequent sale of these shares in the public market could negatively affect the market price of our common stock.

We have registered for offer and sale the shares of common stock that are reserved for issuance pursuant to our outstanding share-based compensation plans. Shares issued after the effective date of such registration statements in connection with our share-based compensation plans generally will be eligible for sale in the public market, except that affiliates will continue to be subject to volume limitations and other requirements of Rule 144. The issuance or subsequent sale of such shares could depress the market price of our common stock.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

Not applicable.

## ITEM 2. PROPERTIES

Our principal executive offices as well as our principal research, development, sales, marketing, and administrative functions are located in our 70,000 square foot facility in Santa Clara, California. We believe this facility will be adequate to meet our needs for the foreseeable future. Our Asia/Pacific headquarters are located in Hong Kong where we lease approximately 13,300 square feet. We also maintain approximately 10,000 square feet of office space in Taiwan, approximately 4,600 square feet of office space in China, approximately 2,500 square feet of office space in Korea, and less than 1,000 square feet of office space in both Japan and Switzerland. We have satellite sales support offices in Thailand and Texas.

## ITEM 3. LEGAL PROCEEDINGS

In March 2006, Elantech Devices Corporation ("Elantech") filed a Complaint for Patent Infringement against us claiming that we infringed one of its patents and seeking damages, attorneys' fees, and a permanent injunction against us infringing or inducing others to infringe the patent. In April 2006, we filed our Answer to the Complaint and Counterclaims against Elantech claiming that Elantech has infringed and induced infringement of four of our patents and seeking damages, attorneys' fees, and a permanent injunction against infringing or inducing others to infringe.

Elantech responded to our counterclaim denying liability and counterclaimed seeking an injunction and damages for alleged violations of California law. We subsequently filed a motion to dismiss the Elantech counterclaims that was granted in July 2006 with leave to amend the counterclaims after the adjudication of the patent infringement claims. We intend to vigorously defend our patents and pursue our counterclaims. We have not recorded any liability associated with Elantech's claims and have expensed as incurred all legal fees associated with the legal proceedings.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

Not applicable.

**EXHIBIT 6**



#12
1-2  12-27-96
SYN-071

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:                    ) Art Unit:
                                         )
Gillespie, et al.                        ) Examiner:
                                         )
Serial No.  08/623,483                   )
                                         )
Filed:  28 March 1996                    )
                                         )
For:   OBJECT POSITION DETECTOR WITH     )
       EDGE MOTION FEATURE AND           )
       GESTURE RECOGNITION               )

CERTIFICATE OF MAILING
I hereby certify that this correspondence is being
deposited with the United States Postal Service with
sufficient postage as First Class Mail, in an envelope
addressed to:
        Assistant Commissioner for Patents
        Washington, D.C. 20231

on  12/5/96      Diane Morse
    Date              Diane Morse

## INFORMATION  DISCLOSURE  STATEMENT

Honorable Assistant Commissioner
    for Patents
Washington, D.C. 20231

Dear Sir:

Each item of information listed in the attached FORM PTO-1449, for which a

copy of each is attached, may be material to the examination of the above-identified

application and is, therefore, submitted in compliance with the duty of disclosure

defined in 37 CFR §§ 1.56, 1.97 and 1.98.  The Examiner is requested to make these

items of official record in this application.

This Information Disclosure Statement under 37 CFR §§ 1.56, 1.97 and 1.98 is

1

SYN-071

not to be construed as a representation that a search has been made, that additional

information material to the examination of this application does not exist, or that any

one or more of these items constitutes prior art.

I

This statement is filed pursuant to:

(X)    C.F.R.  § 1.97(b).
       This information disclosure statement is filed either (1) within three months of the filing
       date of the national applications;  (2) within three months of the date of entry of the
       national stage as set forth in 37 C.F.R. § 1.491 in an international application; or (3) before
       the mailing date of a first office action on the merits, whichever event occurs last.

       Accordingly, this information disclosure statement requires no fee and no certification.

( )    37 C.F.R.  § 1.97 (c).
       This information disclosure statement is filed after the period specified in 37 C.F.R.  § 197
       (b), but before the mailing date of either (1) a final action under 37 C.F.R.  § 1.113 or (2) a
       notice of allowance under 37 C.F.R.  § 1.311.

       Accordingly, this information disclosure statement requires either the fee specified in 37
       C.F.R.  § 1.17 (p) for submission of an information disclosure statement under 37 C.F.R.
       § 1.97 (c)  ($230), or a certification according to 37 C.F.R.  § 1.97 (e).

( )    37 C.F.R.  §  1.97 (d).
       This information disclosure statement is filed after the period specified in 37 C.F.R. § 1.97
       (c).

       Accordingly, this information disclosure statement requires the petition fee specified in
       37 C.F.R.  § 1.17 (i) (1) to consider an information disclosure statement under 37 C.F.R.
       § 1.97 (d)  ($130), a certification according to 37 C.F.R. § 1.97 (e), and a petition
       requesting consideration of the information disclosure statement.

If this statement crosses in the mail with an office action, or is otherwise not in

the indicated category of 37  C.F.R. § 1.97, it is respectfully requested that this

statement be treated in the next appropriate category and made of record.  To the

extent required, please treat this paper as a conditional petition for acceptance of the

information disclosure statement.

2

Page 1 of 5

| Form PTO-449<br>(Rev...) | U. S. Department of Commerce<br>Patent and Trademark Office | Atty. Docket No.<br>SYN-071 | Serial No.<br>08/623,483 |
|---|---|---|---|
| MAILROOM<br>DEC 17 1996 | Information Disclosure Statement by Applicant | Applicant: Gillespie, et al. | |
| | (Use several sheets if necessary) | Filed: 03/28/96 | Group: 2975 |

**U. S. Patent Documents**

| Init. | | Document No. | Date | Name | Class | Subclass | Filing Date |
|---|---|---|---|---|---|---|---|
| √J | A | re23,030 | 08/24/48 | Holt | | | 06/29/44 |
| | B | 2,219,497 | 10/29/40 | Stevens, et al. | | | 01/11/38 |
| | C | 3,128,458 | 04/07/64 | Romero | | | 05/10/62 |
| | D | 3,207,905 | 09/21/65 | Bray | | | 08/17/61 |
| | E | 3,244,369 | 04/05/66 | Nassimbene | | | 09/25/64 |
| | F | 3,401,470 | 09/17/68 | Gaven | | | 05/04/66 |
| | G | 3,437,795 | 04/08/69 | Kuljian | | | 06/28/65 |
| | H | 3,482,241 | 12/02/69 | Johnson | | | 08/02/66 |
| | I | 3,492,440 | 01/27/70 | Cerbone, et al. | | | 05/25/67 |
| | J | 3,493,791 | 02/03/70 | Adelson, et al. | | | 08/12/66 |
| | K | 3,497,617 | 02/24/70 | Ellis, et al. | | | 08/21/67 |
| | L | 3,497,966 | 03/03/70 | Gaven | | | 02/20/67 |
| | M | 3,516,176 | 06/23/70 | Cleary, et al. | | | 12/26/67 |
| | N | 3,522,664 | 08/04/70 | Lambright, et al. | | | 11/20/67 |
| | O | 3,530,310 | 09/22/70 | Adelson, et al. | | | 10/28/66 |
| | P | 3,543,056 | 11/24/70 | Klein | | | 08/07/67 |
| | Q | 3,549,909 | 12/22/70 | Adelson, et al. | 307 | 252 | 08/25/69 |
| | R | 3,593,115 | 07/13/71 | Dym, et al. | 323 | 93 | 09/10/69 |
| | S | 3,598,903 | 08/10/71 | Johnson, et al. | 178 | 18 | 06/06/68 |
| | T | 3,662,378 | 05/09/72 | MacArthur | 340 | 347 DD | 06/01/70 |
| | U | 3,675,239 | 07/04/72 | Ackerman, et al. | 340 | 365 | 09/14/70 |
| | V | 3,683,371 | 08/08/72 | Holz | 340 | 365 | 09/15/70 |
| | W | 3,696,409 | 10/03/72 | Braaten | 340 | 365 | 12/28/70 |
| | X | 3,732,389 | 05/08/73 | Kaelin, et al. | 200 | 167 A | 02/14/72 |
| | Y | 3,737,670 | 06/05/73 | Larson | 307 | 116 | 07/09/71 |
| √J | Z | 3,757,322 | 09/04/73 | Barkan, et al. | 340 | 365 C | 02/03/71 |

| Examiner | | Date Considered |
|---|---|---|
| | Shan Lee | 3/27/98 |

EXAMINER: Initial if citation considered, whether or not citation is in conference with MPEP 609. Draw line through citation if not in conformance and not considered. Include a copy of this form with the next communication to applicant.

Page  2 of  5

| Form PTO 1449 (Rev. 2-32) | U. S. Department of Commerce Patent and Trademark Office | | | | Atty. Docket No. SYN-071 | | Serial No. 08/623,483 |
|---|---|---|---|---|---|---|---|
| Information Disclosure Statement by Applicant | | | | | Applicant: Gillespie, et al. | | |
| (Use several sheets if necessary) | | | | | Filed: 03/28/96 | | Group: 2775 |

### U. S. Patent Documents

| Init. | | Document No. | Date | Name | Class | Subclass | Filing Date |
|---|---|---|---|---|---|---|---|
| √ʃ | AA | 3,760,392 | 09/18/73 | Stich | 340 | 200 | 05/15/72 |
| | AB | 3,773,989 | 11/20/73 | Hacon | 200 | 52 R | 01/22/71 |
| | AC | 3,875,331 | 04/01/75 | Halsenbalg | 178 | 19 | 11/08/73 |
| | AD | 3,921,166 | 11/18/75 | Volpe | 340 | 365 C | 09/15/72 |
| | AE | 3,931,610 | 01/06/76 | Marin, et al. | 340 | 172.5 | 11/29/73 |
| | AF | 3,932,862 | 01/13/76 | Graven | 340 | 324 M | 04/02/75 |
| | AG | 3,974,332 | 08/10/76 | Abe, et al. | 178 | 18 | 03/10/75 |
| | AH | 3,992,579 | 11/16/76 | Dym, et al. | 178 | 18 | 06/02/75 |
| | AI | 3,999,012 | 12/21/76 | Dym | 178 | 18 | 07/07/75 |
| | AJ | 4,056,699 | 11/01/77 | Jordan | 200 | 5 A | 11/13/75 |
| | AK | 4,058,765 | 11/15/77 | Richardson, et al. | 324 | 61 R | 06/07/76 |
| | AL | 4,071,691 | 1/31/78 | Pepper, Jr. | 178 | 19 | 08/24/76 |
| | AM | 4,087,625 | 05/02/78 | Dym, et al. | 178 | 19 | 12/29/76 |
| | AN | 4,103,252 | 06/25/78 | Bobick | 331 | 48 | 11/26/76 |
| | AO | 4,129,747 | 12/12/78 | Pepper,Jr. | 178 | 19 | 11/11/77 |
| | AP | 4,148,014 | 04/03/79 | Burson | 340 | 709 | 04/06/77 |
| | AQ | 4,177,354 | 12/04/79 | Mathews | 178 | 18 | 04/17/78 |
| | AR | 4,177,421 | 12/04/79 | Thornburg | 324 | 61 R | 02/27/78 |
| | AS | 4,198,539 | 04/15/80 | Pepper, Jr. | 178 | 18 | 01/05/78 |
| | AT | 4,221,975 | 09/09/80 | Ledniczki, et al. | 307 | 116 | 04/19/78 |
| | AU | 4,224,615 | 09/23/80 | Penz | 340 | 712 | 09/14/78 |
| | AV | 4,246,452 | 01/20/81 | Chandler | 200 | 5 A | 01/05/79 |
| | AW | 4,257,117 | 03/17/81 | Besson | 368 | 69 | 04/04/79 |
| | AX | 4,264,903 | 04/28/81 | Bigelow | 340 | 365 C | 05/07/79 |
| | AY | 4,281,323 | 07/28/81 | Burnett, et al. | 340 | 712 | 12/05/78 |
| √ʃ | AZ | 4,290,052 | 09/15/81 | Eichelberger, et al. | 340 | 365 C | 10/26/79 |

| Examiner Shankar | Date Considered 3/27/98 |
|---|---|

EXAMINER:  Initial if citation considered, whether or not ciatation is in conference with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include a copy of this form with the next communication to applicant.

| Form PTO 1449 (Rev. 2-32) | U. S. Department of Commerce Patent and Trademark Office | Atty. Docket No. SYN-071 | Serial No. 08/623,483 |
|---|---|---|---|
| Information Disclosure Statement by Applicant | | Applicant: Gillespie, et al. | |
| (Use several sheets if necessary) | | Filed: 03/28/96 | Group: 2775 |

## U. S. Patent Documents

| Init. | | Document No. | Date | Name | Class | Subclass | Filing Date |
|---|---|---|---|---|---|---|---|
| VJ | BA | 4,290,061 | 09/15/81 | Serrano | 340 | 712 | 08/23/79 |
| | BB | 4,291,303 | 09/22/81 | Cutler, et al. | 340 | 711 | 08/23/79 |
| | BC | 4,293,734 | 10/06/81 | Pepper, Jr. | 178 | 18 | 02/23/79 |
| | BD | 4,302,011 | 11/24/81 | Pepper, Jr. | 273 | 85 | 01/30/78 |
| | BE | 4,310,839 | 01/12/82 | Schwerdt | 340 | 712 | 11/23/79 |
| | BF | 4,313,113 | 1/26/82 | Thornburg | 340 | 709 | 03/24/80 |
| | BG | 4,334,219 | 06/08/82 | Paülus, et al. | 340 | 712 | 02/19/80 |
| | BH | 4,371,746 | 02/01/83 | Pepper, Jr. | 178 | 18 | 02/12/80 |
| | BI | 4,398,181 | 08/09/83 | Yamamoto | 340 | 365 S | 03/24/81 |
| | BJ | 4,423,286 | 12/27/83 | Bergeron | 178 | 19 | 07/21/82 |
| | BK | 4,430,917 | 02/14/84 | Pepper, Jr. | 84 | 1.01 | 08/22/79 |
| | BL | 4,442,317 | 04/10/84 | Jandrell | 178 | 18 | 09/14/81 |
| | BM | 4,455,452 | 06/19/84 | Schuyler | 178 | 18 | 09/13/82 |
| | BN | 4,475,235 | 10/02/84 | Graham | 382 | 3 | 01/04/82 |
| | BO | 4,476,463 | 10/09/84 | Ng, et al. | 340 | 712 | 08/24/81 |
| | BP | 4,511,760 | 4/16/85 | Garwin, et al. | 178 | 18 | 05/23/83 |
| | BQ | 4,550,221 | 10/29/85 | Mabusth | 178 | 18 | 10/07/83 |
| | BR | 4,554,409 | 11/19/85 | Mitsui, et al. | 178 | 19 | 10/24/83 |
| | BS | 4,570,149 | 2/11/86 | Thornburg, et al. | 338 | 114 | 03/15/83 |
| | BT | 4,582,955 | 04/15/86 | Blesser | 178 | 19 | 03/23/84 |
| | BU | 4,595,913 | 06/17/86 | Aubuchon | 340 | 365 | 02/10/83 |
| | BV | 4,616,107 | 10/07/86 | Abe, et al. | 178 | 18 | 02/26/85 |
| | BW | 4,639,720 | 01/27/87 | Rympalski, et al. | 340 | 712 | 01/12/81 |
| | BX | 4,672,154 | 06/09/87 | Rodgers, et al. | 178 | 19 | 04/03/85 |
| | BY | 4,680,430 | 07/14/87 | Yoshikawa, et al. | 178 | 19 | 02/27/85 |
| VJ | BZ | 4,686,332 | 08/11/87 | Greanias, et al. | 178 | 19 | 06/26/86 |

| Examiner      Shanker | Date Considered   3/27/98 |
|---|---|

EXAMINER: Initial if citation considered, whether or not citation is in conference with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include a copy of this form with the next communication to applicant.

| Form PTO 1449 (Rev. 2-32) | U. S. Department of Commerce Patent and Trademark Office | | Atty. Docket No. SYN-071 | Serial No. 08/623,483 |
|---|---|---|---|---|
| Information Disclosure Statement by Applicant | | | Applicant: Gillespie, et al. | |
| (Use several sheets if necessary) | | | Filed: 03/28/96 | Group: 2771 |

### U. S. Patent Documents

| Init. | | Document No. | Date | Name | Class | Subclass | Filing Date |
|---|---|---|---|---|---|---|---|
| VJ | CA | 4,733,222 | 03/22/88 | Evans | 340 | 365 C | 04/18/86 |
| | CB | 4,734,685 | 03/29/88 | Watanabe | 340 | 710 | 07/18/84 |
| | CC | 4,736,191 | 04/05/88 | Matzke, et al. | 340 | 365 C | 08/02/85 |
| | CD | 4,758,690 | 07/19/88 | Kimura | 178 | 19 | 03/03/87 |
| | CE | 4,766,423 | 08/23/88 | Ono, et al. | 340 | 709 | 01/05/87 |
| | CF | 4,788,385 | 11/29/88 | Kimura | 178 | 19 | 12/03/86 |
| | CG | 4,794,208 | 12/27/88 | Watson | 178 | 19 | 02/08/88 |
| | CH | 4,820,886 | 04/11/89 | Watson | 178 | 19 | 01/04/88 |
| | CI | 4,853,498 | 08/01/89 | Meadows, et al. | 178 | 19 | 06/13/88 |
| | CJ | 4,914,624 | 04/03/90 | Dunthorn | 364 | 900 | 05/06/88 |
| | CK | 4,918,262 | 04/17/90 | Flowers, et al. | 178 | 18 | 03/14/89 |
| | CL | 4,922,061 | 05/01/90 | Meadows, et al. | 178 | 19 | 07/20/89 |
| | CM | 4,935,728 | 06/19/90 | Kley | 340 | 709 | 11/20/87 |
| | CN | 4,988,982 | 01/29/91 | Rayner, et al. | 340 | 706 | 04/03/89 |
| | CO | 5,016,008 | 05/14/91 | Gruaz, et al. | 341 | 33 | 05/23/88 |
| | CP | 5,120,907 | 06/09/92 | Shinbori, et al. | 478 | 18 | 03/21/90 |
| | CQ | 5,149,919 | 09/22/92 | Greanias, et al. | 178 | 19 | 11/26/91 |
| | CR | 5,194,862 | 03/16/93 | Edwards | 341 | 20 | 06/07/91 |
| | CS | 5,231,450 | 07/27/93 | Daniels | 355 | 27 | 08/2792 |
| | CT | 5,239,140 | 08/24/93 | Kuroda, et al. | 178 | 18 | 12/03/91 |
| | CU | 5,270,711 | 12/14/93 | Knapp | 341 | 34 | 4/30/90 |
| | CV | 5,327,161 | 07/05/94 | Logan, et al. | 345 | 157 | 10/21/91 |
| | CW | 5,369,227 | 11/29/94 | Stone | 178 | 18 | 07/22/92 |
| | CX | 5,373,118 | 12/13/94 | Watson | 178 | 19 | 10/25/93 |
| VJ | CY | 5,374,787 | 12/20/94 | Miller, et al. | 178 | 18 | 08/31/93 |

| Examiner   Shan/lee | Date Considered   3/27/98 |
|---|---|

EXAMINER: Initial if citation considered, whether or not citation is in conference with MPEP 609. Draw line through citation if not in conformance and not considered. Include a copy of this form with the next communication to applicant.

| Form PTO 1449<br>(Rev. 2-32) | U. S. Department of Commerce<br>Patent and Trademark Office | | Atty. Docket No.<br>SYN-071 | Serial No.<br>08/623,483 |
|---|---|---|---|---|
| Information Disclosure Statement by Applicant | | | Applicant: Gillespie, et al. | |
| (Use several sheets if necessary) | | | Filed: 03/28/96 | Group: 2775 |

### U. S. Patent Documents

| Init. | | Document No. | Date | Name | Class | Subclass | Filing Date |
|---|---|---|---|---|---|---|---|
| VJ | CZ | 5,408,593 | 04/18/95 | Kotaki, et al. | 395 | 122 | 10/18/93 |

### Foreign Documents

| Init. | | Document No. | Date | Name | Class | Sub-class | Translation Yes | Translation No |
|---|---|---|---|---|---|---|---|---|
| VJ | DA | 0 490 001 | 06/17/92 | Europe | G06F3 | 033 | X | |
| | DB | 2 139 762 | 11/14/84 | United Kingdom | G06F3 | 033 | X | |
| | DC | 2 266 038 | 10/13/93 | United Kingdom | G06F3 | 033 | X | |
| | DD | 2 662 528 | 5/25/90 | France | G06K11 | 16 | | X |
| | DE | 06 139022 | 05/20/94 | Japan | G06F3 | 033 | X | |
| | DF | 62 126429 | 06/08/87 | Japan | G06F3 | 033 | X | |
| | DG | 63 073415 | 04/04/88 | Japan | G06F3 | 033 | X | |
| | DH | 0 609 021 | 08/03/94 | Europe | G06K 11 | 16 | Y | |
| | DI | 0 574 213 | 12/15/93 | Europe | G06K 11 | 16 | Y | |
| VJ | DJ | 91/03039 | 03/07/91 | PCT | G09G 3 | 02 | Y | |

### Other Documents (Including Author, Title, Date, Pertinent Pages, Etc.)

| | | |
|---|---|---|
| VJ | DK | "Double-Click Generation Method for Pen Operations", IBM Technical Disclosure Bulletin, November 1992, Vol. 35, No. 6, p. 3. |
| VJ | DL | "Three-Axis Touch-Sensitive Pad", IBM Technical Disclosure Bulletin, January 1987, Vol. 29, No. 8, pp. 3451 - 3453. |
| VJ | DM | Chun, et al., "A High-Performance Silicon Tactile Imager Based on a Capacitive Cell", IEEE Transactions on Electron Devices, July 1985, Vol. ED-32, No. 7, pp. 1196 - 1201 |

| Examiner    Shan/Lee | Date Considered    3/27/98 |
|---|---|

EXAMINER: Initial if citation considered, whether or not citation is in conference with MPEP 609. Draw line through citation if not in conformance and not considered. Include a copy of this form with the next communication to applicant.